UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Steward Health Care System LLC, | |
| Plaintiff, | Civil Action No. 1:21-cv-11902 |
| v. | |
| American Guarantee and Liability Insurance Company and Zurich American Insurance Company, | |
| Defendants. | |

**PLAINTIFF'S (i) OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND (ii) CROSS-MOTION, IN THE ALTERNATIVE, TO <u>COMPEL PRODUCTION OF DOCUMENTS FROM DEFENDANTS</u>**

Plaintiff Steward Health Care System LLC ("Steward") respectfully submits this memorandum in opposition to the Motion to Compel filed by Defendants American Guarantee and Liability Insurance Company's ("AGLIC") and Zurich American Insurance Company's ("Zurich") (together, "Defendants") [ECF Nos. 94-95]. Steward also cross-moves, in the alternative, for an order compelling Defendants to complete their own deficient document production no later than the date by which Steward is ordered to complete its production.

### i. <u>Introduction</u>

Defendants' Motion is not so much a motion as it is a maneuver—a calculated attempt to manufacture a discovery "dispute" for the sole purpose circumventing and revisiting this Court's (Saris, J.) recent denial of their request to extend all case deadlines, including trial, by nearly a year. *See* ECF Nos. 84, 89. The Motion was filed a mere six days prior to filing yet another motion to push the trial date back. ECF No. 103. The timing is no coincidence; it is a tactic, and

it is unwarranted given the timing of Steward's document production about which Defendants are fully aware.

Indeed, Defendants filed this Motion knowing full well that Steward was already in the process of *completing* its production of non-privileged, non-objectionable documents by June 6—just one week from the filing of this expedited opposition. That inconvenient truth was nowhere to be found in Defendants' initial filing. Defendants filed a "corrected" pleading after Steward insisted that Defendants amend their Local Rule 7.1 certification to reflect the parties' actual discussion about document productions, walking back their misleading representation that "counsel was unable to state when Steward Health would be serving its remaining documents." The corrected version now concedes that Steward timely indicated the remaining production will be completed within "10–14 days" from the date of the parties' conference on the topic. *See* ECF Nos. 91, 93.

The irony here is thick: while Defendants cry foul over Steward's ongoing production, they have yet to finish their own. Worse still, they now admit that their prior productions—productions they tout as evidence of diligence—were unreasonably narrow in scope. And they remain silent on the significant and unresolved deficiencies in their discovery responses that Steward raised over a month ago and still have not received a response. **Exhibit 1**. Steward offered a simple, fair resolution: a stipulated and agreed order requiring all parties to complete production of outstanding, non-objectionable, non-privileged documents by June 6. Defendants refused. Their refusal speaks volumes about the true objective of their Motion.

In sum, the Motion is a waste of the Court's time and the parties' resources. It identifies no genuine dispute, seeks no meaningful relief, and appears to serve no purpose other than to

create a hollow citation for its renewed motion to extend the trial date. The Court should decline the invitation to indulge this strategy and deny the Motion in full.

Alternatively, if the Court finds it appropriate to impose a firm deadline for Steward's production, then basic fairness requires that Defendants be held to that same deadline.

## ii.  Background

### A. Relevant Factual Background

#### 1. The Weather Event and Immediate Aftermath

On June 28, 2020, a weather event produced approximately 5.75 inches of rainfall in 90 minutes, causing catastrophic flood water to penetrate the basement and ground levels of Norwood Hospital (the "Rain Event" or "Loss").[1] Water also immediately impacted the roof systems and envelope of at least two buildings in Norwood Hospital's complex, crippled critical mechanical and electrical systems, and destroyed floors, walls, ceilings, fixtures and finishes throughout the Hospital. Essential patient care systems including the nurse-call communication system and medical gas and vacuum systems were severely damaged, as was diagnostic imaging equipment and other major patient diagnostic and treatment equipment which cannot be placed back into safe and consistently reliable service. In short, every single floor of the Hospital was damaged in some way.[2]

At the time of the Rain Event, Norwood Hospital was fully operational, caring for 160 patients, including 74 in medical-surgical, 6 in intensive care, 52 in behavioral health, and 28 in

---

[1] Steward operated Norwood Hospital. Medical Properties Trust ("MPT") owned the property. AGLIC and Zurich insured Steward and MPT respectively. For ease of reference, this pleading will refer to Zurich and AGLIC interchangeably.

[2] On June 30, 2020, as a direct consequence of the Rain Event, the Town of Norwood issued a Cease-and-Desist Order prohibiting all operations on the Hospital campus until new building, electrical, plumbing, and gas permits could be issued.

the emergency department. In response to the crisis, Norwood Hospital immediately activated its emergency management protocol and established a Hospital Incident Command Center. Temporary power was swiftly restored using portable generators, enabling urgent mitigation efforts such as water removal and dehumidification. With critical assistance from the Town of Norwood and surrounding community emergency services, all 160 patients were evacuated safely and efficiently.

From the moment the Loss occurred, Steward promptly notified AGLIC and worked exhaustively with MPT and the insurer to understand and document the extent of the Loss, providing Zurich with detailed information to facilitate claims processing and expedite the Hospital's reopening. Given the critical public need for healthcare facilities like Norwood Hospital, especially during the COVID-19 pandemic, Steward and MPT repeatedly emphasized the urgency of restoring reliable patient services. Their immediate mitigation efforts included engaging dozens of professional consultants to conduct a comprehensive assessment of the Loss.

The magnitude of the Loss drew the attention of the Massachusetts Commissioner of Insurance, who explicitly urged insurers to handle claims promptly and reasonably. ECF No. 61, ¶ 6. Despite these directives, Defendants refused to engage meaningfully with Steward, MPT, or their licensed professionals, disregarding the severity of the Loss and the mandates for timely claims processing. Instead, Zurich's adopted a strategy of contradiction and obstruction, appearing to "deny first and ask questions later."

Initially, Zurich informed Steward that it viewed and would treat the damage caused by flood water in the basement and ground levels of the Hospital as separate from the stormwater damage sustained on the first, second, and third floors. Both Steward's and MPT's Policies provide specific coverage for "Flood" with annual aggregate sub-limits, while damages from

other forms of water intrusion were not subject to sub-limits and instead fell under the overall policy limits—$850,000,000 under Steward's Policy and $750,000,000 under MPT's Policy. Following Zurich's directive, Steward and MPT instructed their professional consultants to allocate damages in their Loss estimates accordingly. These preliminary claims, supported by exhaustive and well-documented Loss estimates, were timely submitted to Zurich.

Weeks later, undoubtedly appreciating the gravity of the loss and potential exposure, Zurich reversed its position, improperly and in bad faith, denying the vast majority of the claims. ***For the first time***, Zurich alleged that all damages sustained during the Rain Event were attributable to "Flood" and therefore subject to the policies' "Flood" sub-limits. In doing so, Zurich summarily dismissed the evidence submitted by Steward and MPT, relying instead on facially incomplete estimates that ignored substantial damage, disregarded applicable code requirements, and were inconsistent with Zurich's own internal assessments. These estimates reflected no meaningful engagement with the comprehensive materials provided by Steward and MPT, further exemplifying Zurich's willful disregard for its contractual obligations.

### 2. Defendants' Self-Serving and Bad Faith Adjustment of the Claim

In its first coverage position letter to Steward, AGLIC asserted that an "initial review" of the Loss concluded that property damage to both the basement and ground levels of the Hospital, as well as any time element losses, stemmed from "Flood." AGLIC further stated:

> [a]ny water damage sustained on the first, second and third floors appears to have resulted from water intrusion caused by wind driven rain and/or overflow or roof drains and parapet flashings. AGLIC plans to separate the flood damage sustained on the basement and ground floors, including all time element losses, from the water intrusion property damage sustained on the first, second and third floors.[3]

---

[3] Around the same time, Zurich issued its first coverage position letter to MPT, reiterating its stated "plan[]" to distinguish flood-related damage on the basement and ground floors from water intrusion damage affecting the first, second and third floors of the property.

5

Despite these initial representations, Zurich quickly began exhibiting bad faith in its handling of the claims. For example, during an early visit to the Hospital following the Rain Event, one of Zurich's representatives remarked that the damage appeared to be nothing more than "a dry out and paint job." Zurich also leveled baseless accusations against Steward, alleging improper attempts to secure coverage under the MPT Policy and a lack of cooperation in the investigation of the Loss – all of which was patently incorrect.

On October 29, 2020, MPT, Steward, Zurich, and the Massachusetts Commissioner of Insurance met to discuss next steps. All parties expressed a shared commitment to collaboratively and expeditiously move the claims process forward. Steward and MPT agreed to submit preliminary claims by early December 2020, with Zurich pledging to provide an initial assessment by mid-December. On December 4, 2020, Steward and MPT separately submitted detailed preliminary claims, supported by exhaustive details of the Loss, remedial measures taken, professional consultants engaged to date, and damage estimates (by category), all of which were amply supported by reports, Basis of Design documents, data, and other accompanying evidence supplied to the Defendants via a secure SharePoint link. As per Zurich's earlier directive, the claims meticulously allocated damages between "Flood" and "Storm," i.e., water intrusion on floors other than the basement and ground floor. The preliminary claims also explained the importance of accurately allocating coverage between the Policies.

Steward's comprehensive Initial Claim was submitted on December 4, 2020. Despite this comprehensive submission, Zurich responded to MPT on December 23, 2020, with a partial payment that effectively denied 88% of the claimed amounts. Zurich opined that Norwood Hospital can be reconstructed to its pre-Loss condition **for only $32,008,340** based on a "conceptual" schedule from Shawmut Design and Construction ("Shawmut Schedule") that was

submitted on November 12, 2020 and **prior to MPT's and Steward's submission of their preliminary claims**. ECF No. 61-3.  The Shawmut Schedule did not account for the work required to bring Norwood Hospital up to the current building code and Department of Public Health regulations, among other infirmities.  At the same time, Zurich also reversed its prior position on damage allocation, declaring that all losses fell under the "Flood" sublimit, thereby severely restricting coverage.  *Id.*

Zurich's response to Steward's preliminary claim on January 11, 2021, continued this pattern of bad faith.  ECF No. 61-4.  Notably absent from Zurich's later January 11, 2021 response to Steward's Initial Claim is any mention of the Shawmut Schedule.  Zurich also falsely accused Steward of being uncooperative in the adjustment process.  Zurich made the same contradictory statement as it did to MPT that all the damages incurred by Steward are subject to the "Flood" sublimit within the Steward Policy.  Zurich further alleged that Steward's claimed business interruption loss was "incomplete" and yet "appear[s] based on a scope of repair beyond that which is needed to restore the" damage.  This position ignored key undisputed facts: that Steward had engaged building specialists who are the leading industry experts in hospital design, environmental health and safety, and building and accessibility codes, many of which prepared assessments based on their own visual inspections of the Loss as well as ongoing testing at the Hospital.  Tellingly, Zurich cited zero evidence in support of its supposition that the Hospital can be repaired sooner.  Zurich also claimed that Steward failed to take proper steps to mitigate claimed losses by not, among other things, preserving surgical and medical supplies used to treat patients and contended that Steward should have returned medical supplies for credit or allocated them to other Steward network hospitals.  Contrary to Zurich's suggestion, Steward could not simply "dry out," clean, and place *medical* supplies back into circulation.

### 3. Interim Proof of Loss

On February 5, 2021, Steward submitted a separate "Sworn Statement in Proof of Loss – Interim" ("Interim Proof of Loss"), voicing its mounting frustration with Zurich's lack of progress in administering the claim. Steward highlighted the "critical public need" for the Hospital's swift restoration, underscoring that "time is of the essence" in bringing the facility back to operational status. The Interim Proof of Loss also detailed the numerous deficiencies in Zurich's adjustment of the claims to date and formally notified Zurich of Steward's intent to pursue recovery under Massachusetts General Laws Chapter 93A due to Zurich's unfair and deceptive practices in administering the claims.

On March 5, 2021,[4] Zurich responded by purporting to "reject" the Interim Proof of Loss, claiming it failed to "comport with the coverage and provisions of the Policy." However, Zurich once again failed to cite to any specific Policy language Steward allegedly violated. Instead, Zurich leveled unfounded accusations, asserting that Steward had improperly sought coverage for elements addressed under the MPT Policy, engaging in "non-productive testing" and other unnecessary activities and failed to mitigate damage to certain business personal property. Despite these assertions, Zurich's substantive coverage positions regarding Steward's claims remained largely unchanged from its January 11, 2021 response, perpetuating its pattern of bad faith and unwarranted delays.

### 4. Zurich Unilaterally Halts Steward's Business Interruption Payments in Bad Faith and Without Justification.

On January 11, 2021, Zurich issued a letter to Steward referencing a prior letter to MPT, asserting:

---

[4] **On the same day**, in a separate correspondence, Zurich responded to MPT's Interim Proof of Loss asserting its "rejection" on the grounds that "until MPT repairs the building, Zurich owes actual cash value for covered damage, not replacement cost." Notably, Zurich cited no Policy language in support of that statement.

8

> Although the claim support and detail is incomplete, Steward's Time Element claim, which runs through June of 2023, appears based on a scope of repair beyond that which is needed to restore the flood damage from the June 28, 2020 event. The owner of the buildings that house Steward's Norwood Hospital operation – [MPT] – is insured under a separate policy issued by Zurich . . . . [Zurich], by letter dated December 23, 2020, identified to its insured MPT several concerns with the scope of repair claimed as to the buildings and equipment, the lack of due diligence in testing and evaluating damage, and the failure of MPT to begin certain needed repairs or replacement of building components and equipment, even where there is agreement that repair or replacement is needed. Those concerns are relevant here as well to the calculation of Steward's Time Element loss for reasons stated above.

ECF No. 61-3. The parties' competing proposed reopening dates for an "as-was" rebuild were discussed in detail during various adjustment meetings and presentations at which representatives of Steward, MPT, AGLIC and Zurich were all present. All parties had understood and agreed that the proposed reopening dates provided were, at best, preliminary and subject to change due to evolving circumstances.

For nearly two years, Zurich made quarterly payments to Steward for its business interruption claim, despite the parties never reaching agreement on the full Period of Liability. However, by late November 2022, Steward had not received the payment due for the second quarter of 2022. Steward demanded the overdue payment, prompting a response from AGLIC and Zurich on December 23, 2022. The letter stated that payment would be processed that week but also unilaterally declared:

> AGLIC determined the Period of Liability for Steward's claimed business income loss – including when Norwood Hospital could have been repaired with due diligence and dispatch and made ready for operations under the same conditions that existed prior to the Flood ends July 15, 2022.
>
> Accordingly, the payment to Steward to be processed this week will encompass AGLIC's calculation of Steward's actual business interruption loss Steward sustained through the end of the Period of Liability, namely July 15, 2022.

ECF No. 61-6. This abrupt cutoff of the Period of Liability came without explanation or prior discussion, following a prolonged period of silence from Zurich. Notably, intervening facts had rendered the prior Shawmut timeline irrelevant. Zurich's decision to terminate payments after paying out approximately $97 million was a thinly veiled attempt to use the "Flood" sublimit as leverage to coerce a settlement short of $150 million.

Steward, seeing Zurich's game, demanded that AGLIC and Zurich provide a basis for their decision to cut off the loss period. Steward also reiterated that its conservative estimate of a reopening after June 2023 was likely understated, projecting an even longer timeline for resuming operations. Zurich, however, never responded to Steward's objections or provide any rationale for rejecting Steward's proposed timeline. Zurich's actions epitomize its bad-faith conduct, prioritizing financial leverage over its contractual obligations and the pressing public need for the restoration of Norwood Hospital.

   B. *Relevant Procedural Background*

On October 4, 2021, Zurich filed a declaratory judgment action against MPT in the United States District Court for the District of Massachusetts, seeking a declaration that: (1) MPT's total recovery was capped by the Flood sublimit; (2) there was no coverage for MPT's Increased Cost of Coverage claim; and (3) there would be no recovery for systems unaffected by the Loss. In its Complaint, Zurich alleged that as of October 2021, it had paid MPT $27.5 million in relation to the damage caused by the "Flood," asserting that based on Zurich's analysis of MPT's claim to date, no additional funds were owed. In response, MPT filed an answer and counterclaim on November 19, 2021, alleging that Zurich had breached the policy, violated G.L. c. 93A, and sought a declaratory judgment on the parties' rights and obligations under the insurance policy.

Steward initiated its own suit in the same court on November 23, 2021, asserting claims for: (1) a declaratory judgment to determine that the "Flood" sublimit did not apply to all of Steward's losses; (2) breach of the all-risk policy; (3) breach of the implied covenant of good faith and fair dealing; (4) tortious interference with contractual relations; and (5) violation of G.L. c. 93A, § 11.[5] During an initial scheduling conference, the parties, along with the District Court, agreed that the proper interpretation of the term "surface waters," as used in the definition of "Flood" in Steward's Policy should be resolved early through cross-motions for partial summary judgment. The parties briefed their cross-motions between April and June of 2022, and a hearing was held on August 10, 2022. On November 15, 2022, the District Court granted Zurich's partial summary judgment motion and denied Steward's motion, ruling that the "Flood" sublimit applied to all damage caused by rainwater that accumulated on the rooftop courtyard and the parapet roofs of the hospital (*i.e.*, top-down damage)

Appreciating that this legal issue involved a controlling question of law for which there is substantial ground for difference of opinion, the judge allowed an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). MPT and Steward appealed, and the United States Court of Appeals for the First Circuit then certified the following question to the Supreme Judicial Court of Massachusetts:

> Whether rainwater that lands and accumulates on either (i) a building's second-floor outdoor rooftop courtyard or (ii) a building's parapet roof and that subsequently inundates the interior of the building unambiguously constitutes "surface waters" under Massachusetts law for the purposes of the insurance policies at issue in this case?

The parties then briefed the matter to the Massachusetts Supreme Judicial Court, and oral argument was held in April 2024. In July 2024, the Court issued its decision in *Zurich Am. Ins.*

---

[5] Steward subsequently amended its complaint on January 24, 2022, and March 16, 2023, to include further details regarding AGLIC's bad faith and mishandling of Steward's claim. No additional claims were pled.

11

*Co. v. Med. Properties Tr., Inc.*, 494 Mass. 382 (2024), ruling that the term "surface waters," and thus the definition of "Flood" under the policies, was ambiguous with regard to the rainwater accumulation on roofs. The Court ruled "in favor of the policy holders and against the insurance companies that drafted the policies." 494 Mass. at 384.

The case was then remanded to this Court and it was reopened. ECF No. 76.[6] A status conference in this matter followed on November 4, 2024 [ECF. No. 74], with a Rule 16 Scheduling Conference held on December 5, 2024. *Id*. The Court then: (1) stayed discovery pending a mediation scheduled for January 22, 2025; and (2) ordered the parties to file a Proposed Joint Statement. ECF No. 77. The Joint Statement included competing proposed case deadlines. ECF No. 78. The Court entered an order on January 8, 2025 setting the case deadlines. ECF No. 79.

A few months later, Zurich moved to extend the scheduling order deadlines. ECF No. 84. Steward opposed. ECF No. 85. The Court quickly denied Zurich's motion, stating "**DENIED. This is an old case and a one-year delay is unwarranted**." ECF No. 89 (emphasis added). Through the guise of a motion to compel document production, Zurich once again attempts to delay the schedule, asking the Court to extend the discovery period by "30 days from Steward's final document production to complete depositions of Steward employees or former employees." ECF No. 95, p. 5.

    C. *Relevant Discovery Events*

        1. **Written Discovery**

On February 10, 2023, Steward served its First Request for Production of Documents and First Set of Interrogatories on both AGLIC and Zurich. On November 3, 2023, Zurich and

---

[6] In late 2024, MPT and Zurich resolved their litigation. *See* 1:21-cv-11621-PBS, ECF Nos. 81-82.

12

AGLIC served their respective First Requests for Production of Documents and First Set of Interrogatories on Steward.

This matter was administratively stayed on July 16, 2024. ECF No. 69. The stay remained in effect until the case was reopened on November 13, 2024. ECF No. 76. Shortly thereafter, on December 5, 2024, the Court stayed discovery until January 22, 2025. ECF No. 77. Upon the reopening of discovery, the parties—again by agreement—served written responses on March 10, 2025. Steward subsequently served its Second Set of Interrogatories on May 9, 2025. Zurich served its Second Set of Request for Documents on Steward on May 20, 2025.

### 2. Document Productions

#### a) Zurich's/AGLIC's Productions to Date

Zurich made its initial document production on July 30, 2024, while the case remained administratively stayed. That production comprised of 83,689 pages and was made in response to MPT's—not Steward's—First Request for Production. **Exhibit 2**. At that time, Zurich characterized the production as "the first of a rolling production[.]" *Id*. Zurich's second production occurred on April 16, 2025, consisting of an additional 3,035 pages. Its most recent production was delivered on May 29, 2025, comprised of 31,891 pages.

In its written responses, Zurich represented that its productions were limited to documents dated between June 28, 2020 and August 31, 2022. **Exhibits 3, 4**. That representation appears inaccurate. In prior correspondence, Zurich described the date range of its production to MPT as extending only "through September 2021[.]" Ex. 2. Further, metadata from Steward's document management system indicates that the Zurich's first two productions

span from November 4, 2016 to January 21, 2022– a date range markedly different than what Zurich claims.

More recently, Zurich has represented that it will complete its document production, subject to objections, by June 4, 2025, despite opposing Steward's proposed production deadline of June 5, 2025, as not "agreeable." **Exhibit 5, p. 3**. In response, Steward proposed a stipulation and agreed Order to formalize production deadlines, *id*., p. 1, which Zurich declined.

### b) Steward's Productions to Date

Early on, Steward recognized the significant undertaking required to collect, review, and produce responsive, non-privileged documents. To meet its obligations, Steward retained twenty (20) contract attorneys to assist with this process. Despite the volume and complexity of the task, Steward has made the following rolling productions:

- On April 9, 2025, Steward produced 31,518 pages of documents.
- On May 15, 2025, Steward produced 10,046 pages of documents.
- On May 19, 2025, Steward produced 48,507 pages of documents.
- On May 21, 2025, Steward produced 5,496 pages of documents.
- On May 23, 2025, Steward produced 1,964 pages of documents.

Steward anticipates that it will complete its production of non-objectionable and non-privileged documents by June 6, 2025.[7]

---

[7] To the extent Zurich agrees that there is a cut-off date for responsive documents, Steward is prepared to complete its production earlier. Notably, Steward has endeavored to review and produce documents after Zurich's self-imposed cut-off date of August 31, 2022 – a perplexing limitation, given that Zurich sent a letter to Steward terminating its business interruption losses on December 23, 2022. *See* ECF No. 61-6.

14

### iii. **Argument**

*A. Steward Has Provided a Firm and Reasonable Deadline for Completing Its Document Production*

There is no basis—legal or practical—for compelling Steward's document production at this time. Steward has never represented, to Zurich or this Court, that it will withhold non-objectionable, non-privileged documents. Quite the opposite: Steward has engaged in a diligent and costly review of hundreds of thousands of documents, with the express purpose of identifying those that are relevant, responsive and non-privileged. That process—substantive, labor-intensive, and entirely appropriate under the Rules—cannot simply be willed away by Zurich's impatience. Steward has gone above and beyond to expedite its productions and expects to complete its productions at almost exactly the same time Zurich claims it will complete their production.

Prior to Zurich's filing, Steward informed counsel that its document production would be completed in "10-14" days, *i.e.*, between June 1-6, 2025. But rather than accept that timeline (which coincides with Zurich's own anticipated production end-date), Zurich rushed to Court on the eve of the holiday weekend, seeking to compel production by May 28, 2025, a date that has since passed. ECF No. 95, p. 4. Zurich offers no meaningful argument, and certainly no evidence, that it will suffer any prejudice if Steward completes its production by June 6—just days from now and nearly simultaneously with Zurich's own. Their Motion should be denied alone for this reason.

To compel production on Zurich's arbitrary timetable would be not only inequitable but also perilous. If the Court were to order production before Steward has completed its review, it risks the disclosure of privileged communications, attorney work product, and sensitive proprietary or medical information—an outcome plainly inconsistent with the law and the ethical

15

obligations that undersigned counsel owes to Steward. Steward's review is nearly complete and will be concluded, subject to objections, by June 6. If Zurich contends that any particular categories of documents remain outstanding thereafter, it may raise that issue in due course—on a complete and accurate record, rather than through this premature and performative motion.

   *B. Zurich's Motion Is a Tactical Diversion from Its Own Discovery Failures.*

The sequence of filings here speaks volumes. Just days after the Court (Saris, J.) denied Zurich's motion to extend all case deadlines—including trial—by nearly a year (ECF No. 89), Zurich unleashed a flurry of filings plainly aimed at accomplishing by attrition what it could not obtain by argument. This Motion is merely the latest installment in that campaign: a thinly veiled effort to secure delay by manufacturing urgency.[8]

What makes this all the more brazen is Zurich's own position just months ago. Then, Zurich pressed for an "expedited" schedule, arguing that it would allow "sufficient time for needed fact discovery . . . and for needed expert discovery to be completed in proper order." ECF No. 78 at 4-5. Steward agreed. The Court agreed. Now, having failed to prepare its case accordingly, Zurich attempts to compel Steward's compliance with an arbitrary production date—while refusing to commit to any such deadline for itself unless the entire scheduling order is reopened. Steward offered a reasonable stipulation. Ex. 5. Zurich rejected it. That refusal speaks volumes about Zurich's true motive: it is not to expedite discovery, but to force Steward's capitulation of agreeing to a new scheduling order.

Zurich's discovery conduct also belies its claim of urgency. On May 20, 2025—well after filing this Motion—Zurich served a Second Set of Requests for Production containing

---

[8] ECF No. 95, p. 5 ("Defendants respectfully request that the Court order Steward Health Care to produce all supplemental document productions by May 28, 2025 and that Defendants be given 30 days from Steward's final document production to complete depositions of Steward employees or former employees."); ECF No. 103 ("Defendants' [Second] Motion for Extension of Time").

16

thirty-five additional document requests.  **Exhibit 6**.  Steward's deadline to respond is June 19, 2025 – after the current fact discovery cut-off.  If Zurich truly believed that Steward's document production must be completed before any depositions proceed, it would not have served a second round of discovery weeks later.  This simply belies logic.

    *C.  If the Court Sets a Firm Production Deadline, It Must Apply Equally to Both Parties.*

As Steward relayed to Zurich last week, it reasonably expects that its last production of non-objectionable, non-privileged to Defendants' First Set of document requests will be completed by June 6, 2025.  If Zurich maintains that it will do the same, basic fairness demands that any firm deadline apply equally to both parties.  Steward sought to memorialize that mutual commitment through a stipulation and agreed Order. Ex. 5. Zurich refused.  That refusal underscores the tactical nature of Zurich's Motion and confirms that its true goal is to use the discovery process as a lever to alter the Court's scheduling order.  The Court should not countenance such gamesmanship.

### iv.  **Conclusion**

For the reasons set forth above, Plaintiff requests that the Court deny Defendants' Motion in full.  In the alternative, should the Court deem it appropriate to set a firm deadline for completion of document production, that deadline should apply equally to both parties.

STEWARD HEALTH CARE SYSTEM LLC,

By their Attorneys,

*/s/ Seth J. Robbins*
Howard M. Cooper (BBO No. 543842)
Seth J. Robbins (BBO No. 655146)
William E. Gildea (BBO No. 699112)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
srobbins@toddweld.com
wgildea@toddweld.com

Dated: May 30, 2025

**CERTIFICATE OF SERVICE**

I, William E. Gildea, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on May 30, 2025.

*/s/ William E. Gildea*
William E. Gildea