# Exhibit I

**Todd&Weld** LLP

Seth J. Robbins
Direct Dial: 617-624-4775
E-mail: srobbins@toddweld.com

October 27, 2025

_Via Electronic Mail to_ judgehochberg@judgehochberg.com

Honorable Faith S. Hochberg
Hochberg ADR, LLP

Re:     ***Steward Health Care System, LLC v. American Guarantee and Liability
        Insurance Company, et al.*, 1L21CV11902PBS (D. Mass.)**
        **Steward's Letter Brief – Issue 1**

Dear Judge Hochberg:

Steward Health Care System LLC ("Steward") submits this letter brief in support of its position on Issue 1, which concerns Zurich American Insurance Company's ("Zurich") continuing refusal to produce the complete claims file for the Medical Properties Trust ("MPT") insurance claim, as outlined in the accompanying Redfern chart.

**Background**

This action—filed in 2021—arises from Zurich and its subsidiary Defendant American Guarantee and Liability Insurance Company's ("AGLIC") refusal to properly adjust or pay Steward's insurance claim for losses sustained when a catastrophic storm destroyed Norwood Hospital on June 28, 2020. Steward operated Norwood Hospital, leasing the premises from MPT. Zurich insured MPT and AGLIC insured Steward under separate but closely related policies.

Under Steward's policy, AGLIC was obligated to indemnify Steward for its *Time Element* or business interruption losses—compensating Steward for income lost during the hypothetical period reasonably necessary to conduct repairs to restore operations at the Hospital to their pre-loss condition (the "Period of Liability"). Ex. A, Policy, § IV; *see Noranda Aluminum Holding Co. v. XL Ins. Am., Inc.*, No. CVN17C01152WCCCCLD, 2019 WL 1399956, at *4 (Del. Super. Ct. Mar. 21, 2019) (A "decision not to rebuild would not terminate coverage since it would in effect remove any benefit to Plaintiff for the premiums accepted by the Insurers. Instead, coverage is determined by a hypothetical period of how long a reasonable entity would have taken to rebuild if they had decided to do so."); *see also B A Props., Inc. v. Aetna Cas. & Sur. Co.*, 273 F. Supp. 2d 673, 685 (D.V.I. 2003).

AGLIC has stated that in adjusting Steward's claim, it "retained and relied upon qualified professionals to assist in determining the Period of Liability." *See* Ex. B, AGLIC's June 11, 2025, Corrected Response to Steward's Interrogatory No. 6. Those professionals included DBI Construction, Shawmut Design and Construction, and J.S. Held. *Id.* On November 12, 2020, Shawmut submitted a "conceptual" schedule estimating that repairs could restore operations by May 2022. In December 2022, AGLIC extended the Period of Liability by two months—to July

**T**
**W**

**Todd&Weld** LLP

Seth J. Robbins
Direct Dial: 617-624-4775
E-mail: srobbins@toddweld.com

15, 2022—purportedly based on J.S. Held's further analysis. *See* Ex. C, December 23, 2022, Letter from Mark Graves.

Steward's experts, in contrast, will testify that the Period of Liability extends through September 30, 2024—not because the hospital could have hypothetically been repaired by that date (it could not), but because that marks the date Steward exited the Massachusetts market, having sold its remaining hospitals still in operation.

In a prior submission, Defendants themselves framed the core issues of this case as follows:

"At the end of the day, resolution of Steward's claims turns on the following issues:

- Whether Steward's statement of its losses, including its claimed monthly business interruption damages were accurate;
- Whether [AGLIC] diligently and in good faith determined that July 15, 2022, was the proper cut off for Steward's business interruption damage (based upon the date by which the Hospital could have been repaired) or whether instead Steward is entitled to recover business losses up to September 30, 2024 [];
- Whether [AGLIC's] payment of Actual Cash Value for Steward's business personal property [] was consistent with its contractual obligations under its policy; and
- Whether Zurich's disputes with MPT regarding whether the Hospital should have been repaired or rebuilt rise to the level of a tortious interference with Steward's contractual rights under the [AGLIC] policy."

*See* Ex. D, ECF No. 140 at 2–3.

**The Steward and MPT Insurance Claims were Adjusted "Concurrently and Jointly"**

Although Zurich insured MPT and AGLIC insured Steward, both claims arising from the same loss were adjusted by the same Zurich adjuster, Mark Graves. Zurich has expressly acknowledged that the two claims were adjusted "jointly and concurrently"—an admission signed by Mr. Graves himself. *See* Ex. E, AGLIC's March 10, 2025, Responses to Steward's Interrogatory No. 6 ("AGLIC and Zurich adjusted the claims of both Steward and MPT arising out of the water loss at Norwood Hospital ***concurrently and jointly***") (emphasis supplied).

The relationship between the two claims was not incidental; it was integral to Zurich's own adjustment process. In a January 11, 2021, letter, Zurich advised Steward that MPT's "lack of due diligence in testing and evaluating damage" and its "failure . . . to begin certain needed repairs" were "relevant . . . to the calculation of Steward's Time Element loss." *See* Ex. F, ZUR0080853 at -0854. Zurich thus treated MPT's performance—and Zurich's own handling of MPT's claim—as a direct factor in adjusting Steward's coverage. The two claims were not merely parallel; they were interdependent.

**Todd&Weld** LLP

Seth J. Robbins
Direct Dial: 617-624-4775
E-mail: srobbins@toddweld.com

**Defendants' Adjustment of MPT's Claim Through October 31, 2024**

Despite the passage of four years, MPT had received only approximately $36 million from Zurich as of September 2024. *See* Ex. G, Zurich's August 8, 2025, Responses to Steward's Requests for Admission Nos. 1, 3, 7. MPT executives testified that reconstruction delays stemmed from Zurich's withholding of funds. Ex. H, Portal Deposition, 207:3-208:25.

Then, in November 2024—just weeks after Steward ceased operations in Massachusetts and relinquished any future occupancy of Norwood Hospital—Zurich abruptly paid MPT an additional $124 million lump sum, resolving the claim.[1]

In short: after years of delay, Zurich released the balance of a $160 million total settlement—precisely when Steward was no longer in a position to benefit. We expect to show at trial that sequence was not coincidence; it was strategy. Internal communications reveal Zurich's awareness of Steward's financial vulnerability, which it exploited by using MPT's claim as leverage—delaying payment to pressure Steward into a reduced settlement.

**The Requested Discovery Is Concededly Relevant and Necessarily Complete**

Zurich concedes that the MPT claim file is discoverable. It produced materials through September 2021 but, despite promising rolling production, stopped there. Only recently did it agree to produce materials through August 2023. It refuses to produce materials thereafter—without explanation—even though its own November 2024 settlement with MPT indisputably reflects continued adjustment activity.

Given Zurich's admission that MPT's repair activities were "relevant" to calculating Steward's loss—and Zurich's sustained adjustment of MPT's claim through October 31, 2024— the relevant discovery period for production necessarily extends through that date. To truncate production at 2023 would obscure the most consequential period of Zurich's conduct.

**Steward's Request Is Proportional and Essential**

The MPT claims file is already compiled, electronically maintained, and directly referenced in Zurich's correspondence with Steward. It goes to the heart of Steward's claims: whether Zurich manipulated the adjustment of one insured's loss to disadvantage another. Accordingly, Steward respectfully requests that the Discovery Master direct Zurich to produce its MPT claims file through October 31, 2024.

---

[1] Public filings corroborate this payout. *See, e.g.,* Ex. H, Portal Deposition, 193:3-205:19; Ex. I, Medical Properties Trust, Inc., Form 10-Q for the Quarter Ended June 30, 2024 (filed Aug. 9, 2024); Ex. J, Form 10-Q for the Quarter Ended Sept. 30, 2024 (filed Nov. 12, 2024).



Seth J. Robbins
Direct Dial: 617-624-4775
E-mail: srobbins@toddweld.com

Very truly yours,

Seth J. Robbins

cc:    All Counsel of Record (via email)

# Exhibit A



# The Zurich EDGE
# Healthcare Policy



# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

Insured Name:      **Steward Health Care System, LLC**

Reference Number:  ZMD 1393138-00

Effective Date:    11/01/2019



## THIS DISCLOSURE IS ATTACHED TO AND MADE PART OF YOUR POLICY.

# DISCLOSURE OF IMPORTANT INFORMATION RELATING TO TERRORISM RISK INSURANCE ACT

## SCHEDULE*

| Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA: |
| --- |
| $79,017.00 |

*Any information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of premium attributable is shown in the Schedule above. The premium shown in the Schedule above is subject to adjustment upon premium audit, if applicable.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share will decrease by 5% from 85% to 80% over a five year period while the insurer share increases by the same amount during the same period. The schedule below illustrates the decrease in the federal share:

January1, 2015 – December 31, 2015 federal share: 85%

January1, 2016 – December 31, 2016 federal share: 84%

January1, 2017 – December 31, 2017 federal share: 83%

January1, 2018 – December 31, 2018 federal share: 82%

January1, 2019 – December 31, 2019 federal share: 81%

January1, 2020 – December 31, 2020 federal share: 80%

**C. Disclosure of $100 Billion Cap on All Insurer and Federal Obligations**

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**D. Availability**

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

**E. Definition of Act of Terrorism under TRIA**

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

**1.** To be an act of terrorism;

**2.** To be a violent act or an act that is dangerous to human life, property or infrastructure;

Copyright ©2015 Zurich American Insurance Company
Inc ludes copyrighted material of ISO Properties, Inc. with its permission

**3.** To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

**4.** To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

# SECTION IV - TIME ELEMENT

## 4.01.    LOSS INSURED

4.01.01.    The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location.    The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location**, or as provided in Off Premises Storage for Property Under Construction Coverages.

The Company will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations.  The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations.  Such other Location must depend on the continuation of business activities at the **Location** that sustained direct physical loss or damage caused by a **Covered Cause of Loss**.

4.01.02.    There is recovery only to the extent that the Insured is:

4.01.02.01.    unable to make up lost production within a reasonable period of time not limited to the period during which production is **Suspended**;

4.01.02.02.    unable to continue such operations or services during the Period of Liability; and

4.01.02.03.    able to demonstrate a loss of revenue for the operations, services or production **Suspended**.

4.01.03.    The Company insures Time Element loss only to the extent it cannot be reduced by:

4.01.03.01.    The Insured resuming business activities in whole or part;

4.01.03.02.    Using damaged or undamaged property (including **Raw Stock, Stock in Process** or **Finished Stock**) at the Insured Location or elsewhere;

4.01.03.03.    Using the services or property of others;

4.01.03.04.    Working extra time or overtime; or

4.01.03.05.    The use of other **Locations** not covered under this Policy.

4.01.03.06.    Any amount recovered under property damage coverage at selling price for loss or damage to **Merchandise**.

4.01.04.    The Company will include in any calculation the combined operating results of all Insured Locations in determining the Time Element loss.

4.01.05.    In determining the Time Element loss, the Company will evaluate the experience of the business before and after the loss or damage and the probable experience had no direct physical loss or damage occurred at an Insured Location during the Period of Liability.

## 4.02.    TIME ELEMENT COVERAGES

### 4.02.01.    GROSS EARNINGS-

4.02.01.01.    Gross Earnings loss is the actual loss sustained by the Insured during the Period of Liability.

4.02.01.02.    Gross Earnings value is determined as follows:

4.02.01.02.01.    The sum of:

4.02.01.02.01.01.    In-patient services, out-patient services, and ambulance services;

4.02.01.02.01.02.    Total net sales of **Merchandise** including that sold in gift shops and the cafeteria;

4.02.01.02.01.03.    The rental income; and

4.02.01.02.01.04.    Other income derived from the Insured's business activities including but not limited to grant and research income, tuition and fee income, fund raising income and donations.

4.02.01.02.02.    Less the cost of the following:

4.02.01.02.02.01.    Contractual adjustments, bad debt, free services or any other discounts;

4.02.01.02.02.02.    Supplies consisting of materials consumed directly in supplying the service(s) sold by the Insured;

4.02.01.02.02.03.    **Merchandise** sold, including related packaging materials; and

4.02.01.02.02.04.    Service(s) purchased from outsiders (not Insured's employees) for resale, which do not continue under contract.

4.02.01.02.03.    Gross Earnings loss is determined as follows:

Gross Earnings value that would have been earned during the Period of Liability, less charges and expenses that do not necessarily continue during the Period of Liability.

Consideration shall be given to the continuation of normal charges and expenses, including **Ordinary Payroll** for the number of consecutive days as stated in the Declarations but not to exceed the limit shown for **Ordinary Payroll**, to the extent necessary to resume the Insured's business activities with the same quality of service that existed immediately preceding the loss.

4.02.01.02.04.    This Policy will also pay the reasonable and necessary expenses incurred (except the cost to extinguish a fire) by the Insured to reduce the amount of Gross Earnings loss during the Period of Liability. This Policy will pay for such expenses to the extent that they do not exceed the amount of Gross Earnings loss that otherwise would have been payable. This provision will not pay for the cost of permanent repair or replacement of property that has suffered direct physical loss or damage.

4.02.01.02.05.    This Policy will also pay the increased tax liability incurred by the Insured due to the profit portion of a Gross Earnings loss payment being greater than the tax liability incurred on the profits that would have been earned had no loss occurred..

## 4.02.02.    EXTENDED PERIOD OF LIABILITY

Upon the termination of the coverage for Gross Earnings loss under 4.02.01.01. this Policy will continue to pay the actual Gross Earnings loss sustained by the Insured until the earlier of:

4.02.02.01.            The date the Insured could restore its business with due diligence, to the condition that would have existed had no direct physical loss or damage occurred to the Insured's Covered Property; or

4.02.02.02.            The number of consecutive days as stated in the Declarations

4.02.02.03.            Exclusion 4.02.05.01.02.01. is deleted during the Extended Period of Liability and is replaced with:

> 4.02.05.01.02.01.            A reduction in sales after the Extended Period of Liability ends due to suspension, cancellation or lapse of any lease, contract, license or orders.

## 4.02.03.    EXTRA EXPENSE

The Company will pay for the reasonable and necessary Extra Expenses incurred by the Insured, including the cost to remove and return patients, during the Period of Liability, to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**.

The Company will reduce the amount payable as Extra Expense by the fair market value remaining at the end of the Period of Liability for property obtained in connection with the above.

Extra Expenses mean that amount spent to continue the Insured's business activities over and above the expenses the Insured would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property of the type insurable under this policy at a **Location**.  Extra Expense does not include any Gross Earnings loss, the cost of permanent repair or replacement of property that has suffered direct physical loss or damage, or expenses otherwise payable elsewhere in the Policy.

## 4.02.04.    LEASEHOLD INTEREST

The Company will pay for the actual Leasehold Interest loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage caused by a **Covered Cause of Loss** to a building (or structure) which is leased and not owned by the Insured, as follows:

4.02.04.01.            If the building (or structure) becomes wholly untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured the present value of the actual rent payable for the unexpired term of the lease, not including any options;

4.02.04.02.            If the building (or structure) becomes partially untenantable or unusable and the lease agreement requires continuation of the rent, the Company will pay the Insured for the present value of the proportionate amount of the actual rent payable for the unexpired term of the lease, not including any options; or

4.02.04.03.            If the lease is cancelled by the lessor pursuant to the terms of the lease agreement or by operation of law, this Policy will pay the Insured for their **Lease Interest** for the first three (3) months following the loss or damage and for their **Net Lease Interest** for the remaining unexpired term of the lease.

4.02.04.04.            The Insured must use any suitable property or service owned, controlled, or obtainable from any source to reduce the loss.

4.02.04.05.    In addition to the exclusions elsewhere in this Policy the Leasehold Interest Coverage excludes:

4.02.04.05.01.    Any increase in the Leasehold Interest loss resulting from the suspension, lapse or cancellation of any lease;

4.02.04.05.02.    Any loss from the Insured exercising an option to cancel the lease; or

4.02.04.05.03.    Any loss from an act or omission by the Insured that constitutes default under the lease.

## 4.02.05.    EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Time Element Coverage;

4.02.05.01.    This Policy does not insure against:

4.02.05.01.01.    Any loss during any idle period that would have been experienced had the **Suspension** of business activities not occurred.  This includes, but is not limited to, when production, operation, services, delivery or receipt of goods or services or any other business activities would have ceased, or would not have taken place or would have been prevented due to:

4.02.05.01.01.01.    Planned or rescheduled shutdown;

4.02.05.01.01.02.    Strikes or other work stoppage; or

4.02.05.01.01.03.    Any reason other than physical loss or damage insured by this Policy.

4.02.05.01.02.    Any increase in Time Element loss due to:

4.02.05.01.02.01.    Suspension, cancellation or lapse of any lease, contract, license or orders;

4.02.05.01.02.02.    Fines or damages for breach of contract or for late or non-completion of orders;

4.02.05.01.02.03.    Penalties of any nature; or

4.02.05.01.02.04.    Any other consequential or remote factors.

4.02.05.01.03.    Any loss resulting from loss or damage to **Finished Stock**, nor the time required for their reproduction.

4.02.05.01.04.    Any Time Element loss due to physical loss or damage not insured by this Policy on or off of the Insured Location.

However, in the event that a **Suspension** is due to a **Covered Cause of Loss** and during such **Suspension** a loss that is otherwise excluded occurs, the Company will pay for the Time Element loss which is directly caused by the **Covered Cause of Loss** to Covered Property under this Policy.

4.02.05.01.05.    Any Time Element loss resulting from damage to Property of Others; however this exclusion does not apply to Time Element loss suffered by the Insured as a direct result of the damage to Property of Others.

## 4.03.          PERIOD OF LIABILITY

4.03.01.          The Period of Liability applying to all Time Element Coverages, except Leasehold Interest, and as shown below or if otherwise provided under any Special Coverage, and subject to any Time Limit provided in 2.03.08., is as follows:

4.03.01.01.          For building and equipment: The period starting from the time of physical loss or damage of the type insured against and ending when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage.  The expiration of this Policy will not limit the Period of Liability.

4.03.01.02.          For building and equipment under construction:  The equivalent of the above period of time will be applied to the level of business that reasonably would have been achieved after construction and startup would have been completed had there been no direct physical loss or damage.  Due consideration will be given to the actual experience of the business after completion of the construction and startup.

4.03.01.03.          For **Stock in Process** and **Merchandise**:  The period of time required with the exercise of due diligence and dispatch to restore **Stock in Process** to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services and to replace physically damaged **Merchandise**.

4.03.01.04.          For **Raw Materials** and supplies:  The period of time of actual interruption of production or suspension of operations or services resulting from the inability to get suitable **Raw Materials** and supplies to replace **Raw Materials** and supplies damaged, but limited to that period for which the damaged **Raw Materials** and supplies would have supplied operating needs.

4.03.02.          The Period of Liability applying to all Time Element Coverage, except Leasehold Interest, or if otherwise provided under any Special Coverage, and subject to any Time Limit provided in 2.03.08., does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

4.03.02.01.          Making changes to equipment;

4.03.02.02.          Making changes to the buildings or structures except as provided in the Increased Costs of Construction Coverage of the Special Coverages section; or

4.03.02.03.          Re-staffing or retraining employees.

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-11902 |
| | ) | |
| AMERICAN GUARANTEE AND LIABILITY | ) | |
| INSURANCE COMPANY and ZURICH | ) | |
| AMERICAN INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY'S CORRECTED[1] OBJECTIONS AND RESPONSES TO STEWARD HEALTH CARE SYSTEM LLC'S FIRST SET OF INTERROGATORIES**

American Guarantee and Liability Insurance Company ("AGLIC") interposes the following objections and provides the following responses to Steward Health Care System LLC's ("Steward") First Set of Interrogatories (the "Interrogatories") served on February 10, 2023

AGLIC has not completed its investigation in this action. AGLIC has not completed its trial preparation at this time and discovery is in early stages. Accordingly, all responses below are based only upon the information and documents that are presently available and specifically known to AGLIC. The following discovery responses are provided without prejudice to AGLIC's rights: (a) to supplement the responses with additional documents or information at a later date; (b) to present evidence of any facts subsequently identified during the course of

---

[1] AGLIC hereby corrects its Objections and Responses to Steward Health Care's First Set of Interrogatories. The response and objection to Interrogatory Nos. 6 and 13 are corrected. In the process of transferring and serving AGLIC's Objections and Responses to Steward's First Set of Interrogatories, the Verification page was inadvertently attached to an earlier draft.

obtain proprietary and confidential information belonging to third parties—including, but not limited to, other policyholders that cannot be produced without consent—and seeks documents protected by the attorney-client privilege, the work product doctrine, or any otherwise applicable privilege, doctrine, exemption, or immunity.

6.    Please set forth in full and complete detail all facts which support AGLIC's "determin[ation] [that] the Period of Liability for Steward's claimed business income loss – including when the Norwood Hospital could have been repaired with due diligence and dispatch and made ready for operations under the same conditions that existed prior to the Flood ends July 15, 2022" as claimed in Mr. Graves' Letter to Steward dated December 23, 2022.

OBJECTION: AGLIC incorporates the Introductory Objections and objections to the Definitions and Instructions, as set forth above. AGLIC objects to this Interrogatory, including the use of the phrase "complete detail," in that it is vague, ambiguous, and lacks particularity. AGLIC further objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it seeks "all facts" supporting AGLIC's determination of the Period of Liability. AGLIC further objects to this Interrogatory to the extent it seeks information that will necessarily be the subject of expert review and disclosure. AGLIC will provide such information in accordance with the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Massachusetts, and the Court's Orders.

RESPONSE: Subject to and without waiving these objections, American Guarantee and Liability Insurance Company, subject to and in accordance with its Objections and Responses to Steward Health's First Request for Production of Documents, is producing documents, including (a) certain claim  documents; and (b) emails from certain custodians,

- 14 -

from which, as provided for in Federal Rule of Civil Procedure 33(d), Steward may determine the information sought by this Request for Production.

Responding further, in adjusting Steward's claim, AGLIC retained and relied upon qualified professionals to assist in determining the Period of Liability, including sharing experts with Zurich which adjusted the MPT claim under a separate policy as to the same water loss event at Norwood Hospital. Zurich obtained a scope of work from DBI Construction outlining the repair required to restore the buildings damaged by the water intrusion developed with input from multiple engineering and trade-specific construction professionals. Shawmut Design and Construction ("Shawmut") prepared a construction schedule outlining the repairs needed to address the water damage, concluding that construction could be completed by May 13, 2022. AGLIC retained Katie Twomey, Executive Managing Director at J. S. Held, to review Shawmut's scheduling assumptions.

The Period of Liability runs from June 28, 2020 (the date of loss) to July 15, 2022, a total of 747 calendar days. AGLIC has since paid Steward over $91 million for its Gross Earnings loss during this period.

7.    Identify all persons who have participated in AGLIC's Investigation, analysis of and/or response to Steward's requests for coverage under the Policy for losses Steward claims to have incurred because of the Storm, and describe in detail the role each such person played on AGLIC's behalf, the actions taken and the communications made by or on behalf of AGLIC as a result of Steward's notification to AGLIC of the Storm, including without limitation any Investigation conducted or the procedures followed to determine whether to provide coverage for any of Steward's claimed losses.

**OBJECTION: AGLIC incorporates the Introductory Objections and objections to the Definitions and Instructions, as set forth above. AGLIC objects that the instant Interrogatory is a premature contention interrogatory. AGLIC further objects that the instant Interrogatory is premature in that it seeks information that will necessarily be the subject of expert review and disclosure. AGLIC will provide such information in accordance with the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Massachusetts, and the Court's Orders. AGLIC further objects to the extent this Interrogatory seeks information subject to the attorney-client privilege and/or attorney work product doctrine. AGLIC further objects that the instant interrogatory is a compound interrogatory of at least three separate interrogatories combined to bypass the limit on total number of interrogatories.**

Dated: June 11, 2025

AS TO OBJECTIONS:

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY

By Its Attorneys,


 _/s/ Jonathan D. Mutch_
Jonathan D. Mutch, Esq. (BBO No. 634543)
Timothy Wenger (BBO No. 674087)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel: (617) 267-2300
Email: JMutch@RobinsKaplan.com
        TWenger@RobinsKaplan.com


***Attorneys for Defendant American
Guarantee and Liability Insurance Company***

- 23 -

## **VERIFICATION**

     I, Mark Graves, being first duly sworn, do hereby affirm that the foregoing Responses to Steward's First Set of Interrogatories are true and correct to the best of my knowledge and belief.

**Mark A. Graves**

By: _____

# Exhibit C



December 23, 2022

**<u>Via Electronic Mail Only</u>**

Chris Kidney
Senior Director of Emergency Project Management
Steward Health Care, Corporate Real Estate Facilities

chris.kidney@steward.org

| | | |
|---|---|---|
| Re: | Insured: | Steward Health Care System LLC |
| | Claim No.: | 5630054105 |
| | Policy No: | ZMD 1393138-00 (the "Policy") |
| | Date of Loss: | June 28, 2020 |
| | Loss Location: | 800 Washington, Norwood, MA 02062 |

Dear Mr. Kidney:

I write in response to a letter dated November 29, 2022 written by Steward's outside counsel Howard M. cooper to our outside counsel Jonathan Mutch concerning AGLIC's second quarter 2022 ("Q2 2022") business interruption payment to your client, Steward Health Care System LLC ("Steward").

Contrary to Mr. Cooper's assertion, AGLIC is neither "holding up" its Q2 2022 business interruption payment to Steward nor has AGLIC withheld any payment due to Steward in connection with Emergency Department considerations – please advise your counsel that his information is incorrect.

No payment to Steward is "substantially overdue." AGLIC's analysis of Steward's most recent business income claim submission (as well as all others previously submitted by Steward) has been diligent. Timely payments have followed completion of the needed analysis for each submission, as is the case now. Each of Steward's submissions of data (including its most recent which is the subject of Mr. Cooper's letter) required significant forensic accounting analysis which has been performed (at AGLIC's expense) in a timely manner as indicated above. Each of Steward's submissions has differed, as has this one, requiring that analysis each time a submission was made.

December 23, 2022
Page 2

Prior to the most recent submission, AGLIC has already made payments to Steward in connection with the Claim referenced above that total $87,697,593.72.

I am able to inform you that AGLIC's analysis of Steward's most recent business income loss submission is now complete. AGLIC has processed payment for that adjusted business income claim submission this week. AGLIC is issuing a further payment to Steward in the amount of $9,836,250.00.

As you are aware, the Policy provides the terms, limits, and conditions applicable to Steward's time element claim. One such condition (among all other Policy terms) concerns the period of time for which Steward may recover for any claimed business income (Gross Earnings) loss. That amount of time is determined (subject to all other applicable Policy terms, conditions, and limitations) by the Period of Liability.

The Policy provides in part as follows:

4.02.        TIME ELEMENT COVERAGES

4.02.01.        GROSS EARNINGS-

4.02.01.01.    Gross Earnings loss is the actual loss sustained by the Insured during the Period of Liability.

* * *

We next direct your attention to Section 4.03 of the Policy, which sets forth the Period of Liability applicable to all Time Element Coverages. In pertinent part, the Policy provides:

4.03.        PERIOD OF LIABILITY

4.03.01.        The Period of Liability applying to all Time Element Coverages, except Leasehold Interest, and as shown below or if otherwise provided under any Special Coverage, and subject to any Time Limit provided in 2.03.08., is as follows:

4.03.01.01.    For building and equipment: The period starting from the time of physical loss or damage of the type insured against and ending when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage. The expiration of this Policy will not limit the Period of Liability.

* * *

AGLIC determined the Period of Liability for Steward's claimed business income loss – including when the Norwood Hospital could have been repaired with due diligence and dispatch and made ready for operations under the same conditions that existed prior to the Flood ends July 15, 2022.

Accordingly, the payment to Steward to be processed this week will encompass AGLIC's calculation of Steward's actual business interruption loss Steward sustained through the end of the Period of Liability, namely July 15, 2022.

With this payment, AGLIC will have paid Steward $97,433,843.72 in connection with its Claim.

Please feel free to contact me should you have any questions

AGLIC continues to reserve all of its rights under the Policy and all rights at law.

Sincerely,

*Mark A. Graves*

Mark A. Graves, AIC, CPCU, AIC-M, RPA, PCLS
AVP, Executive General Adjuster
American Guarantee and Liability Insurance Company

cc:    Howard M. Cooper
       Todd & Weld LLP
       One Federal St.
       Boston, MA 02110

# Exhibit D

UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWARD HEALTH CARE SYSTEM LLC, <br><br>      Plaintiff, <br><br>      v. <br><br> AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY, <br><br>      Defendants. | Civil Action No. 1:21-cv-11902 – PBS |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
STEWARD'S MOTION TO COMPEL DISCOVERY**

Steward Health Care System LLC ("Steward")—a bankrupt hospital operations company backed by private equity firms that is no longer licensed to operate in Massachusetts—received nearly $100 million in coverage paid out by its insurer, American Guarantee and Liability Insurance Company ("American Guarantee") for losses arising from a storm that flooded Norwood Hospital on June 28, 2020. That amount is divided between two types of loss for which Steward had coverage: (1) "actual cash value" paid out for damage to business personal property (e.g., medical equipment and supplies) that Steward had in the Hospital, and (2) over $91 million in business interruption losses arising from Steward's inability to operate due to damage to the Hospital.

Zurich American Insurance Company ("Zurich")—a separate entity that owed Steward no contractual obligations—has been named in this suit because Zurich, not American Guarantee,

insured the Hospital building. But that policy was issued by Zurich to MPT,[1] the entity that owned the Hospital building and from whom Steward leased space to operate its business. Nevertheless, Steward alleges that because the two claims were adjusted simultaneously, Zurich's refusal to agree with MPT's assessment that the Norwood Hospital should be demolished and replaced by an entire new facility interfered with American Guarantee's adjustment and payment of Steward's business interruption claim. Zurich, in consultation with three construction experts, assessed that the damage to the Hospital could be remediated without demolishing the Hospital, and that the construction could be completed by July 15, 2022, 25 months from the date of the loss.

American Guarantee agreed with Zurich's experts, concluded based upon its policy language that Steward was entitled to recover business losses up until July 15, 2022, and paid out over $91 million to reimburse Steward. In this lawsuit, Steward claims that it is entitled to more because the Norwood Hospital was never rebuilt (largely due to MPT's refusal to undertake any repairs of the property). Steward accordingly argues that the loss period should stretch until September 30, 2024, the date that Steward's license to operate within the state of Massachusetts was revoked.

At the end of the day, resolution of Steward's claims turns on the following issues:

- Whether Steward's statement of its losses, including its claimed monthly business interruption damages were accurate;

- Whether American Guarantee diligently and in good faith determined that July 15, 2022, was the proper cut off for Steward's business interruption damage (based upon the date by which the Hospital could have been repaired) or whether instead Steward is entitled to recover business losses up to September 30, 2024 (the final day Steward operated any Massachusetts facilities before its license to do so was revoked);

---

[1] The separate claims between Zurich and MPT have been resolved.

- Whether American Guarantee's payment of Actual Cash Value for Steward's business personal property (none of which was replaced by Steward) was consistent with its contractual obligations under its policy; and

- Whether Zurich's disputes with MPT regarding whether the Hospital should have been repaired or rebuilt rise to the level of a tortious interference with Steward's contractual rights under the American Guarantee policy.

This case is not about whether American Guarantee or Zurich are guilty of an amorphous allegation of "bad faith."[2] Nevertheless, Steward's Motion to Compel (ECF Nos. 122 ("Mot."), 123 ("Mem.")) ignores all this detail in attempting to justify the vague, irrelevant, unduly burdensome, and wide-ranging discovery that it has served on American Guarantee and Zurich. Under Rule 26(b)(1), discovery is limited only to that which is "relevant to any party's claim or defense and proportional to the needs of the case." Because the evidence sought by Steward goes well beyond those boundaries, the Court should deny Steward's Motion.

**ARGUMENT**

**I.    The Court Should Deny Steward's Request to Compel Production of Documents.**

Steward has moved to compel production by both Zurich and American Guarantee of several sweeping categories of documents and information without meeting its burden to explain the relevance of that information to its claims. *See Close v. Account Resolution Servs.*, 557 F.Supp.3d 247, 250 (D. Mass. 2021) ("The party seeking an order compelling discovery response over the opponent's objection bears the initial burden of showing that the discovery requested is

---

[2] As to American Guarantee, the Second Amended Complaint asserts claims for declaratory judgment (Count I), breach of contract (Count II), and breach of the covenant of good faith and fair dealing (Count III). As to Zurich, the claims asserted are tortious interference with contract (Count IV). And as to both Defendants, Steward asserts a claim for violation G.L. c. 93A, §11 (Count V) which prohibits deceptive acts or practices in the engagement of commerce in Massachusetts, including deceptive practices in the business of insurance, *see* G.L. c. 176D, § 3(9)(d).

3

Respectfully submitted,


 /s/ Jonathan D. Mutch
Jonathan D. Mutch, Esq. (BBO No. 634543)
Timothy Wenger (BBO No. 674087)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel: (617) 267-2300
JMutch@RobinsKaplan.com
Dated:  June 25, 2025                    TWenger@RobinsKaplan.com

*Attorneys for Defendants American Guarantee and*
*Liability Insurance Company and Zurich American*
*Insurance Company*


## CERTIFICATE OF SERVICE

I, Jonathan D. Mutch, hereby certify that on this day, I electronically filed the within document with the Clerk of the Court using the CM/ECF system that will send notification of such filing(s) to all counsel of record. The document is available for viewing and downloading through the ECF system.

Dated: June 25, 2025                    */s/ Jonathan D. Mutch*
                                        Jonathan D. Mutch

# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| STEWARD HEALTH CARE SYSTEM LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-11902 |
| | ) | |
| AMERICAN GUARANTEE AND LIABILITY | ) | |
| INSURANCE COMPANY and ZURICH | ) | |
| AMERICAN INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY'S
OBJECTIONS AND RESPONSES TO STEWARD HEALTH CARE
SYSTEM LLC'S FIRST SET OF INTERROGATORIES**

American Guarantee and Liability Insurance Company ("AGLIC") interposes the

following objections and provides the following responses to Steward Health Care System

LLC's ("Steward") First Set of Interrogatories (the "Interrogatories") served on February 10,

2023.

AGLIC has not completed its investigation in this action. AGLIC has not completed its

trial preparation at this time and discovery is in early stages. Accordingly, all responses below

are based only upon the information and documents that are presently available and specifically

known to AGLIC. The following discovery responses are provided without prejudice to

AGLIC's rights: (a) to supplement the responses with additional documents or information at a

later date; (b) to present evidence of any facts subsequently identified during the course of

discovery; (c) to present any analyses not yet obtained or completed; and (d) to amend or

withdraw any responses accordingly.

AGLIC makes no implied admissions regarding the contents of the following responses.

obtain proprietary and confidential information belonging to third parties—including, but not limited to, other policyholders that cannot be produced without consent—and seeks documents protected by the attorney-client privilege, the work product doctrine, or any otherwise applicable privilege, doctrine, exemption, or immunity.

6.      Please set forth in full and complete detail all facts which support AGLIC's "determin[ation] [that] the Period of Liability for Steward's claimed business income loss – including when the Norwood Hospital could have been repaired with due diligence and dispatch and made ready for operations under the same conditions that existed prior to the Flood ends July 15, 2022" as claimed in Mr. Graves' Letter to Steward dated December 23, 2022.

OBJECTION: AGLIC incorporates the Introductory Objections and objections to the Definitions and Instructions, as set forth above. AGLIC objects to this Interrogatory, including the use of the phrase "complete detail," in that it is vague, ambiguous, and lacks particularity. AGLIC further objects to this Interrogatory as being overly broad and unduly burdensome to the extent that it seeks "all facts" supporting AGLIC's determination of the Period of Liability. AGLIC further objects to this Interrogatory to the extent it seeks information that will necessarily be the subject of expert review and disclosure. AGLIC will provide such information in accordance with the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Massachusetts, and the Court's Orders.

RESPONSE: Subject to and without waiving these objections, American Guarantee and Liability Insurance Company, subject to and in accordance with its Objections and Responses to Steward Health's First Request for Production of Documents, is producing documents, including (a) certain claim  documents; and (b) emails from certain custodians,

from which, as provided for in Federal Rule of Civil Procedure 33(d), Steward may determine the information sought by this Request for Production.

Responding further, ==AGLIC and Zurich adjusted the claims of both Steward and MPT arising out of the water loss at Norwood Hospital concurrently and jointly==.  They retained and relied upon qualified professionals to assist in determining the Period of Liability. Zurich obtained a scope of work from DBI Construction outlining the repair required to restore the buildings damaged by the water intrusion developed with input from multiple engineering and trade-specific construction professionals. Shawmut Design and Construction ("Shawmut") prepared a construction schedule outlining the repairs needed to address the water damage, concluding that construction could be completed by May 13, 2022. AGLIC retained Katie Twomey, Executive Managing Director at J. S. Held, to review Shawmut's scheduling assumptions.

The Period of Liability runs from June 28, 2020 (the date of loss) to July 15, 2022, a total of 747 calendar days. AGLIC has since paid Steward over $91 million for its Gross Earnings loss during this period.

7.    Identify all persons who have participated in AGLIC's Investigation, analysis of and/or response to Steward's requests for coverage under the Policy for losses Steward claims to have incurred because of the Storm, and describe in detail the role each such person played on AGLIC's behalf, the actions taken and the communications made by or on behalf of AGLIC as a result of Steward's notification to AGLIC of the Storm, including without limitation any Investigation conducted or the procedures followed to determine whether to provide coverage for any of Steward's claimed losses.

Dated: March 10, 2025

AS TO OBJECTIONS:

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY

By Its Attorneys,


  /s/ Jonathan D. Mutch
Jonathan D. Mutch, Esq. (BBO No. 634543)
Timothy Wenger (BBO No. 674087)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel: (617) 267-2300
Email: JMutch@RobinsKaplan.com
         TWenger@RobinsKaplan.com


**_Attorneys for Defendant American_**
**_Guarantee and Liability Insurance Company_**


## CERTIFICATE OF SERVICE

I, Jonathan D. Mutch, certify that on this date, the foregoing American Guarantee and

Liability Company's Objections and Responses to Steward Health Care System LLC's First Set

of Interrogatories were served via email upon counsel of record.


Dated: March 10, 2025                  /s/ Jonathan D. Mutch

## <u>VERIFICATION</u>

I, Mark Graves, being first duly sworn, do hereby affirm that the foregoing Responses to Steward's First Set of Interrogatories are true and correct to the best of my knowledge and belief.

**Mark A. Graves**

By: _Mark A. Graves_

# Exhibit F



January 11, 2021

***Via Electronic Mail Only***

Scott Kenyon
Vice President
Steward Health Care System LLC
1900 Pearl Street
Suite 2400
Dallas, TX 75201

Re:    Insured:        Steward Health Care System LLC
       Claim No.:      5630054105
       Policy No:      ZMD 1393138-00 (the "Policy")
       Date of Loss:   June 28, 2020
       Loss Location:  800 Washington Street, Norwood, MA 02062

Dear Mr. Kenyon,

I write to address certain matters relating to Steward Health Care System, LLC's ("Steward")
December 4, 2020 claim presentation.

### I.    Response to Claim Submission

#### A.    High Level Concerns

Steward's December 4, 2020 claim submission includes a document entitled "Claim Summary –
Steward Only" which identifies the total amounts that Steward asserts it suffered from the June
28, 2020 flood event at the Norwood Hospital facility.  Steward seeks a total of $202,483,879
from that event, of which Steward claims $112,218,364 for what it terms "Flood" and a further
$90,265,515 for what is termed "Storm."

As part of its total claim Steward seeks $57.5 million for "Property Damage" consisting of $13.2
million asserted as "Flood" property damage and $44.3 million asserted as "Storm" property
damage.  A majority of both claimed amounts are asserted to be loss of business personal
property, although loss for Building and Remediation and Clean Up are also included.

The bulk of Steward's claim seeks a total of $144.5 million for Time Element loss.  This is
broken down by Steward as $98.8 million asserted for "Flood" time element loss and $45.7
million asserted for "Storm" time element loss.  Of the total claimed Time Element loss, all but
$15.3 million is asserted to be Business Interruption loss running from June 28, 2020 through

ZUR0080853

January 11, 2021
Page 2

June of 2023. A total of $10.3 million is claimed for Extra Expenses and $5 million for Extended Period of Indemnity; both are split roughly evenly between what Stewart asserts as "Flood" and "Storm" loss.

American Guarantee and Liability Insurance Company ("AGLIC") issued the Policy insuring Steward pursuant to all terms, limits, exclusions and conditions contained therein. AGLIC and its consultants are working to provide a detailed analysis of this claim submission, which will be provided once completed. In the interim, AGLIC has identified two primary areas of concern with the claim as asserted. These concerns are set out below and are identified here without limiting or waiving AGLIC's right to respond in more detail. AGLIC reserves all rights under the Policy and at law, waiving none.

First, substantially too long of a time is asserted by Steward as necessary to repair and restore operations of the Norwood Hospital following the loss. As you know, the Policy provides (subject to all Policy terms) that AGLIC will pay for the actual Time Element loss Steward sustains, as provided in the Time Element Coverages, during the "Period of Liability." The Period of Liability is a term addressed by Section 4.03 of the Policy, and it is quoted within Section II of this letter. Subject, again, to all Policy terms and stated generally, the Period of Liability begins on the date of loss and ends when "when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage."

In measuring the actual Time Element loss recoverable by Steward as a result of the loss, AGLIC will follow the terms of the Policy including the Period of Liability. Factors that are relevant to the Time Element loss calculation include the scope of repair and restoration of covered damage, the due diligence with which any covered repair and restoration work is completed, and Steward's efforts at resuming hospital operations with due diligence.

Although the claim support and detail is incomplete, Steward's Time Element claim, which runs through June of 2023, appears based on a scope of repair beyond that which is needed to restore the flood damage from the June 28, 2020 event. The owner of the buildings that house Steward's Norwood Hospital operation – Medical Properties Trust, Inc. ("MPT") – is insured under a separate policy issued by Zurich American Insurance Company ("ZAIC").[1] ZAIC, by letter dated December 23, 2020, identified to its insured MPT several concerns with the scope of repair claimed as to the buildings and equipment, the lack of due diligence in testing and evaluating damage, and the failure of MPT to begin certain needed repairs or replacement of building components and equipment, even where there is agreement that repair or replacement is needed. Those concerns are relevant here as well to the calculation of Steward's Time Element loss for the reasons stated above.

Second, Steward's claim as asserted also does not take into account the $150 million sublimit applicable to Flood (subject to all Policy provisions). In other words, while Steward's losses will

---

[1] As we have noted before, Steward appears to be asserting MPT's claim under the MPT policy, a practice to which ZAIC has objected and continues to reserve rights.

ZUR0080854

January 11, 2021
Page 12

the cause or amount of loss or other matters relating thereto shall not act to waive, invalidate, forfeit, or modify any of their rights under the terms and conditions of the above numbered policy, and that American Guarantee and Liability Insurance Company reserves the right, if its investigation warrants, to claim that the loss asserted by you is not, or may not be, within the coverage of the involved policy.

Under such conditions, this letter is to make clear that any acts of investigation that may be performed are done without prejudice to any defense or rights, which American Guarantee and Liability Insurance Company may have, and without waiver of any of the terms, conditions, or provisions of the policy that you hold or applicable law.

Thank you for your anticipated cooperation.

Sincerely,

Mark A. Graves, AIC, CPCU, AIC-M, RPA, PCLS
AVP, Executive General Adjuster
American Guarantee and Liability Insurance Company

cc:  Robert Gendron (Via email only)
     Steward Health Care System LLC

     Nathalie Hibble (Via email only)
     Steward Health Care System LLC

     John Doyle (Via email only)
     Steward Health Care System LLC

     Ron Papa (Via email only)
     National Fire Adjustment

     Steven Richards (via email only)
     Optisure Risk Partners

     Sarah Finnegan (via email only)
     Optisure Risk Partners

CONFIDENTIAL                                                     ZUR0080864

# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWARD HEALTH CARE SYSTEM LLC,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | Civil Action No. 1:21-cv-11902 |
| ) | |
| AMERICAN GUARANTEE AND LIABILITY    ) | |
| INSURANCE COMPANY and ZURICH    ) | |
| AMERICAN INSURANCE COMPANY,    ) | |
| ) | |
| Defendants.    ) | |

## ZURICH AMERICAN INSURANCE COMPANY'S
## OBJECTIONS AND RESPONSES TO
## PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Federal Rules of Civil Procedure 36, and the Local Civil rules of the United

States District Court for the District of Massachusetts, Defendant Zurich American Insurance

Company ("Zurich"), by and through undersigned counsel, hereby object and respond to Plaintiff

Steward Health Care System LLC's ("Steward") First Set of Requests for Admission to

Defendant Zurich served on July 10, 2025 (the "Requests").

## PRLIMINARY STATEMENT

Zurich has not completed its investigation in this action.  Zurich has not completed its trial

preparation at this time.  The discovery process is still ongoing.  Accordingly, all objections and

responses below are based only upon the information and documents that are presently available

and specifically known to Zurich.  The following objections and responses are provided without

prejudice to Zurich's rights: (a) to supplement the responses with additional documents or

information at a later date; (b) to present evidence of any facts subsequently identified during the

course of discovery; (c) to present any analyses not yet obtained or completed; and (d) to amend or

withdraw any responses accordingly.

11. Zurich objects to the definition of "Shawmut" as vague, ambiguous, overly broad and unduly burdensome. Zurich's Responses will be on the basis that Shawmut refers only to Shawmut Woodworking & Supply, Inc. d/b/a Shawmut Design and Construction.

## RESPONSES TO REQUESTS FOR ADMISSION

**Request No. 1**

Admit that on December 24, 2021, as reflected in **Exhibit A**, Mark Graves of Zurich informed MPT that Zurich was updating its loss assessment and, based on that update, was increasing its actual cash value payment on the Norwood Hospital claim to $36,093,766.95.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1**

Zurich adopts and incorporates its Introductory Objections. Zurich objects that this Request is vague and ambiguous, in part because it is unclear if Steward is referencing some manner or instance in which Zurich informed MPT about the content of Exhibit A other than through Exhibit A itself. Zurich further objects that the Request mischaracterizes the contents of Exhibit A, which speaks for itself. Exhibit A does not state that Zurich was increasing its actual cash value payment on the Norwood Hospital claim to $36,093,766.95. Rather, Exhibit A states that Zurich's "updated replacement cost loss estimate for MPT's covered loss under the Policy is $47,494,505.00 with an *actual cash value loss estimate* of $36,093,766.95" and "[p]er the attached Statement of loss, the *net actual cash value loss payment owed* is $8,530,751.75." (emphasis added).

Subject to the foregoing and without waiving the same: Admitted only that on or about December 24, 2021, Mark Graves, on behalf of Zurich, sent to MPT the letter attached as Exhibit A.

**Request No. 3**

Admit that on November 1, 2024, the parties informed the Court in the MPT Lawsuit that settlement negotiations were ongoing and the parties will file a stipulation of dismissal as soon as an agreement was reached.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

Zurich adopts and incorporates its Introductory Objections.

Subject to the foregoing and without waiving the same: Admitted only that, on November 1, 2024, counsel for Zurich or MPT reported to the Court that the parties were engaged in discussions that may lead to the dismissal of the lawsuit *Zurich American Ins. Co. v. Medical Properties Trust, Inc*., D. Mass., Docket No. 1:21-cv-11621-PBS.

**Request No. 4**

Admit that on November 13, 2024, MPT voluntarily dismissed all claims against Zurich in the MPT Lawsuit.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4**

Zurich adopts and incorporates its Introductory Objections.  Zurich objects that this Request attempts to characterize actions taken by someone other than Zurich.  Zurich further objects that this Request is not relevant to any claim or defense in dispute and is therefore burdensome, harassing, oppressive, and does not seek relevant information proportional to the needs of this case.  Zurich further objects to the extent this Requests seeks information protected by the attorney-client privilege, work product doctrine, the settlement privilege, and any confidentiality agreement between Zurich and MPT.

Subject to the foregoing and without waiving the same: Admitted only that, on November 13, 2024, counsel for MPT filed a Stipulation of Dismissal in the lawsuit *Zurich*

**Request No. 7**

Admit that prior to the settlement agreement resolving the MPT Lawsuit, Zurich had paid MPT approximately $36,093,766.95 toward its insurance claim related to Norwood Hospital.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7**

Zurich adopts and incorporates its Introductory Objections.  Zurich objects that this Request is vague and ambiguous, in part because "related to Norwood Hospital" is vague and ambiguous.  Zurich further objects that this Request attempts to characterize communications between Zurich and MPT, the contents of which speak for themselves.  Zurich further objects that this Request is not relevant to any claim or defense in dispute and is therefore burdensome, harassing, oppressive, and does not seek relevant information proportional to the needs of this case.  Zurich further objects to this Request to the extent that it seeks the production and/or disclosure of trade secrets or information that is proprietary, confidential, or commercially sensitive to Zurich's and/or its employees, clients, and/or customers.  Zurich further objects to the extent this Requests seeks information protected by the attorney-client privilege, work product doctrine, the settlement privilege, and any confidentiality agreement between Zurich and MPT.

Subject to the foregoing and without waiving the same: Admitted only that, prior to MPT filing the Stipulation of Dismissal in the lawsuit *Zurich American Ins. Co. v. Medical Properties Trust, Inc.*, D. Mass., Docket No. 1:21-cv-11621-PBS, Zurich made payments to MPT totaling approximately $36 million as a result of MPT's claim related to the June 28, 2020 flood event at Norwood Hospital.

11

communication from Sedgwick but does not cite any document or other record, the contents of which speak for themselves.

Subject to the foregoing and without waiving the same: Admitted only that Clifford W. Hyde, Jr. and Amy O'Rourke at Sedgwick sent a report related to Norwood Hospital, dated December 7, 2020, the content of which speaks for itself.

Dated August 8, 2025                         _____/s/ Michael Menapace_____
                                             Michael Menapace, Esq. (BBO 568841)
                                             Wiggin and Dana, LLP
                                             20 Church Street
                                             Hartford, Connecticut 06103
                                             Telephone: (860) 297-3733
                                             Fax (860) 297-3799
                                             E-mail:  mmenapace@wiggin.com

                                             *Counsel for Defendant Zurich American Insurance Company*

21416\65\4897-8318-7799.v3

17

# Exhibit H

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF MASSACHUSETTS

4    ----------------------------------x

5    STEWARD HEALTH CARE SYSTEM LLC,

6                          Plaintiff,

7    -against-            Civil Action No.
                          1:21-cv-11902

8

     AMERICAN GUARANTEE AND LIABILITY

9    INSURANCE COMPANY and ZURICH AMERICAN
     INSURANCE COMPANY,

10

                         Defendants.

11

     ----------------------------------x

12

13

          REMOTE VIDEOTAPED DEPOSITION OF

14                  LARRY PORTAL
                New York, New York

15               June 25, 2025

16

17

     Reported By:

18

     ERIC J. FINZ

19

20

21

22

23

24

25       Job No. CRCC7428436

Page 193

1                    LARRY PORTAL
2          A.    I'm sure I did.
3                 (Plaintiff's Exhibit 10 for
4          identification, Q2 2024 Form 10-Q.)
5    BY MR. ROBBINS:
6          Q.    Mr. Portal, you have in front
7    of you what's been marked as Plaintiff's
8    Exhibit 10.
9                 Do you see that?
10         A.    I do.
11         Q.    What is this document?
12         A.    The Form 10-Q for quarter
13   ended June 30, 2024.
14         Q.    That's the second quarter.
15   Correct?
16         A.    Yes.
17         Q.    And the 10-Q was filed on
18   August 9, 2024.  Correct?
19         A.    I don't have the exact date in
20   front of me.
21         Q.    Well, if you skip to the end
22   of the 10-Q.
23         A.    If that's what it says, then
24   yeah.
25         Q.    You have no reason to disagree

Page 194

1                    LARRY PORTAL
2        with --
3              A.    Correct.
4              Q.    Okay.  Would you agree that
5        this document is prepared in the ordinary
6        course of MPT's reporting obligations and
7        reflects information known to the company
8        at the time?
9              A.    Yes, of course.
10             Q.    Now, before we dive into the
11       document, it's true that in 2024, MPT
12       still owned the property where Norwood
13       Hospital is located.  Correct?
14             A.    Sorry, as of Q2 '24 we owned
15       the hospital, is that what you asked?
16             Q.    Yes, you still owned Norwood
17       Hospital.
18             A.    Yes, we do.
19             Q.    And we've established
20       obviously following the storm MPT
21       submitted a property insurance claim to
22       Zurich in 2020.  Correct?
23             A.    Yes.
24             Q.    I imagine that was one of
25       MPT's largest property damage claims.

Page 195

1                    LARRY PORTAL
2       Correct?
3            A.    Yes, we've established that.
4            Q.    And MPT eventually filed suit
5       against Zurich concerning its failure to
6       pay for losses related to Norwood.
7       Correct?
8            A.    I think it was --
9                  MR. MENAPACE:  Objection.
10           A.    If I recall correctly, and my
11      counsel can confirm or -- it was a
12      response to an initial claim -- complaint
13      filed by Zurich.
14           Q.    That's a fair correction.
15                 Zurich filed a lawsuit, and
16      then MPT responded with a counterclaim?
17           A.    That's what I recall.
18           Q.    And as -- so let's take a look
19      at the document.  Specifically page 16.
20                 MR. JEFFERSON:  Which page?
21                 MR. ROBBINS:  16.
22           A.    16, 1-6?
23           Q.    Correct.
24           A.    Okay.
25           Q.    And again, this is a

Page 196

1                    LARRY PORTAL
2       disclosure made by MPT on August 9, 2024,
3       a few months prior to the settlement with
4       Zurich.   Correct?
5            A.    Yes.
6            Q.    And if you look at the bottom,
7       second to last paragraph on this page,
8       under the heading "development
9       activities," MPT discloses, "separately,
10      on the Norwood redevelopment, we have
11      approximately $150 million net of
12      payments received to date due to us from
13      a combination of recovery receivables,
14      included in other assets in the condensed
15      consolidated balance sheets, associated
16      with the damage to the original facility
17      in 2020, and a $50 million advance
18      (reflected in other loans in the
19      condensed consolidated balance sheets)
20      made to Steward in the first half of 2023
21      that is secured by, among other things,
22      proceeds from Steward's business
23      interruption insurance claims."
24                    Do you see that?
25           A.    Mm-hmm, yes.

1                    LARRY PORTAL

2          Q.    So the term "recovery

3     receivable" in MPT's 10-Q, reflects MPT's

4     internal accounting of its expected

5     recovery on account of the Norwood

6     insurance claim.  Correct?

7          A.    You would have to double-check

8     with the accountants, but I think that's

9     what it means.

10         Q.    You think that's what it means

11    but we could --

12         A.    I have to double-check with

13    the accountants, but yeah.

14         Q.    But what is your understanding

15    of what a recovery receivable means here?

16         A.    The expected receivable -- the

17    expected recovery.

18         Q.    From the Norwood insurance

19    claim?

20         A.    Yes.

21         Q.    And if we do the math here,

22    that expected recovery was $100 million.

23    Correct?

24         A.    I'm not sure how you got that.

25         Q.    Well, subtracting the $50

1                    LARRY PORTAL
2      million advance made to Steward, this
3      statement suggests that in the second
4      quarter of 2024, MPT recorded a $100
5      million recovery receivable.  Correct?
6           A.    I think they are two separate
7      things.  The 50 million advance was a
8      separate advance.
9           Q.    I agree with you.
10          A.    And that was -- if I stand
11     corrected from what I said earlier, that
12     was secured by the BI policy.
13          Q.    Right.  That's what that says
14     here.
15          A.    On the 50 million.
16          Q.    On the 50 million.
17                But if you look at the first
18     line, it says "separately, on the Norwood
19     redevelopment, we have approximately 150
20     million," which is made up, correct, of
21     two different components, the $50 million
22     advance and the -- what would be a $100
23     million recovery receivable.  Correct?
24          A.    I don't read it that way.
25     Give me a minute, let me read it myself.

Page 199

LARRY PORTAL

1

2       Q.      Sure, take your time.

3       A.      Oh, due from a combination --

4               (Reporter clarification.)

5       A.      Now I read it the way you read

6   it.

7       Q.      Just to be clear for the jury,

8   what we're saying here is subtracting the

9   $50 million advance made to Steward in

10  2023, this statement suggests, in the

11  second quarter of 2024, MPT recorded a

12  $100 million recovery receivable

13  attributable to the Norwood Hospital

14  property damage claim.  Correct?

15      A.      That's what it seems to say,

16  yes.

17      Q.      And by the time of this

18  filing, as we've established, MPT had

19  only received approximately $36 million

20  in payments.  Correct?

21      A.      That's correct.

22      Q.      So as of August 9, 2024, MPT's

23  estimate of what it expected to recover

24  in total from Zurich was $136 million.

25  Correct?

Page 200

1              LARRY PORTAL
2       A.    That sounds about right.
3       Q.    But, so now let's look at the
4    next quarter disclosure.  You can keep
5    that one by you in case you want to refer
6    back to it.
7              (Plaintiff's Exhibit 11 for
8              identification, Q3 2024 Form 10-Q.)
9    BY MR. ROBBINS:
10      Q.    Mr. Portal, you have in front
11   of you what's been marked as Plaintiff's
12   Exhibit 11.  Correct?
13      A.    Yes.
14      Q.    And what is this document?
15      A.    This is the Q3 2024 10-Q.
16      Q.    And this form, I'll represent
17   to you, was filed on November 12, 2024.
18      A.    That sounds right.
19      Q.    Okay.  And so this 10-Q was
20   actually published after MPT settled its
21   lawsuit with Zurich regarding Norwood
22   Hospital.  Correct?
23      A.    I'm not sure if we received
24   the final resolution by then, but it was
25   after the mediation where we had an

Page 201

1                    LARRY PORTAL
2      agreement.
3             Q.    Okay.  And if you still are in
4      doubt, I can show you the docket of the
5      lawsuit, where everything was dismissed
6      before November 12 --
7             A.    No need to show me, I take
8      your word for it.
9             Q.    Okay.  Let's take a look at
10     page 19.  At the very top of page 19.
11                  Why don't you take a moment
12     and read it to yourself and then we'll go
13     through it.
14            A.    I read it.
15            Q.    Okay.  It says, "Separately,
16     on the Norwood redevelopment, we
17     recovered cash in November 2024 that was
18     in excess of our recovery receivable
19     (included in other assets in the
20     condensed consolidated balance sheets)
21     resulting in a $24 million additional
22     recovery in the 2024 third quarter."
23                  Do you see that?
24            A.    I do.
25            Q.    So you would agree with me,

Page 202

1                    LARRY PORTAL

2      Mr. Portal, according to MPT's public

3      filings, the actual cash received in

4      November 2024 exceeded the earlier

5      recorded receivable by $24 million.

6      Correct?

7           A.    That's what it seems to say.

8           Q.    Okay.  And the recovery

9      receivable that we discussed earlier was

10     the $100 million that MPT was expecting

11     to recover from Zurich regarding the

12     Norwood Hospital property damage claim.

13     Correct?

14          A.    Say that last part again.

15          Q.    Sure.

16          A.    Just the last sentence.

17          Q.    Sure.

18               The recovery receivable that

19     we discussed earlier in the last document

20     from Q2 2024, the 10-Q filing, was the

21     $100 million that MPT was expecting to

22     recover from Zurich regarding the Norwood

23     Hospital property damage claim.  Correct?

24          A.    I mean, if that's what you

25     want to imply from that, that's fine.

Page 203

1               LARRY PORTAL
2       Q.    I think you said it when we
3   walked through the last document.
4   Correct?
5       A.    Okay.  So what's your
6   question?
7       Q.    So based on MPT's public
8   filings, the amount MPT received from
9   Zurich in November of 2024 to resolve the
10  Norwood litigation would be approximately
11  $124 million?
12              (Direction not to answer.)
13              MR. MENAPACE:  I'm going to
14      just object now you're going beyond
15      words that are actually in the
16      filings.  And I'm going to invoke
17      the confidentiality of the
18      agreement.
19              MR. JEFFERSON:  Yeah.
20              THE WITNESS:  I'm not going to
21      comment anything more --
22              MR. JEFFERSON:  I'm going to
23      instruct the witness not to answer
24      that question.
25              THE WITNESS:  I'm not going to

```
 1                    LARRY PORTAL
 2          comment.
 3     BY MR. ROBBINS:
 4          Q.    You would agree with me that
 5     100 plus 24 equals 124?
 6          A.    I'm not going to comment on
 7     anything in our public filings beyond
 8     what we have in our public filings.
 9          Q.    Taking the $124 million
10     recovery receivable, I'm going to say
11     hypothetically, hypothetically, if the
12     recovery for this receivable that we've
13     been reading about was $124 million, and
14     that reflects what the settlement was --
15     you're not saying that, I am -- if we add
16     that to the $36 million that Zurich had
17     already received -- that MPT had already
18     received, that would mean that MPT
19     received approximately $160 million for
20     its property insurance claim,
21     hypothetically.
22               MR. MENAPACE:  I'm going to
23          object.  So this is too close to
24          the confidentiality agreement to
25          disclose.
```

Page 205

1                    LARRY PORTAL
2            MR. ROBBINS:  I'm not asking
3       him to agree with me.  I'm asking
4       him to agree with the math.
5       Q.    I'm asking if the recovery
6   receivable related to the MPT settlement,
7   and you're not saying it is, but
8   hypothetically if it does, that would
9   mean that Zurich -- that MPT received
10   approximately $160 million for its
11   property insurance claim from Zurich.
12       A.    I'm not going to comment on
13   anything.  You have the same calculator
14   that I have.  I'm not going to comment on
15   anything related to the mediation.
16       Q.    As you sit here today,
17   certainly you have no reason to believe
18   that anything in the 10-Q is inaccurate?
19       A.    Correct.
20       Q.    I would like to refer you back
21   and ask you some questions about the
22   verified complaint that we were looking
23   at earlier.  If I can find it.
24       A.    Is that the one from October
25   2024?

Page 206

1                        LARRY PORTAL

2          Q.     Correct.

3                 MR. JEFFERSON:  Exhibit 9.

4          A.     Are you done with the 10-Qs?

5          Q.     Yes.  You can burn them.

6                 MR. MENAPACE:  Can we go off

7          the record for two seconds?

8                 THE VIDEOGRAPHER:  The time on

9          the video monitor is 2:07 p.m., we

10         off the record.  This end media 3.

11              (Discussion off the record.)

12                THE VIDEOGRAPHER:  We are back

13         on the record.  The time on the

14         video monitor is 2:13 p.m.  This

15         start media 4.

16    BY MR. ROBBINS:

17         Q.     Mr. Portal, if you could just

18      turn to page 9 again of the verified

19      complaint that you have in front of you,

20      which is Plaintiff's Exhibit 9.

21         A.     Yes.

22         Q.     Paragraph 44 at the top is

23      titled "Limited access to insurance

24      funds."

25                Do you see that?

Page 207

1                        LARRY PORTAL

2          A.    I do.

3          Q.    And paragraph 44 reads,

4    "Efforts to advance the project have been

5    further impeded due to the refusal of the

6    hospital's insurers to make prompt and

7    complete payments on claims stemming from

8    the June 28, 2020 storm."

9                Do you see that?

10         A.    I do.

11         Q.    And you would agree with that

12   statement.  Correct?

13         A.    I do.

14         Q.    Is there any other reason -- I

15   want to ask you about your basis for

16   agreeing with that statement.  Is there

17   anything different from what you've

18   already testified to?

19         A.    No.

20         Q.    Then in paragraph 49 on the

21   next page, the second sentence -- the

22   first sentence refers to proceedings in

23   the District Court.  Then the second

24   sentence says, "In the meantime, neither

25   MPT nor the holder, which is Steward, is

Page 208

1                    LARRY PORTAL
2    receiving the insurance payments related
3    to damage from the storm."
4              Do you see that?
5         A.    Yes.
6         Q.    And it was your understanding
7    that the status of the payments to -- it
8    was your understanding at this time in
9    October of 2024, that Steward wasn't
10   being paid on the business interruption
11   loss.  Correct?
12        A.    That was my understanding.
13        Q.    That was your understanding?
14        A.    That was my understanding.
15        Q.    Then the next paragraph says,
16   "MPT is reliant on these insurance
17   payments to help cover the costs of
18   construction and advance the project, and
19   the wait to receive them is contributing
20   to the ongoing construction delays."
21              Do you see that?
22        A.    I do.
23        Q.    And you would agree with that
24   statement?
25        A.    I would.

# Exhibit I

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the quarterly period ended June 30, 2024**

## OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to

Commission file number 001-32559

Commission file number 333-177186

# MEDICAL PROPERTIES TRUST, INC.
# MPT OPERATING PARTNERSHIP, L.P.
### (Exact Name of Registrant as Specified in Its Charter)

<table>
<tr><td>MARYLAND<br>DELAWARE<br>(State or other jurisdiction of<br>incorporation or organization)</td><td>20-0191742<br>20-0242069<br>(I. R. S. Employer<br>Identification No.)</td></tr>
</table>

1000 URBAN CENTER DRIVE, SUITE 501
BIRMINGHAM, AL                        35242
(Address of principal executive offices)      (Zip Code)

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (205) 969-3755**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share, of Medical Properties Trust, Inc. | MPW | The New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ (Medical Properties Trust, Inc. only) | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (MPT Operating Partnership, L.P. only) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of August 6, 2024, Medical Properties Trust, Inc. had 600.2 million shares of common stock, par value $0.001, outstanding.

DEPOSITION EXHIBIT
PHS    10
6 25 25
ERIC J. FINZ

On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third-party lenders, we agreed to the following restructuring of our then $1.7 billion investment in Prospect including: a) maintaining the master lease covering six California hospitals without any changes in rental rates or escalator provisions, but with cash payments starting in September 2023 for a substantial portion of the contractual monthly rent due on these California properties, b) transitioning the Pennsylvania properties back to Prospect in return for a $150 million first lien mortgage on the facilities, c) providing up to $75 million in a loan secured by a first lien on Prospect's accounts receivable and certain other assets, of which we funded in full during 2023, d) continuing to pursue the sale of the three Connecticut properties to Yale New Haven ("Yale"), as more fully described in Note 9 to the condensed consolidated financial statements, and e) obtaining a non-controlling ownership interest in PHP Holdings of approximately $654 million consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings (collectively, the "Prospect Transaction"). This non-controlling ownership interest was received in exchange for unpaid rent and interest through December 2022, previously unrecorded rent and interest revenue in 2023 totaling approximately $82 million, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.

Lifepoint Transaction

On February 7, 2023, a subsidiary of Lifepoint Health, Inc. ("Lifepoint") acquired a majority interest in Springstone (now Lifepoint Behavioral Health, "Lifepoint Behavioral") (the "Lifepoint Transaction") based on an enterprise value of $250 million. As part of the transaction, we received approximately $205 million in full satisfaction of our initial acquisition loan, including accrued interest, and we retained our minority equity investment in the operations of Lifepoint Behavioral. Separately, we converted a mortgage loan (as part of our initial acquisition in 2021) into the fee simple ownership of a property in Washington, which is leased, along with other behavioral health hospitals, to Lifepoint Behavioral, under a master lease agreement. In connection with the Lifepoint Transaction, Lifepoint extended its lease on eight existing general acute care hospitals by five years to 2041.

In the first quarter of 2024, we sold our minority equity investment in Lifepoint Behavioral for approximately $12 million.

Other Transactions

In the second quarter of 2023, we acquired three inpatient rehabilitation facilities for a total of approximately €70 million (approximately $77 million). These hospitals are leased to Median Kliniken S.á.r.l ("MEDIAN") pursuant to a long-term master lease with annual inflation-based escalators.

On April 14, 2023, we acquired five behavioral health hospitals located in the United Kingdom for approximately £44 million (approximately $58 million). These hospitals are leased to Priory Group ("Priory") pursuant to five separate lease agreements with annual inflation-based escalators.

*Development Activities*

See table below for a status summary of our current development projects (in thousands):

| Property | Commitment | | Costs Incurred as of June 30, 2024 | | Estimated Rent Commencement Date |
|---|---|---|---|---|---|
| IMED Hospitales ("IMED") (Spain) | $ | 37,526 | $ | 25,688 | 4Q 2024 |
| IMED (Spain) | | 51,440 | | 19,514 | 1Q 2026 |
| | $ | 88,966 | $ | 45,202 | |

We have two other development projects ongoing in Texas (Wadley development) and Massachusetts (Norwood redevelopment). These are not highlighted above given the ongoing restructuring of Steward Health Care System ("Steward") as discussed further in this same Note 3. However, on a combined basis, we have spent approximately $415 million through June 30, 2024.

Separately, on the Norwood redevelopment, we have approximately $150 million, net of payments received to date, due to us from a combination of recovery receivables (included in "Other assets" in the condensed consolidated balance sheets) associated with the damage to the original facility in 2020 and a $50 million advance (reflected in "Other loans" in the condensed consolidated balance sheets) made to Steward in the first half of 2023 that is secured by, among other things, proceeds from Steward's business interruption insurance claims.

2024 Activity

During the first quarter of 2024, we completed construction and began recording rental income on a $35.4 million behavioral health facility located in McKinney, Texas, that is leased to Lifepoint Behavioral. We also completed construction and began

16

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MEDICAL PROPERTIES TRUST, INC.


By:   /s/ R. Steven Hamner
    Name:    R. Steven Hamner
    Title:    Executive Vice President and Chief Financial Officer


MPT OPERATING PARTNERSHIP, L.P.

By: MEDICAL PROPERTIES TRUST, LLC, its general partner

    By: MEDICAL PROPERTIES TRUST, INC., its sole member


    By: /s/ R. Steven Hamner
        Name:    R. Steven Hamner
        Title:    Executive Vice President and Chief Financial Officer


SECOND AMENDED AND RESTATED
REVOLVING CREDIT AND TERM LOAN AGREEMENT

# Exhibit J

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2024**

## OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

Commission file number 001-32559

Commission file number 333-177186

# MEDICAL PROPERTIES TRUST, INC.
# MPT OPERATING PARTNERSHIP, L.P.
### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **MARYLAND**<br>**DELAWARE**<br>(State or other jurisdiction of<br>incorporation or organization) | **20-0191742**<br>**20-0242069**<br>(I. R. S. Employer<br>Identification No.) |



**1000 URBAN CENTER DRIVE, SUITE 501**
**BIRMINGHAM, AL**
(Address of principal executive offices)

**35242**
(Zip Code)

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (205) 969-3755**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share, of Medical Properties Trust, Inc. | MPW | The New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ (Medical Properties Trust, Inc. only) | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (MPT Operating Partnership, L.P. only) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of November 8, 2024, Medical Properties Trust, Inc. had 600.4 million shares of common stock, par value $0.001, outstanding.

Separately, on the Norwood redevelopment, we recovered cash in November 2024 that was in excess of our recovery receivable (included in "Other assets" in the condensed consolidated balance sheets), resulting in a $24 million additional recovery in the 2024 third quarter.

2024 Activity

     During the first quarter of 2024, we completed construction and began recording rental income on a $35.4 million behavioral health facility located in McKinney, Texas, that is leased to Lifepoint Behavioral. We also completed construction and began recording rental income on a €46 million (approximately $49.0 million) general acute care facility located in Spain that is leased to IMED.

2023 Activity

     During the first nine months of 2023, we completed construction and began recording rental income on one inpatient rehabilitation facility located in Lexington, South Carolina, which commenced rent on July 1, 2023, and another inpatient rehabilitation facility located in Stockton, California, which commenced rent on May 1, 2023. Both of these facilities are leased to Ernest Health, Inc. ("Ernest") pursuant to an existing long-term master lease.

*Disposals*

2024 Activity

     During the first nine months of 2024, we had the following disposal activities:

- See Utah Transaction above for a discussion of the five Utah hospitals sold on April 12, 2024.

- On April 9, 2024, we sold five properties to Prime Healthcare Services, Inc. ("Prime") for total proceeds of approximately $250 million along with a $100 million interest-bearing mortgage loan (which was fully repaid on August 29, 2024). This transaction resulted in a gain on real estate of approximately $53 million, partially offset by a non-cash straight-line rent write-off of approximately $30 million. As part of this sale transaction, we extended the lease maturity of four other facilities with Prime to 2044. This amended lease has inflation-based escalators, collared between 2% and 4%, and a purchase option on or prior to August 26, 2028 for a value of $238 million, which is greater than our net book value for these properties at September 30, 2024. After August 26, 2028, this option price reverts to $260 million (subject to annual escalations).

- On July 23, 2024, we sold the 50-bed Arizona General Hospital in Mesa, Arizona and seven freestanding emergency departments to Dignity Health ("Dignity") for $160 million. This sale resulted in a gain on real estate of approximately $85 million, partially offset by a non-cash straight-line rent write-off of approximately $20 million.

- On August 14, 2024, we sold 11 freestanding emergency departments to UCHealth for $86 million. This sale resulted in a gain on real estate of approximately $40 million, partially offset by a non-cash straight-line rent write-off of approximately $16 million.

- As a result of the Company's global settlement with Steward Health Care System ("Steward") approved by the bankruptcy court on September 18, 2024 (as discussed further under "Leasing Operations (Lessor)" under this same Note 3), we agreed to sell three facilities located in Florida ("Space Coast" properties) to Orlando Health. As such, we designated these properties as held for sale at September 30, 2024 and adjusted the value of our investment, after considering the provisions of the settlement agreement, to $45 million, equal to fair value less cost to sell.

- In the third quarter of 2024, Pajaro Valley Healthcare District Corporation notified us of their intent to exercise their purchase option on the Watsonville facility. As such, we designated this property as held for sale at September 30, 2024 under a sales-type lease. This transaction, which closed on October 31, 2024, resulted in an approximate $4 million gain in the third quarter of 2024.

- During the first nine months of 2024, we also completed the sale of four other facilities and two ancillary facilities for approximately $9 million, resulting in a loss on real estate of approximately $2 million.

19

**IN WITNESS WHEREOF**, the parties hereto have caused this Amendment No. 2 to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**MEDICAL PROPERTIES TRUST, INC.**

By: /s/ R. Steven Hamner
    Name:  R. Steven Hamner
    Title:      Executive Vice President and Chief      Financial Officer

**MPT OPERATING PARTNERSHIP, L.P.**

By: MEDICAL PROPERTIES TRUST, LLC, its general partner

    By: MEDICAL PROPERTIES TRUST, INC., its sole member

        By: /s/ R. Steven Hamner
            Name:  R. Steven Hamner
            Title:      Executive Vice President and      Chief Financial Officer

[SIGNATURE PAGE – AMENDMENT No. 2]