# Exhibit A

## UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK KRONFELD, as Trustee of the SHC Creditor Litigation Trust,<br><br>       Plaintiff,<br><br>       v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>       Defendants. | Civil Action No. 1:21-cv-11902 – PBS |

**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY'S AMENDED ANSWER AND AFFIRMATIVE AND OTHER DEFENSES TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

American Guarantee and Liability Insurance Company ("AGLIC") hereby amends its answer, adding defense seven, and otherwise answers and responds to Steward Health Care System LLC's ("Steward") Second Amended Complaint (the "Complaint"). To the extent the headings and sub-headings that appear throughout the Complaint include characterizations of the factual allegations and conclusions of law, no response is required. To the extent a response is required, AGLIC denies the allegations in each and every heading or sub-heading that appears in the Complaint, which are repeated herein for convenience only. With respect to each numbered paragraph of the Complaint, AGLIC answers as follows and denies any allegations not expressly admitted:

## I.    **INTRODUCTION**

1.    This coverage dispute arises out of the failure of Defendant American Guarantee and Liability Insurance Company ("AGLIC") to indemnify Plaintiff Steward Health Care System LLC ("Steward") pursuant to the terms of a commercial property insurance policy (the "Steward Policy") for substantial losses Steward has suffered as a result of a devastating storm on June 28, 2020 that caused significant damage to the Norwood Hospital (the "Hospital"), which has been closed ever since.  AGLIC's parent company, Defendant Zurich American Insurance Company ("Zurich"), largely has been managing the adjustment of Steward's claim in conjunction with a separate, but inextricably linked insurance claim asserted by Medical Properties Trust, Inc. ("MPT") under a separate commercial property insurance policy (the "MPT Policy") for damage to the Hospital's real property.[1]

> **ANSWER:**    Admitted that Zurich American Insurance Company ("Zurich") is the parent corporation of AGLIC and that Medical Properties Trust, Inc. ("MPT") has made a claim for damage to its real property under a separate commercial property insurance policy, which speaks for itself. Denied that AGLIC has failed to indemnify Steward and denied that Zurich largely has been managing the adjustment of Steward's claim in conjunction with MPT's claim. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1 and leaves Steward to its proof.

2.    MPT owns the Hospital buildings and is Steward's landlord with respect to the Hospital, whereas Steward operates the Hospital as MPT's tenant.  The MPT Policy thus covers damage to the structure and building systems of the Hospital, while the Steward Policy covers

---

[1] The MPT Policy (together with the Steward Policy, the "Policies") and MPT's claim arising from the June 28, 2020 event are the subject of another, related lawsuit pending in this Court, No. 1:21-cv-11621-PBS.

business personal property, time element and medical equipment losses. The Steward and MPT Policies contain identical provisions regarding many of the material terms. Steward herein seeks declaratory relief as to the meaning of certain of those terms and to hold the Defendants accountable for their breaches of contract and violations of Chapter 93A of the Massachusetts General Laws, all arising from their bad faith handling of Steward's insurance claim (both directly and indirectly, through Zurich's mismanagement of MPT's claim), which has unnecessarily prolonged the closure of the Hospital during a once in a century pandemic.

> **ANSWER:**   Admitted that the Steward Policy provides certain coverage for time element loss, business personal property and medical equipment, subject to all terms, which speak for themselves. To the extent the allegations in paragraph 2 purport to further characterize the MPT Policy and Steward Policy, those policies speak for themselves. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 regarding the ownership of the Hospital buildings and the relationship between MPT and Steward, and leaves Steward to its proof. Denied as to all remaining allegations in paragraph 2.

3.      On June 28, 2020, a weather event produced approximately 5.75 inches of rainfall in 90 minutes, causing catastrophic flood water to penetrate the basement and ground levels of the Hospital (the "Rain Event" or "Loss"). Water also immediately impacted the roof systems and envelope of at least two buildings in the complex, catastrophically crippled critical mechanical and electrical systems, and destroyed floors, walls, ceilings, fixtures and finishes throughout the Hospital. Essential patient care systems including the nurse-call communication system and medical gas and vacuum systems were critically damaged, as was diagnostic imaging equipment and other major patient diagnostic and treatment equipment which cannot be placed back into safe

and consistently reliable service.  In short, every single floor of the Hospital was damaged in some way.  As a result of the devastating damage, the Town of Norwood issued a Cease-and-Desist Order restricting all operations on the Hospital campus, which is still in effect.

> **ANSWER:**    Admitted that the Town of Norwood issued a Cease-and-Desist Order, which speaks for itself. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 3 and leaves Steward to its proof.

4.    Since June 28, 2020, Steward and MPT have worked tirelessly to understand and document the extent of the Loss and to provide the Defendants with the information that would enable them to administer and process the claims and permit the Hospital to be rebuilt, reopened, and returned to reliable patient service at the earliest opportunity.  Given what is at stake, not least of which is the undeniable public need for health care facilities like the Hospital during the COVID-19 pandemic, Steward and MPT have consistently emphasized that time is of the essence. Their mitigation efforts began immediately and included the enlistment of dozens of professional consultants to aid in a comprehensive assessment of the Loss.

> **ANSWER:**    Denied that Steward has provided AGLIC with the information that would enable it to administer and process the claim. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 and leaves Steward to its proof.

5.    In consultation with these professionals and in consideration of all available data, and due to the severity of the Loss and the difficulty in taking a patchwork approach to buildings and elements damaged in varying degrees, Steward and MPT have determined that the best approach to resumption of health care operations at the Hospital is to remove the existing buildings and develop a new complex in its place.

**ANSWER:**    Admitted that Steward and MPT seek to remove the existing buildings and develop a new complex in its place. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 and leaves Steward to its proof.

6.    The Massachusetts Commissioner of Insurance has expressly recognized the magnitude of this Loss and specifically advised insurers of the importance of their prompt and reasonable handling of claims arising therefrom.  The Defendants have in turn refused to meaningfully work with Steward, MPT, and their licensed professionals, in complete disregard for these mandates and the weight of the Loss.  Instead, the Defendants' approach to handling the claims has been to both contradict themselves and to "deny first and ask questions later."  The Defendants initially informed Steward and MPT that the Defendants viewed and would treat damage caused by flood water in the basement and ground levels of the Hospital as separate from damage sustained on the first, second and third floors due to storm water intrusion.  Both Policies specifically cover damage caused by "Flood" and include annual aggregate sub-limits applicable to "Flood," whereas the Policies provide coverage for other forms of water intrusion without any limit other than the overall policy limits of $850,000,000 in the Steward Policy and $750,000,000 in the MPT Policy.

**ANSWER:**    Admitted that the Massachusetts Commissioner of Insurance issued advice to insurers regarding the rain event. To the extent the allegations in paragraph 6 purport to characterize the terms of the MPT Policy and Steward Policy, those policies speak for themselves. Denied as to all remaining allegations in paragraph 6.

7.    Steward and MPT, at the Defendants' directive, thus informed their professional consultants to allocate damages in Loss estimates between "Flood" and storm and presented the

5

Defendants with preliminary claims together with those Loss estimates, which did so allocate the damages, and which were themselves exhaustive and well supported. Weeks later, Zurich improperly and in bad faith denied the vast majority of those claims and for the first time alleged that all the damages sustained during the Rain Event were a result of "Flood" and were thus subject to the "Flood" sublimits in the Policies. The Defendants also summarily rejected Steward and MPT's supporting evidence, choosing instead to rely on estimates that were facially incomplete, that ignored substantial portions of the damage and existing code requirements, and that did not appear to engage with Steward and MPT's materials at all.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 regarding communications Steward and MPT had with their consultants and leaves Steward to its proof. Denied as to all remaining allegations in paragraph 7.

8.    Over time, the Defendants have also outrageously suggested that, among other things, Steward and MPT have somehow attempted to seek coverage under each other's Policies; failed to cooperate in the Loss investigation; proposed excessive testing of Hospital equipment; and should consider reusing certain equipment, circuitry, and supplies, even if wetted and/or compromised. The Defendants' posture is disturbingly reductive and ignores that patient health and safety is and must be paramount in a hospital setting.

> **ANSWER:**    Denied.

9.    Most recently, shortly before the filing of this Second Amended Complaint and Jury Demand, AGLIC and Zurich unilaterally cut off Steward's business interruption (referred to as 'Time Element') loss without basis, in bad faith and without discussion or explanation despite Steward's request for the basis of their decision.

6

**ANSWER:**    Denied.

10.    In short, the Defendants have acted in bad faith throughout the adjustment process, harming Steward's interests both directly through AGLIC's failure to administer and pay sums due under Steward's policy, and indirectly through their mismanagement of MPT's claim. To date, the Defendants have tendered to each of Steward and MPT only a fraction of their claimed (and covered) losses.

**ANSWER:**    Denied.

11.    The Defendants' refusal to effectuate a prompt and reasonable resolution of the claims has needlessly protracted the closure of the Hospital, which has had unquantifiable effects on the Norwood community and surrounding areas resulting in, without limitation: much longer trips for local residents to receive medical services; Emergency Medical Services needing to now bypass the Hospital and transport patients much longer distances; a severely disrupted physician network that will continue to deteriorate over time as physicians and other staff depart for employment opportunities elsewhere; furloughed and relocated employees (of which there are almost 1,000) no longer buying goods and services in the local communities; the Hospital no longer purchasing supplies or other materials locally; the Hospital not consuming water and sewer service from the municipal utility, nor electricity and gas from the local private utilities; and the continued suspension of the Hospital's community benefits program. In addition, the drastic reduction in spending attendant to the Hospital's continued closure has had a multiplier effect on the local economy.

**ANSWER:**    Denied, except AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding a multiplier effect on the local economy and leaves Steward to its proof.

12.     Prior to the Rain Event, and even the pandemic, the Hospital was a critical and necessary component of the overall health care infrastructure in Norfolk County.  Steward and MPT have done everything in their power to expedite the adjustment process and restore the Hospital to its previous stature, but they cannot do so alone, especially not when being stonewalled by the Defendants in direct violation of Massachusetts General Laws Chapter 93A at every turn.

> **ANSWER:**     Denied, except AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 regarding the overall health care infrastructure in Norfolk County and leaves Steward to its proof.

## II.     PARTIES

13.     Plaintiff Steward is a Delaware limited liability company with a principal place of business in Dallas, Texas.  Steward is a physician-led, private health care services organization committed to providing the highest quality of care in the communities it serves.  In Massachusetts alone, Steward operates community hospitals in Brighton, Brockton, Dorchester, Norwood (which is presently inoperative for the reasons discussed herein), Fall River, Haverhill, Methuen, Taunton, Ayer, and Stoughton.  Steward's membership interests are held by two entities.  One of Steward's members is a Maryland corporation with a principal place of business in Alabama.  Steward's other member is a Delaware limited liability company with a principal place of business in Texas.  None of the members of this Delaware limited liability company are domiciled in New York or Illinois.

> **ANSWER:**     AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 and leaves Steward to its proof.

14.     Defendant AGLIC is a New York corporation with a principal place of business in Schaumburg, Illinois.  AGLIC is a wholly owned subsidiary of Zurich and the insurer under Steward's Policy.

**ANSWER:**    Admitted.

15.    Defendant Zurich is a New York corporation with a principal place of business in Schaumburg, Illinois.  Zurich is the parent company of AGLIC and the insurer under MPT's Policy.  Zurich has been managing the adjustment of Steward's claim on behalf of AGLIC together with Zurich's own adjustment of the MPT claim.

> **ANSWER:**    Admitted, except denied that Zurich has been managing the adjustment of Steward's claim on behalf of AGLIC together with Zurich's own adjustment of the MPT claim.

### III.    JURISDICTION AND VENUE

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum value of $75,000, exclusive of interest and costs, and is between citizens of different States.

> **ANSWER:**    Paragraph 16 states a legal conclusion to which no response is required. To the extent a response is required, AGLIC admits that the Court has subject matter jurisdiction over this matter only on information and belief, given that Steward's Complaint does not identify the legal status and citizenship of the sub-member Delaware LLC's member entities.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property that is the subject of the action is situated.

> **ANSWER:**    Paragraph 17 states a legal conclusion to which no response is required.

### IV.    FACTS

9

A.    **The Steward Policy[2]**

18.    Steward has an all-risk insurance policy with AGLIC (number ZMD1393138-00) that applies to the Hospital and under which it is seeking coverage for damage caused by the Rain Event.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

19.    The Steward Policy specifically insures "against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property." Steward Policy § 1.01 (emphasis in original).

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

20.    "**Covered Cause of Loss**" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." *Id.* § 7.11 (emphasis in original).

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

21.    The Policy contains a $850 million total policy limit and an annual aggregate sublimit of $150 million for "Flood." *Id.* § 2.03.06. The "Flood" provision within the "Described Causes of Loss" section of the Steward Policy states, in pertinent part:

> The Company[3] will pay for direct physical loss of or damage to Covered Property, Time Element loss and Special Coverages loss as provided by this Policy, if such loss or damage is caused by Flood regardless of any other cause or event contributing concurrently or in any other sequence of loss.

*Id.* § 5.03.03.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

22.    The Steward Policy defines "Flood," in pertinent part, as:

---

[2] A true and accurate copy of the full Steward Policy excluding the Amendatory Endorsements for every state but Massachusetts is attached hereto as Exhibit A. A true and correct copy of MPT's Policy (likewise excluding non-Massachusetts Amendatory Endorsements) is attached hereto as Exhibit B.
[3] AGLIC is defined as the "Company" under the Steward Policy.

A general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by:

a)    The unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, tsunami, the release of water, the rising, overflowing or breaking of boundaries of nature or man-made bodies of water; or the spray there from all whether driven by wind or not.

[. . .]

Flood also includes the backup of water from a sewer, drain or sump caused in whole or in part by Flood.

*Id.* § 7.22.

> **ANSWER:**    Admitted and refers to the Policy which speaks for itself.

23.    For the Special Coverage that applies to "New Construction or Additions," the Steward Policy includes an exclusion for certain types of loss or damage caused by the effects of rain. No other coverage in the Steward Policy includes any such "rain" exclusion or even mentions rain. None of the Hospital buildings affected by the Rain Event qualify as "New Construction or Additions."

> **ANSWER:**    Admitted and refers to the Policy which speaks for itself.

24.    The Steward Policy contains no provisions that specifically refer to physical loss or damage caused by non-named "storms."

> **ANSWER:**    Admitted and refers to the Policy which speaks for itself.

25.    The Steward Policy states the following regarding "Priority of Payment," in pertinent part:

In the event of a claim that involves more than one interest and/or coverage and/or peril; the insured has the option to apportion recovery under this Policy when submitting final proof of loss, subject to the overall amount of claim not exceeding the applicable limit of liability and subject to all other terms and conditions of the policy.

Steward Policy § 6.18.05.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

26.    The full policy limit of the Steward Policy of $850 million per occurrence "include[es] any insured Time Element loss" among other components.  Steward Policy § 2.03.05.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

27.    AGLIC agreed to "pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability." Steward Policy § 4.01.01. "Gross Earnings loss is the actual loss sustained by the Insured during the Period of Liability." *Id*. § 4.02.01.01.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

28. In relevant part, the Steward Policy defines the Period of Liability – the key provision at issue here – as follows:

> For building and equipment: The period starting from the time of physical loss or damage of the type insured against and ending when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage. The expiration of this Policy will not limit the Period of Liability.

Steward Policy § 4.03.01.01 (emphasis added)

**ANSWER:**    Admitted that Steward quoted from the Policy, except to the extent the allegations in paragraph 28 purport to characterize the Policy, which speaks for itself.

### B.    **Norwood Hospital**

29.    In Massachusetts, hospitals are among the most highly regulated built environments and are subject to stringent oversight from regulatory agencies, including the Department of Public Health and the Division of Health Care Facility Licensure and Certification. Hospitals nationwide, including Norwood Hospital, are also subject to The Joint Commission, which accredits health care organizations through a rigorous survey process focusing on physical environment and life-

safety related items. Accreditation ensures that hospitals meet the Centers for Medical and Medicaid Services certification requirements.

**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and leaves Steward to its proof.

30.    Steward designs, builds, maintains, and operates its health care facilities with several cardinal principles in mind.  First among these is patient safety: in every one of Steward's facilities, the buildings, their supporting infrastructure, and the equipment contained within them and used for clinical care must be "patient safe."  Steward's culture is one of high reliability and zero tolerance for patient harm.  Anything less presents an unacceptable risk to the diagnosis, treatment, and safety of those under Steward's care.

**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 and leaves Steward to its proof.

31.    Before the Rain Event, Norwood Hospital was a 215-bed acute care facility that provided services in the following departments: emergency, surgery, intensive care, pediatrics, obstetrics, and in-patient and out-patient psychiatry.  The Hospital's reach was broad and extended throughout an area of over 450,000 residents.  The Hospital was also a major contributor to the economic life of the Town of Norwood and surrounding areas.  Indeed, it was a top employer with over 1,300 employees.

**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and leaves Steward to its proof.

32.    The Hospital is sited on a parcel of approximately 10.58 acres with a total floor area of approximately 399,833 square feet.  The Hospital campus is comprised of 6 main buildings, each of which supports clinical and non-clinical functions: Linden, Youngdahl, Draper, Emergency

13

Department, Lorusso, and the Power Plant. The Hospital campus is also outfitted with a suite of interconnected mechanical, electrical and plumbing ("MEP") systems; heating, ventilation and air conditioning ("HVAC") systems; medical gas (oxygen, nitrous oxide, nitrogen, and medical air) systems; and life safety systems, including fire alarm/sprinkler, mass notification and nurse call elements.

> **ANSWER:**    Admitted, except AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 regarding all six buildings supporting clinical and non-clinical functions and leaves Steward to its proof.

33.    Before the Rain Event, the Hospital was a fully compliant and licensed Hospital that was in good condition and met all regulatory requirements, passing all inspections and surveys year over year.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 and leaves Steward to its proof.

### C.    The Rain Event

34.    On June 28, 2020, approximately 5.75 inches of rain fell within 90 minutes in the Norwood area causing the entire Hospital site, and all buildings except Linden and the Power Plant, to sustain water intrusion from multiple points. Approximately 369,341 of the 399,833 total square feet of space was damaged.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and leaves Steward to its proof.

35.    The below graphic illustrates water intrusion at the Hospital as a result of the Rain Event, with the blue arrows depicting the flow of water from rain above and swept by wind on all

four sides, from surface flooding on all four sides and in the basement, and from groundwater below.



**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 and leaves Steward to its proof.

### 1.    Flooding of the Basement and Ground Floors

36.    As the graphic depicts, the loading dock of the Lorusso Building flooded, causing water to permeate and fill the entire 30,000 square foot basement with over 5 feet of water.  18 to 24 inches of flood water also filled the basement of the Draper Building.  Critical hospital infrastructure and equipment was housed in the basement level of both buildings and catastrophically damaged beyond repair.

**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 and leaves Steward to its proof.

37.    Flood water also entered the Lorusso and Draper Buildings through entry points at the ground levels and undermined the administrative and clinical laboratory sections of the Draper Building.  Significant flood water further entered the Emergency Department.  In total, most of the

15

120,000 square footage of the ground floor of the entire campus was inundated with 3 to 6 inches of water.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 and leaves Steward to its proof.

### 2.    Storm Water Damage on Upper Floors

38.    Simultaneously, the parapet roof and second-floor courtyard of the Lorusso Building were battered by wind-driven rain, which then cascaded through all floors of the building and caused damage to the Intensive Care Unit, Post-Anesthesia Recovery Unit, Diagnostic Imaging, Emergency Department, and the highly specialized Operating Theaters. Storm water also entered portions of the Draper Building through areas of the lower roof and the roof of the connector building between the Draper and Lorusso Buildings, overcoming the envelope-flashing systems in select locations. The storm water also poured through gaps and sealant joints, significantly damaging architectural finishes, electrical and HVAC systems as well as the Day Surgery and support areas of the Draper Building.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and leaves Steward to its proof.

39.    Throughout the Hospital, storm water seeped through walls and ceilings, damaging a significant amount of electrical, fire alarm, and other MEP equipment as the water worked its way down.

> **ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and leaves Steward to its proof.

### D.    Hospital Operations Cease and Steward/MPT Immediately Begin to Assess and Investigate the Damage

40.     At the time of the Rain Event, the Hospital was fully operational with 160 patients, including 74 medical-surgical, 6 intensive care, 52 behavioral health and 28 emergency department patients.  The Hospital immediately activated its emergency management protocol, and a Hospital Incident Command Center was established.  Temporary power was established with the use of portable generators to assist in the immediate mitigation efforts, such as water removal and dehumidification.  Aided by the Town of Norwood and surrounding community emergency services, all 160 patients were safely evacuated from the Hospital.

**ANSWER:**     AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and leaves Steward to its proof.

41.     Within twenty-four hours, Steward notified AGLIC of the Loss under its Policy, and MPT notified Zurich of the Loss under its Policy.  The Defendants acknowledged the Loss on June 30, 2020 and assigned separate claim numbers to Steward and MPT.  Zurich subsequently identified Sedgwick as its adjuster for both claims.

**ANSWER:**     Admitted, except denied that Zurich identified Sedgwick as its or the adjuster for both claims.

42.     On June 30, 2020, because of the Rain Event, the Town of Norwood issued a Cease-and-Desist Order barring all operations on the Hospital campus pending the issuance of new building, electrical, plumbing and gas permits.  That Order remains in effect.

**ANSWER:**     Admitted and refers to the Cease-and-Desist Order which speaks for itself.

43.     On July 7, 2020, the Massachusetts Commissioner of Insurance issued Bulletin 2020-22, which provided guidance to insurers responding to claims arising from the Loss, particularly in light of the pandemic.  "Because COVID-19 may impose unique risks to our insurance market that Massachusetts has not faced for at least a generation," the Bulletin

17

emphasized the "important[ce]" of insurers, including the Defendants, responding "appropriately" to the Loss through "prompt[] investigat[ion of] all claims" and "investigation of the causation of loss."

**ANSWER:**    Admitted that the Massachusetts Commissioner of Insurance issued Bulletin 2020-22, which speaks for itself, and that the quoted portions appear in that Bulletin.

44.    Following the Loss, Steward took the lead in interfacing with the Defendants as to both its and MPT's claims.  Thus, once Sedgwick initiated the adjustment process, Steward, on its behalf as well as that of MPT, established a governance structure and meeting cadence to ensure regular and consistent collaboration among all parties involved.  From the outset, Steward insisted that the magnitude of the Loss required an "all hands" on-site approach and, in conjunction with Sedgwick, established a team with a rolling eight-week look-ahead schedule.

**ANSWER:**    Admitted that Steward sought to take the lead as to both its and MPT's claim, and denied as to the remaining allegations in paragraph 44 of the Complaint.

45.    In an ongoing effort to restore operations at the Hospital as soon as is safely possible, Steward and MPT engaged a team of highly qualified building specialists with expertise in, among other things, hospital design, environmental health and safety, and building and accessibility codes.  These specialists were hired to properly assess and document the damage caused by the Rain Event and include (with a description of their respective areas of expertise), among others:

- Array Architects, Inc.: architectural planning and design; health care specialists

- Code Red Consultants: life safety, building and accessibility code consultants

18

- Continental Machinery: loss assessment mechanical, electrical and plumbing consultants

- BR+A Consulting Engineers: MEP and fire protection engineers

- EH&E: environmental health engineers

- Gale Associates, Inc.: building envelope consultants

- North S.Tarr Concrete Consulting, PC: flooring consultants

- Thyssenkrupp Elevator: elevator consultants

- L.A. Fuess Partners: structural engineers

- Green Seal Environmental, Inc.: civil engineers

- GE: diagnostic and equipment vendor

- Phillips: diagnostic and equipment vendor

- Hologic: diagnostic and equipment vendor

- Seimens: diagnostic and equipment vendor

- Konica: diagnostic and equipment vendor

- Drager, Inc.: medical equipment vendor

- BeaconMedaes USA: medical gas systems vendor

**ANSWER:**    AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and leaves Steward to its proof.

46.    Steward and MPT also engaged National Fire Adjustment Co., Inc. ("NFA") and Marsh Forensic Accounting and Claims Services ("Marsh") to provide guidance throughout the insurance claims process; assist in determining the status of all building components, equipment

19

and supplies; compile all Loss-related financial costs; track the process; and present claims to the Defendants.

**ANSWER:**     AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 and leaves Steward to its proof.

47.     The assessments of all these professionals reveal that the damage sustained at the Hospital campus is devastating.  Based on all available data, MPT and Steward have therefore concluded that the best way to restore health care operations at the Hospital is to remove the existing buildings and develop a new complex.

**ANSWER:**     Admitted that Steward and MPT seek to remove the existing buildings and develop a new complex in its place. AGLIC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 and leaves Steward to its proof.

### E.     The Defendants' Adjustment of the Claims

48.     In its first coverage position letter to Steward, the Defendants stated that an "initial review" of the Loss showed that the property damage to both the basement and ground levels of the Hospital, as well as any time element losses, resulted from "Flood."  The Defendants also indicated that:

> [a]ny water damage sustained on the first, second and third floors appears to have resulted from water intrusion caused by wind driven rain and/or overflow or roof drains and parapet flashings. AGLIC plans to separate the flood damage sustained on the basement and ground floors, including all time element losses, from the water intrusion property damage sustained on the first, second and third floors.[4]

---

[4] Around the same time, Zurich sent its first coverage position letter to MPT with an identical statement regarding Zurich's "plan[]" to separate flood damage on basement and ground floors from water intrusion property damage on the first, second and third floors.

**ANSWER:**     Denied except to admit that Mark Graves sent a letter on August 20, 2020, while the investigation was ongoing, containing the quoted language. The letter speaks for itself.

49.     The Defendants soon began to outwardly display their bad faith handling of the claims.  During an initial visit to the Hospital after the Rain Event, for example, one of Zurich's representatives commented that "it looks like a dry out and paint job."

**ANSWER:**     Denied.

50.     In complete ignorance of Steward and MPT's retention of all the above-listed professionals as well as their collective and steadfast commitment to understanding the extent of the damage and paths forward, the charade continued when the Defendants suggested early on that Steward, MPT, and NFA were not cooperating in the investigation and assessment of the Loss in several ways.  The Defendants also accused Steward of improperly trying to seek coverage under the MPT Policy.

**ANSWER:**     Denied.

51.     Although these unfounded allegations did not warrant a response, Steward and MPT nevertheless explained their working relationship, synergy of interest and process for approaching the Loss.  Steward and MPT also outlined the many ways in which they, through NFA, were regularly communicating with the Defendants to mutually assess and understand the extent of the damage.

**ANSWER:**     Denied.

52.     On October 29, 2020, MPT, Steward, Zurich, and the Massachusetts Commissioner of Insurance met to discuss next steps regarding the Loss.  At this meeting, all parties expressed an eagerness to move the claims process forward collaboratively and swiftly, including by setting an

initial schedule.  The parties specifically agreed that Steward and MPT would each submit a preliminary claim in early December 2020, after which they would have further substantive discussions.  Zurich indicated that it would be prepared to present an initial assessment of the preliminary submissions at a meeting set for mid-December.

> **ANSWER:**    Admitted that on October 29, 2020, MPT, Steward, Zurich, and the Massachusetts Commissioner of Insurance met to discuss next steps regarding the Loss; all parties expressed a willingness to work collaboratively to move the claims process forward; and that Zurich would be prepared to have a preliminary discussion in December 2020; otherwise denied.

53.     As agreed, on December 4, 2020, Steward and MPT separately filed preliminary claims with the Defendants based on the information then available.  Both preliminary claims provided exhaustive details of the Loss, remedial measures taken, professional consultants engaged to date, and damage estimates (by category), all of which were amply supported by reports, Basis of Design documents, data, and other accompanying evidence supplied to the Defendants via a secure SharePoint link.  In accordance with Zurich's earlier statements, the preliminary claims segregated damages between Flood and "storm," *i.e.*, water intrusion on floors other than the basement and ground floor.  The preliminary claims also explained the importance of accurately allocating coverage between the Policies.

> **ANSWER:**    Denied, except to admit that Steward and MPT presented certain claim information on December 4, 2020.

54.     Steward's preliminary claim calculated extensive business interruption (time element) damages and explained that the business personal property aspect of the overall Loss was "critical" and included damage to IT components and highly sensitive equipment servicing the

Emergency Department, Diagnostic Imaging and Cardiac Catherization Lab. Steward's preliminary claim detailed that all surgical and medical supplies are deemed a total loss and must be replaced.

> **ANSWER:**    Admitted that the Steward December 4, 2020 submission asserted time element loss and damage to certain equipment and supplies, and refers to the submission which speaks for itself.

55.    Steward's preliminary claim also included the results of an Economic Impact Assessment compiled by Stantec, an economic analysis expert, that details the impact of the Loss. This Economic Impact Assessment revealed that the Hospital closure and delayed rebuild and reopening had, and continues to have, a significant impact on the economy of the Town of Norwood and the surrounding communities. Stantec specifically found that the closure of the Hospital has had a negative economic impact of approximately $4.2 million a month, not including the 787 jobs lost and numerous less quantifiable benefits and negative health impacts.

> **ANSWER:**    Admitted that the Steward December 4, 2020 submission included certain information from Stantec, and refers to the submission which speaks for itself.

56.    MPT's preliminary claim outlined the extensive damage, supported by expert reports, to Hospital structures, infrastructure, and building systems. In addition, the MPT preliminary claim recommended actions to restore the Hospital to its pre-Loss condition, including Consigli's "as was" and "code required" scope estimates.

> **ANSWER:**    This allegation solely concerns the claim by MPT under a policy of insurance issued by Zurich to which no response is required by AGLIC.

57.    Also on December 4, 2020, BR+A, MPT's consultant responsible for assessing damage to MEP systems, submitted a report explaining that certain electrical equipment is deemed

23

immediately compromised when it is wetted or exposed to moisture and cannot safely be reconditioned for future use; it must instead be replaced. BR+A explained that initial successful testing of equipment and cables that has been subjected to moisture will not be an indicator of whether they will function properly in the long term.

**ANSWER:**  Admitted that BR+A submitted a report expressing that opinion, denied that the opinion is accurate, and refers to the report which speaks for itself.

58.     Following their preliminary claim submissions, Steward and MPT were eager to work with the Defendants to resolve any questions or concerns. At the scheduled mid-December meeting, however, when Steward and MPT attempted to engage Zurich in a dialogue regarding its reactions to and progress on the preliminary claims as initially agreed, Zurich said it had nothing to share, was only present to "listen," and would respond at a later date.

**ANSWER:**  Denied.

59.     On December 23, 2020, Zurich responded to MPT by making a partial payment that effectively denied about 88% of the amounts MPT had claimed. Zurich opined that the Hospital can be reconstructed to its pre-Loss condition for only $32,008,340, based on a "construction conceptual schedule" dated prior to MPT's preliminary claim.

**ANSWER:**  This allegation solely concerns the claim by MPT under a policy of insurance issued by Zurich to which no response is required by AGLIC.

60.     Zurich also reversed its prior position concerning the separate causes of damage on the basement and ground floors (Flood) and upper floors (storm) and stated that it would pay MPT no increased cost of construction amounts until such costs were actually incurred.

**ANSWER:**  Denied.

24

61.     On January 11, 2021, the Defendants responded to Steward's preliminary claim, accusing it of lacking diligence and being uncooperative in the adjustment process. As with MPT, the Defendants made the same contradictory statement that all the damages incurred by Steward because of the Rain Event are subject to the "Flood" sublimit within the Steward Policy. The Defendants further alleged that Steward's claimed time element loss is "incomplete" and yet "appear[s] based on a scope of repair beyond that which is needed to restore the" damage. This position ignores key undisputed facts: that Steward has engaged building specialists who are the leading industry experts in hospital design, environmental health and safety, and building and accessibility codes, many of which prepared assessments based on their own visual inspections of the Loss as well as ongoing testing at the Hospital. Tellingly, the Defendants cited *zero* evidence in support of its supposition that the Hospital can be repaired sooner.

**ANSWER:**     Admitted that a letter was sent on January 11, 2021 responding to Steward's preliminary submission, the contents of which speak for itself. Denied as to the remaining allegations in paragraph 61 of the Complaint.

62.     The Defendants also alleged that Steward had failed to take proper steps to mitigate claimed losses by not, among other things, preserving surgical and medical supplies used to treat patients. The Defendants contend that Steward should have returned medical supplies for credit or allocated them to other Steward network hospitals. Zurich's position is reckless, divorced from science and cannot be advanced in good faith in the context of a medical setting. Indeed, unlike office supplies or warehouse equipment with which the Defendants may be more familiar, Steward cannot simply dry out, clean and place *medical* supplies back into circulation. Steward cannot and will not place patient health and safety at risk by utilizing surgical and medical supplies which have been compromised, even at the Defendants' insistence.

25

**ANSWER:**    Admitted that a letter was sent on January 11, 2021 responding to Steward's preliminary submission, the contents of which speak for itself. Denied as to the remaining allegations in paragraph 62 of the Complaint.

63.    On February 5, 2021, because Steward and MPT's substantial albeit informal efforts failed to advance the adjustment process, and it was clear that the Defendants were refusing to appreciate the gravity of the Loss, Steward and MPT each filed a separate "Sworn Statement in Proof of Loss – Interim" ("Interim Proof(s) of Loss").

**ANSWER:**    Denied, except admitted that Steward and MPT submitted separate documents styled as "Sworn Statement in Proof of Loss – Interim" on February 5, 2021.

64.    The Interim Proofs of Loss expressed Steward and MPT's concerns with the Defendants' lack of progress and outlined the numerous problems with their adjustment of the claims to date.  The Interim Proofs of Loss also notified the Defendants that, because of their unfair and deceptive actions in administering the claims, Steward and MPT intended to pursue recovery under G.L. c. 93A.

**ANSWER:**    Denied and refers to the Interim Proofs of Loss, which speak for themselves.

65.    On March 5, 2021, Zurich responded to MPT's Interim Proof of Loss purporting to "reject" it on the basis that "until MPT repairs the building, Zurich owes actual cash value for covered damage, not replacement cost," though Zurich cited no Policy language in support of that statement.  Zurich also "rejected" MPT's Interim Proof of Loss because it allegedly includes loss related to replacement of property that Zurich does not agree was damaged.  The rest of Zurich's coverage positions as to MPT were essentially unchanged from December 23, 2020.

**ANSWER:**    This allegation solely concerns the claim by MPT under a policy of insurance issued by Zurich to which no response is required by AGLIC.

26

66.     Also on March 5, 2021, the Defendants responded to Steward's Interim Proof of Loss purporting to "reject" it because "it does not comport with the coverage and provisions of the Policy," though the Defendants (again) cited no actual Policy language that Steward allegedly violated.  The Defendants also accused Steward of, among other things, attempting to seek coverage for elements covered under the MPT Policy; engaging in "non-productive testing" and other activities that were not necessary to "'understand the Loss;'" and failing to mitigate damage to certain business personal property.  The Defendants' actual coverage positions as to Steward were largely unchanged from January 11, 2021.

**ANSWER:**     Admitted that AGLIC responded to the Interim Proof of Loss on March 5, 2021, that it contains the quoted language, and refers to that letter, which speaks for itself. Denied to the extent this paragraph alleges that there is no additional new information in AGLIC's March 5, 2021 letter, and further refers to the letters of March 5, 2021 and January 11, 2021 which speak for themselves.

67.     In the ensuing months, the parties have continued to engage in discussions and exchange correspondence concerning Steward's and MPT's claims and the Defendants' adjustment thereof.  For its part, Steward has provided the Defendants with extensive supporting documentation and data in support of its claim on a rolling basis, oftentimes providing the same information multiple times at the Defendants' request.

**ANSWER:**     Admitted, except denied that Steward has provided extensive supporting documentation and data in support of its claim on a rolling basis, oftentimes providing the same information multiple times at AGLIC's request.

68.     Unfortunately, in response, the Defendants have exemplified their bad-faith handling of Steward's claim by, among other things:

27

- Continuing to maintain, despite their August 2020 statement to the contrary, that the entirety of the Loss is covered only under the "Flood" provision of the Steward Policy and therefore subject to the "Flood" sublimit within that Policy;

- Failing to tender to Steward the entirety of the "Flood" sublimit when Steward has supplied ample documentation to the Defendants that the Loss clearly exceeds that amount;

- Repeatedly requesting (themselves and through their consultants) the same supporting categories of information from Steward on multiple occasions, without any statement that the information previously provided by Steward was somehow insufficient;

- Suggesting, on multiple occasions, that Steward has failed to cooperate in the investigation of the Loss and adjustment process, without any adequate basis for doing so; and

- Taking over 7 weeks to finalize a 3-page Nondisclosure Agreement drafted by Steward to govern its production of confidential third-party vendor information, which delayed Steward's ability to provide that information to the Defendants.

**ANSWER:**    Denied.

69.    Just as Steward and MPT are partners in their ownership of the Hospital so too do they share in the Loss. As a practical matter, Steward cannot actually repair, rebuild, and/or replace that portion of the Hospital damage covered under the Steward Policy (*i.e.*, business personal property, time element and medical equipment losses) until MPT begins the process of repairing, rebuilding, and/or replacing the structure and building systems of the Hospital, which are covered by the MPT Policy. Accordingly, Zurich's mismanagement of MPT's claim has hindered Steward's ability to progress its own claim. Examples of Zurich's bad faith as to MPT, which has necessarily harmed Steward's interests in restoring Hospital operations as soon as is reasonably and safely practicable, include, without limitation:

- Paying MPT only $36,093,766.95 to date despite MPT's submission of well-supported evidence that the cost to restore the Hospital to its "as was" pre-June 28, 2020 condition and functionality alone exceeds $180,000,000 (not including the

28

additional estimate of approximately $83,000,000 to meet various code and other requirements); and

- Otherwise needlessly delaying the adjustment of MPT's claim in a manner that has led to increased costs for Steward and extended the schedule for getting the Hospital back online.

**ANSWER:**    Denied.

70.    Zurich is fully aware that Steward desperately needs to get Norwood Hospital back up and running both for its own needs and the needs of the community it serves. Steward has repeatedly and forcefully communicated to Zurich and AGLIC from the outset both orally and in writing that time is of the essence. In response, however, Zurich has attempted in bad faith and with actual malice to leverage the fact that MPT owns the building and real estate and that as Steward's landlord, it is the resolution of MPT's claim which is driving Steward's ability to get back up and running. By improperly delaying and contesting MPT's claims in bad faith, Zurich has acted in bad faith to try and coerce both Steward and MPT to resolve their claims for less than their actual worth. In so doing, Zurich has demonstrated its ill will and actual malice.

**ANSWER:**    Denied.

71.    Defendants' claim that their adjustment of Steward's claim is ongoing. With each passing day in this limbo, however, the Hospital continues to be closed and thus unable to provide critical services to the patients and communities it is supposed to serve and that desperately require its services during this pandemic.

**ANSWER:**    Denied to the extent this paragraph alleges that the Hospital's closure is due to Defendants.

**F.    Defendants Unilaterally Cut Off Steward's $10 Million Per Quarter Business Interruption Payments Without Basis, in Bad Faith and Without Discussion or Explanation Despite Steward's Request for An Explanation**

29

72.    Early in the adjustment process, MPT submitted to Zurich an initial estimate of its loss, together with a preliminary estimate of the schedule for rebuilding, repairing and restoring the hospital to its pre-loss condition.  That preliminary schedule conservatively estimated a reopening date of approximately June 2023.

**ANSWER:**    Admitted that MPT submitted to Zurich documents that MPT characterized as an estimate of loss and schedule, both of which speak for themselves. Denied as to the remaining allegations in paragraph 72 of the Complaint.

73.    On December 23, 2020, Zurich sent a letter to MPT prematurely objecting to its initial estimate of the loss and supplying MPT with a proposal from Shawmut Design and Construction, indicating that the Hospital could be reopened in as-was condition in May 2022.  A copy of this letter is attached hereto as **Exhibit C**.  The Shawmut proposal was on its face incomplete, and Zurich knew it to be incomplete.

**ANSWER:**    Admitted that a letter was sent on December 23, 2020 from Zurich to MPT containing a report and repair schedule prepared by Shawmut Design and Construction, and refers to that letter and report, both of which speak for themselves. Denied as to the remaining allegations in paragraph 73 of the Complaint.

74.    On January 11, 2021, Zurich wrote a letter to Steward, referring to its prior letter to MPT and stating, in relevant part, the following:

Although the claim support and detail is incomplete, Steward's Time Element claim, which runs through June of 2023, appears based on a scope of repair beyond that which is needed to restore the flood damage from the June 28, 2020 event. The owner of the buildings that house Steward's Norwood Hospital operation – [MPT] – is insured under a separate policy issued by Zurich . . . . [Zurich], by letter dated December 23, 2020, identified to its insured MPT several concerns with the scope of repair claimed as to the buildings and equipment, the lack of due diligence in testing and evaluating damage, and the failure of MPT to begin certain needed repairs or replacement of building components and equipment, even where

there is agreement that repair or replacement is needed. Those concerns are relevant here as well to the calculation of Steward's Time Element loss for reasons stated above.

A copy of this letter is attached hereto as **Exhibit D**.

> **ANSWER:**    Admitted that a letter was sent on January 11, 2021 from AGLIC to Steward, that it contains the language quoted in Paragraph 74, and refers to that letter, which speaks for itself. Denied as to the remaining allegations in paragraph 74 of the Complaint.

75.    The parties' competing proposed reopening dates for an as-was rebuild were discussed in detail during various adjustment meetings and presentations at which representatives of Steward, MPT, AGLIC and Zurich were all present.  All parties understood and agreed that the proposed reopening dates provided were, at best, preliminary and subject to change as facts became known.

> **ANSWER:**    Admitted that Steward, MPT, AGLIC and Zurich held adjustment meetings and presentations that included the period of time necessary to repair and restore Norwood Hospital. Denied as to the remaining allegations in paragraph 75 of the Complaint.

76.    For example, the report from Shawmut Design and Construction relied on by AGLIC and Zurich was full of irrational assumptions that make a May 2022 as-was reopening date entirely impossible.  Some examples include, without limitation, the following:  (a) the scope and time allotted for the replacement of major electrical and mechanical equipment destroyed by the event is inadequate; (b) the schedule does not allot any time for Massachusetts Department of Public Health regulatory requirements for the Determination of Need, Plan Review, or Survey and Licensure and Accreditation; (c) engineering and design durations are unrealistic, and no time is allotted for the engineering review and approval of major equipment; (d) lead times for the procurement of major mechanical and electrical equipment destroyed by the event do not reflect supply chain realities; (e) the sequencing of construction trades does not account for getting the

building water-tight, or for the establishment of proper heat and humidity controls prior to installation of finishes; (f) the time allotted for closeout and commissioning is inadequate to meet hospital operational standards and the requirements for regulatory approvals; and (g) no time is allotted to comply with new code requirements.

>     **ANSWER:**     Denied.

77.     For Steward, the difference in the ending date for the Period of Liability is significant.

>     **ANSWER:**     AGLIC lacks knowledge or information sufficient to form a belief as to the
>     truth of the allegations in paragraph 77 and leaves Steward to its proof.

78.     For approximately two years, AGLIC made quarterly payments to Steward toward its business interruption claim without the full Period of Liability ever being agreed upon by the parties.  However, Steward had still not received its quarterly payment for the second quarter of 2022 by the end of November 2022.  Accordingly, counsel for Steward wrote to counsel for AGLIC to demand that the overdue payment be made.  A copy of this letter is attached hereto as **Exhibit E**.

>     **ANSWER:**     Admitted as to quarterly payments, denied that AGLIC's quarterly business
>     interruption payment to Steward for the second quarter of 2022 was overdue, and to the
>     extent Steward seeks to characterize the Policy concerning "agreed upon by the parties"
>     regarding the Period of Liability, the Policy speaks for itself.

79.     AGLIC and Zurich responded by letter dated December 23, 2022, indicating that the second quarter 2022 payment would be processed that week.  But the letter then went on to state the following:

AGLIC determined the Period of Liability for Steward's claimed business income loss – including when Norwood Hospital could have been repaired with due diligence and dispatch and made ready for operations under the same conditions that existed prior to the Flood ends July 15, 2022.

Accordingly, the payment to Steward to be processed this week will encompass AGLIC's calculation of Steward's actual business interruption loss Steward sustained through the end of the Period of Liability, namely July 15, 2022.

A copy of this letter is attached hereto as **Exhibit F.**

> **ANSWER:**    Admitted that a letter was sent on December 23, 2022 from AGLIC to Steward regarding Steward's second quarter 2022 business interruption payment and the Period of Liability containing the quoted wording, and refers to that letter in its entirety, the contents of which speak for itself. Denied as to the remaining allegations in paragraph 79 of the Complaint.

80.    This pronouncement that AGLIC and Zurich were unilaterally cutting off the Period of Liability for Steward's business interruption loss without explanation or discussion followed a lengthy period of silence on the issue, and facts which became known which rendered the prior Shawmut timeline irrelevant.  Upon information and belief, AGLIC and Zurich made this decision in bad faith to avoid paying tens of millions of dollars in additional business income loss owed to Steward under the plain terms of the Steward Policy.

> **ANSWER:**    Denied.

81.    Steward demanded that AGLIC and Zurich provide a basis for their decision to cut off the loss period. Steward also repeated and made clear that its prior conservative estimate of an after June 2023 reopening will likely extend much further into the future.  Neither AGLIC nor Zurich have responded to Steward's criticisms of its proposed May 2022 re-opening date or

otherwise explained why the Period of Liability should not run through at least June 2023 (Steward's preliminary, conservative estimate), and likely much longer.

**ANSWER:**    Admitted that Steward sought an explanation of AGLIC's determination of the Period of Liability, otherwise denied.

## COUNT I
## Declaratory Judgment
### (Against AGLIC)

82.    Steward repeats and incorporates by reference the allegations in the paragraphs above.

**ANSWER:**    AGLIC adopts, incorporates and realleges all preceding paragraphs as if set forth fully herein.

83.    An actual case or controversy exists between Steward and AGLIC with respect to (a) the coverage afforded under the Steward Policy for Steward's losses resulting from the Rain Event, (b) the coverage afforded under business interruption (or 'time element') provisions of the Steward Policy, specifically when the Period of Liability ends for purposes of this aspect of Steward's loss, and (c) AGLIC's performance of its obligations under the Policy.

**ANSWER:**    Admitted.

84.    This controversy has caused and continues to cause substantial actual monetary loss to Steward, and declaratory relief is appropriate to resolve the controversy.

**ANSWER:**    Admitted that declaratory relief is appropriate and denied as to the remainder of the allegations in paragraph 84.

85.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, Steward is entitled to a declaration of the nature and extent of its rights and AGLIC's obligations under the Steward Policy with respect to Steward's losses resulting from the Rain Event, including

34

without limitation that (a) the Period of Liability does not conclude on July 15, 2022, and extends many additional months into the future until an end date that Steward will prove at trial, and (b) the unilateral decision of AGLIC and Zurich to cut off the Period of Liability for Steward's business interruption loss without explanation or discussion was made in bad faith to avoid paying tens of millions of dollars in additional business income loss owed to Steward under the plain terms of the Steward Policy, and a finding that AGLIC presently stands in breach of those obligations, together with a determination of the nature, manner, extent, and impact of such breaches.

**ANSWER:**    Denied.

### COUNT II
### <u>Breach of Contract</u>
### (Against AGLIC)

86.    Steward repeats and incorporates by reference the allegations in the paragraphs above.

**ANSWER:**    AGLIC adopts, incorporates and realleges all preceding paragraphs as if set forth fully herein.

87.    The Steward Policy constitutes an express all-risk contract for insurance with AGLIC.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

88.    Steward has satisfied all conditions necessary to invoke AGLIC's obligations to Steward under the Steward Policy.

**ANSWER:**    Denied.

89.    Damage to the Hospital was caused by more than one Covered Cause of Loss under the Steward Policy.  Some of that damage was caused by Flood as defined in the Steward Policy,

35

and other damage was caused by water intrusion not included within the definition of "Flood" and not otherwise excluded from coverage under the Policy.

**ANSWER:**   Denied.

90.     AGLIC has breached the Steward Policy by (a) failing to pay Steward for all its Covered Causes of Loss thereunder, including, without limitation, losses covered under the Steward Policy's main Insuring Agreement, § 1.01, and the Described Cause of Loss for Flood, § 5.03.03, and (b) unilaterally cutting off the Period of Liability for Steward's business interruption loss without explanation or discussion following two years of silence on the issue in bad faith to avoid paying tens of millions of dollars in additional business income loss owed to Steward under the plain terms of the Steward Policy.

**ANSWER:**   Denied.

91.     As a result of these and the other breaches of contract outlined herein, Steward has been damaged in an amount to be determined at trial.

**ANSWER:**   Denied.

**COUNT III**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against AGLIC)**

92.     Steward repeats and incorporates by reference the allegations in the paragraphs above.

**ANSWER:**   AGLIC adopts, incorporates and realleges all preceding paragraphs as if set forth fully herein.

93.     There is a covenant of good faith and fair dealing implied in every contract.

**ANSWER:**   Paragraph 93 states a legal conclusion to which no response is required.

36

94.    The implied covenant of good faith and fair dealing requires each party to a contract to refrain from conduct which prevents the other party from receiving the fruits of the bargain.

**ANSWER:**    Paragraph 94 states a legal conclusion to which no response is required.

95.    The Steward Policy constitutes an express all-risk contract for insurance with AGLIC.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

96.    By failing to adjust Steward's insurance claim in good faith in the above-described ways and by unilaterally cutting off the Period of Liability for Steward's business interruption loss without explanation or discussion following two years of silence on the issue in bad faith to avoid paying tens of millions of dollars in additional business income loss owed to Steward under the plain terms of the Steward Policy, AGLIC has prevented Steward from reaping the benefits of the contract and breached the implied covenant of good faith and fair dealing.

**ANSWER:**    Denied.

97.    AGLIC's conduct was in bad faith or, at a minimum, was conducted with a lack of good faith.

**ANSWER:**    Denied.

98.    As a result of AGLIC's breaches of the implied covenant of good faith and fair dealing, Steward has been damaged in an amount to be determined at trial.

**ANSWER:**    Denied.

### COUNT IV
### Tortious Interference with Contractual Relations
### (Against Zurich)

99.    Steward repeats and incorporates by reference the allegations in the paragraphs above.

**ANSWER:**    AGLIC adopts, incorporates and realleges all preceding paragraphs as if set forth fully herein.

100.    The Steward Policy constitutes an express all-risk contract for insurance with AGLIC, of which Zurich is aware.

**ANSWER:**    Admitted and refers to the Policy which speaks for itself.

101.    By and through the acts and omissions set forth above, Zurich has knowingly and intentionally interfered with the Steward Policy, inducing AGLIC to breach that Policy.

**ANSWER:**    This Count is directed solely at Zurich and no response is required by AGLIC. To the extent a response is required to this paragraph, denied.

102.    Zurich's tortious interference has been undertaken with improper motive and/or through improper means.

**ANSWER:**    This Count is directed solely at Zurich and no response is required by AGLIC. To the extent a response is required to this paragraph, denied.

103.    By and through the acts and omissions set forth above, Zurich has acted intentionally, unlawfully, with actual malice and without legal justification and/or privilege, so as to interfere with the Steward Policy.

**ANSWER:**    This Count is directed solely at Zurich and no response is required by AGLIC. To the extent a response is required to this paragraph, denied.

104.    As a result of Zurich's tortious interference, Steward has been damaged in an amount to be determined at trial.

**ANSWER:**    This Count is directed solely at Zurich and no response is required by AGLIC. To the extent a response is required to this paragraph, denied.

**COUNT V**

38

**<u>Violation of G.L. c. 93A, § 11</u>**
**(Against AGLIC and Zurich)**

105.    Steward repeats and incorporates by reference the allegations in the paragraphs above.

**<u>ANSWER:</u>**    AGLIC adopts, incorporates and realleges all preceding paragraphs as if set forth fully herein.

106.    At all times relevant hereto, Steward was engaged in the conduct of trade or commerce within the Commonwealth.

**<u>ANSWER:</u>**    Admitted.

107.    At all times relevant hereto, AGLIC was engaged in the conduct of trade or commerce within the Commonwealth.

**<u>ANSWER:</u>**    Admitted.

108.    At all times relevant hereto, Zurich was engaged in the conduct of trade or commerce within the Commonwealth.

**<u>ANSWER:</u>**    Admitted.

109.    At all times relevant hereto, Steward and AGLIC were parties to the Steward Policy which covers the Hospital.

**<u>ANSWER:</u>**    Admitted.

110.    Through the Steward Policy, AGLIC created the reasonable expectation in Steward that AGLIC would provide coverage as outlined therein.

**<u>ANSWER:</u>**    Paragraph 110 states a legal conclusion to which no response is required. To the extent a response is required, AGLIC denies that Steward held reasonable expectations of coverage other than what is expressly specified by the Policy.

39

111.    At all relevant times hereto, Zurich participated substantially in, if not directed, AGLIC's adjustment of Steward's claim under the Steward Policy.

**ANSWER:**    Denied.

112.    The Defendants' unfair or deceptive acts or practices in the conduct of trade or commerce include, without limitation:

- Misrepresenting pertinent facts or provisions of the Steward Policy related to the coverages at issue;

- Failing to adopt and implement reasonable standards for the prompt investigation of Steward's insurance claim under the Steward Policy (and, in so doing, flouting Bulletin 2020-22);

- Refusing to pay all of Steward's covered losses, which Steward has demonstrated to be reasonable and necessary to restore Hospital operations, without conducting a reasonable investigation based upon all available information;

- Delaying the investigation and payment of Steward's claim by requiring Steward to submit (or resubmit) information that is not necessary to the adjustment of the claim or that has already been provided to the Defendants;

- Providing shifting and inconsistent explanations for its failure to pay all of Steward's losses;

- Refusing to tender to Steward the full "Flood" sublimit under the Steward Policy, which amount (at the very least) is clearly due and owing to Steward based on ample support provided to the Defendants;

- Failing to respond to reasonable requests for information substantiating the Defendants' coverage positions; and

- Doing (or failing to do) all of the above with respect to MPT and its claim and Policy with Zurich, which has impaired Steward's progress on its own claim and under its Policy with AGLIC.

- Unilaterally cutting off the Period of Liability for Steward's business interruption loss without explanation or discussion following two years of silence on the issue without a proper basis and in bad faith to avoid paying tens of millions of dollars in additional business income loss owed to Steward under the plain terms of the Steward Policy.

**ANSWER:**    Denied.

113.    The Defendants' actions constitute unfair or deceptive business practices under G.L. c. 93A, § 2 for which the Defendants are liable to Steward under G.L. c. 93A, § 11.

**ANSWER:**    Denied.

114.    The Defendants' actions took place primarily and substantially in Massachusetts.

**ANSWER:**    Denied.

115.    The Defendants' actions were knowing and willful.

**ANSWER:**    Denied.

116.    The Defendants' actions are particularly egregious as they have unnecessarily prolonged the closure of the Hospital, a vital health care facility and community contributor, during a pandemic.

**ANSWER:**    Denied.

117.    Steward has suffered damages due to the Defendants' violations of G.L. c. 93A, §§ 2 and 11 in an amount to be proven at trial. Steward is entitled to recovery of its damages, plus multiple damages and attorney's fees and costs, under G.L. c. 93A, § 11.

**ANSWER:**    Denied.

AGLIC does not respond to Steward's "WHEREFORE" paragraph reciting the relief sought. To the extent a response is required, denied.

## AFFIRMATIVE AND OTHER DEFENSES TO THE CLAIMS

**Defense One – Failure to State a Claim**

1.      Steward's claims are barred because it failed to state a claim upon which relief may be granted.

**Defense Two – Performance**

2.      Steward's claims are barred because AGLIC fully met its obligations under the terms of the Policy.

**Defense Three – Failure of Condition Precedent**

3.      Steward's claims are barred because it did not fulfill conditions precedent to coverage pursuant to the terms of the Policy.

**Defense Four – Lack of Subject Matter Jurisdiction**

4.      This court may lack subject matter jurisdiction because Steward's Complaint fails to identify the legal status and citizenship of its members and sub-members of all levels.

**Defense Five – Failure to Comply with Policy Reference Requirements and Massachusetts General Laws chapter 175 § 99**

5.      Steward's claims may be barred in whole or in part because it has failed to comply with required reference proceedings as set forth in the Policy and in M. G. L. c. 175, § 99.

**Defense Six – Failure to Mitigate**

6.      Steward has failed to properly mitigate its damages.

**Defense Seven – Intentional Concealment and Misrepresentation of Material Facts**

**<u>Introduction</u>**

7. ████████████████████████████████████████████████████

████████████████

8. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

9. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

10. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

11. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

12.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

13.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

14.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

44

15. ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

16. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

17. ████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████

18. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

**The Policy**

19. ████████████████████████████████████████████

████████████████████████████████████████████████

20. ████████████████████████████████████████████

███████████████████████████████████████████████████████

45

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

21.    ████████████████████████████████████

████████████████████████████████████████████████

████████

22.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

23.    ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

24.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

25.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

26.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

46

████████████████████████████████████████████

███████████████████

**Particular Circumstances of Steward's Concealments and Misrepresentations**

27.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

28.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

29.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

30. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

    a. ██████████████████████████████████████

31. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

32. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

33. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

34. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████

35. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

36. 

37.

    **b.**

38.

39.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

40.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

41.    ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

42.    ████████████████████████████████████████

███████████████████████████████████████████████████

█████    ██████████████████████████████████████████

████████████

43.    ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████████████

44.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

45.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

46.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

c.    ████████████████████████████

███████████

47.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

48. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

49. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

50. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

51. ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

52. 

53.

54.

55. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

56. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

57. ████████████████████████    ████████████████████

███████████████████████████████████████████

**Steward's Concealments and Misrepresentations Were Material**

58. ████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

59. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

60. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

61.    In ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████

62.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

63.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

**Conclusion**

64.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

56

65. ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████

66. ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

67. ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████  ████████████████
████████████████████████████████████

68. ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

Dated: March 6, 2026                              Respectfully submitted,

                                                  */s/Ronald S. Safer*

                                                  Ronald S. Safer (pro hac vice)
                                                  Amy C. Andrews (pro hac vice)
                                                  Abigail L. Peluso (pro hac vice)
                                                  Lucas T. Rael (pro hac vice)
                                                  RILEY SAFER HOLMES & CANCILA LLP
                                                  1 South Dearborn Street, Suite 2200
                                                  Chicago, Illinois 60603
                                                  Tel: (312) 471-8700
                                                  Email: rsafer@rshc-law.com
                                                          aandrews@rshc-law.com
                                                          apeluso@rshc-law.com
                                                          lrael@rshc-law.com

                                                  Michael Menapace, Esq. (BBO #568841)
                                                  WIGGIN and DANA LLP
                                                  20 Church Street
                                                  Hartford, CT 06103
                                                  Tel: (860) 297-3733
                                                  Email: mmenapace@wiggin.com

                                                  Jonathan D. Mutch, Esq. (BBO No. 634543)
                                                  Timothy Wenger (BBO No. 674087)
                                                  ROBINS KAPLAN LLP
                                                  800 Boylston Street, 25th Floor
                                                  Boston, MA 02199
                                                  Tel: (617) 267-2300
                                                  Email: JMutch@RobinsKaplan.com
                                                          TWenger@RobinsKaplan.com

                                                  *Attorneys for Defendants American*
                                                  *Guarantee and Liability Insurance Company*
                                                  *and Zurich American Insurance Company*

58

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the March 6, 2026 a copy of the foregoing Amended Answer was filed with the Court via the ECF filing system.  As such, this document will be electronically sent to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/Ronald S. Safer*

# Exhibit A
# to AGLIC Defenses

## Redacted

# Exhibit B
# to AGLIC Defenses

## Redacted

# Exhibit C
# to AGLIC Defenses

## Redacted

# Exhibit D
# to AGLIC Defenses

## Redacted

# Exhibit E
# to AGLIC Defenses

## Redacted

# Exhibit F
# to AGLIC Defenses

## Redacted

# Exhibit G
# to AGLIC Defenses

## Redacted

# Exhibit H
# to AGLIC Defenses

## Redacted

# Exhibit I
# to AGLIC Defenses

## Redacted

# Exhibit J
# to AGLIC Defenses

## Redacted

# Exhibit K
# to AGLIC Defenses

## Redacted

# Exhibit L
# to AGLIC Defenses

## Redacted

# Exhibit M
# to AGLIC Defenses

## Redacted

# Exhibit N
# to AGLIC Defenses

## Redacted

# Exhibit O
# to AGLIC Defenses

## Redacted

# Exhibit P
# to AGLIC Defenses

## Redacted