**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,<br><br>      Plaintiff,<br><br>      v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>      Defendants. | Civ. Action. No. 21-cv-11902-PBS |

**DISCOVERY MASTER ORDER NO. 22:**
**Withholding of Communications with Third-**
**Parties on "Derivative" Privilege and Work Product Grounds**

The Parties have long-standing disputes regarding the withholding from production of a great number of communications with third-parties on the basis of attorney-client privilege, work product protection, and other related privilege grounds. Both Parties object to the opposing side's withholding of communications involving third-parties, and claim that such communications are not in fact privileged nor protected, or that any privilege protection has been waived, and that the communications must be produced. Pursuant to the Court's Order appointing the undersigned as Discovery Master (ECF 149), the Discovery Master rules as follows.

**I.**      **Issues for Resolution**

The Parties have submitted thousands of pages in multiple briefs and extraordinarily voluminous exhibits on the overarching issues of privilege and work product protection for communications involving third-parties. The Discovery Master also requested and received additional factual information regarding the role of these many third-parties for whom communications were withheld, as well as the timing of the communications, the history of the interactions with these multiple third-parties, both before and during the progression of this litigation.

Literally thousands of such communications have not been produced. The unusually late production of Plaintiff's privilege log, when barely weeks were left in the discovery period for the claims in the Complaint, left no time to do a comprehensive *in camera* review. When finally produced, the challenge faced by the Discovery Master is the huge volume of the documents withheld, compounded by the numerous different third-parties, all claimed as essential

"translators," all alleged to be wearing the cloak of derivative attorney client privilege.  There is ample law developed on this area of privilege law, but these are primarily cases where at most the documents withheld were fewer than 20.  In addition to derivative privilege, the logs also claim other bases for withholding communications, including the common interest, and work product doctrines.

The privilege logs are the starting point for the analysis. The Parties each challenge the other's withholding of third-party communications, but the volume of the Defendants' log third-party is a mere 63 documents, and each of them has an attorney involved in the communication. The Plaintiff's privilege log was produced exceptionally late during the discovery period, and withheld 8,772 documents, including a great many with multiple bases claimed to support the non-production.  Many of the descriptors provided in Plaintiff's logs for withheld communications are variations of: "Email requesting/containing information to assist counsel with insurance claim submission" or "Email reflecting legal advice regarding insurance claim submission."

Until the log is produced, the opposing party does not know what documents have been withheld; with whom the communications were made; and what grounds are asserted as the basis for the non-production.  In this case, it is not surprising that Plaintiff has more documents to review, and more third-parties with whom communications were made without any lawyer on the chain, but the volume is extraordinary, particularly when the logs were produced within weeks of the deadline for completion of document discovery.[1]

While the logs provide some information, many of the entry descriptions are rote.  The relevant caselaw in Massachusetts derives from cases in which there were but a handful of withheld documents, with ample time to do an *in camera* review and a reasoned decision.  By contrast, this case presents with multiple thousands of documents withheld, and decisions that must be made as discovery is practically at an end.  Indeed, if not for a recent short extension of discovery granted for unrelated reasons, this ruling would be issued at the very end of the discovery period.

Having reviewed voluminous briefs, the many engagement letters of the retained third-parties, hundreds of pages of Exhibits and privilege log entries, as well as the relevant case law authorities, the Discovery Master summarizes the arguments, facts, and law and makes the following rulings.

A.  <u>Issues Regarding Plaintiff's Withheld Communications</u>

As described in several previous orders issued by the Discovery Master, Plaintiff's document production and privilege log submission have been seriously delayed.  (*See, e.g.*, ECF 197 and 180). In their briefing to the Discovery Master on this issue, Defendants assert that Plaintiff initially represented that the privilege log would be produced in July 2025; and when that did not happen, Plaintiff refused to provide rolling privilege logs. (Defendants' Feb. 4, 2026

---

[1] Discovery has since been extended by the filing of an amended Answer, alleging new defenses, but this additional discovery is limited to the new claims by the defense.

Letter Br. at p. 1). The Plaintiff's privilege log was first produced on January 21, 2026, and then an amended log for the third-party communications at issue here was finally produced on February 12, 2026, nearly at the end of the extended date for completion of discovery.[2]

Decisions must be made based upon the principles established in the rules and caselaw, but without the time to do an *in camera review* of even a standard sampling of this volume of withheld documents containing communications with third-parties.  Of particular concern is the volume of third-party documents where there is no attorney from Plaintiff's law firm on the document.

There is no question that privilege is a vital fundamental aspect of litigation; that the core principle of exchange of information is limited by it; but that its importance to zealous advocacy makes this essential trade-off.  The rules protect privilege, unless it is waived by disclosure to third-parties.  But the issue of "who" is an agent of an attorney (per F.R.C.P. 26(b)(3) and F.R.E. 502); and who meets the criteria for "derivative privilege" is at the heart of the dispute between the Parties.  While this extension of privilege cannot be described in a sentence, or even a paragraph, "derivative" privilege developed to allow counsel to communicate with third-parties who are its "agents" or its essential "translators" of key highly specialized information between attorney and client. Traditionally, the doctrines developed for complex accounting principles that required a "translator" to enable the attorney to understand those accounting principles, and to explain advice based on these principles to his client.

A third-party cannot become cloaked with the "essential translator" status simply upon the say-so of counsel;  rather, the party that bears the burden of proof to withhold a document communicating attorney/client information to third-parties must make a strong showing that this third-party as to whom the privileged is claimed is so vitally essential to "translating" highly complex material, that an attorney cannot adequately advise his client, and the client cannot understand the attorney's advice and make informed decisions, without the "translator's" direct involvement in the communication.

In this case, each Party contends that multiple third-parties acted in this "translator" role. While it is easy to use the moniker "translator" in a facile manner, meeting the burden of proof requires a genuine factual showing that the third-party meets the rigorous level of complexity to attain the status as a necessary "translator" without whom an attorney might not understand the client's need for advice, or the client might not understand the attorney's advice sufficiently to make informed decisions. Only when the status is attained are the third-party communications protected from disclosure on this basis of "translator" for the attorney. The protection of communications with non-testifying expert consultants engaged for litigation assistance of counsel rests upon a similar principle.

---

[2] According to Plaintiff's response to the Discovery Master's questions, Plaintiff served a Second Amended Privilege Log on March 20, 2026.  It still contains thousands of entries and the Discovery Master's analysis is still applicable.

The work product doctrine requires a showing that a third-party claimed to be an "agent" of the attorney, was actually acting upon the direction of counsel to obtain and provide information that counsel sought that "agent" to obtain, in order to properly represent his client.

The "common interest" doctrine is a doctrine that prevents waiver of the attorney-client privilege for communications that would otherwise certainly be privileged, but retain their privileged status even when shared with third-parties, as long as the third-party is shown to share a "common interest." These various grounds of privilege and/or non-waiver of privilege will be further discussed below.

In their February 4, 2026 brief to the Discovery Master, Defendants challenge Plaintiff's privilege log withholdings on the basis of attorney-client privilege, derivative privilege, common interest privilege, and work product protection.  Specifically, Defendants argue that: (1) Plaintiff's log fails to justify the withholding of attorney communications with third-parties on adequate grounds; (2) Plaintiff's log fails to justify withholding thousands of communications with CREF employees; (3) Plaintiff's log fails to justify communications entirely between non-lawyers; (4) Plaintiff's log fails to justify the withholding of communications where attorneys appear to be merely copied; and (5) Plaintiff's log fails to justify withholding communications on the basis of the common interest privilege.  Plaintiff responds that the communications in its privilege log are appropriately withheld on the grounds of one or more of: (1) the "derivative privilege" doctrine; (2) work product protection; and (3) the common-interest doctrine.

The Defendants' brief argues that, due to the exceptionally late production of Plaintiff's privilege log, which led to the impossibility of reviewing thousands of Plaintiff's withheld documents *in camera* so late in the discovery period set in the case schedule, the Discovery Master should order all documents withheld on derivative privilege grounds to be produced, subject to clawback.  The Plaintiff opposes this motion, and instead seeks a ruling on each of the multiple grounds of privilege asserted for these thousands of documents.

The Discovery Master has decided that ordering virtually all documents to be produced, subject to clawback, is too unrefined an analysis; however, the rulings must be made without taking months to review even a sample of hundreds of the 8,772 documents *in camera.* Therefore, the Discovery Master has chosen a middle pathway that rules on these various privilege claims by categories, based on the type of privilege asserted; the actual role of the third-party consultant claimed to be an essential "translator" of attorney-client communications between counsel and client; and modifying the several categories further by those created "in anticipation of litigation", by viewing the time frame of this insurance claim's progression from an insurance claim to a lawsuit; taking into account critical time periods of the lawsuit when a hybrid third-party consultant went from "doing actual work of flood damage assessment and remediation" to becoming a "non-testifying litigation consultant."

On April 13, 2026, after multiple briefs and thousands of pages of exhibits were reviewed, the Discovery Master sent the Parties a set of questions to establish with more precision what was actually occurring during the various periods of time after the Storm Event, during claim adjustment, and when litigation activity was being undertaken.  On April 17, 2026

the Parties submitted a joint response to the questions. The questions asked by the Discovery Master and corresponding answers are as follows:

**(1) What were the dates of the actual mediation sessions with the mediator in this matter - that is, on what dates did the parties actually meet with the mediator?**

Defendants' Response
a. Dates of Actual Mediation Sessions with the Mediator:
- Steward and Defendants first mediated this matter with mediator Clifford J. Shapiro in person on January 22, 2025.
- On June 22, 2021, Medical Properties Trust ("MPT") and Zurich mediated MPT's insurance claim under the MPT Policy with mediator Larry Pollack. At Steward's request, Steward attended the MPT and Zurich mediation, but no mediation occurred between Steward and Defendants in 2021.

b. Other Dates the Parties Met with the Mediator:
- On May 5, 2021, Defendants, Medical Properties Trust ("MPT") and Steward Health Care System LLC ("Steward") retained mediator, Larry Pollack.
- On May 11-12, 2021, and May 25, 2021, Mr. Pollack attended adjustment meetings between MPT, Steward, and the Defendants. Those meetings were part of the claims-adjustment process, and the parties agreed that the statements made and actual materials shown (i.e. PowerPoint presentations) were considered part of the claim adjustment and not confidential settlement materials.
- On June 10, 2021, Mr. Pollack toured Norwood Hospital with Steward, MPT, and Defendants.

Plaintiff's Response
While Steward Health Care Systems LLC ("Steward") and Defendants did not directly mediate this litigation until conducting an in-person mediation with mediator Clifford J. Shapiro on January 22, 2025, mediation first occurred years earlier before any lawsuits concerning the June 28, 2020 storm that devasted Norwood Hospital were filed.

On May 5, 2021, Defendants, Medical Properties Trust ("MPT"), and Steward retained mediator, Larry Pollack. On May 11-12, 2021, and May 25, 2021, Mr. Pollack attended adjustment meetings between MPT, Steward, and the Defendants. Those meetings were part of the claims-adjustment process, and the parties agreed that the statements made and actual materials shown (i.e. PowerPoint presentations) were not considered confidential settlement materials.

On June 10, 2021, Mr. Pollack toured Norwood Hospital with Steward, MPT, and Defendants.

On June 22, 2021, Mr. Pollack held an in-person mediation concerning MPT's insurance claim under its Policy with Zurich. At the time, the parties agreed

to try to resolve MPT's claim prior to Steward's. Although Steward was one of the entities that retained Mr. Pollack and attended this in-person mediation, its insurance claim under its policy with AGLIC was not a subject of the mediation.

**(2) Did the mediator request any follow-up information? If so, when?**

As to the mediation between Steward and Defendants on January 22, 2025, the mediator did not request any follow-up information.

Defendants' Additional Response

As to the MPT and Zurich June 22, 2021 mediation, follow-up questions from the mediator, if any, did not include Steward, and any information exchanged with the mediator, if any, is confidential and subject to the mediation privilege between MPT and Zurich.

Plaintiff's Additional Response

Defendants' position is confusing—unable to answer "yes" or "no" to the simple prompt, Defendants instead incorrectly, and without any basis, suggest that Steward would not have been privy to follow-up questions from the mediator subsequent to the June 22, 2021 in-person mediation. While neither Plaintiff nor, apparently, Defendants are aware of any specific follow-up questions from Mr. Pollack, if any were asked they would have been addressed jointly by MPT and Steward, likely with Steward taking the lead as it had throughout the claim adjustment process. As Defendants have freely acknowledged, Steward and MPT's claims were inextricable and adjusted together. For this reason, Steward—and not just MPT—retained Mr. Pollack and jointly presented with MPT during the May 2021 claim adjustment meetings with him. Although Steward's claim under its insurance policy with AGLIC was not at issue in the mediation, this was because Defendants, MPT, and Steward all agreed at the time that MPT's claim should be resolved prior to Steward's business interruption claim.

**(3) What is the actual date of the 93A letter?**

Steward served its 93A/176D demand letter, along with its Interim Proof of Loss, on February 5, 2021.

**(4) On what date did Steward retain Todd & Weld for purposes of this case?**

Given Todd & Weld's long-standing relationship with Steward—including representing Steward on other matters at that time—Steward's General Counsel, Herbert Holtz, first contacted Attorney Howard Cooper on June 29, 2020, the day after the loss event, to engage Todd & Weld with regard to the loss and insurance claim and introduce him to Robert Gendron, CEO of CREF.

6

**(5) What is the earliest communication between Todd & Weld and Steward that are claimed to be attorney-client privileged in this matter?**

The earliest communication involving Todd & Weld that Plaintiff has withheld on the basis of attorney-client privilege is the June 29, 2020, email described above in response no. 5, which appears as entry no. 635 on Plaintiff's Second Amended Privilege Log.

Plaintiff's Additional Response

Plaintiff notes that the earliest communication between Zurich and its outside counsel at Robins Kaplan appearing on Defendants' First Amended Privilege Log is dated August 14, 2020.

Plaintiff also wants to inform Your Honor that Plaintiff served his Second Amended Privilege Log referenced above on March 20, 2026 (the "Second Amended Log"). Similar to his Amended Privilege Log served on February 12, 2026, which Plaintiff detailed in his Response to Discovery Master Order No. 14, submitted to Your Honor on February 12, 2026, the Second Amended Log does not contain a single new entry but rather reflects that Plaintiff reduced the number of documents he withheld. Plaintiff's original privilege log served on January 12, 2026,contained 9,666 entries. The Second Amended Log contains 7,690 entries as Plaintiff has since downgraded and produced 914 documents in full and 1,062 with redactions.

**(6) Which of Plaintiff's consultants do Defendants contend are "hybrid witnesses" whose depositions are or will be scheduled? Do Plaintiffs disagree that any of these named consultants are "hybrid "witnesses?**

Defendants' Position

Defendants contend that the below consultants are "hybrid witnesses" whose depositions are or will be scheduled. These third-party consultants were involved in Steward's assessment of damages and preparation of plans for the repair and rebuild of Norwood Hospital. Plaintiff has withheld communications with these entities as attorney-client privileged communications and/or as attorney work product. As discussed throughout Defendants' letter briefs submitted to Your Honor, the nature of the work that these consultants did, including any attorney mental impressions that they relied upon in performing that work, is at issue and not properly withheld. For those witnesses already deposed, Defendants may seek to reopen those depositions pending resolution of the privilege disputes by Your Honor:

- Array
- Tim Nichols (30(b)(6) Witness) (deposed on 4/1)

7

- BR+A
- 30(b)(6) witness (deposition postponed pending resolution of privilege dispute)

  - Code Red
- Christopher Lynch (deposed on 3/6 as a 30(b)(6) fact witness; disclosed by Plaintiff as a litigation expert; expert deposition to be scheduled)

  - Consigli
- Stephanie O'Brien (30(b)(6) Witness) (deposed on 3/5)

  - Continental Machinery
- Jeff Williams (disclosed as fact witness in Plaintiff's Rule 26(a)(1) disclosures; disclosed as litigation expert by Plaintiff; expert deposition to be scheduled)

  - CREF
- Michael Crowley (deposition postponed pending resolution of privilege dispute)
- Ronald Doncaster (deposition postponed pending resolution of privilege dispute)
- Robert Gendron (deposed on 4/6; deposition held open pending resolution of privilege dispute)
- Scott Kenyon (deposed on 4/2; deposition held open pending resolution of privilege dispute)
- Stephen Van Ness (deposition postponed pending resolution of privilege dispute)

  - Marsh FACS
- 30(b)(6) witness (deposition postponed pending resolution of privilege dispute)

  - NFA
- Ronald Papa (deposition postponed pending resolution of privilege dispute)
- Sean O'Mara (deposition postponed pending resolution of privilege dispute)

<u>Plaintiff's Position</u>

None of the individuals in Defendants' list is a non-reporting, testifying expert and percipient fact witness, the category of witness actually considered "hybrid" in a legally relevant sense. The case law Defendants relied upon in their January 2026 briefing on this issue (e.g., *United States v. Sierra Pacific*) defined "hybrid witnesses" in this manner and assessed the implication of the legal rules associated with the specific provisions of Federal Rule of Civil Procedure 26 that apply to this narrow category of witness.

As an initial matter, however, there is no pending dispute before Your Honor concerning any "hybrid witness." Defendants raised the "hybrid witness" issue in January 2026 with regard to communications/documents involving Consigli. As detailed in Mr. Launer's January 16, 2026, letter to Your Honor, Plaintiff withheld Consigli documents only on the basis of attorney-client privilege and/or work product doctrine—not because Consigli is an expert witness. The privilege issues presently before Your Honor are those in the parties' respective February 4,

2026, submissions, which do not contain a "hybrid witness" challenge to privilege by either party. Indeed, none of the five privilege waiver arguments that Defendants set forth in their 12-page February 4 submission are based on the existence of a "hybrid witness."

Now, however, Defendants for the first time, and without notice to Plaintiff, have inexplicably and drastically expanded their notion of a "hybrid witness" putting forth a list that includes many of Plaintiff's primary consultants during the claim adjustment period. While they are percipient fact witnesses, none are also non-reporting, testifying experts. In fact, only two— Jeff Williams and Christopher Lynch—are Plaintiff's testifying expert witnesses, and Plaintiff served expert reports from both on April 1, 2026, pursuant to Discovery Master Order No. 17. Consigli and BR+A, for example, may be experts in their respective fields, but Plaintiff is not offering them—or anyone else in Defendants' list besides Messrs. Williams and Lynch—as an expert witness in this litigation.

**(7) Can a visual timeline be created jointly by counsel as to the key events in the history of this case?**

[The Parties created a visual timeline of events in chart form. Those entries relevant to this Order are discussed in Section II below]

(Parties' April 17, 2026 Joint Submission to Discovery Master).

The Discovery Master must now decide which of Plaintiff's third-party communications have properly been withheld as privileged on a derivative privilege basis, and which communications have not been sufficiently shown to be covered by any properly invoked privilege, and should therefore be produced.  Given the lateness and volume of Plaintiff's withholdings, this is no easy task.  Plaintiff asserts non-production privilege for over 7,500 documents involving third-parties, and has provided reams of privilege logs to the Discovery Master.  It is neither possible nor appropriate to review this quantity of allegedly privileged communications *in camera* without undue delay to the case schedule.  As noted above, the Discovery Master is not adopting Defendants' argument that all should be ordered to be produced subject to clawback.  Thus, the Discovery Master's decisions will be guided by the case law, the degree to which each party has met its burden to establish privilege, and permitting a modest sampling of purportedly privileged content to be sought.

B.  Issues Regarding Defendants' Withheld Communications

Plaintiff's February 4, 2026 brief to the Discovery Master seeks an order compelling the Defendants to produce documents withheld as privileged involving three of Defendants' third-party consultants: (1) DBI Construction ("DBI"); (2) Shawmut Design and Construction; and (3) J.S. Held.  Plaintiff argues that these consultants were engaged to assist Defendants in determining the end date of the insurance "period of liability" for Norwood Hospital's business interruption claim.

Plaintiff argues that, in insurance cases that contain an allegation of "bad faith" handling of a claim, the strategy, mental impressions, and opinions of an insurer's agents concerning the handling of the claim lose any privilege status because they have become "at issue" by the Defendants' reliance upon their opinions and advice as a defense to the "bad faith" claim. Plaintiff asserts that Defendants intend to argue that they could not have acted in bad faith because they relied on the work of "qualified professionals" in setting the "period of liability." Plaintiff argues that an assertion of this defense places the communications between the defendants and these third-parties "at issue," thus waiving privilege for these materials. Plaintiff also argues that its need for these documents is compelling.

Defendants oppose Plaintiff's request, arguing that the "at issue" cases relied upon by Plaintiff are inapposite. Defendants argue that the "at issue" doctrine in the cases cited comes into play when a party asserts a reliance on counsel defense.  In this case, Defendants' consultants did not rely on advice of counsel to formulate opinions or conclusions regarding the schedule to repair, and the mental impressions or opinions of the attorneys that communicated with the consultants are not "at issue." Defendants further argue that Plaintiff can fully explore with the consultants at their depositions what they relied upon to inform their conclusions or opinions. Defendants have not asserted "advice of counsel" defense.

Defendants have withheld a total of 63 documents in which any third-party is involved in the communication, and all of the communications involve one of the Defendants' attorneys and the consultant. This total number of 63 documents that have been withheld are communications with 5 consultants: Sedgwick Claims Management Services, Inc. ("Sedgwick"); DBI; Matson Driscoll & Damico LLP ("MDD"); J.S. Held, LLC; and Thornton Tomasetti.[3] Defendants argue that the communications with these are protected from production by the "derivative privilege" doctrine recognized by Massachusetts law. Defendants do not assert any privilege or work product claims on the basis that the third-parties at issue were retained as non-testifying consulting experts for the purposes of litigation.

The Plaintiff's arguments in support of their motion to require these communications to be produced are analyzed in Section V, below.

## II.    Relevant Facts and Procedural History

Steward Health Care System LLC ("Steward") leased Norwood Hospital from Medical Properties Trust, Inc. ("MPT").  On June 28, 2020, a severe weather event caused damage to Norwood Hospital ("Storm Event"), ultimately resulting in separate insurance claims being filed by MPT with its insurer, Defendant Zurich, and by Steward with its insurer, Defendant American Guarantee and Liability Insurance Company("AGLIC").  The MPT insurance claim sought insurance payments primarily for damage to the structure and building systems of Norwood Hospital, while the Steward claim sought insurance payments primarily for business personal property, business interruption, and medical equipment losses.  (*See, e.g.*, ECF 61 at ¶¶ 2 and

---

[3] Not all of these third-party withholdings are challenged by Plaintiff, as discussed in more detail below.

54).  The MPT insurance claim was settled in November 2024, and is relevant to the analysis solely on the "common interest" doctrine basis.

On July 2 and October 16, 2020, AGLIC made claims payments to Steward, before any claim was made by Steward.  Steward made its Initial Claims Submission on December 4, 2020.  AGLIC responded on January 11, 2021, and made an additional payment to Steward on that date.

On February 5, 2021, during the claim adjustment process, Steward served Defendants a 93A/176D letter, together with its Interim Proof of Loss statement to the insurer.  On March 5, 2021, AGLIC responded to Steward's Interim Proof of Loss and made an additional payment to Steward.

On March 11 and 12, 2021, adjustment meetings were held at Norwood Hospital, and were attended by the Parties, as well as third-parties MPT, CREF, Array, NFA, Code Red, EH&E, BR+A, Gale Associates,[4] Consigli, Sedgwick, JS Held, and DBI.[5]  Another adjustment meeting was held with representatives from Steward, MPT, Defendants and Sedgwick on April 23, 2021.

On May 5, 2021, MPT and Steward retained a mediator to assist with the Parties' claims-related disagreements. However, the mediator's initial involvement was intentionally not covered by a mediation confidentiality agreement. The mediator attended adjustment meetings with the Parties on May 11-12, and 25, 2021. Those meetings were "part of the claims-adjustment process, and the parties agreed that statements made and actual materials shown (i.e. PowerPoint presentations) were considered part of the claims adjustment and not confidential settlement materials." (Apr. 17, 2026 Parties Joint Response to Discovery Master's Questions at p. 2).  On June 10, 2021, the mediator toured Norwood Hospital with the Parties.

On June 22, 2021, the mediator held an in-person mediation of MPT's insurance claim with its insurer, Zurich. The Parties all agreed to resolve MPT's claim prior to Steward's; for that reason, Steward's insurance claim with AGLIC was not a subject of the 2021 mediation sessions; they were devoted solely to an attempt to mediate a settlement of the MPT insurance claim. (Apr. 17, 2026 Parties Joint Response to Discovery Master's Questions at pp. 2-3).

The mediation did not result in a settlement of MPT's insurance claim. On October 4, 2021, Zurich filed a lawsuit against MPT, seeking declaratory judgment that all damage at Norwood Hospital related to a "Flood," and was therefore subject to a "Flood Sublimit."

On October 14, 2021, Steward submitted an Updated Statement of Loss to AGLIC. The instant lawsuit by Steward against Defendants was filed on November 23, 2021.  On December 24, 2021, AGLIC made an additional payment to Steward.

On November 15, 2022, the Court ruled that all damage to Norwood Hospital was the result of a "Flood" as defined in the relevant insurance policy.  Steward filed an interlocutory

---

[4] The Parties' disputes do not involve any withheld documents involving Gale Associates.
[5] These third-party entities are discussed in detail below.

11

appeal in February 2023. The question of policy interpretation was certified to the Massachusetts Supreme Judicial Court on December 19, 2023.

On May 6, 2024, Steward filed for bankruptcy. On July 23, 2024, the Massachusetts Supreme Judicial Court issued a decision concluding "that the definition of 'surface water' does not include the rainwater that landed and accumulated on the rooftop courtyard and parapet roofs in this case, or at least it does not unambiguously include such accumulation of water on a roof," thereby  holding that the damage was not capped by the "Flood Sublimit."  Following this ruling, MPT and Zurich settled their case in late 2024.

On September 30, 2024, Steward sold its remaining facilities in Massachusetts and ceased all operations in the state.

On January 22, 2025, Steward and Defendants conducted an in-person confidential mediation session with a different mediator than the one engaged for the 2021 mediation involving MPT.  The mediator did not request any follow-up information after the 2025 mediation session.

## III.    Applicable Law

### A.  Attorney-Client Privilege

The attorney-client privilege "protects communications between a client and an attorney that are made in confidence for the purpose of giving or obtaining legal advice." *McCarthy v. Slade Assocs., Inc.*, 463 Mass. 181, 190 (2012). "Although the privilege promotes unfettered communications between the attorney and the client, the privilege runs contrary to full disclosure of relevant information and is, therefore, narrowly construed." *Colonial Gas Co. v, Aetna Cas. & Sur. Co*., 144 F.R.D. 600, 604 (D. Mass. 1992).

The attorney-client privilege "covers confidential communications conveying legal advice from attorney to client as well as confidential communications conveying questions or information from client to attorney in order to obtain legal advice." *American's Test Kitchen v. Kimball*, 35 Mass.L. Rptr. 75, *1 (Sup. Ct. Mass., 2018). "[T]his privilege also protects 'confidential communications made for the purpose of obtaining or providing professional legal services,' including such communications between parties that are 'involved in a joint defense'; 'between representatives of the client[;] or between the client and a representative of the client." *Id*. at *2 (citing Mass Guide Evid. §502(b)).

Application of the attorney-client privilege is a question of fact. *Colonial Gas*, 144 F.R.D. at 604. The party asserting the privilege bears the burden of showing that it applies and that it has not been waived.  *Commissioner of Revenue v. Comcast Corp*., 453 Mass. 293, 304 (2009); *Burke v. General Hospital Corp.*, 2019 WL 6197040 at *5 (Sup. Ct. Mass. May 3, 2019). "The privilege only protects disclosure of communications, it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. U.S.,* 449 U,S, 383, 395 (1981).

12

B.  "Derivative Attorney-Client Privilege"

"Generally, disclosing attorney-client communications to a third-party, undermines the privilege." *Cavallaro v. United States*, 284 F. 3d 236, 246-47 (1st Cir. 2002).  However, as the Second Circuit explained in *United States v. Kovel*, an exception to this rule exists if a third-party communications is "necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." 296 F.2d 918, 922 (2d Cir. 1961).  Under the *Kovel* doctrine, "the 'necessity' element means more than just useful and convenient," and requires that "[t]he involvement of the third-party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Cavallaro*, 284 F.3d at 249.

"[T]he exception applies only to communications in which the third-party plays an interpretive role;" that is, "the third party's communication must serve to translate information between the client and the attorney." *Dahl v. Bain Capital Partners, LLC*, 714 F.Supp.2d 225, 228 (D. Mass. 2010).  In addition, "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice." *Id.*

C.  "Functional Equivalent" Doctrine

The attorney-client privilege "applies when the client is a corporation and protects communications between its employees and counsel." *United States ex. rel. Long v. Janssen Biotech, Inc.*, 788 F.Supp.3d 167, 170 (2025). A corporation's attorney-client privilege extends to communications with corporate employees if those "communications concern[] matters within the employees' corporate duties." *Upjohn*, 449 US 383, 394; *see also American's Test Kitchen*, 35 Mass.L. Rptr. 75, *2 ("the attorney-client privilege protects communications that gather or convey information from knowledgeable employees or agents that is needed by counsel in formulating legal advice, as well as communications that relay legal advice obtained from an attorney to employees or other agents of the client who must understand and help to implement that advice.").

"Where an outside consultant to a business is the functional equivalent of an employee, and plays a 'pivotal role' in matters as to which the business obtains legal advice from an attorney, the attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant involved in, copied on, or becomes privy to those communications." *Id.*  "This 'functional equivalent doctrine' does not, however, encompass all outside consultants" and if the non-employee in not "in a high-level, trusted decision-making or guiding role, equivalent to that of an employee, the non-employee does not hold the status necessary to keep communications involving him or her privileged." *Id.*

Not all communications regarding legal advice with consultants who perform functions similar to employees will be privileged.  Such communications will "only be privileged if the client needed the consultant to help facilitate the rendition of legal advice by the lawyer or the implementation of that advice by the client." *Id.*

13

D.  Common-Interest Doctrine

"The common-interest doctrine, sometimes referred to as the joint defense privilege, is not an independent privilege, but is an exception to the rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." *AnywhereCommerce, Inc. v. Ingenico Inc.*, 2022 WL 2818321 at *4 (D. Mass. 2022).  The common interest doctrine "prevents waiver of the attorney-client privilege when otherwise privileged communications are disclosed to and shared, in confidence, with an attorney for a third person having a common legal interest for the purpose of rendering legal advice to the client." *Hanover Ins. Co. v. Rapo & Jepsen Ins. Services, Inc.*, 449 Mass. 609, 614 (2007). In other words, the common interest doctrine does not create any privilege; rather, it prevents waiver of a privilege that had already come into existence, by holding that the communication of already privileged information was not waived by disclosure to a party with a common legal interest.

Courts in Massachusetts have stated that "the common interest doctrine is not limited to litigation or impending litigation."  *Id*. In *Hanover*, the Massachusetts Supreme Judicial Court expanded the common interest non-waiver doctrine, stating that it does not require that the parties share an identical, narrow legal interest, or that the interest be "entirely congruent," but that a "sufficiently similar interest" is enough to warrant protection when sharing confidential communications to foster a joint defense. *Id*. at 618.  The Court found the "more expansive approach as being more consonant with the purpose of the attorney-client privilege." *Id*. at 619.

E.  Work Product Protection

The work product doctrine protects: "(1) a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for a party's representative." *Colonial Gas Co. v. Aetna Cas. & Sur. Co*., 144 F.R.D. 600, 604-05 (D. Mass. 1992).  "Opinion work product revealing an attorney's mental impressions receives heightened protection." *Id*.  The applicable test is "whether in light of the nature of the document and the factual situation in the particular case the document can be said to have been prepared or obtained because of the prospect of litigation." *Id*.

In determining whether the work product protection is waived when the information is disclosed to a third-party, three factors must be evaluated: "(1) whether the party claiming the privilege seeks to use it in a way that is inconsistent with the purpose of the privilege; (2) whether the party claiming the privilege had a reasonable basis for believing that the disclosed materials would be kept confidential, and (3) whether waiver of the privilege in these circumstances would trench on any policy elements inherent in the privilege." *Id*. at 605-06.

F.  "At Issue" Waiver

"There are, under Massachusetts law, certain exceptions to the attorney-client privilege and some circumstances in which the privilege may be deemed waived other than by express waiver." *Global Invs. Agent Corp. v. Nat'l Fire Ins. Co. of Hartford*, 76 Mass. App. Ct. 812, 816 (2010).  This can happen in situations in which the nature of a party's allegations place the work that an attorney performed "at issue," and the attorney is the only source available to testify

14

regarding that work. *Id*. This "at issue" doctrine is strictly limited, however.  Massachusetts courts have explained that the "at issue" waiver, "in circumstances where it is recognized, should not be tantamount to a blanket waiver of the entire attorney-client privilege in the case," but is, by its very definition, "a limited waiver of the privilege with respect to what has been put 'at issue.'" *Id*. at 817.  In addition, "there can be no 'at issue' waiver unless it is shown that the privileged information sought to be discovered is not available from any other source." *Id*.

In *Global*, the court allowed limited discovery of attorney-client communications, upon its finding that plaintiffs waived the privilege when they placed advice they received from their own attorney "at issue" in the litigation.  In the *Global* case, Plaintiff insureds brought an action against their insurers claiming damages related to legal fees and costs stemming from the insurers' alleged failure to defend them in prior litigation. The plaintiffs alleged in their complaint that they were forced to settle by their own prior attorney's statements to them, urging them to settle an underlying litigation on unfavorable terms, due to the litigation cost and uncertainty as to insurer coverage of defense costs. The insurer sought the testimony of the plaintiff's prior counsel on the value of the claims and cost of litigation.

The Appellate Court affirmed, explaining that "[t]here are, under Massachusetts law, certain exceptions to the attorney-client privilege and some circumstances in which the privilege may be deemed waived other than by express waiver;" that is, "there are circumstances in which a litigant may implicitly waive the privilege, at least in part, by injecting certain types of claims or defenses into a case." *Global*, 76 Mass. App. Ct. 812, 816-17.  The Global court expressly stated that "at issue" waiver is not a blanket waiver of the entire attorney-client privilege in a case, and "there can be no 'at issue' waiver unless it is shown that the privileged information sought to be discovered is not available from any other source." *Id*. at 817-18.

In *Zabin v. Picciotto*, 73 Mass.App.Ct. 141, 158 (2008), the Court found that in cases where a client sues an attorney for legal malpractice, the attorney-client privilege is waived as to communications by a client with its attorneys in the underlying litigation in which the legal malpractice allegedly occurred. 73 Mass. App. Ct. 141, 157.  The Court explained that "[t]he nature of the defendant's allegations placed the work [the attorney] performed in the underlying litigation directly at issue, and [the attorney] was the only source available to testify regarding the work she performed." *Id*. at 158.

The applicability of this line of "at issue" waiver cases to the claims in this case will be analyzed in the Section V of this ruling.

**IV.    Analysis of Plaintiff's Challenged Withholdings Based on Derivative Attorney Client Privilege as to 13 Third-Parties; and Work Product Withholdings**

A.  Plaintiff's Third-Party Consultants

Plaintiff withholds thousands of documents it describes as communications "involving consultants who assisted Steward *and its counsel* in connection with the insurance claim that underlies this action." (Plaintiff's Feb. 17, 2026 Letter Br. at p. 4) (emphasis in original). The log generally states the same basis for withholding as, for example: "Email with consultant hired by

counsel to assist with insurance claim submission"; "Email requesting/containing information to assist counsel with insurance claim submission"; "Email reflecting legal advice regarding insurance claim submission."

These third-parties are: (i) Array Architects, Inc. ("Array"); (ii) BR+A; (iii) Code Red Consultants ("Code Red"); (iv) Consigli Construction Co., Inc. ("Consigli"); (v) Continental Machinery ("Continental"); (vi) Environmental Health & Engineering, Inc. ("EH&E"); (vii) Green Seal Environmental, Inc. ("Green Seal"); (viii) L.A. Fuess Partners ("L.A. Fuess"); (ix) Marsh FACS ("Marsh"); (x) Medical Properties Trust ("MPT"); (xi) National Fire Adjustment Co., Inc. ("NFA"); (xii) Optisure; and (xiii) The Suffolk Group ("Suffolk"). Despite Plaintiff's arguments to the contrary, the documents reviewed by the Discovery Master show that most of these 13 third-parties are so-called "hybrid" entities: They were first engaged to do actual work planning the site remediation and/or rebuilding of the damaged physical premises and machinery following the flood event; after that initial period of work, certain of them were engaged for litigation consulting at a later date.

It bears repeating that the physical premises of the hospital were owned by MPT, and leased to Steward. MPT settled its insurance claim with Zurich as to the physical premises in November 2024; Steward is insured by AGLIC. The insurance claim in this case is primarily to recompense business interruption, business personal property and medical equipment losses.

Plaintiff submitted its factual support to meet its burden of proof for withholding thousands of documents based on "derivative privilege" as to each of these third-parties via the Declaration of Steward's then-in-house counsel, Nathalie Hibble, Esq. Ms. Hibble's Declaration (the "Hibble Declaration") sets forth the bases for Steward's claim of derivative attorney client privilege as to these 13 third-parties. It is a stunningly bare-bones, rote recitation of the same sentence no fewer than 11 times in the 16 paragraphs that make up the Declaration. As to virtually each third-party, Ms. Hibble states: "[The third-party] translated information, using its subject matter expertise, for counsel to ensure effective attorney-client consultation at various points, including around the party presentations and mediation in 2021 and as the litigation progressed." (Hibble Decl. at ¶¶7(a), 7(a)(i), 8(b), 8(b), 8(c), 8(d), 8(e), 8(f), 8(h), 8(i), 8(j)).

The effort of Attorney Hibble to sustain Steward's burden to justify withholding thousands of documents is so thin as to be barely beyond a summary legal conclusion, barren of any of the types of factual explanations found in the caselaw when derivative privilege is claimed. The Discovery Master has been left with virtually no useful information from Ms. Hibble to attempt to discern which communications meet the standard, and which do not. At the Discovery Master's request, the Plaintiff also produced all of the engagement letters with the third-parties with whom such letters exist. These letter do provide additional information stating the scope of the duties of the third-parties. Plaintiff argues that it produced far more documents than it withheld, with its internal document reviewers doing their own analysis of the derivative privilege criteria. However, the cases require a showing to the Court as to why each third-party consultant was a "virtually essential" "translator" of a highly specialized area that required counsel to involve them in its client communications to be sure that the lawyer understood the highly complex area [comparable to esoteric accounting principles] sufficiently to give advice to the client, and for the client to understand that advice and seek legal counsel on it. This is

16

particularly important for the hundreds of entries of communications where no attorney is on the chain of correspondence.

Absolutely *none* of that essential factual information or analysis is stated by Attorney Hibble in her Declaration. While the Discovery Master does not doubt that outside counsel in the Todd & Weld firm, or contract attorneys working with them, conducted their own review of the thousands of documents in order to determine which to produce and which meet the high standard to be withheld on grounds of derivative privilege, the argument in the briefing relies principally on statistics of the percentages withheld versus produced, which, without more, does not meet the Plaintiff's burden of proof.  It needed Ms. Hibble's Declaration, which was sorely lacking in substance beyond a few conclusory sentences.  It never states exactly why "translation" was needed by her or outside counsel on the variety of disciplines which the third-parties practice.

The Discovery Master was therefore left with a conundrum: either grant the Defendants' motion seeking production of this entire mass of withheld documents, subject to clawback; or attempt to do her own analysis with the information provided in the engagement letters for those of the 13 third-parties as to whom such engagement letters exist, combined with the timelines of activity from the date of the Storm Event; to the date of the submission of the insurance claim; to the date of the first shot across the bow of intended legal action, in the "93A letter"; and the later dates of the mediation and litigation-related activity.  This is a paucity of information, as contrasted with the detailed descriptions of the relatively few withheld documents in the caselaw. The utterly uninformative Hibble Declaration does not remotely assist the Plaintiff in meeting its burden of proof.

For these reasons, and applying the burden of proof as required by law, the Discovery Master is applying the only path available at this late stage of the case: upholding the derivative privilege for certain third-parties as to certain time periods when they could plausibly have switched to litigation consultant in their hybrid roles; denying it as to others, (subject to clawback); and denying it with leave to hold back a modest number and submit them for *in camera* review.  The biggest challenge to Plaintiff is not on the communications with counsel from Todd & Weld to third-parties; it is the fact that approximately 1,468 communications have no attorney on the chain of correspondence; and another group of approximately 574 merely copy Ms. Hibble (that is, she is not the author in the "from" field, nor the recipient in the "to" field).

i.      *Array*

Array is an architectural firm, whose architectural work with Steward long pre-dates the June 28, 2020 Storm Event at Norwood Hospital. Clearly, Array was an architectural firm doing its regular work for Steward for years. Steward retained Array in July 2020 for architectural planning following the Storm Event; MPT's counsel[6] retained Array as a consulting expert on

---

[6] MPT was Steward's landlord at Norwood Hospital and at other facilities operated by Steward across the US. Prior to Steward's bankruptcy, MPT held an ownership interest in Steward.

May 19, 2022, nearly two years after the Storm Event, to assist both MPT's and Steward's counsel,[7] and Steward's contact with Array continued until January 2024.  Plaintiff argues that Array's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that Array created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 2).

Plaintiff withheld 409[8] emails involving Array that cite the attorney-client privilege, common interest, and/or work product doctrines: 1 document dated November 2020; many documents between February-July 2021; many documents between February 2022-February 2023.  Only 87 of the emails are dated after execution of the consulting expert engagement letter on May 19, 2022. Approximately 25 documents are held back on grounds of "Attorney-Client" privilege alone; approximately 5 on grounds of "Work Product" protection alone, and the remainder are held back claiming various combinations, using explanations stating, *e.g.,* "Attorney-Client/Work-Product/Common-Interest," without further distinguishing the bases for each ground asserted.[9] On many of these documents, Nathalie Hibble,[10] in-house counsel for Steward, is the only attorney listed.

The primary support for Plaintiff's assertion that Array's presence on the withheld documents was necessary for effective consultation between Steward and its counsel comes from

---

Defendants adjusted both Steward's insurance claim and MPT's insurance claim following the Storm Event concurrently. They each had separate policies; as stated above, with MPT's case involving insurance for the damaged physical buildings settled in late 2024.

[7] On May 19, 2022, Array executed an engagement letter with Foley Hoag LLP (which was representing MPT) to assist MPT's and Steward's counsel.  [May 19, 2022 Engagement Letter, ARRAY00041480-488 at 41480].  The engagement letter discloses Steward's counsel in this matter, Todd & Weld LLP.  The Scope of Engagement is described as assisting MPT's and Steward's counsel in the representation of their clients "in seeking recovery from property insurers (units of Zurich Insurance Group) in respect of losses, including business income losses, arising out of damage to Norwood Hospital resulting from a severe storm on June 28, 2020." [May 19, 2022 Engagement Letter, ARRAY00041480-488 at 41480].

[8] The document statistics described herein reflect information provided by Plaintiff to the Discovery Master on February 12, 2026, prior to its service of Plaintiff's amended privilege logs The analysis and holding of this Order applies equally to any privilege log entries in the amended logs.

[9] Although in its February 12, 2026 brief Plaintiff writes that it withheld documents "on the basis of attorney-client privilege, pursuant to the derivative privilege doctrine, and/or work product doctrine, Plaintiff's privilege log generally does not make a distinction between those documents held back pursuant to attorney-client privilege or derivative attorney-client privilege, versus work product.

[10] Ms. Hibble's declaration, submitted with Plaintiff's Feb. 17, 2026 Letter Brief, provides no elaboration of the grounds asserted for withholding the Array documents on the various separate bases stated in the privilege log.  Where the attorney on the email chain is from the Todd & Weld firm, the Discovery Master looks to Plaintiff's brief for the factual representations necessary to support application of the applicable basis for withholding that are lacking from Ms. Hibble's declaration.

18

the February 17, 2026 Hibble Declaration (Ms Hibble was the former in-house counsel for Steward). The Hibble Declaration states that "[t]o support both the preparation of the insurance claim submission and the related legal advice about the adjustment process and this litigation, Steward hired" Array; BR+A; Code Red; Consigli; Continental; EH&E; Green Seal; Marsh; and NFA. (Hibble Decl. at ¶ 6).  Yet, the entire Hibble Declaration, which addresses the 13 third-parties at issue, including Steward's multi-year relationship with third-party CREF, is a mere 7 pages long, and consists primarily of the repeated incantation that each of the third-party consultants "translated information, using its subject matter expertise," "for counsel to ensure effective attorney-client consultation at various points, including around the party presentations and mediation in 2021 and as the litigation progressed." (Hibble Decl. at ¶¶ 7(a); (a)(i); (b); (c); (d); (e); (f); (g); (h); (i); (j); and 16). The quoted language is repeated verbatim for virtually every third-party consultant, with no further explanation of the actual "translation" needed or provided by each of these entities, nor any information about the transition of their role from a business consultant to a litigation consultant. The engagement letter shows that Array was first engaged in 2020 clearly as a consultant in connection with the hospital's planning for its business when it reopened. It later transitioned to a litigation consultant in May 2022.

As stated above, the Discovery Master finds the Hibble Declaration to be exceptionally weak support for the withholding of thousands of documents involving third-parties. Under Massachusetts law, the application of the attorney-client privilege is a question of fact, as to which the party asserting the privilege bears the burden of proof; yet, the details regarding the privilege withholdings for Array — as well as other third party consultants — are remarkably sparse. As the party asserting that protection from production exists for communications involving third-party Array, Plaintiff bears the burden of showing that privilege applies and has not been waived. *Commissioner of Revenue v. Comcast Corp.*, 453 Mass. 293, 304 (2009).  But Ms. Hibble's Declaration is conclusory and deficient of even an attempt to provide the level of detail required to sustain this burden of explaining why Array's role is essential "translation," particularly for the vast volume of documents withheld for communications with Array for the time periods prior to the May 19, 2022 engagement letter to become a litigation consultant.

The derivative privilege exception applies only to communications in which the third-party plays an essential role interpreting highly complex information essential for effective attorney communications with the client.  The "third party's communication must serve to translate information between the client and the attorney" and "must be made for the purpose of rendering legal advice, rather than business advice." *Dahl,* 714 F.Supp.2d 225, 228. This means that in order to prevent Array's – a third-party's – presence on the communications from waiving any attorney client privilege that may have already applied to those communications, Array must be playing an essential interpretive role for the purpose of rendering legal advice, not business advice.

Plaintiff's privilege log, even in combination with Ms. Hibble's Declaration and Plaintiff's briefing, is largely devoid of the factual representations about the need for "translation" or "interpretation" between lawyer and client essential to make this showing. This is particularly true as to the Array emails for which only vague descriptions such as "Email requesting legal advice regarding insurance claim submission" is listed on the privilege log, for communications on which no attorney from the Todd & Weld firm is on the chain.  There is no

19

factual assertion of what architectural advice from a third-party was needed to facilitate legal advice from lawyer to client about submitting an insurance claim for flood damage well in advance of any litigation. None has been stated by Attorney Hibble in her declaration.

Insurance claim submissions, particularly before a mediation or litigation has started, may be reasonably considered to be business advice, rather than legal advice. The mediator in the related MPT/Zurich dispute was not engaged until May 5, 2021, and the mediation did not take place until June 22, 2021.  Moreover, the mediator attended several adjustment meetings with MPT, Steward, and Defendants in May 2021 that were specifically *not* covered by a mediation confidentiality agreement, and that were part of the insurance claims process. While it is potentially possible that legal advice was sought in advance of these meetings as to what should or should not be said during these sessions, there is no representation nor proffer of any such basis for withholding documents, even as to the June 2021 hospital walk-through with the mediator. Array was an architectural firm doing work for Steward long before it was engaged as a non-testifying expert consultant in May, 2022. Prior to that date, Plaintiff has not met its burden of proof to show that Array was a "translator to facilitate the rendition of legal advice to Steward." After May, 2022, Array did take on that role, when the engagement letter was signed between Array and Steward's/MPT's counsel.  There is no showing sufficient to meet the Plaintiff's burden of proof that Array was "translating information for counsel to ensure effective attorney-client communication" in the time period prior to May, 2022.

In response to the Discovery Master's request to see all of the engagement letters with third-party consultants, they were provided where they existed. As to Array, there are several "basis of understanding and scope of services"-type documents signed between Array and Steward prior to the May 2022 engagement letter with Steward's counsel. One such document dated July 27, 2020, by way of example, describes the scope of the project for which Array was engaged as one where Array would "[a]ssist Steward leadership in developing an effective vision an program for [a replacement Hospital]"; provide "Market Study/Demand Analysis"; "Develop forecast of expected volumes by service lines"; and "Develop High level space program." [STEWARD01109281].  Another document from October 14, 2020 provides that "Array proposes to provide the following process-led design services required to complete this project in an organized and cost-effective manner." [STEWARD00496953].  Another, signed in January 2021 provides that "Array has provided architectural and structural services to assess the damage caused to the Hospital, developed conceptual plans for the short and mid-term reactivation of critical patient care services, and developed . . . conceptual level Basis of Design documents for reactivation of the entire facility." [STEWARD01412480]. Yet another such document signed on October 4, 2021 provides as the additional scope of project an "Update to Array's prior volume projections with a sensitivity range for reopening risk"; to "Identify potential impacts to the KPMG financial models"; "Review claims and other data regarding Orthopedic practice aligning with Norwood; and to "Translate resulting volumes to adjusted (if needed) bed counts by type." [STEWARD01013872]. None of these documents describing Array's work indicate that it was translating information between a client and attorney for the purpose of rendering legal advice, rather than business advice. Instead, it points to the development of plans for a new hospital, assessing volumes of patients, and financial models for future business.

20

In addition, many documents on the Array privilege log do not include an attorney,[11] yet claim to provide legal advice regarding insurance claim submission. Many of those that do include an attorney, include only Ms. Hibble. As already discussed, Ms. Hibble's Declaration states nothing to shed light on her involvement in these communications.

Ruling as to Array Withholding:

 Plaintiff has not met its burden of proof to establish that Array was engaged for the purpose of translating information for counsel to ensure effective attorney-client consultation prior to the May 19, 2022 engagement letter to be a non-testifying litigation consultant.

To deal with the plausible possibility that there could have been some request by counsel for work product information in the three-week period prior to the MPT mediation on June 22, 2021, Plaintiff's counsel may provide up to 5  documents within this 3 week "Mediation Period" for *in camera* review to determine if any of these documents meets the standard to establish actual "translation" of information necessary to take a legal position at the mediation, or work product type information requested by counsel.  Any such communication claimed as work product shall also be paired with the corresponding communication from the attorney seeking that information (to be provided in the same file for ease of reference by the Discovery Master).

With this exception for the mediation-related time period, the withheld Array documents that do not have an attorney from Todd & Weld on the communication chain shall be produced for those documents dated prior to May 19, 2022, when Array became a non-testifying litigation consultant, subject to possible clawback. In light of the delay in document production and privilege logging, the volume of documents withheld, and conclusory nature of the Hibble Declaration, production of withheld documents up to the time of May 19, 2022, the date of the engagement letter, subject to clawback, is proper.

The same contours apply to the other Array documents held back on grounds of work-product protection. Plaintiff has not met its burden of proof to establish that prior to the May 19, 2022 engagement letter, the work done by Array can be said to have been prepared or obtained because of the prospect of litigation. *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 144 F.R.D. 600, 604-05.

Plaintiffs shall:

(1) Provide for *in camera* review the 1 document dated November 2020.
(2) Produce, subject to clawback, any documents dated prior to the May 19, 2022 engagement letter, that are listed on the Array privilege log that do not include any attorneys in the chain, because no showing has been made that an attorney made the request for information from Array in anticipation of litigation. While the 93A letter was sent before the engagement letter, there has been no link establishing that any of the communications with Array that do not have an attorney, were in response to a

---

[11] In their February 4, 2026 letter brief, Defendants claim that 1,468 entries from the third-party privilege logs fall into this category.

request for certain information to be gathered by Array and submitted back to counsel in anticipation of litigation. Based on the facts presented, Array's role prior to May, 2022 was the creation of plans and financial projections for patient volume for a newly established hospital or physician groups — having nothing to do with the 93A letter (as stated above, for the three-week period immediately prior to the MPT mediation on June 22, 2021, Plaintiff's counsel may submit the subset of documents for *in camera* review described).

(3) Produce, subject to clawback, any documents on the Array privilege log on which Ms. Hibble is the only attorney copied (other than the document described in (1) above), that are dated prior to the May 2022 engagement letter with Foley Hoag; the same Mediation Period provision as stated above can apply if one of the small number of documents submitted for *in camera* review is one in which Ms. Hibble is cc'd.

(4) Defendants may select 10 sample entries from the Array privilege log for *in camera* review by the Discovery Master, of documents on which Ms. Hibble is the only attorney copied, that are dated *after* the May 2022 engagement letter; based on the *in camera* review, the Discovery Master will determine how other similar documents will be treated.

(5) Defendants may select 5 sample entries from the Array privilege log for *in camera* review by the Discovery Master, of documents on which no attorneys are on the chain, that are dated *after* the May 2022 engagement letter; based on the *in camera* review, the Discovery Master will determine how other similar documents will be treated.

(6) Maintain as privileged those documents dated *after* May 19, 2022 involving Array and an attorney other than Ms. Hibble on the communication chain.

    ii.    *BR+A*

BR+A is as an engineering firm, whose business working relationship with Steward pre-dates the June 28, 2020 Storm Event at Norwood Hospital.[12] Plaintiff states that Steward retained BR+A in July 2020 to assess the damage from the Storm Event, including damage to Steward's business personal property (such as complex medical equipment), that MPT's counsel retained BR+A as a consulting expert in April 2022,[13] and that Steward's contact with BR+A continued until at least October 2023. Plaintiff argues that BR+A's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that BR+A created and received communications and documents prepared in anticipation of this litigation. (Plaintiff's Feb. 12, 2026 Letter Br. at p. 2). The Hibble Declaration offers no statements of fact to support Plaintiff's brief; as with every other third-party consultant, Hibble states the same rote phrase in conclusory terms.

---

[12] Plaintiff describes BR+A as similar to J.S. Held and DBI, third-party consultants used by Defendants in connection with the insurance claim at issue in this case. Defendants' third-party consultants are described in more detail below.

[13] Although the engagement letter bears April 15, 2022 as the heading date, BR+A appears to have executed this agreement on May 2, 2022.

22

Plaintiff withheld 472 emails involving BR+A citing attorney-client privilege and/or work product protection: 1 from Dec 2020; many from February-July 2021; many from October 2021-Mar 2023.  Approximately 106 of the emails are dated after the date of the consulting expert engagement letter on April 15, 2022 (although 26 of them are dated before the May 2, 2022 execution date of the letter).  The Discovery Master will use the April 15th date of the letter, because it shows the intent to transition to a litigation consultant role for this hybrid business entity. About 38 documents are held back on grounds of "Attorney-Client" privilege alone; approximately 3 on grounds of "Work Product" protection alone, and the remainder are withheld claiming various combinations of "Attorney-Client/Work-Product/Common-Interest" grounds.  On many of these documents, Nathalie Hibble, in-house counsel for Steward, is the only attorney listed in any of the "to," "from," or "cc" fields.

The analysis pertaining to BR+A is largely the same as that applied to Array above.  Prior to the April 15th engagement letter with BR+A, the scope of work documents between Steward and BR+A are similar to those with Array; it is a hybrid witness that performed engineering work following the Storm Event. Prior to April 15, 2022, the Plaintiff has not met its burden of proof to establish what complex "translation" work BR+A did to assist Steward's attorneys in communicating effectively with their client; Ms. Hibble's Declaration could conceivably have done that, if it had occurred.  But it did not do so. There has also been insufficient evidence to meet the burden of proof that work done by BR+A prior to the April 15, 2022 engagement letter was sought by counsel, or supplied to counsel in anticipation of litigation; thus no basis for work product protection has been shown.

Plaintiffs shall:

(1) Provide for *in camera* review the 1 document dated December 2020.
(2) Produce, subject to clawback, any documents dated prior to April 15, 2022 on the BR+A privilege log that do not include an attorney in the chain, with the following narrow exception: During the 3 week period prior to the mediation on June 22, 2021, the Plaintiff may submit up to 5 documents from that period for *in camera* review that it contends reflect mediation strategy communications from BR+A in response to a request from counsel, together with the email showing the request (the "Mediation Period Exception"). The remainder of the documents during that time period shall be produced, subject to clawback.
(3) Produce, subject to clawback, any documents prior to April 15, 2022 on the BR+A privilege log on which Ms. Hibble is the only attorney copied (other than the document described in (1) above), with the same Mediation Period Exception for 5 documents meeting the criteria described in subsection (2).
(4) Defendants may select 10 entries for *in camera* review by the Discovery Master from the BR+A privilege log that are dated after the April, 2022 engagement letter, on which Ms. Hibble is the only attorney copied, or on which no attorneys are on the chain; Based on the *in camera* review, the Discovery Master will determine how other similar documents will be treated.
(5) Maintain as privileged those documents involving BR+A and an attorney (other than only Ms. Hibble) that are dated after the signing of the engagement letter with BR+A

on April 15, 2022, or within 3 weeks prior to the date of the 93A letter, and such Mediation Period Exception documents as Plaintiff may select for *in camera review.*

    *iii.*    *Code Red*

Code Red is a building code consultant.[14] Steward retained Code Red in August 2020 to evaluate life safety, building, and accessibility code requirements associated with post-loss construction at Norwood Hospital. It is also a "hybrid" witness. The May 19, 2022 engagement letter between Array and Foley Hoag (counsel for MPT) identified in the above discussion of Array provides: "For the avoidance of doubt, we are aware that Array plans to retain services of Code Red Consultants, LA Fuess Partners, Gale Associates, Inc., DJM and perhaps others to assist in the performance of Array's services hereunder and we consent to that retention." [ARRAY00041480-488 at 480].

Plaintiff withheld 280 emails involving Code Red citing attorney-client privilege and/or work product protection. Approximately 20 documents are held back on grounds of "Attorney-Client" privilege alone, about 5 on grounds of "Work Product" protection alone, and the remainder are held back claiming various combinations of "Attorney-Client/Work-Product/Common-Interest" grounds. On many of these documents, Nathalie Hibble, in-house counsel for Steward, is the only attorney listed in any of the "to," "from," or "cc" fields.

The analysis pertaining to Code Red is largely the same as that applied to Array above. The May 19, 2022 engagement letter between Array and Foley Hoag specifically includes Code Red as a consultant to Array; there has been insufficient evidence shown to establish that Code Red's role as a "translator" prior to May 19, 2022.

Plaintiffs shall:

(1) Produce, subject to clawback, any documents on the Code Red privilege log that do not include attorneys, dated prior to the May 19, 2022 engagement letter with Array (which retained Code Red), subject to the Mediation Period Exception.

(2) Produce, subject to clawback, any documents dated before May 19, 2022 on the Code Red privilege log, on which Ms. Hibble is the only attorney copied, subject to the Mediation Period Exception.

(3) Defendants may select up to 10 sample entries dated after May 19, 2022 from the Code Red privilege log for *in camera* review by the Discovery Master, of documents on which Ms. Hibble is the only attorney copied, or on which there are no attorneys; the Discovery Master may determine how other similar documents from that time period will be treated.

(4) Maintain as privileged those documents involving Code Red and an attorney (other than only Ms. Hibble) that are dated after the signing of the engagement letter with Array on May 19, 2022, as well as those identified for *in camera* review by the Plaintiff.

---

[14] Plaintiff equates Code Red with Thornton Tomasetti used by Defendants in connection with the insurance claim at issue in this case.

24

*iv.    Consigli*

Consigli is a construction management service for Steward.[15] As is the case for the vast majority of Plaintiff's third-party consultants, Consigli is a "hybrid" witness — they were retained for the actual planning and construction work to assess flood damage and plan to either rebuild or build a new hospital.  Plaintiff states that Consigli's relationship with Steward pre-dates the Storm Event.  Steward retained Consigli in September 2020 to provide pre-construction services for Norwood Hospital.  Later, MPT's counsel retained Consigli as a litigation consulting expert in May 2022.[16]

Plaintiff argues that Consigli's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that Consigli created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 3).  Consigli's communications with Steward continued until October 2023.

Ms. Hibble's Declaration is as opaque for Consigli as it is for all the other third-party consultants of Steward.  It therefore does next to nothing to meet Steward's burden of proof.  The only information the Discovery Master has is from the engagement letters, counsel's briefing, and voluminous attachments of thousands of privilege log entries on hundreds of pages of tiny print.

Plaintiff withheld 446 emails involving Consigli citing attorney-client privilege and/or work product protection.  Approximately 35 documents are held back on grounds of "Attorney-Client" privilege alone, about 5 on grounds of "Work Product" protection alone, and the remainder are held back claiming various combinations of "Attorney-Client/Work-Product/Common-Interest" grounds.  On many of these documents, Nathalie Hibble, in-house counsel for Steward, is the only attorney listed in any of the "to," "from," or "cc" fields.

The analysis pertaining to Consigli is largely the same as that applied to Array above.  Prior to the signing of an engagement letter with Consigli, the scope of work documents with Steward are similar to those signed with Array, and it is a "hybrid" witness.  Plaintiff has neither sufficiently established a "translator" role played by Consigli prior to May 2022, nor that prior to

---

[15] Plaintiff describes Consigli as similar to J.S. Held and DBI, third-party consultants used by Defendants in connection with the insurance claim at issue in this case. Defendants' third-party consultants are described in more detail below.

[16] On May 26, 2022, Consigli executed an engagement letter with Foley Hoag LLP (which was representing MPT) to assist MPT's and Steward's counsel. [May 26, 2022 Engagement Letter, ORDER-CONSIGLI_00000017-021 at 017].  The engagement letter identifies Steward's counsel in this matter, Todd & Weld LLP.  The Scope of Engagement is described as assisting MPT's and Steward's counsel in the representation of their clients "in seeking recovery from property insurers (units of Zurich Insurance Group) in respect of losses, including business income losses, arising out of damage to Norwood Hospital resulting from a severe storm on June 28, 2020." [May 26, 2022 Engagement Letter, ORDER-CONSIGLI_00000017-021 at 017].

the May, 2022 engagement letter, Consigli prepared or obtained any work because of the prospect of litigation.

Plaintiffs shall:

(1) Provide for *in camera* review the 1 document dated December 2020;

(2) Produce, subject to clawback, any documents on the Consigli privilege log that do not include any attorneys and are dated before the May 26, 2022 engagement letter; Plaintiff may select up to 10 such documents that they can connect to a request from counsel for information necessary to prepare for the litigation or mediation in this case and withhold those 10 documents while they are being reviewed *in camera* by the Discovery Master; those 10 documents shall be submitted for *in camera* review, in the same file folder as the aforementioned attorney request, so that the connection can be verified (this procedure should be followed for all documents submitted for *in camera* inspection for which such attorney request connecting documents are offered).

(3) Produce, subject to clawback, any documents on the Consigli privilege log dated before the May 26, 2022 engagement letter to serve as a litigation consultant and on which Ms. Hibble is the only attorney copied (other than the document described in (1) above), subject to the Mediation Period Exception.

(4) Allow Defendants to choose 10 sample entries from the Consigli privilege log for *in camera* review by the Discovery Master, of documents on which there are no attorneys, or on which Ms. Hibble is the only attorney copied, that are dated after the May 26, 2022 engagement letter; based on the *in camera* review, the Discovery Master will determine how other similar documents will be treated.

(5) Maintain as privileged those documents involving Consigli and an outside counsel attorney that are dated after the signing of the engagement letter with Consigli on May 26, 2022 or are dated within 30 days prior to the 93A Letter or are selected by Plaintiff for *in camera* review pursuant to the Mediation Period Exception.

> *v.      Continental*

Plaintiff describes Continental as providing loss assessment and management services focused on mechanical, electrical, and plumbing systems, as well as Steward's business personal property.[17]  Steward retained Continental in July 2020 to assess losses at Norwood Hospital. Plaintiff argues that Continental's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that Continental created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 4).

---

[17] Plaintiff describes Continental as similar to J.S. Held and DBI, third-party consultants used by Defendants in connection with the insurance claim at issue in this case. Defendants' third-party consultants are described in more detail below.

However, unlike the third-party consultants discussed above, Continental was never engaged as a non-testifying litigation consultant.  Continental's communications with Steward continued until at least April 2023.

Ms. Hibble's declaration states no basis (beyond her repeated rote incantation) as to how Continental served Steward in any capacity other than as a regular consultant on loss assessment and management services.  Therefore, there is no factual support sufficient to meet Plaintiff's burden of proof for a finding that Continental served in any capacity as a "translator" of complex information that was essential for Steward's attorneys to communicate with their clients.

Plaintiff withheld 169 emails involving Continental, citing attorney-client privilege and/or work product protection.  Approximately 60 documents are held back on grounds of "Attorney-Client" privilege alone; about 10 on grounds of "Work Product" protection alone; and the remainder are held back claiming various combinations of "Attorney-Client/Work-Product/Common-Interest" protection. On many of these documents, Nathalie Hibble, in-house counsel for Steward, is the only attorney listed in any of the "to," "from," or "cc" fields.

The Discovery Master finds that Plaintiff has failed to meet its burden to establish that Continental's presence on the withheld documents was essential as a "translator" for effective communication between Steward and its counsel. The only engagement document provided is a 1-page Service Agreement dated July 11, 2020 that described the "Scope of Project" as "evaluation, scope preparation (including repair estimate), damage mitigation (if required, and agreed upon) and restoration (as required and agreed upon) of equipment damaged by the recent water intrusion incident." [STEWARD015038330]. This description is not sufficient to meet Plaintiff's burden to show that Continental was necessary, or even highly useful, for the effective consultation between the client and the lawyer. Continental is not even a hybrid third-party.

Continental was also not present at the March 11-12, 2021 adjustment meetings at Norwood Hospital attended by multiple other third-parties, nor did it attend the later adjustment meeting held on April 23, 2021.

All Continental documents withheld on the grounds of "Attorney-Client" privilege alone, where no attorney from Todd & Weld appears in the email chain, and where Ms. Hibble is only cc'd, shall be produced, subject to clawback. Of those documents designated as protected by "Work Product," Defendants shall select 5 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that an attorney asked Continental to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC. Defendants may similarly select 5 documents from those designated as protected by various combinations of Attorney-Client/Work-Product/Common-Interest protection, and no Todd & Weld attorney is on the chain, for *in camera* inspection.

27

*vi.*     *EH&E*

Plaintiff describes EH&E as providing environmental health and engineering service for Steward.[18]  EH&E's relationship with Steward pre-dates the Storm Event.  Steward retained EH&E in July 2020 to assess water damage and hazardous materials at Norwood Hospital following the storm.  Plaintiff argues that EH&E's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that EH&E created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 5).

Plaintiff withheld 231 emails involving EH&E, citing attorney-client privilege and/or work product protection. Approximately 20 documents are held back on grounds of "Attorney-Client" privilege alone, while the remainder are held back claiming various combinations of Attorney-Client/Work-Product/Common-Interest protection. On many of these documents, Nathalie Hibble, in-house counsel for Steward, is the only attorney listed in any of the "to," "from," or "cc" fields.

The Discovery Master finds that Plaintiff has not met its burden to establish that EH&E's presence on the withheld documents was essential as a "translator" for effective communication between Steward and its counsel. No showing has been made that EH&E was asked for or provided work to be used in preparation for litigation.  No engagement letter as a non-testifying consultant has been provided.  The Discovery Master finds that for the EH&E withheld documents, all EH&E documents withheld on the grounds of "Attorney-Client" privilege alone, where no attorney from Todd & Weld appears in the email chain, shall be produced, subject to clawback. Of those documents designated as protected by "Work Product," Defendants may select 5 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that an attorney asked EH&E to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC (the privilege log documents and any supporting/connecting attorney requests shall be provided in the same folder).

 Defendants may similarly select 5 documents from those designated as protected by various combinations of Attorney-Client/Work-Product/Common-Interest protection, and no Todd & Weld attorney is on the chain, for *in camera* inspection.

*vii.*     *Green Seal*

Plaintiff describes Green Seal as an engineering consultant.  Green Seal's relationship with Steward pre-dates the Storm Event.  Steward retained Green Seal in September 2020 to evaluate damage caused by the storm at Norwood Hospital.  Ms. Hibble's Declaration, once again states only that Green Seal "translated information, using its subject matter expertise, for counsel to ensure effective attorney-client consultation." (Hibble Decl. at ¶7(g)). Green Seal's

---

[18] Plaintiff describes EH&E as similar to J.S. Held and DBI, third-party consultants used by Defendants in connection with the insurance claim at issue in this case. Defendants' third-party consultants are described in more detail below.

privilege-logged communications with Steward continued until April 2023. There is no engagement letter with Green Seal to become a non-testifying litigation consultant.

Plaintiff withheld 55 emails involving Green Seal, citing attorney-client privilege and/or work product protection: 1 document is dated November 2020, and the remainder dated October 2021-May 2022. Approximately 38 documents are held back on grounds of "Attorney-Client" privilege alone, while the remainder are held back claiming various combinations of Attorney-Client/Work-Product/Common-Interest grounds.

No evidence sufficient to meet the burden of proof has been submitted by Plaintiff to establish a basis that Green Seal met the standard required by the case law to permit its communications to be derivatively privileged.

The Discovery Master rules that for the Green Seal withheld documents, Plaintiff shall:

(1) Provide the 1 document dated November 2020 for *in camera* inspection by the Discovery Master.
(2) Produce, subject to clawback, all Green Seal documents withheld on the grounds of "Attorney-Client" privilege alone, where no attorney from Todd & Weld appears in the email chain.
(3) Of those documents designated as protected by various combinations of Attorney-Client/Work-Product/Common-Interest protection, and no Todd & Weld attorney is on the chain, Defendants shall select 5 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that an attorney asked Green Seal to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC.

*viii.    L.A. Fuess*

Plaintiff describes L.A. Fuess as an engineering consultant, which provided Steward services in connection with Steward's retention of Array.[19]  Plaintiff states that L.A. Fuess was retained in the fall of 2020 to assist Array.  Plaintiff argues that L.A. Fuess's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that L.A. Fuess created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 6).  Plaintiff states that L.A. Fuess's contact with Steward continued until at least April 2021.[20]

---

[19] The May 19, 2022 engagement letter between Array and Foley Hoag (counsel for MPT) identified in the Array discussion above provides: "For the avoidance of doubt, we are aware that Array plans to retain services of Code Red Consultants, LA Fuess Partners, Gale Associates, Inc., DJM and perhaps others to assist in the performance of Array's services hereunder and we consent to that retention." [ARRAY00041480-488 at 480].

[20] The privilege log contains documents showing contact up to January 2023.

Plaintiff withheld 61 emails involving L.A. Fuess, citing attorney-client privilege and/or work product protection: 1 from November 2020; the remainder of these documents are dated between April 2022 and January 2023.  One document is held back on grounds of "Attorney-Client" privilege alone, while the remainder are held back claiming various combinations of Attorney-Client/Work-Product/Common-Interest grounds.

The analysis pertaining to L.A. Fuess is largely the same as that applied to Array and Code Red above.  The May 19, 2022 engagement letter between Array and Foley Hoag specifically includes L.A. Fuess as a consultant to Array.

Plaintiffs shall:

(1) Produce, subject to clawback, any documents on the L.A. Fuess privilege log that do not include attorneys, dated prior to the May 19, 2022 engagement letter to Array (which retained L.A. Fuess), subject to the Mediation Period Exception.
(2) Produce, subject to clawback, any documents on the L.A. Fuess privilege log on which Ms. Hibble is the only attorney copied, that are dated before May 19, 2022, the date of the litigation consultant engagement letter to Array (which retained L.A. Fuess), subject to the Mediation Period Exception.
(3) Defendants may select up to 5 sample entries from the L.A. Fuess privilege log for *in camera* review by the Discovery Master, of documents on which Ms. Hibble is the only attorney copied, that are dated after May 19, 2022; based on the *in camera* review, the Discovery Master may determine how other similar documents from that time period will be treated.

ix.    *Marsh*

Plaintiff describes Marsh as providing forensic accounting services. Marsh's relationship with Steward pre-dates the Storm Event.  Steward retained March in June 2020 to calculate Steward's business interruption losses for its insurance claim at Norwood Hospital. Ms. Hibble states that Marsh "translated information, using its subject matter expertise, for counsel to ensure effective attorney-client consultation." (Hibble Decl. at ¶7(i)).

Plaintiff withheld 367 emails involving Marsh, citing attorney-client privilege and/or work product protection.  About half the documents are held back on grounds of "Attorney-Client" privilege alone, about 10 on grounds of "Work Product" protection alone, and the remainder are held back claiming various combinations of Attorney-Client/Work-Product/Common-Interest protection.

In light of the caselaw establishing derivative privilege for accountants with expertise in the more complex areas of accounting, the Discovery Master will permit Plaintiff to submit 25 documents for *in camera* review, to attempt to establish attorney communications with Marsh and with its clients, to satisfy the required elements stated in the caselaw for derivative attorney client privilege. If the Discovery Master is persuaded by this proffer, it will apply the privilege to Marsh communications with counsel and Steward.

30

Defendants may select 5 documents from those designated as protected by various combinations of Attorney-Client/Work-Product/Common-Interest protection, and no Todd & Weld attorney is on the chain, for *in camera* inspection by the Discovery Master, on the issue of derivative privilege.

Of those documents designated as protected by "Work Product," Defendants shall select 5 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that an attorney asked Marsh to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC (the privilege log documents and any supporting/connecting attorney requests shall be provided in the same folder).

    x.    *MPT*

MPT was Steward's landlord at Norwood Hospital and other locations throughout the US.  Prior to Steward's bankruptcy, MPT held an ownership interest in Steward. As set out in the Parties' briefing, the pleadings, and other submissions made in this case, Defendants adjusted both Steward's and MPT's insurance claims concurrently, using the same adjuster, Mark Graves, for both MPT's and Steward's claims. Both claims resulted in litigation in the fall of 2021. Plaintiff argues that Steward, MPT, and their respective counsel shared information and worked together on legal strategies in connection with their insurance claims and the litigation.

Plaintiff withheld 195 emails involving MPT, citing attorney-client privilege and/or work product protection: 5 documents are from 2018; the rest of the documents are from July 2020-January 2023. Most of the documents are held back claiming various combinations of Attorney-Client/Work-Product/Common-Interest grounds.

The Discovery Master finds that the factual background of this case supports Plaintiff's position that Steward and MPT shared a common legal interest in the actions and disputes related to the 2020 Storm Event at Norwood Hospital. The Discovery Master reaches this conclusion based on the prevalence of MPT in the filings and submissions made in this matter.  Ms. Hibble's Declaration includes one sentence stating summarily that "Steward and MPT has a common interest" in the insurance claim and subsequent litigation. (Hibble Decl. at ¶5).  MPT was Steward's landlord, and both of these entities had a shared interest in submitting claims for the damage to the premises and business caused by the Storm Event.  Both entities also shared an interest in the resolution of insurance claims pertaining to Norwood Hospital.

In May 2021, MPT and Steward jointly retained a business mediator to assist with the Parties' insurance claims-related disagreements on a non-confidential basis and then participated in a mediation in June 2021.  In that mediation process, the Parties agreed that the MPT dispute would be addressed before Steward's, demonstrating that MPT and Steward were collaborating in the timing of their insurance claims resolutions. MPT's claim was settled shortly after the Massachusetts Supreme Judicial Court construed the insurance policy language about a particular sublimit.

Ms. Hibble says nothing about a common interest in litigation in 2018, which was 2 years prior to the Storm Event.

The Discovery Master concludes that Plaintiff has sufficiently established that common-interest protection applies to the MPT documents after the Storm Event that were withheld from production. This is particularly true given the intertwined relationship of the two entities described above, in light of the fact that "the common interest doctrine is not limited to litigation or impending litigation." *Hanover Ins. Co. v. Rapo & Jepsen Ins. Services, Inc.*, 449 Mass. 609, 614. Plaintiff may maintain as privileged all documents on the MPT privilege log on which any counsel appears. For those communications with MPT that do not contain an attorney, Defendants may select 10 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that the employees of Steward and MPT were discussing attorney client communications on an issue of common interest, either about this litigation or another issue in which they shared a common interest.

For those documents withheld on work product grounds only, the Defendants may select 5 for *in camera* review; they shall be submitted to the Discovery Master tougher with the communication showing that an attorney asked the involved non-attorneys to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC (the privilege log documents and any supporting/connecting attorney requests shall be provided in the same folder).

The 5 documents withheld in 2018 shall be submitted for *in camera review* to ascertain what the common interest was that was being discussed between MPT and Steward.

   *xi.*    *NFA*

Plaintiff describes NFA as Steward's independent adjuster in this case.[21] Steward retained NFA in August 2020 to adjust its insurance claim for Norwood Hospital. Ms. Hibble once again repeats her verbatim incantation that NFA "translated" information for effective attorney-client consultation, without anything further to support this claim. Steward's privilege-logged communications with NFA continued until November 2022.

Plaintiff withheld 974 emails involving NFA, citing attorney-client privilege and/or work product protection.

While Plaintiff has not proffered much, the Discovery Master will permit outside counsel's direct communications with NFA to remain privileged, as communications with adjustment consultants that counsel must explain to its client. Ms. Hibble's direct communications with NFA, where she is on the "To" or "From" line will similarly remain privileged.

However, there has been no proffer of the need for non-counsel to be communicating with NFA; while this could be conceivable, there has been no showing of this, which the caselaw

---

[21] According to Plaintiff, this is a similar role filled by Sedgwick for Defendants.

requires. The Discovery Master finds that NFA documents withheld on the grounds of "Attorney-Client" privilege alone, where no attorney from Todd & Weld appears in the email chain, and where Ms. Hibble is only a cc, shall be produced, subject to clawback. Of this tranche of documents, Plaintiff may select 10 for *in camera* review, where they can show that these communications were necessary for "translation" of advice between counsel and the client. Defendants may likewise select 10 for *in camera* review. Plaintiffs shall produce both sets of 10, together with the communication showing that an attorney has asked for an explanation of certain information to provide to the client; or the client seeks information to seek attorney advice upon.

Of those documents designated as protected by "Work Product," Defendants shall select 5 for *in camera* inspection, and Plaintiff shall provide those to the Discovery Master, together with any other document showing that an attorney asked NFA to prepare information for counsel's use in anticipation of this litigation between Steward and AGLIC (the privilege log documents and any supporting/connecting attorney requests shall be provided in the same folder). Defendants may similarly select 5 documents from those designated as protected by various combinations of Attorney-Client/Work-Product/Common-Interest protection, and no Todd & Weld attorney is on the chain, for *in camera* inspection.

### xii.    *Optisure*

Plaintiff describes Optisure as Steward's insurance broker who helped Steward obtain the insurance policy at issue in this case. Plaintiff argues that Optisure's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that Optisure created and received communications and documents prepared in anticipation of this litigation. (Plaintiff's Feb. 12, 2026 Letter Br. at p. 7). Plaintiff states that Steward's communications with Optisure continued until March 2023.

Plaintiff withheld 18 emails involving Optisure: 14 of the emails are dated July 2020; 2 from March 2021; 1 from September 2022; and 1 from January 2023. All of these are withheld on the grounds of "Attorney-Client" privilege. The Discovery Master is aware from other cases that communications with an insurance broker are sometimes recognized as quasi-privileged during the period before a party engages counsel. And that, after counsel is engaged, communications with a broker are no longer deemed privileged. However, neither party has briefed Massachusetts caselaw on this particular issue.

Given the small number of entries for Optisure, Plaintiff shall:

(1) Provide to the Discovery Master, for *in camera* inspection, the 2 documents from March 2021, the September 2022 document and the January 2023 document; and
(2) Defendants may select 5 entries from the Optisure privilege log for *in camera* review by the Discovery Master, of documents dated July 2020, which long predated the anticipation of this litigation.

*xiii.*    *Suffolk*

Plaintiff describes Suffolk as providing government relations and lobbying services to Steward, including lobbying related to Norwood Hospital and this litigation. Plaintiff argues that Suffolk's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that Suffolk created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 8).  Steward's contact with Suffolk continued until at least April 2024.

Plaintiffs withheld 21 emails involving Suffolk: 1 from July 2020; 1 from January 2021; 15 from April 2021; 5 from Jan 2022.  All of these are withheld on the grounds of "Attorney-Client" privilege.

The Discovery Master finds that Plaintiff has failed to establish that Suffolk's involvement was necessary or even highly useful in translating information to ensure effective consultation between Steward and its counsel. The type of work Ms. Hibble in her Declaration states that Suffolk performed – government relations services – is not the type of work that requires translation to enable an attorney to understand it in his or her consultation with a client. (Hibble Decl. at ¶10).  All but one of the 21 emails involve only Ms. Hibble as the attorney emailed or copied, and all of these shall be produced, subject to clawback.  The one remaining email includes Todd & Weld attorneys and shall be provided to the Discovery Master for *in camera* inspection.

B.   Plaintiff's Withholdings Involving CREF

Plaintiffs withheld over 4,500 communications in which a CREF employee was the author, recipient or copied, citing attorney-client privilege and/or work product protection: 1 from 2017; 1 from 2018; 1 from 2019; and the remainder from June 2020 – Oct 2024. CREF is a third-party company that managed Steward's real estate development and facilities for its hospital portfolio. CREF is a real estate development and facilities manager that is a separate company from Steward. Interestingly, CREF was 40% owned by Steward's former CEO, who had a personal interest in CREF. Norwood Hospital funds were used to pay for the personnel employed by CREF, rather than having its own employees manage its real estate.

Plaintiff describes CREF as the equivalent of Steward's corporate real estate division, except that Norwood Hospital does not employ the CREF employees.  Instead, it pays CREF for their work. CREF employees interacted regularly with Defendants and their agents during the claim submission and adjustment process.

Plaintiff's basis for withholding these thousands of emails is that CREF employees frequently communicated with Plaintiff's attorney, and served as "a conduit for seeking and obtaining information from Plaintiff's other consultants as requested by counsel." (Plaintiff's Feb. 12, 2026 Letter Br. at p. 4).  Todd & Weld was retained by Steward shortly after the Storm Event to help prepare its insurance claim.

34

CREF employees wore many hats. They are persons who did the actual work to respond to the storm damage; they also communicated directly with the insurers regarding the insurance claim; and they served to gather information for counsel's use in this litigation, which would be a potential work product role.  At their highest level, one CREF employee appears to be a trusted high-level person functioning in the capacity of a trusted employee for certain functions. For all of these reasons, determining the correct manner to treat these thousands of withheld communications must be varied.

Plaintiff describes CREF employees as functionally equivalent to Steward employees, and that it was in this capacity that they were involved in privileged communications with Todd & Weld attorneys.  Ms. Hibble states that CREF provided support to Steward's response to the Storm Event (a business work portion of their job), communicated with Defendants on behalf of Steward, gathered information from other third-party hybrid witnesses who worked on the storm damage response, and conveyed their information to counsel (a work product role).  The CREF employee who served in a high-level trusted capacity was also privy to attorney client communications, and Plaintiff argues that, similarly with a corporate employee, this CREF "functional equivalent" employee should not destroy the privilege. Plaintiff's brief argues that CREF's presence on withheld documents was necessary for effective consultation between Steward and its counsel, and that CREF created and received communications and documents prepared in anticipation of this litigation.  (Plaintiff's Feb. 12, 2026 Letter Br. at p. 4).

CREF employees are described in a manner that could support a work product claim in the claimed "information gathering" role, as well as a "high level trusted [functional] employee role, which, if supported, would be treated in the same way as an actual corporate employee. The weakest role claimed for CREF is the "translator" role between counsel and client.

CREF as "Functional Employees of Steward:

Several high-level CREF employees served as the functional equivalent of Steward employees. This fact came into sharp focus during the first hearing between the Discovery Master and the Parties, when Defendants admitted that they initially thought that several high-level CREF employees were actually Steward employees, until Steward informed them otherwise. These high level CREF employees maintained steward.org email addresses, and regularly worked in collaboration with Steward employees and counsel. Thus, those CREF employees identified on Plaintiff's privilege log who acted "in a high-level, trusted decision-making or guiding role, equivalent to that of an employee," became a "functional employee." *See American's Test Kitchen*, 35 Mass.L. Rptr. 75, *2. These individuals' status as a third-party does not destroy any privilege that would otherwise apply to their communications with Steward counsel.  Based on some of the communications read, the Special Master finds that Chris Kidney acted in such "high-level trusted decision-making or guiding role."  If he was copied on an email from Todd & Weld directly to Ms. Hibble; or received an email directly from Steward counsel, that would not destroy attorney client privilege, based on the cited caselaw.  This individual can be thought of being akin to a corporate management executive.

None of the CREF employees, however, were handling any esoteric complex area of expertise; they handled real estate management matters at the ground level. No showing has been

made that they were indispensable "translators" necessary for Steward counsel to communicate with their client.  Mr. Kidney has the status of a "high-level, trusted, or decision-making or guiding role," which makes him a functional employed.  If he is copied on otherwise privilege communications between Todd & Weld and Steward, or Todd & Weld and other consultants who do meet the "translator" criteria for portions of their hybrid work, the CREF employees' presence on the chain does not destroy that privilege.  But it also does not create a privilege if they communicated with a third-party who was acting in a hybrid role, doing actual engineering or architectural or storm damage assessment work and the like.

The vast majority of the function of CREF employees was gathering and relaying information sought by counsel.  This is a work product claim. It certainly is not a highly complex specialty area of expertise that is the hallmark of derivative privilege, developed in the *Kovel* line of caselaw through the decades.

In their briefing, Defendants point to emails from Mr. Kidney, who was a CREF employee with the title of Senior Director of Emergency Project Management, providing a blanket instruction to CREF and other third-party consultants to copy Ms. Hibble on their communications and include "communication protected by attorney client privilege" in the subject line for any emails "around scope, budget and schedule," without any instruction that only those communications must relate to eliciting or receiving legal advice. [STEWARD01326278 and STEWARD01387984].

Scope, budget and schedule are not the types of activities that require "translation" for the attorney and client to seek or understand legal advice given. Defendants also provide examples of documents produced by Steward with redactions that do not appear to contain any privileged information, yet bear the same subject line "Communication Protected by Attorney Client Privilege." [STEWARD01365317-321]. The Discovery Master finds that Mr. Kidney's broad instructions to copy Ms. Hibble routinely, in combination with the examples provided with the improper use of "Attorney-Client Privilege" on communications showing no privileged communication within the communication undermines Plaintiff's claims that it has met the burden needed to support derivative privilege.  That subject line is so overused that it signifies nothing by itself.

The Discovery Master has accorded appropriate latitude to the Plaintiff, in giving Mr. Kidney the status of a "a high-level, trusted decision-making or guiding role, equivalent to that of an employee," whose communications are the equivalent of a corporate counsel's communications with its own management team.  In this way, many of the emails in which Mr. Kidney communicates with counsel can remain attorney client privileged under the functional equivalent doctrine.  But no CREF employee has the status of "translator".

Mr. Kidney's instructions to all of the CREF employees to routinely copy Ms. Hibble and use the legend "Attorney-Client" call the alleged privileged nature of any such documents into question.  Cleary, Mr. Kidney was apparently not instructed by Ms. Hibble about the proper use of the designation, and he used labels in an attempt to shield documents. This did not come to light until very late in the discovery period, when it is too late to easily remediate what he did.

36

In short, Mr. Kidney's presence on emails between Todd & Weld and Steward does not destroy the privilege between Steward and its counsel.  But Mr. Kidney himself cannot cloak himself with derivative privilege as a "translator" of other third-parties' communications. Those could only qualify as work product, if the requisite showing had been made for them. However, it has not, and the use of multiple bases for withholding makes it even more difficult to separate those that might qualify as work product, from those that do not.  The other CREF employees who worked under Mr. Kidney do not meet the status of "a high-level, trusted decision-making or guiding role case for functional employees." No showing has been made that Mr. Gendron, the CEO of CREF, worked solely for Steward and warrants the "functional employee" label. Similarly, no analysis of Mr. Kidney's emails has been proffered by the Hibble Declaration to establish them as work product in anticipation of litigation.

The Plaintiff shall:

(1) Produce, subject to clawback, any documents on the privilege log as to CREF that do not directly show work product requests by or responses to such requests from Todd & Weld for work product information, or that include only Ms. Hibble as a cc regardless of the date of the document.

(2) Produce, subject to clawback, any communications between Mr. Kidney and other CREF employees with third-parties, when no Todd & Weld attorney is part of the email, regardless of whether that third party has been ruled to be a "translator" at the time of the communication.  Kidney's work has not been ruled to be a "re-translator" of the other third-party "translators"; his role could only have been, if at all, as a gatherer of information to provide back to counsel, as a work product role. If a work product claim was made for such communications by Mr. Kidney, then Plaintiff may seek a ruling from the Discovery Master to claw back such communication as a work product request by Steward counsel, Todd & Weld. The work product request shall be shown to the Discovery Master, *in camera*, together with the CREF email as to which clawback is sought.  Todd & Weld represented Steward from shortly after the loss event.  Work product attaches when a communication is in anticipation of litigation, which the Discovery Master has ruled starts on the date that Todd & Weld sent the "93A letter" to the Defendants, even though the actual litigation started much later than that date.

(3) Defendants may also select up to 20 entries in which Mr. Kidney is communicating directly with Ms. Hibble for review as to the elements of attorney client privilege or, if also claimed, whether the requirements for work product protection are met. Communications where Ms. Hibble is only cc'd shall be produced, subject to clawback, for the reasons stated above.

C.  Procedure for Production and *In Camera* Review

For those documents that are ordered to be produced, subject to clawback, Plaintiffs shall make such production by May 26, 2026.

For those categories of documents for which Defendants are instructed to provide selections of examples for *in camera* review, those selections shall be provided to Plaintiff by

May 20, 2026. Plaintiff shall then provide these documents for *in camera* inspection by May 29, 2026.

## V.    Defendants' Withheld Third-Party Documents

Plaintiff asks that the Discovery Master order Defendants to produce documents they have withheld as privileged communications between defense counsel directly "to" or "from" three consultants: DBI Construction Consultants, LLC ("DBI"), Shawmut Design (Shawmut) and J.S. Held, LLC ("J.S. Held").[22]  Defendants have represented that they are not withholding any Shawmut documents; therefore, the Plaintiff's request for Shawmut documents is moot.

DBI is a building damage and engineering consultant retained to advise on the scope of work needed to repair physical damage to Norwood Hospital. Defendants withheld 12 documents consisting of direct emails between defense counsel and DBI.

 J.S. Held is an engineering consulting firm retained to provide consulting services relating to (1) Steward's "business personal property claims" and (2) various aspects of MPT's building-related claims.  Defendants withhold 27 documents consisting of direct emails between defense counsel and J.S. Held.

Let's start with attorney client privilege:  Plaintiff has not argued that either J.S. Held or DBI lacks the derivative privilege status of the *Kovel* line of cases. Therefore, defense attorneys' communications with both entities remains privileged, because the involvement of these third-parties does not destroy the privilege.

Plaintiff instead argues that Defendants [i.e. AGLIC and Zurich] considered the work done by these consultants when Defendants made their determination of the end date of the insurance "period of liability" for the Norwood Hospital business interruption claim.  Plaintiff then makes a huge leap, by further arguing that in alleged "bad faith insurance cases," the strategy, mental impressions and opinions of an insurer's agents concerning the handling of a claim are directly "at issue" and that the Plaintiff's need for such documents is compelling. Plaintiff erroneously relies on a conflation of two separate principles. One is that the "at issue" waiver necessary to pierce through counsel's privilege with its client occurs only when *the defense attorneys' own conduct* is at issue. *See Global Invs. Agent Corp. v. Nat'l Fire Ins. Co. of Hartford*, 76 Mass. App. Ct. 812 (2010); *Zabin v. Picciotto,* 73 Mass. App. Ct. 141 (2008).  This can result from either the advice of counsel to a client in a prior case; a fee dispute between client and counsel; or the defense of "advice of counsel", none of which applies here. The second is a claim to a compelling need to obtain the attorney's own mental impressions work product. That also has not been shown by any proffer of any evidence; Nothing but use of the phrase "compelling need," without any showing.

---

[22] In their February 11, 2026 communication to the Discovery Master, Defendants state that they also withheld 39 documents involving third-party for Sedgwick Claims Management Services, Inc., 8 documents involving third-party Matson Driscoll & Damico LLP, and 4 documents involving Thornton Tomasetti.  Plaintiff has not challenged these withholdings and any potential objections to those documents have therefore been waived.

These communications that Plaintiff seeks an order to compel are communications between defense counsel directly with its third-party consultants whose *Kovel* status as within the derivative privilege has not been challenged. These are therefore communications within the attorney client privilege.

No action of defense counsel is challenged as inappropriate.  Therefore the "at issue" line of cases is in applicable.  Even Plaintiff's reliance on the one "bad faith" insurance case cited by Plaintiff, *Rhodes v. AIG Domestic Claims, Inc.,* No. CIV.A. 05- 1360-BLS2, 2006 WL 307911, at *6 (Mass. Super. Jan. 27, 2006), is an unpersuasive stretch of the "at issue" doctrine. The *Rhodes* case itself relies on *Ward v. Peabody, 380 Mass. 805, 818, 405 N.E.2d 973 (1980),* in which the Supreme Judicial Court discussed that opinion product may be ordered to be disclosed only in extremely unusual circumstances; the Court stated that "in the singular instances when the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with such activities, though they are work product.'" As stated above by the Discovery Master, these "singular" cases are entirely inapposite here. Nobody has argued that the acts of counsel from Riley Safer are themselves being challenged, nor that Defendants have asserted an "advice of counsel" defense.  Therefore, the "at issue" doctrine does not apply.

Here, Plaintiff seeks an unprecedented extension of the "at issue" principle to argue that in cases in which an allegation of "bad faith insurance" claims processing has been made, the derivative attorney client privilege is deemed waived as if the Defendants had asserted an "advice of counsel" defense. They have not, and these communications between client and its defense counsel remain privileged.

Likewise, compelling need for these attorney-client privileged, and/or work product privileged communications has not been shown: Depositions are available to ask about the analysis undertaken by Defendants' claims agents to determine how they determined the duration of business interruption insurance.  What cannot be asked is what the discussions were between defense counsel and these consultants, or the defense counsel's theories, because no argument has been presented to strip these communications from derivative privilege, and those arguments have been waived.

The Discovery Master finds that the 39 communications between attorney and client that were withheld by Defendants all involved their attorneys communicating directly with DBI and J.S. Held.  They are properly withheld under derivative privilege and/or the work product doctrine. All of these documents are dated after Defendants' receipt of Plaintiff's 93A letter and all of them include Defendants' attorneys.  These third-parties translated information regarding technical aspects of the claim adjustment that counsel needed to provide services to the Defendants, or were made in anticipation of litigation.  There has been no "at issue" waiver of the privilege.

**SO ORDERED**

Dated: May 14, 2026                         /s/ *Faith S. Hochberg*_____
                                            Hon. Faith S. Hochberg, U.S.D.J. (ret.)