**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

MARK KRONFELD, AS TRUSTEE
OF THE SHC CREDITOR
LITIGATION TRUST,

        Plaintiff,

        v.

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY
and ZURICH AMERICAN INSURANCE
COMPANY,

        Defendants.

Civil Action No. 1:21-cv-11902-PBS

**PLAINTIFF'S OBJECTION TO SECTION IV(B) OF**
**DISCOVERY MASTER ORDER NO. 22 (ECF NO. 224)**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ i

I. Relevant Background ................................................................................................................4

    A. The Norwood Hospital Loss and the Resulting Need for a Multi-Layered, Consultant-Driven Response ................................................................................................................4

    B. Steward's Use of CREF as Its Functional Internal Real Estate Department ..................6

    C. CREF's Role Managing the Norwood Insurance Loss and Redevelopment .................8

    D. The Volume and Complexity of Plaintiff's Privilege Review and Logs ........................9

    E. Defendants' Privilege Challenges and Discovery Master's Review ............................11

    F. The CREF Ruling and CREF Communications on the Second Amended Log ...........12

II. Standard of Review ..............................................................................................................13

III. Argument ...........................................................................................................................13

    A. The CREF Ruling Must Be Vacated Because it Improperly Narrows the Functional Equivalent Doctrine and Conflates the Attorney-Client Privilege with the Work Product Doctrine .......................................................................................................13

    B. If the CREF Ruling Stands, its Inherent Contradictions Make it Impossible to Apply ...................................................................................................................................19

    C. Plaintiff Preserves the Right to Further Object to Order No. 22 With Respect to Steward's 13 Other Consultants as Those Rulings Are Not Yet Ripe........................19

IV. Conclusion ..........................................................................................................................20

Pursuant to Fed. R. Civ. P. 53(f) and the Order Appointing the Honorable Faith S. Hochberg as Discovery Master (ECF No. 149) at § III, Plaintiff Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust ("Plaintiff"), respectfully objects to and seeks an order vacating Section IV(B) of Discovery Master Order No. 22 (ECF No. 224) (the "Order" or "Order No. 22") governing Plaintiff's withholding of privileged communications involving an entity known by the acronym CREF, which functioned as Steward Health Care System LLC's ("Steward") internal corporate real estate department.

This part of Order No. 22 (the "CREF Ruling") mandates that Plaintiff produce more than 4,000 communications that are protected by the attorney-client privilege and the work product doctrine. The ruling's rationale is internally inconsistent, unsupported by governing law, and impracticable to apply across many thousand documents in a complex case.

The CREF Ruling should be overturned because it suffers from three fundamental and interrelated defects. *First*, it misapplies the functional equivalent doctrine, under which the subject documents are privileged because multiple CREF personnel operated in roles equivalent to Steward employees. *Second*, it erroneously treats attorney-client privilege the same as work product even though the attorney-client privilege offers greater protection, such as because it cannot be overcome by a showing of a substantial need. *Third*, it erroneously limits Steward's attorney-client privileged communications to those in which outside counsel—Todd & Weld— was a party to the communication. None of these conclusions is grounded in governing doctrine or the evidentiary record. Rather, the Order appears to reflect a skeptical eye towards Plaintiff's privilege assertions because one individual routinely included privilege disclaimers on his emails. But Plaintiff was not relying on those disclaimers: Plaintiff individually reviewed

1

documents and narrowed the withheld documents involving that individual.  Thus, any concern over those disclaimers does not justify eroding Steward's attorney-client privilege.

The Order itself recognizes that CREF personnel operated as the functional equivalents of Steward employees.  It further finds that "several high-level CREF employees served as the functional equivalent of Steward employees," working closely with Steward personnel and counsel in roles "equivalent to that of an employee." Order No. 22 at 35.  Indeed, the record shows that Steward tasked CREF with leading that response immediately following the loss, including coordinating consultants, interfacing with insurers, and working directly with counsel to gather and synthesize the information necessary to provide legal advice.  CREF personnel were therefore indispensable to counsel's ability to understand the underlying facts, advise the client, and implement legal strategy.

CREF was so instrumental in helping outside counsel that of the *448 logged communications sent by Todd & Weld attorneys, 446—approximately 99.5%—include at least one CREF employee*. CREF's participation was therefore pervasive and essential to Steward's legal response.  But CREF's role was equally essential in assisting Steward's in-house and outside counsel address the legal issues relating to the insurance claim.  For this reason, the CREF privilege log includes hundreds of communications involving such counsel that do not include Todd & Weld.  The CREF Ruling would require disclosure of attorney-client privileged communications that *reflect* legal advice rendered by in-house or outside counsel.  It is well settled that attorney-client privilege covers these documents that reflect legal advice even when outside counsel did not send or receive the communication.

Even though the Order recognizes that  multiple CREF personnel satisfied the functional equivalent standard, the Order treats only one individual—Chris Kidney—as someone whose

communications are privileged. Thus, the CREF Ruling is arbitrary because it excludes other senior CREF personnel, including Robert Gendron.  The ruling would require the production of *892* logged communications between CREF and Todd & Weld that do not involve Mr. Kidney absent a specific showing of work product.  And it would require the production of *895* logged communications between CREF and Steward's other outside counsel, which do not include both Mr. Kidney and an attorney from Todd & Weld.  The Order offers no principled basis for distinguishing among them, and none exists.

The exclusion of Mr. Gendron is a grave error. As CEO of CREF, he was Steward's most senior real estate executive.  Steward's General Counsel instructed him to work with outside counsel on legal issues arising from the loss. For this reason, he was included on more communications with counsel—both in-house and outside—than any other CREF employee.  The Order identifies no record evidence that would justify treating him differently from other acknowledged functional equivalents.  Defendants' own affirmative defenses and deposition testimony place CREF—and Mr. Gendron specifically—at the center of the relevant events, confirming the integral role CREF played within Steward's operations.  The Order ignores that evidence, which further highlights the serious ramifications of an arbitrary ruling about CREF's status that carves out privilege protection for its most senior executive.

In sum, these legal errors and internal inconsistencies require that Section IV(B) of Order No. 22 be vacated. Plaintiff respectfully requests that the Court vacate the CREF Ruling; hold that CREF personnel—including, at minimum, Robert Gendron, Chris Kidney, Michael Crowley, Scott Kenyon, Dana Meunier, Steve VanNess, and David Soucy—were functional equivalents of Steward employees; confirm that their participation in communications with

3

counsel does not waive attorney-client privilege or work product protection; and otherwise modify the Order consistent with the relief set forth in Section III.A.iv.

## I.    Relevant Background

### A.    The Norwood Hospital Loss and the Resulting Need for a Multi-Layered, Consultant-Driven Response

On June 28, 2020, an unprecedented storm ("Storm") struck Norwood, Massachusetts, releasing approximately 5.75 inches of rainfall within a 90-minute period and causing catastrophic flooding at Norwood Hospital ("Norwood").  *See* ECF No. 61, ¶ 34.  The resulting damage was extensive and multifaceted, affecting not only the structural integrity of the facility, but also its building-envelope mechanical, electrical, and plumbing systems, complex biomedical and diagnostic imaging equipment, and numerous regulatory and code-compliant functions critical to the operation of an acute-care hospital.

The scale and technical complexity of the loss required an immediate and highly coordinated response involving professionals across numerous specialized disciplines.  Steward necessarily engaged architects, engineers, construction managers, environmental and restoration experts, and other consultants to assess damage, develop remediation and rebuilding plans, and ensure compliance with applicable regulatory frameworks.  This effort could not proceed in silos.  It required centralized coordination to manage the work of these consultants, facilitate communication with insurers and their representatives, and ensure the efficient flow of information needed by counsel to provide legal advice concerning the insurance claim and, ultimately, the ensuing litigation.

Steward immediately turned to CREF—an entity that functioned as its internal corporate real estate division—to serve in this coordinating role.  CREF personnel mobilized onsite at Norwood on the day of the Storm.  The following day, Steward's General Counsel introduced

4

CREF's leadership, including Robert Gendron, to Steward's outside counsel at Todd & Weld, and directed that CREF and counsel work together to address all legal and claim-related aspects of the loss.[1]  From the outset, CREF operated as the central hub through which technical information was gathered, organized, summarized, and transmitted to counsel, and through which communications with insurers and their consultants were coordinated.

Defendants responded to the loss in a materially similar manner.  They retained their own consultants and relied on Sedgwick, Inc., their claims administrator, to coordinate the adjustment process and manage communications.  The magnitude of the loss required experienced oversight at every level.

---

[1] As Plaintiff explained in his February 17, 2026 opposition to Defendants' privilege challenge, CREF's involvement in communications with counsel began immediately following the Storm and reflected its role as Steward's operational arm.  For example, on June 29, 2020—the day after the loss—Steward's General Counsel and Todd & Weld communicated directly with Mr. Gendron, to begin coordinating Steward's response and addressing its legal rights.  *See* **Exhibit 1**, Plaintiff's Opposition at 9 n.16 (citing Privilege Log Entry No. 634).  The notion that such a communication—between Steward's senior in-house counsel, outside counsel, and the executive responsible for coordinating the response to the loss—would lose its privileged status solely because it included Mr. Gendron is inconsistent with settled privilege principles.  Under the CREF Ruling, however, that communication—and hundreds of others like it—would not be protected by the attorney-client privilege unless they included Mr. Kidney and would have to be produced unless Plaintiff can demonstrate a specific request for or provision of work product.  This outcome illustrates the extent to which the ruling departs from the functional equivalent doctrine and imposes a framework untethered to the realities of how Steward's response was structured.

In short, both sides recognized that this was an unusually large and complex loss event requiring layered expertise and centralized coordination.  The structure of communications that followed—including the involvement of multiple consultants and the central role played by CREF—was a direct and necessary product of those realities.

B.    **Steward's Use of CREF as Its Functional Internal Real Estate Department**

At all relevant times, CREF functioned as Steward's internal corporate real estate division and served as its principal agent in managing the Norwood loss and subsequent redevelopment efforts.  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████ █



**C.**    **CREF's Role Managing the Norwood Insurance Loss and Redevelopment**

8

Taken together, this testimony demonstrates that CREF functioned not as a discrete third-party vendor, but as Steward's central coordinating body for the Norwood loss—managing information flow, interfacing with consultants and insurers, and supporting Steward's legal and operational response.

### D.        The Volume and Complexity of Plaintiff's Privilege Review and Logs

Plaintiff conducted a detailed, document-by-document review of a massive volume of potentially privileged communications.  This undertaking was driven by several factors.

First, Discovery Master Order No. 1 ("Order No. 1") drastically expanded the scope of discovery.  It required Plaintiff to review roughly 700,000 additional documents, which naturally lumped in communications with counsel, including on issues unrelated to the loss but that happened to hit on an overbroad search term.

Second, Steward's response to the Norwood loss involved not only CREF, but at least thirteen additional consultants, each of whom played different roles at different times.  These consultants provided specialized services spanning multiple disciplines, ranging from engineering and construction to accounting and environmental remediation.  Some later entered into litigation consulting engagements, while others remained involved primarily in operational or claim-adjustment capacities.  Communications often included multiple consultants, requiring Plaintiff to evaluate privilege issues under multiple doctrines—including derivative privilege and the work product doctrine—based on the specific role each participant was serving at a particular time.  That analysis was necessarily detailed, fact-specific, and time-intensive.[4]

---

[4] Plaintiff's privilege review was further complicated because, as the CREF Ruling notes, Mr. Kidney instructed consultants to include the phrase "attorney-client privilege" in email subject lines and to copy Steward's Assistant General Counsel, Nathalie Hibble.  Plaintiff addressed this issue in his February 17 Opposition to Defendants' Privilege Motion, explaining that neither the presence of such language nor the inclusion of an attorney on an email was determinative of whether the attorney-client privilege or work product doctrine applied.  To the contrary, Plaintiff conducted a document-by-document review and produced thousands of communications, including: (i) emails with Todd & Weld attorneys in the top-line distribution; (ii) emails where Ms. Hibble was the sole attorney

Third, Plaintiff did not make any bright line rules about when all communications were made in anticipation or furtherance of litigation. Claim adjustment activity and related communications continued into 2023, after litigation-related events had begun, including Plaintiff's February 2021 93A/176D demand letter, prelitigation mediation efforts in May and June 2021, and the initiation of litigation later that year. At the same time, certain consultants were engaged in ongoing construction and operational work unrelated to the insurance claim or litigation. As a result, communications during this period frequently served overlapping purposes. Plaintiff therefore evaluated each document in context, considering the participants, timing, and purpose of the communication, rather than applying categorical assumptions.[5]

Consistent with that approach, Plaintiff conducted iterative reviews of his privilege assertions. Pursuant to the Discovery Master's directive, Plaintiff first produced a privilege log in January 2026 ("Original Log"), which contained 9,666 entries. Plaintiff then continued his review and refinement of those entries, resulting in an amended privilege log served on February 12, 2026 ("Amended Log"), which reduced the total to 8,772 entries.[6] Following further review, Plaintiff produced a second amended privilege log on March 20, 2026 ("Second Amended

---

included; (iii) emails involving Ms. Hibble together with other Steward in-house counsel; and (iv) emails bearing subject lines referencing attorney-client privilege or work product. *See* Exhibit 1 at 14.

These productions confirm that Plaintiff did not rely on superficial indicators of privilege. Rather, they reflect a disciplined and context-specific review process that resulted in the production of a substantial volume of communications involving counsel—or otherwise suggestive of privilege—where the content did not primarily convey legal advice or otherwise qualify for protection. ***Accordingly, contrary to the suggestion in the CREF Ruling that Mr. Kidney's instruction "undermines Plaintiff's claims" of privilege, Order at 36, the record demonstrates the opposite.***

[5] Ironically, while the Order criticizes Plaintiff for the time required to complete his privilege review and for withholding a substantial number of communications, it was precisely that careful and resource-intensive process that materially narrowed the scope of withheld documents. As of February 12, 2026, Plaintiff withheld 4,690 communications that included at least one of Steward's 14 consultants but produced in full 59,297—resulting in a withholding rate of approximately 7%. *See* Decl. of Josh L. Launer at ¶ 3-4.

[6] Discovery Master Order No. 14 required the parties to provide their privilege logs to the Discovery Master with separate tabs reflecting entries related to each of their respective consultants. *See* **Exhibit 9**.

10

Log"), which reduced the total to 7,690 entries.[7]  These successive reductions reflect Plaintiff's ongoing, good-faith effort to ensure that privilege assertions were tailored, accurate, and consistent with governing law.

> ### E.    Defendants' Privilege Challenges and Discovery Master's Review

On February 4, 2026, Defendants submitted their letter brief challenging nearly all of the entries reflected on the Original Log, asserting five purported deficiencies.  *See* **Exhibit 11**. Recognizing that CREF occupied a distinct role relative to Steward's other consultants, Defendants addressed CREF separately, advancing a discrete argument for waiver of privilege in communications involving CREF.  *Id.* at 6.  Notably, although Defendants identified certain individual CREF employees, their challenge was directed at CREF as an entity, rather than undertaking any employee-by-employee analysis.[8]  *Id.*

Before Plaintiff had an opportunity to respond, the Discovery Master issued Order No. 14 on February 8, 2026, directing the parties to provide detailed responses to a series of questions concerning their consultants, as well as privilege log excerpts corresponding to each individual consultant, "in order to expedite the resolution of these and other disputes in a timely manner so that the case may proceed according to schedule."  ECF No. 186.  Those requests likewise focused on consultants at the entity level, including CREF as a whole, and did not seek information regarding individual CREF personnel or their specific roles.

---

[7] *See* **Exhibit 10**.  Aligning with the submission of the Amended Log in response to Order No. 14, Plaintiff's Second Amended Log has updated tabs corresponding to communications for each of the 14 consultants.

[8] Defendants' treatment of CREF as an integrated entity, rather than as a collection of discrete individuals, was consistent with their earlier submissions to the Discovery Master.  For example, in an October 15, 2025 letter, Defendants described CREF as closely intertwined with Steward's operations, explaining that "CREF provided services to Steward for Norwood Hospital and many other locations, including outside of Massachusetts," and that CREF personnel were issued steward.com email addresses, reflecting a high degree of organizational integration. *See* **Exhibit 12**.  These admissions, drawn from Defendants' own characterization of the relationship, reflect many of the factors courts find persuasive when evaluating whether a third party functions as the equivalent of an internal employee for purposes of privilege analysis.

Plaintiff submitted his response on February 12. That submission included engagement agreements for the relevant consultants—many of which were executed by Mr. Gendron on Steward's behalf—and explained in detail why communications involving CREF were protected under the functional equivalent doctrine. *See* **Exhibit 13** at 4, 10-11. Plaintiff's presentation thus squarely addressed the issue as it had been framed in the proceedings to that point: whether CREF, as Steward's integrated real estate function, operated in a manner that preserved attorney-client privilege.

Thereafter, Plaintiff submitted his letter brief in opposition to Defendants' Privilege Motion on February 17, 2026. *See* **Exhibit 1**. Once again, Plaintiff addressed head on Defendants' privilege challenge as to CREF as a whole based on the functional equivalent doctrine. *Id.* at 8-10.[9]

The Discovery Master continued to request additional information from the parties regarding third-party privilege issues including on March 7 and again on April 13. *See* **Exhibit 14** and **Exhibit 15**, respectively. Despite each of these requests, at no time did the Discovery Master ask Plaintiff to provide information as to a specific CREF employee. Nor did the Discovery Master request that Plaintiff provide a single CREF document—or any document for that matter—for *in camera* review prior to the issuance of Order No. 22.

### F.    The CREF Ruling and CREF Communications on the Second Amended Log

The CREF Ruling begins its analysis by recognizing—without equivocation—that "several" CREF employees satisfied the functional equivalent standard:

> *Several* high-level ***CREF employees*** served as the functional equivalent of Steward employees. This fact came into sharp focus during the first hearing between the

---

[9] Defendant did not reply to Plaintiff's opposition and never provided any response whatsoever in any submission to the Discovery Master challenging Plaintiff's assertion of the functional equivalent doctrine. Indeed, the phrase "functional equivalent" does not appear in a single submission from Defendants regarding privilege.

Discovery Master and the Parties, when Defendants admitted that they initially thought that *several* high-level *CREF employees* were actually Steward employees, until Steward informed them otherwise. These high-level *CREF employees* maintained steward.org email addresses, and regularly worked in collaboration with Steward employees and counsel. Thus, those *CREF employees* identified on Plaintiff's privilege log who acted "in a high-level, trusted decision-making or guiding role, equivalent to that of an employee," became a "functional employee."

Order No. 22 at 35 (emphasis added) (citation omitted). Every aspect of that finding is consistent with the record. However, the subsequent conclusion that only Mr. Kidney achieved this status of serving a "high-level, trusted decision-making or guiding role" implicates the 4,034 emails remaining on the Second Amended Log that include at least one CREF employee in the top line email distribution list. Of those, Todd & Weld is in the top line distribution list of 1,923.

## II.      Standard of Review

Under Fed. R. Civ. P. 53(f)(1), "[i]n acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; *may receive evidence*; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." (emphasis added). *See also* ECF No. 149 (Order Appointing the Honorable Faith S. Hochberg as Discovery Master), § III.

## III.     Argument

### A.     The CREF Ruling Must Be Vacated Because it Improperly Narrows the Functional Equivalent Doctrine and Conflates the Attorney-Client Privilege with the Work Product Doctrine

#### i.     Massachusetts Recognizes the Functional Equivalent Doctrine

The CREF Ruling correctly acknowledges that Massachusetts recognizes the "functional equivalent" doctrine and that, where applicable, it preserves privilege for communications involving non-employees who act in "a high-level, trusted decision-making or guiding role, equivalent to that of an employee." Order at 35 (citing *America's Test Kitchen, Inc. v. Kimball*, 35 Mass. L. Rptr. 75, *2 (Mass. Super., BLS, April 2, 2018); *see also id*. at 13.

13

That doctrine flows directly from *Upjohn Co. v. United States*, 449 U.S. 383 (1981), which rejected rigid, formal distinctions in favor of a functional analysis designed to ensure that attorneys can obtain the information necessary to provide legal advice.  Courts applying *Upjohn* have consistently explained that limiting privilege to formal employees would frustrate its purpose where non-employees perform equivalent roles.  As the Eighth Circuit explained:

> [W]hen applying the attorney-client privilege to a corporation … it is inappropriate to distinguish between those on the client's payroll and those … employed as independent contractors, because doing so would prevent counsel from conferring confidentially with individuals who possess the very sort of information that the privilege envisions flowing most freely.

*In re Bieter Co.*, 16 F.3d 929, 937-938 (8th Cir. 1994) (internal quotations and citations omitted).

Courts applying Massachusetts law have adopted the same functional inquiry.  *See*, *e.g.*, *United States ex rel. Long v. Janssen Biotech, Inc.*, 788 F. Supp. 3d 167, 171 (D. Mass. 2025). The analysis is fact-specific and factors supporting the conclusion that an individual or consultant entity is the functional equivalent of the client's employee for purposes of preserving attorney-client privilege includes: "holding itself out as the client's agent and/or spokesperson; helping to fit the client's actions into a legal framework; conferring frequently with the client and/or its attorneys; drafting documents incorporating legal advice received from the client's attorneys; having authority to make decisions and statements on the client's behalf; having a long involvement with the client's business; being a key decision leader for the client; and working exclusively or almost exclusively with the client." *Burke v. Gen. Hosp. Corp.*, No. 1784CV02876, 2019 WL 6197040, at *8 (Mass. Super. May 3, 2019).

No single factor is dispositive.  The inquiry is holistic and turns on whether, in practical terms, the individual functions as part of the client organization in connection with the matters

14

for which legal advice is sought.  Here, however, the facts establish that CREF satisfies *all* of the potential functional equivalent factors.

### ii.    The CREF Ruling Misapplies that Doctrine

Although the CREF Ruling correctly states the governing standard, it fails to apply it in any coherent manner.  The Order expressly finds that "*several* high-level CREF employees served as the functional equivalent of Steward employees."  Order at 35 (emphasis added).

Having made that finding—supported by the undisputed record—the Order then departs from it without explanation, effectively limiting functional-equivalent status to a single individual, Chris Kidney.  The Order provides no principled basis for that distinction. It offers only a cursory reference to "[b]ased on some of the communications read," without identifying those communications or explaining how they justify excluding other senior CREF personnel.[10] Nor did the Discovery Master ask to review a single document *in camera* in the time that elapsed between when Defendants filed the Privilege Motion and Order No. 22 issued.

Even if the slightest doubt existed that CREF served in a functionally equivalent role as Steward's internal corporate real estate division, Mr. Gendron's deposition testimony, elicited entirely by Defendants, lays that to rest.  In fact, it solidifies that CREF met each of the *Burke* factors courts consider when determining whether a consultant served in a functionally equivalent role for privilege purposes.  Mr. Gendron's testimony and the record evidence establishes that

---

[10] The Discovery Master also appears to overlook facts identified by Defendants in their Privilege Motion demonstrating that Mr. Kidney is included on a comparable volume of communications reflected on the then-operative Amended Log, as other high-level CREF personnel serving in functionally equivalent roles. *See* **Exhibit XX** at 6.  The CREF Ruling offers no principled basis for treating Mr. Kidney's 2,521 emails differently from those of Mr. Gendron (2,526 emails), Mr. Crowley (2,956 emails), Mr. Kenyon (2,315 emails), or Mr. VanNess (796 emails). The absence of any articulated distinction underscores the arbitrary nature of the differential treatment.

(i)     CREF had a longstanding relationship with Steward, which began at least two full years before the Storm when the "lift-out" agreement was executed and continued uninterrupted until Steward filed for bankruptcy;

(ii)    CREF employees had frequent if not daily interaction with Steward personnel and counsel, which is also reflected by the sheer volume of communications that include CREF and Todd & Weld;

(iii)   CREF assumed responsibility for Steward's entire corporate real estate division – not just a discrete, limited task;

(iv)    CREF employees utilized steward.org email addresses, worked from Steward offices, and CREF later opened its own offices to align with Steward's expanding national footprint. Such integration into client's system is a hallmark feature of employee-equivalent status;

(v)     CREF was entirely dependent on Steward for it financial survival as Steward accounted for over 95% of CREF's annual revenue;

(vi)    Mr. Gendron had authority to enter into contracts on Steward's behalf, not as CREF's CEO, including many of the engagement agreements with the consultants who worked for Steward in response to the Storm;

(vii)   CREF employees acted as Steward's agent for corporate real estate matters, which included facilitating the vast majority of communications between and exchange of information with Defendants and their consultants during the claim adjustment process;

(viii)  CREF employees collected and synthesized complex information to assist counsel with fitting the events regarding the loss into a proper legal framework;

(ix)    CREF employees were in routine contact with Steward' attorneys, including Todd & Weld, evidenced by the fact that 99.5% of the withheld emails authored by Todd & Weld were sent to at least one CREF employee and that approximately 60% of the 4,034 communications on the CREF-specific log involve Todd & Weld; and

(x)     Without CREF, Todd & Weld would not have been able to provide Steward legal advice concerning the loss at Norwood and, indeed, Steward's General Counsel expressly instructed Todd & Weld to coordinate legal services related to the loss through CREF.

In sum, nothing in the record supports treating Mr. Kidney differently from Mr. Gendron, Mr. Crowley, Mr. Kenyon, Mr. Van Ness, or any of the other senior CREF personnel.  To the contrary, the factual record—including that credited by the Discovery Master—demonstrates that these individuals were deeply integrated into Steward's operations, exercised significant responsibility and authority, and worked directly with Steward's counsel to coordinate the

16

response to the Norwood loss.  Under any proper application of the functional equivalent doctrine, they stand on equal footing.

> ### iii.    The CREF Ruling Improperly Conflates the Attorney-Client Privilege and Work Product Doctrine and the Resulting Consequences Are Profound

Under the CREF Ruling, communications between Todd & Weld and senior CREF personnel—who the Order itself recognizes as operating in high-level, decision-making roles— lose attorney-client privilege protection unless Mr. Kidney is included.  That result has no basis in law.  Privilege does not turn on the presence or absence of a particular individual once the communicants are within the functional scope of the client organization.  Plaintiff's ability to protect such communications with Todd & Weld is limited solely to the existence of a discrete work product request.  Of the 1,923 emails on the CREF-log with a Todd & Weld attorney in top line distribution list, **892 do not** also include Mr. Kidney.  *See* Launer Decl. ¶ 7.  Under the CREF Ruling, Plaintiff must produce these absent a showing of work product.

The CREF Ruling also repeatedly frames the privilege analysis through the lens of the "translator" doctrine derived from *Kovel*.  But that doctrine is distinct from—and not a prerequisite to—the functional equivalent doctrine.  The former applies to communications necessary to translate specialized information; the latter applies where a third party operates as a functionally equivalent part of the client organization itself.  By collapsing these doctrines and requiring CREF personnel to satisfy a "translator" standard, the Order imposes a requirement that does not exists under Massachusetts law and that is inconsistent with *Upjohn* and its progeny.  The court in *America's Test Kitchen,* the very case cited by the Discovery Master, makes clear that a functionally equivalent employee *can* in effect serve as a "retranslator" because "[i]n the context of a corporate client, the attorney-client privilege protects communications that gather or convey information from knowledgeable employees or agents that

17

is needed by counsel in formulating legal advice, as well as communications that relay legal advice obtained from an attorney to employees or other agents of the client who must understand and help to implement that advice." *America's Test Kitchen, Inc. v. Kimball*, 35 Mass.L.Rptr. 75, *2 (Mass. Superior, BLS April 2, 2018).

Even where allowing for attorney-client privilege, the CREF Ruling requires the involvement of Todd & Weld. That too is not the law. Attorney-client privilege attaches to confidential communications for the purpose of obtaining legal advice—whether from in-house counsel, outside counsel, or different law firms—and regardless of whether the communication reflects a forma "request." There are 1,124 emails on the CREF-log that have Steward's outside counsel other than Todd & Weld in the top line distribution list. *See* Launer Decl. ¶ 8. Of those, both Todd &Weld and Mr. Kidney are included in only 229. *Id.* ¶ 9. The CREF Ruling would require Plaintiff to produce 895 attorney-client communications with Steward's other outside counsel on key matters related to the loss including with hundreds with regulatory counsel.

    *iv.*  *Plaintiff's Requested Modifications to Order No. 22*

Plaintiff respectfully requests that the Court vacate the CREF Ruling and modify the Order to reflect that:

(1) CREF served as the functional equivalent of Steward's internal, corporate real estate division;

(2) In addition to Chris Kidney, Michael Crowley, Robert Gendron, Scott Kenyon, and Steve VanNess served in "a high-level, trusted decision-making or guiding role, equivalent to that of a[] [Steward] employee …"

(3)  The presence CREF employees on communications otherwise protected by the attorney-client privilege and/or work product doctrine, does not destroy such protections;

(4) The attorney client privilege is not limited to communications involving litigation counsel and/or in anticipation of or related to ongoing litigation;

18

(5) CREF's functional equivalent status is not limited only to communications with Todd & Weld but applies to otherwise privileged communications with Steward's other in-house or outside counsel even when Todd & Weld is not included in the communication; and

(6) CREF employees' roles in gathering information for and providing information to Todd & Weld and Steward's other counsel is not limited to protection from disclosure by the work product doctrine.

### B.    If the CREF Ruling Stands, its Inherent Contradictions Make it Impossible to Apply

To further illustrate the impropriety of the CREF Ruling, if allowed to stand, so much clarification is required that it would need to be entirely rewritten. The limited attorney-client privilege protections the CREF Ruling appears to provide Plaintiff in Section 4(B)(2) are rendered meaningless by the language of Section 4(B)(1).

Section 4(B)(2) recognizes that communications involving Mr. Kidney and Todd & Weld may retain privilege under the functional equivalent doctrine, at least in limited circumstances. Yet Section 4(B)(1) requires the production of "any documents … as to CREF" that do not reflect work product requests—without regard to whether those same communications involve Mr. Kidney and counsel.  Because every document on the CREF log is, by definition, "as to CREF," Section 4(B)(1) effectively nullifies the privilege protection recognized in Section 4(B)(2).  The Order thus adopts mutually incompatible rules: one preserving privilege and the other compelling production of the same communications.

### C.    Plaintiff Preserves the Right to Further Object to Order No. 22 With Respect to Steward's 13 Other Consultants As Those Rulings Are Not Yet Ripe

Plaintiff respectfully submits that some of the defects identified with respect to the CREF Ruling—including the Order's internal inconsistencies, its misapplication of governing privilege doctrines, and its failure to provide a workable framework for compliance—are not confined to CREF, but instead permeate to other aspects of Order No. 22 for Steward's 13 other consultants.  His silence on these issues here does not suggest otherwise.

19

Rather, many of those rulings set forth in Sections 4(A)(i) – (xiii) of the Order depend on future events, including *in camara* review of scores of documents requested by the Discovery Master only now for the very first time. The Order expressly sets forth that further rulings could be result based on that review and thus any objection as to rulings concerning these 13 other consultants is not yet ripe for full consideration. Following those further rulings, Plaintiff will determine whether he wishes to lodge any objection and therefore preserves his right to seek further relief pursuant to Fed. R. Civ. P. 53(f)(1) as those issues crystallize.

Nonetheless, Plaintiff is producing documents pursuant to the Sections 4(A)(i) – (xiii) of the Order concerning Steward's 13 other consultants in good faith, subject to his clawback rights expressly set forth in the Order and pursuant to the Confidentiality Stipulation [ECF No. 66]. Plaintiff desires to keep this case moving forward, as he always has, without any disruption to the current recommended case schedule set forth in Discovery Master Order No. 21: Case Schedule Recommendation [ECF No. 223].

The CREF Ruling, however, compels the production of thousands of communications that Plaintiff contends are privileged or otherwise protected, based on a framework that is both legally flawed and practically unworkable. Absent relief now, Plaintiff faces immediate and irreparable harm through the compelled disclosure of materials that may not be recoverable through clawback. For that reason, and given the scale and significance of the issues presented, the CREF Ruling must be addressed at this time.

## IV.    Conclusion

For all of these reasons, Plaintiff respectfully requests that this Court vacate Section IV(B) of Discovery Master Order No. 22 and modify Order No. 22 as set forth above in Section III.A.iv.

20

Respectfully submitted,

PLAINTIFF,

By his attorneys,

*/s/ Josh L. Launer*
Howard M. Cooper (BBO No. 543842)
Seth J. Robbins (BBO No. 655146)
Josh L. Launer (BBO No. 673661)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
srobbins@toddweld.com
jlauner@toddweld.com

-and-

Barbara Whiten Balliette
Jeremy H. Wells
William T. Reid IV
Jeffrey E. Gross
Yonah Jaffe
Reid Collins & Tsai LLP
420 Lexington Avenue, Suite 2515
New York, NY 10170
Telephone: (212) 344-5209
bballiette@reidcollins.com
jwells@reidcollins.com
wreid@reidcollins.com
jgross@reidcollins.com
yjaffe@reidcollins.com

Dated: May 29, 2026

21

## <u>CERTIFICATE OF SERVICE</u>

I, Josh L. Launer, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on May 29, 2026.

*/s/ Josh L. Launer*

Josh L. Launer