# Exhibit 4

Page 1

Volume I
Pages 1 to 237
Exhibits 1 - 29

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
MARK KRONFELD, as Trustee of        :
the SHC Creditor Litigation         :
Trust,                              :
                Plaintiff,          :
                                    :  Civil Action No.
        vs.                         :  1:21-cv-11902-
                                    :  PBS
AMERICAN GUARANTEE AND              :
LIABILITY INSURANCE COMPANY         :
and ZURICH AMERICAN INSURANCE       :
COMPANY,                            :
                Defendants.         :
                                    :
- - - - - - - - - - - - - - - - - -x

VIDEOTAPED DEPOSITION OF CONSIGLI CONSTRUCTION CO., INC., by its Designee STEPHANIE O'BRIEN, a witness called by counsel for the Defendants, taken pursuant to the Federal Rules of Civil Procedure before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Robins Kaplan LLP, 800 Boylston Street, Boston, Massachusetts, on Thursday, March 5, 2026, commencing at 9:10 a.m.

PRESENT:

        Todd & Weld, LLP
            (by David H. Rich, Esq., Aedan Dunn, Esq.,
            and, via Zoom, Seth J. Robbins, Esq., and
            Samuel Myers, Esq.) One Federal Street,
            Boston, MA  02110, 617.720.2626,
            drich@toddweld.com, adunn@toddweld.com,
            srobbins@toddweld.com, smyers@toddweld.com,
            for the Plaintiff.
Job No. CRCC7915984

(Continued on Page 2)

Page 2

PRESENT (Continued):

Riley Safer Holmes & Cancila, LLP
(by Michael H. Fleck, Esq., Steven E. Vogel, Esq., and, via Zoom, Amy C. Andrews, Esq., Lucas T. Rael, Esq., and Abigail L. Peluso, Esq.) One S. Dearborn Street, Chicago, IL 60603, 312.471.8700, mfleck@rshc-law.com, svogel@rshc-law.com, aandrews@rshc-law.com, lrael@rshc-law.com, apeluso@rshc-law.com, for the Defendants.

Consigli Construction Co., Inc.
(by Robert Lizza, Esq., and Deirdre D. Foley, Esq.) 313 Congress Street, Boston, 617.212.9933, rlizza@consigli.com, dfoley@consigli.com, for Consigli Construction Co., Inc., and the Deponent.

Also Present:  Paul Bosch, Videographer

* * * *

Page 3

INDEX

WITNESS          DIRECT CROSS  REDIRECT RECROSS

STEPHANIE O'BRIEN

BY MR. FLECK          10

BY MR. RICH          227

EXHIBITS

NO.          DESCRIPTION          PAGE

Exhibit 1    Subpoena to Consigli          8
             Construction Co., Inc., with
             attached Schedule A

Exhibit 2    Notice of 30(b)(6) Deposition of    8
             Consigli Construction Co., Inc.

Exhibit 3    Email exchange between Stephanie    13
             O'Brien and Chris Kidney dated
             June 30, 2020, Bates Page
             STEWARD00759411

Exhibit 4    Norwood Hospital Monthly          33
             Preconstruction Report for
             August 2020, Bates Pages
             CONSIGLI_00011288-295

Exhibit 5    Email from Stephanie O'Brien to    53
             John Anzalone, et al., dated
             10/6/2020, Bates Page CONSIGLI_
             00018621

Exhibit 6    Email exchange between Steve          65
             VanNess and Stephanie O'Brien
             dated October 19-21, 2020, Bates
             Pages STEWARD00497302-304

Page 4

EXHIBITS, Continued

NO.          DESCRIPTION          PAGE

Exhibit 7    Document entitled "Norwood Short   65
             Term Activation Plan, Revised
             Draft 01.10.20," Bates Pages
             STEWARD00497305-315

Exhibit 8    Schedule entitled "SHC Norwood     65
             Hospital Support, Updated
             10/19/2020," Bates Page STEWARD
             00497316

Exhibit 9    Email from John McCarthy to          91
             Stephanie O'Brien dated
             4/27/2021, with attached
             drawings entitled "Norwood
             Replacement Approach Draft,"
             Bates Pages CONSIGLI_00022034-53

Exhibit 10   Document entitled "Steward          92
             Health Care System LLC, Norwood
             Hospital Replacement Project,"
             dated May 21, 2021, Bates Pages
             STEWARD00998329-356

Exhibit 11   Document entitled "Draft Norwood  109
             Hospital Insurance Claim
             Estimate," dated December 3,
             2020, Bates Pages MPT0022791-
             23110

Exhibit 12   Document entitled "Norwood          120
             Hospital 'As-Was' Renovation,"d
             dated 11/20/20, Bates Page
             CONSIGLI_00021630

Exhibit 13   Multipage document entitled          144
             "Building Commissioning
             Services, Steward Health Care
             Norwood Hospital Building
             Assessment Final Report," dated
             June 16, 2021, Bates Pages
             beginning CONSIGLI_00003110

Page 5

EXHIBITS, Continued

NO.          DESCRIPTION          PAGE

Exhibit 14   Chain of emails, the topmost          148
             being from Stephanie O'Brien to
             Michael Benjamin dated 7/8/2021,
             Bates Pages CONSIGLI_00019964-
             966

Exhibit 15   Seven-page chain of emails, the   156
             topmost being from Stephanie
             O'Brien to Chris Kidney dated
             7/28/2021, with attached letter
             between the same parties of the
             same date, Bates Pages CONSIGLI_
             00020070-81

Exhibit 16   Chain of emails, the topmost          173
             being from John McCarthy to John
             Anzalone,  et al., dated
             9/27/2022, Bates Pages BR+A_
             00354659-661

Exhibit 17   Document entitled "Draft Norwood  176
             Hospital Insurance Claim
             Estimate, 'As-Was' Estimate -
             Draft 12-13-22," Bates Pages
             ORDER-CONSIGLI_00002007 and 2008

Exhibit 18   Document entitled "Draft Norwood  177
             Hospital Insurance Claim
             Estimate, 'As-Was' Estimate -
             Draft 12-13-22," Bates Pages
             ORDER-CONSIGLI_00001943 through
             2000

Exhibit 19   Document entitled "Norwood          184
             Hospital - Insurance Claim,
             Variance Report - Draft,
             12/15/2022," Bates Pages
             ORDER-CONSIGLI_00002002-2006

2 (Pages 2 - 5)

Page 6

E X H I B I T S, Continued

NO.          DESCRIPTION          PAGE

Exhibit 20   Document entitled "Draft Norwood   187
Hospital Insurance Claim
Estimate, 'Code Compliant'
Estimate - Draft 5-13-23," Bates
Pages ORDER-CONSIGLI_00000077
through 84

Exhibit 21   Document entitled "Draft Norwood   191
Hospital Insurance Claim
Estimate, 'As-Was' Estimate -
Draft 8-10-23," Bates Pages
BR+A_00370539-540

Exhibit 22   Document entitled "Draft Norwood   191
Hospital Insurance Claim
Estimate, 'As-Was' Estimate -
Draft 8-10-23," Bates Pages
BR+A_00370332-338

Exhibit 23   Document entitled "Draft Norwood   191
Hospital Insurance Claim
Estimate, 'As-Was' Estimate -
Draft 8-10-23," Bates Pages
BR+A_00370347-428

Exhibit 24   Document entitled "Draft Norwood   193
Hospital Insurance Claim
Estimate, 'Code Compliant'
Estimate - Draft 8-10-23," Bates
Pages BR+A_00370541-542

Exhibit 25   Document entitled "Draft Norwood   193
Hospital Insurance Claim
Estimate, 'Code Compliant'
Estimate - Draft 8-10-23," Bates
Pages BR+A_003703339-346

Exhibit 26   Document entitled "Draft Norwood   193
Hospital Insurance Claim
Estimate, 'Code Compliant'
Estimate - Draft 8-10-23," Bates
Pages BR+A_00370429-538

Page 7

E X H I B I T S, Continued

NO.          DESCRIPTION          PAGE

Exhibit 27   Schedule captioned "Consigli   195
Construction Co., Inc., Norwood
Hospital - As-Was, 12-Oct-22
Schedule for Review and
Comment," Bates Pages ORDER-
CONSIGLI_00006121 through 6130

Exhibit 28   Schedule captioned "Consigli   203
Construction Co., Inc., Norwood
Hospital - As-Was, Preliminary
Project Schedule," Run Date
30-Jan-23, Bates Pages STEWARD
01533847-857

Exhibit 29   Schedule captioned "Consigli   223
Construction Co., Inc., Norwood
Hospital - Code Compliant,
Preliminary Project Schedule,"
Run Date 11-Aug-23, Bates Pages
ORDER-CONSIGLI_00000049 through
62

* * * *

Page 8

P R O C E E D I N G S

Stipulation

It is stipulated by and between counsel for the respective parties that the deposition is to be read and signed within 30 days, notary waived, and that all objections, except as to form and privilege, are reserved to the time of trial.

____

(Documents marked as Consigli Exhibits 1 and 2 for identification)

THE VIDEOGRAPHER:  This is Media 1 of the video-recorded deposition of Stephanie O'Brien, taken by counsel for the Defendants in the matter of Mark Kronfeld, et al., versus American Guarantee, et al., filed in the U.S. District Court for the District of Massachusetts, Case Number 1:21-cv-11902-PBS.

My name is Paul Bosch, representing Veritext.  I'm the videographer.  The court reporter is Carol Kusinitz for the firm Veritext.

I am not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.  If there is any objection to this proceeding, please state

Page 9

them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. FLECK:  Good morning.  My name is Michael Fleck on behalf of the Defendants.

MR. VOGEL:  My name is Steven Vogel on behalf of Defendants.

MR. RICH:  My name is David Rich, and I am here on behalf of the Plaintiff.

MS. DUNN:  My name is Aedan Dunn, also here on behalf of the Plaintiff.

MR. LIZZA:  My name is Robert Lizza.  I'm the Chief Legal Officer at Consigli and here to represent the deponent.

MS. O'BRIEN:  My professional name is Stephanie O'Brien from Consigli Construction.  My legal name is Stephanie Lyman.

THE COURT REPORTER:  And I'll need to swear the witness.

3 (Pages 6 - 9)

Page 10

STEPHANIE O'BRIEN
a witness called for examination by counsel for the
Defendants, having been satisfactorily identified by
the production of her driver's license and being
first duly sworn by the Notary Public, was examined
and testified as follows:

DIRECT EXAMINATION

BY MR. FLECK:

Q. Good morning.

A. Good morning.

Q. Have you ever been deposed before?

A. Yes.

Q. Okay. How many times have you been deposed in the past?

A. Once.

Q. And when was that?

A. Approximately two or three years ago.

Q. Okay.

A. From an old employer, not Consigli.

Q. Okay. So I'll go over a few of the kind of rules of the road for the deposition.

I'll be asking a bunch of questions, obviously, today. You may hear objections from counsel, so try to give a little bit of a pause

Page 11

between my questions and the answers to give them a chance. Your answers have to be verbal so that the court reporter can pick up your responses, and it's great to not talk over each other.

Does that make sense?

A. Yes.

MR. FLECK: Can we provide the witness what has been marked as Exhibits 1 and 2.

Q. Do you recognize what's marked as Exhibit 1?

A. Yes.

Q. And have you seen that before today?

A. Yes.

Q. And this is the subpoena that we sent to you to show up today for your deposition; is that correct?

A. Yes.

Q. And at the back of Exhibit 1, there are -- it's a schedule with a series of definitions, instructions and topics. Do you see that?

A. Yes.

Q. Did you review the topics for examination prior to today?

A. Yes.

Page 12

Q. And did you prepare for this deposition?

A. Yes.

Q. And how did you prepare for this deposition?

A. I read through past reports that Consigli had issued, including preconstruction -- Monthly Preconstruction Reports. I reviewed past deliverables, including estimates and schedules.

I reviewed the other consultants, just to refresh my memory, that were involved in kind of the fact-finding and the exploratory to identify the damages. That's about the limit of what I reviewed.

Q. Okay. Did you meet with counsel, your counsel Mr. Lizza, to prepare for this deposition?

A. Yes.

Q. And when did you meet with him?

A. Earlier this week.

Q. Did you meet with Steward's counsel to prepare for this deposition?

A. No.

Q. Did you discuss with anyone from Steward or MPT anything about this deposition leading up to it?

A. No.

Page 13

(Document marked as Consigli
Exhibit 3 for identification)

Q. I've just marked as Exhibit 3 -- this is Bates labeled at the bottom STEWARD00759411. Is that right?

A. Yes.

Q. Do you recognize what's marked as Exhibit 3?

A. Yes.

Q. And at the bottom of the page there's an email from you to Chris Kidney on June 30th, 2020; is that correct?

A. Correct.

Q. And who is Chris Kidney?

A. He's the director of -- I don't know his exact title -- but essentially emergency response for Steward. If an emergency happened at one of their facilities, he would spearhead the efforts to get everything back on track.

Q. Do you know what "CREF" stands for?

A. No.

Q. Do you have an understanding of what CREF is?

A. Yes.

4 (Pages 10 - 13)

Page 14

Q. What is CREF?

A. They offer a number of services, including owner's project manager services. They also offer facilities support and environmental support, a number of different services for hospitals.

Q. Let's talk a little bit about the time, the time frame. So what was your role at Consigli around June 30th, 2020?

A. Project executive.

Q. And how long have you been a project executive at Consigli for?

A. Since 2019.

Q. What do you do as a project executive at Consigli?

A. I manage teams including project managers, assistant project managers, senior project managers, project engineers, on complex health care projects. So anything from renovations to fit-outs, additions, new builds, across all the different health care program areas.

Q. Do your projects focus on health care projects?

A. Yes.

Q. And what kind of health care projects have

Page 15

you worked on at Consigli?

A. At this point it's probably well over 50 projects. But anything from $100,000 medical equipment upgrade to ICUs, med-surg operating rooms, pharmacies, additions, like emergency department expansions, new buildings, such as medical office buildings. The largest project right now I am managing is 480 million. It's a new clinical behavioral health tower that's about 320,000 square feet.

Q. And at a high level, what kind of services does Consigli provide for these types of health care projects?

A. We offer services during preconstruction and during construction. So during preconstruction we would work with the client and the consultants that are normally hired by the client, depending on the delivery method, and we would provide services such as cost estimating, schedule development, logistics, options analysis. We would do exploratory to help understand existing conditions.

We really are a resource to help the client make informed decisions and understand the cost and timeline for their project.

Page 16

And then during construction I would high-level manage my team that would be responsible to -- be boots on the ground and build the project. So, you know, my role in that is really to make sure that the project stays on time, stays on budget, is a safe project, and is executed to the best of our ability, based upon the design documents that we receive.

Q. I was looking at Consigli's website. Are you familiar with Consigli's website?

A. Yes.

Q. It describes lean principles. Are you familiar with that phrase?

A. Yes.

Q. What does "lean principles" mean in the context of Consigli's services?

A. It covers a number of different areas, but essentially it's making sure that you are efficient, you're safe, your job site is clean; for instance, just-in-time deliveries, making sure you are not sending a bunch of materials to the job site that are just going to clutter the space well before you need them.

So it's making sure you really run an

Page 17

efficient and safe job site. That's the short version.

MR. RICH: And you meant "lean," l-e-a-n, rather than l-i-e-n, correct?

THE WITNESS: Correct.

MR. FLECK: Correct.

MR. RICH: This is a construction.

Q. What are just-in-time deliverables?

A. Just-in-time deliveries would mean if you -- it would be materials you need for the next day or two, possibly a week, depending on the amount of storage space you have.

But it's to avoid delivering materials to the job site that aren't needed for a long time, so that -- you don't want the job site to become almost a storage facility. You want it open and clean. You want all your materials on wheels so that, if you do need to relocate them and move them, it's an efficient process to do so.

Q. So Consigli tries to schedule materials to arrive at a point where they can be actually installed within a short-term period -- time period?

A. Correct.

Q. Do these lean principles apply to your

5 (Pages 14 - 17)

Page 18

preconstruction services?

A.   To a lesser extent.  It's more, I guess, about the way that you want to make sure that your preconstruction phase is also efficient.  So you're trying to inform decision-making.  You're trying to make the timeline efficient.  You're working together collaboratively with the design team and the client to understand what their goals are and how to execute on those goals.

Q.   Who is typically your client on a health care project?

A.   The hospital that we are engaged with.

Q.   The owner of the hospital is usually the client in the projects you've worked with at Consigli?

A.   Correct.  We are usually hired by the hospital.  Now, it's usually, say, a director of planning, design and construction or someone in charge of their capital funding or their facilities department.

So there's a representative from that hospital that's responsible for engaging a construction manager and hiring us to be part of the team.

Page 19

Q.   Can you talk a little bit about -- talk a little bit about the cost estimating services at Consigli.  What kind of services do you provide with respect to cost estimating for health care projects at Consigli?

A.   Cost estimating services could be very high level.  They could be essentially cost model level or conceptual level, which is when you have really very little information about a project.  It's really back-of-napkin, there's minimal information, maybe square footage, maybe definition of the program that needs to be included in the cost, kind of the size, the scale.  And we, based on our historical database and past projects, can put a number to that with very little information.

And then, as design progresses through schematic design, design development and construction documents, the estimates become more detailed, and rather than just applying a cost per square foot for each trade, you start to quantify better based on the scope that is reflected in the design documents.

Q.   What do you mean by estimate based on cost per square foot?

Page 20

A.   So based on our experience as health care builders, we -- you start to see a pattern in -- or a history of what projects cost based upon the program or the -- I guess the definition of "program," for those that might not know, but -- so "program" to me means whether it is an intensive care unit or whether it is an operating room or whether it's a pharmacy or a waiting room.

Those are all going to have a different cost per gross square foot of that floor plate where that program is, because they all have a different level of intensity of MEP services -- mechanical, electrical, plumbing, fire protection services -- different medical equipment needs, different finishes, different expectations, right?

So a waiting room is going to cost a lot less per square foot than an operating room would cost.

Q.   How does Consigli track the cost per square foot for those different programs?

A.   We have priced enough of them -- so we have health care specialty -- specialized health care estimators, whereas that is pretty much all they do.  So they -- we have a history, from our past

Page 21

projects, where we have developed Guaranteed Maximum Prices or GMPs.  And so we have that history, and then just you start to build up, based on performing estimates like that over and over again, an understanding of how much different program areas cost.

Q.   So it sounds like Consigli had a database of this information; is that correct?

A.   I guess you could call it a database.  I mean, we have an estimating tool.  We use Timberline as an estimating tool, which does have some costs entered into the database by the estimators.  We're constantly going -- the estimating team is constantly going out to vendors and subcontractors to get costs updated so that they have real-time costs.  And certainly with escalation happening every year, that's another major component of keeping up with how much things cost year to year.

So the estimating team -- and I can't really speak to how they manage it; it's outside my wheelhouse -- but they do update material costs, equipment costs within their own estimating software.

And then there's also just the -- as health

6 (Pages 18 - 21)

Page 22

care specific estimators, it's just the knowledge that they've gained over the years of how much different program areas are going to cost, just based upon their experience and expertise in the industry.

Q.   You had talked about -- was it unit pricing?  Did I hear that correctly before?

A.   I don't think I mentioned unit pricing.

Q.   Did you talk about estimating based on unit costs, something along those lines?

A.   We do -- so depending upon how detailed the design documents are will inform the type of tools that we use to develop an estimate.

So when it's really conceptual, it's unlikely that there will be a lot of unit cost estimating happening, because the design documents have not been developed to a state where you can actually quantify scope.

So you might not know the number of doors, the number of windows, the number of bathrooms, even.  So that, to me, is unit cost pricing, when you're actually counting doors on a plan and you're saying each door costs $1,000, there's ten doors, it's $10,000.

Page 23

When you're high-level conceptual estimating, you tend to gravitate more towards a cost per square foot, because you might only have a few pages of maybe some blocking diagrams and a general idea of the square foot of the project and a general description of the type of program that's going in that square footage.

So in that case you wouldn't be able to use unit costs; you'd have to use a cost per square foot.

Q.   So when you don't have enough information to know, for example, how many doors you're going to need to build, then you estimate the cost based more generally on the number of square feet?

A.   Correct.

Q.   So what other types of estimating tools does Consigli use, other than unit cost estimating and estimating by the square footage?

A.   So, like I said before, it depends on the stage of the design.  So when it's conceptual, it's usually cost per square foot.  As you -- as the design progresses and you can better quantify the scope, the estimates become more detailed.

So when we are doing a high-level

Page 24

conceptual estimate, it might only be one page, and it will have a cost per square foot by trade for, say, concrete, steel, finishes, plumbing, electrical.  And we'll have a cost per square foot and then all the below-the-line markups.

As design progresses, you'll see the details start -- the estimate start to evolve from that one page to, I don't know, at conceptual it might be, depending on the size of the project, 20 pages, and at schematic design it might be 30 pages, at design development it might be 60 pages.

So as more details become available, based on the progression of the design, it allows us to become, at Consigli, more detailed in the way we develop our estimate.  And then we start to add things like you mentioned, the unit cost of how much the door costs, how much it costs to install the door.  You'll start to see that level of detail in the estimate when you get into more design development and the construction document phase.

Q.   Are there specific milestones along the project in which Consigli will update their estimates to be more specific?

A.   Yes.

Page 25

Q.   And what are those milestones?

A.   It is -- depending on the -- sometimes -- it depends on when we are brought in.  So if we are brought in -- those milestones are usually defined by the owner, but if we are brought in at the very beginning phases of the design early in preconstruction, it could start with either conceptual or schematic design, and then it would go to design development, and then construction documents.

There are times, however, that, if a project is very small, you might have a combined phase of -- they might call it schematic/design development, where it's kind of a hybrid between the two, and we would -- we would submit an estimating deliverable at that time.

So it really varies based on the size and complexity of the project and how many estimating deliverables the client would like us to prepare to inform cost along the way so they don't get surprises -- they don't get surprised, when the construction documents are issued and we issue a GMP, how much the project costs.

The idea is to continue to inform them

7 (Pages 22 - 25)

Page 26

along the way so that the project stays on track with their budget.

Q. Is there a way in which Consigli tries to get their estimating accurate in the early stages of the project so that there aren't these kind of surprises at those milestones regarding the cost of the project?

A. Yes. I would say that we try to do as much exploratory as we can. We ask a lot of questions, like whether or not the client or the design team thinks that the MEP infrastructure, for example, is sufficient. That's usually a big driver on how expensive the project will be. If you have to replace an air handler unit or add electrical panel boards or switchgear, that all drives the cost of the project up.

So we try to ask the right questions. We try to do exploratory. If there's an existing facility and we're doing a renovation, we try to walk that facility, try to avoid those surprises.

It really depends on the type of a project. If it's a new build, it tends to be a lot more straightforward. If it's a renovation, there's a lot of exploratory and fact-finding that has to

Page 27

happen to inform the scope.

Q. Does Consigli have any internal standards regarding how accurate it wants the conceptual estimates to be relative to the more refined estimates that are produced as the progress -- project progresses?

A. I would say that we -- our involvement during pre-con is in part to try to develop estimates where maybe not all the information is there yet, the design isn't fully developed and baked, and we might not know -- fully understand the existing conditions. But we have done enough of these types of projects to understand that there are -- there are some scope elements in there that likely just haven't been identified yet.

So we try to be on the conservative side, the more conservative side at the conceptual or the schematic phase, knowing that just the design isn't developed yet.

And I would say the other -- the other way that the minimal design is accounted for is that you'll see a line item in our estimates that says "design contingency." So there's a percentage held below the line that accounts for the fact that the

Page 28

design is -- we don't know what we don't know yet, right?

So we carry a higher design contingency at the conceptual or schematic phase, and then as the estimate becomes more developed, we reduce that contingency line item, so it becomes a little lower at the DD phase, and in theory it goes away at the construction document phase when the design is fully on the documents.

Q. You had mentioned "exploratory" a moment ago. Can you describe, what is "exploratory"?

A. It depends on the project, but it would mean things like if it's, for instance, a renovation and there's an existing facility, we would poke our head above the ceiling and just check and see how congested above the ceiling is. In hospitals they tend to be very congested.

We might inspect existing pieces of equipment or do some metering of existing panel boards to understand the spare capacity in those panel boards and whether or not additional circuitry can be added.

There's a whole -- there's a whole -- there's a bunch of different things we could do. It

Page 29

totally depends on the project. We might help trace out circuitry. We might do some hazmat testing to inform whether or not abatement or mitigation is required.

On new builds it usually is a little different process: Are there existing utilities in the ground that would need to be relocated. It just totally depends on the project.

Q. You had mentioned design contingencies. Is there also a construction contingency?

A. Yes.

Q. What is a construction contingency?

A. That is more for our use as the builder. So it's to cover things -- and it's usually explained in the contract. It's defined in the contract as to what it can cover. But essentially it covers additional overruns or costs that might not be chargeable as a change order to the owner, but are true costs of the construction.

And if I were to give you an example, if we needed to rent a lull, and way back when the construction documents were issued, we think we're going to need that lull for three months, and then as the project is being built, we incur a number of

8 (Pages 26 - 29)

Page 30

weather days or we need the lull for an extra two weeks, construction contingency would pay for that.

It's not something that we would submit to the owner as a change order or additional cost. It would come out of that contingency fund for our use to keep the project moving without asking for additional costs from the owner.

Q. Can I turn you back to Exhibit 3.

A. Yes.

Q. So going back to Exhibit 3 and the June 30th, 2020, email that you had sent to Mr. Kidney, its subject line is "Norwood Hospital," right? Do you follow me there?

A. Uh-huh.

Q. It says, "Hi Chris, I'm sure you are actively trying to assess 'next steps' at Norwood Hospital due to the recent flooding."

Do you see that?

A. Yes.

Q. How did you learn about the flooding at Norwood Hospital?

A. It was all over the news.

Q. What was your relationship with Steward as of June 30th, 2020?

Page 31

A. They were a client of mine. We had a project at Saint Anne's Hospital, St. Elizabeth's Medical Center. So I was either actively pricing work with them or I was actively working on projects with them.

Q. And how long had you been working with Steward in those previous projects?

A. Since I started at Consigli in 2019.

Q. In the third line of that email it says, "We are readily available to assist or provide resources as needed."

Do you see that?

A. Yes.

Q. What kind of assistance or provision of resources were you contemplating when you sent that email?

A. Typically, when something as catastrophic as this flood happens at a hospital, they are overwhelmed. Their facilities staff, the people that they have on staff, they are overwhelmed with trying to keep patients safe and trying to -- they're thinking about the patients and they're trying to respond as quickly as they can. But as you can imagine, the manpower they have, the staff

Page 32

they have, is more geared towards the everyday and not an event like this.

So they tend to find themselves short-staffed. They need people to help with getting water out of the building, pumps, temp heaters, temp electric services.

The immediate goal is to get the patients out of the building if they need to be evacuated, which was the case at Norwood. But from a building perspective and protecting their assets, they also understand the need to get the water out of the building as quickly as possible, because the longer you have standing water in the building and the longer areas remain wetted, the higher the chances for mold to grow and additional damages to be incurred.

So in my mind, for immediate response, it was less -- the insurance claim wasn't even on my mind. It was, "How do we help you? Can we get some laborers out there, some carpenters out there? Can we get some pumps out there to get water out of the building? Can we get some fans?"

Usually we employ a bunch of fans to help speed up the drying process, any equipment and

Page 33

manpower that might help them in their time of need.

Q. And Mr. Kidney responded to you at the top of Exhibit 3 and said, "Thanks for the offer of support"; is that right?

A. Yes.

Q. What happened after that?

A. I don't remember how long -- I don't remember if I heard back from him, say, in the month of July. I do know that, at some point in early August, he took up -- he took us up on our offer and reached out and asked if we could help.

Q. So, best of your recollection, early August is when Steward reconnected with you about helping at Norwood Hospital?

A. I think that's right, but it's been a while. If you have something to refresh my memory, it would be helpful.

(Document marked as Consigli Exhibit 4 for identification)

Q. All right. I've just handed you what's marked as Exhibit 4. For the record, this is Bates labeled CONSIGLI_00011288.

Do you recognize what's marked as Exhibit 4?

9 (Pages 30 - 33)

Page 34

A.  Yes.

Q.  What is Exhibit 4?

A.  Monthly Preconstruction Report for the month of August.

Q.  What is a Monthly Preconstruction Report in the context of Norwood Hospital and Consigli's work?

A.  It documents what we -- so they're usually issued at the first of the following month to document what happened the previous month.

So this particular one documents at a high level what services we were providing and where we were from a cost perspective and any meetings we attended, that sort of thing.

Q.  Can I turn you to Page 4, and the Bates label number is 11291.

A.  Yes.

Q.  Do you see there is a heading called "Meetings Attended"?

A.  Yes.

Q.  And in there there's a table, and the first date is August 6th, 2020, and it says next to that date, "Consigli Launch Meeting & Tour of Norwood Hospital."

Do you see that?

Page 35

A.  Yes.

Q.  Is August 6th the first time that you went to Norwood Hospital following the flood?

A.  Yes.

Q.  Did you tour Norwood Hospital on August 6th, 2020?

A.  Yes.

Q.  Could you describe that tour.

A.  Yes.  We walked through the different levels of the hospital.  There were markings on the wall, I believe, that were from noting the level of moisture in the walls.

You could see where some of the damages were.  We walked most of the levels, I believe, of both Lorusso and Draper, just to get an understanding of the expansiveness of the damage.

Q.  Can you describe the layout of Norwood Hospital?

A.  It's -- like a typical hospital, it started out probably as one building, and over the years they added on numerous times.  So it is kind of a maze of different buildings that have different names.  For simplicity's sake, we would really only speak of Draper and Lorusso, but each of those

Page 36

buildings were probably made up of smaller little additions over the years.

And I don't believe they both had a full basement, but, say, partial/basement level.  Then they had ground floor, then a first floor, and then -- I believe one of the buildings went up to the third floor, so that would be what, one, two, three -- five levels, and one of -- the other building went up an additional level.

Q.  On your August 6th, 2020, tour of Norwood Hospital, did you go into the basements of both the Draper and Lorusso?

A.  I did, eventually.  I don't -- I honestly don't know, the hospital was so large, that I saw every single level of both buildings on that day.  I honestly don't remember the -- at some point I'm guessing we had to stop; it was just too much to see.  But at some point I did see both basements, correct.

Q.  Do you remember if you went into a basement on August 6th, 2020?

A.  Again, I don't -- I honestly don't remember if I saw the basement those days or not.

Q.  What's kind of your earliest recollection

Page 37

of what damage you saw in the basement at Norwood Hospital?

A.  The earliest reco -- of what I saw or when I think it was?

Q.  What you saw.

A.  There was a lot of equipment in the basement, mechanical, electrical, plumbing, fire protection type infrastructure.

Today's designs try to keep that equipment out of the basement for resiliency purposes or, you know, to protect the hospital from events like this.  But it was not uncommon in older hospitals to see that infrastructure in the basement.

So it was a lot of -- there was the -- the main switchgear for the hospital was in the basement, which is where the main utility feed entered the building and landed at the switchgear.  They had generators in the basement, panel boards.  It looked like there were some older program spaces, but I don't think they were being used as such, like maybe some offices or things like that that might have long since been abandoned.

I believe there was an older kitchen or dining space that might have been down there, but

10 (Pages 34 - 37)

Page 38

it -- for the most part, it was unfinished, back-of-house mechanical, electrical, plumbing type spaces is my recollection. But, like I said, there were some areas that actually had finishes.

Q. Was there any indication that there had been any abatement or repairs done in the basements in August 2020?

MR. RICH: Object to the form.

You can answer.

THE WITNESS: Okay.

MR. RICH: Sorry.

THE WITNESS: That's okay.

A. I'm going by memory, but I think that they had -- before we arrived on site, there had been some removal of -- I don't know if it was kitchen equipment, but there had been some equipment and/or finishes that had been removed, but I don't remember well enough. It was more of a conversation, because it would have been before my time, so I wouldn't have been able to see what was there before the walk versus during the walk.

Q. And what do you mean by "finishes"?

A. Flooring or lighting fixtures, any kitchen equipment. Once again, I'm guessing, because I

Page 39

wasn't -- I didn't see it in its before state, so it's hard for me to envision what they did prior to our engagement.

Q. You had mentioned that you saw water lines; is that correct?

A. I don't think I mentioned seeing water lines.

Q. I think you mentioned -- did you see any indication of water damage to Norwood Hospital when you went around August 6th of 2020?

A. Yes.

Q. What did you see?

A. You could see that some of the walls had already been opened a little bit at the bottom, where they were immediately wetted, and the idea behind that is to open up the wall, the wall cavities, to avoid mold growth. But there had been a little bit of that.

Some of the walls had been marked with tape and/or lines to show, from moisture mapping performed by others, where the moisture from the flood had wicked up the drywall partitions.

And you could just see evidence of where things had been wet. There were still things

Page 40

that -- you couldn't see standing water, but you could -- you could tell that the hospital had been flooded.

Q. You said there was a little bit of opening of the walls. After a flood, what would Consigli typically recommend with regard to the finishes that have been subject to water damage?

MR. RICH: Object to the form.

You can answer.

A. That wasn't our decision. That was based on -- they hired, I believe it was, EH&E to do the moisture mapping and make recommendations on next steps to mitigate potential mold growth and to get things dried out.

Q. Turning back to Exhibit 4 on Page 2.

A. Page 2. Okay.

Q. Let me know when you're there.

A. Yes, I'm here.

Q. Do you see the second heading, "Consigli Pre-Construction Scope (as of August 31, '20)"?

A. Yes.

Q. It says, "Steward first engaged Consigli to support 'water damage'-related efforts on August 3, 2020."

Page 41

Do you see that?

A. Yes.

Q. "Since that time, Consigli's role has evolved to include the following."

Do you see that?

A. Yes.

Q. The next is "Cost Model."

What is a cost model?

A. That's that high-level estimate I spoke to earlier that's typically a one-page estimate based on a cost per square foot. It's a cost-per-square-foot estimate based on high-level scope assumptions.

Q. And the next line under the heading says, "Consigli developed a cost model for both restoration and New Market replacement options."

Do you see that?

A. Yes.

Q. What were the new market replacement options?

A. So if you have a document I could review that would refresh my memory, that would be helpful. But if I remember, they were -- they asked Consigli to price some documents that had been prepared by Array Architects, and I believe it was just some

11 (Pages 38 - 41)

Page 42

high-level blocking diagrams and some scope -- some narrative, some description of what should be included in the cost model.

And it was -- one of the options was what was coined a New Market Hospital, which was new construction, and the other was restoring the existing hospital.

Q. Did you talk to anyone around the time of August of 2020 about Steward's plans, following the June 2020 flood, for the hospital?

A. No.

Q. Did you talk to anyone about what Steward was going to do with Norwood Hospital following the flood around the time of this report?

A. No.

Q. Going down to "Insurance Claim Support," do you see that heading?

A. Yes.

Q. It says, "Consigli is providing estimating support relating to the insurance claim effort."

Do you see that?

A. Yes.

Q. And then it talks about two buckets, "Replace in Kind," and "Replace to incorporate Code

Page 43

Updates."

Do you see that?

A. Yes.

Q. Can you describe Consigli's estimating support relating to those two buckets around the time of this report in September, August 2020.

A. Yes. NFA was the consultant hired by -- I believe by Steward, and they were essentially the experts in the room on insurance policies and how -- and the different coverages that were included in Norwood Hospital's policy.

And from my memory, we broke it out into these two separate buckets because of those policy coverages and the limits within those coverages.

So that there was -- there was the "Replace in Kind" bucket, meaning if this floor was damaged, we're going to include in our estimate the cost to replace that flooring.

And then the second was related to the code updates, which there are certain building elements that you could not just replace in kind, meaning replace with what was -- what is currently there; you can't -- you can't just install the same thing again, because it no longer complies with current

Page 44

building codes.

And so to get a building permit and get a certificate of occupancy, you would have to meet current codes. And there were a number of code requirements that were identified by other consultants and experts in that field on the scope that needed to be included in that estimate.

Q. I think it was -- was it NFA who gave Consigli direction to break out their estimating into those two buckets, "Replace in Kind" and "Replace to incorporate Code Updates"?

A. Correct.

Q. A little bit below that it says, "Pending information includes the following."

Do you see that?

A. Oh, yes. Yes.

Q. And then the second bullet is, "AHJ and DBH expectations/requirements are pending and will be clarified by Steward."

Do you see that?

A. Yes.

Q. As of around September 8th, 2020, did Consigli have -- strike that.

As of September 8th, 2020, was Consigli

Page 45

aware of any meetings between Steward or its representatives and the Authority Having Jurisdiction?

A. I don't know at this time, and I can't tell from the way I wrote this, whether or not the conversations had started or whether they were scheduled for some time in the future.

Q. Did Consigli ever have any meetings with the Authority Having Jurisdiction regarding Norwood Hospital?

A. Our conversations with the AHJ were really limited, to the best of my knowledge, because the superintendent would have had those conversations related to permit.

The questions regarding -- there were conversations that were had with the Authority Having Jurisdiction outside of building permits, including things like what was the expectation related to the fire alarm system in the building and whether or not they expected a wholescale replacement of the fire alarm or whether or not a kind of piecemeal approach to replacing the fire alarm would be acceptable.

So those types of conversations were had

12 (Pages 42 - 45)

Page 46

mostly between Steward and either Norwood Fire or Norwood Inspectional Services.

Our role in speaking to the Authority Having Jurisdiction was more limited to the role of a construction manager.

Q.  Did Consigli participate in the conversations with the Authority Having Jurisdiction that didn't involve permitting that you just mentioned?

A.  I did not.  I do not believe our superintendents did either, but I don't -- I can't confirm that.  I don't know.

Q.  Sitting here today, are you aware of anyone from Consigli who did participate in any conversations with the Authority Having Jurisdiction, other than for a permit, regarding Norwood Hospital?

A.  I believe our conversations were limited to permitting.

Q.  And when did those conversations with the Authority Having Jurisdiction about permitting occur?

A.  As permits needed to be pulled.

So, you know, as you can imagine, there's a

Page 47

lot of emergency response and temporary provisions that need to -- need to happen to keep everyone safe and keep the building heated and cooled and keep electrical to the building and all that.

So the typical permitting process would be you'd walk down to -- you'd go on their portal and you'd submit design documents and you'd do the work, you'd get a permit and you'd do the work.

In an emergency situation like this, it's a lot more conversational:  "Hey, what do we got to do to dot the Is and cross the Ts so that we can get this work done to protect the assets and protect the patients and all that?"

So it was probably more conversation -- conversational than we would normally have.  It's usually very straightforward, but in an emergency response like this, it's a little different.

Q.  Was Consigli involved in an emergency response at Norwood Hospital?

A.  When I say -- like, to me, even trying to mitigate the impacts of the flood is something that happens quickly, because you want to avoid mold growth and things like that.  You don't always wait for design documents to come out that say, "Take out

Page 48

this wall and put in new insulation and new drywall and repaint the wall."

So we were involved in helping in any way we were needed from a superintendent perspective and putting-work-in-place perspective.  We were also working with the electrical subcontractor who was actively working to make sure the building was safe electrically to avoid anyone getting injured.  And I know there were also temporary measures in place for air circulation, because the air handler units were down because the electrical service was down.

So there was a lot going on.  And so our superintendents would meet with the Authority Having Jurisdiction as different scope came up and just to better understand what the permitting requirements would be across those different scope elements as they materialized.

Q.  So Consigli's discussions with the Authority Having Jurisdiction surrounded the immediate mitigation of impacts of the flood on Norwood Hospital and not with respect to the longer-term estimating of the restoration of the project; is that correct?

A.  To the best of my memory, that's correct.

Page 49

Q.  At the bottom of Page 2 on Exhibit 4 it says, "Short-term re-opening Plan," and then in brackets, "Limited to ED."

Do you see that?

A.  Yes.

Q.  Do you know what "ED" stands for?

A.  Yes.

Q.  What does it stand for?

A.  Emergency Department.

Q.  And then underneath it says, "Estimating support related to getting the ED back up and operational," and then in brackets, "Effort on-hold per Steward."

Do you see that?

A.  Yes.

Q.  Do you recall a short-term reopening plan that was limited to the Emergency Department at Norwood Hospital?

A.  Yes.

Q.  Can you describe what that plan was.

A.  I don't remember when we actually received the documents.  And once again it was high level, similar to the market plan -- market hospital conversation, where we received maybe five or six

Page 50

8-1/2-by-11 pieces of paper that described what the short-term reopening plan would include.

And I believe they -- I don't -- I don't recall whether we actually priced that. I think we might have only informed schedule on that. But I -- I could be wrong. It was a long time ago.

But I believe that Steward pulled together a plan. It could have been informed by Array Architects, but I don't recall. And it would -- it was like the short-term plan of mitigating the impacts of the flood, and then there was kind of a phased activation plan of getting different Emergency Department required program up and online so that they could get services back to the community that desperately needed them.

Q. And it sounds like, as of September 8th, 2020, that effort was on hold, per Steward; is that correct?

A. Yes.

Q. Do you recall discussing why the effort was on hold?

A. I don't.

Q. Do you know why Steward had put that effort on hold?

Page 51

A. No.

Q. Did you ever learn why Steward had put the effort to try to reopen the Emergency Department on hold?

A. No.

Q. Do you know how far that plan went into effectuation?

A. I don't. I know that when I had it on hold here, I want to say -- we got documents later, like, I don't know, October or something like that, so it was -- it was on hold for a short period of time. And then we received documents that we were able to respond to, but it was, I don't know, a month or two after this report was published.

Q. On the next page, on Page 3, there's a heading titled "Schedule." Do you see that?

A. Yes.

Q. And it says, "Consigli is developing an 8-week look-ahead schedule and long-range P6 schedule based upon design team durations, Steward milestones, and durations needed for estimating efforts."

Do you see that?

A. Yes.

Page 52

Q. What is a long-range P6 schedule?

A. That's a Primavera schedule that is -- uses specific software that tracks schedule tasks, preconstruction and construction schedule tasks.

Q. Did Consigli develop a long-range P6 schedule for the Norwood Hospital restoration?

A. We did, yes.

Q. When was the first time Consigli prepared a schedule, a long-range P6 schedule for the restoration of Norwood Hospital?

A. I don't recall.

Q. Do you recall if Consigli developed a long-range schedule for the restoration of Norwood Hospital in 2020?

A. I don't remember whether it was included in the insurance claim estimate that we would have issued in December. So that's where -- that would have gone in in December 2020, and I honestly don't recall whether a P6 schedule was in there or not.

Q. In 2020, did Consigli do any type of scheduling developments for the restoration of Norwood Hospital?

A. I don't recall.

MR. FLECK: By the way, any time you'd like

Page 53

to take a break, five or ten minutes, let us know. We'd be happy to do that. We'll take a break about every hour-ish or so. So I'm getting close to that mark.

THE WITNESS: Okay.

MR. FLECK: So would you like to take a break now, or would you like to keep going --

THE WITNESS: I'm comfortable.

MR. FLECK: Okay. Why don't we keep going.

(Document marked as Consigli Exhibit 5 for identification)

Q. All right. We've just marked Exhibit 5. This is Bates labeled CONSIGLI_00018821.

Do you recognize what's marked as Exhibit 5?

A. Yes.

Q. And this is an email from you to several people, including John Anzalone, on October 6th, 2020; is that correct?

A. Yes. I'm looking at my -- I'm looking at what I said. Okay.

Q. So we had just talked for a little while about what was happening in August and early September of 2020. Leading up to this October 6th

14 (Pages 50 - 53)

Page 54

email marked as Exhibit 5, what work had Consigli done at Norwood Hospital?

A. What work had we done?

Q. Correct.

MR. RICH: Object to the form.

You can answer.

A. Physical work in place or estimating support?

Q. Let's start with physical work in place. Did Consigli do any physical work in place at Norwood Hospital in September of 2020?

A. We did -- there was -- there was a small project in the basement, and I just don't recall the timing of it. There was some hazmat abatement, so I don't recall whether that had been completed at that point or time -- of time.

Q. Okay. What estimating work had Consigli done leading up to around October 6th, 2020?

A. Prior to October, you're saying?

Q. Yes.

A. I believe we had done that high-level cost model market hospital and restoration estimate.

I don't recall the timing of the shorter-term activation plan effort. And once again, I

Page 55

don't recall whether we submitted an estimate of that or just a schedule, but that could have been around the October time frame.

The big estimating deliverable that we were all focused on was really the -- related to the insurance claim support, and as of the date of this email, those estimates had not yet gone in.

Q. How far along in your estimating work for the insurance claim was Consigli as of October 6th, 2020?

A. Based upon this look-ahead schedule, it looks like we had just gotten started. It looks like we would have received -- the architectural and structural base of design documents were due the beginning of October, and then -- and then we were supposed to have our estimates completed by the end of October, or mid-October, end of the October.

Q. So had you started estimating costs for the insurance claim as of this time?

A. Possibly. I say that because we -- it looks like there were still some outstanding -- "Confirm Utility Requirements and Demark," "Scope Confirmation Review Meeting."

So it's possible our estimating would have

Page 56

started sometime in early October.

Q. All right. Let's go to the body of the email up at the top on Exhibit 5. It says, "See attached email thread."

A. Yep.

Q. "We need to get documentation of final DPH expectations."

Do you see that?

A. Yes.

Q. What kind of documentation of final DPH expectations are you referring to?

A. So DPH has a lot of requirements, because ultimately they're the ones that certify whether or not a hospital can open. And obviously patients had been removed from the hospital, right? So the hospital was not permitted to treat patients at the time of this flood, or after this flood.

So to get the proper certification and approval to reopen the hospital, we would need to understand -- be aligned on expectations with DPH. And some of those outstanding items might be the scope, say, of the med gas replacement and the medical equipment. There's a lot of expectations on their end of what needs to be in the scope.

Page 57

And Consigli would not have had those conversations with them. It would have been Steward that had those conversations with DPH to align expectations and make sure that whatever they needed was included in the scope of the restoration.

Q. So Consigli would rely on Steward relaying DPH expectations to Consigli?

A. Yes.

Q. On the next line it says, "General estimating note: we need to comply with the Steward expectation re: estimate due dates even if it means square foot costs and qualifying the hell out of the estimates."

Do you see that?

A. Yes.

Q. What's your understanding of Steward's expectations regarding the estimate due dates as of October 6th, 2020?

A. They had a deadline, and we were concerned with how quick the deadline was, especially with the breakouts that were needed. We were concerned it was maybe not enough time.

Q. What were the breakouts that were needed?

A. Oh, gosh. They went back and forth a few

15 (Pages 54 - 57)

Page 58

times. I believe it was the replace in kind, and then it was the code upgrades. But then at one point it evolved to also needing to be broken out by floor and by building. So there were a lot of breakouts.

Q. And what did you mean here when you referred to "square foot costs and qualifying the hell out of the estimates"?

A. So "square foot costs" would be just that.

So to give you an idea of what we received from the design team -- obviously their effort was equally quick. It was a very fast timeline. Normally, on a scale of this -- a project of this scale, design -- to get through all those steps, schematic design, development, CDs, it would take months if not a year.

This was a quick assessment, high level, more conceptual or schematic level estimate. So the expectation would be that there would be a number of cost per square foot versus being able to quantify.

So what that means is, you know, although we are listing, for example, that we're replacing drywall on a particular floor, because we don't have design documents that would allow us to quantify the

Page 59

square footage of drywall removal, we would apply more a cost per square foot of that drywall replacement based upon a percentage -- an approximate percentage of the drywall on the floor that needs to be replaced.

So if the entire ground floor incurred water damage and we were replacing three feet up on the wall of the drywall and -- we're applying more of a square footage -- we're not taking off all the drywall that needs to be replaced. We're applying more of a square footage -- a cost per square foot of the drywall that needs to be replaced on that floor.

So it's a higher-level way of looking at estimating when you've got quick turnarounds like this, versus -- and you don't have design documents that allow you to quantify the scope.

Q. And what did you mean by "qualifying the hell out of the estimates"?

A. So qualifications are where you list out what is included in your estimate and what is not included in your estimate and also what your scope is based on.

So I'm sure you saw the qualifications in

Page 60

our estimates that we submitted, but it would be listing out our understanding or our baseline for how the costs were accounted for for a particular trade.

Q. In the next line you say, "We should keep a running list of all limitations being imposed upon us such as untimely reports, poorly defined and/or undefined scope, and resulting assumption."

Do you see that?

A. Yes.

Q. Did Consigli keep a running list of limitations being imposed upon it?

A. I don't -- I don't remember.

Q. Do you recall what reports were untimely as of October 6th, 2020?

A. I don't remember which specific reports, but consultants continued to be engaged, and new findings were happening each day that might not have made it into the design documents at the time that they were issued in early October.

So, you know, that comment, I think, was more to protect our deliverable, I guess outline the limitations of our deliverable based upon -- it's only based on what we know today, and we continue to

Page 61

find -- consultants continue to find more information as they're brought on board for additional services.

Q. And as of October 6th, 2020, was the scope of the restoration poorly defined and undefined?

A. I wouldn't say it was poorly defined or undefined. I think it was -- it was at a point in time, right?

So, you know, maybe a better way of putting it would have been it was early -- we were kind of early in the discovery process. There were still consultants that were coming out and documenting their findings. You know, I'd have to look at the timing of when, say, the structural report was issued and when some of these other consultant reports were issued.

There were -- we just didn't know what we didn't know yet. So it was -- it became more comprehensive as time went on.

But Steward was very intent on trying to turn something around as quickly as possible. And so there were some strict deadlines in place for when the design team -- the design team was equally struggling. They were trying to pull together the

16 (Pages 58 - 61)

Page 62

design documents and doing their due diligence, but reports kept coming in.

So it was, like, where is the line drawn on what ends up in these design documents. And then as dates pushed, it started to impact the timeline we had to get the estimate in. Like, the estimate due date wasn't changing, so as everything pushed, we were getting crunched more.

Q. Do you know why Steward was imposing this deadline on Consigli for the estimate?

A. No.

Q. Did you ever talk to anyone about why the deadline for the estimates was towards the end of October of 2020?

A. No.

Q. Around this time, what was your understanding of the scope of work necessary to restore Norwood Hospital?

MR. RICH: Object to the form.

You can answer.

THE WITNESS: Okay.

A. The scope of work was defined -- so -- what's the best way to explain this...

We essentially -- there were a lot of

Page 63

different consultant reports, and there were also -- so there's the scope that's obvious, right, where something's been damaged and it needs to be replaced. But then there's what I think we called consequential scope. There's that scope that also gets developed because of the baseline scope. And then there's means and methods scope.

So there's -- what we did is we sat in a room as a multidisciplinary team, Consigli, Array Architects, BR+A, NFA as the policy kind of consultant, and any other consultants where it made sense.

And we would talk through the findings in the consultant reports, and then translate that to a tracking document that we used to help to outline and define the scope on the project.

And I think the process worked really well, because when you get all the different disciplines in the room, you start to understand and appreciate the relationships between all those different entities and how it helps to inform the scope that needs to show up in the plan.

So it was a high-level approach to trying to identify the scope, align with all the different

Page 64

disciplines, and help to inform the way the scope -- Array needed to document the scope on the plans.

Because ultimately we priced what was on the plans and what was in the -- this matrix that we developed, because we didn't have true, like, design development plans or construction documents. We had to work from these higher-level documents.

MR. FLECK: I think this is a good time for me to take a quick break, if that's okay. Do you mind if we do that?

MR. RICH: Your show.

MR. FLECK: Take about a five-minute break?

MR. LIZZA: Sure.

THE WITNESS: Sounds good.

THE VIDEOGRAPHER: The time is 10:28. We're off the record.

(Recess)

THE VIDEOGRAPHER: The time is 10:37. We're back on the record.

(Ms. Foley replaced Mr. Lizza)

BY MR. FLECK:

Q. I'd like to hand you what's now marked Exhibit 6, 7 and 8.

Page 65

(Documents marked as Consigli
Exhibits 6, 7 and 8
for identification)

Q. Just real quick for the record, Exhibit 6 is Bates labeled STEWARD00497302, Exhibit 7 is Bates numbered STEWARD00497305, and Exhibit 8 is Bates labeled STEWARD00497316.

Ms. O'Brien, do you have all three of those in front of you?

A. Yes.

Q. Okay. Exhibit Number 6, this is an email string with a top email being from you to Steve VanNess on October 21st, 2020; is that correct?

A. Yes.

Q. And do you see where it says "Attachments," and then it goes "Norwood Activation Plan," and then it continues?

A. Yes.

Q. And Exhibit 6 in that email lists two attachments; is that right?

A. Yes.

Q. All right. And can you take a look at Exhibit 7 and Exhibit 8. And are Exhibit 7 and Exhibit 8 the attachments to that email?

Page 66

A.  Yes.

Q.  Do you remember the email that you had sent on October 21st, 2020, to Mr. VanNess?

A.  (Reviewing document)  Yes.

Q.  And down below there's another email from Mr. VanNess to you dated October 19th, 2020.  Do you see that?

A.  Yes.

Q.  And in the body of that email it says, "Hi, Stephanie, Following up on our conversation today, below is an outline of the scope and my own rough schedule durations."

Do you see that?

A.  Yes.

Q.  Do you recall that conversation with Mr. VanNess?

A.  No.

Q.  Do you recall the context of this email?

A.  Yes.

Q.  What was the context regarding this email?

A.  It was related to a short-term activation plan.

Q.  And is that the short-term activation plan described in Exhibits 7 and 8?

Page 67

A.  Yes.

Q.  And what is a high-level overview of that reactivation plan?

A.  I believe they want to open -- reopen the Emergency Department in a limited way with some other program elements that would also be required to open an ED.

Q.  Do you recognize Exhibit Number 7?

A.  Yes.

Q.  Do you know who prepared Exhibit 7?

A.  No.

Q.  What is Exhibit 7?

A.  It's a few documents that explain the approach to the short-term activation plan.

Q.  And what is Exhibit 8?

A.  That is Consigli's schedule, high-level schedule associated with the activation plan as outlined in Exhibit 7.

Q.  And did you prepare the schedule shown in Exhibit 8?

A.  I believe I did, and I likely worked with the superintendent as well.

Q.  All right.  Let's turn back to Exhibit 6 and the email.  Up top it says, "Hi Steve -- I'm

Page 68

attaching a high-level schedule where I built up the front end of your schedule assumptions below to better inform the start-up process and early activities."

Do you see that?

A.  Yes.

Q.  What did you mean by "built up the front end of your schedule assumptions"?

A.  Because there are things that have to happen before you can actually start the work.

Q.  So what did you do with respect to the schedule to build up the front-end assumptions?

A.  You would -- you would need design.  You would need to order any long lead procurement. You'd need to submit for your permit, all those kind of front -- up-front activities that happen before you can mobilize.

Q.  Did Mr. VanNess send you a schedule prior to you preparing the schedule shown in Exhibit 8?

A.  There's a high -- there's a schedule outlined in the activation plan.

Q.  Did you create -- did Consigli create Exhibit Number 8 from scratch, or were you working off of a schedule that Steward had provided you?

Page 69

A.  We were working off a schedule Steward provided.

Q.  And is that schedule that you were provided shown in the email in Exhibit 6 in those tables, or did they provide you with something else?

A.  This -- well...  Oh, okay.  (Reviewing document)  This -- the -- we would have used the design timeline and the occupancy and licensing, the DPH approval timelines provided by Steve in his email.

Q.  Okay.  Did you create -- did Consigli create the schedule in Exhibit 8 using Primavera?

A.  No.

Q.  How did you create the schedule in Exhibit 8?

A.  Excel.

Q.  Going back to Exhibit, 6 it says -- there's a heading called "A few points of note."

Do you see that?

A.  Yes.

Q.  It says, "Since this is a renovation, I showed MEP design assist to allow for exploratory, early make-safe, demo, corridor rework, early shop drawings and release of long lead items."

18 (Pages 66 - 69)

Page 70

Do you see that?

A. Yes.

Q. What is "MEP design assist"?

A. That's when you bring on mechanical, electrical, plumbing and/or possibly fire protection trades to work alongside the design team and help to inform the design.

Q. And why would you utilize MEP design assist in a renovation?

A. It helps move things along faster.

Q. In what way does MEP design assist help move things along faster?

A. Because they -- the subcontractor that's hired in the design assist capacity can walk the building, understand existing conditions, review the equipment and use their expertise to help inform the design, thereby avoiding changes after the design documents are issued. It's a collaborative approach to design.

Q. So turning to the schedule shown in Exhibit 8, is MEP design assist reflected in that schedule?

A. Yes.

Q. Okay. And where is it reflected?

A. In Phase 1.

Page 71

Q. And how does the MEP assist impact the actual schedule shown in Exhibit 8?

A. Well, it includes early release and long lead equipment. The schedule -- it helps make the design efficient, and it also helps to ensure that the long lead procurement items show up on the site as early as possible.

Q. And how does it allow for the long lead procurement items to show up on site as soon as possible?

A. Because the subcontractor can start the shop drawing process and get the equipment into fabrication during the design phase, versus waiting until the traditional time of award, which is after CDs.

Q. Going back to the bullet points, first bullet point under the title "A few points of note," it talks about "early make-safe."

Do you see that?

A. Yes.

Q. What is "early make-safe"?

A. When you have to -- when you're doing exploratory, you might have to demolish or open up -- do some destructive opening of walls and

Page 72

things like that, and sometimes it requires MEP make-safe, or cutting, capping, turning off power, that sort of thing, to keep workers safe.

Q. Is there a difference between make-safe and early make-safe?

A. No.

Q. Does early make-safe -- are you indicating here that the make-safe could occur earlier than it would under the traditional schedule that you, I think, had mentioned before?

A. It's make-safe. It's -- what I'm saying is, if we bring on a design assist contractor early, they can do some of that make-safe to help assist with the exploratory efforts that have to happen.

Q. What are "early shop drawings"?

A. Normally shop drawings, if you follow the traditional subcontractor award after construction documents, and after the GMP shop drawings would be issued at that time -- if you hire design assist, you can start that shop drawing process sooner.

Q. So traditionally shop drawings begin to be created after construction drawings?

A. In a traditional procurement you would award subcontractors after the GMP is approved based

Page 73

on the construction documents.

Q. And by employing MEP design assist, the shop drawing process can begin sooner?

A. I mean, the shop drawing process -- it depends. It depends on the equipment. It depends on the design. It depends on what's ready during design that can be submitted on.

Q. How about with respect to the schedule shown in Exhibit 8? Are shop drawings -- is the shop drawing process beginning at a stage in the schedule earlier than it would if the schedule is set up in a traditional procurement schedule?

A. The way it's shown here is, for the long lead equipment, we would start the procurement during Phase 1, versus when it's traditional, when procurement would traditionally happen, which is during Phase 2, after GMP approval.

Q. Why is the schedule set up in Phase 1, Phase 2 and Phase 3?

A. Because you -- I'm sorry, I probably misspoke. It wouldn't happen during Phase 2. It would happen after GMP development. So I misspoke there.

The way that it's organized, it looks like,

19 (Pages 70 - 73)

Page 74

is based on the phasing outlined by Steward.

So Phase 1 is more about reactivating the ED. Phase 2 is about the inpatient units and some additional scope.

So I misspoke when I said it would happen during Phase 2. It would traditionally happen after GMP approval and after subcontractors are brought on board, whereas here we're showing long lead procurement is happening earlier, based on design assist involvement.

Q.   So are shop drawings worked into the long lead procurement tasks shown in the schedule in Exhibit 8?

A.   It's in the bar "Long Lead Procurement."

Q.   So more broadly, the schedule in Exhibit 8 is broken into three phases; is that correct?

A.   Yes.

Q.   Why is the schedule broken into three phases?

A.   Because that's the way Steward wanted it broken out.

Q.   What is Phase 1?

A.   It's outlined in Exhibit 6, but it includes reactivating the ED, and then he describes the

Page 75

scope, and the "Imaging Reception/Waiting Room as an X-Ray Room," he has a whole description here.

Q.   Okay.  So you followed, for Phase 1, what Mr. VanNess provided you in terms of scope and then developed a corresponding schedule for that phase?

A.   Right.

Q.   And Phase 1, Phase 2 and Phase 3, they all begin, it looks like, in the beginning of November 2020; is that correct?

A.   With design, yes.

Q.   Okay.  Why do Phase 1, Phase 2 and Phase 3 of the schedule in Exhibit 8 all begin in the beginning of November of 2020?

A.   Because that's what Steve told us the start date would be in this email.

Q.   So if Steward had given Consigli an instruction that the project was going to proceed right away to reactivate the hospital, is that what's reflected in Exhibit 8?

A.   It was a -- it was a short-term activation plan.  But, yes, it was limited in scope.

Q.   Let me put it this way:  So the schedule in Exhibit 8, this assumes that Steward would want to get working on reactivating the hospital, you know,

Page 76

right away; is that correct?

A.   Sorry.  I just need a minute to review this.  (Reviewing document)

I'm sorry, could you repeat your question.

Q.   Sure.  Does the schedule shown in Exhibit 8 assume that Steward would want to get working on the reactivation plan as soon as possible?

A.   It incorporates the dates that were provided within this email.

Q.   And the date to start design would be November 1st?

A.   Yes.

Q.   And according to the schedule that you put together, Exhibit 8, when would the full activation of the hospital be complete?

A.   Phase 1, October 1st of 2021.

Q.   And what would be complete with respect to the building by the end of Phase 1?

A.   The Emergency Department, the stat lab, a small sterile supply room, a med room, imaging reception/waiting room, x-ray room, mobile CT.

Q.   And all that work would be complete by the end of October 2021, according to the schedule?

A.   Yes.

Page 77

Q.   And how could that be accomplished?

A.   I'm not sure I understand the question.

Q.   Sure.  Can you -- how does the sequencing of the schedule for Phase 1 allow for the reactivation of the Emergency Department and the other work associated with Phase 1 to be completed by the end of October of 2021?

A.   Design documents would be issued.  We'd bring on design assist trades.  We would start the early procurement process.  We'd arrive at a GMP. We'd start the permitting.  We'd engage the rest of the subs, and we'd build out the job.  And then we'd go through the regulatory process.

Q.   Is the schedule for Phase 1 in Exhibit 8 a realistic schedule for the scope set forth for Phase 1?

A.   I wouldn't be able to confirm that until design documents are developed and until a schedule is included within the GMP.

Q.   Is it a reasonable estimate in Consigli's view that Phase 1 could have been completed by the end of October 2021?

A.   I would not be able to confirm that until a formal schedule was developed, based on the design

20 (Pages 74 - 77)

Page 78

documents.

Q. Why not?

A. Because -- because design helps to inform -- both architectural and MEP design and structural design all help to inform the scope, and that all gets documented in design documents. And that level of detail is what goes into our schedule when we submit a GMP.

Q. Sure. At the outset of a project like the reactivation of a hospital here set forth in Exhibit -- Exhibit 8, this is an estimate of the schedule, correct?

A. Correct.

Q. And it's based on the information that you had at the time?

A. Correct.

Q. And you try to do the best you can with that information?

A. Correct.

Q. And so based on the information that Consigli had and its experience putting together construction schedules for health care facilities including hospitals, is the completion of Phase 1 by October 2021, and when it begins in the beginning of

Page 79

November '20, a reasonable time frame to complete that work?

MR. RICH: Objection. Asked and answered.

A. I -- I don't think there's enough time for design. I don't think there's enough time for permitting. But, once again, I would not -- I would not be able to comment on the construction timeline until I had design documents.

Q. Did you tell Mr. VanNess that there was not enough time for design built into the schedule you provided him in Exhibit 8?

A. I don't recall.

Q. Did you tell Mr. VanNess that there was not enough time in your schedule in Exhibit 8 for permitting?

A. I don't recall.

Q. Why would you provide a schedule to Mr. VanNess that did not include enough time for design?

A. Design timelines are informed by the design consultant, not Consigli.

Q. Okay. So you incorporate that information on the design duration based on what you're provided, regardless of whether or not you think it's realistic?

Page 80

A. Typically the information would come from the architect that's being hired. In this case it came from Steve VanNess. So typically we would get the information from the architect of record, and we would incorporate that into our schedule.

Q. Ultimately, isn't Consigli responsible for the project schedule and how it plays out?

A. Not until, like I said, the GMP; not until the design is developed and we understand the scope of the project and we submit it as part of a Guaranteed Maximum Price.

Q. Even when Consigli is providing a conceptual schedule at the outset of a project for a client?

A. I would say at a really high-level conceptual phase when we're developing the schedule, it's based on the best information we have at that time.

Q. In the schedule for Exhibit 8, does it have mobilization commencing before the design phase is complete?

A. I'm sorry, could you repeat that.

Q. Sure. Let me put it this way: In the schedule in Exhibit 8, does it have construction

Page 81

beginning before the design phase is complete?

A. No.

Q. For Phase 3 it says, "Design thru CD's," and that extends all the way until the end of August 2021; is that correct?

A. Yes.

Q. And in Phase 1 construction is set to begin in April 2021; is that correct?

A. Yes.

Q. So doesn't construction, under this schedule, begin prior to the completion of the design for the full activation of the hospital?

A. There's three separate design phases. So maybe I misunderstood your question. But there's design for Phase 1, design for Phase 2, and design for Phase 3. Each phase's construction mobilization date does not start until sometime after design is complete for each phase.

Q. For the respective phases?

A. Correct.

Q. But overarching, for the entire project to reactivate the entire Norwood Hospital, the design phase and construction phases are happening in overlap; is that correct?

21 (Pages 78 - 81)

Page 82

A. Yes.

Q. And why did Consigli set up the schedule so that at least some construction is overlapping the design phase for the entire hospital reactivation?

A. I don't understand your question. Sorry.

Q. Does starting at least certain parts of construction of Norwood Hospital while the design phase for the full reactivation is occurring allow for the hospital to be reactivated sooner than if the design phase was completed in its entirety before any construction began?

MR. RICH: Objection to the form.

You can answer.

A. I believe that's the intent in the way that Steve outlined this approach, is to be able to activate portions of the hospital in a phased approach.

Q. Can we go back to Exhibit 6. It's the third bullet point. It says, "Would allow for MEP Coordination to start right when CD's are available."

Do you see that?

A. Yes.

Q. What does it mean, to "allow for MEP

Page 83

coordination to start right when CD's are available"?

A. Before -- before MEP installation happens in the field, it needs to be coordinated. So what it means is we would not -- if we brought on some design assist subcontractors earlier, we would not have to -- they could dig right into the coordination when the full design set is available, versus losing time to post CD awards.

Q. The next bullet point says, "Some subs are awarded prior to GMP finalization."

What is that referring to?

A. That's the early release -- that means subcontractors getting awards before the client has had a chance to review the Guaranteed Maximum Price and approved it.

Q. And how does awarding subcontractors prior to GMP finalization impact the schedule for the project?

A. It just means they can start their submittals sooner and get materials released sooner.

Q. The next bullet point says, "The regulatory/permitting period could take longer than 1 month if impacted by COVID and/or due to

Page 84

complexities of this project."

Do you see that?

A. Yes.

Q. Okay. Was it your understanding that the regulatory/permitting period could take as little as one month?

A. I think I spoke to that earlier when I said I thought permitting would take longer than one month. There were a few things happening at this time, between COVID and not being able to -- like, Inspectional Services didn't always have a full staff of people in their office. So it would impact permitting timelines.

And also, depending on the complexity of the project, it could make permitting take longer to review all the plans.

Q. Was it your understanding, when you prepared the schedule, that permitting could happen in as little as one month?

A. That was the way Steve VanNess outlined it, and I expressed some concerns with that duration, but that's what we incorporated, I believe, into our schedule.

Q. But here you did not say to Mr. VanNess

Page 85

that the regulatory permitting period definitely would exceed more than one month; is that right?

A. Correct. I would have no way of knowing.

Q. The next bullet says, "Previously developed construction schedule durations are generally pretty close."

What are they pretty close to?

A. I don't recall what I meant by that.

Q. After that semicolon, the same sentence, it says, "Although I outlined early enabling durations for abatement and demo."

Do you see that?

A. Yes.

Q. What do you mean by "early enabling durations for abatement and demo"?

A. So we're showing hazmat and -- hazmat abatement and demo happening before construction mobilization, and it overlaps with design.

Q. And why did you sequence, in the schedule that's Exhibit 8, the hazmat abatement and demo occurring before construction?

A. Because it -- you have to abate hazardous materials before you can start demolition. And so it would add some efficiencies to the schedule.

22 (Pages 82 - 85)

Page 86

Q. And why did you sequence hazmat abatement and demo and schedule due date to begin while the design phase was still ongoing?

A. I believe it was in an effort to make -- make his dates work a little better than they would have. If you don't award hazmat and demo until after GMP development, which -- I mean, traditionally a client wants a GMP developed and approved before they award any subs so they understand the cost of the project.

But if you -- if you had to wait until after GMP approval to do hazmat abatement and demo, it would -- it would cause the schedule to shift out further.

Q. Does the exhibit set forth -- does the schedule set forth in Exhibit 8 include any strategies or techniques in order to make the schedule shorter?

A. I think it does a little on the front end, pre-mobilization.

Q. Is that things like MEP design assist?

A. Yes.

Q. How about getting ahead of long lead items?

A. Yes.

Page 87

Q. Having MEP coordination to start right when the construction documents are available, is that another technique to accelerate the schedule?

A. Yes.

Q. And does awarding subs prior to GMP finalization help accelerate the schedule?

A. It could. There is also a risk there, though, that you're -- the design isn't fully baked and you're trying to award subcontractors. But on select subs it's possible.

Q. If things -- if the events play out as you hope with the subs that are awarded prior to GMP finalization, does that usually result in a shorter schedule?

A. It could.

Q. Is it possible for the owner to expedite regulatory and permitting?

A. Not really, no.

Q. Can I turn you to Exhibit 7, on the second page.

A. Okay.

Q. The third bullet says, "Expedite regulatory approval"?

A. Okay.

Page 88

Q. Are you aware of any ways to expedite regulatory approval for a project like the Norwood Hospital renovation?

A. I didn't write this, so I don't really know what they had in mind there. I'm not aware of anything they could have done.

Q. Okay. So based on your experience and career, are you aware of any way in which an owner can expedite regulatory approval on a project like Norwood Hospital restoration?

A. First of all, there's many different regulatory agencies, so I don't know if they're speaking to the DPH regulatory approval that they would need to occupy the hospital again or whether they're talking about, like, ISD, Inspectional Services.

Q. It's regardless of what -- they're saying what they mean; I can't expect you to look into their minds here.

A. Right.

Q. But based on your experience and your career working on renovation projects like the one at Norwood Hospital, have you ever seen where an owner takes any efforts to expedite the regulatory

Page 89

process?

A. No.

Q. Going back to Exhibit 6, five bullets from the bottom of your top email.

A. Okay.

Q. It says, "I added time to Phase 3 since final program locations for all phases are unknown. Occupied renovations take longer when considering impacts to earlier phases."

Do you see that?

A. Yes.

Q. What does it mean, "Occupied renovations take longer when considering impacts to earlier phases"?

A. When you have a partially occupied hospital or even a fully occupied hospital and you are doing renovations, you have to consider all the infection control measures and work hours to allow the patients to safely continue to be cared for while construction's going on.

Q. So for a reactivation plan that does not include a phased reopening, would you expect that to go faster than a reactivation plan that includes phased reopening?

23 (Pages 86 - 89)

Page 90

A. All things being equal, if it's the same scope, yes.

Q. And all things being equal, in your experience, about how much faster would it go?

A. It depends on the project.

Q. How about a project like the one that's shown in Exhibit 8?

A. I can't answer that.

Q. Okay. In your experience, any sense of whether that would be a day, a week, a month?

MR. RICH: Object to the form.

A. I -- I'm unable to answer that question at this time.

Q. At the bottom of your email at the top of Exhibit 6, it says, "If my assumptions above are not correct, I'm happy to discuss and adjust."

Do you see that?

A. Yes.

Q. Did you ever discuss your assumptions with Mr. VanNess?

A. I don't remember.

Q. Do you recall Mr. VanNess ever indicating that any of your assumptions were not correct?

A. I -- I don't remember.

Page 91

Q. Did you have any discussions with anyone at Steward about the reactivation plan following this email?

A. I don't believe so.

Q. Do you know what happened to the reactivation plan after October 21, 2020?

A. No.

Q. Did you ever talk to anyone ever again about the reactivation plan after sending the email in Exhibit 6?

A. I don't recall whether there were some conversations that happened after.

(Document marked as Consigli Exhibit 9 for identification)

Q. You now have what's marked as Exhibit 9 in front of you?

A. Yes.

Q. And this Bates labeled CONSIGLI_00022034.

Does Exhibit 9 consist of an email and then there's a document behind the email?

A. Yes.

Q. And Exhibit 9, the email at the top is an email from John McCarthy to you on April 27th, 2021, correct?

Page 92

A. Yes.

Q. And who is John McCarthy?

A. He goes by "Jack." He was the architect from Array Architects that worked on the insurance claim support.

Q. And do you recognize the attachment to the email beginning on Bates Number CONSIGLI_00022035?

A. I need a moment. (Reviewing document) I really don't recall this. Sorry. I don't remember it at all.

Q. That's okay. Let's move on.

(Document marked as Consigli Exhibit 10 for identification)

MR. FLECK: Are you still okay on breaks to go a little bit longer? Is that okay?

THE WITNESS: I'm good. Thank you.

Q. All right. Now, marked as Exhibit 10, this is Bates labeled STEWARD00998329.

Do you recognize what's marked as Exhibit 10?

A. Yes.

Q. What is Exhibit 10?

A. This is our interview slide deck for the interview for the new Norwood -- Norwood Hospital

Page 93

Replacement Project.

Q. When did Consigli become aware of the Norwood Hospital Replacement Project?

A. I mean, I'm sure we heard in conversations, but we were issued an RFP. I don't recall the date, but it would have been before this interview date.

Q. When you said "interview date," were you referring to May 21st, 2021?

A. Yes.

Q. So did you present the presentation in Exhibit 10 to Norwood Hospital on May 21st, 2021?

A. Yes.

Q. And this presentation was prepared in response to an RFP from Steward?

A. Yes.

Q. Do you recall what the RFP requested?

A. It would have -- I mean, it would have asked for a project approach for -- a progressive design/build approach to the Norwood Hospital Replacement Project. It would have been a number of requirements outlined in the RFP.

Q. Prior to receiving the RFP from Steward, did Consigli have an understanding about whether Steward wanted to replace Norwood Hospital?

24 (Pages 90 - 93)

Page 94

(Fire alarm interruption)

THE VIDEOGRAPHER: Off the record for a second.

The time is 11:27. We're off the record.

(Recess)

THE VIDEOGRAPHER: The time is 11:37. We are back on the record.

MR. FLECK: Madam Court Reporter, would you mind reading back the question right before --

THE COURT REPORTER: That was interrupted?

MR. FLECK: Yes, please.

(Question read)

A. We had, I'm sure, at some point heard that that was the direction they were going, but I don't recall a specific conversation.

Q. Do you know generally about when Consigli understood that the direction Steward was going to go in for Norwood Hospital was to replace it?

A. It would have been right before the RFP was issued, but I don't know when the RFP was issued. I don't remember.

Q. Did Consigli ever receive an RFP from Steward to renovate or repair Norwood Hospital?

A. No.

Page 95

Q. Are you aware of Steward issuing an RFP to renovate or repair Norwood Hospital?

A. No.

Q. Who created the presentation marked as Exhibit 10?

A. Consigli. I would say I probably led the effort, but it was a team of people.

Q. Okay. And forgive me if I missed this because of the alarm, but could you describe generally what the RFP requested from Consigli.

A. I don't remember specifically what was in the RFP.

Q. Looking at the presentation, do you have a sense of what Steward was requesting in its RFP?

A. Yes.

Q. Okay. What was Steward generally requesting in its RFP that led you to put together this presentation marked as Exhibit 10?

A. They would have requested a progressive design/build team to manage the replacement hospital project and really the services and the value that Consigli would bring to the process.

Q. What is a progressive design/build?

A. Oh, good question. So that is -- it is --

Page 96

it's a design/build approach that includes the client in kind of the risk profile for the project.

So it essentially means that the contract is set up in a little different way than a traditional CM-at-risk contract. And all three entities -- I shouldn't say three, there are many entities -- but the client, the construction manager and the design team all collaboratively form this team that works through design and through construction. And I believe there's -- there could be shared risk. I don't remember.

Q. Can I turn you to the page that's Bates numbered 998335. And on the top it has the title "Project Timeline."

A. Oh. Yes.

Q. Can you describe what is shown in this slide.

A. Yes. It's showing construction timelines for the main hospital, the CUP, and the parking garage.

Q. So is this Consigli's proposed schedule to replace Norwood Hospital?

A. This would have been a high-level conceptual schedule on our -- that outlines our

Page 97

approach. Obviously design documents hadn't been generated yet.

Q. At the top, near the top left, within the chart it says "PREMOB." Do you see that?

A. Yes.

Q. Does that stand for pre-mobilization?

A. Yes.

Q. Okay. What activities are taking place in that pre-mobilization phase?

A. It says, "Survey," "Cut-Caps" and "Enabling" and "Abatement."

Q. Okay. What does that entail?

A. "Survey" would be the physical surveying that has to happen to locate the buildings. And "Cut-Caps," they would be utilities that have to be cut and capped and made safe. "Enabling," that could include a number of activities. And then "Abatement" would be to mitigate the hazmat within the buildings.

Q. And all of those activities are estimated to take place between, like, the beginning of June 2021 until the end of October 2021; is that correct?

A. Yes.

Q. And then the schedule has full mobilization

25 (Pages 94 - 97)

Page 98

beginning in the beginning of November of 2021; is that correct?

A. Yes.

Q. And what does full mobilization entail?

A. It means we have the construction trailer set up. Consigli -- the Consigli team is out there, and we're starting to -- we're starting demolition activities and foundations.

Q. On the far right of this slide it has a star that says "Go Live."

A. Yes.

Q. What does "Go Live" mean in the context of this slide and schedule?

A. First patient.

Q. And according to this schedule, the first patient is estimated to be at Norwood Hospital by the end of November 2023?

A. Yes.

Q. How did Consigli come up with the go-live date?

A. It was likely in the RFP, but I don't remember whether or not it was in there or not. Usually RFPs have target start dates and end dates.

Q. So is it your understanding that Consigli

Page 99

was working backwards from a deadline provided by Steward to develop this schedule to replace Norwood Hospital?

A. As far as I can remember, but I would have to refer to the RFP to be sure.

Q. Do you recall giving the presentation to Steward?

A. Yes.

Q. What did you tell Steward regarding the project timeline shown on this slide?

A. We likely would have focused on our approach of having the projects broken out into separate timelines -- separate teams managing the different projects to ensure schedule efficiency.

Q. Anything else that you can remember talking to Steward about regarding this slide?

A. I don't remember.

Q. During your presentation to Steward, did you talk to Steward about the feasibility of replacing Norwood Hospital by the end of November 2023?

A. There's a delicate balance when you're trying to win a job of saying what you need to say to meet the RFP requirements and the expectations of

Page 100

the client, and then whether or not it's realistic.

So it's likely we focused on meeting their expectations.

Q. Did you believe Consigli could meet Steward's expectations to replace Norwood Hospital and go live in 2023?

A. I thought it was highly unlikely.

Q. Why?

A. It's too much happening in a short period of time.

Q. And did you tell Steward at this presentation that it was highly unlikely that Consigli could carry out the schedule that it put forth in its presentation?

A. No.

Q. I turn you -- it's a handful of pages, but it ends in 998344, and on the top it says, "Driving the Fast-Track Schedule."

A. Okay.

Q. What is shown in the slide that's titled "Driving the Fast-Track Schedule"?

A. (Reviewing document) It's showing the design timeline and the corresponding regulatory submissions that need to happen -- that align with

Page 101

those different design deliverables.

Q. So on the top there's a chart or a table that says "Design Milestones," and in there it shows overlapping "Schematic Design," "Design Development" and "Construction Documents"; is that correct?

A. Yes.

Q. So was Consigli proposing for the replacement hospital project to have the schematic design, design development and construction document tasks overlap in order to expedite the schedule?

A. That's what we're showing here, yes.

Q. On the kind of bottom half of the slide it says, "Actions/Deliverables." Do you see that?

A. Yes.

Q. Below that there are a handful of items listed. What are these?

A. Do you mean the darker ones or do you mean all the lighter ones?

Q. Just generally, what is listed below "Actions" and "Deliverables"?

A. It gives you an idea of all the actions and deliverables that have to happen by certain deadlines in order to hit this fast-track design schedule.

26 (Pages 98 - 101)

Page 102

Q. So on the left-hand side, under "June 3, 2021,"it lists "Early Procurement, Pre-Mobilization, Subcontractors, Exploratory/Survey, Demolition Contractor, Site [Enablement] Subcontractor"; is that right?

A. Yes.

Q. So is Consigli proposing that each of those items be complete by June 3rd of 2021?

A. The procurement of them, yes.

Q. And what do you mean by "the procurement of them"?

A. Engaging subcontractors before you have a GMP, getting them under contract.

Q. So this proposal contemplates getting subcontractors for pre-mobilization, such as exploratory and survey and demolition and site enabling, awarded prior to construction documents being completed?

A. Correct.

Q. And then it says, "Number 2, June 17, 2021," and it lists a number of items below that. Do you see that?

A. Yes.

Q. What is "Procurement of Design-Assist

Page 103

Subcontract Partners" under June 17th, 2021?

A. That's, once again, engaging some subcontractors, issuing RFPs, and getting them engaged to help with the design and -- you know, under this delivery method, the idea is they work alongside the design team and they help to facilitate a timely design.

Q. And then "Number 3, August 12, 2021," it lists "Procurement," and then it has a number of items listed under there. Do you see that?

A. Yes.

Q. And what is this describing underneath "August 12, 2021"?

A. Sorry, I'm having trouble reading. It's very light. (Reviewing document) It's bringing on additional subcontractors, and it looks like there might even be an early foundations package to facilitate an early start to foundations.

Q. There's a bullet point that says "Material Release." Do you see that?

A. Yes.

Q. And underneath it has "Facade for Hospital"

Page 104

and "M/E/P/FP Long Lead Equipment." Do you see that?

A. Yes.

Q. What is being described under "Material Release" under August 12, 2021?

A. It's essentially saying, for these long lead items, that in order to make the schedule work, they'd have to be released as early as August.

Q. So for the items listed under June 3rd, 2021, June 17th, 2021, and August 12th, 2021, those are a listing of actions that Consigli was proposing to try to accelerate the schedule in order to meet Steward's go-live date; is that true?

A. Yes.

Q. Can you go to the next page. The next page is titled "Norwood Hospital Cost Model." Do you see that?

A. Yes.

Q. Is this Consigli's estimate for the cost to replace Norwood Hospital?

A. It's a cost model, yeah.

Q. So what do you mean by "It's a cost model"? It sounds like you're correcting me.

A. It just -- when you say an estimate, I

Page 105

don't know, I think of an estimate as something that's more detailed than this. This is a high-level cost model or cost per square foot based on, you know, the limited information we have.

Q. Okay. So this is the cost model that Consigli put together to price the replacement for Norwood Hospital?

A. To give them an idea on where -- an order of magnitude, yes.

Q. And the cost, total cost for the replacement hospital, according to this slide, was over $332 million; is that correct?

A. Yes.

Q. Can you go two more slides. It says on the top, "Pulse on the Market."

A. Yes.

Q. Do you see that? What is this slide describing?

A. Lead times for material and anticipated escalation.

Q. And is escalation an increase in price over time?

A. Yes.

Q. And do you see where it says, right in the

27 (Pages 102 - 105)

Page 106

middle of the slide, "Solutions"?

A.  Yes.

Q.  Are those solutions that Consigli was proposing to help bring down the lead time and escalation costs associated with procurement?

A.  Yes.

Q.  And those solutions include pre-purchase and early delivery of materials and equipment for the project?

A.  Yes.

Q.  And the solutions include to source alternatives for materials and equipment on the project?

A.  Yes.

Q.  And then to pre-buy equipment, including long lead MEP?

A.  Yes.

Q.  What does it mean to pre-buy equipment?

A.  Early release.

Q.  What does "early release" mean?

A.  Before the 100 percent construction documents are completed, we would need an early release design package that would allow us to purchase equipment during the design phase.

Page 107

Q.  So you would work with the subcontractor and have the subcontractor provide sufficient information to enable the procurement of some of those long lead MEP items before the design was complete?

A.  We'd work with the design team -- the design team would issue the specifications and what was needed, and then we would go out to vendors for pricing, competitive pricing.

Q.  Okay.  So before the design was complete, the design team would provide the information sufficient to start pre-buying some of the long lead MEP equipment?

A.  Yes.

Q.  Can you turn to what's Bates numbered 998353.  It's three back from -- three or four back from the end of the presentation.

A.  Yes.

Q.  It says "Restoring Services to Norwood Community."

A.  Yes.

Q.  What is this slide showing?

A.  Different ways we engage the community and celebrate different construction milestones.

Page 108

Q.  And the particular milestone that's shown, at least in the future at this time, being celebrated is the new community hospital that was in place of Norwood Hospital coming December 2023?

A.  Yeah, I think they were just showing an example of the custom scrim, what we could do on custom scrim.

Q.  I wonder if we're on the same slide.  Mine says on top, "Restoring Services to Norwood Community."

A.  Yes.  So where it says "Building a Healthy Future for Norwood," underneath the image it says "Custom Scrim."

That block right there is an example of custom scrim we'd put on our fence line, and we'd highlight, like, the patients and the work they do at the hospital, the different project team members and whatever messaging you'd want to put on that scrim.

Q.  Thank you.

There's a box to the right of that that says, "Your New Community Hospital Coming December 2023"?

A.  That's on the scrim, yeah.  That would be

Page 109

on the scrim, yes.

Q.  Is that referring to the replacement hospital for Norwood?

A.  I guess so, yes.

MR. VOGEL:  11.

(Document marked as Consigli Exhibit 11 for identification)

Q.  We just marked as Exhibit 11 what is Bates labeled MPT0022791.  Do you see that?

A.  Yes.

Q.  Do you recognize the document that's marked as Exhibit Number 11?

A.  Yes.

Q.  And what is Exhibit Number 11?

A.  The insurance claim estimate.

Q.  And Exhibit Number 11, this was issued on December 3rd, 2020?

A.  Yes.

Q.  Is that the date on which this was shared with Steward, or is that different?

A.  We likely shared drafts leading up to this, but I don't remember.

Q.  It lists on the first page both you and John Anzalone; is that correct?

28 (Pages 106 - 109)

Page 110

A. Yes.

Q. Am I pronouncing his name correctly?

A. Yes, you are.

Q. Thank you.

It lists him as the estimator?

A. Yes.

Q. What is John Anzalone's role as an estimator?

A. He prepares -- he reviews the design documents and specifications and prepares the detailed estimates.

Q. What was his involvement in the preparation of Exhibit 11?

A. He developed the estimates within this submission.

Q. If I refer to the estimates in Exhibit 7 (sic) as "the December 3rd, 2020, estimates," will you understand what I'm referring to?

A. Yes.

Q. What was your involvement in developing the December 3rd, 2020, estimates?

A. I would review them -- you know, this wasn't a traditional approach. So he -- you know, between the documents and the scope assumption

Page 111

matrices and the narratives and the specifications, it was -- it required a little bit of a team review and effort to make sure that everything was broken out the right way and documented correctly.

So I would review -- you know, he would ask me questions. I would review the estimate with him, and, from a quality perspective, we just both went through it and tried to make it as accurate as possible.

Q. Up top it says -- this is titled "Draft Norwood Hospital Insurance Claim Estimate"; is that correct?

A. Yes.

Q. Okay. Why is it labeled a draft?

A. Steward asked us to call it a draft.

Q. Can you describe, as a high level, why did you create the Draft Norwood Hospital Insurance Claim Estimate of Exhibit 11?

A. Because we were hired to do so by Steward.

Q. And what direction did you receive by Steward or others in order to put together the December 3rd of 2020 estimates?

A. I believe we received a contract, but, honestly, I don't remember. There was a lot of

Page 112

back-and-forth on contracts, but -- I'd have to check the timing of the contract, but it was verbal direction, definitely.

Q. Is Exhibit 11 -- is this created exclusively for the insurance claim?

A. Yes.

Q. Can you turn to the next Page, Page 2 of the report. It has a table of contents?

A. Yes.

Q. And about one, two, three, four -- it starts with "Report Narrative," correct?

A. Yes.

Q. And then it has "'As-Was,'" "'Code Compliant,'" and "Document Matrix Log" as 2, 3, and 4.

Do you see that?

A. Yes.

Q. Can you describe what the "'As-Was' Draft Submission" was?

A. Yes. That was the estimate, assumptions and qualifications, the scope assumption matrix, and the basis of design documents for the, I guess, replace-in-kind without consideration of code-required upgrades.

Page 113

Q. And then what is the "'Code Compliant' Draft Submission"?

A. It is, once again, all of the -- it includes all the scope. So we didn't just look at the code premiums. We priced the whole job again, but included code-required upgrades.

Q. And did Consigli break out those estimates by "As-Was" and, quote, "Code Compliant" at the direction of Steward?

A. Yes.

Q. Can we turn to Page 5.

A. Yes.

Q. In the second lower half of Page 5, it says "Damage Assessment." Do you see that?

A. Yes.

Q. Okay. And here it lists a number of, it looks like, ten consultants from which it mentions a list of consultant reports.

Do you see that?

A. Yes.

Q. Okay. So did Consigli receive reports from each of the ten consultants listed here regarding the damage assessment at Norwood Hospital?

A. Yes.

29 (Pages 110 - 113)

Page 114

Q.  And at the bottom of Page 5 it says, "The damage assessment reports were used as a baseline for scope development as described in the next section of this Report."

A.  Yes.

Q.  Can you describe how Consigli used the damage assessment reports provided by those consultants for scope development?

A.  Yes.  We mostly advised from a means and methods perspective.  So, like I said, we would review each of these reports collaboratively multidiscipline -- in a multidisciplinary manner.

And we in particular would advise on -- for instance, if you need to replace wet insulation on ductwork, but in order to get to that insulation, you need to remove some ceiling tiles and you need to maybe move some electrical pipes out of the way in order to get to that insulation, we would help to advise on that kind of means and methods scope that needed to be added to the document to be able to perform the work.

Q.  And if you advise on the means and methods, what were the other consultants providing with respect to the scope?

Page 115

A.  Everyone would kind of discuss the findings and then talk about how it would need to evolve into scope on the plans.

So, for instance, if it's noted that drywall is wetted up to three feet up the wall, you know, the -- BR+A might say, "Okay, that means you've got to move that piece of equipment out of the way temporarily in order to replace the drywall or move the millwork out of the way in order to replace the drywall."

So we all just talked about what it meant to the different disciplines and then how that would be documented on the drawings as scope.

Q.  In Exhibit 11, for each of the as-was and code compliant submissions, there are scope assumptions matrices and basis of design documents; is that right?

A.  Yes.

Q.  Was the scope that Consigli used for its December 3rd, 2020, estimates based on the scope assumptions matrix, the basis of design documents, or something else?

A.  Both.  There were narratives -- yeah, there were narratives, there were plans, and there was

Page 116

that matrix that was used to inform the costs in the estimate.

Q.  So Consigli used both the narrative, assumption and qualifications, scope assumptions matrix, and then the drawings in order to determine the scope of work for estimating?

A.  The assumptions and qualifications were something we wrote to go in with our estimate, but the rest of those documents, correct, we used those to price.

Q.  So the scope of work for the as-was draft submission -- let me strike that.

The scope of work that Consigli used in order to develop its as-was estimate was a combination of the as-was scope assumptions matrix and the as-was basis of design documents; is that correct?

A.  Yes, I believe that's true.  Yep.

Q.  And then the scope of work that Consigli relied upon to develop its code compliant estimate consisted of the code compliant scope assumptions matrix and the code compliant basis of design documents?

A.  Correct.

Page 117

Q.  On Page 6 of Exhibit 11, do you see in red it says "Construction Estimate Development"?

A.  Yes.

Q.  And then a little bit below that it says "Direct Costs" in blue.  Do you see that?

A.  Yes.

Q.  Okay.  And it lists out, underneath there, it says, "Consigli developed direct trade costs using a combination of the following estimating methods."  And it lists "Unit costs," "Cost per gross square foot," "Program Premiums," and "Subcontractor/Vendor pricing."

Do you see that?

A.  Yes.

Q.  "Unit costs," is that the estimating method that you described earlier today in which you would receive actual measurements and quantities for work?

A.  Yes.

Q.  And the "Cost per square foot" estimating method, that would be employed when Consigli did not have sufficient information in order to know the precise quantities of work, and so it would use an estimation based on the total square footage for a particular area?

30 (Pages 114 - 117)

Page 118

A. Yes.

Q. So why did Consigli use both unit costs and cost per gross square foot estimated methods to come up with its December 3rd, 2020, estimates?

A. Because of the state of the design documents. Some things were quantifiable, and other scope items were more -- were less quantifiable.

Q. What were the states of the design documents as of December 3rd, 2020?

A. They weren't at a level, like what I would call a design development level, where you can -- where you were at the point where you can really quantify everything. They were something earlier than that.

And their approach to identifying scope was, if I'm remembering correctly, in large part identified with key notes and highlighting areas, versus -- when design documents progress, they get more detailed, and you -- the scope is identified in a more detailed way than they were in this set.

Q. So referring to key notes and highlighting, are those key notes and highlighting of drawings?

A. Yes.

Q. So for something like flooring, it would

Page 119

highlight the areas of a particular floor, and there would be a key note that would say "full replacement," along those lines?

A. Yes.

Q. Is that right?

A. Right.

Q. On Page 7 it describes, on the top, it lists "Indirect Costs." Do you see that?

A. Yes.

Q. And Number 5 is, "General Conditions are carried at 6 percent."

What are "General Conditions"?

A. That would include the Consigli staffing and any temp office trailers or office requirements to manage the job.

Q. And how does Consigli estimate the cost for general conditions?

A. It depends on the state of the estimate, the stage of the estimate. When it's early, it could be just applying percentages based on historical costs. As schedules get more detail and staffing becomes more detailed, we would actually map out the staffing required and apply it to the timeline with the rates for each staff member and

Page 120

develop it that way.

Q. For Consigli's December 3rd, 2020, estimates, how did Consigli calculate the cost of general conditions?

A. I don't remember whether I -- I might have just applied a percentage based on historical costs. I'm not seeing a detailed GC GR breakout here, so that's likely what I did. But I don't remember.

MR. VOGEL: Exhibit 12.

(Document marked as Consigli Exhibit 12 for identification)

A. Ah, you do have it. You knew the answer to that before you asked it. Yes, I did.

Q. I marked as Exhibit 12 -- when I can help with a memory, I'll try to do that.

A. Okay.

Q. So we just marked as Exhibit 12 what's labeled as CONSIGLI-00021630

A. Okay.

Q. Do you recognize Exhibit 12?

A. I do.

Q. What is Exhibit 12?

A. It's general conditions.

Q. And do you know who created this document?

Page 121

A. Me.

Q. And does this break out the personnel and their hourly rate in order for Consigli to determine or estimate the cost of general conditions for the as-was estimate from December 3rd, 2020?

A. Yes. I mean, it has a different date on it. That's the only thing that's confusing me. But, yes, that's correct.

Q. So potentially this is a draft that preceded the December 3rd, 2020, estimates?

A. Correct.

Q. But Exhibit 12 reflects the methodology that Consigli used in order to calculate the general conditions costs for purposes of its December 3rd, 2020, estimates?

A. Yes.

Q. Let's go back to Exhibit 11 and the report. I'd like to turn to -- it's Page 72 of your report. The Bates number is MPT0022861.

A. Okay.

Q. "Section 2B, 'As-Was' Assumptions & Qualifications."

A. Yes.

Q. So what are -- to give a high-level

31 (Pages 118 - 121)

Page 122

explanation, what are the as-was assumptions and qualifications set forth here in the report?

A. It just clarifies our assumptions when we developed the estimate.

Q. And how does Consigli go about recognizing what its assumptions are for its estimate?

A. Obviously, on a high-level estimate like this, it would -- they could be very lengthy. So we try to keep them to only the -- limited to the items that we think could impact the estimate if we didn't kind of discuss them and make sure we qualified our approach.

Q. On Page 72, under "General" and then Number 2 --

A. Yes.

Q. -- it says, "Escalation is included to anticipated mid-point of construction 12/31/22."

Do you see that?

A. Yes.

Q. What does that line mean?

A. That means that once we developed the direct costs, all the direct trade costs, the trades don't purchase the materials the day we submit the estimate, so we have to project how much we think

Page 123

those materials are going to cost when they're actually ordered and released and delivered to the job site.

Q. How did Consigli come up with a midpoint of construction of 12/31/2022 as --

A. Because -- it's a good rule of thumb because, although half the materials you could say are ordered before the midpoint and the other half are ordered after the midpoint, so it's a good kind of compromise position on where to extend the escalation to.

Q. And what is the basis for Consigli using December 31st, '22, as the midpoint of construction?

A. It would have been a schedule -- it would have been based on our schedule development.

Q. And there's no schedule in Exhibit 11; is that correct?

A. I don't see one, no.

Q. Why wasn't a schedule included in Exhibit Number 11?

A. I don't remember why.

Q. By December 3rd, 2020, had Consigli developed a project schedule associated with the as-was restoration of Norwood Hospital?

Page 124

A. I know we developed P6 schedules. I just don't remember when they were issued, so I can't comment on the timeline.

Q. Sitting here today, do you recall whether or not there was a project schedule for the as-was restoration of Norwood Hospital by the time December 3rd, 2020, rolled around?

A. I don't remember.

Q. Do you recall having any discussions with Steward or Steward's representatives regarding the schedule for the as-was restoration of Norwood Hospital by the time this report was written, December 3rd, 2020?

A. I don't recall -- I do not recall when schedule was developed. I know we developed one. I just don't remember when it was issued.

Q. Can I turn you back to Exhibit 12.

A. Yes.

Q. At the top right, it lists "Construction/Closeout Duration." It says "26 months."

Do you see where I'm at?

A. Yes.

Q. Underneath that it says, "Construction

Page 125

Duration: 24 months." Do you see that?

A. Yes.

Q. Okay. Does the 24-month construction duration listed in Exhibit 12 have any relationship with the midpoint of construction of December 31st, 2022, that we just talked about on Page 72 of the December 3rd, 2020, as-was estimates?

A. To me it would mean that design would have to start immediately and, say, you have a year of design and then start construction in 2021 and finish in 2023. That would be my best guess.

Q. So is that your understanding of how the construction duration that's listed on Exhibit 12 would factor into the midpoint of construction in Exhibit 11 for the as-was restoration of Norwood Hospital?

A. Yes.

Q. So when Consigli put together its December 3rd, 2020, estimates, it was also estimating that the end of construction would be around the end of 2023; is that correct?

A. Yes.

Q. And what was that based upon?

A. The assumption that design would start

Page 126

right away. It would, you know, start up, and design would take about a year, or the preconstruction phase about a year, and we would start, I guess, a year from the date of the submission, the 12 -- the December 2020 submission.

A year from then we would start construction, I guess, based on my -- I don't believe I was ever told that. I think it's just it was an assumption we had to make; otherwise we wouldn't know where to escalate the project to.

Q. You mentioned design would have to start right away. What do you mean by "right away" relative to the June 28th storm?

A. "Right away" meaning right after this submission went in, because, for our assumptions to make sense on the midpoint of construction, it would allow about a year of preconstruction, and then construction would start. So we wouldn't be able to start construction until, you know, that design had been completed and subs were lined up and all that, so...

Q. Okay. So the December 3rd, 2020, estimates that Consigli prepared presumed that the design phase for the restoration of Norwood Hospital would

Page 127

begin in December of 2020?

A. Correct.

Q. On Page 23 (sic) of Exhibit -- go back to your report -- Exhibit 11, Number 35 underneath "Mechanical." Let me know when you're there.

MR. RICH: What page are you on?

MR. FLECK: I'm on 73, also Bates labeled 22863.

MR. RICH: 73 is fine. I was just flipping and lost it.

THE WITNESS: It was a lot of work.

A. Yes, I see 35.

Q. It says, "Testing of existing mechanical equipment is excluded. Replacement of mechanical equipment as indicated is included."

Do you see that?

A. Correct. Yes.

Q. What does that mean?

A. So the scope of this was developed before the equipment testing took place. The equipment testing didn't begin until, gosh, maybe November, so maybe a week or two prior to this going in.

We helped manage all the equipment testing, all the mechanical equipment, electrical equipment,

Page 128

and documenting on a matrix the findings of BR+A and any other experts that looked at the equipment, to determine whether or not it needed to be replaced.

Q. So let me break that down a little bit. So for -- this is -- this document says "'As-Was' Assumptions & Qualifications," and is 35 an assumption?

A. Yes.

Q. Okay. And is this -- is Number 35, here on Page 73, assuming that there would be the replacement of mechanical equipment instead of testing and determining that certain equipment could stay and certain equipment had to be replaced?

A. Yeah, the testing didn't come up till later. I for -- I don't recall how that decision came down, but at some point Steward indicated that the equipment would have to be tested so the scope could be verified, and they asked us to help manage that process.

Q. And so for purposes of the December 3rd, 2020, estimates, instead of assuming that the equipment would be tested and some would be allowed to remain while others would be replaced --

A. Right.

Page 129

Q. -- the estimates contemplate the replacement of the equipment?

A. Correct. It aligns with what's in the document, the design documents and assumptions matrix.

Q. Okay. So the December 3rd, 2020, estimates assume the replacement of the mechanical equipment, the plumbing equipment, the electrical equipment and the full fire alarm as indicated in the documents that are also attached to the estimate?

A. Yes.

Q. Can we turn to Page 76 of Exhibit 11.

A. Yes.

Q. This is titled "'As-Was' Scope Assumptions Matrix," correct?

A. Yes.

Q. What is a scope assumptions matrix?

A. Okay. This was a tool we developed because, as you can imagine, it was overwhelming trying to identify all the scope items and weed through all these different consultant reports and try to come up with scope in a very limited period of time and then turn around an estimate in a limited period of time.

Page 130

So what we agreed as a team to do, the consultants and Steward and NFA and all of us, is get in a room together, review the reports as they come in, and use this as a tool to start to document what scope needed to eventually be included in design documents.

Q. Has Consigli in any other project, to your knowledge, created or used a scope assumptions matrix like the one here in Exhibit 11?

A. Design teams use tools like this all the time. We -- I've never been on an insurance claim support team before, so I thought that this tool that I've seen design teams use would be a good tool to start to just take notes and document the scope as it evolves.

But to answer your question, I have never -- I have never used a tool like this in the past, me personally.

Q. Can you give an overview of the as-was assumptions that Consigli relied upon in order to develop its December 3rd, 2020, estimates for the as-was restoration of Norwood Hospital?

A. Sorry, could you repeat that. I didn't quite understand what you're asking.

Page 131

MR. FLECK: Would you mind reading back my question.

(Question read)

A. Thank you. I guess I would say that the idea behind this matrix was that this was used more to inform what ends up on the drawings. So at this point in the estimate process, we used this matrix more as a check to make sure that the design team incorporated all of the scope that we all agreed to as an interdisciplinary team into their design documents.

So in theory you shouldn't have to refer to this anymore, but we used it more from a quality perspective to check to make sure everything we discussed actually shows up in the drawings appropriately.

Q. And the drawings that you're talking about for purposes of checking, are they contained in the December 3rd, 2020, report of Exhibit 11?

A. Yes.

Q. And so are all of the assumptions that are reflected in the scope assumptions matrix reflected in the drawings attached in Exhibit 11?

A. I -- I can't recall if there were some

Page 132

items that maybe they missed or whether or not the matrix just provided clarification for us, but -- so I don't really know how to answer that, but --

Q. Was it at least the intention of Consigli and the rest of the team for the assumptions in the scope assumptions matrix to be reflected in the basis of design drawings for the as-was?

A. Yes.

Q. Can we turn to Page 78 -- I'm sorry, we can stay on 77. Talk briefly about the envelope. This is Item Number 16. It assumes 100 percent facade replacement.

Do you see that?

A. I think I'm on wrong page.

Q. It's Page 77 of the report.

A. Oh, okay. I was looking at the wrong thing. 77. Okay.

Q. All right. And so Item 17 under "Envelope," it assumes 100 percent facade replacement; is that correct?

A. Yes.

Q. And then under 20 it assumes 100 percent roofing replacement; is that correct?

A. Yes.

Page 133

Q. Turning to the next page, 78, starting on 25, Consigli assumes that all flooring and base would be replaced on the basement, ground floor, first floor, and second floor?

A. (Reviewing document) Yes.

Q. And as of December 3rd, 2020, was Consigli aware that all of the flooring -- or let me strike that.

As of December 3rd, 2020, what was Consigli's understanding of what portions of the floor at Norwood Hospital, you know, were damaged by the storm from June 28th, 2020?

A. I don't recall -- so you're asking the limits of the damage versus what flooring wasn't damaged, like what the percentage was? I don't -- I don't recall.

Q. Did Consigli believe that all of the flooring at Norwood Hospital for the Lorusso Building suffered damage as a result of the June 28th, 2020, storm?

A. That wasn't really our determination. I don't -- I'd have to look, I guess, at the moisture mapping plans and remind myself on to how much of the flooring was actually damaged.

34 (Pages 130 - 133)

Page 134

But we -- just to clarify, we didn't determine what was damaged and what needs to be replaced. That was -- it was documented in this matrix, but that wasn't our decision.

Q. Whose decision was it?

A. It was a combination of different consultant reports. So the moisture mapping, which I think was prepared by EH&E, the architect, and in large part NFA, who -- there were a lot of conversations on what the limits of the flooring replacement would be to align with policy -- insurance policy allowances, I guess is the best way to put it.

Q. Can you explain what you mean by align with the insurance policy.

A. For instance, if you -- if half this room was wetted by a flood and the other half wasn't, and this flooring was discontinued, you currently own a room where all the flooring matches. The way NFA described it is you would be entitled to a matching flooring in the corrected condition or the repaired condition. So if it meant you couldn't find a floor that matched, you would be entitled to have all the flooring in this room replaced.

Page 135

Q. Okay. Did NFA give that direction with regard to aspects of Norwood Hospital other than flooring?

A. Yes.

Q. And what aspects of Norwood Hospital did NFA provide that direction?

A. The same held true for millwork. I'm trying to think other finishes. Facade, probably.

Q. That was facade, probably; is that --

A. I don't -- I don't remember if facade came up. I want to say facade was more a result of the Gayle report and means and methods of being able to remove those panels to replace them.

But I know flooring was. I know millwork was. I'm also trying to think of other things.

Q. How about painting?

A. Painting's a good one. You know -- yes. That's a good example.

Q. Okay. How about interior doors?

A. I don't think that came up as one of the NFA items. I think the concern there was the standing water and it being wetted for a certain period of time, being worried about biologics or damage or something. I don't remember.

Page 136

Q. Do you recall NFA providing any other guidance about the scope of work at Norwood Hospital that was appropriate based on its view of the insurance policies at issue?

A. I believe it was mostly finishes, but... (Reviewing document) Millwork, painting... And wall protection. Those are the ones that jump out at me.

Q. And when did NFA relay their guidance regarding scope that was just discussed?

A. In the interdisciplinary meetings I just spoke about when we reviewed the scope matrices.

Q. Did the design team adopt NFA's suggestions regarding scope that NFA provided in those meetings?

A. Yes.

Q. And why did they do that?

MR. RICH: Object to the form.

A. Because we all documented the scope in this matrix, and we followed the direction of the interdisciplinary team, and that's what was -- that's what the design team was directed to include in their design documents.

Q. And the design team was directed to include that scope by NFA?

Page 137

A. NFA was Steward's policy expert. So we understood -- we all played a role in developing the scope, and they played a role in informing the scope based on policy -- the insurance policy.

Q. So Steward acting through NFA was your understanding where the direction was coming from?

A. I don't know -- I just know that NFA was in the room when we were -- they were the insurance expert, and so we listened to them. I didn't know enough about the policy to know whether they were correct or not correct.

Q. Can we turn to Page 9 of Exhibit 11. I'm going to read the Bates number because there are multiple page numbers. It's MPT0022799.

A. Yes.

Q. And at the top it says, "Draft Norwood Hospital Insurance Claim Estimate, 'As Was' Conceptual Estimate - Draft 11/24/2020."

Do you see that?

A. Yes.

Q. What is shown on this page?

A. This is a -- this is a summary of the cost, direct cost per floor, and then all the below-the-line, kind of business terms, additional costs

35 (Pages 134 - 137)

Page 138

outside of the subcontractor costs.

Q.  Are the subcontractor costs encapsulated in the first column that shows up in red and reads "$104,280,405"?

A.  Yes.

Q.  So, in Consigli's December 3rd, 2020, estimates, it estimated that the subcontractor costs for the as-was restoration of Norwood Hospital would amount to $104,280,405?

A.  Yes.  I guess in theory you should add in the design contingencies, because eventually that -- the thought is that is going to end up being a direct cost.

Q.  And that would occur earlier in the project, and so you would incur that?

A.  No.  It's extra contingency for the design based on the early state of the design documents.

So essentially what it means is we documented all the scope we saw in the plans, but we recognize there could be some scope missing.  So, because it's so early in design, we apply a design contingency.  But we eventually expect that that -- those numbers will work their way up into the trade costs as the design progresses.

Page 139

So, in my mind, the direct costs are really a combination of the 104 and the 5 million, because when you get to CDs, you'd expect that to be in that number.

Q.  Why would you have a design estimating contingency in addition to the assumptions of the scope?

A.  Because we always apply a design contingency to our estimates.  The percentage will vary based on the -- how complete the design documents are.  But when you -- when you get to the final design, the idea is that that contingency is zero.  So it helps to account for kind of the incomplete nature of the design, early on.

Q.  Has Consigli updated the as-was conceptual estimate in Exhibit 11?

A.  Not -- I don't believe we updated it again, based on the documents that are in this set.

Q.  Earlier in the deposition you described how Consigli would update its estimates for construction projects as certain milestones were hit --

A.  Yes.

Q.  -- in a project.  And so here, at least as of December 3rd, 2020, Consigli has issued its

Page 140

as-was conceptual estimates and code compliant conceptual estimates based on the information set forth in the assumptions matrix and the basis of design drawings.

And did Consigli subsequently update its estimates for the as-was restoration of Norwood Hospital?

A.  I mean -- so, just to clarify, this design process didn't follow the traditional path, because it wasn't a real project.  It was an insurance claim support.

But there was an effort -- there was -- there were revised design documents developed and issued as part of a separate or later effort, and Consigli was developing estimates and schedules to align with that design.

Q.  And those were for the insurance claim?

A.  Yes.

Q.  Do you recall the time frame in which that occurred?

A.  It was a couple of years -- I think it was a couple of years ago, a year or two ago?  I'm losing track of time.

Q.  And what additional information did

Page 141

Consigli receive when it revised its estimates later on?

A.  Array Architects and BR+A revised their drawings, and we were -- we submitted a revised estimate, albeit in draft form.  The effort was just going on so long, I don't think we ever completed a final revised estimate based on final revised design documents.

Q.  For the revised estimate using the design team's more updated drawings, did that result in Consigli not using an assumptions matrix?

A.  We always submit -- oh, you mean this? Scope assumptions matrix?

Q.  Correct.

A.  Correct.  That wasn't -- that wasn't maintained at part of that separate effort.  Yeah.

MR. FLECK:  I'll round out just a few more things on this exhibit, and then we can break for lunch.

THE WITNESS:  Nice.  Thank you.

Q.  So, can you turn to -- it's Page 155 of the report.  The Bates number is MPT0022945.

A.  Okay.

Q.  And this is the code compliant estimate

36 (Pages 138 - 141)

Page 142

that Consigli prepared, correct?

A. Yes.

Q. And turning to the next page, Page 156, this sets forth Consigli's code compliant estimate and its amounts, and the total is 263,823,859; is that correct?

A. Yes.

Q. And then for Consigli's estimate for the cost for the code compliant scope of work for Norwood for the subcontractors cost, that's $152,468,482; is that correct?

A. Yes.

Q. And then you would include the additional 7 million 623 dollars -- $7,623,424 for the design/ estimating contingency on top of the subcontractor total?

A. Yes.

Q. And to develop -- or particularly to develop its code compliant estimate, it also relied on scope -- a scope matrix and basis of design drawings from the design team; is that correct?

A. Yes.

Q. And the scope matrix for the code compliant estimate had additional assumptions based on what

Page 143

the design team believed was resulting from the need to comply with codes; is that correct?

A. Yes.

Q. Forgive me for retreading. Could you go back to Page 9, MPT0022799, back to the as-was conceptual estimate.

A. Yes.

Q. For the December 3rd, 2020, estimate -- I'm sorry, strike that.

For Consigli's December 3rd, 2020, as-was estimate, it calculated 180,000 -- $180,704,632; is that correct?

A. Yes.

MR. FLECK: All right. Break for lunch?

THE WITNESS: Sure.

THE VIDEOGRAPHER: The time is 12:57. We are off the record.

(Luncheon recess)

Page 144

AFTERNOON SESSION

(Document marked as Consigli Exhibit 13 for identification)

THE VIDEOGRAPHER: The time is 1:40 p.m. We are back on the record.

BY MR. FLECK:

Q. Welcome back, Ms. O'Brien.

A. Thank you.

Q. You now have what is marked as Exhibit 13 in front of you in the box.

A. Okay.

Q. Can you at least take out the first few pages.

Do you recognize what's marked as Exhibit 13?

A. Yes.

Q. And what is Exhibit 13?

A. This is the facility assessment report.

Q. Is the first Bates Number CONSIGLI_ 00003110?

A. Yes.

Q. And it's dated June 16, 2021; is that correct?

A. Yes.

Page 145

Q. And do you recall this document?

A. I honestly don't know that I ever saw it in its final form in June, but I -- we were involved in managing the testing and inspection of equipment at the hospital.

Q. Okay. Did you see versions, prior versions of what's marked as Exhibit 13?

A. I saw it as it was being developed, where everything was being tracked, and we were tracking when different pieces of equipment and panel boards were being tested, and we'd verify that the testing was complete or the inspection was complete.

I just don't recall whether I ever saw a physical -- I don't ever remember seeing a physical hard copy like this. But it could have been sent to me at some point.

Q. For several months there was testing of equipment and various electrical systems at Norwood Hospital between some point in 2020 and 2021; is that correct?

A. Yes.

Q. And during that period of time, BR+A and other consultants for Steward were gathering information about the results of the testing; is

37 (Pages 142 - 145)

Page 146

that correct?

A.  Yes.

Q.  And as they were doing that, they were putting together a series of reports and other documentation regarding their testing, correct?

A.  Yes.

Q.  And ultimately that culminated in the issuance of a report from BR+A that encapsulated all the testing results; is that correct?

A.  Yes.

Q.  And what's marked as Exhibit 13, do you understand that to be the culmination of the testing results from BR+A's team?

A.  Yes.

Q.  And you were kept, it sounds like, apprised of the results of testing as the testing was occurring; is that right?

A.  Yes.

Q.  And do you recall the more precise time frame of the testing?

A.  I believe it started maybe November of 2020, and I thought it was complete by around April or May, but I don't remember exactly.

Q.  April-May of 2021?

Page 147

A.  Yes.

Q.  And what was -- what were the sense of the updates that you were receiving about the testing as it was occurring between November of 2020 and April and May of 2021?

A.  So Consigli's super -- assistant superintendent and our MEP manager, Blake Wilcox, I think, were working with BR+A because some of the testing or inspections needed assistance from a superintendent or an MEP manager to help execute the work.

So we were helping to track and notify Steward of the next piece of equipment that were going to be tested and when they were going to be tested and the results of those tests.

Q.  Were you also relaying the results of the tests to Steward?

A.  I believe Chris Kidney was kept in the loop on kind of the status of the testing, yes.

Q.  Including the results?

A.  Yes.  I believe so, correct.

Q.  Was Consigli keeping Mr. Kidney updated on the results of the testing as it occurred?

A.  Yes.  We had a matrix where we were

Page 148

tracking everything.

(Document marked as Consigli Exhibit 14 for identification)

Q.  All right.  You have now what's marked as Exhibit 14, an email string Bates labeled CONSIGLI_00019964?

A.  Yes.

Q.  And if you could turn to the second page of that exhibit, and up at the top this is an email from you to Chris Kidney and others on July 7th, 2021; is that correct?

A.  Yes.

Q.  And it says, "Hi Chris - based upon the BR+A testing report findings, there will be a significant adjustment to scope."

Do you see that?

A.  Yes.

Q.  Are the BR+A testing report findings reflected in Exhibit 13?

A.  Yes.

Q.  And what was the significant adjustment to scope that you referred to here in your July 7th, 2021, email?

A.  There were piece of equipment that were

Page 149

tested and confirmed that they did not need to be replaced, so the design -- the design documents needed to be updated to reflect that.

Q.  And did you have an understanding of how much the scope needed to be adjusted at the time you wrote this email to Mr. Kidney?

MR. RICH:  Object to the form.

You can answer.

A.  Yes.  I believe that the original assumptions made for the purpose of the estimate did not align with all the testing results and that the equipment replacements would be reduced, significantly reduced, thereby reducing the cost.

Q.  And the next sentence in your email is, "Is the design team being tasked with updating BOD documents so that we can update our estimate?"

Why did you ask Mr. Kidney that question?

A.  Because new information is available, and we recognize that the previously issued estimate did not align with this newer information.

Q.  So because Consigli received new information that indicated there was going to be a significant adjustment to the scope downward, Consigli felt it was necessary to update its

Page 150

December 3rd, 2020, estimates?

A. Yes.

Q. Did you speak with -- around the time of July 7th, 2021, or earlier, did you speak with anyone about the recognition that the scope needed to be adjusted downward?

A. I -- it's likely I had conversations outside of this email thread about the timeline for the drawings being updated and whether or not we were providing an updated estimate.

Q. Do you recall speaking to anyone from Steward prior to July 7th, 2021, about the need to revise the December 3rd, 2020, estimates downward?

A. I guess same answer as before. I believe I probably had some conversations, I just -- I don't recall with who or when.

Q. Did you speak with anyone at Consigli about your determination that the scope of work for the December 3rd, 2020, estimates needed to be adjusted downward?

A. No.

Q. Why not?

A. Because we didn't have updated design documents yet.

Page 151

Q. Did you get updated design documents at some point reflecting the downward adjustment in scope for the restoration for Norwood Hospital?

A. Yes.

Q. And about when did you receive those?

A. I -- I do not remember when it was. It was after we had demobilized from the site.

Q. When did you demobilize from the site?

A. Before this report was issued. I believe it was whenever the testing ended.

Q. Can you go to the front of Exhibit 14 and the top email, which is from you to Michael Benjamin on July 8th, 2021.

Do you see that?

A. Yes.

Q. It says, "MPT is pushing the team directly to get it updated per our meeting on Tuesday - so Steward likely realizes it needs to happen."

Do you see that?

A. Yes.

Q. Were you having meetings with MPT and its representatives around this time?

A. I don't believe I had -- I certainly didn't have any meetings just with MPT that I can recall.

Page 152

Most of our meetings were limited to Steward.

So this -- this could have been just a phone call from MPT to me. I don't exactly remember what led to my -- my response.

Q. Were you having regular meetings with Steward around July 2021?

A. No. Our meetings had dropped off after we demobilized, and certainly at the time that the RFP was issued for the replacement hospital.

Q. Prior to BR+A issuing its Building Assessment Final Report that's Exhibit 13, did Consigli have an understanding that the scope of work associated with its December 3rd, 2020, estimates would need to be revised downward?

A. I'm sorry. Did you say did we have knowledge or -- what was your question?

Q. Did Consigli have an understanding during the testing, but before BR+A issued its final report, that the scope of work associated with the December 3rd, 2020, estimates was going to be revised downward?

A. Yes.

Q. Okay. And about when did Consigli know that?

Page 153

A. I would say, as the testing results started coming in, and we realized that some panel boards, for instance, or pieces of equipment were salvageable and the numbers kept climbing, we -- we realized that there would need to be updated design documents so that we could adjust our estimate accordingly.

Q. Okay. So starting in November 2020?

A. Maybe not that early. January, maybe.

Q. January of 2021?

A. Yes.

Q. Consigli had an understanding that the estimates needed to be revised downward?

A. Yes.

Q. And did you inform -- did Consigli inform Steward, beginning in January of 2021, that the estimates would need to be revised downward?

A. No. I would not say we specifically reached out to Steward then. We waited for really the results of the testing to come in, and BR+A in particular was -- they were the ones responsible for publishing those results.

So it just needs to follow the right process. We need the design documents first before

39 (Pages 150 - 153)

Page 154

we can adjust our estimate.  So --

Q.  How were they -- sorry to interrupt.

A.  That's all right.

Q.  How was BR+A publishing the results?

A.  You mean as the testing was happening?

Q.  Correct.

A.  There was -- so this massive matrix that is in this report, a form of it was being tracked by Consigli -- our MEP manager, Blake Wilcox, I believe -- and Vinnie at BR+A.  They were working hand in hand in identifying the equipment that needed to be tested and documenting the testing results.

And so it was a lengthy, robust process, and so that matrix was being updated real time, it was fluid.  As the results came in, as the pieces of equipment were identified, the matrix was being updated day to day.

Q.  And who was the matrix available to?

A.  I believe Chris Kidney at Steward or CREF was keeping regular track of it.  He was kind of the lead boots on the ground at Steward.  BR+A, obviously, and then the Consigli team.

I don't know how far the results made it up

Page 155

the food chain at Steward, but I know that Chris Kidney was involved.

Q.  So Consigli, BR+A, and the other consultants involved in the testing of equipment at Norwood Hospital were regularly updating the testing matrix with results in real time?

A.  Yes.

Q.  And those results would be published and made available to Chris Kidney?

A.  Yes.

Q.  And did Consigli ever speak to Chris Kidney about the testing matrix and the results reflected in it?

A.  There would be regular conversations about how did the testing go today and generalities about what the results were.

Q.  And beginning in June 2021, the results that were being reflected in the testing matrix and being discussed with Chris Kidney reflected that certain equipment didn't need to be replaced?

MR. RICH:  Object to the form of the question.

A.  Yes.

Q.  And that process continued through the

Page 156

conclusion of the testing in April and May of 2021?

A.  Yes.

Q.  So Mr. Kidney was receiving at least periodic updates from Consigli, BR+A regarding equipment testing that reflected that the scope of work for the Norwood restoration was going down?

MR. RICH:  Object to the form.

A.  Yes.

Q.  Did you say the matrix was included in the report exhibit?

A.  In a high-level form, yes.

Q.  Can you read first Bates number that you see on it?

A.  (Reviewing document)  It's Page 1 of 99 at the bottom, and it says CONSIGLI_00003114.

Q.  Thank you.

A.  You're welcome.

(Document marked as Consigli Exhibit 15 for identification)

MR. RICH:  This goes with it too.  It's all one document.

THE WITNESS:  Okay.

MR. VOGEL:  There should be two separate stapled things.  They're part of the same.

Page 157

MR. RICH:  And we're going to call this 15A and B or it doesn't matter?

MR. VOGEL:  It's all 15.

MR. RICH:  Okay.

Mr. VOGEL:  It should have been stapled together.

MR. RICH:  So I just want to put on the record -- is that okay?

MR. FLECK:  Sure.

MR. RICH:  So the document which has just been marked as Exhibit 15 has been the subject matter of some back-and-forth with counsel, and -- between counsel, and it is -- was our intention to claw this document back under the attorney-client privilege/work product doctrine.

But given the ruling of the Discovery Master, I am simply going to lodge my objection and let the questioning go forward, subject to our right to make that argument after the deposition is concluded.

And I will do my best not to interrupt counsel endlessly by repeating the same objection over and over, but to the extent that there are questions that are less clear as to whether it's

40 (Pages 154 - 157)

Page 158

talking about specifics about the document or not, I will try to make my objections on the record clear. Fair?

MR. FLECK: Thank you. Fair.

MR. RICH: Thank you.

BY MR. FLECK:

Q. So Exhibit 15 is Bates labeled CONSIGLI_ 00020070; is that correct?

A. Yes.

Q. And this is an email string, and then at the end there is an attachment; is that right?

A. Yes.

Q. And if you go to the earliest email in the email string, that is dated Wednesday, July 14th, 2021; is that correct?

A. Yes.

Q. So that is right at about a week after the previous email that we just talked about in Exhibit 14; is that correct?

A. Yes.

Q. And you see, starting in the second line of -- let me start over.

So the earliest email in the string is an email from Chris Kidney, dated July 14th, 2021, to

Page 159

you and others; is that correct?

A. Yes.

Q. And in the body of the email, beginning on the second line, it says, "MPT Lawyers are looking for a greater accuracy in the cost model tied to what we know today and additionally causation issues."

Do you see that?

A. Yes.

Q. And what was known July 14th, 2021, that's being referred here in this email?

MR. RICH: Object to the form.

A. I believe they're referring to the assessment report that BR+A issued.

Q. And later in that sentence it says, "and [additional] causation issues." Do you see that?

A. Yes.

Q. Do you have an understanding of what additional causation issues this is referring to?

A. No.

Q. Do you know what an interim proof of loss is?

A. No.

Q. Go to the next email up. This is an email

Page 160

dated July 18, 2021, from Chris Kidney to you and others; is that correct?

A. Yes.

Q. And it says, "Good afternoon all, As discussed we were going to host a follow up call tomorrow or Tuesday to answer or provide the consultant team with additional direction. The consultant team was generating a list of questions to be addressed."

Do you see that?

A. Yes.

Q. Were you involved with generating a list of questions that's referred to here?

A. I remember that exercise. I do remember that exercise. I don't remember what I had on the list. But, yes.

Q. What do you remember about that exercise?

A. Very little, but -- I think it was clarification on, for instance, the fire alarm question and what the scope of the fire alarm Authority Having Jurisdiction decisions, DPH type scope, and really the way the documents, the design documents and the estimate, needed to be organized.

Q. What AHJ decisions were you referring to?

Page 161

A. They would help to inform what needs to happen with the fire alarm.

Q. Are you aware of an AH decision regarding fire alarm at Norwood Hospital?

A. Officially, no. There was a lot -- it felt like it -- it felt like it was a little fluid. It changed over time. Code Red had their opinions, and I believe Simplex was the fire alarm manufacturer in the building. So everyone sort of had their consensus.

But the Fire Department ultimately would have the final say, as the Authority Having Jurisdiction, as to what needed to happen, and I was not involved in those conversations.

Q. Okay. So at least to Consigli's knowledge, the Fire Department did not make any formal decisions regarding Norwood Hospital?

A. To my -- I am not aware of any formal decisions that were made.

Q. So why was the consultant team generating a list of questions?

A. I think to make sure we do it right the first time -- or the second time.

Q. Who were the questions directed towards?

41 (Pages 158 - 161)

Page 162

A.  I don't recall.  Probably Steward.

Q.  Did the consultant team provide Steward with a list of questions that's referred in this email?

A.  I think -- I don't recall there being a written list.  I thought that we just discussed it in, like, a Teams call.  We went through questions everyone had.

Q.  So the consulting team including Consigli had a call with Steward in which Consigli asked -- the Consigli consultant team asked a series of questions around the middle of July 2021?

A.  Yes.

Q.  And the questions were geared towards updating the December 3rd of 2020 estimates?

A.  And design documents.

Q.  Yeah, and design documents?

A.  Yes.

Q.  Did the consultant team request additional direction regarding revising the estimates and the design documents to Steward?

A.  Yes.

Q.  And what direction did Steward provide Consigli and other members of the consulting team

Page 163

about revising the estimates and the design documents?

A.  The design documents were to be updated based upon the latest information and latest consultant reports.  And then there was a timeline for Consigli to develop estimates and schedules that align with the new documents.

Q.  Did Steward provide any direction about the scope of work that would be included in the design documents?

A.  Scope of work...  I think the scope of work was being updated to reflect the findings of the assessment report and any changes in regulatory decisions -- really any updated information that would inform the design.

Q.  Before you had mentioned there were no formal decisions made by an Authority Having Jurisdiction, is that correct, at this time?

A.  I was unaware -- if there was, I was unaware of it.

Q.  What direction was Steward providing regarding the scope of work as impacted by the Authority Having Jurisdiction providing any type of decision?

Page 164

MR. RICH:  Object to the form.

A.  I mean, at some point direction was given on how to handle the fire alarm in particular and any DPH requirements.  I -- you know, that could have gone directly to the design team.  I don't recall there being something in writing that formally gave us direction on that.

Q.  That direction was coming from Steward?

A.  They would have had the conversations with DPH, and I believe they were the ones spearheading the conversations with the Authority Having Jurisdiction.  In fact, I believe they asked us not to talk to the Authority Having Jurisdiction about the fire alarm system in particular.

Q.  When did they tell you not -- when did Steward tell Consigli not to have any communications with the Fire Department regarding Norwood Hospital's sprinkler system?

A.  During the original estimating effort.

Q.  Do you know why Steward did not want Consigli to speak with the Fire Department about that?

A.  I think they wanted to streamline communications with them and not have the design

Page 165

team or us or different people reaching out to them.

Q.  What was your understanding of the goal for Consigli coming out of that discussion around mid-July 2021?

A.  We were supporting the process by developing estimates that reflect the updated design documents.

Q.  And was it your understanding that these estimates were going to be used to update the insurance claim, Steward's insurance claim?

A.  Yes.

Q.  Can you go to the next email dated July 26th, 2021.  It's on Bates number that ends in 20073.  It's an email from Chris Kidney to you and others, July 26th, 2021.

Do you see that?

A.  Yes.

Q.  And it starts with "Good morning all"?

A.  Yes.

Q.  And in this email it says, "I am checking on the deliverable due by Wednesday or sooner to provide the following:  Consultants to define the Duration and Financial investment for MPT to develop the following three Basis of Design."  And then it

42 (Pages 162 - 165)

Page 166

lists three bullets.

Do you see that?

A. Yes.

Q. Do you have an understanding of what it means, "to define the Duration and Financial investment for MPT to develop the following three Basis of Design"?

A. Yes. They want to know how long -- how much it will cost and how long it will take us to develop the estimates.

Q. And there's three bases of design, an as-was detailed design, a code compliant design, and then another code compliant design; is that correct?

A. Yes.

Q. What is the difference between the two code compliant bases of design set forth here in this email?

MR. RICH: Object to the form.

You can answer if you know.

THE WITNESS: Okay. Thank you. I just need to read a second to refresh my memory.

A. (Reviewing document) So the 2A option is for DD level, or design development level, code complaint basis of design documents, including

Page 167

drawings and specifications, with a due date of 2/18/2022, and then Consigli's estimate duration based upon those documents.

The second option is for a quicker turnaround on the design team documents, more of an SD/DD level, or schematic design/design development level set of documents, which would come in six weeks sooner or five weeks sooner, and then Consigli would develop an estimate and schedule off those documents.

Q. Do you know if the lesser detailed code compliant design, labeled 2B in this email, that was ever performed?

A. It would be -- it would be one or the other. So I don't recall which one they actually proceeded with, whether it was the hybrid or the DD level.

Q. Who is "they" in that sentence?

A. The design team, excuse me. So, yeah, they would only be issuing one set of code compliant documents. It -- the difference here is whether it would be DD level or a hybrid level of detail.

Q. So it's your understanding that only one of those two code complaint bases of design was

Page 168

actually developed?

A. Correct.

Q. Could you turn to the attachment to the emails for Exhibit 15.

A. Yes.

Q. And this is dated July 28th, 2021, and it's a letter from you to Mr. Kidney; is that correct?

A. Yes.

Q. Okay. And what is this attachment, beyond my description of just that it's a letter?

A. It is the proposal that he is requesting in the email for estimate and schedule services for the as-was estimate and schedule and then the two options for the code compliant estimate and schedule.

Q. Okay. And on the first sentence it says, "Enclosed please find Consigli Construction's proposal for DD-Level estimating and scheduling support related to the Norwood Hospital insurance claim"; is that right?

A. Yes.

Q. Was it Consigli's understanding that it was providing a proposal for work to support Steward's insurance claim?

Page 169

A. Yes.

Q. And did Steward accept this proposal?

A. They did, but it then got changed, I believe, to be addressed to the legal team, and we were working directly for the legal team instead of Steward.

Q. Did the scope of -- sorry.

Did Consigli's work to meet the proposal change when it went underneath the umbrella of the legal team as opposed to Mr. Kidney?

MR. RICH: Object to the form.

You can answer.

A. I don't believe it did. There might have been some minor markups by the legal team, if I'm remembering correctly. But other than that, no, it didn't change.

Q. Do you know if you -- if Consigli submitted a new proposal when the DD level estimating and scheduling support moved from Steward to the legal team?

A. I vaguely think I remember having to change who it was addressed to, but I could be wrong on that. I don't remember.

Q. Other than who it was addressed to --

43 (Pages 166 - 169)

Page 170

A. No.

Q. -- I'm actually talking about the work that Consigli was going to do. Did that change in the...

A. No.

Q. And did Consigli carry out the work that's described in the proposal under Number 1, "'As Was' Design Development"?

A. So we did do estimates. I don't think they ever made it to final -- their final form. Design kept being delayed, things were dragging out longer, and it didn't match -- the process didn't match the milestones that were the basis of our assumptions.

So I believe we submitted draft estimates, but I don't believe the final estimates were ever submitted.

Q. Did Consigli back out of the project at some point?

A. We backed out of our -- the relationship for this effort, yes.

Q. Okay. And why did Consigli back out of the relationship for the effort connected to this proposal?

A. Because everything just kept taking longer, and, as a company, we're really not insurance claim

Page 171

support experts. We are builders, and it just became too much of a drain on our time.

Q. And is that true also for the code compliant estimates and scheduling described in the proposal here?

A. I believe so. Like I said, I think it got to draft form, but then I think there were revised design documents being issued, and we had to go back and make updates, and it just dragged out.

So I don't believe we ever had final estimates for either of these efforts, but I believe drafts were submitted.

Q. Did Consigli ever prepare final schedules associated with the as-was estimates and the code compliant estimates?

A. We did submit a P6 schedule, yes, that I do not believe would change based on the minor modifications that had to be made to the estimate.

Q. And about how long did Consigli's work last -- or strike that.

This proposal is dated July 28, 2021, correct?

A. Yes.

Q. How long after July 28, 2021, did Consigli

Page 172

continue to work to help support Steward's insurance claim?

A. I mean, our services went well into 2022. At some point in 2022, and I don't recall the exact month, so many milestones had been missed that we then stopped supporting the effort. I just don't remember what month it was.

Q. Did you ever -- did Consigli resume their effort after that?

A. No. After we told them we were done, we did not resume any efforts.

MR. RICH: Is she okay to take that box down at this point?

MR. FLECK: Yes.

Can we go off the record for a second.

THE VIDEOGRAPHER: The time is 2:28. We're off the record.

(Brief recess)

THE VIDEOGRAPHER: The time is 2:30. We are back on the record.

BY MR. FLECK:

Q. I just provided what is marked as Exhibit 16.

Page 173

(Document marked as Consigli Exhibit 16 for identification)

Q. This is Bates labeled BR+A_00354659.

Ms. O'Brien, this is an email string. The earliest -- earlier email is from John Anzalone to you on September 27, 2022; is that right?

A. Yes.

Q. On the bottom of the first page?

A. Yes.

Q. And it says, "Also please note that the As Was Drawing Set seems to be either missing (or there is no scope)."

Do you see that?

A. Yes.

Q. Do you recall this?

A. Not really.

Q. At the top of Exhibit 16 there's an email from John McCarthy to John Anzalone dated December 27th, 2022, and you are included on that email as well, correct?

A. Yes.

Q. And Mr. McCarthy responds to Mr. Anzalone and says, "Those sheets were not issued as there is no scope in those areas."

44 (Pages 170 - 173)

Page 174

Do you see that?

A. Yes.

Q. Do you have an understanding of what that means?

A. Yes. From the -- from the explanation that Jack provided, he's trying to keep his drawing sets consistent for the two different buildings, Draper and Lorusso, so he kept the same format for his drawing set. But there are some drawings that are absent because there was no scope in that area in the Draper Building, which sustained less impact than Lorusso.

Q. So taking a step back, what's the context of this email exchange?

A. It's us -- so we received documents, and it's us issuing questions to the design team for clarification on things that -- which is a typical process -- to make sure that we have all the documents, first, and second, if we have questions on the documents, that we get them issued to the design team for clarification.

Q. So at this time Consigli is working on revising its December 3rd, 2020, estimates?

A. Yes.

Page 175

Q. And around September 2022, Consigli is getting updated drawing sets from Array?

A. Yes.

Q. And the drawing sets that Array is sending Consigli around September 27th, 2022, relate to the drawings that were used for the December 3rd, 2020, estimates?

A. Relate to the new drawings that came out as part of this follow-up effort.

Q. Okay. So the drawings that were being provided to Consigli by Array around September of 2022, those are a continuation of the work from December of 2020; is that correct?

A. Yes. But with updated scope, correct, based on our proposal, yes.

Q. And here the updates to the scope that are being discussed are that there is no scope associated with certain drawings from December 3rd, 2020, that used to deal with some scope?

MR. RICH: Object to the form.

A. I don't know that. The drawings were missing, which means they could have shown on a cover page and didn't show up in the set, or John noticed some inconsistencies between Part A and Part

Page 176

B. I don't know whether those drawings were in the December set or not, 2020.

Q. Was Consigli receiving drawings, updated drawings from Array, on a rolling basis around September of 2022?

A. On a rolling basis? I mean, there was a formal issuance, and then I -- that's a good question. I believe there was a formal issuance, and then I -- it's possible they could have been following up with some scope later. But typically we would expect they would issue the entire set at once.

I don't remember.

Q. And the drawings that Array was providing Consigli around September of 2022, those were reflecting less scope than the drawings that were contained in the December 3rd, 2020, report that we discussed earlier, correct?

A. Yes.

MR. VOGEL: Here's the first one.

(Document marked as Consigli Exhibit 17 for identification)

MR. VOGEL: And the other one.

Page 177

(Document marked as Consigli Exhibit 18 for identification)

Q. I've just handed you what's marked as Exhibits 17 and 18. Exhibit 17 is Bates labeled ORDER-CONSIGLI_00002007; is that right?

A. Yes.

Q. And Exhibit 18 is Bates labeled ORDER-CONSIGLI_00001943.

A. Yes.

Q. What is Exhibit 17?

A. This is a draft as-was estimate that was published on December 13th, 2022.

Q. And do you recall how far along in developing the as-was estimate Consigli was at the time it prepared this around December of 2022?

A. I mean, I believe it reflected what was in the documents. I just think, at some point, there were revisions pending -- document revisions pending with the design team that then we did not update this estimate to reflect that.

Q. So it's your recollection that, preceding December 13th of 2022, Consigli received a submission from the design team that enabled Consigli to update its as-was estimate?

45 (Pages 174 - 177)

Page 178

A. Yes.

Q. And if you turn to the second page of Exhibit 17, it references the estimate totals. Do you see that?

A. Yes.

Q. And we had talked earlier about the estimate totals for the December 3rd, 2020, estimates. Do you remember that?

A. Yes.

Q. And for the subcontractor trades for the December 3rd, 2020, as-was estimate, that amounted to about $104 million. Do you recall that?

A. Yes.

Q. And here in the draft December 13th, 2022, as-was estimate, Consigli has revised that total for the subcontractor work down to just under $51 million; is that correct?

A. Yes.

Q. So Consigli, in its revised estimate for December of 2022, calculated that it would cost less than half than Consigli calculated in December 3rd, 2020?

A. Correct.

Q. Can you explain why the total for the

Page 179

subcontractor trades decreased over $50 million?

A. The scope reflected on the design documents was significantly less, both from an MEP perspective, based upon the assessment report prepared by BR+A, and I would say the other major bucket would be the -- previously NFA had been involved in informing scope related to the policy coverage, and they were not involved in this effort.

Q. And why did NFA's lack of involvement in this effort affect Consigli's estimate?

A. It affected the scope, which in turn impacted our estimate, because previously there had been scope added to account for policy-related provisions of what's allowed to be covered under the insurance policy, and when the revised design documents were generated, that scope was significantly reduced.

Q. And what scope accounted for a policy provision that was removed when Consigli put together its December 2022 estimates?

A. I would say a lot of it was millwork, flooring, those same finishes we talked about earlier. So flooring, millwork and possibly other finishes.

Page 180

Q. Do you know why NFA was no longer involved when the design team put together the scope that Consigli used for its 2022 as-was estimate?

A. No.

Q. In the absence of NFA, do you know who the design team was taking direction from as to the scope of work that Consigli used to develop its December 2022 as-was estimate?

A. We had similar meetings as we had had during the first effort, where BR+A and Code Red and Consigli and Array Architects reviewed the scope. And we weren't tracking it the way we were before, using the scope assumptions matrix, because we essentially had a starting point, based upon the original design documents.

And so there was -- there were collaborative meetings that were held with Consigli and those consultants to help refine the scope and confirm how it needed to be reflected on the drawings.

Q. So does Consigli -- so once NFA was absent from those meetings and the process, each of those entities you just described, those are working professionals?

Page 181

A. Yes.

Q. In the construction industry; is that correct?

A. Yes.

Q. So when Consigli was having meetings with the design team in the efforts to develop a revised scope and the revised estimates, was there anyone from Steward who would be present for those meetings?

A. I don't remember if Chris Sidney was there at that time or whether most of our communications were through the attorneys. I honestly don't recall.

Q. Can I turn you to Exhibit 18?

A. Yes.

Q. What is Exhibit 18?

A. This is the estimate detail related to Exhibit 17.

Q. So it would be exhibit detail shown -- sorry, the estimate detail shown in Exhibit 18 reflects the details of the summary shown in Exhibit 17?

A. Yes.

Q. So it breaks out the work that Consigli is

46 (Pages 178 - 181)

Page 182

estimating the cost for by building and location?

A. Yes.

Q. And the numbers in the detail of Exhibit 18, if we added those all up, they would add up to the numbers shown in the summary of Exhibit 17?

A. To the direct costs, yes.

Q. Going back to kind of NFA, why did NFA have such significant influence on what the design team developed as the scope of work for the as-was estimate?

MR. RICH: Object to the form.

You can answer.

A. Because they were the insurance policy experts that helped to define what the client was entitled to as part of the damages that the hospital incurred.

Q. And is it your understanding that the scope of work that NFA was giving direction on to comply with the policy was greater than the scope of work necessary to restore Norwood Hospital to its as-was condition?

MR. RICH: Object to the form of the question.

A. I think the -- that's a little bit of a

Page 183

loaded question, because -- I'll go back to the flooring question again. I would not expect it to be acceptable to a client to replace half the floor in a room and have it not match the other half.

So I think in part it made sense to us that there would be some additional scope that went beyond materials that were directly damaged by the flood, but I don't think anyone in the room knew enough about insurance policy coverage and the provisions in those policies to know whether they were correct or not correct in the direction they were giving.

Q. What you just described about trying to match up the floor, you know, that is aesthetics, correct?

A. Yes.

Q. And the difference between the December 2020 estimates and the December 2022 estimates are an order of magnitude different from each other?

A. Yes.

Q. And that order of magnitude difference between the December 2020 estimates and the December 2022 estimates are attributable to more than aesthetics, correct?

Page 184

A. Correct. I would say the brunt of the difference is likely in the MEPs. MEPs are traditionally a significant portion of the estimate. So when those drop, it impacts both those trades and complementary trades as well.

Q. And could we look into the details of the estimates for 2022 and compare those to the details of the estimates in 2020 and map out the differences between them?

A. Yes.

(Document marked as Consigli Exhibit 19 for identification)

Q. I've just handed you what's marked as Exhibit 19. This is Bates labeled ORDER-CONSIGLI_ 00002002.

Do you see that?

A. Yes.

Q. Do you recognize Exhibit 19?

A. Yes.

Q. And what is this document?

A. It's a variance report between the two estimates. He didn't put a date at the top here, but I assume the second column -- the first column is the estimate from November 2020, and the second

Page 185

column... I assume that's from the December 2022 estimate. And then the "Variance" column explains the variance between the two estimates.

Q. Do you know who created this document?

A. Yes. John Anzalone, the estimator.

Q. On the right-hand column it's titled "Notes." Do you see that?

A. Yes.

Q. Do you know who inserted the notes into that column?

A. Yes. John Anzalone.

Q. And so -- do you know why this document was created?

A. Yes. We traditionally create a variance report to explain differences between an original estimate and a follow-up estimate.

Q. So creating a variance report is a normal activity in Consigli's business in order to track differentials between estimates as a project progresses?

A. Yes.

Q. How do the variances in Exhibit 19 compare to the variances that Consigli has seen in its prior health care renovation projects?

47 (Pages 182 - 185)

Page 186

A. We would never want to see variances this large. This is unusual.

Q. And why wouldn't you want to see variances this large in between estimates?

A. Because traditionally the design intent between the earliest of design, schematic design, and as it progresses through design development and construction documents remains fairly static. We start to see more detail on the design documents, but it would be unusual to see this much change in scope.

Q. Is the revised scope of work that was used to prepare the 2022 estimates a more accurate scope of work than compared to that that was used to prepare the 2020 estimates?

MR. RICH: Object to the form.

A. Yes. I would say we knew more at the second round of estimate than we did at the first, correct.

Q. Do you know how Mr. Anzalone determines the information that he inputs into the notes?

A. Yes. I mean, he's the one reviewing all the scope and the design documents, and he tracks the differences in that scope between the different

Page 187

design issuances.

Q. So Mr. Anzalone, as the estimator, will review the updated design documents, the previous iteration of the design documents, the same thing for the estimates, and then figure out what the differentials are coming from?

A. Yes.

Q. And why does Consigli create variance reports when it is involved in an estimating project, other than merely to capture the difference?

A. That's why we do it, to capture the differences.

Q. Why does the difference matter to Consigli?

A. Because it helps to explain why the value changed over time, and it helps to, I guess, justify -- not -- justify the reason for the cost changing.

(Document marked as Consigli Exhibit 20 for identification)

Q. We've marked Exhibit 20. This is Bates labeled ORDER-CONSIGLI_00000077.

What is Exhibit 20?

A. This is the code compliant estimate draft

Page 188

that was issued May 12th of 2023.

Q. So did Consigli receive design documents from the design team at some point relatively near May 12th, 2023, from which Consigli developed these updated estimates for its code compliant?

A. Yes.

Q. And the total for this May 12, 2023, code compliant estimate is a bit more than $104 million; is that correct?

A. Yes. There's a couple items under the subtotal that hadn't been determined yet, but, yes, at this point in time, 104.6 million.

Q. Overhead and FEE are not currently included?

A. Yes.

Q. So the 104 million would increase by a certain percentage?

A. Yes.

Q. But the total estimated for the subcontractors, that's about $67.5 million; is that correct?

A. Yes.

Q. And going back to your December -- sorry. Turning to the Consigli's December 3rd, 2020,

Page 189

estimates for the code compliant version, that total exceeded $260 million; is that correct?

A. I don't have it in front of me, but, yes, probably. If you say so.

Q. Do you still have Exhibit 11 around?

A. Yes.

Q. Could you turn to Page 156, which is Bates Number MPT0022946.

A. Yes.

Q. And the total for Consigli's code complaint estimate is about $263 million; is that correct?

A. Yes.

Q. And the total for the subcontractors' work is about $152 million in the December 3rd, 2020, report; is that correct?

A. Yes.

Q. Now, turning back to Exhibit 20, the total for the subcontractors' work in the -- strike that.

Turning back to Exhibit 20, which is the May 12, 2023, estimate, the subtotal for these subcontractors' work has been reduced from about $152 million to about $67.5 million; is that right?

A. Yes.

Q. And was the reduction in Consigli's

48 (Pages 186 - 189)

Page 190

estimate for the code compliant version attributable for the same reasons as the reduction to the as-was estimate?

A. It was, although there could have also been some code -- some changes in the code scope as well.

Q. And those would be reductions in the code scope?

A. I guess I'd have to -- do you have a variance report for this one too? Did we do that?

Q. I do not.

A. Okay.

Q. Did Consigli create other variance reports related to its work at Norwood Hospital?

A. I don't -- we would have normally, which tells me this is likely where we were expecting another addendum, and, you know, at this point we're well into 2023, so we stopped our services.

But -- so this is a draft estimate. I believe there were some -- possibly some revised drawings, design drawings that came after this that we did not provide an updated estimate for.

So once the estimate was closer to be final, we would have developed the variance report to explain the difference.

Page 191

(Documents marked as Consigli
Exhibits 21, 22 and 23
for identification)

Q. Ms. O'Brien, do you have now what's marked as Exhibit 21, Exhibit 22 --

A. Yes, and 23.

Q. -- and 23? Okay.

All right. Just for the record, Exhibit 21 is Bates labeled BR+A_00370539, Exhibit 22 is Bates labeled BR+A_00370332, and Exhibit 23 is Bates labeled BR+A_00370541.

All in front of you, Ms. O'Brien?

A. Yes.

Q. What are Exhibits 21, 22, and 23?

A. They appear to be updated as-was estimates that were issued -- draft estimates that were issued 8/10/23.

Q. Do you recall Consigli updating its as-was estimates between 2022 and 2023?

A. I remember there being an addendum issued, yes. So we -- an addendum was issued or there were comments that came back on our original estimate. And so we issued an update, yes.

Q. And did the updates to the as-was estimate

Page 192

materially change the estimate totals?

A. Not significantly, no.

Q. So both the estimates for 2022 and then in here in August 10th of 2023 have the subtotal for the subcontractors' work at around $50 million; is that correct?

A. Yes.

Q. So Exhibit 2022, can you describe what that is briefly?

A. 22?

Q. Yeah. Exhibit 22. Sorry.

A. That is the estimate detail that aligns with the Exhibit 21 estimate summary. Actually, it's more of a summary by trade. The true estimate detail is more Exhibit 23.

Q. And what's the difference between Exhibit 22 and Exhibit 23?

A. Exhibit 22 provides trade totals per floor per building, but does not provide all the detail. And Exhibit 23 provides similar breakouts by building by floor, but provides all the estimate detail.

Q. So different ways to express the estimates?

A. Yes.

Page 193

(Documents marked as Consigli
Exhibits 24, 25, and 26
for identification)

Q. Do you now have what's marked as Exhibits 24, 25 and 26 in front of you?

A. Yes.

Q. Exhibit 24 is Bates labeled BR+A_00370541, Exhibit 25 is Bates labeled BR+A_00370339, and Exhibit 26 is Bates labeled BR+A_00370429.

Are you on the same page, Ms. O'Brien?

A. Yes.

Q. What are Exhibits 24, 25 and 26?

A. 24 is a high-level schedule -- estimate summary of the code compliant estimate. It's a draft dated 8/10/23. Exhibit 25 is -- shows trade costs per floor per building. And then Exhibit 26 provides all the estimate detail per floor per building.

Q. Are these the most recent code compliant estimates that Consigli has developed for Norwood Hospital?

A. I believe so.

Q. And the -- for the August 10th, 2023, code compliant estimates, the total for the

49 (Pages 190 - 193)

Page 194

subcontractors' work is about $67 million; is that correct?

A. Yes.

Q. And can I turn you back to Exhibit 11, Page 156?

A. Okay. (Reviewing documents) Yes.

Q. So by August 10, 2023, Consigli has revised down its estimate for the subcontractors' work for the code compliant restoration from about $152 million to about $67 million; is that correct?

A. Yes.

Q. Do you know if there were variance reports related to the August 10th, 2023, estimates?

A. I don't know. If they weren't in my folder that was within the information that was sent to you, it's unlikely they exist. I would have had a copy of them.

Q. Okay. But normally Consigli would create a variance report between estimates?

A. Yes.

MR. FLECK: Is now an okay time to take a five-minute break?

THE WITNESS: Sure.

MR. RICH: You're driving.

Page 195

THE VIDEOGRAPHER: The time is 3:16. We're off the record.

(Recess)

(Document marked as Consigli Exhibit 27 for identification)

THE VIDEOGRAPHER: The time is 3:27, and we are back on the record.

BY MR. FLECK:

Q. All right. We now have in front of you what is labeled as Exhibit 27. This is Bates labeled ORDER-CONSIGLI_00006121.

Ms. O'Brien, do you recognize Exhibit 27?

A. Yes.

Q. And what is Exhibit 27?

A. A P6 schedule for the Norwood Hospital as-was scope.

Q. This is dated October 12, 2022; is that correct?

A. Yes.

Q. Do you know if there were any P6 schedules developed by Consigli for Norwood Hospital developed prior to October 12th, 2022?

A. I don't remember.

Q. This has, on bottom right, it has a run

Page 196

date of October 12th, 2022. Do you see that?

A. Yes.

Q. Is the run date the date on which the schedule is created using a computer program?

A. It's the date it's printed, yes.

Q. Is that physically printed on a piece of paper?

A. Physically run and turned into a pdf that can be printed, yeah.

Q. Okay. And then what is the data date, which here is January 3rd, 2022?

A. I don't -- I don't know what that date represents, to be honest with you. That would be something the scheduler put in.

Q. To create a schedule like this, does Consigli input a variety of information into Primavera?

A. Yes.

Q. And can Consigli determine the start date for the project?

A. When you say do we determine it, we look at a lot of tied tasks, and it helps to inform when the mobilization date is, things like permit and procurement and design timelines, yes.

Page 197

Q. Let me put it this way: Does Consigli, when developing a schedule like the one shown in Exhibit 27, input what the start date for the project Consigli wants the schedule to begin at?

A. You mean the mobilization date, the construction start date?

Q. The first date on the schedule.

A. The first date, so like "Buyout Complete"? I guess where I'm going is, like, some dates are informed by the logic of the schedule and others are entered.

So things like design timelines, those are -- those are tasks that have start and end dates that we would enter in. They would be informed by the design team. Other dates are not entered in. They're informed by relationships with other tasks.

Q. What tasks and durations does Consigli input into Primavera to develop a schedule like that shown in Exhibit 27?

A. We receive the design durations from Array, from the design team. That's not something we would determine. We do enter in durations, like how long it will take us to provide a DD estimate or compile a GMP. Something like the DoN submission date, that

Page 198

would have been informed by likely Steward or the design team as to when that DoN submission goes in.

And then the actual construction durations to perform tasks would all be informed by Consigli -- like, all the durations that are entered there.

Q. So the durations for the construction activities, Consigli would provide the durations to the program?

A. Yes.

Q. So does Consigli -- strike that.

For the schedule shown in Exhibit 27, did Consigli input the dates for first patient, or is that a date that Primavera developed based on other dates that are inputted by Consigli?

A. That date would have been informed by when we had DPH approval, and that DPH approval date would have been informed by when we received all the documents needed to submit for DPH approval.

So it would not have been a hard date that was entered. It would have been a date that was calculated.

Q. So what is the latest date in the schedule or in Exhibit 27 that was input by Consigli as

Page 199

opposed to calculated automatically by the computer program?

A. So the latest date that was calculated by the program would have been the DPH approval date, which ties to the first patient date.

And then we would have had to, I guess, back into the mobilization date. The schedule -- the schedule software isn't smart enough to adjust other tasks without incorporating procurement timelines.

So you might be ready to mobilize because you have a permit in hand, but you might not want to mobilize yet, because if you mobilize too soon, and then you get a quarter of the way into construction and you're sitting around waiting for materials or equipment, that's not an effective use of our staffing costs, right, to be sitting around and waiting.

So there's a certain amount of work and rework and finesse that has to happen when developing a schedule to make sure you're accounting for all those procurement ties. The schedule can't figure that out; that schedule software can't figure that out on its own.

Page 200

And, if you recall, this was, like, COVID times where procurement timelines were crazy, so...

Q. Where did Consigli get the DPH approval date from?

A. The last task, the DPH approval date?

Q. Yes.

A. That would -- that would have been calculated -- so it would have been tied -- you can see that the project completion or the certificate of occupancy is July 10th of '26. That would then kick off the start of the DPH approval, beginning on July 10th and finishing on August 21st.

And that's a best guess of 30 days. And those 30 days are not calendar days; those are work days. So that's six weeks. It could take shorter, it could take longer. Educated guess.

Q. So Consigli did not enter the date for DPH approval?

A. We entered in the duration, and we established the ties with certificate of occupancy, but we did not enter the dates. That's more logic ties.

Q. And what is the most recent date in the schedule that Consigli input?

Page 201

A. Once again -- I mean, we probably -- we probably inputted the mobilization date by backing into it, based on busts that happened throughout the schedule on procurement timelines. So it's possible we did a hard enter of the actual mobilization date.

And then beyond that, ideally, you want the rest of the schedule to be -- to have all the construction tasks, but have them tied to a previous task somewhere so that the dates all automatically populate based on the durations needed.

Q. And does Consigli do the linking between tasks in the schedule manually?

A. Yes.

Q. And does Consigli enter durations for the tasks manually as well?

A. Yes.

Q. You said the Primavera will print the schedules to pdf?

A. Yes.

Q. Are there other formats in which the schedules can be generated?

A. Possibly. I am not a Primavera expert. I don't know. I'd make a huge mess of this if I got in there.

51 (Pages 198 - 201)

Page 202

Q. Do you know who created the schedule shown in Exhibit 27 using Primavera?

A. Oh, gosh. Who was it... I forget who the scheduler was at the time.

Q. It wasn't John Anzalone?

A. No. He's an estimator.

Q. Okay.

A. He'd make a bigger mess than me.

Q. Does someone supervise that person's work who created this schedule?

A. I would have -- myself and the superintendent, Tom Smith, would have provided feedback as quality checks to go through and make sure it made sense and identify anything that needed to be changed.

Q. Did Consigli receive any direction from Steward or any of its representatives regarding the schedule shown in Exhibit 27?

A. The only thing they probably would have informed is the duration we used for DPH approval, likely the DoN timeline, and that's probably it. Array would have informed the design timeline, and then, you know, we knew it was a two-part DPH submission, and we know when those submissions have

Page 203

to go in. So we would have tied those submissions to the different design deliverables under permitting.

Q. And when you say that someone informs a particular time or duration, does that mean that Consigli is accepting the date or duration being provided by someone else?

A. Yes.

(Document marked as Consigli Exhibit 28 for identification)

Q. Exhibit 28 is another schedule created by Consigli for the as-was renovation of Norwood Hospital; is that right?

A. Yes.

Q. And this is in color; is that correct?

A. That is right.

Q. Is this how the documents typically show up when printed in a pdf from Primavera?

A. Yes.

Q. On the bottom left of Exhibit 28 it says, "Run Date January 30th, 2023."

A. Right. Yes.

Q. That means Exhibit -- the schedule shown in Exhibit 28 was printed January 30th, 2023?

Page 204

A. Yes.

Q. And you did not know what "Data Date" meant; is that correct?

A. I don't --no, I don't know.

Q. "Start Date" is the date of loss for Norwood Hospital; is that correct?

A. Yes.

Q. And the "Finish Date" corresponds to the first patient; is that correct?

A. Yes.

Q. Okay. So the duration of this schedule for the as-was restoration of Norwood Hospital extends from June 28th, 2020, until May 6th, 2025; is that correct?

A. Yes.

Q. So it's about five years; is that right?

A. If you go from the weather event, yes. Yep.

Q. We talked about, in the context of the estimates, receiving design drawings from a design team and using those to inform your estimates. What do you use to create the schedules?

A. The design documents.

MR. RICH: Sorry. I didn't object to the

Page 205

form of that question. Sorry. I was late.

Q. So, in order for Consigli to develop a schedule such as shown in Exhibit 28, Exhibit (sic) uses the design documents provided by the design team?

A. Yes.

Q. Okay. So for Exhibit 28 in this schedule Consigli relied on the design documents provided by Array; is that correct?

A. And BR+A, yes.

Q. And BR+A.

Does Consigli's estimate influence the schedule shown in Exhibit 28 in any way?

A. No, but I would say the schedule influences our estimate.

Q. How so?

A. For the general conditions and general requirements. They're based on time.

Q. Okay. So can you explain that a little bit, and I'll ask a question.

So how do the general conditions impact the duration of the construction schedule for this schedule shown in Exhibit 28?

A. The schedule impacts the general

52 (Pages 202 - 205)

Page 206

conditions, the other way around. So the length of the time that our team is on site directly relates to the cost for general conditions for that staffing.

So the way the general conditions are calculated is based on the rate and time.

Q. Okay. So the longer the construction duration, the more expensive the general conditions are likely to be, because the personnel are going to be on site for a longer period of time?

A. Yes.

Q. What are typical working hours in construction for a project like the restoration of Norwood Hospital?

A. 7:00 a.m. to 3:30 in the afternoon.

Q. Are those the working hours that are assumed for purposes of this schedule in Exhibit 28?

A. Yes.

Q. Could Consigli have factored in overtime, weekends, and off work hours into its schedule shown in Exhibit 28?

A. Yes.

Q. And how would that impact -- strike that.

That would decrease the length of the

Page 207

schedule; is that right?

A. It would pull in the end date, yes. Correct.

Q. This schedule's run date is January 30th, 2023. Did the scope of work, the design documents used to create the schedule, the revised design documents that Array provided -- you can strike that. I'll ask a better question.

A. Okay.

Q. There were design documents attached to the December 3rd, 2020, report that contains Consigli's estimates, correct?

A. Yes.

Q. Were those design drawings used to create this schedule in Exhibit 28?

A. No. It would have been the later -- sorry. I'm getting confused here. (Reviewing documents) It would have been the revised design documents is my -- the way I'm remembering it, that were issued as part of that separate proposal.

Q. So the schedule in Exhibit 28 actually reflects the revised design documents with the significantly reduced scope of work --

A. Yes.

Page 208

Q. -- compared to the December 3rd, 2020, estimates?

A. I believe so.

Q. Did Consigli receive any direction or suggestions from Steward regarding the duration of the as-was schedule for Norwood Hospital shown in Exhibit 28?

A. No.

Q. Did Consigli receive any directions or suggestions from any members of the design team when it was developing its as-was preliminary project schedule shown in Exhibit 28?

A. Outside of the design durations, which I asked them for, no, they did not.

Q. There is a vertical line that runs through August of 2021.

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. What is that vertical line in about August of 2021?

A. That aligns with the data date, and I don't really know what it -- what purpose it serves, but I'm sure the scheduler understands it.

Page 209

Q. The dates to the left of that line, do those correspond to -- I'm sorry. Strike that.

The events on the left side of that vertical line, do those corresponds to actual events that occurred at Norwood Hospital?

A. "Weather Event," "Testing," "Enabling Work"...

THE COURT REPORTER: Excuse me, I need to --

THE WITNESS: Oh, sorry, sorry, sorry. I'm reading aloud.

A. Yes.

Q. Do you know why those events, other than the weather event, to the left of that vertical line were included in this schedule?

A. I know we had -- I remember asking, and maybe this goes back to your earlier question, I remember asking how much information we should share in the schedule related to the weather event. And ultimately, I think we zeroed in on the equipment testing, because it was so important to the scope development.

I do remember having that conversation. I don't truly remember how we landed on those tasks

53 (Pages 206 - 209)

Page 210

being the ones that ended up in here.

Q. Who did you have that conversation with?

A. Chris Kidney and possibly some of the attorneys.

Q. Did you have discussions with Chris Kidney about any of the other tasks in the schedule as part of Consigli's development of the schedule?

A. I don't believe so.

Q. So did Chris Kidney inform the dates to the left of that vertical line?

A. No. Those dates were, I think, my recollection at the time that this schedule was developed as to when the testing started and ended, because we were helping to manage that process.

Q. But the inclusion of those tasks and dates were a result of your conversations with Chris Kidney; is that correct?

A. I believe he was one of the people on the call, but there were also attorneys on the call. Steve VanNess could have been on the call. I -- we would have a number of meetings with a large group of people, and I can't remember who helped narrow down what belonged here.

But it was prompted, I believe, by my

Page 211

question asking what they wanted to see.

Q. Okay. And did you put into the schedule what those on that phone call wanted to see?

A. Yes.

Q. Do you see where "Start Design" is on the schedule?

A. "Start Design," yes.

Q. So the start design is set for August 16th, 2021; is that correct?

A. Yes.

Q. Why is start design set for August 16th, 2021?

A. I can't recall what led to that. I can say that our estimate has to align with some assumptions, because the escalation is in there, and weather-dependent activities. So you have to -- you have to make some assumption as to when design is going to start, because that informs when we can mobilize the site and buy out subcontractors and all that.

So I don't recall who chose that date or how we landed there, but it likely, in some way, shape or form, aligned with our pricing efforts.

Q. So the start design date was chosen in

Page 212

collaboration with Chris Kidney and others?

A. I don't remember who informed that date.

Q. There is a line in "Schematic" -- for "Schematic Design." It's in red. It begins on August 16th, 2021. Do you see that?

A. Yes.

Q. This schedule is for an as-was restoration, correct?

A. Yes.

Q. Why does an as-was restoration have a task for schematic design documents?

A. Most projects have three major design phases: schematic design, design development, and construction documents.

Q. Why does this particular schedule for the as-was restoration of Norwood Hospital include durations for schematic design documents and SD estimate?

A. That's a normal progression of design. We see "Schematic Design" on nearly all of our design efforts. There's traditionally three major design deliverables: schematic design, design development and construction documents. That's standard, pretty standard.

Page 213

Q. For an as-was restoration where you're replacing or repairing the building in kind, what would need to be schematically designed?

A. All the -- all the scope. So the way that the design was developed for the purposes of the high-level estimate was a little more nontraditional; it was a lot of key notes and areas that were highlighted to tell you what the scope was.

That's not a true schematic design. Schematic design has to meet certain AIA criteria as to what needs to be in those documents and how it's shown, and -- so schematic design is kind of following those standards, design standards.

Q. Why, for an as-was restoration, could Consigli not begin with design development documents and skip the schematic design documents tasks?

A. I mean, typically you would not do that. You would have -- on a project of this size, you would have those three major design deliverables.

Q. What would you be doing -- what would the design team be schematically designing for this particular project from August 16th of 2021 to November 9th of 2021?

54 (Pages 210 - 213)

Page 214

A.  The entire project.  So the schematic design includes -- there's a checklist through the AIA that shows what needs to be included in the schematic design deliverable, and there's a certain level of design that needs to be included to meet that criteria.

And so typically you would track design and cost of that design across those three major deliverables, just as a standard process.

Q.  Did Consigli have as-built drawings for Norwood Hospital?

A.  I don't remember.  I remember seeing some life safety plans, but I don't -- I don't think I ever really saw -- I remember seeing a few as-builts mostly for electrical.  I don't think -- with the age of that hospital it's highly unusual -- unlikely that they would have as-builts for the entire facility.

Q.  For an as-was repair, if there were as-built drawings, would it be necessary to engage in schematic design document activities?

A.  Yes.

Q.  Why?

A.  Because you still have to inform the scope.

Page 215

Both the demolition scope and the new scope required to be priced by subcontractors.

Q.  And how does that differ from design development document activities set forth in the schedule from November 10th, 2021, to July 18th, 2022?

A.  Design development is just further progression.  There's a different checklist issued by the AIA that shows what needs to be included in that set.  But it's a -- it's got greater detail. It includes things like elevations and additional design information that helps to refine our estimate.

Q.  Do you have an understanding of why it would take from August 16th, 2021, to July 18th of 2022 for a design team to prepare schematic design documents and design development documents for an as-was repair at Norwood Hospital?

A.  Design development is usually what takes the longest.  I -- like I said, I would have received those dates from the design team.

On the flip side, the durations for schematic design and construction documents are very short.  So if you look at the overall duration of a

Page 216

little over a year for a project of this size, that overall duration does not surprise me.

Q.  Does the schedule shown in Exhibit 28 utilize MEP design assist?

A.  I don't believe it does.  I think we have all normal procurement timelines.

Q.  If the scheduler utilized MEP design assist, would that shorten the as-was preliminary project schedule in Exhibit 28?

A.  I'd have to run that logic.  I would say that it was likely procurement that drove the schedule, especially based on the time that we were developing it, with all the pipeline issues due to COVID.

So it was likely procurement that drove -- yeah, critical procurement -- hold on one second. (Reviewing document)

Q.  Let me ask it this way:  Do the schematic design document activities, the design development activities -- design development document activities and the construction document activities all complete before any procurement begins?

A.  That's what I'm looking at right now. (Reviewing document)  We are showing going out to

Page 217

mechanical and electrical ahead of time, and fire protection and plumbing.  (Reviewing document)

So I would say some trades we went out to before GMP approval on December 9th of 2022.  There are several trades where we're going out earlier than that.  And then other trades that maybe weren't critical path, we have a more traditional procurement timeline for them.

Q.  So in -- the durations that are in red in the schedule, those are critical path, correct?

A.  Yes.

Q.  So the schematic design documents, design development documents and 100 percent construction documents, those are all critical path activities, correct?

A.  Yes.

Q.  So if any of those activities were shortened or they were overlapping so that the 100 percent construction documents activities ended earlier, that would have resulted in a reduction of the overall schedule, correct?

A.  It would, but there's -- so, for instance, when design development documents are complete, that's when you have to submit your DPH Part 1.  And

55 (Pages 214 - 217)

Page 218

you want to make sure those comments come back in time to incorporate their comments into the construction documents.

So looking at this, I actually think -- I'm wondering if we don't have the comments coming back in time to incorporate into the CDs and the CDs need to take longer.

But there are -- so there are regulatory reviews that have to happen with the DPH at both the design development phase and at the 100 percent construction document phase. The major comments usually come back at the design development phase, and you want to make sure you allow enough time to incorporate those comments into the CDs.

The way this logic works right now, I think the construction document phase would actually have to get longer to allow those comments to get incorporated.

Q. So it's your testimony today that the schematic design documents, the design development documents and the 100 percent construction documents activities could not overlap in time?

A. They don't traditionally -- when you say "overlap," they don't traditionally. The end of

Page 219

schematic design is essentially the start of design development. It's a very different process than what we looked at really high level with that Norwood -- New Norwood Hospital interview slide deck. It's a completely different approach.

This is a -- this is not an IPD job. It's a completely different delivery, project delivery. So you wouldn't typically have those design phases overlapping the way you're suggesting.

Q. So comparing to -- if you recall the reactivation schedule that was three phases that Consigli helped prepare for Norwood Hospital back in 2020, that is a totally different approach to scheduling a project than what is reflected in Exhibit 28 here; is that correct?

A. No. What the -- what I was referring to was the New Norwood Hospital pursuit that we interviewed on. That was a completely different delivery method than what is reflected in this schedule.

The activation schedule was a phased approach with discrete scopes of work that all followed a similar path as this, just on a much smaller scale.

Page 220

Q. But in that instance the design phase started almost immediately; I believe it was almost two weeks after the email that you had written?

A. So I would look at those efforts a little differently. I think -- I think we recognized there is no way design was going to start in a week. It was more to establish the kind of schedule relationships and what the overall construction schedule would be and how it's informed by those up-front activities. It was -- it was less about a true project that was about to happen, if that makes sense.

Q. Does the schedule shown in Exhibit 28 reflect early shop drawings?

A. Yes.

Q. Where?

A. Well, we have -- we are awarding mechanical, electrical, fire protection and plumbing trades early. So that would mean that their submittals and/or shop drawings would be sooner than they would be on a traditional award path.

Q. Are there subcontracts that are being awarded prior to the GMP --

A. Yes.

Page 221

Q. -- in the schedule?

And which subcontracts are those?

A. The ones I just read off, so mechanical, electrical, fire protection, plumbing. That might be -- that might be it.

Q. This schedule has MEP coordination beginning around October 2023; is that correct?

A. Sorry, what page is that on?

Q. This is Bates numbered 1533849.

A. (Reviewing document) Yes. It has it starting... (Reviewing document) October of '23.

Q. MEP coordination could begin as soon as construction documents are available, correct?

A. Yes.

Q. And MEP coordination in the schedule shown in Exhibit 28 are critical path items, correct?

A. (Reviewing document) For the basement level, yes.

Q. Demolition, on that same page, that's also shown as a critical path item; is that correct?

A. Yes.

Q. It's possible to award the subcontract for the demolition subcontractor prior to the completion of buyout; is that right?

Page 222

A. (Reviewing document) It is possible to award the demo really as -- probably as early as the demo scope has been identified. What I'm looking at right now is, so what is likely making that critical path is we probably made it as late -- or as early as possible. I'd have to look at how it was tagged in the -- in the schedule.

But, once again, if the -- if the mobilization date is ultimately informed by procurement and we're backing into the mobilization date, the first task is going to be critical path.

So the mobilization date may not change. The mobilization date is going to be informed by the overall procurement strategy for the job. So that will -- mobilization is going to be critical path always, because it's the start of the schedule, and that demo -- the start of that demo work is going to be critical path.

But we would have backed into the date. It doesn't mean we couldn't have done it sooner, but we don't want to start so soon that then we have a lull in the middle of the job and we can't do any work because we're waiting for equipment.

Page 223

(Document marked as Consigli Exhibit 29 for identification)

Q. Ms. O'Brien, do you recognize what's been marked as Exhibit 29, which is Bates labeled ORDER-CONSIGLI_00000049?

A. Yes.

Q. And what is Exhibit 29?

A. A code compliant schedule.

Q. And this run date -- the run date on the code compliant schedule is August 11th, 2023; is that correct?

A. Yes.

Q. And so this code compliant preliminary project schedule was developed based on the design team's revised scope of work; is that right?

A. I believe so, yes.

Q. And if you look up into "Project Milestones."

A. Yes.

Q. Okay. The project milestones for this code compliant schedule have the same dates as the project milestones for the as-was schedule; is that right?

A. Yes.

Page 224

Q. And the scope of work for the code compliant restoration was more significant than the scope of work for the as-was restoration; is that correct?

A. Yes.

Q. Why are the project milestones for the code compliant schedule the same as the project milestone dates shown in Exhibit 28 for the as-was schedule?

A. I asked my superintendent the very same question, and he talked through it with me at the time. And, you know, ultimately I think he thought the code compliant would end up taking longer, but the way the tasks overlapped, and the way the scope activities overlapped, it didn't prove out. It ended up taking about the same amount of time.

Q. Did Consigli ever have discussions with anyone at Steward or with any of their representatives regarding the potential length of the as-was schedule versus the code compliant schedule prior to the creations of these reports?

A. No.

Q. So never before 2023 did Consigli have any conversations with anyone at Steward or their representatives about how long it would take to

Page 225

restore Norwood Hospital to the as-was condition?

A. I mean, aside from the schedules we issued them, no.

Q. Did Consigli ever have any discussions with anyone at Steward or their representatives prior to 2023 about how long Consigli thought it would take to restore Norwood Hospital to its code compliant condition?

A. I don't remember. I know we issued some -- looking back at some of, like, the Excel schedules and things we prepared. I don't recall, other than when we developed the P6 schedules, ever talking about how long we thought the project would take.

Q. Did anyone at Steward ever ask anyone at Consigli, prior to 2023, how long Consigli thought the project to restore Norwood to its as-was condition would take?

A. I don't -- once again, I don't recall having specific conversations about schedule until we issued our P6 schedules, where we could actually build in all the logic and all the tasks.

I guess there could have been high-level conversations, but nothing that proved out, based on the scope and the design documents, through a formal

57 (Pages 222 - 225)

Page 226

schedule exercise like a P6 schedule is.

MR. FLECK: Can we take about a five-minute break?

MR. RICH: Of course.

THE VIDEOGRAPHER: The time is 4:18. We are off the record.

(Recess)

THE VIDEOGRAPHER: The time is 4:25. We are back on the record.

BY MR. FLECK:

Q. Did Consigli consider developing its as-was or code compliant schedules for Norwood Hospital using a phased approach?

A. Can you clarify what you mean by "phased."

Q. Sure. So earlier today we talked about a three-phased reactivation plan to reopen Norwood Hospital. Did Consigli consider a phased reactivation for reopening Norwood Hospital for its as-was schedule or the code compliant schedule?

A. No.

Q. Why not?

A. There's a lot to consider with a phased opening like that, in particular the MEP infrastructure for the building.

Page 227

So, for instance, the main switchgear was damaged and needed to be replaced, so -- and that's the main source of power for the building.

It would be -- the design would have to change to reflect a phased approach and show how that infrastructure would be established in more of a piecemeal basis versus the approach that was taken where the infrastructure was being provided for the entire hospital.

MR. FLECK: No further questions from Defendants.

MR. RICH: Okay. Well, I have probably five minutes or less of questions, so I'm going to try and move through these quickly and get you on your way.

THE VIDEOGRAPHER: Counselor, are you wearing your mic? Oh, yeah, you are. I'm not hearing you very well.

MR. RICH: Well, that's a first. Test 1, 2, you got me? Test 1, 2, you got me?

THE VIDEOGRAPHER: Okay. Gotcha.

CROSS EXAMINATION

BY MR. RICH:

Q. You mentioned in your testimony in the last

Page 228

hour, I think, you mentioned COVID time, and I think you went on to say, at least according to my notes, procurement was crazy.

Could you provide a little context for what you meant when you said those things.

MR. FLECK: Object to the form.

A. Yes. Procurement of in particular equipment, MEP equipment, went from being very predictable during -- prior to COVID, to very unpredictable after COVID.

And as a result, it created very lengthy lead times, mostly due to computer chips that were being procured from overseas, or the way that COVID distancing requirements would impact how many people could be in a factory working and creating different pieces of equipment, fabricating different pieces of equipment.

So COVID had the impact of creating very lengthy and unpredictable lead times for major pieces of equipment and other materials, but mostly MEP equipment.

It also had the effect of driving costs up significantly, escalation, which saw escalation rates of 15 percent for 2021 and another 15 percent

Page 229

for 2022. Those rates have never been seen, at least in my lifetime while I've been working.

Q. And this was ongoing during the period of time that you were providing the insurance claim support to Steward?

A. Yes.

Q. And did your understanding and knowledge about these procurements and delays influence how you put your analysis together relative to the dates and milestones set forth in your summaries and reports?

A. Yes. Absolutely.

Q. Okay. You were asked some questions about Exhibit 10, which was that proposal interview document.

Do you remember being asked those questions?

A. Yes.

Q. Could you speak to the different work and scholarship, for lack of a better word, that you and your team put into that document relative to some of the other documents we've looked at today on schedules, particularly Exhibit 11, the claim estimate, and the last three or four reports and

58 (Pages 226 - 229)

Page 230

schedules, which set out the timeline.

Could you speak to sort of the work and the scholarship that went into one versus the other.

MR. FLECK: Object to the form.

A. Yes. The interview was more to hit targets that were outlined in the RFP to win the job. They were unreal -- that timeline was very unrealistic. In fact, when Suffolk actually built the job, I believe they were at least a year behind what those targets were. So that was more of a sales strategy, to give the client what they want and figure out the details later.

The detailed schedules that we provided for this effort were much more informed by actual scope, because there were some preliminary design documents that were not available with the RFP for the actual project and by our presence on site and our knowledge of the building and our knowledge of the times with COVID.

So I would say that these schedules and these estimates are much more informed than anything we would prepare as part of an interview.

Q. So speaking to the work that you performed, and again there's a document I think that describes

Page 231

it as insurance claim support -- do you remember that phrase turning up in a document?

A. Yes.

Q. So I'm going to refer generally to the work that you did for Steward in connection with the insurance claim. We'll call that the insurance claim support, okay?

A. Yes.

Q. Did you perceive that Consigli's work on that project was competently performed?

A. Yes.

Q. Comprehensively performed?

A. Yes.

Q. Accurate based on the information available to you at the time, the various reports and summaries were prepared?

A. Yes.

Q. Did anyone from Steward attempt to interfere or influence Consigli to insert, modify or change a date or milestone that you felt was unreasonable or unsupportable based on your knowledge and experience?

MR. FLECK: Object to the form.

A. No.

Page 232

Q. Do you stand behind the analysis and detail in the analyses and reports prepared in this insurance claim project?

A. Yes.

Q. Including the last four or five exhibits that we looked at, that counsel showed you, Exhibits 27, 28, and 29?

A. Yes.

MR. RICH: That's all I have.

THE VIDEOGRAPHER: All set?

MR. RICH: Did you have any more?

MR. FLECK: No. I'm all set on that question. Thank you.

MR. RICH: Great.

MR. FLECK: Thank you for your time.

THE WITNESS: Thank you.

MR. FLECK: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record at 4:34. This concludes today's testimony. All media will be retained by Veritext.

(End of video record)

MR. RICH: And I do want a video.

THE COURT REPORTER: Mr. Rich, do you need a copy of the transcript?

Page 233

MR. RICH: I do.

THE COURT REPORTER: Thank you.

Ms. Foley, do you need a copy of the transcript?

MS. FOLEY: Please. I'll need the witness to read and sign.

MR. FLECK: Do you have our order?

THE COURT REPORTER: Do you need a rough or expedited final?

MR. FLECK: Yes, I need a rough.

THE COURT REPORTER: Is Monday deliverable acceptable?

MR. FLECK: Yes. Can we have the transcript expedited by the end of the week?

THE COURT REPORTER: Yes, will do.

(Whereupon the deposition was concluded at 4:35 p.m.)

59 (Pages 230 - 233)

Page 234

CERTIFICATE

I, Stephanie O'Brien, do hereby certify that I have read the foregoing transcript of my testimony, and further certify, under the pains and penalties of perjury, that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at _____, this ____ day of _____, 2026.

_____

* * * * *

Page 235

SUGGESTED CORRECTIONS

RE: Mark Kronfeld, etc., vs. American Guarantee and Liability Insurance Company, et al.

WITNESS:  Stephanie O'Brien, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |
| ___ | ___ | _____ | _____ |

Page 236

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.              )

I, Carol H. Kusinitz, RPR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 5th day of March, 2026, at 9:10 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon examined upon her oath, and her examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

Page 237

Under Federal Rule 30:
    X Reading and Signing was requested
      Reading and Signing was waived
      Reading and Signing was not requested.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 10th day of March, 2026.

*Carol H. Kusinitz*

Notary Public
Commission expires 5/20/27

60 (Pages 234 - 237)

Page 238

Robert Lizza Esq.

rlizza@consigli.com

March 9, 2026

RE: Kronfeld, Mark, Etc. v. American Guarantee And Liability

3/5/2026, Stephanie O'Brien (#7915984)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Court Reporting Cost Containment          1-866-318-1233
A Veritext Company                        www.veritext.com

**[& - 12]**                                                     Page 1

| **&** | 00021630  4:19 | **1** | **10:28**  64:15 |
|---|---|---|---|
| **&**  1:19 2:2 34:22 121:21 128:6 | 120:18<br>**00022034**  91:18<br>**00022034-53** 4:10<br>**00022035**  92:7 | **1**  1:1,2 3:9 8:10 8:11 11:8,10 11:18 70:24 73:15,18 74:2 | **10:37**  64:18<br>**10th**  192:4 193:23 194:13 200:10,12 215:5 237:7 |

**&**

**&**  1:19 2:2 34:22 121:21 128:6

**0**

**00000049**  7:12 223:5
**00000077**  6:5 187:22
**00001943**  5:18 177:8
**00002002** 184:15
**00002002-20...** 5:21
**00002007**  5:15 177:5
**00003110**  4:23 144:20
**00003114** 156:15
**00006121**  7:5 195:11
**00011288**  33:22
**00011288-295** 3:17
**00018621**  3:19
**00018821**  53:13
**00019964**  5:4 148:6
**00020070**  158:8
**00020070-81** 5:9

**00021630**  4:19 120:18
**00022034**  91:18
**00022034-53** 4:10
**00022035**  92:7
**00354659**  173:3
**00354659-661** 5:12
**00370332** 191:10
**00370332-338** 6:11
**003703339-3...** 6:20
**00370339**  193:8
**00370347-428** 6:14
**00370429**  193:9
**00370429-538** 6:23
**00370539**  191:9
**00370539-540** 6:8
**00370541** 191:11 193:7
**00370541-542** 6:17
**00497316**  4:7
**01.10.20**  4:4
**01533847-857** 7:9
**02110**  1:21

**1**

**1**  1:1,2 3:9 8:10 8:11 11:8,10 11:18 70:24 73:15,18 74:2 74:22 75:3,7 75:11 76:16,18 77:4,6,14,16,21 78:23 81:7,15 83:24 156:14 170:6 217:24 227:19,20
**1,000**  22:23
**10**  3:4 4:11 92:13,17,20,22 93:11 95:5,18 194:7 229:14
**10,000**  22:24
**10/19/2020**  4:6
**10/6/2020**  3:19
**100**  106:21 132:11,19,22 217:13,18 218:10,21
**100,000**  15:3
**104**  139:2 178:12 188:8 188:16
**104,280,405** 138:4,9
**104.6**  188:12
**109**  4:14

**10:28**  64:15
**10:37**  64:18
**10th**  192:4 193:23 194:13 200:10,12 215:5 237:7
**11**  4:14 7:12 50:1 109:5,7,8 109:12,14,16 110:13 111:18 112:4 115:14 117:1 121:17 123:16,20 125:15 127:4 129:12 130:9 131:19,23 137:12 139:16 189:5 194:4 229:23
**11/20/20**  4:18
**11/24/2020** 137:18
**11291**  34:15
**11902**  1:8 8:17
**11:27**  94:4
**11:37**  94:6
**11th**  223:10
**12**  4:17 7:4 103:8,14 104:5 120:9,11,14,17 120:20,22 121:12 124:17 125:4,13 126:5 188:7 189:20

**[12 - 2020]**

195:17
**12-13-22** 5:14
  5:17
**12/15/2022**
  5:21
**12/31/2022**
  123:5
**12/31/22**
  122:17
**120** 4:17
**12:57** 143:16
**12th** 104:10
  188:1,4 195:22
  196:1
**13** 3:13 4:20
  144:3,9,15,17
  145:7 146:11
  148:19 152:11
**13th** 177:12,22
  178:14
**14** 5:3 148:3,5
  151:11 158:19
**144** 4:20
**148** 5:3
**14th** 158:14,24
  159:10
**15** 5:6 156:19
  157:3,11 158:7
  168:4 228:24
  228:24
**152** 189:14,22
  194:9
**152,468,482**
  142:11

**1533849** 221:9
**155** 141:21
**156** 5:6 142:3
  189:7 194:5
**15a** 157:1
**16** 4:22 5:10
  132:11 144:22
  172:23 173:2
  173:17
**16th** 211:8,11
  212:5 213:23
  215:15
**17** 5:13 102:20
  132:18 176:22
  177:4,4,10
  178:3 181:18
  181:22 182:5
**173** 5:10
**176** 5:13
**177** 5:16
**17th** 103:1
  104:10
**18** 5:16 160:1
  177:2,4,7
  181:14,16,20
  182:4
**180,000** 143:11
**180,704,632**
  143:11
**184** 5:19
**187** 6:3
**18th** 215:5,15
**19** 5:19 184:12
  184:14,18

185:22
**19-21** 3:21
**191** 6:6,9,12
**193** 6:15,18,21
**195** 7:3
**19th** 66:6
**1:21** 1:8 8:16
**1:40** 144:4
**1st** 76:11,16

---

**2**

**2** 1:24 3:11
  8:10 11:8
  40:15,16 49:1
  73:17,19,21
  74:3,6 75:7,11
  81:15 102:20
  112:7,14
  122:14 227:20
  227:20
**2/18/2022**
  167:2
**20** 6:3 24:9
  40:20 79:1
  132:22 187:20
  187:21,23
  189:17,19
**2000** 5:18
**20073** 165:14
**2008** 5:15
**2019** 14:12
  31:8
**2020** 3:14,16,21
  4:16 13:11

14:8 30:11,24
34:21 35:6
36:10,21 38:7
39:10 40:24
42:9,10 43:6
44:22,24 50:17
52:14,18,20
53:19,24 54:11
54:18 55:10
57:18 60:15
61:4 62:14
65:13 66:3,6
75:9,13 91:6
109:17 110:17
110:21 111:22
115:20 118:4,9
120:2 121:5,10
121:15 123:22
124:7,13 125:7
125:19 126:5
126:22 127:1
128:21 129:6
130:21 131:19
133:6,9,12,20
138:6 139:24
143:8,10
145:19 146:22
147:4 150:1,13
150:19 152:13
152:20 153:8
162:15 174:23
175:6,13,19
176:2,17 178:7
178:11,22

**[2020 - 3]**

183:18,22
184:8,24
186:15 188:24
189:14 204:13
207:11 208:1
219:13
**2021**   4:13,22
76:16,23 77:7
77:22 78:24
81:5,8 91:23
93:8,11 97:22
97:22 98:1
102:2,8,21
103:1,8,14
104:5,10,10,10
125:10 144:22
145:19 146:24
147:5 148:11
148:23 150:4
150:12 151:13
152:6 153:10
153:16 155:17
156:1 158:15
158:24 159:10
160:1 162:12
165:4,13,15
168:6 171:21
171:24 208:16
208:21 211:9
211:12 212:5
213:23,24
215:5,15
228:24

**2022**   125:6
172:3,4 173:6
173:19 175:1,5
175:12 176:5
176:15 177:12
177:15,22
178:14,20
179:20 180:3,8
183:18,23
184:7 185:1
186:13 191:19
192:3,8 195:17
195:22 196:1
196:11 215:6
215:16 217:4
229:1
**2023**   98:17
99:21 100:6
108:4,23
125:11,21
188:1,4,7
189:20 190:17
191:19 192:4
193:23 194:7
194:13 203:21
203:24 207:5
221:7 223:10
224:22 225:6
225:15
**2025**   204:13
**2026**   1:17
234:9 236:6
237:8 238:3

**203**  7:6
**21**   4:13 6:6
91:6 191:2,5,8
191:14 192:13
**21st**   65:13 66:3
93:8,11 200:12
**22**   6:9 7:4
123:13 191:2,5
191:9,14
192:10,11,17
192:18
**223**   7:10
**227**   3:5
**22863**   127:8
**23**   6:12 7:8,12
127:3 191:2,6
191:7,10,14
192:15,17,20
221:11
**23110**   4:16
**237**   1:1
**24**   6:15 125:1,3
193:2,5,7,12,13
**25**   6:18 133:2
193:2,5,8,12,15
**26**   6:21 124:20
193:2,5,9,12,16
200:10
**260**   189:2
**263**   189:11
**263,823,859**
142:5
**26th**   165:13,15

**27**   7:3 173:6
195:5,10,12,14
197:3,19
198:12,24
202:2,18 232:7
**27th**   91:23
173:19 175:5
**28**   7:6 171:21
171:24 203:10
203:11,20,24
205:3,7,13,23
206:17,21
207:15,21
208:7,12 216:3
216:9 219:15
220:13 221:16
224:8 232:7
**28622**   237:10
**28th**   126:13
133:12,20
168:6 204:13
**29**   1:2 7:10
223:2,4,7
232:7
**2:28**   172:16
**2:30**   172:19
**2a**   166:22
**2b**   121:21
167:12

|  **3** |
|---|

**3**   3:13 4:15
13:2,3,8 30:8
30:10 33:3

**[3 - 8]**

40:23 51:15
73:19 75:7,11
81:3,16 89:6
102:1 103:8
112:14
**3/5/2026** 238:5
**30** 3:11,14 7:8
8:5 24:10
200:13,14
237:1 238:16
**30th** 13:11 14:8
30:11,24
203:21,24
207:4
**31** 40:20
**312.471.8700**
2:5
**313** 2:8
**31st** 123:13
125:5
**320,000** 15:9
**33** 3:15
**332** 105:12
**35** 127:4,12
128:6,9
**3:16** 195:1
**3:27** 195:6
**3:30** 206:15
**3rd** 102:8
104:9 109:17
110:17,21
111:22 115:20
118:4,9 120:2
121:5,10,14

123:22 124:7
124:13 125:7
125:19 126:22
128:20 129:6
130:21 131:19
133:6,9 138:6
139:24 143:8
143:10 150:1
150:13,19
152:13,20
162:15 174:23
175:6,18
176:17 178:7
178:11,21
188:24 189:14
196:11 207:11
208:1

**4**

**4** 3:15 33:19,21
33:24 34:2,14
40:15 49:1
112:15
**4/27/2021** 4:9
**480** 15:8
**4:18** 226:5
**4:25** 226:8
**4:34** 232:19
**4:35** 233:17

**5**

**5** 1:17 3:18
53:11,12,15
54:1 56:3
113:11,13

114:1 119:10
139:2
**5-13-23** 6:4
**5/20/27** 237:12
**50** 15:2 179:1
192:5
**51** 178:16
**53** 3:18
**5th** 236:5

**6**

**6** 3:11,20 64:23
65:2,4,11,19
67:23 69:4,17
74:23 82:18
89:3 90:15
91:10 117:1
119:11
**60** 24:11
**60603** 2:5
**6130** 7:5
**617.212.9933**
2:9
**617.720.2626**
1:21
**62** 7:13
**623** 142:14
**65** 3:20 4:3,5
**67** 194:1,10
**67.5** 188:20
189:22
**6th** 34:21 35:2
35:6 36:10,21
39:10 53:18,24

54:18 55:9
57:18 60:15
61:4 204:13

**7**

**7** 4:3 64:23
65:2,5,23,23
66:24 67:8,10
67:12,18 87:19
110:16 119:7
142:14
**7,623,424**
142:14
**7/28/2021** 5:7
**7/8/2021** 5:4
**72** 121:18
122:13 125:6
**73** 127:7,9
128:10
**76** 129:12
**77** 132:10,15,17
**78** 132:9 133:1
**7915984** 238:5
**7:00** 206:15
**7th** 148:10,22
150:4,12

**8**

**8** 3:9,11 4:5
51:19 64:23
65:2,6,23,24
66:24 67:15,20
68:19,23 69:12
69:15 70:21
71:2 73:9

**[8 - added]**

74:13,15 75:12
75:19,23 76:5
76:14 77:14
78:11 79:11,14
80:19,24 85:20
86:16 90:7
**8-1/2** 50:1
**8-10-23** 6:8,11
6:14,17,20,23
**8/10/23** 191:17
193:15
**800** 1:16
**84** 6:5
**8th** 44:22,24
50:16 151:13

**9**

**9** 4:8 91:14,15
91:19,22
137:12 143:5
238:3
**9/27/2022** 5:11
**91** 4:8
**92** 4:11
**966** 5:5
**99** 156:14
**998335** 96:13
**998344** 100:17
**998353** 107:16
**9:10** 1:17 236:6
**9th** 213:24
217:4

**a**

**a.m.** 1:17
206:15 236:6
**aandrews** 2:6
**abandoned**
37:22
**abate** 85:22
**abatement** 29:3
38:6 54:14
85:11,15,17,20
86:1,12 97:11
97:18
**abigail** 2:4
**ability** 16:7
**able** 23:8 38:20
51:12 58:20
77:17,23 79:7
82:15 84:10
114:20 126:18
135:12
**above** 28:15,16
90:15 235:4
238:6
**absence** 180:5
**absent** 174:10
180:21
**absolutely**
229:12
**accelerate** 87:3
87:6 104:12
**accept** 169:2
**acceptable**
45:23 183:3

233:12
**accepting**
203:6
**accomplished**
77:1
**account** 139:13
179:13
**accounted**
27:21 60:3
179:18
**accounting**
199:21
**accounts** 27:24
**accuracy** 159:5
238:9
**accurate** 26:4
27:3 111:8
186:13 231:14
234:6
**acknowledg...**
238:12
**acting** 137:5
**action** 1:7 8:22
236:17
**actions** 101:13
101:20,21
104:11
**activate** 82:16
**activation** 4:3
50:12 54:24
65:16 66:21,23
67:14,17 68:21
75:20 76:14
81:12 219:21

**actively** 30:16
31:3,4 48:7
**activities** 68:4
68:16 97:8,17
97:20 98:8
198:8 211:16
214:21 215:4
216:19,20,20
216:21 217:14
217:17,19
218:22 220:10
224:14
**activity** 185:18
**actual** 71:2
117:17 198:3
201:5 209:4
230:14,16
**actually** 17:21
22:18,22 38:4
49:21 50:4
68:10 119:22
123:2 131:15
133:24 167:15
168:1 170:2
192:13 207:21
218:4,16
225:20 230:8
**add** 24:15
26:14 85:24
138:10 182:4
**added** 28:22
35:21 89:6
114:20 179:13
182:4

**[addendum - anzalone]**

| | | | |
|---|---|---|---|
| **addendum** 190:16 191:20 191:21 | **advise** 114:13 114:19,22 | **alarm** 45:19,21 45:23 94:1 95:9 129:9 160:19,20 161:2,4,8 164:3,14 | **american** 1:9 1:10 8:14 235:2 238:4 |
| **addition** 139:6 | **advised** 114:9 | | **amount** 17:11 138:9 199:19 224:15 |
| **additional** 28:21 29:17 30:4,7 32:15 36:9 61:3 74:4 103:18 137:24 140:24 142:13 142:24 159:16 159:19 160:7 162:19 183:6 215:11 | **aedan** 1:20 9:12 | | |
| | **aesthetics** 183:14,24 | **albeit** 141:5 | **amounted** 178:11 |
| | **affect** 179:10 | **align** 57:3 63:24 100:24 134:11,14 140:16 149:11 149:20 163:7 211:14 | **amounts** 142:5 |
| | **affected** 179:11 | | **amy** 2:3 |
| | **affiliations** 9:4 | | **analyses** 232:2 |
| | **affixed** 237:7 | | **analysis** 15:20 229:9 232:1 |
| | **afternoon** 144:1 160:4 206:15 | | **andrews** 2:3 |
| **additionally** 159:6 | **age** 214:16 | **aligned** 56:20 211:23 | **anne's** 31:2 |
| **additions** 14:18 15:5 36:2 | **agencies** 88:12 | **aligns** 129:3 192:12 208:22 | **answer** 38:9 40:9 54:6 62:20 82:13 90:8,12 120:12 130:16 132:3 149:8 150:14 160:6 166:19 169:12 182:12 |
| | **ago** 10:17 28:11 50:6 140:22,22 | | |
| **addressed** 160:9 169:4,22 169:24 | | **allotted** 238:19 | |
| | **agreed** 130:1 131:9 | **allow** 58:24 59:17 69:22 71:8 77:4 82:8 82:19,24 89:18 106:23 126:17 218:13,17 | |
| **adjust** 90:16 153:6 154:1 199:8 | **ah** 120:12 161:3 | | |
| | | | **answered** 79:3 |
| | **ahead** 51:19 55:11 86:23 217:1 | **allowances** 134:12 | **answers** 11:1,2 |
| **adjusted** 149:5 150:6,19 | | | **anticipated** 105:19 122:17 |
| | **ahj** 44:17 45:11 160:24 | **allowed** 128:22 179:14 | |
| **adjustment** 148:15,21 149:23 151:2 | | | **anymore** 131:13 |
| | **aia** 213:11 214:3 215:9 | **allows** 24:13 | |
| | | **alongside** 70:6 103:6 | **anzalone** 3:18 5:11 53:18 109:24 173:5 173:18,22 185:5,11 |
| **administer** 8:21 | **air** 26:14 48:10 48:10 | | |
| **adopt** 136:13 | | **aloud** 209:11 | |
| **adunn** 1:22 | **al** 3:18 5:11 8:14,15 235:2 | **alternatives** 106:12 | |

186:20 187:2 202:5

**anzalone's** 110:7

**apeluso** 2:6

**appear** 191:15

**appearance** 9:1

**appearances** 9:3

**applicable** 238:8

**applied** 120:6

**apply** 17:24 59:1 119:23 138:21 139:8

**applying** 19:19 59:8,10 119:20

**appreciate** 63:19

**apprised** 146:15

**approach** 4:10 45:22 63:23 67:14 70:18 82:15,17 93:18 93:19 96:1 97:1 99:12 110:23 118:15 122:12 219:5 219:13,22 226:13 227:5,7

**appropriate** 136:3

**appropriately** 131:16

**approval** 56:19 69:9 73:17 74:7 86:12 87:23 88:2,9 88:13 198:17 198:17,19 199:4 200:3,5 200:11,18 202:20 217:4

**approved** 72:24 83:16 86:9

**approximate** 59:4

**approximately** 10:17

**april** 81:8 91:23 146:22 146:24 147:4 156:1

**architect** 80:2,4 92:3 134:8

**architects** 41:24 50:9 63:10 92:4 141:3 180:11

**architectural** 55:13 78:4

**area** 117:24 174:10

**areas** 14:20 16:17 21:5

22:3 32:14 38:4 118:17 119:1 173:24 213:7

**argument** 157:19

**array** 41:24 50:8 63:9 64:2 92:4 141:3 175:2,4,11 176:4,14 180:11 197:20 202:22 205:9 207:7

**arrive** 17:21 77:10

**arrived** 38:14

**aside** 225:2

**asked** 33:11 41:22 79:3 93:18 111:15 120:13 128:18 162:10,11 164:12 208:14 224:9 229:13 229:16

**asking** 10:22 30:6 130:24 133:13 209:16 209:18 211:1

**aspects** 135:2,5

**assess** 30:16

**assessment** 4:22 58:17

113:14,23 114:2,7 144:18 152:11 159:14 163:13 179:4

**assets** 32:10 47:12

**assist** 31:10 69:22 70:3,8 70:11,14,21 71:1 72:12,13 72:19 73:2 74:10 77:9 83:6 86:21 102:24 216:4,8

**assistance** 31:14 147:9

**assistant** 14:16 147:6

**associated** 67:17 77:6 106:5 123:23 152:13,19 171:14 175:18

**assume** 76:6 129:7 184:23 185:1

**assumed** 206:17

**assumes** 75:23 132:11,19,22 133:2

**assuming** 128:10,21

**assumption**
60:8 110:24
112:21 116:4
125:24 126:9
128:7 211:17

**assumptions**
41:12 68:2,8
68:12 90:15,19
90:23 112:20
115:16,21
116:4,7,15,21
121:21 122:1,3
122:6 126:15
128:6 129:4,14
129:17 130:8
130:20 131:21
131:22 132:5,6
139:6 140:3
141:11,13
142:24 149:10
170:12 180:13
211:15

**attached**   3:10
4:9 5:7 56:4
129:10 131:23
207:10 238:11

**attaching**   68:1

**attachment**
92:6 158:11
168:3,9

**attachments**
65:15,20,24

**attempt**   231:18

**attended**   34:13
34:18

**attorney**   9:5
157:14 236:14
236:16 238:13

**attorneys**
181:12 210:4
210:19

**attributable**
183:23 190:1

**aug**   7:12

**august**   3:16
33:10,12 34:4
34:21 35:2,5
36:10,21 38:7
39:10 40:20,23
42:9 43:6
53:23 81:4
103:8,14 104:5
104:8,10 192:4
193:23 194:7
194:13 200:12
208:16,20
211:8,11 212:5
213:23 215:15
223:10

**authority**   45:2
45:9,16 46:3,7
46:15,21 48:13
48:19 160:21
161:12 163:17
163:23 164:11
164:13

**authorized**
8:21

**automatically**
199:1 201:9

**available**   24:12
31:10 82:21
83:2,8 87:2
149:18 154:19
155:9 221:13
230:16 231:14
238:6

**avoid**   17:13
26:20 39:17
47:22 48:8

**avoiding**   70:17

**award**   71:14
72:17,24 86:6
86:9 87:9
220:21 221:22
222:2

**awarded**   83:11
87:12 102:17
220:23

**awarding**
83:17 87:5
220:17

**awards**   83:9,14

**aware**   45:1
46:13 88:1,5,8
93:2 95:1
133:7 161:3,18

**b**

**b**   3:7,11 4:1 5:1
6:1 7:1 157:2
176:1

**back**   11:18
13:19 19:10
29:21 30:8,10
33:8 38:1
40:15 49:11
50:14 57:24
64:19 67:23
69:17 71:16
82:18 89:3
94:7,9 107:16
107:16 112:1
121:17 124:17
127:3 131:1
143:5,5 144:5
144:7 157:12
157:14 170:16
170:20 171:8
172:20 174:13
182:7 183:1
188:23 189:17
189:19 191:22
194:4 195:7
199:7 209:17
218:1,5,12
219:12 225:10
226:9

**backed**   170:18
222:19

backing 201:2 222:10

backwards 99:1

baked 27:11 87:8

balance 99:22

bar 74:14

base 55:14 133:2

based 16:7 19:13,21,23 20:1,3 21:3 22:4,9 23:13 24:12 25:17 40:10 41:10,12 51:20 55:11 59:3,23 60:23 60:24 72:24 74:1,9 77:24 78:14,20 79:22 80:17 88:7,21 105:3 115:20 117:23 119:20 120:6 123:15 125:23 126:7 136:3 137:4 138:17 139:10 139:18 140:2 141:7 142:24 148:13 163:4 167:3 171:17 175:15 179:4 180:14 198:14

201:3,10 205:18 206:6 216:12 223:14 225:23 231:14 231:21

baseline 60:2 63:6 114:2

basement 36:4 36:4,20,23 37:1,7,10,13,16 37:18 54:13 133:3 221:17

basements 36:11,18 38:6

bases 166:11 166:16 167:24

basis 112:22 115:16,21 116:16,22 123:12 132:7 140:3 142:20 165:24 166:7 166:24 170:12 176:4,6 227:7

bates 3:14,16 3:19,21 4:4,6 4:10,13,16,18 4:22 5:4,8,11 5:14,17,21 6:4 6:8,11,14,17,20 6:23 7:5,8,12 13:4 33:21 34:14 53:13 65:5,5,6 91:18

92:7,18 96:12 107:15 109:8 121:19 127:7 137:13 141:22 144:19 148:5 156:12 158:7 165:13 173:3 177:4,7 184:14 187:21 189:7 191:9,9,10 193:7,8,9 195:10 221:9 223:4

bathrooms 22:20

began 82:11

beginning 4:23 9:4 25:6 55:15 73:10 75:8,13 78:24 81:1 92:7 97:21 98:1,1 153:16 155:17 159:3 200:11 221:7

begins 78:24 212:4 216:22

behalf 9:7,9,11 9:13

behavioral 15:9

believe 35:11 35:14 36:3,6 37:23 40:11 41:24 43:8

46:10,18 50:3 50:7 54:21 58:1 67:4,21 82:14 84:22 86:4 91:4 96:10 100:4 111:23 116:18 126:8 133:17 136:5 139:17 146:21 147:18 147:21 149:9 150:14 151:9 151:23 154:10 154:20 159:13 161:8 164:10 164:12 169:4 169:13 170:13 170:14 171:6 171:10,11,17 176:8 177:16 190:19 193:22 208:3 210:8,18 210:24 216:5 220:2 223:16 230:9

believed 143:1

belonged 210:23

benjamin 5:4 151:12

best 16:6 33:12 45:12 48:24 62:23 78:17 80:17 125:11

134:12 157:21 200:13

**better** 19:21 23:22 48:15 61:9 68:3 86:5 207:8 229:20

**beyond** 168:9 183:7 201:6

**big** 26:12 55:4

**bigger** 202:8

**biologics** 135:23

**bit** 10:24 14:6 19:1,2 39:14 39:18 40:4 44:13 92:15 111:2 117:4 128:4 182:24 188:8 205:20

**blake** 147:7 154:9

**block** 108:14

**blocking** 23:4 42:1

**blue** 117:5

**board** 61:2 74:8

**boards** 26:15 28:20,21 37:18 145:10 153:2

**bod** 149:15

**body** 56:2 66:9 159:3

**boots** 16:3 154:22

**bosch** 2:11 8:18

**boston** 1:16,21 2:8

**bottom** 13:4,10 39:14 49:1 89:4 90:14 101:12 114:1 156:15 173:8 195:24 203:20

**box** 108:21 144:10 172:12

**boylston** 1:16

**br** 5:11 6:8,11 6:14,17,20,23 63:10 115:6 128:1 141:3 145:22 146:8 146:13 147:8 148:14,18 152:10,18 153:20 154:4 154:10,22 155:3 156:4 159:14 173:3 179:5 180:10 191:9,10,11 193:7,8,9 205:10,11

**brackets** 49:3 49:12

**break** 44:9 53:1 53:2,7 64:9,12

113:7 121:2 128:4 141:18 143:14 194:22 226:3

**breakout** 120:7

**breakouts** 57:21,23 58:5 192:20

**breaks** 92:14 181:24

**brief** 172:18

**briefly** 132:10 192:9

**bring** 70:4 72:12 77:9 95:22 106:4

**bringing** 103:17

**broadly** 74:15

**broke** 43:12

**broken** 58:3 74:16,18,21 99:12 111:3

**brought** 25:3,4 25:5 61:2 74:7 83:5

**brunt** 184:1

**bucket** 43:16 179:6

**buckets** 42:23 43:5,13 44:10

**budget** 16:5 26:2

**build** 16:3 21:3 23:13 26:22 68:12 77:12 93:19 95:20,23 96:1 225:21

**builder** 29:13

**builders** 20:2 171:1

**building** 4:20 4:21 32:5,8,9 32:12,13,22 35:20 36:9 37:17 43:20 44:1,2 45:17 45:19 47:3,4 48:7 58:4 70:15 76:18 108:11 133:19 152:10 161:9 174:11 182:1 192:19,21 193:16,18 213:2 226:24 227:3 230:18

**buildings** 15:6 15:7 35:22 36:1,6,15 97:14,19 174:7

**builds** 14:19 29:5

**built** 29:24 68:1,7 79:10 214:10,20 230:8

**builts** 214:14 214:17
**bullet** 44:17 71:16,17 82:19 83:10,22 85:4 87:22 103:21
**bullets** 89:3 166:1
**bunch** 10:22 16:21 28:24 32:23
**business** 137:24 185:18
**busts** 201:3
**buy** 106:15,18 211:19
**buying** 107:12
**buyout** 197:8 221:24

**c**

**c** 2:3 8:1 234:1 234:1
**calculate** 120:3 121:13
**calculated** 143:11 178:20 178:21 198:22 199:1,3 200:8 206:6
**calendar** 200:14
**call** 21:9 25:13 111:15 118:11

152:3 157:1 160:5 162:7,10 210:19,19,20 211:3 231:6
**called** 1:14 10:2 34:17 63:4 69:18
**cancila** 2:2
**capacity** 28:20 70:14
**capital** 18:19
**capped** 97:16
**capping** 72:2
**caps** 97:10,15
**captioned** 7:3,6 7:10
**capture** 187:10 187:12
**care** 4:12,21 14:17,19,21,24 15:12 18:11 19:4 20:1,7,22 20:22 22:1 78:22 185:24
**cared** 89:19
**career** 88:8,22
**carol** 1:15 8:20 236:3
**carpenters** 32:20
**carried** 119:11
**carry** 28:3 100:13 170:5

**case** 8:16 23:8 32:9 80:2
**catastrophic** 31:17
**causation** 159:6,16,19
**cause** 86:13 236:10
**cavities** 39:17
**cd** 83:9
**cd's** 81:3 82:20 83:1
**cds** 58:15 71:15 139:3 218:6,6 218:14
**ceiling** 28:15,16 114:16
**celebrate** 107:24
**celebrated** 108:3
**center** 31:3
**certain** 43:20 82:6 101:22 128:12,13 135:22 139:21 155:20 175:18 188:17 199:19 213:11 214:4
**certainly** 21:16 151:23 152:8
**certificate** 44:3 200:9,20

**certification** 56:18
**certify** 56:13 234:2,4 236:5 236:14
**chain** 5:3,6,10 155:1
**chance** 11:2 83:15
**chances** 32:14
**change** 29:18 30:4 169:9,16 169:21 170:3 171:17 186:10 192:1 222:12 227:5 231:20
**changed** 161:7 169:3 187:16 202:15
**changes** 70:17 163:13 190:5 235:5 238:10
**changing** 62:7 187:18
**charge** 18:19
**chargeable** 29:18
**chart** 97:4 101:2
**check** 28:15 112:2 131:8,14
**checking** 131:18 165:20

checklist  214:2
  215:8
checks  202:13
chicago  2:5
chief  9:15
chips  228:12
chose  211:21
chosen  211:24
chris  3:13 5:7
  13:11,14 30:15
  147:18 148:10
  148:13 154:20
  155:1,9,11,19
  158:24 160:1
  165:14 181:10
  210:3,5,9,16
  212:1
circuitry  28:21
  29:2
circulation
  48:10
civil  1:7,15
claim  4:15 5:13
  5:16,20 6:3,7
  6:10,13,16,19
  6:22 32:18
  42:16,20 52:16
  55:6,9,19 92:5
  109:15 111:11
  111:18 112:5
  130:11 137:17
  140:10,17
  165:10,10
  168:20,24

170:24 172:2
  229:4,23 231:1
  231:6,7 232:3
clarification
  132:2 160:19
  174:17,21
clarified  44:19
clarifies  122:3
clarify  134:1
  140:8 226:14
claw  157:14
clean  16:19
  17:16
clear  157:24
  158:2
client  15:16,17
  15:22 18:8,10
  18:14 25:19
  26:10 31:1
  80:14 83:14
  86:8 96:2,7
  100:1 157:14
  182:14 183:3
  230:11
climbing  153:4
clinical  15:8
close  53:3 85:6
  85:7
closeout  124:20
closer  190:22
clutter  16:22
cm  96:5
code  6:4,16,19
  6:22 7:11

42:24 43:19
  44:4,11 58:2
  112:13,23
  113:1,5,6,8
  115:15 116:20
  116:21,22
  140:1 141:24
  142:4,9,19,23
  161:7 166:12
  166:13,15,23
  167:11,20,24
  168:14 171:3
  171:14 180:10
  187:24 188:5,7
  189:1,10 190:1
  190:5,5,6
  193:14,19,23
  194:9 223:8,10
  223:13,20
  224:1,6,12,19
  225:7 226:12
  226:19
codes  44:1,4
  143:2
coined  42:5
collaboration
  212:1
collaborative
  70:18 180:17
collaboratively
  18:7 96:8
  114:11
color  203:15

column  138:3
  184:23,23
  185:1,2,6,10
combination
  116:15 117:9
  134:6 139:2
combined
  25:12
come  30:5
  47:24 80:1
  98:19 118:3
  123:4 128:14
  129:22 130:4
  153:20 167:7
  218:1,12
comfortable
  53:8
coming  61:12
  62:2 108:4,22
  137:6 153:2
  164:8 165:3
  187:6 218:5
commencing
  1:17 80:20
comment  7:5
  60:21 79:7
  124:3
comments
  191:22 218:1,2
  218:5,11,14,17
commission
  237:12
commissioning
  4:20

**commonwealth**
1:16 236:1,4
**communicati...**
164:16,24
181:11
**community**
50:15 107:20
107:23 108:3
108:10,22
**company** 1:9
1:10 170:24
235:2
**compare** 184:7
185:22
**compared**
186:14 208:1
**comparing**
219:10
**competently**
231:10
**competitive**
107:9
**compile** 197:23
**complaint**
166:24 167:24
189:10
**complementary**
184:5
**complete** 76:15
76:17,22 79:1
80:21 81:1,18
102:8 107:5,10
139:10 145:12
145:12 146:22

197:8 216:22
217:23
**completed**
54:15 55:16
77:6,21 82:10
102:18 106:22
126:20 141:6
238:16
**completely**
219:5,7,18
**completion**
78:23 81:11
200:9 221:23
**complex** 14:17
**complexities**
84:1
**complexity**
25:18 84:14
**compliant** 6:4
6:16,19,22
7:11 112:14
113:1,8 115:15
116:20,21,22
140:1 141:24
142:4,9,19,23
166:12,13,16
167:12,20
168:14 171:4
171:15 187:24
188:5,8 189:1
190:1 193:14
193:19,24
194:9 223:8,10
223:13,21

224:2,7,12,19
225:7 226:12
226:19
**complies** 43:24
**comply** 57:10
143:2 182:18
**component**
21:17
**comprehensive**
61:19
**comprehensi...**
231:12
**compromise**
123:10
**computer**
196:4 199:1
228:12
**con** 27:8
**conceptual**
19:8 22:14
23:1,20 24:1,8
25:8 27:3,17
28:4 58:18
80:13,16 96:24
137:18 139:15
140:1,2 143:6
**concern** 135:21
**concerned**
57:19,21
**concerning**
236:9
**concerns** 84:21
**concluded**
157:20 233:17

**concludes**
232:19
**conclusion**
156:1
**concrete** 24:3
**condition**
134:21,22
182:21 225:1,8
225:17
**conditions**
15:21 27:12
70:15 119:10
119:12,17
120:4,23 121:4
121:14 205:17
205:21 206:1,3
206:5,8
**confirm** 46:12
55:22 77:17,23
180:19
**confirmation**
55:23
**confirmed**
149:1
**confused**
207:17
**confusing**
121:7
**congested**
28:16,17
**congress** 2:8
**connected**
170:21

**[connection - consisted]**

**connection**
  231:5
**consensus**
  161:10
**consequential**
  63:5
**conservative**
  27:16,17
**consider**  89:17
  226:11,17,22
**consideration**
  112:23
**considering**
  89:8,13
**consigli**  1:13
  2:7,9 3:9,12,17
  3:19 4:10,19
  4:23 5:4,8,15
  5:18,21 6:5 7:3
  7:5,6,10,12 8:9
  9:15,18 10:19
  12:5 13:1 14:7
  14:11,14 15:1
  15:12 17:20
  18:15 19:3,5
  20:19 21:7
  23:17 24:14,22
  26:3 27:2 31:8
  33:18,22 34:22
  40:5,19,22
  41:14,22 42:19
  44:9,23,24
  45:8 46:6,14
  47:18 51:18

52:5,8,12,20
53:10,13 54:1
54:10,17 55:9
57:1,6,7 60:11
62:10 63:9
65:1 68:22
69:11 75:16
78:21 79:20
80:6,12 82:2
91:13,18 92:7
92:12 93:2,23
94:16,22 95:6
95:10,22 98:6
98:6,19,24
100:4,13 101:7
102:7 104:11
105:6 106:3
109:6 113:7,21
114:6 115:19
116:3,13,19
117:8,20 118:2
119:13,16
120:3,10,18
121:3,13 122:5
123:4,12,22
125:18 126:23
130:7,20 132:4
133:2,6,17
139:15,20,24
140:5,15 141:1
141:11 142:1
144:2,19
147:22 148:2,6
149:21,24

150:17 152:12
152:17,23
153:12,15
154:9,23 155:3
155:11 156:4
156:15,18
158:7 162:9,10
162:11,24
163:6 164:16
164:21 165:3
167:8 168:17
169:17 170:3,5
170:16,20
171:13,24
172:8 173:1
174:22 175:1,5
175:11 176:3
176:15,21
177:1,5,8,14,22
177:24 178:15
178:19,21
179:19 180:3,7
180:11,17,21
181:5,24
184:11,14
185:23 187:8
187:14,19,22
188:2,4 190:12
191:1,18 193:1
193:20 194:7
194:18 195:4
195:11,21
196:16,19
197:1,4,17

198:5,8,11,13
198:15,24
200:3,17,24
201:11,14
202:16 203:6,9
203:12 205:2,8
206:19 208:4,9
213:16 214:10
219:12 223:1,5
224:16,22
225:4,6,15,15
226:11,17
231:19
**consigli's**  16:9
  16:10,16 34:6
  41:3 43:4
  48:18 67:16
  77:20 96:21
  104:19 120:2
  133:10 138:6
  142:4,8 143:10
  147:6 161:15
  167:2 168:22
  169:8 171:19
  179:10 185:18
  188:24 189:10
  189:24 205:12
  207:11 210:7
  231:9
**consigli.com**
  2:9,9 238:2
**consist**  91:19
**consisted**
  116:21

**consistent**
174:7
**constantly**
21:13,14
**construction**
1:13 2:7,10
3:10,12 7:3,7
7:10 9:18
15:15 16:1
17:7 18:18,23
19:18 24:20
25:9,22 28:8
29:10,12,19,22
30:2 40:20
42:6 46:5 52:4
64:6 72:17,22
73:1 78:22
79:7 80:24
81:7,10,16,23
82:3,7,11 85:5
85:17,21 87:2
96:7,10,18
98:5 101:5,9
102:17 106:21
107:24 117:2
122:17 123:5
123:13 124:20
124:24 125:3,5
125:10,13,14
125:20 126:7
126:16,18,19
139:20 181:2
186:8 197:6
198:3,7 199:14

201:8 205:22
206:7,13
212:14,23
215:23 216:21
217:13,19
218:3,11,16,21
220:8 221:13
**construction's**
89:20 168:17
**consultant** 43:7
61:15 63:1,11
63:14 79:20
113:18 129:21
134:7 160:7,8
161:20 162:2
162:11,19
163:5
**consultants**
12:9 15:16
44:6 60:17
61:1,12 63:11
113:17,22
114:8,23 130:2
145:23 155:4
165:22 180:18
**consulting**
162:9,24
**contained**
131:18 176:17
**contains**
207:11
**contemplate**
129:1

**contemplates**
102:14
**contemplating**
31:15
**contents** 112:8
**context** 16:16
34:6 66:18,20
98:12 174:13
204:19 228:4
**contingencies**
29:9 138:11
**contingency**
27:23 28:3,6
29:10,12 30:2
30:5 138:16,22
139:6,9,12
142:15
**continuation**
175:12
**continue** 25:24
60:24 61:1
89:19 172:1
**continued** 1:24
2:1 4:1 5:1 6:1
7:1 60:17
155:24
**continues**
65:17
**contract** 29:15
29:16 96:3,5
102:13 111:23
112:2
**contractor**
72:12 102:4

**contracts** 112:1
**control** 89:18
**controversy**
236:9
**conversation**
38:18 47:14
49:24 66:10,15
94:15 209:23
210:2
**conversational**
47:10,15
**conversations**
45:6,11,13,16
45:24 46:7,15
46:18,20 57:2
57:3 91:12
93:4 134:10
150:7,15
155:14 161:14
164:9,11
210:16 224:23
225:19,23
**cooled** 47:3
**coordinated**
83:4
**coordination**
82:20 83:1,8
87:1 221:6,12
221:15
**copies** 238:14
**copy** 145:15
194:17 232:24
233:3

**correct**  11:16
13:12,13 17:4
17:5,6,23
18:16 21:8
23:15 36:19
39:5 44:12
48:23,24 50:18
53:19 54:4
65:13 74:16
75:9 76:1
78:12,13,16,19
81:5,8,20,24
85:3 90:16,23
91:24 97:22
98:2 101:5
102:19 105:12
109:24 111:12
112:11 116:9
116:17,24
121:8,11
123:17 125:21
127:2,17 129:3
129:15 132:20
132:23 137:11
137:11 141:14
141:15 142:1,6
142:11,21
143:2,12
144:23 145:20
146:1,5,9
147:21 148:11
154:6 158:8,15
158:19 159:1
160:2 163:18

166:13 168:2,7
171:22 173:20
175:13,14
176:18 178:17
178:23 181:3
183:11,11,15
183:24 184:1
186:19 188:9
188:21 189:2
189:11,15
192:6 194:2,10
195:18 203:15
204:3,6,9,14
205:9 207:3,12
210:17 211:9
212:8 217:10
217:15,21
219:15 221:7
221:13,16,20
223:11 224:4
**corrected**
134:21
**correcting**
104:23
**corrections**
234:6 235:1
**correctly**  22:7
110:2 111:4
118:16 169:15
**correspond**
209:2
**corresponding**
75:5 100:23

**corresponds**
204:8 209:4
**corridor**  69:23
**cost**  15:19,23
19:2,4,6,7,12
19:19,23 20:3
20:10,16,18,19
21:6,18 22:3
22:15,21 23:3
23:9,13,17,21
24:2,4,16
25:20 26:6,15
30:4 34:12
41:7,8,11,11,14
42:3 43:17
54:21 58:20
59:2,11 86:10
104:16,19,21
104:22 105:3,3
105:5,10,10
117:10,19
118:3 119:16
120:3 121:4
123:1 137:22
137:23 138:13
142:9,10
149:13 159:5
166:9 178:20
182:1 187:17
206:3 214:8
**costs**  21:11,15
21:16,21,22
22:10,23 23:9
24:17,17 25:23

29:17,19 30:7
55:18 57:12
58:7,9 60:3
106:5 116:1
117:5,8,10,15
118:2 119:8,21
120:6 121:14
122:22,22
137:24 138:1,2
138:7,24 139:1
182:6 193:16
199:17 228:22
**counsel**  1:14
8:3,13 9:2 10:2
10:24 12:13,14
12:18 157:12
157:13,22
232:6 236:15
236:16 238:14
**counselor**
227:16
**counting**  22:22
**couple**  140:21
140:22 188:10
**course**  226:4
**court**  1:3 8:15
8:19 9:20 11:3
94:8,10 209:8
232:23 233:2,8
233:11,15
**cover**  29:14,16
175:23
**coverage**  179:8
183:9

**[coverages - days]**

**coverages**
43:10,14,14
**covered** 179:14
**covers** 16:17
29:17
**covid** 83:24
84:10 200:1
216:14 228:1,9
228:10,13,18
230:19
**crazy** 200:2
228:3
**crcc7915984**
1:23
**create** 68:22,22
69:11,12,14
111:17 185:14
187:8 190:12
194:18 196:15
204:22 207:6
207:14
**created** 72:22
95:4 112:4
120:24 130:8
185:4,13 196:4
202:1,10
203:11 228:11
**creating** 185:17
228:15,18
**creations**
224:20
**creditor** 1:6
**cref** 13:20,22
14:1 154:20

**criteria** 213:11
214:6
**critical** 216:16
217:7,10,14
221:16,20
222:4,11,15,18
**cross** 3:2 47:11
227:22
**crunched** 62:8
**cs** 238:15
**ct** 76:21
**culminated**
146:7
**culmination**
146:12
**cup** 96:19
**current** 43:24
44:4
**currently** 43:22
134:18 188:13
**custom** 108:6,7
108:13,15
**cut** 97:10,15,16
**cutting** 72:2
**cv** 1:8 8:16

**d**

**d** 2:8 3:1 4:18
8:1
**damage** 35:16
37:1 39:9 40:7
40:23 59:7
113:14,23
114:2,7 133:14

133:19 135:24
**damaged** 43:16
63:3 133:11,15
133:24 134:2
183:7 227:2
**damages** 12:12
32:15 35:13
182:15
**darker** 101:17
**data** 196:10
204:2 208:22
**database** 19:14
21:7,9,12
**date** 5:8 7:8,12
34:21,22 55:6
62:7 75:15
76:10 81:17
86:2 93:5,6,7
98:20 104:13
109:19 121:6
126:4 167:1
184:22 196:1,3
196:3,5,10,12
196:19,23
197:3,5,6,7,8
197:24 198:14
198:16,17,20
198:21,23
199:3,4,5,7
200:4,5,17,23
201:2,5 203:6
203:21 204:2,5
204:5,8 207:2
207:4 208:22

211:21,24
212:2 222:9,11
222:12,13,19
223:9,9 231:20
**dated** 3:13,18
3:21 4:8,13,15
4:18,22 5:4,7
5:11 66:6
144:22 158:14
158:24 160:1
165:12 168:6
171:21 173:18
193:15 195:17
234:8
**dates** 57:11,17
62:5 76:8 86:5
98:23,23 197:9
197:13,15
198:13,15
200:21 201:9
209:1 210:9,11
210:15 215:21
223:21 224:8
229:9
**david** 1:20 9:10
**day** 17:11
36:15 60:18
90:10 122:23
154:18,18
234:8 236:5
237:7
**days** 8:5 30:1
36:23 200:13
200:14,14,15

238:16
**dbh** 44:17
**dd** 28:7 166:23
  167:6,16,22
  168:18 169:18
  197:23
**deadline** 57:19
  57:20 62:10,13
  99:1
**deadlines** 61:22
  101:23
**deal** 175:19
**dearborn** 2:4
**december** 4:15
  52:17,18 108:4
  108:22 109:17
  110:17,21
  111:22 115:20
  118:4,9 120:2
  121:5,10,14
  123:13,22
  124:6,13 125:5
  125:7,18 126:5
  126:22 127:1
  128:20 129:6
  130:21 131:19
  133:6,9 138:6
  139:24 143:8
  143:10 150:1
  150:13,19
  152:13,20
  162:15 173:18
  174:23 175:6
  175:13,18

176:2,17
177:12,15,22
178:7,11,14,20
178:21 179:20
180:8 183:17
183:18,22,22
185:1 188:23
188:24 189:14
207:11 208:1
217:4
**decision** 18:5
  40:10 128:15
  134:4,5 161:3
  163:24
**decisions** 15:23
  160:21,24
  161:17,19
  163:14,17
**deck** 92:23
  219:5
**decrease**
  206:24
**decreased**
  179:1
**defendants**
  1:11,14 2:6
  8:13 9:7,9 10:3
  227:11
**define** 63:16
  165:22 166:5
  182:14
**defined** 25:4
  29:15 60:7
  61:5,6 62:22

**definitely** 85:1
  112:3
**definition**
  19:11 20:4
**definitions**
  11:19
**deirdre** 2:8
**delayed** 170:10
**delays** 229:8
**delicate** 99:22
**deliverable**
  25:16 55:4
  60:22,23
  165:21 214:4
  233:11
**deliverables**
  12:8 17:8
  25:19 101:1,13
  101:20,22
  203:2 212:22
  213:20 214:9
**delivered** 123:2
**deliveries**
  16:20 17:9
**delivering**
  17:13
**delivery** 15:18
  103:5 106:8
  219:7,7,19
**demark** 55:22
**demo** 69:23
  85:11,15,17,20
  86:2,6,12
  222:2,3,17,17

**demobilize**
  151:8
**demobilized**
  151:7 152:8
**demolish** 71:23
**demolition**
  85:23 98:7
  102:3,16 215:1
  221:19,23
**department**
  15:5 18:20
  49:9,17 50:13
  51:3 67:5
  76:19 77:5
  161:11,16
  164:17,21
**dependent**
  211:16
**depending**
  15:17 17:11
  22:11 24:9
  25:2 84:14
**depends** 23:19
  25:3 26:21
  28:12 29:1,8
  73:5,5,5,6 90:5
  119:18
**deponent** 2:10
  9:16 238:13
**deposed** 10:11
  10:13
**deposing**
  238:13

| | | | |
|---|---|---|---|
| **deposition** 1:13 | 26:10 27:10,18 | 115:16,21 | 182:8 186:5,6 |
| 3:11 8:4,12 | 27:21,23 28:1 | 116:16,22 | 186:6,7,9,23 |
| 10:21 11:15 | 28:3,8 29:9 | 118:5,8,11,18 | 187:1,3,4 |
| 12:1,4,14,19,22 | 47:7,24 51:20 | 125:8,10,24 | 188:2,3 190:20 |
| 139:19 157:19 | 55:14 58:11,14 | 126:2,11,19,23 | 196:24 197:12 |
| 233:16 236:12 | 58:15,24 59:16 | 129:4 130:6,10 | 197:15,20,21 |
| **describe** 28:11 | 60:19 61:23,23 | 130:13 131:8 | 198:2 202:22 |
| 35:8,17 43:4 | 62:1,4 64:5 | 131:10 132:7 | 203:2 204:20 |
| 49:20 95:9 | 68:13 69:8,22 | 136:13,21,22 | 204:20,23 |
| 96:16 111:16 | 70:3,6,7,8,11 | 136:23 138:11 | 205:4,4,8 |
| 112:18 114:6 | 70:14,17,17,19 | 138:16,17,21 | 207:5,6,10,14 |
| 192:8 | 70:21 71:5,13 | 138:21,24 | 207:18,22 |
| **described** 50:1 | 72:12,19 73:2 | 139:5,8,10,12 | 208:10,13 |
| 66:24 104:4 | 73:6,7 74:9 | 139:14 140:4,8 | 211:5,7,8,11,17 |
| 114:3 117:16 | 75:10 76:10 | 140:13,16 | 211:24 212:4 |
| 134:20 139:19 | 77:8,9,18,24 | 141:7,9 142:14 | 212:11,12,13 |
| 170:6 171:4 | 78:3,4,5,6 79:5 | 142:20,21 | 212:13,17,19 |
| 180:23 183:13 | 79:8,10,18,19 | 143:1 149:2,2 | 212:20,20,21 |
| **describes** 16:12 | 79:19,22 80:9 | 149:15 150:23 | 212:22,22 |
| 74:24 119:7 | 80:20 81:1,3 | 151:1 153:5,24 | 213:5,10,11,13 |
| 230:24 | 81:12,13,15,15 | 160:22 162:16 | 213:14,16,17 |
| **describing** | 81:15,17,22 | 162:17,21 | 213:20,22 |
| 103:13 105:18 | 82:4,7,10 83:6 | 163:1,3,9,15 | 214:2,4,5,7,8 |
| **description** 3:8 | 83:8 85:18 | 164:5,24 165:6 | 214:21 215:3,7 |
| 4:2 5:2 6:2 7:2 | 86:3,21 87:8 | 165:24 166:7 | 215:12,16,16 |
| 23:6 42:2 75:2 | 93:19 95:20,23 | 166:11,12,12 | 215:17,19,21 |
| 168:10 | 96:1,8,9 97:1 | 166:13,16,23 | 215:23 216:4,7 |
| **design** 16:7 | 100:23 101:1,3 | 166:24 167:5,6 | 216:19,19,20 |
| 18:7,18 19:16 | 101:4,4,9,9,23 | 167:6,12,19,24 | 217:12,12,23 |
| 19:17,17,22 | 102:24 103:4,6 | 170:7,9 171:8 | 218:10,12,20 |
| 22:12,16 23:20 | 103:7 106:23 | 174:16,21 | 218:20 219:1,1 |
| 23:22 24:6,10 | 106:24 107:4,6 | 177:19,23 | 219:8 220:1,6 |
| 24:11,13,19 | 107:7,10,11 | 179:2,15 180:2 | 223:14 225:24 |
| 25:6,8,9,13 | 110:9 112:22 | 180:6,15 181:6 | 227:4 230:15 |

**[designed - differently]**

| | | | |
|---|---|---|---|
| **designed** 213:3 | **determined** | 223:14 225:12 | 183:17,21 |
| **designee** 1:13 | 188:11 | **developing** | 184:2 187:11 |
| **designing** | **determines** | 51:18 80:16 | 187:14 190:24 |
| 213:22 | 186:20 | 110:20 137:2 | 192:16 |
| **designs** 37:9 | **determining** | 140:15 165:6 | **differences** |
| **desperately** | 128:12 | 177:14 197:2 | 184:8 185:15 |
| 50:15 | **develop** 22:13 | 199:21 208:11 | 186:24 187:13 |
| **destructive** | 24:15 27:8 | 216:13 226:11 | **different** 14:5 |
| 71:24 | 52:5 99:2 | **development** | 14:19 16:17 |
| **detail** 24:18 | 116:14,20 | 15:19 19:17 | 20:9,11,14,14 |
| 78:7 119:21 | 120:1 130:21 | 24:11,20 25:9 | 20:15,20 21:5 |
| 167:22 181:17 | 142:18,19 | 25:14 58:15 | 22:3 28:24 |
| 181:19,20 | 163:6 165:23 | 64:6 73:22 | 29:6 35:9,22 |
| 182:3 186:9 | 166:6,10 167:9 | 86:7 101:4,9 | 35:22 43:10 |
| 192:12,15,19 | 180:7 181:6 | 114:3,8 117:2 | 47:17 48:14,16 |
| 192:22 193:17 | 197:18 205:2 | 118:11 123:15 | 50:12 63:1,18 |
| 215:10 232:1 | **developed** 21:1 | 166:23 167:6 | 63:20,24 88:11 |
| **detailed** 19:19 | 22:17 27:10,19 | 170:7 186:7 | 96:4 99:14 |
| 22:11 23:23 | 28:5 41:14 | 209:22 210:7 | 101:1 107:23 |
| 24:14 105:2 | 52:12 63:6 | 212:13,22 | 107:24 108:17 |
| 110:11 118:19 | 64:5 75:5 | 213:16 215:4,7 | 109:20 115:12 |
| 118:20 119:22 | 77:18,24 80:9 | 215:17,19 | 121:6 129:21 |
| 120:7 166:12 | 85:4 86:8 | 216:19,20 | 134:6 145:10 |
| 167:11 230:13 | 110:14 117:8 | 217:13,23 | 165:1 174:7 |
| **details** 24:7,12 | 122:4,21 | 218:10,12,20 | 183:19 186:24 |
| 181:21 184:6,7 | 123:23 124:1 | 219:2 | 192:23 203:2 |
| 230:12 | 124:15,15 | **developments** | 215:8 219:2,5 |
| **determination** | 127:19 129:18 | 52:21 | 219:7,13,18 |
| 133:21 150:18 | 140:13 145:8 | **dfoley** 2:9 | 228:15,16 |
| **determine** | 168:1 182:9 | **diagrams** 23:4 | 229:19 |
| 116:5 121:3 | 188:4 190:23 | 42:1 | **differentials** |
| 128:3 134:2 | 193:20 195:21 | **differ** 215:3 | 185:19 187:6 |
| 196:19,21 | 195:21 198:14 | **difference** 72:4 | **differently** |
| 197:22 | 210:13 213:5 | 166:15 167:21 | 220:5 |

**[dig - documents]**

**dig** 83:7

**diligence** 62:1

**dining** 37:24

**direct** 3:2 10:7
117:5,8 122:22
122:22 137:23
138:13 139:1
182:6

**directed** 136:21
136:23 161:24

**direction** 44:9
94:14,17
111:20 112:3
113:9 135:1,6
136:19 137:6
160:7 162:20
162:23 163:8
163:21 164:2,7
164:8 180:6
182:18 183:11
202:16 208:4
236:12

**directions**
208:9

**directly** 151:16
164:5 169:5
183:7 206:2

**director** 13:15
18:17

**disciplines**
63:18 64:1
115:12

**discontinued**
134:18

**discovery**
61:11 157:16

**discrete** 219:22

**discuss** 12:21
90:16,19 115:1
122:11

**discussed**
131:15 136:10
155:19 160:5
162:6 175:17
176:18

**discussing**
50:20

**discussion**
165:3

**discussions**
48:18 91:1
124:9 210:5
224:16 225:4

**distancing**
228:14

**district** 1:3,3
8:15,16

**doctrine**
157:15

**document** 4:3
4:11,14,17,20
5:13,16,19 6:3
6:6,9,12,15,18
6:21 13:1
24:20 28:8
33:18 34:9
41:20 53:10
63:15 64:2

66:4 69:7 76:3
91:13,20 92:8
92:12 100:22
101:9 103:17
109:6,11
112:14 114:20
120:10,24
128:5 129:4
130:4,14 133:5
136:6 144:2
145:1 148:2
156:14,18,21
157:10,14
158:1 166:22
173:1 176:21
177:1,18
184:11,20
185:4,12
187:19 195:4
203:9 214:21
215:4 216:17
216:19,20,21
216:24 217:2
218:11,16
221:10,11,17
222:1 223:1
229:15,21
230:24 231:2

**documentation**
56:6,10 146:5

**documented**
78:6 111:4
115:13 134:3
136:18 138:19

**documenting**
61:12 128:1
154:12

**documents** 8:9
16:7 19:18,22
22:12,16 25:10
25:22 28:9
29:22 34:7,10
41:23 47:7,24
49:22 51:9,12
55:14 58:24
59:16 60:19
62:1,4 64:6,7
65:1 67:13
70:18 72:18
73:1 77:8,18
78:1,6 79:8
87:2 97:1
101:5 102:17
106:22 110:10
110:24 112:22
115:16,21
116:9,16,23
118:6,9,18
129:4,9 130:6
131:11 136:22
138:17 139:11
139:18 140:13
141:8 149:2,16
150:24 151:1
153:6,24
160:22,23
162:16,17,21
163:2,3,7,10

**[documents - duration]**

165:7 166:24 167:3,5,7,10,21 171:8 174:15 174:19,20 177:17 179:2 179:16 180:15 186:8,9,23 187:3,4 188:2 191:1 193:1 194:6 198:19 203:17 204:23 205:4,8 207:5 207:7,10,17,18 207:22 212:11 212:14,17,23 213:12,16,17 215:17,17,23 217:12,13,14 217:19,23 218:3,20,21,21 221:13 225:24 229:22 230:15

**doing** 23:24 26:19 62:1 71:22 89:16 146:3 213:21

**dollars** 142:14

**don** 197:24 198:2 202:21

**door** 22:23 24:17,18

**doors** 22:19,22 22:23 23:12 135:19

**dot** 47:11

**downward** 149:23 150:6 150:13,20 151:2 152:14 152:21 153:13 153:17

**dph** 56:6,10,12 56:20 57:3,7 69:9 88:13 160:21 164:4 164:10 198:17 198:17,19 199:4 200:3,5 200:11,17 202:20,23 217:24 218:9

**draft** 4:4,10,14 5:13,14,16,17 5:20 6:3,4,6,8,9 6:11,12,14,15 6:17,18,20,21 6:23 111:10,14 111:15,17 112:18 113:2 116:11 121:9 137:16,18 141:5 170:13 171:7 177:11 178:14 187:24 190:18 191:16 193:15

**drafts** 109:21 171:12

**dragged** 171:9

**dragging** 170:10

**drain** 171:2

**draper** 35:15 35:24 36:12 174:7,11

**drawing** 71:12 72:20 73:3,4 73:10 173:11 174:6,9 175:2 175:4

**drawings** 4:9 69:24 72:15,16 72:18,21,22 73:9 74:11 115:13 116:5 118:22 131:6 131:15,17,23 132:7 140:4 141:4,10 142:21 150:9 167:1 174:9 175:6,8,10,18 175:21 176:1,3 176:4,14,16 180:20 190:20 190:20 204:20 207:14 214:10 214:20 220:14 220:20

**drawn** 62:3

**drich** 1:22

**dried** 40:14

**driver** 26:12

**driver's** 10:4

**drives** 26:15

**driving** 100:17 100:21 194:24 228:22

**drop** 184:4

**dropped** 152:7

**drove** 216:11 216:15

**drying** 32:24

**drywall** 39:22 48:1 58:23 59:1,2,4,8,10 59:12 115:5,8 115:10

**ductwork** 114:15

**due** 30:17 55:14 57:11,17 62:1,6 83:24 86:2 165:21 167:1 216:13 228:12

**duly** 10:5 236:7

**dunn** 1:20 9:12 9:12

**duration** 79:22 84:21 124:20 125:1,4,13 165:23 166:5 167:2 200:19 202:20 203:5,6

**[duration - emergency]**

204:11 205:22
206:8 208:5
215:24 216:2
**durations**
51:20,21 66:12
85:5,10,15
197:17,20,22
198:3,5,7,8
201:10,14
208:13 212:17
215:22 217:9

**e**

**e** 2:3 3:1,7 4:1
5:1 6:1 7:1 8:1
8:1 17:3,4
104:1 234:1,1
**earlier** 12:17
41:10 72:8
73:11 74:9
83:6 84:7 89:9
89:13 117:16
118:13 138:14
139:19 150:4
173:5 176:18
178:6 179:23
209:17 217:5
217:20 226:15
**earliest** 36:24
37:3 158:13,23
173:5 186:6
**early** 25:6 26:4
33:9,12 53:23
56:1 60:20

61:10,11 68:3
69:23,23 71:3
71:7,18,21
72:5,7,12,15
77:10 83:13
85:10,14 102:2
103:19,20
104:8 106:8,19
106:20,22
119:19 138:17
138:21 139:14
153:9 220:14
220:19 222:2,5
**ed** 49:3,6,11
67:7 74:3,24
**educated**
200:16
**effect** 228:22
**effective**
199:16
**effectuation**
51:7
**efficiencies**
85:24
**efficiency**
99:14
**efficient** 16:18
17:1,19 18:4,6
71:5
**effort** 42:20
49:12 50:17,20
50:23 51:3
54:24 58:11
86:4 95:7

111:3 140:12
140:14 141:5
141:16 164:19
170:19,21
172:6,9 175:9
179:8,10
180:10 230:14
**efforts** 13:18
40:23 51:22
72:14 88:24
171:11 172:11
181:6 211:23
212:21 220:4
**eh&e** 40:11
134:8
**either** 25:7 31:3
46:1,11 171:11
173:11
**electric** 32:6
**electrical** 20:13
24:4 26:14
37:7 38:2 47:4
48:6,11 70:5
114:17 127:24
129:8 145:18
214:15 217:1
220:18 221:4
**electrically**
48:8
**elements** 27:14
43:20 48:16
67:6
**elevations**
215:11

**elizabeth's** 31:2
**email** 3:13,18
3:20 4:8 13:11
30:11 31:9,16
53:17 54:1
55:7 56:3,4
65:11,12,19,24
66:2,5,9,18,20
67:24 69:4,10
75:15 76:9
89:4 90:14
91:3,9,19,20,22
91:23 92:7
148:5,9,23
149:6,14 150:8
151:12 158:10
158:13,14,18
158:23,24
159:3,11,24,24
162:4 165:12
165:14,20
166:17 167:12
168:12 173:4,5
173:17,19
174:14 220:3
**emails** 5:3,6,10
168:4
**emergency**
13:16,17 15:5
47:1,9,16,18
49:9,17 50:13
51:3 67:5
76:19 77:5

employ 32:23
employed
117:20 236:15
236:16
employer 10:19
employing 73:2
enable 107:3
enabled 177:23
enablement
102:4
enabling 85:10
85:14 97:11,16
102:17 209:6
encapsulated
138:2 146:8
enclosed
168:17
ended 151:10
210:1,13
217:19 224:15
endlessly
157:22
ends 62:4
100:17 131:6
165:13
engage 77:11
107:23 214:20
engaged 18:12
40:22 60:17
103:4
engagement
39:3
engaging 18:22
102:12 103:2

engineers
14:17
ensure 71:5
99:14
entail 97:12
98:4
enter 197:14,22
200:17,21
201:5,14
entered 21:12
37:17 197:11
197:15 198:5
198:21 200:19
entire 59:6
81:21,22 82:4
176:11 214:1
214:17 227:9
entirety 82:10
entities 63:21
96:6,7 180:23
entitled 4:3,5,9
4:11,14,17,20
5:13,16,19 6:3
6:6,9,12,15,18
6:21 134:20,23
182:15
envelope
132:10,19
environmental
14:4
envision 39:2
equal 90:1,3
equally 58:12
61:23

equipment
15:4 20:14
21:22 28:19
32:24 37:6,9
38:16,16,24
56:23 70:16
71:4,12 73:5
73:14 104:1
106:8,12,15,18
106:24 107:13
115:7 127:14
127:15,20,20
127:23,24,24
128:2,11,12,13
128:17,22
129:2,7,8,8
145:4,10,18
147:13 148:24
149:12 153:3
154:11,17
155:4,20 156:5
199:16 209:20
222:23 228:8,8
228:16,17,20
228:21
errata 238:11
238:13,16
erratas 238:15
escalate 126:10
escalation
21:16 105:20
105:21 106:5
122:16 123:11
211:15 228:23

228:23
especially
57:20 216:12
esq 1:20,20,20
1:21 2:3,3,4,4,4
2:8,8 238:1
essentially
13:16 16:18
19:7 29:16
43:8 62:24
96:3 104:6
138:18 180:14
219:1
establish 220:7
established
200:20 227:6
estimate 4:15
5:14,14,17,17
6:4,4,7,7,10,10
6:13,13,16,17
6:19,20,22,23
19:23 22:13
23:13 24:1,7
24:15,19 28:5
41:9,10,12
43:17 44:7
52:16 54:22
55:1 57:11,17
58:18 59:21,22
62:6,6,10
77:20 78:11
104:19,24
105:1 109:15
111:6,11,18

112:20 116:2,8
116:14,20
117:2 119:16
119:18,19
121:4,5 122:4
122:6,7,10,24
129:10,23
131:7 137:17
137:18 139:16
141:5,7,9,24
142:4,8,19,24
143:6,8,11
149:10,16,19
150:10 153:6
154:1 160:23
167:2,9 168:12
168:13,14
171:18 177:11
177:14,20,24
178:3,7,11,15
178:19 179:10
179:12 180:3,8
181:17,20
182:10 184:3
184:24 185:2
185:16,16
186:18 187:24
188:8 189:11
189:20 190:1,3
190:18,21,22
191:22,24
192:1,12,13,14
192:21 193:13
193:14,17

194:8 197:23
205:12,15
211:14 212:18
213:6 215:13
229:24
**estimated**
97:20 98:16
118:3 138:7
188:19
**estimates** 12:8
19:18 21:4
23:23 24:23
27:4,5,9,22
55:7,16 57:13
58:8 59:19
60:1 62:13
110:11,14,16
110:17,21
111:22 113:7
115:20 118:4
120:3 121:10
121:15 125:7
125:19 126:22
128:21 129:1,6
130:21 138:7
139:9,20 140:1
140:2,6,15
141:1 150:1,13
150:19 152:14
152:20 153:13
153:17 162:15
162:20 163:1,6
165:6,9 166:10
170:8,13,14

171:4,11,14,15
174:23 175:7
178:8 179:20
181:7 183:18
183:18,22,23
184:7,8,22
185:3,19 186:4
186:13,15
187:5 188:5
189:1 191:15
191:16,19
192:3,23
193:20,24
194:13,19
204:20,21
207:12 208:2
230:21
**estimating**
15:19 19:2,4,6
21:10,11,13,19
21:22 22:9,16
23:2,16,17,18
25:15,18 26:4
42:19 43:4
44:9 48:22
49:10 51:21
54:7,17 55:4,8
55:18,24 57:10
59:15 116:6
117:9,15,19
125:19 139:5
142:15 164:19
168:18 169:18
182:1 187:9

**estimation**
117:23
**estimator**
110:5,8 185:5
187:2 202:6
**estimators**
20:23 21:12
22:1
**et** 3:18 5:11
8:14,14 235:2
**evacuated** 32:8
**event** 32:2
204:17 209:6
209:14,19
**events** 37:11
87:11 209:3,4
209:13
**eventually**
36:13 130:5
138:11,22
**everyday** 32:1
**evidence** 39:23
**evolve** 24:7
115:2
**evolved** 41:4
58:3
**evolves** 130:15
**exact** 13:16
172:4
**exactly** 146:23
152:3
**examination**
10:2,7 11:22
227:22 236:11

examined 10:5 236:10

example 23:12 26:11 29:20 58:22 108:6,14 135:18

exceed 85:2

exceeded 189:2

excel 69:16 225:10

except 8:6

exchange 3:13 3:20 174:14

excluded 127:14

exclusively 112:5

excuse 167:19 209:8

execute 18:9 147:10

executed 16:6

executive 14:9 14:11,13

exercise 160:14 160:15,17 226:1

exhibit 3:9,11 3:13,15,18,20 4:3,5,8,11,14 4:17,20 5:3,6 5:10,13,16,19 6:3,6,9,12,15 6:18,21 7:3,6

7:10 11:9,18 13:2,3,7 30:8 30:10 33:3,19 33:21,23 34:2 40:15 49:1 53:11,12,14 54:1 56:3 64:23 65:4,5,6 65:11,19,23,23 65:23,24 67:8 67:10,12,15,18 67:20,23 68:19 68:23 69:4,12 69:14,17 70:20 71:2 73:9 74:13,15,23 75:12,19,23 76:5,14 77:14 78:11,11 79:11 79:14 80:19,24 82:18 85:20 86:15,16 87:19 89:3 90:7,15 91:10,14,15,19 91:22 92:13,17 92:19,22 93:11 95:5,18 109:7 109:8,12,14,16 110:13,16 111:18 112:4 115:14 117:1 120:9,11,14,17 120:20,22 121:12,17

123:16,19 124:17 125:4 125:13,15 127:3,4 129:12 130:9 131:19 131:23 137:12 139:16 141:18 144:3,9,14,17 145:7 146:11 148:3,5,9,19 151:11 152:11 156:10,19 157:11 158:7 158:18 168:4 172:22 173:2 173:17 176:22 177:2,4,7,10 178:3 181:14 181:16,18,19 181:20,21 182:3,5 184:12 184:14,18 185:22 187:20 187:21,23 189:5,17,19 191:5,5,8,9,10 192:8,11,13,15 192:16,17,18 192:20 193:7,8 193:9,15,16 194:4 195:5,10 195:12,14 197:3,19 198:12,24

202:2,18 203:10,11,20 203:23,24 205:3,3,7,13,23 206:17,21 207:15,21 208:7,12 216:3 216:9 219:15 220:13 221:16 223:2,4,7 224:8 229:14 229:23

exhibits 1:2 8:10 11:8 65:2 66:24 177:4 191:2,14 193:2 193:4,12 232:5 232:6

exist 194:16

existing 15:21 26:18 27:12 28:14,18,19 29:6 42:7 70:15 127:13

expansions 15:6

expansiveness 35:16

expect 88:18 89:22 138:22 139:3 176:11 183:2

expectation 45:18 57:11

58:19
**expectations**
20:15 44:18
56:7,11,20,23
57:4,7,17
99:24 100:3,5
**expected** 45:20
**expecting**
190:15
**expedite** 87:16
87:22 88:1,9
88:24 101:10
**expedited**
233:9,14
**expensive**
26:13 206:8
**experience** 20:1
22:4 78:21
88:7,21 90:4,9
231:22
**expert** 137:1,9
201:22
**expertise** 22:4
70:16
**experts** 43:9
44:6 128:2
171:1 182:14
**expires** 237:12
**explain** 62:23
67:13 134:14
178:24 185:15
187:15 190:24
205:19

**explained**
29:15
**explains** 185:2
**explanation**
122:1 174:5
**exploratory**
12:11 15:21
26:9,18,24
28:10,11 69:22
71:23 72:14
102:3,16
**express** 192:23
**expressed**
84:21
**extend** 123:10
**extends** 81:4
204:12
**extent** 18:2
157:23
**extra** 30:1
138:16

**f**

**f** 234:1
**fabricating**
228:16
**fabrication**
71:13
**facade** 103:24
132:11,19
135:8,9,10,11
**facilitate** 103:7
103:20

**facilities** 13:18
14:4 18:19
31:19 78:22
**facility** 17:16
26:19,20 28:14
144:18 214:18
**fact** 12:11
26:24 27:24
164:12 230:8
**factor** 125:14
**factored**
206:19
**factory** 228:15
**fails** 238:18
**fair** 158:3,4
**fairly** 186:8
**familiar** 16:10
16:13
**fans** 32:22,23
**far** 51:6 55:8
98:9 99:4
154:24 177:13
**fast** 58:12
100:18,21
101:23
**faster** 70:10,12
89:23 90:4
**feasibility**
99:19
**federal** 1:14,21
237:1
**fee** 188:13
**feed** 37:16

**feedback**
202:13
**feet** 15:10
23:14 59:7
115:5
**felt** 149:24
161:5,6 231:20
**fence** 108:15
**field** 44:6 83:4
**figure** 187:5
199:23,23
230:11
**filed** 8:15
**final** 4:22 56:6
56:10 89:7
139:12 141:7,7
145:3 152:11
152:18 161:12
170:9,9,14
171:10,13
190:23 233:9
**finalization**
83:11,18 87:6
87:13
**financial**
165:23 166:5
**financially** 8:23
236:17
**find** 32:3 61:1,1
134:22 168:17
**finding** 12:11
26:24
**findings** 60:18
61:13 63:13

**[findings - form]** 

115:1 128:1
148:14,18
163:12
**fine** 127:9
**finesse** 199:20
**finish** 125:11
204:8
**finishes** 20:15
24:3 38:4,17
38:22 40:6
135:8 136:5
179:22,24
**finishing**
200:12
**fire** 20:13 37:7
45:19,21,22
46:1 70:5 94:1
129:9 160:19
160:20 161:2,4
161:8,11,16
164:3,14,17,21
217:1 220:18
221:4
**firm** 8:20
**first** 10:5 34:8
34:20 35:2
36:5 40:22
52:8 71:16
88:11 98:14,15
109:23 133:4
138:3 144:12
144:19 153:24
156:12 161:23
168:16 173:8

174:19 176:20
180:10 184:23
186:18 197:7,8
198:13 199:5
204:9 222:11
227:19
**fit** 14:18
**five** 36:8 49:24
53:1 64:12
89:3 167:8
194:22 204:16
226:2 227:13
232:5
**fixtures** 38:23
**fleck** 2:3 3:4
9:6,7 10:8 11:7
17:6 52:24
53:6,9 64:8,12
64:21 92:14
94:8,11 127:7
131:1 141:17
143:14 144:6
157:9 158:4,6
172:14,21
194:21 195:8
226:2,10
227:10 228:6
230:4 231:23
232:12,15,17
233:7,10,13
**flip** 215:22
**flipping** 127:9
**flood** 31:18
35:3 39:22

40:5 42:10,14
47:21 48:20
50:11 56:17,17
134:17 183:8
**flooded** 40:3
**flooding** 30:17
30:20
**floor** 20:10
36:5,5,7 43:16
58:4,23 59:4,6
59:13 119:1
133:3,4,4,11
134:22 137:23
183:3,14
192:18,21
193:16,17
**flooring** 38:23
43:18 118:24
133:2,7,14,18
133:24 134:10
134:18,19,21
134:24 135:3
135:14 179:22
179:23 183:2
**fluid** 154:16
161:6
**focus** 14:21
**focused** 55:5
99:11 100:2
**folder** 194:14
**foley** 2:8 64:20
233:3,5
**follow** 30:13
72:16 140:9

153:23 160:5
175:9 185:16
**followed** 75:3
136:19 219:23
**following** 34:8
35:3 41:4 42:9
42:13 44:14
66:10 91:2
117:9 165:22
165:24 166:6
176:10 213:14
235:4
**follows** 10:6
**food** 155:1
**foot** 19:20,24
20:10,17,20
23:3,5,10,21
24:2,4 41:11
41:12 57:12
58:7,9,20 59:2
59:11 105:3
117:11,19
118:3
**footage** 19:11
23:7,18 59:1,9
59:11 117:23
**foregoing**
234:3
**forget** 202:3
**forgive** 95:8
143:4
**form** 8:6 38:8
40:8 54:5
62:19 82:12

90:11 96:8 136:17 141:5 145:3 149:7 154:8 155:21 156:7,11 159:12 164:1 166:18 169:11 170:9 171:7 175:20 182:11 182:22 186:16 205:1 211:23 228:6 230:4 231:23

**formal** 77:24 161:16,18 163:17 176:7,8 225:24

**formally** 164:7

**format** 174:8

**formats** 201:20

**forth** 57:24 77:15 78:10 86:15,16 100:14 112:1 122:2 140:3 142:4 157:12 166:16 215:4 229:10

**forward** 157:18

**foundations** 98:8 103:19,20

**four** 107:16 112:10 229:24 232:5

**fp** 104:1

**frame** 14:7 55:3 79:1 140:19 146:20

**front** 65:9 68:2 68:7,12,16,16 86:19 91:16 144:10 151:11 189:3 191:12 193:5 195:9 220:10

**full** 36:3 76:14 81:12 82:8 83:8 84:11 97:24 98:4 119:2 129:9

**fully** 27:10,11 28:8 87:8 89:16

**fund** 30:5

**funding** 18:19

**further** 86:14 215:7 227:10 234:4 236:14

**future** 45:7 108:2,12

**g**

**g** 8:1

**gained** 22:2

**garage** 96:20

**gas** 56:22

**gathering** 145:23

**gayle** 135:12

**gc** 120:7

**geared** 32:1 162:14

**general** 23:5,6 57:9 119:10,12 119:17 120:4 120:23 121:4 121:13 122:13 205:17,17,21 205:24 206:3,5 206:8

**generalities** 155:15

**generally** 23:14 85:5 94:16 95:10,16 101:19 231:4

**generated** 97:2 179:16 201:21

**generating** 160:8,12 161:20

**generators** 37:18

**getting** 32:4 48:8 49:11 50:12 53:3 62:8 83:14 86:23 102:13 102:14 103:3 175:2 207:17

**give** 10:24 11:1 29:20 58:10

105:8 121:24 130:19 135:1 230:11

**given** 75:16 157:16 164:2 235:5 236:13

**gives** 101:21

**giving** 99:6 182:18 183:12

**gmp** 25:23 72:18,24 73:17 73:22 74:7 77:10,19 78:8 80:8 83:11,18 86:7,8,12 87:5 87:12 102:13 197:24 217:4 220:23

**gmps** 21:2

**go** 10:20 25:8 36:11 47:6 56:2 77:13 82:18 89:23 90:4 92:15 94:18 98:10,12 98:19 100:6 104:13,15 105:14 107:8 116:8 121:17 122:5 127:3 143:4 151:11 155:15 157:18 158:13 159:24 165:12 171:8

172:15 183:1
202:13 203:1
204:17 232:17
**goal** 32:7 165:2
**goals** 18:8,9
**goes** 28:7 65:16
78:7 92:3
156:20 198:2
209:17
**going** 16:22
20:9,16 21:13
21:14 22:3
23:7,12 29:23
30:10 38:13
42:13,16 43:17
48:12 53:7,9
69:17 71:16
75:17 89:3,20
94:14,17 123:1
127:22 137:13
138:12 141:6
147:14,14
149:22 152:20
156:6 157:1,17
160:5 165:9
170:3 182:7
188:23 197:9
206:9 211:18
216:24 217:5
220:6 222:11
222:13,15,17
227:13 231:4
232:18

**good** 9:6 10:9
10:10 64:8,14
92:16 95:24
123:6,9 130:13
135:17,18
160:4 165:18
176:7
**gosh** 57:24
127:21 202:3
**gotcha** 227:21
**gotten** 55:12
**gr** 120:7
**gravitate** 23:2
**great** 11:4
232:14
**greater** 159:5
182:19 215:10
**gross** 20:10
117:11 118:3
**ground** 16:3
29:7 36:5 59:6
133:3 154:22
**group** 210:21
**grow** 32:15
**growth** 39:17
40:13 47:23
**guarantee** 1:9
8:14 235:2
238:4
**guaranteed**
21:1 80:11
83:15
**guess** 18:2 20:4
21:9 60:22

109:4 112:22
125:11 126:4,7
131:4 133:22
134:12 138:10
150:14 187:16
190:8 197:9
199:6 200:13
200:16 225:22
**guessing** 36:17
38:24
**guidance** 136:2
136:9

**h**

**h** 1:15,20 2:3
3:7 4:1 5:1 6:1
7:1 236:3
**half** 101:12
113:13 123:7,8
134:16,17
178:21 183:3,4
**hand** 64:22
102:1 154:11
154:11 185:6
199:12 237:6
**handed** 33:20
177:3 184:13
**handful** 100:16
101:15
**handle** 164:3
**handler** 26:14
48:10
**happen** 27:1
47:2 68:10,16

72:14 73:16,21
73:22 74:5,6
84:18 97:14
100:24 101:22
151:18 161:2
161:13 199:20
218:9 220:11
**happened**
13:17 33:6
34:9 91:5,12
201:3
**happening**
21:16 22:16
53:23 60:18
74:9 81:23
84:9 85:17
100:9 154:5
**happens** 31:18
47:22 83:3
**happy** 53:2
90:16
**hard** 39:2
145:15 198:20
201:5
**hazardous**
85:22
**hazmat** 29:2
54:14 85:16,16
85:20 86:1,6
86:12 97:18
**head** 28:15
**heading** 34:17
40:19 41:13
42:17 51:16

**[heading - hospital]**

69:18
**health** 4:12,21 14:17,19,21,24 15:9,12 18:10 19:4 20:1,22 20:22 21:24 78:22 185:24
**healthy** 108:11
**hear** 10:23 22:7
**heard** 33:8 93:4 94:13
**hearing** 227:18
**heated** 47:3
**heaters** 32:5
**held** 27:23 135:7 180:17
**hell** 57:12 58:8 59:19
**help** 15:21,22 29:1 32:4,19 32:23 33:1,11 63:15 64:1 70:6,11,16 72:13 78:5 87:6 103:4,6 106:4 114:18 120:14 128:18 147:10 161:1 172:1 180:18
**helped** 127:23 182:14 210:22 219:12
**helpful** 33:17 41:21

**helping** 33:13 48:3 147:12 210:14
**helps** 63:21 70:10 71:4,5 78:3 139:13 187:15,16 196:22 215:12
**hereinbefore** 236:6
**hereto** 236:16
**hereunto** 237:6
**hey** 47:10
**hi** 30:15 66:9 67:24 148:13
**high** 15:11 16:1 19:6 23:1,24 34:10 41:9,12 42:1 49:22 54:21 58:17 63:23 67:2,16 68:1,20 80:15 96:23 105:2 111:16 121:24 122:7 156:11 193:13 213:6 219:3 225:22
**higher** 28:3 32:14 59:14 64:7
**highlight** 108:16 119:1
**highlighted** 213:8

**highlighting** 118:17,21,22
**highly** 100:7,12 214:16
**hire** 72:19
**hired** 15:17 18:16 40:11 43:7 70:14 80:2 111:19
**hiring** 18:23
**historical** 19:14 119:21 120:6
**history** 20:3,24 21:2
**hit** 101:23 139:21 230:5
**hold** 49:12 50:17,21,24 51:4,8,11 216:16
**holmes** 2:2
**honest** 196:13
**honestly** 36:13 36:16,22 52:18 111:24 145:2 181:12
**hope** 87:12
**hospital** 3:15 4:6,12,15,18,21 5:13,16,20 6:3 6:7,10,13,16,19 6:22 7:4,7,11 18:12,13,17,22 30:12,17,21

31:2,18 33:14 34:6,23 35:3,5 35:10,18,19 36:11,14 37:2 37:11,15 39:9 40:2 42:5,7,10 42:13 45:10 46:17 47:19 48:21 49:18,23 52:6,10,14,22 54:2,11,22 56:14,15,16,19 62:18 75:18,24 76:15 78:10 81:12,22 82:4 82:7,9,16 88:3 88:10,14,23 89:15,16 92:24 93:3,11,19,24 94:18,23 95:2 95:20 96:19,22 98:16 99:3,20 100:5 101:8 103:24 104:16 104:20 105:7 105:11 108:3,4 108:17,22 109:3 111:11 111:17 113:23 123:24 124:6 124:12 125:16 126:24 130:22 133:11,18 135:2,5 136:2

137:17 138:8 140:7 145:5,19 151:3 152:9 155:5 161:4,17 168:19 182:15 182:20 190:13 193:21 195:15 195:21 203:13 204:6,12 206:14 208:6 209:5 212:16 214:11,16 215:18 219:4 219:12,17 225:1,7 226:12 226:17,18 227:9

**hospital's** 43:11 164:18

**hospitals** 14:5 28:16 37:12 78:23

**host** 160:5

**hour** 53:3 228:1

**hourly** 121:3

**hours** 89:18 206:12,16,20

**house** 38:2

**huge** 201:23

**huh** 30:14 208:17

**hybrid** 25:14 167:16,22

**i**

**icus** 15:4

**idea** 23:5 25:24 39:15 58:10 101:21 103:5 105:8 131:5 139:12

**ideally** 201:6

**identification** 8:10 13:2 33:19 53:11 65:3 91:14 92:13 109:7 120:11 144:3 148:3 156:19 173:2 176:22 177:2 184:12 187:20 191:3 193:3 195:5 203:10 223:2

**identified** 10:3 27:15 44:5 118:17,19 154:17 222:3

**identify** 12:11 63:24 129:20 202:14

**identifying** 118:15 154:11

**il** 2:5

**image** 108:12

**imagine** 31:24 46:24 129:19

**imaging** 75:1 76:20

**immediate** 32:7 32:17 48:20

**immediately** 39:15 125:9 220:2

**impact** 62:5 71:1 83:18 84:12 122:10 174:11 205:21 206:23 228:14 228:18

**impacted** 83:24 163:22 179:12

**impacts** 47:21 48:20 50:11 89:9,13 184:4 205:24

**important** 209:21

**imposed** 60:6 60:12

**imposing** 62:9

**include** 41:4 43:17 50:2 79:18 86:16 89:22 97:17 106:7,11 119:13 136:21 136:23 142:13 212:16

**included** 19:12 42:3 43:10

44:7 52:15 57:5 59:21,22 77:19 113:6 122:16 123:19 127:15 130:5 156:9 163:9 173:19 188:14 209:15 214:3,5 215:9

**includes** 44:14 71:3 74:23 89:23 96:1 113:4 214:2 215:11

**including** 9:2 12:6,8 14:2,15 45:18 53:18 78:23 106:15 147:20 162:9 166:24 232:5

**inclusion** 210:15

**incomplete** 139:14

**inconsistencies** 175:24

**incorporate** 42:24 44:11 79:21 80:5 218:2,6,14

**incorporated** 84:22 131:9 218:18

**incorporates**
76:8
**incorporating**
199:9
**increase** 105:21
188:16
**incur** 29:24
138:15
**incurred** 32:16
59:6 182:16
**indicated**
127:15 128:16
129:9 149:22
**indicating** 72:7
90:22
**indication** 38:5
39:9
**indirect** 119:8
**industry** 22:5
181:2
**infection** 89:17
**influence** 182:8
205:12 229:8
231:19
**influences**
205:14
**inform** 18:5
22:12 25:20,24
27:1 29:3
63:21 64:1
68:3 70:7,16
78:4,5 116:1
131:6 153:15
153:15 161:1

163:15 196:22
204:21 210:9
214:24
**information**
19:9,10,15
21:8 23:11
27:9 44:14
61:2 78:14,18
78:20 79:21
80:1,4,17
105:4 107:3,11
117:21 140:2
140:24 145:24
149:18,20,22
163:4,14
186:21 194:15
196:16 209:18
215:12 231:14
**informed** 15:23
50:5,8 79:19
197:10,14,16
198:1,4,16,18
202:20,22
212:2 220:9
222:9,13
230:14,21
**informing**
137:3 179:7
**informs** 203:4
211:18
**infrastructure**
26:11 37:8,13
226:24 227:6,8

**injured** 48:8
**inpatient** 74:3
**input** 196:16
197:3,18
198:13,24
200:24
**inputs** 186:21
**inputted**
198:15 201:2
**insert** 231:19
**inserted** 185:9
**inspect** 28:18
**inspection**
145:4,12
**inspectional**
46:2 84:11
88:15
**inspections**
147:9
**install** 24:17
43:23
**installation**
83:3
**installed** 17:22
**instance** 16:19
28:13 114:14
115:4 134:16
153:3 160:19
217:22 220:1
227:1
**instruction**
75:17
**instructions**
11:20

**insulation** 48:1
114:14,15,18
**insurance** 1:9
1:10 4:15 5:13
5:16,20 6:3,7
6:10,13,16,19
6:22 32:18
42:16,20 43:9
52:16 55:6,9
55:19 92:4
109:15 111:11
111:17 112:5
130:11 134:12
134:15 136:4
137:4,8,17
140:10,17
165:10,10
168:19,24
170:24 172:1
179:15 182:13
183:9 229:4
231:1,6,6
232:3 235:2
**intensity** 20:12
**intensive** 20:6
**intent** 61:20
82:14 186:5
**intention** 132:4
157:13
**interdisciplin...**
131:10 136:11
136:20
**interested** 8:23
236:17

**interfere** 231:19

**interim** 159:21

**interior** 135:19

**internal** 27:2

**interrupt** 154:2 157:21

**interrupted** 94:10

**interruption** 94:1

**interview** 92:23 92:24 93:6,7 219:4 229:14 230:5,22

**interviewed** 219:18

**investment** 165:23 166:6

**involve** 46:8

**involved** 12:10 47:18 48:3 145:3 155:2,4 160:12 161:14 179:7,8 180:1 187:9

**involvement** 27:7 74:10 110:12,20 179:9

**ipd** 219:6

**isd** 88:15

**ish** 53:3

**issuance** 146:8 176:7,8

**issuances** 187:1

**issue** 25:22 107:7 136:4 176:11

**issued** 12:6 25:22 29:22 34:8 52:17 60:20 61:15,16 70:18 72:19 77:8 93:5 94:20,20 109:16 124:2 124:16 139:24 140:14 149:19 151:9 152:9,18 159:14 171:8 173:23 174:20 188:1 191:16 191:16,20,21 191:23 207:19 215:8 225:2,9 225:20

**issues** 159:7,16 159:19 216:13

**issuing** 95:1 103:3 152:10 167:20 174:16

**item** 27:22 28:6 132:11,18 221:20

**items** 56:21 69:24 71:6,9

86:23 101:15 102:8,21 103:10 104:7,9 107:4 118:7 122:9 129:20 132:1 135:21 188:10 221:16

**iteration** 187:4

**j**

**j** 1:20

**jack** 92:3 174:6

**jan** 7:8

**january** 153:9 153:10,16 196:11 203:21 203:24 207:4

**job** 1:23 16:19 16:21 17:1,14 17:15 77:12 99:23 113:5 119:15 123:3 219:6 222:14 222:22 230:6,8

**john** 3:18 4:8 5:10,10 53:18 91:23 92:2 109:24 110:7 173:5,18,18 175:23 185:5 185:11 202:5

**july** 33:9 148:10,22 150:4,12

151:13 152:6 158:14,24 159:10 160:1 162:12 165:4 165:12,15 168:6 171:21 171:24 200:10 200:12 215:5 215:15

**jump** 136:7

**june** 3:14 4:22 13:11 14:8 30:10,24 42:10 97:21 102:1,8 102:20 103:1 104:9,10 126:13 133:12 133:19 144:22 145:3 155:17 204:13

**jurisdiction** 45:3,9,17 46:4 46:7,16,21 48:14,19 160:21 161:13 163:18,23 164:12,13

**justify** 187:17 187:17

**k**

**kaplan** 1:16

**keep** 30:6 31:21 37:9 47:2,3,3

53:7,9 60:5,11 72:3 122:9 174:6

**keeping** 21:18 147:22 154:21

**kept** 62:2 146:15 147:18 153:4 170:10 170:23 174:8

**key** 118:17,21 118:22 119:2 213:7

**kick** 200:11

**kidney** 3:13 5:7 13:11,14 30:11 33:2 147:18,22 148:10 149:6 149:17 154:20 155:2,9,11,19 156:3 158:24 160:1 165:14 168:7 169:10 210:3,5,9,17 212:1

**kind** 10:20 12:10 14:24 15:11 19:3,12 25:14 26:5 31:14 35:21 36:24 42:24 43:16,21 44:10 45:22 50:11 56:10 58:1 61:10 63:10

68:15 96:2 101:12 112:23 114:19 115:1 122:11 123:9 137:24 139:13 147:19 154:21 182:7 213:2,13 220:7

**kitchen** 37:23 38:15,23

**knew** 120:12 183:8 186:17 202:23

**know** 13:15,20 16:4 20:5 22:19 23:12 24:8 27:11 28:1,1 33:9 36:14 37:11 38:15 40:17 45:4 46:12,24 48:9 49:6 50:23 51:6,8 51:10,13 53:1 58:21 60:21,24 61:9,13,17,18 62:9 67:10 75:24 88:4,12 91:5 94:16,20 103:4 105:1,4 110:22,23 111:5 115:6 117:21 120:24 124:1,15 126:1

126:10,19 127:5 132:3 133:11 135:14 135:14,17 137:7,7,9,10 145:2 152:23 154:24 155:1 159:6,21 164:4 164:20 166:8 166:19 167:11 169:17 175:21 176:1 180:1,5 183:10,14 185:4,9,12 186:20 190:16 194:12,14 195:20 196:12 201:23 202:1 202:23,24 204:2,4 208:23 209:13,16 224:11 225:9

**knowing** 27:18 85:3

**knowledge** 22:1 45:12 130:8 152:16 161:15 229:7 230:18,18 231:22 236:8

**known** 159:10

**kronfeld** 1:5 8:14 235:2 238:4

**kusinitz** 1:15 8:20 236:3

**l**

**l** 2:4 17:3,4

**lab** 76:19

**label** 34:15

**labeled** 13:4 33:22 53:13 65:5,7 91:18 92:18 109:9 111:14 120:18 127:7 148:5 158:7 167:12 173:3 177:4,7 184:14 187:22 191:9,10,11 193:7,8,9 195:10,11 223:4

**laborers** 32:20

**lack** 179:9 229:20

**landed** 37:17 209:24 211:22

**large** 36:14 118:16 134:9 186:2,4 210:21

**largest** 15:7

**late** 205:1 222:5

**latest** 163:4,4 198:23 199:3

**launch** 34:22
**law.com** 2:5,5,6 2:6,6
**lawyers** 159:4
**layout** 35:17
**lead** 68:14 69:24 71:4,6,8 73:14 74:8,12 74:14 86:23 104:1,7 105:19 106:4,16 107:4 107:12 154:22 228:12,19
**leading** 12:22 53:24 54:18 109:21
**lean** 16:12,15 17:3,24
**learn** 30:20 51:2
**led** 95:6,17 152:4 211:13
**left** 97:3 102:1 203:20 209:1,3 209:14 210:10
**legal** 9:15,19 169:4,5,10,14 169:19 238:23
**length** 206:1,24 224:18
**lengthy** 122:8 154:14 228:11 228:19

**lesser** 18:2 167:11
**letter** 5:7 168:7 168:10
**level** 15:11 16:2 19:7,7,8 20:12 23:1,24 24:18 34:11 35:11 36:4,9,15 41:9 41:12 42:1 49:22 54:21 58:17,18 59:14 63:23 64:7 67:2,16 68:1 78:7 80:15 96:23 105:3 111:16 118:10 118:11 121:24 122:7 156:11 166:23,23 167:6,7,17,22 167:22 168:18 169:18 193:13 213:6 214:5 219:3 221:18 225:22
**levels** 35:10,14 36:8
**liability** 1:9 235:2 238:4
**license** 10:4
**licensing** 69:8
**life** 214:13

**lifetime** 229:2
**light** 103:16
**lighter** 101:18
**lighting** 38:23
**likely** 27:15 67:21 98:21 99:11 100:2 109:21 120:8 150:7 151:18 184:2 190:15 198:1 202:21 206:9 211:22 216:11,15 222:4
**limit** 12:12
**limitations** 60:6,12,23
**limited** 45:12 46:4,18 49:3 49:17 67:5 75:21 105:4 122:9 129:22 129:24 152:1
**limits** 43:14 133:14 134:10
**line** 24:5 27:22 27:24 28:6 30:12 31:9 41:13 57:9 60:5 62:3 108:15 122:20 137:24 158:21 159:4 208:15 208:20 209:1,4

209:14 210:10 212:3 235:6
**lined** 126:20
**lines** 22:10 39:4 39:7,20 119:3
**linking** 201:11
**list** 59:20 60:6 60:11 113:18 160:8,12,16 161:21 162:3,6
**listed** 101:16 101:19 103:10 104:9 113:22 125:4,13
**listened** 137:9
**listing** 58:22 60:2 104:11
**lists** 65:19 102:2,21 103:9 109:23 110:5 113:16 117:7 117:10 119:8 124:19 166:1
**litigation** 1:6
**little** 10:24 14:6 19:1,2,9,15 28:6 29:5 36:1 39:14,18 40:4 44:13 47:17 53:22 84:5,19 86:5,19 92:15 96:4 111:2 117:4 128:4 160:18 161:6

**[little - make]** Page 37

182:24 205:19 213:6 216:1 220:4 228:4
**live** 98:10,12,19 100:6 104:13
**lizza** 2:8 9:14 9:14 12:14 64:13,20 238:1
**llc** 4:12
**llp** 1:16,19 2:2
**loaded** 183:1
**locate** 97:14
**location** 182:1
**locations** 89:7
**lodge** 157:17
**log** 112:14
**logic** 197:10 200:21 216:10 218:15 225:21
**logistics** 15:20
**long** 14:10 17:14 31:6 33:7 37:22 50:6 51:19 52:1,5,9,12 68:14 69:24 71:3,6,8 73:13 74:8,11,14 86:23 104:1,6 106:16 107:4 107:12 141:6 166:8,9 171:19 171:24 197:22 224:24 225:6

225:13,15
**longer** 32:12,14 43:24 48:21 83:23 84:8,15 89:8,13 92:15 170:10,23 180:1 200:16 206:7,10 218:7 218:17 224:12
**longest** 215:20
**look** 51:19 55:11 61:13 65:22 88:18 113:4 133:22 184:6 196:21 215:24 220:4 222:6 223:17
**looked** 37:19 128:2 219:3 229:22 232:6
**looking** 16:9 53:20,20 59:14 95:13 132:16 159:4 216:23 218:4 222:3 225:10
**looks** 55:12,12 55:21 73:24 75:8 103:18 113:17
**loop** 147:18
**lorusso** 35:15 35:24 36:12 133:18 174:8

174:12
**losing** 83:9 140:23
**loss** 159:21 204:5
**lost** 127:10
**lot** 20:16 22:15 26:9,22,24 37:6,14 47:1 47:10 48:12 56:12,23 58:4 62:24 111:24 127:11 134:9 161:5 179:21 196:22 213:7 226:22
**lower** 28:6 113:13
**lrael** 2:6
**lucas** 2:4
**lull** 29:21,23 30:1 222:21
**lunch** 141:19 143:14
**luncheon** 143:18
**lyman** 9:19

**m**

**m** 104:1
**ma** 1:21
**madam** 94:8
**made** 36:1 60:19 63:11

97:16 149:10 154:24 155:9 161:19 163:17 170:9 171:18 183:5 202:14 222:5
**magnitude** 105:9 183:19 183:21
**main** 37:15,16 96:19 227:1,3
**maintained** 141:16
**major** 21:17 179:5 212:12 212:21 213:20 214:8 218:11 228:19
**make** 11:5 15:23 16:4 18:3,6 40:12 48:7 57:4 69:23 71:4,18 71:21 72:2,4,5 72:7,8,11,13 84:15 86:4,5 86:17 104:7 111:3,8 122:11 126:9,16 131:8 131:14 157:19 158:2 161:16 161:22 171:9 174:18 199:21 201:23 202:8

202:13 211:17 218:1,13 235:4

**makes** 220:11

**making** 16:18 16:20,24 18:5 222:4

**manage** 14:15 16:2 21:20 95:20 119:15 127:23 128:18 210:14

**manager** 14:3 18:23 46:5 96:7 147:7,10 154:9

**managers** 14:15,16,16

**managing** 15:8 99:13 145:4

**manner** 114:12

**manpower** 31:24 33:1

**manually** 201:12,15

**manufacturer** 161:8

**map** 119:23 184:8

**mapping** 39:20 40:12 133:23 134:7

**march** 1:17 236:6 237:7 238:3

**mark** 1:5 8:14 53:4 235:2 238:4

**marked** 8:9 11:8,9 13:1,3,7 33:18,21,23 39:19 53:10,12 53:14 54:1 64:22 65:1 91:13,15 92:12 92:17,19 95:4 95:18 109:6,8 109:11 120:10 120:14,17 144:2,9,14 145:7 146:11 148:2,4 156:18 157:11 172:22 173:1 176:21 177:1,3 184:11 184:13 187:19 187:21 191:1,4 193:1,4 195:4 203:9 223:1,4

**market** 41:15 41:18 42:5 49:23,23 54:22 105:15

**markings** 35:10

**markups** 24:5 169:14

**massachusetts** 1:3,16,17 8:16 236:1,4

**massive** 154:7

**master** 157:17

**match** 170:11 170:11 183:4 183:14

**matched** 134:23

**matches** 134:19

**matching** 134:20

**material** 21:21 103:21 104:4 105:19

**materialized** 48:17

**materially** 192:1

**materials** 16:21 17:10,13,17,20 83:21 85:23 106:8,12 122:23 123:1,7 183:7 199:15 228:20

**matrices** 111:1 115:16 136:12

**matrix** 64:4 112:14,21 115:21 116:1,5 116:15,22 128:1 129:5,15 129:17 130:9 131:5,7,22 132:2,6 134:4

136:19 140:3 141:11,13 142:20,23 147:24 154:7 154:15,17,19 155:6,12,18 156:9 180:13

**matter** 8:13 157:2,12 187:14

**matters** 236:9

**maximum** 21:1 80:11 83:15

**maze** 35:22

**mccarthy** 4:8 5:10 91:23 92:2 173:18,22

**mean** 16:15 17:9 19:23 21:10 28:13 38:22 58:6 59:18 68:7 73:4 82:24 85:14 86:7 88:18 89:12 93:4,17 98:12 101:17,17 102:10 104:22 106:18,20 121:6 122:20 125:8 126:12 127:18 134:14 140:8 141:12 154:5 164:2

172:3 176:6 177:16 186:22 197:5 201:1 203:5 213:18 220:19 222:20 225:2 226:14

**meaning** 43:16 43:21 126:14

**means** 20:6 57:11 58:21 63:7 83:5,13 83:20 96:3 98:5 114:9,19 114:22 115:6 122:21 135:12 138:18 166:5 174:4 175:22 203:23

**meant** 17:3 85:8 115:11 134:22 204:3 228:5

**measurements** 117:17

**measures** 48:9 89:18

**mechanical** 20:12 37:7 38:2 70:4 127:5,13,14,24 128:11 129:7 217:1 220:18 221:3

**med** 15:4 56:22 76:20

**media** 8:11 232:20

**medical** 15:3,6 20:14 31:3 56:23

**meet** 12:13,16 12:18 44:3 48:13 99:24 100:4 104:12 169:8 213:11 214:5

**meeting** 34:22 55:23 100:2 151:17

**meetings** 34:12 34:18 45:1,8 136:11,14 151:21,24 152:1,5,7 180:9,17,22 181:5,9 210:21

**member** 119:24

**members** 108:17 162:24 208:10

**memory** 12:10 33:16 38:13 41:21 43:12 48:24 120:15 166:21

**mentioned** 22:8 24:16 28:10

29:9 39:4,6,8 46:9 72:10 126:11 163:16 227:24 228:1

**mentions** 113:17

**mep** 20:12 26:11 69:22 70:3,8,11,21 71:1 72:1 73:2 78:4 82:19,24 83:3 86:21 87:1 106:16 107:4,13 147:7 147:10 154:9 179:3 216:4,7 221:6,12,15 226:23 228:8 228:21

**meps** 184:2,2

**merely** 187:10

**mess** 201:23 202:8

**messaging** 108:18

**metering** 28:19

**method** 15:18 103:5 117:15 117:20 219:19

**methodology** 121:12

**methods** 63:7 114:10,19,22 117:10 118:3

135:12

**mfleck** 2:5

**mic** 227:17

**michael** 2:3 5:4 9:7 151:12

**mid** 55:17 122:17 165:4

**middle** 106:1 162:12 222:22

**midpoint** 123:4 123:8,9,13 125:5,14 126:16

**milestone** 108:1 224:7 231:20

**milestones** 24:21 25:1,4 26:6 51:21 101:3 107:24 139:21 170:12 172:5 223:18 223:20,22 224:6 229:10

**million** 15:8 105:12 139:2 142:14 178:12 178:17 179:1 188:8,12,16,20 189:2,11,14,22 189:22 192:5 194:1,10,10

**millwork** 115:9 135:7,14 136:6

179:21,23
**mind** 32:17,19
  64:10 88:5
  94:9 131:1
  139:1
**minds** 88:19
**mine** 31:1
  108:8
**minimal** 19:10
  27:21
**minor** 169:14
  171:17
**minute** 64:12
  76:2 194:22
  226:2
**minutes** 53:1
  227:13
**missed** 95:8
  132:1 172:5
**missing** 138:20
  173:11 175:22
**misspoke** 73:21
  73:22 74:5
**misunderstood**
  81:14
**mitigate** 40:13
  47:21 97:18
**mitigating**
  50:10
**mitigation** 29:3
  48:20
**mobile** 76:21
**mobilization**
  80:20 81:16

85:18 86:20
97:6,9,24 98:4
102:2,15
196:23 197:5
199:7 201:2,5
222:9,10,12,13
222:15
**mobilize** 68:17
  199:11,13,13
  211:19
**model** 19:7
  41:7,8,14 42:3
  54:22 104:16
  104:21,22
  105:3,5 159:5
**modifications**
  171:18
**modify** 231:19
**moisture** 35:12
  39:20,21 40:12
  133:22 134:7
**mold** 32:15
  39:17 40:13
  47:22
**moment** 28:10
  92:8
**monday** 233:11
**month** 33:8
  34:4,8,9 51:13
  83:24 84:6,9
  84:19 85:2
  90:10 125:3
  172:5,7

**monthly** 3:15
  12:6 34:3,5
**months** 29:23
  58:16 124:21
  125:1 145:17
**morning** 9:6
  10:9,10 165:18
**move** 17:18
  70:10,12 92:11
  114:17 115:7,9
  227:14
**moved** 169:19
**moving** 30:6
**mpt** 12:22
  151:16,21,24
  152:3 159:4
  165:23 166:6
**mpt0022791**
  4:16 109:9
**mpt0022799**
  137:14 143:5
**mpt0022861**
  121:19
**mpt0022945**
  141:22
**mpt0022946**
  189:8
**multidiscipli...**
  63:9 114:12
**multidiscipline**
  114:12
**multipage** 4:20
**multiple**
  137:14

**myers** 1:21

**n**

**n** 3:1 8:1 17:3,4
**name** 8:18 9:6
  9:8,10,12,14,17
  9:19 110:2
**named** 235:4
  236:7
**names** 35:23
**napkin** 19:10
**narrative** 42:2
  112:11 116:3
**narratives**
  111:1 115:23
  115:24
**narrow** 210:22
**nature** 139:14
**near** 97:3 188:3
**nearly** 212:20
**necessary**
  62:17 149:24
  182:20 214:20
**need** 9:20 16:23
  17:10,18 23:13
  29:7,23 30:1
  32:4,8,11 33:1
  47:2,2 56:6,19
  57:10 68:13,14
  68:15 76:2
  88:14 92:8
  99:23 100:24
  106:22 114:14
  114:16,16

**[need - noticed]** Page 41

115:2 143:1
149:1 150:12
152:14 153:5
153:17,24
155:20 166:21
209:8 213:3
218:6 232:23
233:3,5,8,10

**needed** 17:14
29:21 31:11
44:7 46:23
48:4 50:15
51:21 57:4,21
57:23 64:2
107:8 114:20
128:3 130:5
147:9 149:3,5
150:5,19
153:13 154:12
160:23 161:13
180:19 198:19
201:10 202:14
227:2

**needing** 58:3

**needs** 19:12
20:14 56:24
59:5,10,12
63:3,22 83:4
134:2 151:18
153:23 161:1
213:12 214:3,5
215:9

**neither** 236:14

**never** 130:11
130:17,17
186:1 224:22
229:1

**new** 14:19 15:6
15:8 26:22
29:5 41:15,18
42:5,5 48:1,1
60:17 92:24
108:3,22
149:18,21
163:7 169:18
175:8 215:1
219:4,17

**newer** 149:20

**news** 30:22

**nfa** 43:7 44:8
63:10 130:2
134:9,19 135:1
135:6,21 136:1
136:9,14,24
137:1,5,7
179:6 180:1,5
180:21 182:7,7
182:18

**nfa's** 136:13
179:9

**nice** 141:20

**nontraditional**
213:7

**normal** 185:17
212:19 216:6

**normally** 15:17
47:15 58:13

72:16 190:14
194:18

**norwood** 3:15
4:3,5,9,12,14
4:17,21 5:13
5:16,19 6:3,6,9
6:12,15,18,21
7:3,7,10 30:12
30:16,21 32:9
33:14 34:6,22
35:3,5,17
36:10 37:1
39:9 42:13
43:11 45:9
46:1,2,17
47:19 48:21
49:18 52:6,10
52:13,22 54:2
54:11 62:18
65:16 81:22
82:7 88:2,10
88:23 92:24,24
93:3,11,19,24
94:18,23 95:2
96:22 98:16
99:2,20 100:5
104:16,20
105:7 107:19
108:4,9,12
109:3 111:11
111:17 113:23
123:24 124:6
124:11 125:15
126:24 130:22

133:11,18
135:2,5 136:2
137:16 138:8
140:6 142:10
145:18 151:3
155:5 156:6
161:4,17
164:17 168:19
182:20 190:13
193:20 195:15
195:21 203:12
204:6,12
206:14 208:6
209:5 212:16
214:11 215:18
219:4,4,12,17
225:1,7,16
226:12,16,18

**notarial** 237:7

**notary** 1:15 8:5
10:5 236:3
237:11

**note** 57:10
69:18 71:17
119:2 173:10
238:10

**noted** 115:4

**notes** 118:17,21
118:22 130:14
185:7,9 186:21
213:7 228:2

**notice** 3:11

**noticed** 175:24

**[noticing - okay]**

**noticing** 9:5
**notify** 147:12
**noting** 35:11
**november** 75:8
  75:13 76:11
  79:1 98:1,17
  99:20 127:21
  146:21 147:4
  153:8 184:24
  213:24 215:5
**number** 8:16
  14:2,5 16:17
  19:15 22:19,20
  22:20 23:14
  29:24 34:15
  44:4 58:19
  65:11 67:8
  68:23 92:7
  93:20 97:17
  102:20,21
  103:8,9 109:12
  109:14,16
  113:16 119:10
  121:19 122:13
  123:20 127:4
  128:9 132:11
  137:13 139:4
  141:22 144:19
  156:12 165:13
  170:6 189:8
  210:21
**numbered** 65:6
  96:13 107:15
  221:9

**numbers**
  137:14 138:23
  153:4 182:3,5
**numerous**
  35:21

**o**

**o** 8:1
**o'brien** 1:14
  3:3,13,18,21
  4:8 5:3,7 8:12
  9:17,18 10:1
  65:8 144:7
  173:4 191:4,12
  193:10 195:12
  223:3 234:2
  235:3 238:5
**oath** 8:21
  236:11
**object** 38:8
  40:8 54:5
  62:19 90:11
  136:17 149:7
  155:21 156:7
  159:12 164:1
  166:18 169:11
  175:20 182:11
  182:22 186:16
  204:24 228:6
  230:4 231:23
**objection** 8:24
  79:3 82:12
  157:17,22

**objections** 8:6
  10:23 158:2
**obvious** 63:2
**obviously**
  10:23 56:14
  58:11 97:1
  122:7 154:23
**occupancy** 44:3
  69:8 200:10,20
**occupied** 89:8
  89:12,15,16
**occupy** 88:14
**occur** 46:22
  72:8 138:14
**occurred**
  140:20 147:23
  209:5
**occurring** 82:8
  85:21 146:17
  147:4
**oct** 7:4
**october** 3:21
  51:10 53:18,24
  54:18,19 55:3
  55:9,15,17,17
  55:17 56:1
  57:18 60:15,20
  61:4 62:14
  65:13 66:3,6
  76:16,23 77:7
  77:22 78:24
  91:6 97:22
  195:17,22
  196:1 221:7,11

**offer** 14:2,3
  15:14 33:3,10
**office** 15:6
  84:12 119:14
  119:14
**officer** 9:15
**offices** 1:16
  37:21
**officially** 161:5
**oh** 44:16 57:24
  69:6 95:24
  96:15 132:16
  141:12 202:3
  209:10 227:17
**okay** 10:13,18
  10:20 12:13
  38:10,12 40:16
  53:5,9,21
  54:17 62:21
  64:9 65:11
  69:6,11 70:23
  75:3,11 79:21
  84:4 87:21,24
  88:7 89:5 90:9
  92:11,14,15
  95:8,16 97:8
  97:12 100:19
  105:5 107:10
  111:14 113:16
  113:21 115:6
  117:7 120:16
  120:19 121:20
  125:3 126:22
  128:9 129:6,18

132:16,17
135:1,19
141:23 144:11
145:6 152:23
153:8 156:22
157:4,8 161:15
166:20 168:9
168:16 170:20
172:12 175:10
190:11 191:7
194:6,18,21
196:10 202:7
204:11 205:7
205:19 206:7
207:9 211:2
223:20 227:12
227:21 229:13
231:7
**old** 10:19
**older** 37:12,19
37:23
**once** 10:15
38:24 49:22
54:24 79:6
103:2 113:3
122:21 176:12
180:21 190:22
201:1 222:8
225:18
**ones** 56:13
101:17,18
136:7 153:21
164:10 210:1
221:3

**ongoing** 86:3
229:3
**online** 50:13
**open** 17:16
39:16 56:14
67:4,7 71:23
**opened** 39:14
**opening** 40:4
49:2 71:24
226:23
**operating** 15:4
20:7,17
**operational**
49:12
**opinions** 161:7
**opposed** 169:10
199:1
**option** 166:22
167:4
**options** 15:20
41:15,19 42:4
168:14
**order** 5:15,18
5:21 6:5 7:5,12
29:18 30:4
68:14 86:17
101:10,23
104:7,12 105:8
111:21 114:15
114:18 115:8,9
116:5,14
117:21 121:3
121:13 130:20
177:5,7 183:19

183:21 184:14
185:18 187:22
195:11 205:2
223:4 233:7
**ordered** 123:2
123:8,9
**organized**
73:24 160:23
**original** 149:9
164:19 180:15
185:15 191:22
**originally**
235:5
**outcome** 8:23
**outline** 60:22
63:15 66:11
**outlined** 67:18
68:21 74:1,23
82:15 84:20
85:10 93:21
230:6
**outlines** 96:24
**outs** 14:18
**outset** 78:9
80:13
**outside** 21:20
45:17 138:1
150:8 208:13
**outstanding**
55:21 56:21
**overall** 215:24
216:2 217:21
220:8 222:14

**overarching**
81:21
**overhead**
188:13
**overlap** 81:24
101:10 218:22
218:24
**overlapped**
224:13,14
**overlapping**
82:3 101:4
217:18 219:9
**overlaps** 85:18
**overruns** 29:17
**overseas**
228:13
**overtime**
206:19
**overview** 67:2
130:19
**overwhelmed**
31:19,20
**overwhelming**
129:19
**own** 21:22
66:11 134:18
199:24
**owner** 18:13
25:5 29:18
30:4,7 87:16
88:8,24
**owner's** 14:3

**[p - percentages]**                                      Page 44

| p | | | |
|---|---|---|---|
| **p** 8:1 104:1 | 175:23 178:2 | 230:22 | **patients** 31:21 |
| **p.m.** 144:4 | 189:7 193:10 | **partial** 36:4 | 31:22 32:7 |
| 233:17 | 194:4 221:8,19 | **partially** 89:15 | 47:13 56:14,16 |
| **p6** 51:19 52:1,5 | 235:6 | **participate** | 89:19 108:16 |
| 52:9,19 124:1 | **pages** 1:1 3:16 | 46:6,14 | **pattern** 20:2 |
| 171:16 195:15 | 3:22 4:4,10,13 | **particular** | **paul** 2:11 8:18 |
| 195:20 225:12 | 4:16,22 5:4,8 | 34:10 58:23 | **pause** 10:24 |
| 225:20 226:1 | 5:11,14,17,21 | 60:3 108:1 | **pay** 30:2 |
| **package** 103:19 | 6:5,8,11,14,17 | 114:13 117:24 | **pbs** 1:8 8:17 |
| 106:23 | 6:20,23 7:5,8 | 119:1 153:21 | **pdf** 196:8 |
| **page** 1:24 3:8 | 7:12 23:4 | 164:3,14 203:5 | 201:18 203:18 |
| 3:14,19 4:2,6 | 24:10,10,11 | 212:15 213:23 | **peluso** 2:4 |
| 4:18 5:2,6 6:2 | 100:16 144:13 | 226:23 228:7 | **penalties** 234:4 |
| 7:2 13:10 24:1 | **pains** 234:4 | **particularly** | **pending** 44:13 |
| 24:8 34:14 | **painting** | 142:18 229:23 | 44:18 177:18 |
| 40:15,16 41:10 | 135:16 136:6 | **parties** 5:8 8:4 | 177:18 |
| 49:1 51:15,15 | **painting's** | 236:16 | **people** 31:19 |
| 87:20 96:12 | 135:17 | **partitions** | 32:4 53:18 |
| 104:15,15 | **panel** 26:14 | 39:22 | 84:12 95:7 |
| 109:23 112:7,7 | 28:19,21 37:18 | **partners** 103:1 | 165:1 210:18 |
| 113:11,13 | 145:10 153:2 | **parts** 82:6 | 210:22 228:14 |
| 114:1 117:1 | **panels** 135:13 | **party** 8:22 | **perceive** 231:9 |
| 119:7 121:18 | **paper** 50:1 | **past** 10:14 12:5 | **percent** 106:21 |
| 122:13 125:6 | 196:7 | 12:7 19:14 | 119:11 132:11 |
| 127:3,6 128:10 | **parking** 96:19 | 20:24 130:18 | 132:19,22 |
| 129:12 132:9 | **part** 18:23 27:8 | **path** 140:9 | 217:13,19 |
| 132:14,15 | 38:1 80:10 | 217:7,10,14 | 218:10,21 |
| 133:1 137:12 | 118:16 134:9 | 219:23 220:21 | 228:24,24 |
| 137:14,21 | 140:14 141:16 | 221:16,20 | **percentage** |
| 141:21 142:3,3 | 156:24 175:9 | 222:5,11,15,18 | 27:23 59:3,4 |
| 143:5 148:8 | 175:24,24 | **patient** 98:14 | 120:6 133:15 |
| 156:14 173:8 | 182:15 183:5 | 98:16 198:13 | 139:9 188:17 |
| | 202:23 207:20 | 199:5 204:9 | **percentages** |
| | 210:6 217:24 | | 119:20 |

**perform** 114:21 198:4
**performed** 39:21 167:13 230:23 231:10 231:12
**performing** 21:3
**period** 17:22,22 51:11 83:23 84:5 85:1 100:9 129:22 129:24 135:23 145:22 206:10 229:3
**periodic** 156:4
**perjury** 234:5
**permit** 44:2 45:14 46:16 47:8 68:15 196:23 199:12
**permits** 45:17 46:23
**permitted** 56:16
**permitting** 46:8,19,21 47:5 48:15 77:11 79:6,15 83:23 84:5,8 84:13,15,18 85:1 87:17 203:3

**person** 236:6
**person's** 202:9
**personally** 130:18
**personnel** 121:2 206:9
**perspective** 32:10 34:12 48:4,5 111:7 114:10 131:14 179:4
**pharmacies** 15:5
**pharmacy** 20:8
**phase** 18:4 24:20 25:13 27:18 28:4,7,8 70:24 71:13 73:15,17,18,19 73:19,21 74:2 74:3,6,22 75:3 75:5,7,7,7,11 75:11,11 76:16 76:18 77:4,6 77:14,15,21 78:23 80:16,20 81:1,3,7,15,15 81:16,18,23 82:4,8,10 86:3 89:6 97:9 106:24 126:3 126:24 218:10 218:11,12,16 220:1

**phase's** 81:16
**phased** 50:12 82:16 89:22,24 219:21 226:13 226:14,16,17 226:22 227:5
**phases** 25:6 74:16,19 81:13 81:19,23 89:7 89:9,14 212:13 219:8,11
**phasing** 74:1
**phone** 152:3 211:3
**phrase** 16:13 231:2
**physical** 54:7,9 54:10 97:13 145:14,14
**physically** 196:6,8
**pick** 11:3
**piece** 115:7 147:13 148:24 196:6
**piecemeal** 45:22 227:7
**pieces** 28:18 50:1 145:10 153:3 154:16 228:16,16,20
**pipeline** 216:13
**pipes** 114:17

**place** 48:5,9 54:7,9,10 61:22 97:8,21 108:4 127:20
**plaintiff** 1:7,23 9:11,13
**plan** 4:3 22:22 49:2,16,20,23 50:2,8,10,12 51:6 54:24 63:22 65:16 66:22,23 67:3 67:14,17 68:21 75:21 76:7 89:21,23 91:2 91:6,9 226:16
**planning** 18:18
**plans** 42:9 64:2 64:4,6 84:16 115:3,24 133:23 138:19 214:13
**plate** 20:10
**play** 87:11
**played** 137:2,3
**plays** 80:7
**please** 8:24 94:11 168:17 173:10 233:5
**plumbing** 20:13 24:3 37:7 38:2 70:5 129:8 217:2 220:18 221:4

point 15:2 17:21 33:9 36:16,18 54:16 58:3 61:7 71:17 82:19 83:10,22 94:13 103:21 118:12 122:17 128:16 131:7 145:16 145:19 151:2 164:2 170:17 172:4,13 177:17 180:14 188:3,12 190:16

points 69:18 71:16,17

poke 28:14

policies 43:9 136:4 183:10

policy 43:11,13 63:10 134:11 134:12,15 137:1,4,4,10 179:7,13,15,18 182:13,19 183:9

poorly 60:7 61:5,6

populate 201:10

portal 47:6

portion 184:3

portions 82:16 133:10

position 123:10

possible 32:12 55:24 61:21 71:7,10 76:7 87:10,16 111:9 176:9 201:4 221:22 222:1,6

possibly 17:11 55:20 70:5 179:23 190:19 201:22 210:3

post 83:9

potential 40:13 224:18

potentially 121:9

power 72:2 227:3

pre 27:8 40:20 86:20 97:6,9 102:2,15 106:7 106:15,18 107:12

preceded 121:10

preceding 177:21

precise 117:22 146:19

preconstructi... 3:16 12:6,7 15:14,15 18:1

18:4 25:7 34:3 34:5 52:4 126:3,17

predictable 228:9

preliminary 7:7,11 208:11 216:8 223:13 230:15

premiums 113:5 117:11

premob 97:4

preparation 110:12

prepare 12:1,3 12:14,19 25:19 67:19 171:13 186:13,15 215:16 219:12 230:22

prepared 41:23 52:8 67:10 84:18 93:13 126:23 134:8 142:1 177:15 179:5 225:11 231:16 232:2

prepares 110:9 110:10

preparing 68:19

presence 230:17

present 1:18 2:1,11 9:2 93:10 181:8

presentation 93:10,13 95:4 95:13,18 99:6 99:18 100:12 100:14 107:17

presumed 126:23

pretty 20:23 85:5,7 212:23

previous 31:7 34:9 158:18 187:3 201:8

previously 85:4 149:19 179:6 179:12

price 41:23 80:11 83:15 105:6,21 116:10

priced 20:21 50:4 64:3 113:5 215:2

prices 21:2

pricing 22:7,8 22:21 31:3 107:9,9 117:12 211:23

primavera 52:2 69:12 196:17 197:18 198:14 201:17,22

202:2 203:18
**principles**
16:12,15 17:24
**print** 201:17
**printed** 196:5,6
196:9 203:18
203:24
**prior** 11:23
39:2 54:19
68:18 81:11
83:11,17 87:5
87:12 93:22
102:17 127:22
145:6 150:12
152:10 185:23
195:22 220:23
221:23 224:20
225:5,15 228:9
**privilege** 8:6
157:15
**probably** 15:2
35:20 36:1
47:14 73:20
95:6 135:8,9
150:15 162:1
189:4 201:1,2
202:19,21
222:2,5 227:12
**procedure** 1:15
**proceed** 75:17
**proceeded**
167:16
**proceeding**
8:24

**process** 17:19
29:6 32:24
47:5 61:11
63:17 68:3
71:12 72:20
73:3,4,10
77:10,13 89:1
95:22 128:19
131:7 140:9
153:24 154:14
155:24 165:5
170:11 174:18
180:22 210:14
214:9 219:2
**procured**
228:13
**procurement**
68:14 71:6,9
72:23 73:12,14
73:16 74:9,12
74:14 77:10
102:2,9,10,24
103:9 106:5
107:3 196:24
199:9,22 200:2
201:4 216:6,11
216:15,16,22
217:8 222:10
222:14 228:3,7
**procurements**
229:8
**produced** 27:5
**product** 157:15

**production**
10:4
**professional**
1:15 9:17
**professionals**
180:24
**profile** 96:2
**program** 14:20
19:12 20:4,5,6
20:11 21:5
22:3 23:6
37:19 50:13
67:6 89:7
117:11 196:4
198:9 199:2,4
**programs**
20:20
**progress** 27:5
118:18
**progresses**
19:16 23:22
24:6 27:6
138:24 185:20
186:7
**progression**
24:13 212:19
215:8
**progressive**
93:18 95:19,23
**project** 4:12
7:8,11 14:3,9
14:10,13,15,16
14:16,17 15:7
15:24 16:3,5,6

18:11 19:9
23:5 24:9,22
25:12,18,23
26:1,5,7,13,16
26:21 27:6
28:12 29:1,8
29:24 30:6
31:2 48:22
54:13 58:13
63:16 75:17
78:9 80:7,10
80:13 81:21
83:19 84:1,15
86:10 88:2,9
90:5,6 93:1,3
93:18,20 95:21
96:2,14 99:10
101:8 106:9,13
108:17 122:24
123:23 124:5
126:10 130:7
138:15 139:23
140:10 170:16
185:19 187:10
196:20 197:4
200:9 206:13
208:11 213:19
213:23 214:1
216:1,9 219:7
219:14 220:11
223:14,17,20
223:22 224:6,7
225:13,16
230:17 231:10

232:3
**projects** 14:17
  14:21,22,24
  15:3,13 18:14
  19:4,14 20:3
  21:1 27:13
  31:4,7 88:22
  99:12,14
  139:21 185:24
  212:12
**prompted**
  210:24
**pronouncing**
  110:2
**proof** 159:21
**proper** 56:18
**proposal**
  102:14 168:11
  168:18,23
  169:2,8,18
  170:6,22 171:5
  171:21 175:15
  207:20 229:14
**proposed** 96:21
**proposing**
  101:7 102:7
  104:11 106:4
**protect** 37:11
  47:12,12 60:22
**protecting**
  32:10
**protection**
  20:13 37:8
  70:5 136:7

217:2 220:18
221:4
**prove** 224:14
**proved** 225:23
**provide** 11:7
  15:12,18 19:3
  31:10 69:5
  79:17 107:2,11
  135:6 160:6
  162:2,23 163:8
  165:22 190:21
  192:19 197:23
  198:8 228:4
**provided** 68:24
  69:2,3,9 75:4
  76:9 79:11,23
  99:1 114:7
  132:2 136:14
  172:22 174:6
  175:11 202:12
  203:7 205:4,8
  207:7 227:8
  230:13
**provides**
  192:18,20,21
  193:17
**providing**
  34:11 42:19
  80:12 114:23
  136:1 150:10
  163:21,23
  168:23 176:14
  229:4

**provision** 31:14
  179:19
**provisions** 47:1
  179:14 183:10
**public** 1:15
  10:5 236:3
  237:11
**published**
  51:14 155:8
  177:12
**publishing**
  153:22 154:4
**pull** 61:24
  207:2
**pulled** 46:23
  50:7
**pulse** 105:15
**pumps** 32:5,21
**purchase** 106:7
  106:24 122:23
**purpose** 149:10
  208:23
**purposes** 37:10
  121:14 128:20
  131:18 206:17
  213:5
**pursuant** 1:14
**pursuit** 219:17
**pushed** 62:5,7
**pushing** 151:16
**put** 19:14 48:1
  50:23 51:2
  75:22 76:13
  80:23 95:17

100:13 105:6
108:15,18
111:21 125:18
134:13 157:7
179:19 180:2
184:22 196:14
197:1 211:2
229:9,21
**putting** 48:5
  61:9 78:21
  146:4

**q**

**qualifications**
  59:20,24
  112:21 116:4,7
  121:22 122:2
  128:6
**qualified**
  122:11
**qualifying**
  57:12 58:7
  59:18
**quality** 111:7
  131:13 202:13
**quantifiable**
  118:6,7
**quantify** 19:20
  22:18 23:22
  58:20,24 59:17
  118:13
**quantities**
  117:17,22

**quarter** 199:14
**question** 76:4
77:2 81:14
82:5 90:12
94:9,12 95:24
130:16 131:2,3
149:17 152:16
155:22 160:20
176:8 182:23
183:1,2 205:1
205:20 207:8
209:17 211:1
224:10 232:13
**questioning**
157:18
**questions** 10:22
11:1 26:9,17
45:15 111:6
157:24 160:8
160:13 161:21
161:24 162:3,7
162:12,14
174:16,19
227:10,13
229:13,17
**quick** 57:20
58:12,17 59:15
64:9 65:4
**quicker** 167:4
**quickly** 31:23
32:12 47:22
61:21 227:14
**quite** 130:24

**quote** 113:8

**r**

**r** 8:1 234:1
**rael** 2:4
**range** 51:19
52:1,5,9,13
**rate** 121:3
206:6
**rates** 119:24
228:24 229:1
**rather** 17:4
19:19
**ray** 75:2 76:21
**reached** 33:11
153:19
**reaching** 165:1
**reactivate**
75:18 81:22
**reactivated**
82:9
**reactivating**
74:2,24 75:24
**reactivation**
67:3 76:7 77:5
78:10 82:4,8
89:21,23 91:2
91:6,9 219:11
226:16,18
**read** 8:4 12:5
94:12 131:3
137:13 156:12
166:21 221:3
233:6 234:3

235:6 238:9
**readily** 31:10
**reading** 94:9
103:15 131:1
209:11 237:2,3
237:4
**reads** 138:3
**ready** 73:6
199:11
**real** 21:15 65:4
140:10 154:15
155:6
**realistic** 77:15
79:24 100:1
**realized** 153:2
153:5
**realizes** 151:18
**really** 15:22
16:4,24 19:8
19:10 21:20
22:14 25:17
26:21 35:23
45:11 55:5
63:17 80:15
87:18 88:4
92:9 95:21
118:12 132:3
133:21 139:1
153:19 160:22
163:14 170:24
173:16 208:23
214:14 219:3
222:2

**reason** 187:17
235:6 238:11
**reasonable**
77:20 79:1
**reasons** 190:2
**recall** 49:16
50:4,9,20
52:11,12,19,23
54:13,15,23
55:1 60:14
66:15,18 79:12
79:16 85:8
90:22 91:11
92:9 93:5,16
94:15 99:6
124:4,9,14,14
128:15 131:24
133:13,16
136:1 140:19
145:1,13
146:19 150:11
150:16 151:24
162:1,5 164:6
167:15 172:4
173:15 177:13
178:12 181:13
191:18 200:1
211:13,21
219:10 225:11
225:18
**receipt** 238:17
**receive** 16:8
94:22 111:20
113:21 117:17

141:1 151:5 188:2 197:20 202:16 208:4,9
**received** 49:21 49:24 51:12 55:13 58:10 111:23 149:21 174:15 177:22 198:18 215:21
**receiving** 93:22 147:3 156:3 176:3 204:20
**recent** 30:17 193:19 200:23
**reception** 75:1 76:21
**recess** 64:17 94:5 143:18 172:18 195:3 226:7
**reco** 37:3
**recognition** 150:5
**recognize** 11:9 13:7 33:23 53:14 67:8 92:6,19 109:11 120:20 138:20 144:14 149:19 184:18 195:12 223:3
**recognized** 220:5

**recognizing** 122:5
**recollection** 33:12 36:24 38:3 177:21 210:12
**recommend** 40:6
**recommendat...** 40:12
**reconnected** 33:13
**record** 9:4 33:21 64:16,19 65:4 80:4 94:2 94:4,7 143:17 144:5 157:8 158:2 172:15 172:17,20 191:8 195:2,7 226:6,9 232:17 232:19,21 234:6 236:13
**recorded** 8:12
**recross** 3:2
**red** 117:1 138:3 161:7 180:10 212:4 217:9
**redirect** 3:2
**reduce** 28:5
**reduced** 149:12 149:13 179:17 189:21 207:23 236:11

**reducing** 149:13
**reduction** 189:24 190:2 217:20
**reductions** 190:6
**refer** 99:5 110:16 131:12 231:4
**referenced** 238:6
**references** 178:3
**referred** 58:7 148:22 159:11 160:13 162:3
**referring** 56:11 83:12 93:8 109:2 110:18 118:21 159:13 159:19 160:24 219:16
**refine** 180:18 215:12
**refined** 27:4
**reflect** 149:3 163:12 165:6 177:20 220:14 227:5
**reflected** 19:21 70:21,23 75:19 131:22,22 132:6 148:19

155:12,18,19 156:5 177:16 179:2 180:19 219:14,19
**reflecting** 151:2 176:16
**reflects** 121:12 181:21 207:22
**refresh** 12:10 33:16 41:21 166:21
**regard** 40:6 135:2
**regarding** 26:6 27:3 45:9,15 46:16 57:17 66:20 99:9,16 113:22 124:10 136:10,14 146:5 156:4 161:3,17 162:20 163:22 164:17 202:17 208:5 224:18
**regardless** 79:23 88:17
**registered** 1:15
**regular** 152:5 154:21 155:14
**regularly** 155:5
**regulatory** 77:13 83:23 84:5 85:1 87:17,22 88:2

88:9,12,13,24
100:23 163:13
218:8
**relate** 175:5,8
**related** 8:22
40:23 43:19
45:14,19 49:11
55:5 66:21
168:19 179:7
179:13 181:17
190:13 194:13
209:19 236:15
**relates** 206:2
**relating** 42:20
43:5
**relationship**
30:23 125:4
170:18,21
**relationships**
63:20 197:16
220:8
**relative** 27:4
126:13 229:9
229:21
**relatively** 188:3
**relay** 136:9
**relaying** 57:6
147:16
**release** 69:24
71:3 83:13
103:22 104:5
106:19,20,23
**released** 83:21
104:8 123:2

**relied** 116:20
130:20 142:19
205:8
**relocate** 17:18
**relocated** 29:7
**rely** 57:6
**remain** 32:14
128:23
**remains** 186:8
**remember** 33:7
33:8 36:16,20
36:22 38:17
41:22 49:21
52:15 60:13,16
66:2 90:21,24
92:9 94:21
95:11 96:11
98:22 99:4,15
99:17 109:22
111:24 120:5,8
123:21 124:2,8
124:16 135:10
135:24 145:14
146:23 151:6
152:3 160:14
160:14,15,17
169:21,23
172:7 176:13
178:8 181:10
191:20 195:23
209:16,18,23
209:24 210:22
212:2 214:12
214:12,14

225:9 229:16
231:1
**remembering**
118:16 169:15
207:19
**remind** 133:23
**remotely** 9:3
**removal** 38:15
59:1
**remove** 114:16
135:13
**removed** 38:17
56:15 179:19
**renovate** 94:23
95:2
**renovation**
4:18 26:19,23
28:13 69:21
70:9 88:3,22
185:24 203:12
**renovations**
14:18 89:8,12
89:17
**rent** 29:21
**reopen** 51:3
56:19 67:4
226:16
**reopening**
49:16 50:2
89:22,24
226:18
**repaint** 48:2
**repair** 94:23
95:2 214:19

215:18
**repaired**
134:21
**repairing** 213:2
**repairs** 38:6
**repeat** 76:4
80:22 130:23
**repeating**
157:22
**replace** 26:14
42:24,24 43:15
43:18,21,22
44:10,11 58:1
93:24 94:18
96:22 99:2
100:5 104:20
112:23 114:14
115:8,10
135:13 183:3
**replaced** 59:5
59:10,12 63:4
64:20 128:3,13
128:23 133:3
134:3,24 149:2
155:20 227:2
**replacement**
4:10,12 41:15
41:18 45:21
56:22 59:3
93:1,3,20
95:20 101:8
105:6,11 109:2
119:3 127:14
128:11 129:2,7

132:12,20,23
134:11 152:9
**replacements**
149:12
**replacing** 45:22
58:22 59:7
99:20 213:2
**report** 3:16
4:22 5:20 34:3
34:5 42:14
43:6 51:14
61:14 112:8,11
114:4 121:17
121:18 122:2
124:12 127:4
131:19 132:15
135:12 141:22
144:18 146:8
148:14,18
151:9 152:11
152:19 154:8
156:10 159:14
163:13 176:17
179:4 184:21
185:15,17
189:15 190:9
190:23 194:19
207:11
**reporter** 1:15
8:19 9:20 11:3
94:8,10 209:8
232:23 233:2,8
233:11,15

**reports** 12:5,7
60:7,14,16
61:16 62:2
63:1,14 113:18
113:21 114:2,7
114:11 129:21
130:3 134:7
146:4 163:5
187:9 190:12
194:12 224:20
229:11,24
231:15 232:2
**represent** 9:16
**representative**
18:21
**representatives**
45:2 124:10
151:22 202:17
224:18,24
225:5
**representing**
8:18
**represents**
196:13
**request** 162:19
**requested**
93:16 95:10,19
237:2,4
**requesting**
95:14,17
168:11
**required** 29:4
50:13 67:6
111:2 112:24

113:6 119:23
215:1
**requirements**
44:5,18 48:15
55:22 56:12
93:21 99:24
119:14 164:4
205:18 228:14
**requires** 72:1
**reserved** 8:7
**resiliency**
37:10
**resource** 15:22
**resources**
31:11,15
**respect** 19:4
48:21 68:11
73:8 76:17
114:24
**respective** 8:4
81:19
**respond** 31:23
51:13
**responded** 33:2
**responds**
173:22
**response** 13:16
32:17 47:1,17
47:19 93:14
152:4
**responses** 11:3
**responsible**
16:2 18:22
80:6 153:21

**rest** 77:11
116:9 132:5
201:7
**restoration**
41:15 48:22
52:6,10,13,21
54:22 57:5
61:5 88:10
123:24 124:6
124:11 125:15
126:24 130:22
138:8 140:6
151:3 156:6
194:9 204:12
206:13 212:7
212:10,16
213:1,15 224:2
224:3
**restore** 62:18
182:20 225:1,7
225:16
**restoring** 42:6
107:19 108:9
**result** 87:13
133:19 135:11
141:10 210:16
228:11
**resulted** 217:20
**resulting** 60:8
143:1
**results** 145:24
146:9,13,16
147:15,16,20
147:23 149:11

153:1,20,22 154:4,13,16,24 155:6,8,12,16 155:17

**resume** 172:8 172:11

**retained** 232:20

**retreading** 143:4

**return** 238:13 238:16

**review** 7:4 11:22 41:20 55:23 70:15 76:2 83:15 84:16 110:22 111:2,5,6 114:11 130:3 187:3 238:7

**reviewed** 12:7 12:9,12 136:12 180:11

**reviewing** 66:4 69:6 76:3 92:8 100:22 103:17 133:5 136:6 156:14 166:22 186:22 194:6 207:17 216:17 216:24 217:2 221:10,11,17 222:1

**reviews** 110:9 218:9

**revise** 150:13

**revised** 4:3 140:13 141:1,3 141:4,7,7,9 152:14,21 153:13,17 171:7 178:15 178:19 179:15 181:6,7 186:12 190:19 194:7 207:6,18,22 223:15

**revising** 162:20 163:1 174:23

**revisions** 177:18,18

**rework** 69:23 199:20

**rfp** 93:5,14,16 93:21,22 94:19 94:20,22 95:1 95:10,12,14,17 98:21 99:5,24 152:8 230:6,16

**rfps** 98:23 103:3

**rich** 1:20 3:5 9:10,10 17:3,7 38:8,11 40:8 54:5 62:19 64:11 79:3 82:12 90:11

127:6,9 136:17 149:7 155:21 156:7,20 157:1 157:4,7,10 158:5 159:12 164:1 166:18 169:11 172:12 175:20 182:11 182:22 186:16 194:24 204:24 226:4 227:12 227:19,23 232:9,11,14,22 232:23 233:1

**right** 13:5 15:7 20:15 26:17 28:2 30:12 33:4,15,20 53:12 56:2,15 61:8 63:2 65:20,22 67:23 75:6,18 76:1 82:20 83:1,7 85:2 87:1 88:20 92:17 94:9,19 98:9 102:5 105:24 108:14,21 111:4 115:17 119:5,6 124:19 126:1,12,12,14 126:14 128:24 132:18 143:14 146:17 148:4

153:23 154:3 157:18 158:11 158:17 161:22 168:20 173:6 177:5 185:6 189:22 191:8 195:9,24 199:17 203:13 203:16,22 204:16 207:1 216:23 218:15 221:24 222:4 223:15,23

**riley** 2:2

**risk** 87:7 96:2,5 96:11

**rlizza** 2:9 238:2

**road** 10:21

**robbins** 1:20

**robert** 2:8 9:14 238:1

**robins** 1:16

**robust** 154:14

**role** 14:7 16:4 41:3 46:3,4 110:7 137:2,3

**rolled** 124:7

**rolling** 176:4,6

**roofing** 132:23

**room** 20:7,8,16 20:17 43:9 63:9,19 75:1,2 76:20,20,21,21 130:3 134:16

**[room - schedule]**

134:19,24
137:8 183:4,8
**rooms** 15:4
**rough** 66:11
233:8,10
**round** 141:17
186:18
**rpr** 236:3
**rshc** 2:5,5,6,6,6
**rule** 123:6
237:1
**rules** 1:14
10:21
**ruling** 157:16
**run** 7:8,12
16:24 195:24
196:3,8 203:21
207:4 216:10
223:9,9
**running** 60:6
60:11
**runs** 208:15

**s**

**s** 2:4 3:7 4:1 5:1
6:1 7:1 8:1
**safe** 16:6,19
17:1 31:21
47:2 48:7
69:23 71:18,21
72:2,3,4,5,7,8
72:11,13 97:16
**safely** 89:19

**safer** 2:2
**safety** 214:13
**saint** 31:2
**sake** 35:23
**sales** 230:10
**salvageable**
153:4
**samuel** 1:21
**sat** 63:8
**satisfactorily**
10:3
**saw** 36:14,23
37:1,3,5 39:4
59:24 138:19
145:2,8,13
214:14 228:23
**saying** 22:23
54:19 72:11
88:17 99:23
104:6
**says** 27:22
30:15 31:9
34:21 40:22
41:13 42:19
44:13 49:2,10
51:18 56:3
57:9 65:15
66:9 67:24
69:17,21 81:3
82:19 83:10,22
85:4,10 87:22
89:6 90:15
97:4,10 98:10
100:17 101:3

101:13 102:20
103:21 105:14
105:24 107:19
108:9,11,12,22
111:10 113:13
114:1 117:2,4
117:8 122:16
124:20,24
127:13 128:5
137:16 148:13
151:16 156:15
159:4,15 160:4
165:20 168:16
173:10,23
203:20
**scale** 19:13
58:13,14
219:24
**schedule** 3:10
4:5 7:3,4,6,8,10
7:11 11:19
15:19 17:20
50:5 51:16,19
51:20 52:1,2,3
52:4,6,9,9,13
52:19 55:2,11
66:12 67:16,17
67:19 68:1,2,8
68:12,18,19,20
68:24 69:1,3
69:12,14 70:20
70:21 71:2,4
72:9 73:8,11
73:11,12,18

74:12,15,18
75:5,12,22
76:5,13,23
77:4,14,15,18
77:24 78:7,12
79:10,14,17
80:5,7,13,16,19
80:24 81:11
82:2 83:18
84:18,23 85:5
85:19,24 86:2
86:13,16,18
87:3,6,14
96:21,24 97:24
98:13,15 99:2
99:14 100:13
100:18,21
101:10,24
104:7,12
123:14,15,16
123:19,23
124:5,11,15
167:9 168:12
168:13,15
171:16 193:13
195:15 196:4
196:15 197:2,4
197:7,10,18
198:12,23
199:7,8,21,22
199:23 200:24
201:4,7,12
202:1,10,18
203:11,23

**[schedule - second]**

204:11 205:3,7
205:13,14,22
205:23,24
206:17,20
207:1,6,15,21
208:6,12
209:15,19
210:6,7,12
211:2,6 212:7
212:15 215:5
216:3,9,12
217:10,21
219:11,20,21
220:7,9,13
221:1,6,15
222:7,16 223:8
223:10,14,21
223:22 224:7,8
224:19,20
225:19 226:1,1
226:19,19
**schedule's**
207:4
**scheduled**  45:7
**scheduler**
196:14 202:4
208:24 216:7
**schedules**  12:8
78:22 119:21
124:1 140:15
163:6 171:13
195:20 201:18
201:21 204:22
225:2,10,12,20

226:12 229:23
230:1,13,20
**scheduling**
52:21 168:18
169:19 171:4
219:14
**schematic**
19:17 24:10
25:8,13 27:18
28:4 58:15,18
101:4,8 167:6
186:6 212:3,4
212:11,13,17
212:20,22
213:10,11,13
213:17 214:1,4
214:21 215:16
215:23 216:18
217:12 218:20
219:1
**schematically**
213:3,22
**scholarship**
229:20 230:3
**scope**  19:21
22:18 23:23
27:1,14 40:20
41:12 42:1
44:6 48:14,16
55:22 56:22,24
57:5 59:17,22
60:8 61:4
62:17,22 63:2
63:5,5,6,7,16

63:21,24 64:1
64:2 66:11
74:4 75:1,4,21
77:15 78:5
80:9 90:2
110:24 112:21
113:4 114:3,8
114:19,24
115:3,13,15,19
115:20 116:4,6
116:11,13,15
116:19,21
118:7,15,19
127:19 128:17
129:14,17,20
129:22 130:5,8
130:14 131:9
131:22 132:6
136:2,10,12,14
136:18,24
137:3,3 138:19
138:20 139:7
141:13 142:9
142:20,20,23
148:15,22
149:5,23 150:5
150:18 151:3
152:12,19
156:5 160:20
160:22 163:9
163:11,11,22
169:7 173:12
173:24 174:10
175:14,16,17

175:19 176:10
176:16 179:2,7
179:11,13,16
179:18 180:2,7
180:11,13,18
181:7 182:9,17
182:19 183:6
186:11,12,13
186:23,24
190:5,7 195:16
207:5,23
209:21 213:4,8
214:24 215:1,1
222:3 223:15
224:1,3,13
225:24 230:14
**scopes**  219:22
**scratch**  68:23
**scrim**  108:6,7
108:13,15,19
108:24 109:1
**sd**  167:6 212:17
**seal**  237:7
**second**  40:19
43:19 44:17
87:19 94:3
113:13 133:4
148:8 158:21
159:4 161:23
166:21 167:4
172:15 174:19
178:2 184:23
184:24 186:18
216:16

section  114:4
  121:21
see  11:20 20:2
  24:6,18 27:22
  28:15 30:18
  31:12 34:17,24
  35:13 36:18,18
  37:12 38:20
  39:1,8,12,13,23
  40:1,19 41:1,5
  41:16 42:17,21
  43:2 44:15,20
  49:4,14 51:16
  51:23 56:3,8
  57:14 60:9
  65:15 66:7,13
  68:5 69:19
  70:1 71:19
  82:22 84:2
  85:12 89:10
  90:17 97:4
  101:13 102:22
  103:11,22
  104:2,17
  105:17,24
  109:9 112:16
  113:14,19
  117:1,5,13
  119:8 122:18
  123:18 124:22
  125:1 127:12
  127:16 132:13
  137:19 145:6
  148:16 151:14

  151:19 156:13
  158:21 159:8
  159:16 160:10
  165:16 166:2
  173:13 174:1
  178:4 184:16
  185:7 186:1,3
  186:9,10 196:1
  200:9 208:18
  211:1,3,5
  212:5,20
seeing  39:6
  120:7 145:14
  214:12,14
seems  173:11
seen  11:12
  88:23 130:13
  185:23 229:1
select  87:10
semicolon  85:9
send  68:18
sending  16:21
  91:9 175:4
senior  14:16
sense  11:5
  63:12 90:9
  95:14 126:16
  147:2 183:5
  202:14 220:12
sent  11:14
  30:11 31:15
  66:2 145:15
  194:15 238:14

sentence  85:9
  149:14 159:15
  167:18 168:16
separate  43:13
  81:13 99:13,13
  140:14 141:16
  156:23 207:20
september  43:6
  44:22,24 50:16
  53:24 54:11
  173:6 175:1,5
  175:11 176:5
  176:15
sequence  85:19
  86:1
sequencing
  77:3
series  11:19
  146:4 162:11
serves  208:23
service  48:11
services  4:21
  14:2,3,5 15:11
  15:14,18 16:16
  18:1 19:2,3,6
  20:12,13 32:6
  34:11 46:2
  50:14 61:3
  84:11 88:16
  95:21 107:19
  108:9 168:12
  172:3 190:17
session  144:1

set  73:12,18
  77:15 78:10
  81:7 82:2 83:8
  86:15,16 96:4
  98:6 118:20
  122:2 139:18
  140:2 166:16
  167:7,20
  173:11 174:9
  175:23 176:2
  176:11 211:8
  211:11 215:4
  215:10 229:10
  230:1 232:10
  232:12 237:6
seth  1:20
sets  142:4
  174:6 175:2,4
seven  5:6
several  53:17
  145:17 217:5
shape  211:23
share  209:18
shared  96:11
  109:19,21
shc  1:6 4:5
sheet  238:11
sheets  173:23
shift  86:13
shop  69:23
  71:12 72:15,16
  72:18,20,21
  73:3,4,9,10
  74:11 220:14

**[shop - sorry]**                                                                Page 57

220:20
**short** 4:3 17:1
  17:22 32:3
  49:2,16 50:2
  50:10 51:11
  66:21,23 67:14
  75:20 100:9
  215:24
**shorten** 216:8
**shortened**
  217:18
**shorter** 54:23
  86:18 87:13
  200:15
**show** 11:15
  39:20 63:22
  64:11 71:6,9
  175:23 203:17
  227:5
**showed** 69:22
  232:6
**showing** 74:8
  85:16 96:18
  100:22 101:11
  107:22 108:5
  216:24
**shown** 67:19
  68:19 69:4
  70:20 71:2
  73:9,13 74:12
  76:5 90:7
  96:16 99:10
  100:20 108:1
  137:21 175:22

181:19,20,21
182:5 197:2,19
198:12 202:1
202:18 203:23
205:3,13,23
206:20 208:6
208:12 213:13
216:3 220:13
221:15,20
224:8
**shows** 101:3
  131:15 138:3
  193:15 214:3
  215:9
**sic** 110:17
  127:3 205:3
**side** 27:16,17
  102:1 209:3
  215:22
**sidney** 181:10
**sign** 233:6
  238:12
**signature**
  237:10
**signed** 8:5
  238:19
**significant**
  148:15,21
  149:23 182:8
  184:3 224:2
**significantly**
  149:13 179:3
  179:17 192:2
  207:23 228:23

**signing** 237:2,3
  237:4
**similar** 49:23
  180:9 192:20
  219:23
**simplex** 161:8
**simplicity's**
  35:23
**simply** 157:17
**single** 36:15
**site** 16:19,21
  17:1,14,15
  38:14 71:6,9
  102:4,16 123:3
  151:7,8 206:2
  206:10 211:19
  230:17
**sitting** 46:13
  124:4 199:15
  199:17
**situation** 47:9
**six** 49:24 167:7
  200:15
**size** 19:13 24:9
  25:17 213:19
  216:1
**skip** 213:17
**slide** 92:23
  96:17 98:9,13
  99:10,16
  100:20 101:12
  105:11,18
  106:1 107:22
  108:8 219:4

**slides** 105:14
**small** 25:12
  54:12 76:20
**smaller** 36:1
  219:24
**smart** 199:8
**smith** 202:12
**smyers** 1:22
**software** 21:23
  52:3 199:8,23
**solutions** 106:1
  106:3,7,11
  238:23
**something's**
  63:3
**soon** 71:9 76:7
  199:13 221:12
  222:21
**sooner** 72:20
  73:3 82:9
  83:21,21
  165:21 167:8,8
  220:20 222:20
**sorry** 38:11
  73:20 76:2,4
  80:22 82:5
  92:9 103:15
  130:23 132:9
  143:9 152:15
  154:2 169:7
  181:20 188:23
  192:11 204:24
  205:1 207:16
  209:2,10,10,10

221:8
**sort** 34:13 72:3
  161:9 230:2
**sounds** 21:7
  50:16 64:14
  104:23 146:15
**source** 106:11
  227:3
**space** 16:22
  17:12 37:24
**spaces** 37:19
  38:2
**spare** 28:20
**speak** 21:20
  35:24 150:3,4
  150:17 155:11
  164:21 229:19
  230:2
**speaking** 46:3
  88:13 150:11
  230:23
**spearhead**
  13:18
**spearheading**
  164:10
**specialized**
  20:22
**specialty** 20:22
**specific** 22:1
  24:21,23 52:3
  60:16 94:15
  225:19
**specifically**
  95:11 153:18

**specifications**
  107:7 110:10
  111:1 167:1
**specifics** 158:1
**speed** 32:24
**spoke** 41:9 84:7
  136:12
**sprinkler**
  164:18
**square** 15:9
  19:11,20,24
  20:10,17,19
  23:3,5,7,9,14
  23:18,21 24:2
  24:4 41:11,11
  57:12 58:7,9
  58:20 59:1,2,9
  59:11,11 105:3
  117:11,19,23
  118:3
**srobbins** 1:22
**ss** 236:2
**st** 31:2
**staff** 31:19,20
  31:24 84:12
  119:24
**staffed** 32:4
**staffing** 119:13
  119:22,23
  199:17 206:4
**stage** 23:20
  73:10 119:19
**stages** 26:4

**stand** 49:8 97:6
  232:1
**standard**
  212:23,24
  214:9
**standards** 27:2
  213:14,14
**standing** 32:13
  40:1 135:22
**stands** 13:20
  49:6
**stapled** 156:24
  157:5
**star** 98:10
**start** 19:20
  20:2 21:3 24:7
  24:7,15,18
  25:7 54:9
  63:19 68:3,10
  71:11 72:20
  73:14 75:14
  76:10 77:9,11
  81:17 82:20
  83:1,20 85:23
  87:1 98:23
  103:20 107:12
  125:9,10,24
  126:1,4,6,11,18
  126:19 130:4
  130:14 158:22
  186:9 196:19
  197:3,6,13
  200:11 204:5
  211:5,7,8,11,18

211:24 219:1
  220:6 222:16
  222:17,21
**started** 31:8
  35:19 45:6
  55:12,18 56:1
  62:5 146:21
  153:1 210:13
  220:2
**starting** 82:6
  98:7,7 133:1
  153:8 158:21
  180:14 221:11
**starts** 112:11
  165:18
**stat** 76:19
**state** 8:24 9:3
  22:17 39:1
  118:5 119:18
  138:17
**states** 1:3 118:8
**static** 186:8
**status** 147:19
**stay** 128:13
  132:10
**stays** 16:5,5
  26:1
**steel** 24:3
**step** 174:13
**stephanie** 1:13
  3:3,13,18,21
  4:8 5:3,6 8:12
  9:18,19 10:1
  66:10 234:2

**[stephanie - submission]**

235:3 238:5
**steps** 30:16
  40:13 58:14
**sterile** 76:20
**steve** 3:20
  65:12 67:24
  69:9 75:14
  80:3 82:15
  84:20 210:20
**steven** 2:3 9:8
**steward** 4:6,11
  4:21 7:8 12:21
  13:17 30:23
  31:7 33:13
  40:22 42:12
  43:8 44:19
  45:1 46:1
  49:13 50:7,17
  50:23 51:2,20
  57:2,6,10
  61:20 62:9
  68:24 69:1
  74:1,20 75:16
  75:23 76:6
  91:2 93:14,22
  93:24 94:17,23
  95:1,14,16
  99:2,7,9,16,18
  99:19 100:11
  109:20 111:15
  111:19,21
  113:9 124:10
  128:16 130:2
  137:5 145:23

147:13,17
150:12 151:18
152:1,6 153:16
153:19 154:20
154:22 155:1
162:1,2,10,21
162:23 163:8
163:21 164:8
164:16,20
169:2,6,19
181:8 198:1
202:17 208:5
224:17,23
225:5,14 229:5
231:5,18
**steward's**
  12:18 42:9
  57:16 100:5
  104:13 124:10
  137:1 165:10
  168:23 172:1
**steward0049...**
  65:5
**steward0049...**
  3:22
**steward0049...**
  65:6
**steward0049...**
  4:4
**steward0049...**
  65:7
**steward0075...**
  3:14 13:4

**steward0099...**
  92:18
**steward0099...**
  4:13
**stipulated** 8:3
**stipulation** 8:2
**stop** 36:17
**stopped** 172:6
  190:17
**storage** 17:12
  17:16
**storm** 126:13
  133:12,20
**straightforward**
  26:23 47:16
**strategies**
  86:17
**strategy** 222:14
  230:10
**streamline**
  164:23
**street** 1:16,21
  2:4,8
**strict** 61:22
**strike** 44:23
  116:12 133:7
  143:9 171:20
  189:18 198:11
  206:23 207:7
  209:2
**string** 65:12
  148:5 158:10
  158:14,23
  173:4

**structural**
  55:14 61:14
  78:5
**struggling**
  61:24
**subcontract**
  103:1 221:22
**subcontractor**
  48:6 70:13
  71:11 72:17
  102:4 107:1,2
  117:12 138:1,2
  138:7 142:15
  178:10,16
  179:1 221:23
**subcontractors**
  21:14 72:24
  74:7 83:6,14
  83:17 87:9
  102:3,12,15
  103:3,18
  142:10 188:20
  189:13,18,21
  192:5 194:1,8
  211:19 215:2
**subcontracts**
  220:22 221:2
**subject** 30:12
  40:7 157:11,18
**submission**
  110:15 112:19
  113:2 116:12
  126:5,5,15
  177:23 197:24

198:2 202:24
**submissions**
100:24 115:15
202:24 203:1
**submit** 25:15
30:3 47:7
68:15 78:8
80:10 122:23
141:12 171:16
198:19 217:24
**submittals**
83:21 220:20
**submitted** 55:1
60:1 73:7
141:4 169:17
170:13,15
171:12
**subpoena** 3:9
11:14
**subs** 77:12
83:10 86:9
87:5,10,12
126:20
**subsequently**
140:5
**subtotal** 188:11
189:20 192:4
**suffered** 133:19
**sufficient** 26:12
107:2,12
117:21
**suffolk** 230:8
236:2

**suggested**
234:6 235:1
**suggesting**
219:9
**suggestions**
136:13 208:5
208:10
**summaries**
229:10 231:16
**summary**
137:22 181:21
182:5 192:13
192:14 193:14
**super** 147:6
**superintendent**
45:13 48:4
67:22 147:7,10
202:12 224:9
**superintende...**
46:11 48:13
**supervise** 202:9
**supply** 76:20
**support** 4:6
14:4,4 33:4
40:23 42:16,20
43:5 49:11
54:8 55:6 92:5
130:12 140:11
168:19,23
169:19 171:1
172:1 229:5
231:1,7
**supporting**
165:5 172:6

**supposed** 55:16
**sure** 16:4,18,20
16:24 18:3
30:15 48:7
57:4 59:24
64:13 76:5
77:2,3 78:9
80:23 93:4
94:13 99:5
111:3 122:11
131:8,14
143:15 157:9
161:22 174:18
194:23 199:21
202:14 208:24
218:1,13
226:15
**surg** 15:4
**surprise** 216:2
**surprised**
25:21
**surprises** 25:21
26:6,20
**surrounded**
48:19
**survey** 97:10
97:13 102:3,16
**surveying**
97:13
**sustained**
174:11
**svogel** 2:5
**swear** 9:20

**switchgear**
26:15 37:15,17
227:1
**sworn** 10:5
236:7
**system** 4:12
45:19 164:14
164:18
**systems** 145:18

**t**

**t** 2:4 3:7 4:1 5:1
6:1 7:1 234:1,1
**table** 34:20
101:2 112:8
**tables** 69:4
**tagged** 222:6
**take** 47:24 53:1
53:2,6 58:15
64:9,12 65:22
83:23 84:5,8
84:15 89:8,13
97:21 126:2
130:14 144:12
166:9 172:12
194:21 197:23
200:15,16
215:15 218:7
224:24 225:6
225:13,17
226:2
**taken** 1:14 8:13
227:7

takes  88:24 215:19

talk  11:4 14:6 19:1,1 22:9 42:8,12 62:12 63:13 91:8 99:19 115:2 132:10 164:13

talked  22:6 53:22 115:11 125:6 158:18 178:6 179:22 204:19 224:10 226:15

talking  88:15 99:15 131:17 158:1 170:2 225:12

talks  42:23 71:18

tape  39:19

target  98:23

targets  230:5 230:10

task  200:5 201:9 212:10 222:11

tasked  149:15

tasks  52:3,4 74:12 101:10 196:22 197:13 197:16,17 198:4 199:9 201:8,12,15

209:24 210:6 210:15 213:17 224:13 225:21

team  16:2 18:7 18:24 21:13,19 26:10 51:20 58:11 61:23,23 63:9 70:6 95:7 95:20 96:8,9 98:6 103:6 107:6,7,11 108:17 111:2 130:1,12 131:8 131:10 132:5 136:13,20,21 136:23 142:21 143:1 146:13 149:15 151:16 154:23 160:7,8 161:20 162:2,9 162:11,19,24 164:5 165:1 167:5,19 169:4 169:5,10,14,20 174:16,21 177:19,23 180:2,6 181:6 182:8 188:3 197:15,21 198:2 204:21 205:5 206:2 208:10 213:22 215:16,21 229:21

team's  141:10 223:15

teams  14:15 99:13 130:10 130:13 162:7

technique  87:3

techniques 86:17

tell  40:2 45:4 79:9,13 99:9 100:11 164:15 164:16 213:8

tells  190:15

temp  32:5,5 119:14

temporarily 115:8

temporary  47:1 48:9

ten  22:23 53:1 113:17,22

tend  23:2 28:17 32:3

tends  26:22

term  4:3 17:22 48:22 49:2,16 50:2,10 54:24 66:21,23 67:14 75:20

terms  75:4 137:24

test  227:19,20

tested  128:17 128:22 145:11

147:14,15 149:1 154:12

testified  10:6

testify  236:7

testimony 218:19 227:24 232:19 234:3,7 235:5 236:13 238:9,17

testing  29:2 127:13,20,21 127:23 128:12 128:14 145:4 145:11,17,24 146:5,9,12,16 146:16,20 147:3,9,19,23 148:14,18 149:11 151:10 152:18 153:1 153:20 154:5 154:12 155:4,5 155:12,15,18 156:1,5 209:6 209:21 210:13

tests  147:15,17

thank  92:16 108:20 110:4 131:4 141:20 144:8 156:16 158:4,5 166:20 232:13,15,16 233:2

thanks   33:3
theory   28:7
  131:12 138:10
thing   34:13
  43:23 72:3
  121:7 132:17
  187:4 202:19
things   21:18
  24:16 28:13,24
  29:14 37:21
  39:24,24 40:14
  45:18 47:23
  68:9 70:10,12
  72:1 84:9
  86:21 87:11
  90:1,3 118:6
  135:15 141:18
  156:24 170:10
  174:17 196:23
  197:12 215:11
  225:11 228:5
think   22:8
  29:22 33:15
  37:4,20 38:13
  39:6,8 44:8
  50:4 60:21
  61:7 63:4,17
  64:8 72:10
  79:4,5,23 84:7
  86:19 105:1
  108:5 122:10
  122:24 126:8
  132:14 134:8
  135:8,15,20,21

140:21 141:6
147:8 160:18
161:22 162:5
163:11 164:23
169:21 170:8
171:6,7 177:17
182:24 183:5,8
209:20 210:11
214:13,15
216:5 218:4,15
220:5,5 224:11
228:1,1 230:24
thinking   31:22
thinks   26:11
third   31:9 36:7
  82:19 87:22
thought   84:8
  100:7 130:12
  138:12 146:22
  162:6 224:11
  225:6,13,15
thread   56:4
  150:8
three   10:17
  29:23 36:8
  59:7 65:8
  74:16,18 81:13
  96:5,6 107:16
  107:16 112:10
  115:5 165:24
  166:1,6,11
  212:12,21
  213:20 214:8
  219:11 226:16

229:24
thumb   123:6
thursday   1:17
tied   159:5
  196:22 200:8
  201:8 203:1
ties   199:5,22
  200:20,22
tiles   114:16
till   128:14
timberline
  21:10
time   8:7 9:1
  14:6,7 16:5,20
  17:8,9,14,22
  21:15 25:16
  33:1 35:2
  38:19 41:3
  42:8,14 43:6
  45:4,7 50:6
  51:11 52:8,24
  54:16,16 55:3
  55:19 56:17
  57:22 60:19
  61:8,19 62:16
  64:8,15,18
  71:14 72:19
  78:15 79:1,4,5
  79:10,14,18
  80:18 83:9
  84:10 89:6
  90:13 94:4,6
  100:10 105:22
  106:4 108:2

124:6,12
129:23,24
130:11 135:23
140:19,23
143:16 144:4
145:22 146:19
149:5 150:3
151:22 152:8
154:15 155:6
161:7,23,23
163:18 171:2
172:16,19
174:22 177:15
181:11 187:16
188:12 194:21
195:1,6 202:4
203:5 205:18
206:2,6,10
210:12 216:12
217:1 218:2,6
218:13,22
224:11,15
226:5,8 228:1
229:4 231:15
232:15 238:18
timeframe
  238:8
timeline   15:24
  18:6 58:12
  62:5 69:8 79:7
  96:14 99:10
  100:23 119:24
  124:3 150:8
  163:5 202:21

202:22 217:8 230:1,7

**timelines** 69:9 79:19 84:13 96:18 99:13 196:24 197:12 199:10 200:2 201:4 216:6

**timely** 103:7

**times** 10:13 25:11 35:21 58:1 105:19 200:2 228:12 228:19 230:19

**timing** 54:14,23 61:14 112:2

**title** 13:16 71:17 96:13

**titled** 51:16 100:20 104:16 111:10 129:14 185:6

**today** 10:23 11:12,15,23 46:13 60:24 66:10 117:16 124:4 155:15 159:6 218:19 226:15 229:22

**today's** 37:9 232:19

**todd** 1:19

**toddweld.com** 1:22,22,22,22

**together** 18:7 50:7 61:24 76:14 78:21 95:17 105:6 111:21 125:18 130:3 146:4 157:6 179:20 180:2 229:9

**told** 75:14 126:8 172:10

**tom** 202:12

**tomorrow** 160:6

**took** 33:10,10 127:20

**tool** 21:10,11 129:18 130:4 130:12,13,17

**tools** 22:12 23:16 130:10

**top** 33:2 56:3 65:12 67:24 89:4 90:14 91:22 96:13 97:3,3 100:17 101:2 105:15 108:9 111:10 119:7 124:19 137:16 142:15 148:9 151:12 173:17 184:22

**topics** 11:20,22

**topmost** 5:3,6 5:10

**total** 105:10 117:23 142:5 142:16 178:15 178:24 188:7 188:19 189:1 189:10,13,17 193:24

**totally** 29:1,8 219:13

**totals** 178:3,7 192:1,18

**touching** 236:9

**tour** 34:22 35:5 35:8 36:10

**towards** 23:2 32:1 62:13 161:24 162:14

**tower** 15:9

**trace** 29:1

**track** 13:19 20:19 26:1 100:18,21 101:23 140:23 147:12 154:21 185:18 214:7

**tracked** 145:9 154:8

**tracking** 63:15 145:9 148:1 180:12

**tracks** 52:3 186:23

**trade** 19:20 24:2 60:4

117:8 122:22 138:23 192:14 192:18 193:15

**trades** 70:6 77:9 122:22 178:10 179:1 184:4,5 217:3 217:5,6 220:19

**traditional** 71:14 72:9,17 72:23 73:12,15 96:5 110:23 140:9 217:7 220:21

**traditionally** 72:21 73:16 74:6 86:8 184:3 185:14 186:5 212:21 218:23,24

**trailer** 98:5

**trailers** 119:14

**transcript** 232:24 233:4 233:14 234:3,5 238:6,19

**translate** 63:14

**treat** 56:16

**trial** 8:7

**tried** 111:8

**tries** 17:20 26:3

**trouble** 103:15

**true** 29:19 64:5 104:13 116:18

135:7 171:3
192:14 213:10
220:11 234:6
236:13
**truly** 209:24
**trust** 1:6
**trustee** 1:5
**truth** 236:8,8
**try** 10:24 26:8
26:17,18,19,20
27:8,16 37:9
51:3 78:17
104:12 120:15
122:9 129:22
158:2 227:14
**trying** 18:5,5
30:16 31:21,21
31:23 47:20
61:20,24 63:23
87:9 99:23
129:20 135:8
135:15 174:6
183:13
**ts** 47:11
**tuesday** 151:17
160:6
**turn** 30:8 34:14
61:21 67:23
87:19 96:12
100:16 107:15
112:7 113:11
121:18 124:17
129:12,23
132:9 137:12

141:21 148:8
168:3 178:2
179:11 181:14
189:7 194:4
**turnaround**
167:5
**turnarounds**
59:15
**turned** 196:8
**turning** 40:15
70:20 72:2
133:1 142:3
188:24 189:17
189:19 231:2
**two** 10:17
17:11 25:15
30:1 36:7
42:23 43:5,13
44:10 51:13
65:19 105:14
112:10 127:22
140:22 156:23
166:15 167:24
168:13 174:7
184:21 185:3
202:23 220:3
**type** 22:12 23:6
26:21 37:8
38:2 52:20
160:21 163:23
**types** 15:12
23:16 27:13
45:24

**typewriting**
236:11
**typical** 35:19
47:5 174:17
206:12
**typically** 18:10
31:17 40:6
41:10 80:1,3
176:10 203:17
213:18 214:7
219:8

**u**

**u.s.** 8:15
**uh** 30:14
208:17
**ultimately**
56:13 64:3
80:6 146:7
161:11 209:20
222:9 224:11
**umbrella** 169:9
**unable** 90:12
**unaware**
163:19,20
**uncommon**
37:12
**undefined** 60:8
61:5,7
**under** 41:13
71:17 72:9
81:10 102:1,13
103:1,5,10
104:4,5,9

122:13 132:18
132:22 157:14
170:6 178:16
179:14 188:10
203:2 234:4
236:12 237:1
**underneath**
49:10 103:13
103:24 108:12
117:7 124:24
127:4 169:9
**understand**
15:21,23 18:8
27:11,13 28:20
32:11 48:15
56:20 63:19
70:15 77:2
80:9 82:5
86:10 110:18
130:24 146:12
**understanding**
13:22 21:5
35:16 57:16
60:2 62:17
84:4,17 93:23
98:24 125:12
133:10 137:6
149:4 152:12
152:17 153:12
159:18 165:2,8
166:4 167:23
168:22 174:3
182:17 215:14
229:7

**understands** 208:24

**understood** 94:17 137:2

**unfinished** 38:1

**unit** 20:7 22:6,8 22:9,15,21 23:9,17 24:16 26:14 117:10 117:15 118:2

**united** 1:3

**units** 48:10 74:3

**unknown** 89:7

**unpredictable** 228:10,19

**unreal** 230:7

**unrealistic** 230:7

**unreasonable** 231:21

**unsupportable** 231:21

**untimely** 60:7 60:14

**unusual** 186:2 186:10 214:16

**update** 21:21 24:22 139:20 140:5 149:16 149:24 165:9 177:19,24 191:23

**updated** 4:6 21:15 139:15 139:17 141:10 147:22 149:3 150:9,10,23 151:1,17 153:5 154:15,18 163:3,12,14 165:6 175:2,14 176:3 187:3 188:5 190:21 191:15

**updates** 43:1 43:20 44:11 147:3 156:4 171:9 175:16 191:24

**updating** 149:15 155:5 162:15 191:18

**upgrade** 15:4

**upgrades** 58:2 112:24 113:6

**use** 21:10 22:13 23:8,9,17 29:13 30:5 70:16 117:22 118:2 130:4,10 130:13 199:16 204:22

**used** 37:20 63:15 69:7 114:2,6 115:19 116:1,3,9,13

121:13 130:8 130:17 131:5,7 131:13 165:9 175:6,19 180:3 180:7 186:12 186:14 202:20 207:6,14 238:19

**uses** 52:2 205:4

**using** 69:12 117:9 123:12 141:9,11 180:13 196:4 202:2 204:21 226:13

**usually** 18:13 18:16,17 23:21 25:4 26:12 29:5,14 32:23 34:7 47:16 87:13 98:23 215:19 218:12

**utilities** 29:6 97:15

**utility** 37:16 55:22

**utilize** 70:8 216:4

**utilized** 216:7

**v**

**v** 238:4

**vaguely** 169:21

**value** 95:21 187:15

**vanness** 3:21 65:13 66:3,6 66:16 68:18 75:4 79:9,13 79:18 80:3 84:20,24 90:20 90:22 210:20

**variance** 5:20 184:21 185:2,3 185:14,17 187:8 190:9,12 190:23 194:12 194:19

**variances** 185:22,23 186:1,3

**varies** 25:17

**variety** 196:16

**various** 145:18 231:15

**vary** 139:10

**vendor** 117:12

**vendors** 21:14 107:8

**verbal** 11:2 112:2

**verified** 128:18

**verify** 145:11 238:9

**veritext** 8:19,20 232:20 238:14 238:23

| | | | |
|---|---|---|---|
| **veritext.com** 238:15 | 156:23 157:3,5 176:20,23 | 186:1,3 199:12 201:6 218:1,13 | 213:4 216:18 218:15 219:9 |
| **version** 17:2 189:1 190:1 | **vol** 235:3 | 222:21 230:11 232:22 | 220:6 224:13 224:13 227:15 |
| **versions** 145:6 145:6 | **volume** 1:1 **vs** 1:8 235:2 | **wanted** 74:20 93:24 164:23 | 228:13 **ways** 88:1 |
| **versus** 8:14 38:21 58:20 | **w** | 211:1,3 **wants** 27:3 | 107:23 192:23 **we've** 53:12 |
| 59:16 71:13 73:15 83:9 | **wait** 47:23 86:11 | 86:8 197:4 **water** 32:5,11 | 187:21 229:22 **wearing** 227:17 |
| 118:18 133:14 224:19 227:7 | **waited** 153:19 **waiting** 20:8,16 | 32:13,21 39:4 39:6,9 40:1,7 | **weather** 30:1 204:17 209:6 |
| 230:3 **vertical** 208:15 | 71:13 75:1 76:21 199:15 | 40:23 59:7 135:22 | 209:14,19 211:16 |
| 208:20 209:4 209:14 210:10 | 199:18 222:23 **waived** 8:5 | **way** 18:3 24:14 25:20 26:1,3 | **website** 16:9,10 **wednesday** |
| **video** 8:12 232:21,22 | 237:3 **walk** 26:20 | 27:20 29:21 45:5 48:3 | 158:14 165:21 **weed** 129:20 |
| **videographer** 2:11 8:11,19 | 38:20,21 47:6 70:14 | 52:24 59:14 61:9 62:23 | **week** 12:17 17:11 51:19 |
| 64:15,18 94:2 94:6 143:16 | **walked** 35:9,14 **wall** 35:11 | 64:1 67:5 70:11 73:13,24 | 90:10 127:22 158:17 220:6 |
| 144:4 172:16 172:19 195:1,6 | 39:16,16 48:1 48:2 59:8 | 74:20 75:22 80:23 81:4 | 233:14 **weekends** |
| 226:5,8 227:16 227:21 232:10 | 115:5 136:7 **walls** 35:12 | 82:14 84:20 85:3 88:8 96:4 | 206:20 **weeks** 30:2 |
| 232:18 **videotaped** | 39:13,19 40:5 71:24 | 111:4 114:17 115:8,9 118:20 | 167:8,8 200:15 220:3 |
| 1:13 **view** 77:21 | **want** 17:15,16 17:17 18:3 | 120:1 134:12 134:19 138:23 | **welcome** 144:7 156:17 |
| 136:3 **vinnie** 154:10 | 47:22 51:9 67:4 75:23 | 160:22 180:12 197:1 199:14 | **weld** 1:19 **went** 35:2 36:6 |
| **vogel** 2:3 9:8,8 109:5 120:9 | 76:6 108:18 135:11 157:7 164:20 166:8 | 205:13 206:1,5 207:19 211:22 | 36:9,20 39:10 51:6 57:24 |

**[went - zeroed]**

61:19 111:7 126:15 162:7 169:9 172:3 183:6 217:3 228:2,8 230:3
**wet** 39:24 114:14
**wetted** 32:14 39:15 115:5 134:17 135:22
**wheelhouse** 21:21
**wheels** 17:17
**whereof** 237:6
**wholescale** 45:20
**wicked** 39:22
**wilcox** 147:7 154:9
**win** 99:23 230:6
**windows** 22:20
**wishes** 235:4
**witness** 1:14 3:2 9:21 10:2 11:7 17:5 38:10,12 53:5 53:8 62:21 64:14 92:16 127:11 141:20 143:15 156:22 166:20 194:23 209:10 232:16 233:5 235:3,4

236:13 237:6 238:8,10,12,18
**wonder** 108:8
**wondering** 218:5
**word** 229:20
**work** 15:16 31:4 34:6 47:7 47:8,12 48:5 54:1,3,7,9,10 54:17 55:8 62:17,22 64:7 68:10 70:6 76:22 77:6 79:2 86:5 89:18 103:5 104:7 107:1,6 108:16 114:21 116:6,11,13,19 117:17,22 127:11 136:2 138:23 142:9 147:11 150:18 152:13,19 156:6 157:15 163:9,11,11,22 168:23 169:8 170:2,5 171:19 172:1 175:12 178:16 180:7 181:24 182:9 182:18,19 186:12,14 189:13,18,21

190:13 192:5 194:1,8 199:19 200:14 202:9 206:20 207:5 207:23 209:7 219:22 222:17 222:22 223:15 224:1,3 229:19 230:2,23 231:4 231:9
**worked** 15:1 18:14 63:17 67:21 74:11 92:4
**workers** 72:3
**working** 18:6 31:4,6 48:6,7 68:23 69:1 75:24 76:6 88:22 99:1 147:8 154:10 169:5 174:22 180:23 206:12 206:16 228:15 229:2
**works** 96:9 218:15
**worried** 135:23
**write** 88:4
**writing** 164:6
**written** 124:12 162:6 220:3
**wrong** 50:6 132:14,16

169:22
**wrote** 45:5 116:8 149:6

**x**

**x** 1:4,12 3:1,7 4:1 5:1 6:1 7:1 75:2 76:21 237:2

**y**

**yeah** 104:21 108:5,24 115:23 128:14 141:16 162:17 167:19 192:11 196:9 216:16 227:17
**year** 21:17,18 21:18 58:16 125:9 126:2,3 126:4,6,17 140:22 216:1 230:9
**years** 10:17 22:2 35:20 36:2 140:21,22 204:16
**yep** 56:5 116:18 204:18

**z**

**zero** 139:13
**zeroed** 209:20

**[zoom - zurich]**                                                    Page 68

| | |
|---|---|
| **zoom** | 1:20 2:3 |
| **zurich** | 1:10 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.