**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

MARK KRONFELD, as Trustee of the SHC
Creditor Litigation Trust,

Plaintiff,

v.

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY and
ZURICH AMERICAN INSURANCE
COMPANY,

Defendants.

Civil Action No. 1:21-cv-11902 – PBS

**DEFENDANTS' RESPONSE TO**
**PLAINTIFF'S OBJECTION TO DISCOVERY MASTER ORDER NO. 25 (Dkt. 271)**

The three at-issue emails (the "Three Emails"), sent in the middle of the adjustment of the insurance claim to 14 third parties, demonstrate that Steward understood that its sworn proof of loss was inaccurate and needed to be updated to align the estimate with the facts—not assumptions. The Three Emails do not contain confidential legal advice, and the Three Emails were not prepared by lawyers in anticipation of litigation. Accordingly, the Special Master correctly denied Plaintiff's request to claw back the Three Emails, and she found that the Three Emails: (1) were produced by multiple third parties as early as November 2025, making any clawback untimely; (2) are not privileged attorney-client communications, having been sent to as many as *14* third-party consultants; (3) are not attorney work product, as they concern updating Steward's proof of loss for its pending insurance claim, not litigation; and (4) contain information Defendants substantially need, given Plaintiff's bad-faith accusations. Plaintiff's objection (Dkt. 271) should be overruled.

**Background**

*Retention of Outside Vendors and Submission of Insurance Claim.*

To assess damages and necessary repairs at Norwood Hospital, and to maximize its insurance claim, after the June 2020 rain event, Steward hired multiple third-party consultants, including construction, engineering, and architectural vendors at Consigli, Array, and BR+A. *See, generally,* Dkt. 224 (Discovery Master Order 22). Those consultants then performed damage assessment work and work related to the insurance claim for Steward from July 2020 through at least August 2023. None were retained by counsel before April 2022 to perform any services relating to litigation. *Id.*at 17-18 (Array not retained by counsel until May 2022); *id.* at 22 (BR+A not retained by counsel until April 2022); *id.* at 25 (Consigli not retained by counsel until May 2022).

Steward and MPT first submitted a proof of loss to Defendants American Guarantee, and Zurich American, respectively, on December 4, 2020. Exs. A, B. Both Steward and MPT then submitted *interim* sworn statements proof of loss on February 4, 2021. Exs. C, D. Steward's claim primarily related to interruption of its business and MPT's claim related to the cost to repair the hospital. Steward's claim required analysis of how long it would take "with due diligence and dispatch" to repair the hospital to "the same or equivalent physical and operating conditions that existed prior to the damage." Steward Policy, Dkt. 61-1 at § 4.03.01.01. Ultimately, this calculation was theoretical[1] because Steward and MPT decided to raze Norwood Hospital and replace it with a modern hospital. During the adjustment of Steward's claim, American Guarantee paid Steward

---

[1] Further, neither Steward nor MPT were ultimately entitled to increased time or expense associated with any required code upgrades, as the hospital was not restored to its as-was condition and no increased costs were actually incurred. *See* Steward Policy Dkt. 61-1 at §5.02.14. Nonetheless, in the claim submission to the insurers, both Steward and MPT included anticipated costs and time associated with code upgrades.

over $97 million in insurance proceeds, including over $91 million for business interruption damages through July 15, 2022.

*The Three Emails.*

After their initial proof of loss submissions, Mr. Kidney sent the "Three Emails."[2] The first email, dated July 14, 2021, went to 14 third parties and one in-house lawyer. The 14 third parties were employed by Array, BR+A, Consigli, CREF (including VanNess, Kenyon, and Cooney), and NFA (Steward and MPT's public adjuster).

The subject line indicates a need for a follow-up after a "huddle with legal," to define next steps related to the "Norwood [Cost] Estimate." Dkt. 271 at Ex. 1. The body of the email refers to a need for "deliverables" from the third-party consultants to provide "greater accuracy in the cost model tied to what we know today and additionally causation issues." *Id.* The email states that since the "12/4/20 [insurance] claim submission and the 2/5/21 Interim proof of loss we have learned more through testing and visual investigation that will require us to update the Consigli As-Was and Code Estimates." *Id.* Mr. Kidney instructed the third-party recipients that MPT lawyers sought "greater accuracy in the cost model," and that "[t]hey want to prove the loss based on facts not assumptions." *Id*. Further, Mr. Kidney said that "[t]he legal team asked, what it would take to get the Estimate to a defensible position, both time and cost." *Id.* He closed by asking the

---

[2] Mr. Kidney's label—"Communication Protected by Attorney Client Privilege"—and the inclusion of an in-house attorney (Ms. Hibble) are meaningless. Plaintiff cites to only *one* July 2020 email in which Mr. Kidney "instructed others to label Norwood communications as protected by the attorney-client privilege." Dkt. 271 at fn. 2. In fact, Mr. Kidney repeated that instruction routinely, rubber-stamping all Norwood-claim communications as privileged. *See, e.g.,* Dkt. 260 at Exs. K, L; Q; *see also* Ex. E (November 2020 email from Kidney to Consigli, instructing that *any* critical communications related to "scope, budget and schedule" include the subject line "communication protected by the attorney client privilege.")

consultants to provide timelines and budgets to update the repair cost estimate, which estimate was originally provided to Defendants on December 4, 2020.

The two additional emails (dated July 18 and 26) check in with the consultants on the timetable for the requested work.

*Consigli's Revised Cost Estimates.*

Plaintiff seeks to claw back Mr. Kidney's Three Emails, but not the consultants' responsive work—work that confirms Mr. Kidney's instructions related to Steward's insurance claim, not litigation. For example, Consigli's responsive proposal described its work as "scheduling support related to the Norwood Hospital Insurance Claim." Ex. F. BR+A's response likewise described updating the "cost estimate for the damage occurred [sic] during the flood of 6/28/2021." Ex. G.

When Consigli revisited its as-was repair cost estimate, it cut the cost of the estimate from approximately $180 million to approximately $78 million. Ex. H.[3] Defendants did not learn of this dramatic reduction in cost estimates until BR+A produced it in this case in November 2025.

*Counsel's Instruction to Consigli, and the Production of the Three Emails.*

Plaintiff calls its clawback "modest" in volume, given in part the short deadlines and the Court's "quick peek"[4] procedure. Dkt. 271 at 12. That rings hollow given Steward's involvement in Consigli's production of records. Defendants learned earlier this year that Plaintiff (via counsel)

---

[3] Exhibit H is a demonstrative exhibit, including the relevant page 9 of Exhibit I and page 2 of Exhibit J for direct comparison. The complete documents, MPT0022791 and ORDER-CONSIGLI_00000308, are attached as Exhibits I and J.

[4] It is unclear what Plaintiff is referring to by a "quick peek" procedure. In August 2025, the Special Master invited Plaintiff to produce all its records without review and subject to clawback, to allow for a complete production with minimal burden. Plaintiff declined. Then, at a hearing in January 2026, related to a subsequent Consigli production, Plaintiff's counsel explained that Consigli produced records first to Plaintiff's counsel for review so that Plaintiff's counsel could request withholding for privilege. Ex. K Jan. 22, 2026 Hearing Tr. at 36:21-37:6.

instructed Consigli to withhold as presumptively privileged all materials prepared after February 2021. Ex. L (Mar. 17, 2025 letter from Counsel to Consigli) ("This letter serves as notice that Steward instructs Consigli not to produce any materials, including, but not limited to, communications with Steward's attorneys, that are protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege. . . . Steward maintains that materials prepared after February 2021 are presumptively protected from disclosure, though some earlier materials may also be protected."). Plaintiff (via counsel) specifically stated that if Consigli had any questions about specific materials that "Steward requests the opportunity to review and assess them before any disclosure." *Id.* There is no doubt that Consigli's production of potentially privileged records was on Plaintiff's radar.

The Three Emails were sent to multiple third-party entities that produced the emails in discovery, including Consigli. Indeed, Consigli produced 44 copies in November 2025; BR+A produced two copies in January 2026, and NFA produced 35 copies in March 2026. *See* Dkt. 270 at 2 (Special Master noting the repeated production by multiple third-party subpoena recipients).

*Prior Court Rulings Related to Privilege.*

Plaintiff sidesteps Special Master Hochberg's privilege ruling (Order No. 22), dismissing it as "broad-brush" and "overarching." Dkt. 271 at 11 and fn. 3. But Plaintiff never objected to that ruling except as to CREF, and even that objection was largely overruled. Dkt. 266. Order No. 22 held that none of the third parties on the Three Emails were categorically within the attorney-client relationship in July 2021. *See* Dkt. 224 (Order No. 22) at 21 (as to Array); *id.* at 23 (as to BR+A); *id.* at 25 (as to Consigli). Plaintiff's late attempt to side-step this ruling[5] should be rejected.

---

[5] Plaintiff also ignores that the first of the Three Emails was already before the District Court as proof of improper privilege withholdings. Dkt. 253 (Defendants' Response in Opposition to Plaintiff's Motion to Reconsider) at Ex. D. At a hearing last month, the District Court

## **ARGUMENT**

Special Master Hochberg's ruling was correct, and the Objection should be overruled. Fed. R. Civ. P. 53(f)(3)-(5) (factual findings and legal conclusions reviewed *de novo*; procedural matters for abuse of discretion). Before the Special Master and this Court, Plaintiff has failed to meet his burden, and the Three Emails are not subject to clawback.

### I. The Court Need Not Reach the Merits of Plaintiff's Objection Because the Special Master Correctly Found that Plaintiff's Clawback is Untimely.

Plaintiff's Objection fails on the merits. But the Court may deny Plaintiff's Objection without reaching the merits because Plaintiff's clawback request was untimely. Applying *Amgen's* five factors—(1) reasonableness of precautions, (2) time to recognize the error, (3) scope of production, (4) extent of disclosure, and (5) fairness—the Special Master found that Plaintiff failed to meet its burden on factors (1), (2), and (4). Dkt. 270 at 3, 5; *see also id.* at 3 (citing *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 190 F.R.D. 287, 291 (D. Mass. 2000)). Plaintiff still cannot meet that burden and ignores the case history underlying the Special Master's analysis.

*First*, the Special Master correctly questioned whether disclosure was "actually 'inadvertent,'" given that Consigli produced 44 duplicates in November 2025, BR+A produced two in February 2026, and NFA produced 35 in March 2026 (each production before Plaintiff ultimately produced 74 additional copies on May 29, 2026, as compelled by Order No. 22). Dkt. 270 at 5-6. No case Plaintiff cites involves documents produced repeatedly by multiple third parties, with privilege disputes already top of mind, before any clawback attempt.

---

commented on the documents submitted as part of the CREF privilege dispute, which included Mr. Kidney's July 18 email. Specifically, in response to Plaintiff's contention that the withheld CREF documents were "very privileged documents," the Court commented, "I don't think they're very privileged. I've seen some of them. They're not very privileged." Dkt. 269 (6-26-26 Hearing Tr. at 14:1-5).

*Second*, Plaintiff fails to identify any precautions implemented to prevent third-party production of allegedly privileged material. *See* Dkt. 271 at 12 (addressing only document volume not precautions). Privilege disputes over Consigli documents were "ever-present" in this case, Dkt. 270 at 4, placing the onus on Plaintiff to promptly review Consigli's November 2025 production. *See id.* at 4-5 (summarizing the privilege disputes during the relevant production window). Even a cursory review would have revealed the duplicates. As the Special Master said, the at-issue privilege disputes and specific Consigli-related history "was more than sufficient to alert Plaintiff to the importance of reviewing Consigli's November 2025 production to Defendants. Yet despite this sequence of events, Plaintiff waited until March to check Consigli's document production for any claims of privilege." *Id.* at 5.

*Third*, Plaintiff's timeline (six days following its own production of the documents) downplays all of the productions Plaintiff had from *multiple* third parties starting in November 2025. *See* Dkt. 271 at 11. As the Special Master recognized, the fact that Consigli did not give Steward an advanced opportunity to review the November 2025 production should have given Steward "even greater urgency . . . to do a prompt review," not less. Dkt. 270 at 5.

*Fourth*, as to volume, the Special Master was right that this does "not involve a single email in a virtual 'haystack' of documents." Dkt. 270 at 6. Plaintiff's failure to notice dozens of copies across three productions reflects no review at all.

*Fifth*, fairness favors Defendants. Plaintiff identifies no prejudice beyond losing a privilege claim that it failed to timely assert, while Defendants have a substantial need for the emails, discussed below.

Accordingly, the Special Master was right to find that "the inadvertent disclosure and waiver analysis counsels against clawback given the facts of this case," and the Objection should be overruled. Dkt. 270 at 6.

## II.    The Three Emails are Not Confidential Attorney-Client Communications.

Plaintiff has not sustained his burden to show that the Three Emails, sent to multiple third parties, are confidential communications made to obtain or give legal advice. Dkt. 270 at 10, *citing In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.*, 348 F.3d 16, 22 (1st Cir. 2003). The privilege "must be narrowly construed" because it "stands as an obstacle of sorts to the search for truth." *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 709-10 (1974)).

*First*, the communications were not between a client and an attorney (or an attorney and a necessary client agent needed to receive or obtain legal advice), as Special Master Hochberg already decided in Order No. 22 (Dkt. 224). As a matter of fact, the third-party consultants "were working in the role of vendors of services to Steward at the time of this email; none were non-testifying litigation consultants nor 'translators' to the client nor agents of Steward. A vendor is not an agent of the entity who asks it to do work." Dkt. 270 at 10. Plaintiff again claims the 14 third parties are "extensions of Steward's internal team," supposedly bringing each into any privilege as the "client," but he cites no authority for that sweeping assertion. Dkt. 271 at 10-11. Further, the District Court already rejected a similar argument as to CREF. Dkt. 269, June 26, 2026 Hearing Tr. at 13:13-16 ("there is no case in the United States of America that I know of that has an entire corporation that's an independent contractor and gives every employee in there attorney-client privilege"); *see also* Dkt. 260 at 13-14. Professional licensing standards for architects and engineers do not make them necessary participants in privileged communications between Steward and its lawyers.

*Second*, the communications were not confidential. Mr. Kidney's disclosure to 14 third-party consultants waived any privilege that might have been attached to the prior communication Mr. Kidney had with lawyers. *See, e.g., Cavallaro v. United States*, 284 F.3d 236, 246-47 (1st Cir. 2002) ("Generally, disclosing attorney-client communications to a third party undermines the privilege") (citations omitted).

*Third*, the substance of the Three Emails confirms they were not sent to receive, give, or implement *legal advice.* The Special Master correctly found the July 14 Email to be "a communication among Steward's third-party contractors, including Mr. Kidney's employer CREF, about improving the accuracy of the insurance claim submission, and ensuring that it is made based upon facts and not assumptions." Dkt. 270 at 10. Updating cost and schedule estimates tied to the December 2020 and February 2021 insurance-claim submissions is not legal advice because, among other things, acknowledging that an insurance claim should be based on facts, not assumptions, could have originated from any non-lawyer. The emails contain common-sense instructions for the framework of the consultants' work, not privileged legal advice.

### III.    The Three Emails Are Not Subject to Clawback as Attorney Work Product.

#### A. The Three Emails Provided Instructions for Updating the Proof of Loss Submitted to the Insurance Companies.

The Three Emails never mention litigation. Rather, they *repeatedly* tie back to Steward's December 4, 2020 insurance-claim submission. The lead email (the first of the three) explicitly states: "Since the 12/4/20 claim submission and the 2/5/21 Interim proof of loss we have learned more through testing and visual investigation that will require us to update the Consigli As-Was and Code Estimates." Dkt. 271 at Ex. 1. The fact that Mr. Kidney relayed statements made by lawyers does not convert these communications to work product prepared by an attorney in anticipation of litigation. *See* Dkt. 270 at 8 (the email's "expressed purpose . . . ties back to the

9

'[insurance] claim submission' . . . these statements are more indicative of the ongoing effort by Steward, in collaboration with its vendors, to supplement its insurance claim Proof of Loss statement with defensible positions in seeking the insurance claim payout."). And the second and third emails are "not even debatable" as work product, since they "convey no mention of lawyers and are mere follow-ups about the cost and schedule information[.]" Dkt. 270 at 9.

Plaintiff mischaracterizes the proof of loss submitted to the Defendant-insurers as merely a pre-suit prerequisite. Dkt. 271 at 6. In fact, regardless of litigation, the Policy required Steward to substantiate its claim—through a sworn statement of loss "containing the information necessary to investigate the claim," (Dkt. 61-1 at § 6.13.01.08), cooperation in the claim's investigation (*id.*at § 6.13.01.09), and no concealment or misrepresentation of material facts (*id.* at § 6.03.01.04). Under Massachusetts law, an insured bears the burden to prove that its claim is covered and must provide the insurer with any relevant documents related to its claim. *See, e.g. New Fed. Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 543 F.3d 7, 11 (1st Cir. 2008); *LaFleur v. Trust Ins. Co.,* 792 N.E.2d 149, 2003 WL 21710455 at *1-2 (Mass. App. Ct. July 22, 2003).

Plaintiff's own authority, *Textron*, helps Defendants. There, the First Circuit held that work-product protection requires that a document be "prepared for" litigation, not merely related to a subject that "might conceivably be litigated," and not merely because it was "prepared by lawyers or represent[ed] legal thinking." *United States v. Textron Inc.*, 577 F.3d 21, 29-30 (1st Cir. 2009). The Special Master applied the same standard. Order No. 25, Dkt. 270 at 8 (quoting *Felisberto v. Dumdey*, 541 F. Supp. 3d 142, 148 (D. Mass. 2021)).

Further, the timing of the failed June 2021 mediation and Zurich's October 2021 suit against MPT does not change the emails' core purpose. Dkt. 270 at 8 (the emails' "stated objective was to effectively adjust the claim, not to seek or provide legal advice or legal direction").

Steward's obligation to substantiate its proof of loss with "facts not assumptions" existed independently of any anticipated litigation and would have arisen regardless of when (or whether) litigation commenced. *Id.* ("Steward and its counsel would have requested that their contractors' input into the insurance proof of loss [] be 'based on facts not assumptions' irrespective of the litigation. Such proof is necessary for an insured to successfully set forth its insurance claim and achieve the payout to which it is entitled."). As the Special Master correctly found, it was "not at all clear" the July 14 Email was created "because of the prospect of litigation," Dkt. 270 at 7 (citing *Colonial Gas. Co. v. Aetna Cas. & Sur. Co.*, 144 F.R.D. 600, 605 (D. Mass 1992)), and it would have been "created in essentially similar form irrespective of the litigation," *id.* at 8 (citing *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 70 (1st Cir. 2002)).

### B. The Third-Parties' Responses to the Emails Illustrate the Emails' Non-Litigation Purpose.

Contrary to Plaintiff's argument, the consultants' responses actually confirm the Three Emails' purpose. As the Special Master found, the responses, "further indicate that the request was not created 'because of' litigation[,]" since the consultants "were asked for, and responded with, prepared budgets and schedules for the rebuilding of Norwood Hospital[,]" that "would have been prepared in the same manner 'irrespective of the litigation,'" because "this was required to make a valid and supportable insurance claim." Order No. 25, Dkt. 270 at 8; *see also* Ex. G [BR+A response]; Ex. F [Consigli response].

Plaintiff's reliance on *Frank v. L.L. Bean, Inc.* is misplaced. *See* Dkt. 271 at 5 (citing *Frank v. L.L. Bean, Inc.*, No. CIV. 04-221-P-S, 2005 WL 2177062, at *1 (D. Me. Sept. 8, 2005)). There, an attorney conducted an interview that was indisputably work product. The non-party interviewee, however, requested a copy of the transcript of his interview. The court balanced the work-product claim with the interviewee's right to his own statement pursuant to Federal Rule of

Civil Procedure 26(b)(3)(C)(ii), and merely required redaction of the attorney's questions from the interviewee's own statement. *Frank*, 2005 WL 2177062, at *1-2. That case is not helpful to Plaintiff, and it does not support a finding that the instructions and framework provided to third-party consultants can be withheld as work product where the work done in accordance with those instructions is produced. Here, the consultants' responses and the underlying work were prepared to maximize Steward's insurance claim, not in anticipation of litigation, and the instructions, framework, and assumptions provided to the third-party consultants are as discoverable as the subsequent work itself.

### C. Any Work Product Claim Was Waived by Disseminating the Lawyers' Feedback to 14 Third Parties.

Any work product claim was also waived. Mr. Kidney's disclosure to 14 people at multiple third parties (each performing work toward Steward's insurance claim) substantially increased Defendants' opportunity to obtain the information—which is precisely what occurred when three separate third-party subpoena recipients produced the records. *See, e.g., In re Zofran Prods. Liab. Litig.*, 392 F. Supp. 3d 179, 185 (D. Mass. 2019) (waiver occurs when "disclosure substantially increases the opportunity for potential adversaries to obtain the information.") (citing *Bryan Corp. v. Chemwerth*, *Inc.*, 296 F.R.D. 31, 38 (D. Mass. 2013)).

### D. Defendants Have a Substantial Need to Maintain the Three Emails to Defend the Breach of Contract and Bad Faith Claims.

Defendants must defend a "bad faith" claim that they deliberately "slow-walk[ed]" Steward and MPT's insurance claims. Dkt. 270 at 9 (citing Dkt. 61 at ¶¶ 9-10, 49, 68-70, 112). The Special Master found the Three Emails—obtainable no "any other way than through discovery"—bear directly on "whether the claim was processed improperly slowly" and "[w]ho knew what, and when, and in what amounts." *Id.* at 9. She further found that Defendants "have sufficiently stated

a substantial need to understand" why Consigli's cost estimates changed so significantly, "particularly in light of Plaintiff's accusations of bad faith." *Id.*

This analysis is sound and unrebutted.[6] As relied upon by the Special Master, *Plaintiff* accuses *Defendants* of bad faith. At the same time, Plaintiff seeks to shield the fact that by July 2021, Steward and its consultants knew the proof of loss submitted to Defendants was inaccurate but did not disclose that information to Defendants. This information is critical to both Defendants' defense of the unfair and deceptive practices allegation. As to American Guarantee, Steward claims that it "[d]elay[ed] the investigation and payment of Steward's claim by requiring Steward to submit (or resubmit) information that is not necessary to the adjustment of the claim or that has already been provided to the Defendants." Dkt. 61 at ¶ 112. As to Zurich, Steward claims that it delayed the investigation and payment of MPT's claim, which "impaired Steward's progress on its own claim and under its Policy with [American Guarantee]." *Id.*

The Special Master also correctly found that Defendants cannot obtain this information elsewhere. Deposition testimony is no substitute for the contemporaneous written instructions that both kicked off the consultants' revised work and explained why it was needed. Fed. R. Civ. P. 26(b)(3)(A); *see also* Dkt. 270 at 9-10. Defendants do not simply need to ask witnesses about the timing and accuracy of updated loss estimates (as suggested by Plaintiff at Dkt. 271 at 8), but also

---

[6] Plaintiff focuses on the fact that the Three Emails do not relate directly to "Defendant's new fraud defense" about "the decision to either repair or rebuild the hospital." Dkt. 271 at 9. Plaintiff completely ignores that it sued Defendants for bad faith, and that the Special Master relied heavily on Plaintiff's accusations against Defendants to find substantial need. Dkt. 270 at 11 ("In light of the claims of 'bad faith' insurance claims processing . . . the documents meet the Defendants' work product exception for 'substantial need' and 'lack of other sources' for this information."). Whether the Three Emails are also indicative of concealment of material facts or fraud is yet to be determined, and Defendants reserve all rights to continue to investigate its defenses during discovery and amend the pleadings, including its defenses, to conform with the evidence.

require access to the Three Emails and any other instructions, assumptions, fact-development, and investigation that led the consultants to revisit the loss estimate.

Further, the Three Emails do not contain any "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). A fair reading of the entirety of the Three Emails and the consultants' responses makes clear the Special Master's Order on this point was correct, and certainly not clearly erroneous. Dkt. 270 at 10 (finding that the documents "do not reflect attorney mental impressions, and would not be entitled to any higher standards" that may apply to opinion work product). The fact that a meeting with lawyers prompted the need to revise the estimates, and that Mr. Kidney attributed the request to the lawyers, is unremarkable. The instructions in the emails—even as directed by a lawyer to Mr. Kidney and referring to "causation issues" and "proving the loss" with facts—are common sense, not mental impressions or legal theory related to litigation.

That said, Defendants do not object to the Special Master's proposal that Plaintiff substitute "Steward" for "lawyers" and "legal team," within the email. The point is simply that *Steward* and its consultants knew the loss estimates needed to be updated and based upon newly developed information and facts, which ultimately produced a (previously undisclosed) loss estimate over 60% below the figure used to support the insurance claim.

## CONCLUSION

For each of these reasons, Plaintiff's Objection to Special Master Hochberg's Order Number 25 should be overruled.

Dated: July 28, 2026                           Respectfully submitted,

                                               /s/*Ronald S. Safer*

                                               Ronald S. Safer (pro hac vice)
                                               Amy C. Andrews (pro hac vice)

Abigail L. Peluso (pro hac vice)
Lucas T. Rael (pro hac vice)
RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn Street, Suite 2200
Chicago, Illinois 60603
Tel: (312) 471-8700
Email: rsafer@rshc-law.com
           lrael@rshc-law.com
           aandrews@rshc-law.com
           apeluso@rshc-law.com

Jonathan D. Mutch, Esq. (BBO No. 634543)
Timothy Wenger (BBO No. 674087)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel: (617) 267-2300
Email: JMutch@RobinsKaplan.com
           TWenger@RobinsKaplan.com

Michael Menapace (BBO No. 568841)
Wiggin and Dana, LLP
20 Church Street
Hartford, Connecticut 06103
Telephone: (860) 297-3733
Facsimile: (860) 297-3799
mmenapace@wiggin.com


*Attorneys for Defendants American
Guarantee and Liability Insurance Company
and Zurich American Insurance Company*

15

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2026 a copy of the foregoing document was filed with the Court via the ECF filing system. As such, this document will be electronically sent to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/Ronald S. Safer*