**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendants. | Civ. Action. No. 21-cv-11902-PBS |

**DISCOVERY MASTER ORDER NO. 26:
Motion to Reconsider Order No. 22 Re: Privilege Ruling as to Robert Gendron**

On July 13, 2026, Plaintiff, represented now by the Reid Collins & Tsai law firm, submitted a letter brief requesting that the Discovery Master reconsider Section IV(B) of Discovery Master Order No. 22 (ECF 224) as to Robert Gendron, CEO of third-party consultant CREF. The request was made following Judge Saris' June 26, 2026 denial of Plaintiff's objection to Section IV(B) of Order No. 22, "without prejudice to seeking the privilege with respect to Mr. Gendron." (June 26, 2026 Hrg. Tr. at 14:11-14). Defendants oppose the categorical withholding of Gendron documents and argue that the documents should be produced subject to clawback.

Defendants submitted a responsive letter brief on July 24, 2026. Given the late stage of this case, as it heads toward summary judgment briefing and trial, and the thousands of CREF documents still being withheld, the Discovery Master has prioritized ruling on this motion. This has necessitated a temporary halt of the time-consuming *in camera* review process that is presently underway, in accordance with certain provisions of Order No. 22.

Pursuant to the Court's Order appointing the undersigned as Discovery Master (ECF149), the Discovery Master rules as follows.

**Ruling as to CREF Employees in Order No. 22**:

Section IV(B) of Order No. 22 ruled on Plaintiff's assertions of privilege/work product as grounds to withhold communications involving employees of CREF, a third-party company that was engaged by contract to assist in managing Steward's real estate development and facilities for its hospital portfolio. As discussed in Order No. 22, CREF was 40% owned by Ralph de la Torre, the former Steward Healthcare CEO. Steward owned Norwood Hospital, whose funds

1

were used to pay CREF for the personnel employed by CREF. Thus, the Steward CEO had a large personal ownership stake in CREF— the entity that was receiving hospital funds pursuant to its contract with Steward. The other 60% of CREF was owned by Robert Gendron, de la Torre's associate and co-investor. When ill winds of negative publicly began to blow in Steward's direction, Gendron repurchased de la Torre's interest in their shared investment in CREF—for double what de la Torre had paid Gendron for the 40% interest.

In Order No. 22, the Discovery Master found that Plaintiff could not categorically withhold over 4,000 email communications involving CREF personnel simply by arguing that CREF personnel are "functionally equivalent" to Steward employees. Order No. 22 concluded that Plaintiff provided sufficient grounds for a finding that one CREF employee, Chris Kidney, held "a high-level, trusted decision-making or guiding role, equivalent to that of an employee." (Order No. 22 at 35-36). The Order further found that Mr. Kidney's presence on emails between Todd & Weld and Steward does not waive the privileged status of communications between Steward and its counsel, but that Kidney's presence on otherwise non-privileged communications does not render them privileged. Further, Mr. Kidney is not cloaked with derivative privilege as a "translator" of third-party communications.

Plaintiff's challenge to Order No. 22 has been denied, with the exception of the right to seek reconsideration of Gendron's status. In Order No. 22, the Discovery Master found that Plaintiff had failed to make any showing that Mr. Gendron's work as the CEO of CREF warranted a "functional employee" label. In other words, Plaintiff did not begin to meet its burden of proof.

In this motion for reconsideration, the Discovery Master considers Plaintiff's renewed effort to meet its burden of proof to attempt to show that Mr. Gendron was a "functional employee." In communications with the Discovery Master on July 28, 2026, Plaintiff confirmed that he is withholding 1,749 emails under Section IV(B)(2) involving "Kidney and/or Gendron and Todd & Weld," and that, of those, approximately 200 emails include "Todd & Weld, Kidney and/or Gendron, and no other CREF employee," while the remaining 1,549 "include Todd & Weld, Kidney and/or Gendron and at least one other CREF employee."

The volume of communications still withheld requires a resolution of Gendron's status.

**Robert Gendron's Role at CREF and Steward:**

In the instant motion for reconsideration, Plaintiff was given a second chance by Judge Saris to attempt to meet its burden of proof to establish that the Gendron communications were in his purported role as a "functional employee" of Steward. It is unclear whether Judge Saris intended to allow Plaintiff to state more facts than in the factual statements made prior to Order No. 22, so the Discovery Master will consider all additional facts stated by either Party to determine Mr. Gendron's status, and decide whether he was a "functional employee."

Robert Gendron founded CREF in 2016. (Gendron Dep. Tr. at 14:21-15:1). At the time of CREF's founding, as set out in Plaintiff's own briefing, Gendron already knew Mr. de la Torre, dating back to 2010 when another of Gendron's companies, GenCon, was hired to build a private

2

residence for de la Torre. (*See also* Gendron Dep. Tr. at 53:6-12). In 2017, Gendron was asked by Steward to formulate a "lift-out" strategy to remove certain real estate functions from Steward employees and facilitate the outsourcing of a portion of its real estate and facilities management functions to CREF. (Gendron Dep. Tr. at 74:9-76:13).

This "lift out" goal was established in a contract, first entered into in 2018 and thereafter extended through amendments. The April 2021 amendment of the CREF-Steward Master Services Agreement stated that "Steward's engagement of Contractor [CREF] under any Project Authorization shall be as an independent contractor for the performance of the Services," and that "*[n]othing contained in this Agreement shall be deemed or construed to create any association, partnership, joint venture, or relationship of principal or agent, master or servant, or employer and employee between Contractor [CREF] and Steward.*" (Ex. E to Defendants' Letter Brief, italics added). Thus, the individuals who worked for CREF, including Mr. Gendron, were explicitly disavowed by both Steward and CREF as being either "agents" or "employees" of Steward, from the very outset of the relationship. Since they clearly were not employed by the hospital, this disavowal could only mean that CREF personnel generally could not claim any status as de facto "functional employees."[1]

In the course of their long and mutually beneficial relationship, Mr. Gendron and Mr. de la Torre became business investment shareholders, together benefitting financially from of the entire business success of CREF. As Mr. Gendron testified at his deposition, in April 2021, Steward CEO Ralph de la Torre personally purchased a 40% interest in Gendron's wholly-owned company GenHoldCo (the parent of CREF) for $4 million to Gendron. (Gendron Dep. Tr. at 296:4-9). In August 2024, as Steward Health Care was failing and filing for bankruptcy under Mr. de la Torre's leadership,[2] Gendron re-purchased de la Torre's entire 40% of GenHoldCo interest for $8 million to Mr. de la Torre. (Gendron Dep. Tr. at 296:20-24). Gendron also testified that between May 2023 and Steward's bankruptcy in May 2024, Steward paid CREF $37 million dollars. (Gendron Dep. Tr. at 298:1-8). Given these facts, the relationship between

---

[1] The facts and arguments pertaining to the determination of Mr. Kindey's status are materially different from those pertaining to Mr. Gendron.

[2] Plaintiff's counsel Reid Collins & Tsai is intimately familiar with Mr. de la Torre's handling of Steward. As promoted on the firm's website, Reid Collins filed a $3.4 billion lawsuit in November 2025 on behalf of Mark Kronfeld (who is also Trustee and Plaintiff in this matter) against Mr. de la Torre and other Steward management and insiders "for orchestrating what the complaint calls a 'years-long extraction of value' that led to the collapse of Steward Health Care." Reid Collins further explains: "By 2024, Steward had essentially been gutted, with its most valuable assets sold, its operating capital drained, and its facilities deteriorating," and that "[m]any political and media commentators have described Steward as epitomizing the destructive impact of private equity and corporate greed on the American healthcare system." *See* https://reidcollins.com/media-center/reid-collins-files-3-4-billion-suit-over-systematic-value-extraction-that-led-to-collapse-of-steward-health-care/ (last visited July 30, 2026). The merits of these allegations and those of this case will be decided by the appropriate Courts in due course. Whether the "lift out" contract between Gendron's CREF and Ralph de la Torre's Steward is part of what Plaintiff's firm dubbed an "extraction of value" is to be decided by an appropriate Court, and not by the Discovery Master.

Gendron and Steward can hardly be described as one of a "functional employee" and employer. Gendron and de la Torre were business partners in CREF, which got a lucrative contract to be paid with Norwood Hospital's funds. This is the very hospital that has become bankrupt under the Steward/de la Torre ownership and control. [3]

**Analysis:**

As set out in Order No. 22, "disclosing attorney-client communications to a third-party, undermines the privilege." *Cavallaro v. United States*, 284 F. 3d 236, 246-47 (1st Cir. 2002). The "functional equivalent" doctrine exception to this rule is a narrow exception that has not been adopted by the First Circuit. *See United States ex rel. Long v. Janssen Biotech, Inc.,* 788 F.Supp.3d 167, 171 (D. Mass. 2025) ("[T]he First Circuit has not adopted the functional-equivalent doctrine. This Court will nevertheless assume that under certain circumstances, third-party agents may essentially operate as employees, and that the disclosure to them of otherwise privileged communications will not waive the privilege.").

Even if Judge Saris were to adopt the assumption that a third-party agent may operate as the functional equivalent of an employee, the Plaintiff would first have to overcome the explicit disavowal of agency status for Mr. Gendron and CREF personnel generally. In addition, if Plaintiff could overcome that disavowal, the Plaintiff would then need to meet his burden of proof to establish that each of the Gendron communications was "otherwise privileged," because as stated multiple times, "functional employee" status does not make a communication privileged. All it does is to avoid the loss of that privilege by disclosure to such a "functional employee." This burden of proof "rests with the party asserting the privilege." *See In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003).

To the extent that the doctrine of functional employee equivalence is accorded any validity in the District of Massachusetts, (notwithstanding the First Circuit's ruling that it does not validate this doctrine) the third-party individual in question must be shown to serve "in a high-level, trusted decision-making or guiding role, equivalent to that of any employee." *American's Test Kitchen v. Kimball*, 35 Mass.L. Rptr. 75, *2 (Sup. Ct. Mass., 2018). But the totality of the evidence does not meet this burden this for Mr. Gendron.

As set out in Plaintiff's own brief, Mr. Gendron himself was co-owner of CREF, together with Ralph de la Torre, Steward's CEO, during the time that CREF was engaged as a consultant by Steward to perform outsourced real estate services for Norwood Hospital. At the time, Mr. de la Torre owned a 40% interest in CREF, while Mr. Gendron owned the remaining 60%. The CREF entity was created as a consulting firm, and hospital funds were used to pay for work done by the very consulting firm substantially owned by the hospital CEO. To decide to "lift out" functions from hospital employees to one's own company, for financial gain from the hospital's funds, and then later claim that the personnel who were expressly stated in this "lift-out" contract as *non-employees,* revert to being treated as equivalent to "high-level" employees again when it

---

[3] Gendron bought back de la Torre's 40% ownership share because he was concerned that "the original investment did not play out as hoped, and the bankruptcy and the PR associated with it had negative adverse effects on our ability to grow CREF." (Gendron Dep. Tr. at 297:20-24).

comes time to produce this consulting firm's communications—is a bridge far too far. The theory strains credulity as applied to Mr. Gendron, and the facts wouldn't support it even if the theory had legs.

Mr. Gendron, a close associate and business partner of Mr. de la Torre, was avowedly not in an employee or agency relationship with Steward Healthcare. He was a co-investor with Mr. De la Torre in CREF. He did not work on the premises, and he was not a trusted high-level advisor in seeking legal assistance. The contract with Steward was a significant portion of CREF's portfolio of work, but Steward was certainly not the sole customer of CREF's real estate services, as Gendron conceded. Gendron's work for CREF pursuant to the Master Services Agreement involved assisting in the coordination of third-party consultants who were vendors of services in the clean-up, design, and rebuild planning of Norwood Hospital after the Storm Event. Gendron describes himself as a collector of information from those third-party vendors to use for the business purpose of making the insurance claim that is factually at issue in this case.

Although Plaintiff argues that Gendron managed "all of Steward's [real estate] holdings system wide, nationally and internationally," (Ex. E to Plaintiff's Letter Brief), this does not establish that he held a high-level, decision-making role in the context of the mediation and/or litigation stemming from the Storm Event. He presented a few slides at the mediation, for example, but that does not meet the burden to make his communications the equivalent of a high-ranking trusted employee or decision-maker. His consulting firm simply gathered information from other non-privileged third parties.

Plaintiff has not established that Mr. Gendron had the type of high-level decision-making authority for Steward's legal decisions even on this second chance given them by Judge Saris to try to meet this burden of proof. Indeed, at his deposition, Mr. Gendron distanced himself from such a role, testifying that he did not have a specific role with accounting firm Marsh in developing Steward's business interruption claim and merely compiled information. (Gendron Dep. Tr. at 185:13-186:1). Mr. Gendron also testified that neither he nor CREF managed *any* of the $97.4 million in insurance proceeds that Steward received from American Guarantee. (Gendron Dep. Tr. at 217:8-20). This testimony directly contradicts Plaintiff's argument that Gendron played an "extensive management role in managing the Norwood Hospital insurance claim."

The contract between CREF and Steward is entitled to great weight, because it was a contemporaneous document, between Gendron, whose company was a signatory to the contract, and Steward; The contemporaneous document explicitly disclaims that Gendron's or CREF's role creates any "association, partnership, joint venture, or relationship of principal or agent, master or servant, or employer and employee between Contractor [CREF] and Steward."

In sum, Robert Gendron was not a "high-level" decision-maker of Norwood Hospital/Steward; he was at all times acting as an owner of CREF in its role as a consultant for Steward, and in his role as a private co-investor with Ralph de la Torre, the hospital's then-CEO.

In the course of the Discovery Master's review of the *in camera* production submitted by Plaintiff in accordance with Order No. 22,[4] which is still underway, a pattern has emerged: After Defendants selected a tranche of withheld emails for *in camera* inspection, (as both they and Plaintiff were permitted in part to do in that Order), Plaintiff then "downgraded" a significant percentage of them to a "not privileged" status. In so doing, Plaintiff itself has recognized that its reviewers over-withheld documents as privileged more often than by a few understandable errors.

Pertinent to CREF's documents, Order No. 22 gave Defendants the right to select a tiny sample of CREF communications — still withheld as "privileged"— for *in camera* review. Of the 7 such documents in the sample that Defendants selected to be reviewed, Plaintiff thereafter voluntarily downgraded 4. And, while the review of the total approximately 200 documents submitted by both Parties for *in camera* review is still ongoing, 2 other CREF documents from this tiny sample of 7 have been determined by the Discovery Master not to be privileged, thus far. Even putting aside these 2 additional documents for the moment (which will be discussed in a future order), the mere fact of downgrading 4 out of 7 communications shows that over half of this tranche of documents should have been produced long ago. This scenario is repeated for many other third-party consultants. The pattern of continued excess-claiming of privilege strongly weighs against any further withholding for Gendron's communications. There is no basis in any of the myriad privilege doctrines asserted in this case for *any communications of Gendron to be withheld any longer.*

Indeed, this pattern suggests the need to scrutinize the documents withheld as to Mr. Kidney, to be sure that *not a single document other than those in which only Mr. Kidney and Todd & Weld and/or Foley Hoag attorneys are on the email is withheld.  If any other CREF personnel, or any third-party or third-party consultant who was not a "translator" at the time of the communication is on the chain, it must be produced.*

While Plaintiff is finally, and belatedly, conducting a review of its reviewers' work, this is far too late to be occurring. Privilege logs were represented as being "completed" many months ago; multiple depositions have been taken, in reliance on the Plaintiff's representation that only privileged documents were withheld. There is still too much "blanket withholding," which likely carries over into the approximately 1,700 Gendron communications. We are just months away from summary judgment briefing, and yet many unprivileged documents are still being withheld. Depending on the content of communications and documents yet to be produced, it is conceivable that depositions may need to be retaken or supplemented. This is decidedly *not* where this case should be at this point in the progression toward the trial.

When Order No. 22 granted leave to seek *in camera* review of discrete small samples of withheld documents, and the results are as stated in the above paragraphs, it raises a concern about whether Plaintiff's document review process had qualified reviewers, with supervision by knowledgeable counsel who really put their own eyes on the withheld documents. It is undisputed that it is a party's own duty to ensure that it does not over-withhold documents; the oft-stated principle of privilege is that it must be narrowly confined, so that the production of

---

[4] This review is still in progress, with dozens of communications to review and rule upon.

unprivileged documents is accomplished for the fair administration of justice for all parties in a case.

The opposing party cannot be expected to try its case without ever seeing documents that it has a right to see and ask about at depositions, and rely upon in its motion for summary judgment. And this over-withholding has caused unnecessary expenses to Defendants; delays to the Court; far too many rulings needed from the Discovery Master; and, worst of all, the prospect that there are still potentially hundreds or over 1,000 unprivileged documents still being withheld.

Given the factors discussed above, there shall be no blanket withholding of the Gendron communications, nor selective withholding based on the "functional equivalent" or any other grounds. Mr. Gendron is not a "functional employee." He is a third-party consultant who is not a "translator" needed to provide legal advice to a client.[5] Disclosure of purported attorney-client communications to Mr. Gendron shall be treated as disclosures to a third party, which is what he was. Therefore, the communication on which Mr. Gendron is copied, or on which he is the recipient or sender, are not privileged, subject to claw back. Plaintiff shall therefore produce, subject to clawback, the 1,749 withheld communications involving Mr. Gendron, regardless of whether Mr. Kidney or an attorney is on the communication. There has been no basis shown that Mr. Gendron is anything beyond an owner, with Ralph de la Torre, of a third-party consulting firm that has not been engaged as a non-testifying consultant.  The Gendron documents must be produced forthwith, without further delay, and not later than August 7, 2026.

**SO ORDERED**

Dated: August 4, 2026                         /s/ *Faith S. Hochberg*_____
                                                          Hon. Faith S. Hochberg, U.S.D.J. (ret.)

---

[5] As confirmed by Judge Saris's denial of Plaintiff's objection to Order No. 22.