# Exhibit A



Reid Collins & Tsai LLP
420 Lexington Avenue, Suite 2515
New York, NY 10170
212.344.5200

Jeffrey E. Gross / Partner
212.344.5211
jgross@reidcollins.com

July 13, 2026

***Via Email***

Hon. Faith S. Hochberg
Hochberg ADR, LLP
judgehochberg@judgehochberg.com

> **Re:**   ***Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust v. American Guarantee and Liability Insurance Company, et al., Case No. 21-cv-11902-PBS (D. Mass.)***

Dear Judge Hochberg:

Plaintiff Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust ("**Plaintiff**") respectfully submits this letter brief to request reconsideration of Section IV(B) of Discovery Master Order No. 22 (the "**Order**") as to Robert Gendron, CREF's CEO.

This request follows Judge Saris's June 26, 2026 ruling on Plaintiff's objection to Section IV(B) (the "**June 26 Ruling**"), where the Court expressly invited reconsideration as to Robert Gendron, explaining that "one could take a second look at Mr. Gendron" because he was the CEO of Steward's "major real estate arm," and that the Court "would have to believe a CEO" was a highly trusted individual. Ex. A at 8:2; 8:17–20; 15:1–2.

While the Order found that "[s]everal high-level CREF employees served as the functional equivalent of Steward employees," it ultimately only granted functional equivalent status to Chris Kidney. Order at 35. Your Honor held that the "other CREF employees who worked under Mr. Kidney do not meet the status of 'a high-level, trusted decision-making or guiding role case for functional employees.'" Order at 37. And the Court found that "[n]o showing ha[d] been made that Mr. Gendron, the CEO of CREF, . . . warrants the 'functional equivalent label.'" Order at 37.

The June 26 Ruling expressly upheld Your Honor's decision to apply the functional equivalent doctrine to the privilege issues involving CREF employees but did so "without prejudice to seeking the privilege with respect to Mr. Gendron." Ex. A at 8:24–25; 14:13–14. Judge Saris granted Plaintiff leave to "move for reconsideration on him because he was the CEO," *id.* at 7:22–24, explaining that the Court "would have to believe a CEO was" in the kind of "highly-trusted" position contemplated by the functional equivalence doctrine, *id.* at 14:21–15:2; *see also* *id.* at 10:21–22 ("allowing [Plaintiff] to move to reconsider on Gendron"). The Court, however,



ultimately left it up to Your Honor to determine if Gendron qualifies as a "functional equivalent" employee. *Id.* at 20:24–21:1.

Plaintiff requests that the Order be modified on reconsideration to treat Gendron the same way the Order treats Chris Kidney for otherwise privileged communications with Steward's counsel, because the Court has now expressly identified Gendron as the CREF executive whose status warrants reconsideration.

## I.    THE RECORD AND THE COURT'S JUNE 26 DIRECTION WARRANT RECONSIDERATION AS TO ROBERT GENDRON.

The record before Your Honor, combined with Judge Saris's express invitation to seek reconsideration, demonstrates that Robert Gendron satisfies every criterion Your Honor applied to Chris Kidney in granting functional equivalent status.

The attorney-client privilege protects "'confidential communications made for the purposes of obtaining or providing professional legal services,' including such communications 'between representatives of the client[,] or between the client and a representative of the client.'" *America's Test Kitchen, Inc. v. Kimball*, 2018 WL 2049490, at *2 (Mass. Super. Apr. 2, 2018) (first quoting Mass. Guide Evid. § 502(b); and then citing *Hanover Ins. Co. v. Rapo & Jepsen Ins. Services, Inc.*, 449 Mass. 609, 614–17 (2007)).[1] In scenarios involving a corporate client like Steward, "the attorney-client privilege protects communications that gather or convey information from knowledgeable employees or agents that is needed by counsel in formulating legal advice, as well as communications that relay legal advice obtained from an attorney to employees or other agents of the client who must understand and help to implement that advice." *Id.*; *see also Com. v. Angelo Todesca Corp.*, 842 N.E.2d 930, 937 (Mass. 2006) ("Because a corporation is not a living person, it can act only through its agents.").

Accordingly, for purposes of applying the attorney-client privilege, an individual consultant who "plays a 'pivotal role' in matters as to which the business obtains legal advice from an attorney" is a "functional equivalent of an employee" of the client corporation, and "the

---

[1] In the June 26 Ruling, although the Court acknowledged that there are no precedential First Circuit cases adopting the functional equivalent doctrine, the Court nevertheless found Justice Salinger's opinion in *America's Test Kitchen, Inc. v. Kimbal*, 2018 WL 2049490 (Mass. Super. Apr. 2, 2018), particularly persuasive, describing the decision as "thoughtful" and "really well done." *See* Ex. A at 6:14–17, 25; 9:2–3. In *America's Test Kitchen*, the court "agree[d] with the legal premises" of the functional equivalent doctrine, finding that it "necessarily follows from the general principle that the privilege encompasses confidential communications 'made to or shared with necessary agents of the attorney or the client.'" *America's Test Kitchen*, 2018 WL 2049490, at *2 (quoting *Hanover Ins.*, 449 Mass. at 616); *see also One Ledgemont LLC v. Town of Lexington Zoning Bd. of Appeals*, 2014 WL 2854788, at *2 (Mass. Land Ct. June 23, 2014) ("While this functional equivalent analysis is not yet chiseled deeply into the decisions of Massachusetts' appellate courts, there is good reason to conclude that our Supreme Judicial Court, if and when presented with the occasion, would apply and follow this line of Federal Court jurisprudence.").



attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant is involved in, copied on, or becomes privy to those communications." *America's Test Kitchen*, 2018 WL 2049490, at *2 (citing *One Ledgemont*, 2014 WL 2854788, at *2–*4). As articulated in the Order, "those CREF employees . . . who acted 'in a high-level, trusted decision-making or guiding role, equivalent to that of an employee,' became a 'functional employee'" of Steward, and their "status as a third-party does not destroy any privilege that would otherwise apply to their communications with Steward counsel." Order at 35 (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2).

To determine whether a CREF employee met the requirements of the functional equivalent doctrine, Your Honor considered several factors, including whether the employee: (1) "acted 'in a high-level, trusted decision-making or guiding role"; (2) "maintained [a] steward.org email address[]"; and (3) "regularly worked in collaboration with Steward employees and counsel." Order at 35 (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2); *see also Burke v. Gen. Hosp. Corp.*, 2019 WL 6197040, at *8 (Mass. Super. May 3, 2019) (listing factors courts consider supportive of the application of the functional equivalence doctrine, including a consultant "having a long involvement with the client's business;" "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys").

Gendron satisfies all the factors Your Honor relied upon in finding that Kidney satisfies the functional equivalent doctrine. Like Kidney, Gendron, as CREF's CEO, was a trusted high-level CREF employee, who regularly worked in collaboration with Steward employees and counsel, often acted as a key decision-maker and trusted advisor to Steward, and long maintained his own Steward email address.

### A.    Gendron was deeply intertwined in Steward's operations from its founding.

Gendron is exactly the kind of high-level, highly trusted employee contemplated by the functional equivalence doctrine. He met Ralph de la Torre, Steward's CEO, in or around late 2010, when GenCon (his prior company) was hired to build de la Torre's Cape Cod residence. Ex. B at 53:6–12. From 2012 to 2016, Steward hired GenCon to complete a "series of projects" at Steward's Massachusetts hospitals. *Id.* at 54:2–6.

By the time Gendron founded CREF in 2016, he had already been working closely with Steward and its CEO for years. *See Burke*, 2019 WL 6197040, at *8 (listing "having a long involvement with the client's business" as a factor supporting functional equivalence status). Notably, Gendron, as CREF's CEO, sat "at the top of the [CREF corporate] tree," including **above Chris Kidney**. Ex. B at 115:6–12 (confirming Gendron "do[es]n't report to anyone within CREF" because he is the CEO); *see also* Ex. C.

In 2017, after Steward acquired eight facilities in Massachusetts, Steward's then-general counsel, Joseph Maher, approached Gendron to formulate a "lift-out" strategy by which Steward



outsourced its real estate and facilities management functions to CREF. Ex. B at 74:9–76:13; *see also* Ex. D at 6:10–16 ("Steward has outsourced its Capital Project Management to CREF."). Steward and CREF executed the lift-out in 2018. Ex. B at 117:8–9. Gendron served as the "client executive in charge" of the Steward account until Michael Crowley transitioned into the role in 2021 or 2022. *Id.* at 106:14–23. As a result, Gendron managed "all of Steward's [real estate] holdings system wide, nationally and internationally." Ex. E. As part of the lift-out, Gendron—like Kidney—received a Steward email address. Ex. B at 117:5–14. Gendron did not maintain a comparable address for any other CREF client. *Id.*

Steward was CREF's "biggest client by a large margin": the CREF entities earned between $25 and $35 million annually from the Steward relationship. *Id.* at 59:15–19. At his deposition, Gendron could not even name CREF's next largest client, but testified that the client annually generated only "a million plus or minus." *Id.* at 59:6–60:1. Put differently, Steward was not just one of CREF's clients, it was CREF's business.[2] As CREF's CEO, Gendron was inextricably tied to Steward, its largest client, because maintaining that relationship personally was central to his role.

Having worked closely with Gendron for nearly a decade, Steward unsurprisingly turned to Gendron to manage the Norwood crisis and its aftermath. From the first moment flood water breached hospital walls, Steward looked to Gendron. On the day of the flood, Gendron was informed of the "significant event going on" and that Steward was "evacuating the hospital." *Id.* at 148:2–149:1.

The Norwood flood drew Gendron deeper into Steward's management structure, and he was an integral part of the company's executive-level response to the crisis. After the flood, John Polanowicz, Steward's Chief Operating Officer, became Gendron's "primary contact" at Steward, *id.* at 38:21–25, but it was still "very common for Ralph [de la Torre] to reach out directly" to Gendron "just to say, [d]o everything you can to figure this out," *id.* at 189:15–190:4. In August 2020, Gendron met in person with de la Torre and Polanowicz to review CREF's Norwood Strategic Planning memorandum. *Id.* at 220:25–221:15. Then, in December 2020, the Steward board invited Gendron to their meeting to update them on the situation at Norwood. *Id.* at 243:2–247:8. Gendron gave another Norwood Hospital update to Steward's board alongside Harry Bane, Steward's Regional President of the New England Region, in February 2021. *Id.* at 275:8–276:6; *see also id.* at 238:21–239:3 ("Harry Bane was the regional president of the New England Region with Norwood Hospital . . . being one of the nine hospitals that rolled up to him in that role.").

---

[2] Steward and CREF's businesses were so intertwined that, as Your Honor has recognized, even Defendants initially thought several CREF employees were Steward employees. *See* Order at 35 ("[D]uring the first hearing between the Discovery Master and the Parties, . . . Defendants admitted that they initially thought that several high-level CREF employees were actually Steward employees, until Steward informed them otherwise.").



Gendron's central role in Steward's management of the flood and its aftermath is obvious in the record: Plaintiff has produced over 8,000 emails between Gendron and members of Steward's executive leadership or in-house counsel between June 28, 2020, and April 23, 2024, meaning Gendron averaged six emails a day with Steward's executives or its lawyers following the flood.

### B.     Steward regularly delegated decision-making authority to Gendron.

After years of working shoulder-to-shoulder with Steward's leadership, Gendron occupied a position of authority within the organization. Steward's executives regularly deferred to Gendron when making operational decisions and empowered him to act on Steward's behalf. *See Burke*, 2019 WL 6197040, at *8 (listing "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys" as factors supporting functional equivalence status).

That authority is perhaps best illustrated by Gendron's extensive role in managing the Norwood Hospital insurance claims. Gendron sat at the top of the Steward team that was formed to address the crisis at Norwood after the flood, as reflected in an internal Steward PowerPoint titled Norwood Hospital Team Structure, which placed "Steward Executive VP Bob Gendron" at the top of the communications and responsibility matrix with "insurance, legal, financial and CREF" all below him. Ex. F.[3]

Steward's general counsel's office also gave Gendron "certain authorities to execute proposals" on Steward's behalf. Ex. B at 179:21–180:3. And he did so by signing as ***Steward's*** Executive Vice President of Global Real Estate. *Id.*; Ex. G. For instance, when Steward wanted to engage a public adjuster, the "Steward executive team"—namely, de la Torre and Polanowicz—asked Gendron to interface with MPT about bringing on a public adjuster. Ex. B at 157:17–158:13. When Steward decided to hire NFA as their public adjuster, "de la Torre or the board of directors at Steward referred NFA to [Gendron]." *Id.* at 158:25–159:3. Gendron negotiated and agreed to terms with NFA. There was no pushback from Steward; in-house counsel merely asked for the agreement so it could be reviewed and revised "as necessary before it is executed." Ex. H. When the contract with NFA was finalized, it was Gendron, not a Steward employee, who executed the document on Steward's behalf. Ex. G; *see also Burke*, 2019 WL 6197040, at *8 (listing "holding itself out as the client's agent and/or spokesperson" as factor supporting a consultant's functional equivalence status).

Steward's deference to Gendron extended beyond internal decision making; Steward regularly entrusted Gendron to represent Steward externally as well. At the Zurich mediation, it was Gendron, not outside counsel, not another Steward executive—and not Kidney—who delivered Steward's opening statement from a script he worked with counsel to prepare. Ex. B at

---

[3] Plaintiff does not assert that each exhibit attached hereto is privileged.



270:12–22; 273:11–17. Gendron personally met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative. Ex. I.

In sum, Gendron acted, and Steward treated him, not just as the functional equivalent of an employee but as a corporate insider. He made decisions for Steward, spoke for Steward to regulators and counterparties, and worked alongside Steward's in-house and outside counsel to develop and execute Steward's legal strategy.

### C.    Gendron worked closely with Steward's in-house and outside counsel because he was a trusted and necessary asset to the team handling the insurance claim.

Beyond his operational authority, Gendron was deeply integrated into the legal work involved in responding to the Norwood flood. Gendron repeatedly drafted, revised, and finalized documents implementing legal advice from Steward's in-house and outside counsel. The records reflect a similar pattern: counsel supplied legal analysis, and Gendron combined that with his subject-matter expertise to formulate and dictate correspondence, project directives, and Steward's larger strategy. *See Burke*, 2019 WL 6197040, at *8 (listing "drafting documents incorporating legal advice received from the client's attorneys" and "helping to fit the client's actions into a legal framework" as factors supporting a consultant's functional equivalence status).

Within twenty-four hours of the June 28, 2020 flood, Gendron was communicating with Steward's executive leadership, including Herb Holtz, Steward's General Counsel, about how to remediate damage to Norwood Hospital. Holtz connected Gendron with Todd & Weld so that Gendron could get Todd & Weld "up to speed on . . . *his* tentative plans for managing" the insurance claim. Ex. E (emphasis added). In an email to Gendron and Todd & Weld in July 2020, Nathalie Hibble explained the need to coordinate with MPT because "MPT is the First Named Insured . . . but *Bob/Steward is managing the claim*." Ex. H.

To guide Steward's strategy during the crisis, Gendron himself identified legal problems and brought them to counsel for analysis and resolution. Shortly after the flood, Gendron wrote to Hibble identifying several concerns, and asking counsel to "provide a summary of Steward's legal responsibilities as it relates to the Master Lease provisions of section 14" so he could resolve what he identified as a "gap in strategy." Ex. L. Hibble responded, looping in Todd & Weld and instructing them to respond to Gendron's request so "Bob can manage this process." *Id*. A week later, Gendron further instructed Steward and Todd & Weld to review the interplay between MPT and Steward's insurance policies so that he could prepare an "initial strategy." Ex. H.

Gendron was not only involved in drafting documents prepared by counsel, but he was also responsible for finalizing them. Following Hibble's early directive to coordinate with MPT, Todd & Weld drafted correspondence for Gendron to edit and send under his own name. In July 2020, Todd & Weld sent Gendron a draft email to MPT stating, "Here is the suggested email we talked about to MTP [sic]. Please edit as you see fit." Ex. J. The contents of that email were explicitly



legal and reflect that Steward, through Gendron, was seeking to understand, among other things, "whatever is needed to comply with the [MPT] lease from a legal perspective." *Id.*

Gendron's communications with Steward's counsel in preparation for the Zurich mediation follow a similar pattern. In preparation for the mediation, following "discuss[ions] over the last few weeks" Gendron prepared a detailed summary of Steward's negotiating positions, and solicited "comments/questions" from Todd & Weld and Steward in-house counsel before he submitted it to the mediator. Ex. K.

Taken together, the record demonstrates that Gendron was not merely copied on privileged communications as a courtesy; he actively participated in formulating legal strategy, directed counsel's work product, and served as the linchpin between Steward's legal team and its operational response to the Norwood crisis.

***

Gendron satisfies every criterion of functional equivalence that Your Honor applied in granting the status to Kidney in the Order. Accordingly, Plaintiff respectfully requests that the Order be modified on reconsideration to treat Gendron the same way the Order treats Kidney for otherwise privileged communications with Steward's counsel.

Respectfully submitted,

*/s/ Jeffery E. Gross*

Jeffrey E. Gross, Partner
REID COLLINS & TSAI LLP