**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 1:21-cv-11902 – PBS |

**PLAINTIFF'S OBJECTION TO DISCOVERY MASTER ORDER NO. 26**

Plaintiff Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust, appeals Discovery Master Order No. 26 (ECF No. 281) (the "**Order**") to safeguard the attorney-client privilege over more than 1,700 communications. Order No. 26 requires Plaintiff to produce these communications on the ground that Robert Gendron—the CEO of CREF, the company that served as Steward's functional internal real estate department—is not a "functional equivalent" of a Steward employee and therefore his presence on communications with counsel destroys the privilege. That conclusion is legally and factually wrong. The Order should be reversed.

**I.    FACTUAL & PROCEDURAL BACKGROUND**

This dispute arises from a series of discovery rulings concerning Plaintiff's privilege assertions over communications involving CREF, a third-party company that served as Steward's functional internal real estate department. The sequence of briefing and rulings leading to Order No. 26 is summarized below.

1

### A.    Order No. 22 and the CREF Privilege Dispute.

On May 14, 2026, Discovery Master Hochberg issued Order No. 22, a 39-page ruling that addressed disputes over the withholding of communications involving thirteen third-party consultants, including CREF. Order No. 22 ruled on a consultant-by-consultant basis and imposed different requirements for each. As relevant here, Section IV(B) of Order No. 22 addressed privilege assertions for communications involving CREF employees. The Discovery Master found that CREF employee Christopher Kidney qualified as a "functional equivalent" of a Steward employee because he "acted 'in a high-level, trusted decision-making or guiding role,'" "maintained [a] steward.org email address[]," and "regularly worked in collaboration with Steward employees and counsel." Order No. 22 at 35. However, the Discovery Master declined to extend the same status to Robert Gendron, CREF's CEO, finding that Plaintiff had not made an adequate showing as to him at that time. Order No. 22 at 35–36.

### B.    Plaintiff's Objection and Judge Saris's Ruling.

On May 29, 2026, Plaintiff filed an objection to Section IV(B) of Order No. 22, challenging the exclusion of senior CREF employees—most notably Robert Gendron—from functional equivalent status. On June 26, 2026, Judge Saris held a hearing on Plaintiff's objection. The Court affirmed Order No. 22 but expressly permitted Plaintiff to "move to reconsider on Gendron." Tr. of Mot. Hr'g at 10:18. Judge Saris specifically distinguished direct Gendron/Kidney/counsel communications, stating that "if it's just with Kidney and Gendron" and counsel, those communications "don't need to be produced" subject to the Discovery Master deciding whether Gendron qualifies. *Id.* at 14:11–14. The Court also directed that documents being produced subject to clawback be produced as Attorneys' Eyes Only. Jaffe Decl. ¶ 8.

On July 13, 2026, Plaintiff filed a motion for reconsideration with the Discovery Master, supported by extensive evidence demonstrating that Gendron satisfies every criterion the

2

Discovery Master applied to Kidney in granting functional equivalent status. Jaffe Decl. ¶ 9 & Ex. 1. Defendants filed their opposition on July 24, 2026. Jaffe Decl. ¶ 14.

### C.    Order No. 26.

On August 4, 2026, the Discovery Master issued Order No. 26, denying Plaintiff's motion for reconsideration. The Order concluded that Gendron "is not a 'functional employee'" and that "[d]isclosure of purported attorney-client communications to Mr. Gendron shall be treated as disclosures to a third party, which is what he was." Order at 6. The Order required Plaintiff to produce, subject to clawback, 1,749 withheld communications involving Gendron "regardless of whether Mr. Kidney or an attorney is on the communication." Id. at 7. The Order further directed that communications involving Kidney could only be withheld if "only Mr. Kidney and Todd & Weld and/or Foley Hoag attorneys are on the email"—meaning that if any other CREF personnel or any third-party consultant appeared on the communication, it must be produced, even if the communication was otherwise between Steward and its attorneys seeking or providing legal advice. The Order set a production deadline of August 7, 2026—three days after issuance and four days before the seven-day objection period expired under the Order Appointing the Discovery Master.

### D.    Plaintiff's Emergency Motion to Stay.

On August 6, 2026, Plaintiff filed an Emergency Motion to Stay Order No. 26 in advance of the August 7 production deadline. The Court allowed the emergency stay motion that same day and directed that the objection be filed on August 11, 2026. *Id.* This objection follows.

## II.    STANDARD OF REVIEW

The Court reviews the Discovery Master's ruling de novo. Under Federal Rule of Civil Procedure 53(f)(4), "[t]he court must decide de novo all objections to conclusions of law made or recommended by a master," and under Rule 53(f)(3) the court likewise "must decide de novo all

3

objections to findings of fact made or recommended by a master" unless the parties have stipulated, with the Court's approval, to a more deferential standard. No such stipulation was entered here, so both the factual and legal components of the Discovery Master's ruling are subject to plenary review. *See* Order Appointing the Honorable Faith S. Hochberg as Discovery Master at 4 (Dkt. No. 149). This standard matches the framework the First Circuit applies to privilege determinations generally: "the standard of review depends on the precise issue being litigated," with "rulings on questions of law [reviewed] de novo" and "findings of fact for clear error." *In re Keeper of Recs. (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16 (1st Cir. 2003); *accord Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002). Because the assertion of attorney-client privilege "involves both law and law-application issues," a challenge to the scope or application of the privilege presents strictly legal questions that are reviewed de novo. *In re Grand Jury Proc.*, 417 F.3d 18 (1st Cir. 2005). Where, as here, the privilege ruling "largely turns on a legal question," review is de novo. *Lluberes v. Uncommon Prods.*, LLC, 663 F.3d 6 (1st Cir. 2011). The Court therefore owes no deference to the Discovery Master's legal conclusions and findings of fact and should determine the privilege question anew. Fed. R. Civ. P. 53(f)(3)–(4).

## III.    <u>ARGUMENT</u>

Order No. 26 should be reversed for three independent reasons. First, the functional-equivalent doctrine preserves privilege where a non-employee plays an integral role in the client's receipt of legal advice—a standard Gendron plainly satisfies. Second, applying the criteria the Discovery Master used to find that Christopher Kidney qualified as a functional equivalent, the undisputed record demonstrates that Gendron—Kidney's superior—satisfies every one of those criteria and more. Third, Order No. 26 commits reversible error by treating independent-contractor status as dispositive, ignoring undisputed facts, and converting purported concerns about over-withholding into a punitive categorical waiver of otherwise privileged communications.

A.    **The Functional Equivalence Doctrine Preserves Attorney-Privilege Where a Client's Agent Is Integral to the Rendering of Legal Advice.**

The functional-equivalent doctrine stems from the Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981), which recognized that a corporation's attorney-client privilege must protect the communications between the corporation's employees and the "attorneys seeking to render legal advice to the client corporation."[1]

Building on that principle, the Eighth Circuit in *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), extended the corporate attorney-client privilege to communications between a company's counsel and a non-employee—an independent contractor, consultant, or other agent—who, because of the person's relationship to the company, is "in all relevant respects the functional equivalent of an employee." The court reasoned that, "just as '[m]iddle-level—and indeed lower-level—employees . . . would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to . . . actual or potential difficulties,' so too would nonemployees who possess a 'significant relationship to the [client] and the [client]'s involvement in the transaction that is the subject of legal services.'" *Id.* at 938 (first quoting *Upjohn*, 449 U.S. at 391; and then quoting John E. Sexton, *A Post-Upjohn Consideration of the Corporate Attorney–Client Privilege*, 57 N.Y.U. L. Rev. 443, 498 (1982)) (alterations in original). Accordingly, using too narrow a definition of "representative of the client" would prevent counsel from "confer[ring] confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* The Eighth Circuit held that "when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors" where the "communications in question [fall] within the scope of [their] duties, were made at the behest of [their] superior, and were made for the purpose of seeking legal advice" for the client. *Id.* at 938–40.

---

[1] [rejection of the narrower control group standard]

Other federal courts of appeals have since adopted the functional-equivalent doctrine. *See United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010) ("We find the reasoning in *Bieter* persuasive and adopt its principles in the Ninth Circuit."); *F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (extending attorney-client privilege protections to client's "public relations and government affair consultants"). And several district courts have applied it even where the test has not been formally adopted in their circuits. *See Dialysis Clinic, Inc. v. Medley*, 567 S.W.3d 314, 320–23 (Tenn. 2019) (collecting cases). Notably, no circuit has rejected the functional-equivalent doctrine.[2] *See, e.g.*, *Walsh v. CSG Partners, LLC*, 544 F. Supp. 3d 389, 392 (S.D.N.Y. 2021) (explaining that the Second Circuit "has not yet adopted" the functional-equivalent doctrine); *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 457 n.2 (E.D. Pa. 2012) (noting that the "Third Circuit has not yet had the opportunity to address" the functional-equivalent doctrine).

While the Massachusetts Supreme Judicial Court has yet to explicitly adopt the functional-equivalent doctrine, several Massachusetts courts have applied the functional-equivalent doctrine or its logic. In *America's Test Kitchen, Inc. v. Kimball*, No. 1684CV03325BLS2, 2018 WL 2049490 (Mass. Super. Apr. 2, 2018), the court "agree[d] with the legal premises" of the functional equivalent doctrine, finding that it "necessarily follows from the general principle that the privilege encompasses confidential communications 'made to or shared with necessary agents of the attorney or the client.'" *Id.*, at *2 (quoting *Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 616 (2007)); *see also One Ledgemont LLC v. Town of Lexington Zoning Bd. of Appeal*s, No. 13 PS 477585(GHP), 2014 WL 2854788, at *2 (Mass. Land Ct. June 23, 2014) ("While this functional equivalent analysis is not yet chiseled deeply into the decisions of Massachusetts' appellate courts, there is good reason to conclude that our Supreme Judicial Court, if and when

---

[2] Order No. 26 references—without citation—a "First Circuit[] ruling that it does not validate [the functional-equivalent] doctrine." Order at 2. Plaintiff is not aware of any such First Circuit decision.

presented with the occasion, would apply and follow this line of Federal Court jurisprudence.").[3] Accordingly, for purposes of applying the attorney-client privilege, an individual consultant who "plays a 'pivotal role' in matters as to which the business obtains legal advice from an attorney" is a "functional equivalent of an employee" of the client corporation, and "the attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant is involved in, copied on, or becomes privy to those communications." *America's Test Kitchen*, 2018 WL 2049490, at *2 (citation omitted).

To determine whether a third-party contractor meets the requirements of the functional-equivalent doctrine, courts consider several factors that ask whether the consultant acted "in a high-level, trusted decision-making or guiding role" for the corporate client. *Id.*; *see also Burke v. Gen. Hosp. Corp.*, No. 1784CV02876, 2019 WL 6197040, at *8 (Mass. Super. May 3, 2019) (listing factors courts consider supportive of the application of the functional equivalence doctrine, including a consultant "having a long involvement with the client's business"; "being a key decision leader for the client"; "having authority to make decisions and statements on the client's behalf"; and "conferring frequently with the client and/or its attorneys"); *see also* Order No. 22 at 35 (considering whether the employee: "acted 'in a high-level, trusted decision-making or guiding role'"; "maintained [a] steward.org email address[]"; and "regularly worked in collaboration with Steward employees and counsel" (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2)).

### B.    On De Novo Review, Gendron Satisfies the Functional-Equivalent Doctrine.

Because the Court reviews the Discovery Master's factual findings and legal conclusions de novo, it should independently determine whether Gendron functioned, in the relevant matters, in a high-level, trusted decision-making or guiding role equivalent to that of a Steward employee. Fed. R. Civ. P. 53(f)(3)–(4). The record confirms that Gendron, as CREF's CEO, was a trusted

---

[3] In the June 26 Ruling, although the Court acknowledged that there are no precedential First Circuit cases adopting the functional equivalent doctrine, the Court nevertheless found Justice Salinger's opinion in *America's Test Kitchen* particularly persuasive, describing the decision as "thoughtful" and "really well done." *See* Ex. A at 6:14–17, 25; 9:2–3.

high-level employee, who regularly worked in collaboration with Steward employees and counsel, and often acted as a key decision-maker and trusted advisor to Steward.

### 1. Gendron's decade-long relationship with Steward.

Gendron is exactly the kind of high-level, highly trusted employee contemplated by the functional equivalence doctrine. He met Ralph de la Torre, Steward's CEO, in or around late 2010, when GenCon (his prior company) was hired to build de la Torre's Cape Cod residence. Ex. B at 53:6–12. From 2012 to 2016, Steward hired GenCon to complete a "series of projects" at Steward's Massachusetts hospitals. *Id.* at 54:2–6. So, by the time Gendron founded CREF in 2016, he had already been working closely with Steward and its CEO for years. *See Burke*, 2019 WL 6197040, at *8 (listing "having a long involvement with the client's business" as a factor supporting functional equivalence status). Notably, Gendron, as CREF's CEO, sat "at the top of the [CREF corporate] tree," including above Christopher Kidney, to whom functional-equivalent status applies. Ex. B at 115:6–12 (confirming Gendron "do[es]n't report to anyone within CREF" because he is the CEO); *see also* Ex. C.

In 2018, Steward and CREF executed a "lift-out" strategy by which Steward outsourced all of its real estate and facilities management functions to CREF, with Gendron serving as the "client executive in charge" of the Steward account until 2021 or 2022. Ex. B at 74:9–76:13, 106:14–23, 117:8–9; *see also* Ex. D at 6:10–16 ("Steward has outsourced its Capital Project Management to CREF."). As a result, Gendron managed "all of Steward's [real estate] holdings system wide, nationally and internationally." Ex. E. The fact that Gendron was the head of Steward's "major real estate arm," Tr. of Mot. Hr'g at 8:17–20, and that Steward did not have an internal real estate and facilities management department after the lift-out supports application of the functional-equivalent doctrine to Gendron, *see, e.g.*, *Dialysis Clinic, Inc.*, 567 S.W.3d at 325 (holding that functional-equivalent doctrine applies to third-party property manager where it "operated as the 'property management department'" of the client corporation); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 215 (S.D.N.Y. 2001) (finding functional-equivalent doctrine

applicable to outside public relations firm where corporation itself had insufficient internal resources to perform that function); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4–5 (C.D. Cal. July 20, 2011) (finding public relations firm to be functional equivalent of an employee where the firm "essentially function[ed] as [the client's] public relations department"); *MLC Automotive, LLC v. Town of S. Pines*, No. 1:05cv1078, 2007 WL 128945, at *2–4 (M.D.N.C. Jan. 11, 2007) (finding that engineer hired for development of an auto park was the functional equivalent of an employee since it was a specialized role that no employee or other agent of the company fulfilled).

Steward was CREF's "biggest client by a large margin": the CREF entities earned between $25 and $35 million annually from the Steward relationship. Ex. B at 59:15–19. At his deposition, Gendron could not even name CREF's next largest client, but testified that the client annually generated only "a million plus or minus." *Id.* at 59:6–60:1. Indeed, as part of the lift-out, Gendron—like Kidney—received a Steward email address. *Id.* at 117:5–14. Gendron did not maintain a comparable address for any other CREF client. *Id.* Put differently, Steward was not just one of CREF's clients; it was CREF's business.

**2.  Steward entrusted Gendron with handling the Norwood crisis.**

Having worked closely with Gendron for nearly a decade, Steward unsurprisingly turned to Gendron to manage the Norwood crisis and its aftermath, and Gendron became an integral part of the company's executive-level response to the crisis.

On the day of the flood, Gendron was informed of the "significant event going on" and that Steward was "evacuating the hospital." Ex. B at 148:2–149:1. After the flood, John Polanowicz, Steward's Chief Operating Officer, became Gendron's "primary contact" at Steward, *id.* at 38:21–25, but it was still "very common for Ralph [de la Torre] to reach out directly" to Gendron "just to say, [d]o everything you can to figure this out," *id.* at 189:15–190:4. In August 2020, Gendron met in person with de la Torre and Polanowicz to review CREF's Norwood Strategic Planning memorandum. *Id.* at 220:25–221:15. Then, in December 2020, the Steward board invited Gendron

9

to their meeting to update them on the situation at Norwood. *Id.* at 243:2–247:8. Gendron gave another Norwood Hospital update to Steward's board alongside Harry Bane, Steward's Regional President of the New England Region, in February 2021. *Id.* at 275:8–276:6; *see also id.* at 238:21–239:3 ("Harry Bane was the regional president of the New England Region with Norwood Hospital . . . being one of the nine hospitals that rolled up to him in that role.").

Gendron's central role in Steward's management of the flood and its aftermath is obvious in the record: Plaintiff has produced over 8,000 emails between Gendron and members of Steward's executive leadership or in-house counsel between June 28, 2020, and April 23, 2024, meaning Gendron averaged six emails a day with Steward's executives or counsel after the flood.

### 3. Gendron had authority to act for Steward and implement legal strategy.

After years of working shoulder-to-shoulder with Steward's leadership, Gendron occupied a position of authority within the organization. Steward's executives regularly deferred to Gendron when making operational decisions and empowered him to act on Steward's behalf. *See Burke*, 2019 WL 6197040, at *8 (listing "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys" as factors supporting functional equivalence status).

That authority is perhaps best illustrated by Gendron's extensive role in managing the Norwood Hospital insurance claims. Gendron sat at the top of the Steward team that was formed to address the crisis at Norwood after the flood, as reflected in an internal Steward PowerPoint titled Norwood Hospital Team Structure, which placed "Steward Executive VP Bob Gendron" at the top of the communications matrix with "insurance, legal, financial and CREF" all below him. Ex. F.

Steward's general counsel's office also gave Gendron "certain authorities to execute proposals" on Steward's behalf. Ex. B at 179:21–180:3. And he did so by signing as ***Steward's*** Executive Vice President of Global Real Estate. *Id.*; Ex. G. For instance, when Steward wanted to engage a public adjuster, the "Steward executive team"—namely, de la Torre and Polanowicz—

asked Gendron to interface with MPT about bringing on a public adjuster. Ex. B at 157:17–158:13. When Steward decided to hire NFA as their public adjuster, "de la Torre or the board of directors at Steward referred NFA to [Gendron]." *Id.* at 158:25–159:3. Gendron negotiated and agreed to terms with NFA. There was no pushback from Steward; in-house counsel merely asked for the agreement so it could be reviewed and revised "as necessary before it is executed." Ex. H. When the contract with NFA was finalized, it was Gendron, not a Steward employee, who executed the document on Steward's behalf. Ex. G; *see also Burke*, 2019 WL 6197040, at *8 (listing "holding itself out as the client's agent and/or spokesperson" as factor supporting a consultant's functional equivalence status).

Steward's deference to Gendron extended beyond internal decision making; Steward regularly entrusted Gendron to represent Steward externally as well. At the Zurich mediation, it was Gendron, not outside counsel, not another Steward executive—and not Kidney—who delivered Steward's opening statement from a script he worked with counsel to prepare. Ex. B at 270:12–22; 273:11–17. Gendron personally met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative. Ex. I.

In sum, Gendron acted, and Steward treated him, not just as the functional equivalent of an employee but as a corporate insider. He made decisions for Steward, spoke for Steward to regulators and counterparties, and worked alongside Steward's in-house and outside counsel to develop and execute Steward's legal strategy.

### 4. Gendron worked closely with Steward's counsel because he was integral to the team handling the insurance claim.

Beyond his operational authority, Gendron was deeply integrated into the legal work involved in responding to the Norwood flood. Gendron repeatedly drafted, revised, and finalized documents implementing legal advice from Steward's in-house and outside counsel. The records reflect a similar pattern: counsel supplied legal analysis, and Gendron combined that with his subject-matter expertise to formulate and dictate correspondence, project directives, and Steward's larger strategy. *See Burke*, 2019 WL 6197040, at *8 (listing "drafting documents incorporating

legal advice received from the client's attorneys" and "helping to fit the client's actions into a legal framework" as factors supporting a consultant's functional equivalence status).

Within twenty-four hours of the June 28, 2020 flood, Gendron was communicating with Steward's executive leadership, including Herb Holtz, Steward's General Counsel, about how to remediate damage to Norwood Hospital. Holtz connected Gendron with Todd & Weld so that Gendron could get Todd & Weld "up to speed on . . . *his* tentative plans for managing" the insurance claim. Ex. E (emphasis added). In an email to Gendron and Todd & Weld in July 2020, Nathalie Hibble explained the need to coordinate with MPT because "MPT is the First Named Insured . . . but ***Bob/Steward is managing the claim***." Ex. H (emphasis added); *see also MLC Automotive*, 2007 WL 128945, at *2–4 (finding that engineer was functional equivalent of client where engineer communicated directly with the company's attorneys as their primary source of information about the property); *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV 05-5155 (AKT), 2008 WL 5231831, at *2–3 (E.D.N.Y. Dec. 11, 2008) (holding construction management contractor was the functional equivalent of an employee of the client company where the contractor was the company's "eyes and ears" on day-to-day supervision of a project).

To guide Steward's strategy during the crisis, Gendron himself identified legal problems and brought them to counsel for analysis and resolution. Shortly after the flood, Gendron wrote to Hibble identifying several concerns, and asking counsel to "provide a summary of Steward's legal responsibilities as it relates to the Master Lease provisions of section 14" so he could resolve what he identified as a "gap in strategy." Ex. L. Hibble responded, looping in Todd & Weld and instructing them to respond to Gendron's request so "Bob can manage this process." *Id.* A week later, Gendron further instructed Steward and Todd & Weld to review the interplay between MPT and Steward's insurance policies so that he could prepare an "initial strategy." Ex. H; *see also Dialysis Clinic, Inc.*, 567 S.W.3d at 325 (reasoning that property management firm's "involvement in the management of the [client's] properties makes it precisely the sort of entity with which [the client's] attorneys would like to communicate because [the property manager] possesses information that the attorneys need and that [the client] does not have").

12

Gendron was not only involved in drafting documents prepared by counsel, but he was also responsible for finalizing them. Following Hibble's early directive to coordinate with MPT, Todd & Weld drafted correspondence for Gendron to edit and send under his own name. In July 2020, Todd & Weld sent Gendron a draft email to MPT stating, "Here is the suggested email we talked about to MTP [sic]. Please edit as you see fit." Ex. J. The contents of that email were explicitly legal and reflect that Steward, through Gendron, was seeking to understand, among other things, "whatever is needed to comply with the [MPT] lease from a legal perspective." *Id.* Gendron's communications with Steward's counsel in preparation for the Zurich mediation follow a similar pattern. In preparation for the mediation, following "discuss[ions] over the last few weeks" Gendron prepared a detailed summary of Steward's negotiating positions, and solicited "comments/questions" from Todd & Weld and Steward in-house counsel before he submitted it to the mediator. Ex. K.

### C.    Order No. 26 Commits Reversible Error.

Order No. 26 should be reversed for three independent reasons: (1) it incorrectly treats independent-contractor status as dispositive of functional equivalence, without citing any case law; (2) it ignores undisputed facts that directly satisfy the functional-equivalence inquiry; and (3) it improperly converts (unfounded) concerns about over-withholding into a categorical waiver of otherwise privileged communications.

#### 1.    Order No. 26 incorrectly treats formal contractor status as dispositive.

In finding that Gendron did not qualify as a functional employee of Steward, Order No. 26 effectively treated as dispositive the fact that the CREF-Steward agreement "explicitly disclaims" an agency, employer-employee, master-servant, joint venture, or principal-agent relationship. Order at 5. Indeed, Order No. 26 found that before even applying the functional-equivalent doctrine, "Plaintiff would first have to overcome the explicit disavowal of agency status for Mr. Gendron and CREF personnel generally." Order at 4. But these formalistic labels cannot override the fact that Gendron actually functioned as Steward's executive-level decision-maker in

13

connection with the Norwood loss. As the name of the doctrine suggests, the proper inquiry is functional, not formal.

The functional-equivalent doctrine exists precisely to protect privilege where formal employment status is absent. Courts have consistently held that a consultant's self-selected or contractually-assigned label does not control the privilege analysis. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010) (holding "outside consultant" was a functional employee despite the fact that he was not formally an employee and disavowed an agency relationship); *Waste Admin. Servs., Inc. v. Krystal Co.*, No. E2017-01094-COA-R9-CV, 2018 WL 4673616, at *5 (Tenn. Ct. App. Sept. 27, 2018) (concluding that "[d]espite the categorical provisions of the parties' written agreements disclaiming agency, we cannot ignore the parties' actual course of conduct"); *Frank v. Morgans Hotel Grp. Mgmt. LLC*, 66 Misc. 3d 770, 775, 116 N.Y.S.3d 889 (N.Y. Sup. Ct. 2020) (declining to "exalt form over substance" and finding that functional-equivalent doctrine applies). If formal employment status were sufficient to defeat functional equivalence, the doctrine would serve no purpose.

### 2.   Order No. 26 ignores undisputed facts directly relevant to the inquiry.

Order No. 26 fails to engage with undisputed record evidence that directly satisfies the functional-equivalence inquiry. The Order either ignores facts that were not contested by Defendants, introduces new criteria that have no basis in the caselaw or in the Discovery Master's prior analysis, or mischaracterizes the evidence to reach a predetermined conclusion. Each of these errors independently warrants reversal.

Order No. 26 ignores undisputed evidence that Gendron acted as Steward's agent in external negotiations and executed binding agreements on Steward's behalf using a Steward title. The NFA engagement letter—the public-adjuster agreement for the insurance claim at the center of this dispute—was addressed to "Mr. Robert Gendron, Executive Vice President - Corporate Real Estate and Facilities, Steward Health Care System LLC." Ex. G. Gendron signed the agreement on Steward's behalf. When asked at his deposition why he signed using a Steward title rather than

listing himself as "founder or CEO of CREF," Gendron explained that Steward's general counsel's office "gave me certain authorities to execute proposals, and this is how it was identified." Ex. B at 179:21–180:3. Gendron also negotiated the terms of the agreement with NFA—Steward's in-house counsel merely asked for the agreement "so it could be reviewed and revised 'as necessary before it is executed.'" Ex. H. And when NFA notified the insurance companies that it had been retained, NFA's August 2020 letter directed Zurich and American Guarantee to copy "Robert Gendron, Executive Vice President, Global Corporate Real Estate & Facilities, Steward Health Care System LLC." Ex. G. Order No. 26 does not address any of this evidence.

Order No. 26 introduces a new criterion—whether Gendron "work[ed] on the premises"—that appeared nowhere in the Discovery Master's prior analysis of functional equivalence. Order at 5. Neither Order No. 22 nor any prior ruling required physical presence at Steward's facilities, and the premise is factually wrong: Gendron relocated to Dallas to align with Steward's headquarters and opened CREF offices in proximity to Steward's core operations. Ex. B at 52. More fundamentally, the "premises" criterion has no basis in the caselaw. The functional-equivalent inquiry focuses on the individual's role, authority, and integration with the client's operations—not whether he occupied a particular office. Order No. 26's after-the-fact introduction of this factor is both arbitrary and unsupported.

Order No. 26 reasons that Gendron "did not manage[] any of the $97.4 million of insurance proceeds that Steward received from American Guarantee." Order at 5. But managing proceeds is distinct from managing a claim. Gendron testified that CREF "managed the Norwood insurance loss and redevelopment" on Steward's behalf. Ex. B at 150–151. His role was to coordinate the submission and prosecution of the claim—not to disburse the resulting funds after they were received. Order No. 26 conflates two different functions and uses that confusion to dismiss undisputed evidence of Gendron's central role.

Order No. 26 also relies on the fact that Gendron "was a co-investor with Mr. De la Torre in CREF." Order at 5. But rather than undermining the functional-equivalence analysis, this fact

15

underscores just how intertwined CREF and Steward were.[4] The ownership structure reflects that Steward's most senior executive trusted Gendron's firm to manage all of Steward's real estate operations—including the most complex and high-stakes insurance claim in the company's history. Functional equivalence does not require independence; it requires integration and trust. *See America's Test Kitchen*, 2018 WL 2049490, at *2 ("functional equivalent of an employee" determined by whether individual "plays a 'pivotal role' in matters as to which the business obtains legal advice").

Finally, Order No. 26 downplays record evidence that went undisputed. For example, Order No. 26 characterizes Gendron as having "presented a few slides at the mediation," Order at 5, when in fact Gendron delivered Steward's opening statement at the Zurich mediation from a script he developed with counsel, personally met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative, and prepared Steward's detailed negotiating-position summary for submission to the mediator. *See supra* Section III.C. Order No. 26 also fails to credit evidence concerning the disparity among CREF's clients: Steward was not merely "a significant portion of CREF's portfolio," as Order No. 26 suggests, but generated $25 million to $35 million annually and "dwarfed CREF's next-largest client." Ex. B at 59:6–60:1. Gendron maintained a Steward email address but did not have a comparable email address for any other CREF client. *Id.* at 117:5–14. None of this evidence is addressed.

Order No. 26 fails to engage with the same undisputed facts that the Discovery Master credited for Kidney. In Order No. 22, the Discovery Master concluded that Kidney qualified as a functional equivalent because he (1) "acted 'in a high-level, trusted decision-making or guiding role'"; (2) "maintained [a] steward.org email address[]"; and (3) "regularly worked in

---

[4] Steward and CREF's businesses were so intertwined that even Defendants initially thought several CREF employees were Steward employees. *See* Order No. 22 at 35 ("[D]uring the first hearing between the Discovery Master and the Parties, . . . Defendants admitted that they initially thought that several high-level CREF employees were actually Steward employees, until Steward informed them otherwise.").

collaboration with Steward employees and counsel." Order No. 22 at 35 (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2). Gendron satisfies every one of these criteria—and then some.

Gendron was CREF's CEO, sat above Kidney in the organizational structure, maintained a Steward email address, and worked closely with Steward's executive leadership and counsel on the Norwood response. *See supra* Section III.E. The record shows that Gendron was placed at the top of the "Steward team" formed to address the Norwood crisis, with "insurance, legal, financial and CREF" all below him. Ex. F. Steward's general counsel connected Gendron with Todd & Weld within twenty-four hours of the flood so that counsel could get "up to speed on . . . his tentative plans for managing" the insurance claim. Ex. E. And Nathalie Hibble explained to counsel that "Bob/Steward is managing the claim." Ex. H.

Order No. 26 does not explain why Gendron—the CEO above Kidney—fails where Kidney passed. The absence of any principled distinction is reversible error.

### 3. Order No. 26 incorrectly relies on purported over-withholding to justify a categorical privilege waiver.

Order No. 26 concludes with a sweeping, punitive directive: "the communication on which Mr. Gendron is copied, or on which he is the recipient or sender, are not privileged, subject to claw back," and Plaintiff must "produce, subject to clawback, the 1,749 withheld communications involving Mr. Gendron, regardless of whether Mr. Kidney or an attorney is on the communication." Order at 7. This categorical command required production "forthwith, without further delay, and not later than August 7, 2026"—just three days after the Order issued, and four days before the objection period under the Order Appointing the Discovery Master expired on August 11, 2026. The Order further directed that communications involving Mr. Kidney could only be withheld if "only Mr. Kidney and Todd & Weld and/or Foley Hoag attorneys are on the email," effectively stripping privilege from any attorney-client communication that included even one additional CREF employee or third-party consultant—regardless of whether the communication was otherwise between Steward and its counsel seeking or providing legal advice. The punitive nature

17

of this relief is underscored by its stated rationale: Order No. 26 expressly relies on what it characterizes as Plaintiff's "pattern of continued excess-claiming of privilege" and "too much 'blanket withholding'" to justify the categorical waiver. Order at 6. In effect, the Order punishes Plaintiff for perceived prior withholding by eliminating the need for any document-by-document privilege analysis going forward.

These concerns are particularly acute here because the documents at issue are direct communications between Mr. Gendron and counsel concerning legal advice, litigation strategy, and mediation—precisely the types of communications the attorney-client privilege exists to protect. *See Upjohn*, 449 U.S. at 389 (attorney-client privilege "encourages full and free discussion, better enabling the client to conform his conduct to the dictates of the law"); *Hanover Ins. Co.*, 449 Mass. at 616 ("The attorney-client privilege is so highly valued that . . . it is acknowledged that the 'social good derived from the proper performance of the functions of lawyers acting for their clients . . . outweigh[s] the harm that may come from the suppression of the evidence.'"). Order No. 26's categorical waiver—stripping privilege from over 1,700 attorney-client communications solely because a functional equivalent was copied—undermines the very interests the privilege is designed to serve.

The extremity of this categorical privilege waiver is compounded by its irreversibility. Courts have long recognized that forced disclosure of privileged material constitutes irreparable harm because, once disclosed, the privilege cannot be restored. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) ("[A]ppeal after final judgment will often come too late because the privileged materials will already have been released."); *In re FirstEnergy Corp.*, 154 F.4th 431, 441 (6th Cir. 2025) ("There is no way to unring those disclosure bells."); *Am. Nat'l Bank & Trust Co. v. Equitable Life Assurance Soc'y of U.S.*, 406 F.3d 867, 875 (7th Cir. 2005) (reversing discovery sanction that "forced [the defendant] to turn over privileged information to its litigation adversary" because the defendant "labor[ed] under a 'lingering disability' from the judgment" as "its adversary continues to possess sensitive and indisputably privileged information"). As the Seventh Circuit observed in *American National Bank*, once opposing counsel

has reviewed privileged communications, "[the adversary] uses [the defendant's] in-house counsels' evaluation of the lawsuit as support" for its claims—underscoring the impossibility of remedying such disclosure after the fact. 406 F.3d at 875.

The relief in Order No. 26 reflects a fundamental misapprehension of Plaintiff's extensive, good-faith efforts to comply with Order No. 22. *See* Declaration of Yonah Jaffe in Support of Plaintiff's Objection to Order No. 26 (the "Jaffe Declaration"), which sets forth a more complete rendition of the procedural history and Plaintiff's diligent compliance efforts. The themes that emerge from the record are clear: Plaintiff has met every agreed-upon deadline; made rolling productions even beyond what the Order required; voluntarily reassessed privilege positions and produced additional documents; and reduced its privilege log entries by nearly half through document-by-document review. Jaffe Decl. ¶¶ 6–11, 22–26, 36–37.

Order No. 26 treated Plaintiff's diligent re-review and voluntary production of additional documents as evidence of wrongdoing rather than evidence of good faith. Jaffe Decl. ¶ 28. But refining a privilege log demonstrates diligence, not malfeasance. Jaffe Decl. ¶ 36. In this case, Plaintiff reduced its privilege log entries from 9,666 to 5,097—a reduction of nearly half—through careful, document-by-document review. *Id.* Penalizing Plaintiff for voluntarily narrowing its privilege assertions would create a perverse incentive for parties to maintain overbroad privilege claims rather than engage in the ongoing reassessment that furthers the efficient administration of justice. *Id.*

The numerical data confirms that Plaintiff's withholding is neither unusual nor disproportionate. Of the 142,761 emails Plaintiff has produced in this case, only 3,177 (approximately 2.2%) have been withheld. Jaffe Decl. ¶ 34. Of the 73,119 CREF-related emails produced, only 2,364 (approximately 3.2%) have been withheld. *Id.* These percentages are well within the normal range for complex commercial litigation involving communications with counsel. *Id.* Indeed, approximately 5,912 of the emails Plaintiff has produced contain "Attorney Client Privileged" or similar language in the subject line—demonstrating that Plaintiff did not rely on labels but has endeavored to determine whether the documents still withheld are truly

privileged. *Id.* Complying with Order No. 26's requirement to produce the 1,749 Gendron-related emails would reduce Plaintiff's overall withholding rate even further below what is typical for litigation of this nature.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court reverse Order No. 26 and hold that Gendron's presence does not waive privilege for otherwise privileged communications with Steward's in-house or outside counsel. In the alternative, Plaintiff requests that the Court modify Order No. 26 to preserve direct Gendron/Kidney/counsel communications from production and use an attorneys'-eyes-only clawback process only for communications involving additional nonqualified third parties.

Respectfully submitted,

**MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,**

By his Attorneys,

*/s/ Yonah Jaffe*
Howard M. Cooper (BBO No. 543842)
Seth J. Robbins (BBO No. 655146)
Josh L. Launer (BBO No. 673661)
**TODD & WELD LLP**
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
hcooper@toddweld.com
srobbins@toddweld.com
jlauner@toddweld.com

William T. Reid IV (*pro hac vice*)
Jeremy Wells (*pro hac vice*)
Barbara Whiten Balliette (*pro hac vice*)
Julia P. Gokhberg (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
wreid@reidcollins.com
jwells@reidcollins.com
bballiette@reidcollins.com
jgokhberg@reidcollins.com

Jeffrey E. Gross (*pro hac vice*)
Yonah Jaffe (*pro hac vice*)
**REID COLLINS & TSAI LLP**
420 Lexington Avenue, Suite 2515
New York, NY 10170
Tel.: (212) 344-5200
jgross@reidcollins.com
yjaffe@reidcollins.com

Dated: August 11, 2026

21