

Reid Collins & Tsai LLP
420 Lexington Avenue, Suite 2515
New York, NY 10170
212.344.5200

Jeffrey E. Gross / Partner
212.344.5211
jgross@reidcollins.com

July 13, 2026

***Via Email***

Hon. Faith S. Hochberg
Hochberg ADR, LLP
judgehochberg@judgehochberg.com

> **Re:** ***Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust v. American Guarantee and Liability Insurance Company, et al., Case No. 21-cv-11902-PBS (D. Mass.)***

Dear Judge Hochberg:

Plaintiff Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust ("**Plaintiff**") respectfully submits this letter brief to request reconsideration of Section IV(B) of Discovery Master Order No. 22 (the "**Order**") as to Robert Gendron, CREF's CEO.

This request follows Judge Saris's June 26, 2026 ruling on Plaintiff's objection to Section IV(B) (the "**June 26 Ruling**"), where the Court expressly invited reconsideration as to Robert Gendron, explaining that "one could take a second look at Mr. Gendron" because he was the CEO of Steward's "major real estate arm," and that the Court "would have to believe a CEO" was a highly trusted individual. Ex. A at 8:2; 8:17–20; 15:1–2.

While the Order found that "[s]everal high-level CREF employees served as the functional equivalent of Steward employees," it ultimately only granted functional equivalent status to Chris Kidney. Order at 35. Your Honor held that the "other CREF employees who worked under Mr. Kidney do not meet the status of 'a high-level, trusted decision-making or guiding role case for functional employees.'" Order at 37. And the Court found that "[n]o showing ha[d] been made that Mr. Gendron, the CEO of CREF, . . . warrants the 'functional equivalent label.'" Order at 37.

The June 26 Ruling expressly upheld Your Honor's decision to apply the functional equivalent doctrine to the privilege issues involving CREF employees but did so "without prejudice to seeking the privilege with respect to Mr. Gendron." Ex. A at 8:24–25; 14:13–14. Judge Saris granted Plaintiff leave to "move for reconsideration on him because he was the CEO," *id.* at 7:22–24, explaining that the Court "would have to believe a CEO was" in the kind of "highly-trusted" position contemplated by the functional equivalence doctrine, *id.* at 14:21–15:2; *see also id.* at 10:21–22 ("allowing [Plaintiff] to move to reconsider on Gendron"). The Court, however,

---

ultimately left it up to Your Honor to determine if Gendron qualifies as a "functional equivalent" employee. *Id.* at 20:24–21:1.

Plaintiff requests that the Order be modified on reconsideration to treat Gendron the same way the Order treats Chris Kidney for otherwise privileged communications with Steward's counsel, because the Court has now expressly identified Gendron as the CREF executive whose status warrants reconsideration.

## I. THE RECORD AND THE COURT'S JUNE 26 DIRECTION WARRANT RECONSIDERATION AS TO ROBERT GENDRON.

The record before Your Honor, combined with Judge Saris's express invitation to seek reconsideration, demonstrates that Robert Gendron satisfies every criterion Your Honor applied to Chris Kidney in granting functional equivalent status.

The attorney-client privilege protects "'confidential communications made for the purposes of obtaining or providing professional legal services,' including such communications 'between representatives of the client[,] or between the client and a representative of the client.'" *America's Test Kitchen, Inc. v. Kimball*, 2018 WL 2049490, at *2 (Mass. Super. Apr. 2, 2018) (first quoting Mass. Guide Evid. § 502(b); and then citing *Hanover Ins. Co. v. Rapo & Jepsen Ins. Services, Inc.*, 449 Mass. 609, 614–17 (2007)).[1] In scenarios involving a corporate client like Steward, "the attorney-client privilege protects communications that gather or convey information from knowledgeable employees or agents that is needed by counsel in formulating legal advice, as well as communications that relay legal advice obtained from an attorney to employees or other agents of the client who must understand and help to implement that advice." *Id.*; *see also Com. v. Angelo Todesca Corp.*, 842 N.E.2d 930, 937 (Mass. 2006) ("Because a corporation is not a living person, it can act only through its agents.").

Accordingly, for purposes of applying the attorney-client privilege, an individual consultant who "plays a 'pivotal role' in matters as to which the business obtains legal advice from an attorney" is a "functional equivalent of an employee" of the client corporation, and "the

---

[1] In the June 26 Ruling, although the Court acknowledged that there are no precedential First Circuit cases adopting the functional equivalent doctrine, the Court nevertheless found Justice Salinger's opinion in *America's Test Kitchen, Inc. v. Kimbal*, 2018 WL 2049490 (Mass. Super. Apr. 2, 2018), particularly persuasive, describing the decision as "thoughtful" and "really well done." *See* Ex. A at 6:14–17, 25; 9:2–3. In *America's Test Kitchen*, the court "agree[d] with the legal premises" of the functional equivalent doctrine, finding that it "necessarily follows from the general principle that the privilege encompasses confidential communications 'made to or shared with necessary agents of the attorney or the client.'" *America's Test Kitchen*, 2018 WL 2049490, at *2 (quoting *Hanover Ins.*, 449 Mass. at 616); *see also One Ledgemont LLC v. Town of Lexington Zoning Bd. of Appeals*, 2014 WL 2854788, at *2 (Mass. Land Ct. June 23, 2014) ("While this functional equivalent analysis is not yet chiseled deeply into the decisions of Massachusetts' appellate courts, there is good reason to conclude that our Supreme Judicial Court, if and when presented with the occasion, would apply and follow this line of Federal Court jurisprudence.").



attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant is involved in, copied on, or becomes privy to those communications." *America's Test Kitchen*, 2018 WL 2049490, at *2 (citing *One Ledgemont*, 2014 WL 2854788, at *2–*4). As articulated in the Order, "those CREF employees . . . who acted 'in a high-level, trusted decision-making or guiding role, equivalent to that of an employee,' became a 'functional employee'" of Steward, and their "status as a third-party does not destroy any privilege that would otherwise apply to their communications with Steward counsel." Order at 35 (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2).

To determine whether a CREF employee met the requirements of the functional equivalent doctrine, Your Honor considered several factors, including whether the employee: (1) "acted 'in a high-level, trusted decision-making or guiding role'"; (2) "maintained [a] steward.org email address[]"; and (3) "regularly worked in collaboration with Steward employees and counsel." Order at 35 (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2); *see also Burke v. Gen. Hosp. Corp.*, 2019 WL 6197040, at *8 (Mass. Super. May 3, 2019) (listing factors courts consider supportive of the application of the functional equivalence doctrine, including a consultant "having a long involvement with the client's business;" "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys").

Gendron satisfies all the factors Your Honor relied upon in finding that Kidney satisfies the functional equivalent doctrine. Like Kidney, Gendron, as CREF's CEO, was a trusted high-level CREF employee, who regularly worked in collaboration with Steward employees and counsel, often acted as a key decision-maker and trusted advisor to Steward, and long maintained his own Steward email address.

## A.    Gendron was deeply intertwined in Steward's operations from its founding.

Gendron is exactly the kind of high-level, highly trusted employee contemplated by the functional equivalence doctrine. He met Ralph de la Torre, Steward's CEO, in or around late 2010, when GenCon (his prior company) was hired to build de la Torre's Cape Cod residence. Ex. B at 53:6–12. From 2012 to 2016, Steward hired GenCon to complete a "series of projects" at Steward's Massachusetts hospitals. *Id.* at 54:2–6.

By the time Gendron founded CREF in 2016, he had already been working closely with Steward and its CEO for years. *See Burke*, 2019 WL 6197040, at *8 (listing "having a long involvement with the client's business" as a factor supporting functional equivalence status). Notably, Gendron, as CREF's CEO, sat "at the top of the [CREF corporate] tree," including ***above Chris Kidney***. Ex. B at 115:6–12 (confirming Gendron "do[es]n't report to anyone within CREF" because he is the CEO); *see also* Ex. C.

In 2017, after Steward acquired eight facilities in Massachusetts, Steward's then-general counsel, Joseph Maher, approached Gendron to formulate a "lift-out" strategy by which Steward



outsourced its real estate and facilities management functions to CREF. Ex. B at 74:9–76:13; *see also* Ex. D at 6:10–16 ("Steward has outsourced its Capital Project Management to CREF."). Steward and CREF executed the lift-out in 2018. Ex. B at 117:8–9. Gendron served as the "client executive in charge" of the Steward account until Michael Crowley transitioned into the role in 2021 or 2022. *Id.* at 106:14–23. As a result, Gendron managed "all of Steward's [real estate] holdings system wide, nationally and internationally." Ex. E. As part of the lift-out, Gendron—like Kidney—received a Steward email address. Ex. B at 117:5–14. Gendron did not maintain a comparable address for any other CREF client. *Id.*

Steward was CREF's "biggest client by a large margin": the CREF entities earned between $25 and $35 million annually from the Steward relationship. *Id.* at 59:15–19. At his deposition, Gendron could not even name CREF's next largest client, but testified that the client annually generated only "a million plus or minus." *Id.* at 59:6–60:1. Put differently, Steward was not just one of CREF's clients, it was CREF's business.[2] As CREF's CEO, Gendron was inextricably tied to Steward, its largest client, because maintaining that relationship personally was central to his role.

Having worked closely with Gendron for nearly a decade, Steward unsurprisingly turned to Gendron to manage the Norwood crisis and its aftermath. From the first moment flood water breached hospital walls, Steward looked to Gendron. On the day of the flood, Gendron was informed of the "significant event going on" and that Steward was "evacuating the hospital." *Id.* at 148:2–149:1.

The Norwood flood drew Gendron deeper into Steward's management structure, and he was an integral part of the company's executive-level response to the crisis. After the flood, John Polanowicz, Steward's Chief Operating Officer, became Gendron's "primary contact" at Steward, *id.* at 38:21–25, but it was still "very common for Ralph [de la Torre] to reach out directly" to Gendron "just to say, [d]o everything you can to figure this out," *id.* at 189:15–190:4. In August 2020, Gendron met in person with de la Torre and Polanowicz to review CREF's Norwood Strategic Planning memorandum. *Id.* at 220:25–221:15. Then, in December 2020, the Steward board invited Gendron to their meeting to update them on the situation at Norwood. *Id.* at 243:2–247:8. Gendron gave another Norwood Hospital update to Steward's board alongside Harry Bane, Steward's Regional President of the New England Region, in February 2021. *Id.* at 275:8–276:6; *see also id.* at 238:21–239:3 ("Harry Bane was the regional president of the New England Region with Norwood Hospital . . . being one of the nine hospitals that rolled up to him in that role.").

---

[2] Steward and CREF's businesses were so intertwined that, as Your Honor has recognized, even Defendants initially thought several CREF employees were Steward employees. *See* Order at 35 ("[D]uring the first hearing between the Discovery Master and the Parties, . . . Defendants admitted that they initially thought that several high-level CREF employees were actually Steward employees, until Steward informed them otherwise.").



Gendron's central role in Steward's management of the flood and its aftermath is obvious in the record: Plaintiff has produced over 8,000 emails between Gendron and members of Steward's executive leadership or in-house counsel between June 28, 2020, and April 23, 2024, meaning Gendron averaged six emails a day with Steward's executives or its lawyers following the flood.

### B.     Steward regularly delegated decision-making authority to Gendron.

After years of working shoulder-to-shoulder with Steward's leadership, Gendron occupied a position of authority within the organization. Steward's executives regularly deferred to Gendron when making operational decisions and empowered him to act on Steward's behalf. *See Burke*, 2019 WL 6197040, at *8 (listing "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys" as factors supporting functional equivalence status).

That authority is perhaps best illustrated by Gendron's extensive role in managing the Norwood Hospital insurance claims. Gendron sat at the top of the Steward team that was formed to address the crisis at Norwood after the flood, as reflected in an internal Steward PowerPoint titled Norwood Hospital Team Structure, which placed "Steward Executive VP Bob Gendron" at the top of the communications and responsibility matrix with "insurance, legal, financial and CREF" all below him. Ex. F.[3]

Steward's general counsel's office also gave Gendron "certain authorities to execute proposals" on Steward's behalf. Ex. B at 179:21–180:3. And he did so by signing as ***Steward's*** Executive Vice President of Global Real Estate. *Id.*; Ex. G. For instance, when Steward wanted to engage a public adjuster, the "Steward executive team"—namely, de la Torre and Polanowicz—asked Gendron to interface with MPT about bringing on a public adjuster. Ex. B at 157:17–158:13. When Steward decided to hire NFA as their public adjuster, "de la Torre or the board of directors at Steward referred NFA to [Gendron]." *Id.* at 158:25–159:3. Gendron negotiated and agreed to terms with NFA. There was no pushback from Steward; in-house counsel merely asked for the agreement so it could be reviewed and revised "as necessary before it is executed." Ex. H. When the contract with NFA was finalized, it was Gendron, not a Steward employee, who executed the document on Steward's behalf. Ex. G; *see also Burke*, 2019 WL 6197040, at *8 (listing "holding itself out as the client's agent and/or spokesperson" as factor supporting a consultant's functional equivalence status).

Steward's deference to Gendron extended beyond internal decision making; Steward regularly entrusted Gendron to represent Steward externally as well. At the Zurich mediation, it was Gendron, not outside counsel, not another Steward executive—and not Kidney—who delivered Steward's opening statement from a script he worked with counsel to prepare. Ex. B at

---

[3] Plaintiff does not assert that each exhibit attached hereto is privileged.



270:12–22; 273:11–17. Gendron personally met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative. Ex. I.

In sum, Gendron acted, and Steward treated him, not just as the functional equivalent of an employee but as a corporate insider. He made decisions for Steward, spoke for Steward to regulators and counterparties, and worked alongside Steward's in-house and outside counsel to develop and execute Steward's legal strategy.

> **C.      Gendron worked closely with Steward's in-house and outside counsel because he was a trusted and necessary asset to the team handling the insurance claim.**

Beyond his operational authority, Gendron was deeply integrated into the legal work involved in responding to the Norwood flood. Gendron repeatedly drafted, revised, and finalized documents implementing legal advice from Steward's in-house and outside counsel. The records reflect a similar pattern: counsel supplied legal analysis, and Gendron combined that with his subject-matter expertise to formulate and dictate correspondence, project directives, and Steward's larger strategy. *See Burke*, 2019 WL 6197040, at *8 (listing "drafting documents incorporating legal advice received from the client's attorneys" and "helping to fit the client's actions into a legal framework" as factors supporting a consultant's functional equivalence status).

Within twenty-four hours of the June 28, 2020 flood, Gendron was communicating with Steward's executive leadership, including Herb Holtz, Steward's General Counsel, about how to remediate damage to Norwood Hospital. Holtz connected Gendron with Todd & Weld so that Gendron could get Todd & Weld "up to speed on . . . *his* tentative plans for managing" the insurance claim. Ex. E (emphasis added). In an email to Gendron and Todd & Weld in July 2020, Nathalie Hibble explained the need to coordinate with MPT because "MPT is the First Named Insured . . . but ***Bob/Steward is managing the claim***." Ex. H.

To guide Steward's strategy during the crisis, Gendron himself identified legal problems and brought them to counsel for analysis and resolution. Shortly after the flood, Gendron wrote to Hibble identifying several concerns, and asking counsel to "provide a summary of Steward's legal responsibilities as it relates to the Master Lease provisions of section 14" so he could resolve what he identified as a "gap in strategy." Ex. L. Hibble responded, looping in Todd & Weld and instructing them to respond to Gendron's request so "Bob can manage this process." *Id*. A week later, Gendron further instructed Steward and Todd & Weld to review the interplay between MPT and Steward's insurance policies so that he could prepare an "initial strategy." Ex. H.

Gendron was not only involved in drafting documents prepared by counsel, but he was also responsible for finalizing them. Following Hibble's early directive to coordinate with MPT, Todd & Weld drafted correspondence for Gendron to edit and send under his own name. In July 2020, Todd & Weld sent Gendron a draft email to MPT stating, "Here is the suggested email we talked about to MTP [sic]. Please edit as you see fit." Ex. J. The contents of that email were explicitly



legal and reflect that Steward, through Gendron, was seeking to understand, among other things, "whatever is needed to comply with the [MPT] lease from a legal perspective." *Id.*

Gendron's communications with Steward's counsel in preparation for the Zurich mediation follow a similar pattern. In preparation for the mediation, following "discuss[ions] over the last few weeks" Gendron prepared a detailed summary of Steward's negotiating positions, and solicited "comments/questions" from Todd & Weld and Steward in-house counsel before he submitted it to the mediator. Ex. K.

Taken together, the record demonstrates that Gendron was not merely copied on privileged communications as a courtesy; he actively participated in formulating legal strategy, directed counsel's work product, and served as the linchpin between Steward's legal team and its operational response to the Norwood crisis.

<div align="center">***</div>

Gendron satisfies every criterion of functional equivalence that Your Honor applied in granting the status to Kidney in the Order. Accordingly, Plaintiff respectfully requests that the Order be modified on reconsideration to treat Gendron the same way the Order treats Kidney for otherwise privileged communications with Steward's counsel.

Respectfully submitted,

*/s/ Jeffery E. Gross*

Jeffrey E. Gross, Partner
REID COLLINS & TSAI LLP

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MARK KRONFELD                         )
As Trustee of the SHC Creditor        )
Litigation Trust,                     )
                                      )
              Plaintiff               ) CA No. 21-11902-PBS
                                      ) Pages 1 - 25
       -VS-                           )
                                      )
AMERICAN GUARANTEE AND LIABILITY      )
INSURANCE COMPANY, et al,             )
                                      )
              Defendants              )


**MOTION HEARING BY VIDEO**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts  02210
                    June 26, 2026, 9:35 a.m.


                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
                United States District Court
                 1 Courthouse Way, Room 7200
                    Boston, MA  02210
                   leemarz47@gmail.com

A P P E A R A N C E S:

JOSHUA L. LAUNER, ESQ., Todd & Weld LLP, One Federal Street, 27th Floor, Boston, Massachusetts, 021110, for the Plaintiff.

JULIA PAULA GOKHBERG, ESQ., Reid Collins & Tsai LLP, 1301 S. Capital of Texas Highway, Austin, Texas, 78746, for the Plaintiff.

ABIGAIL L. PELOSI, ESQ. and AMY C. ANDREWS, ESQ., Riley Safer Holmes & Cancila LLP, 1 South Dearborn Street, Suite 3300, Chicago, Illinois, 60603, for the Defendants.

JONATHAN D. MUTCH, ESQ., Robins Kaplan LLP, 800 Boylston Street, Suite 2500, Boston, Massachusetts, 02109, for the Defendants.

MICHAEL MENAPACE, ESQ., Wiggin and Dana LLP, 30 Church Street, Hartford, Connecticut, for the Defendants.

P R O C E E D I N G

THE CLERK:  The Court calls Civil Action 21-11902, Mark Kronfeld v. American Guarantee Liability Insurance.  Could counsel please identify themselves for the record.

MR. LAUNER:  Good morning, your Honor.  This is Josh Launer from Todd & Weld on behalf of the plaintiff, and with me is cocounsel from the firm of Reid Collins, Yonah Jaffe, who will be taking the lead on the argument this morning.

MR. JAFFE:  Good morning, your Honor.

MS. PELUSO:  Good morning, your Honor.  Abigail Peluso on behalf of the defendant.  Also with us is cocounsel Jonathan Mutch and Michael Menapace along with my partner Amy Andrews. We also, for the record, have on the Zoom call Katherine Frost. She's a representative from the client.

THE COURT:  Thank you.  So there have been objections to the magistrate judge's order.  The theory behind having a magistrate judge, of course, was because everything -- a magistrate judge couldn't possibly, possibly handle the volume of discovery disputes, and that is still the case.  So I decided to take it, just simply because she's swamped, the magistrate judge, and I didn't want there to be a double appeal, which there potentially could be.

So let me start with a few basic things.  I don't really understand this case anymore.  It morphed from parapet roofs and rain on a roof and whether that's surface water to

4

this blowup beyond anything I expected.  And I also remember that Todd & Weld, representing at the time Steward Hospital chain, said, "Hurry, hurry, hurry, we really need to get this done, hurry, hurry."  And it was an old case anyway, and we set a schedule, and now it seems to have stalled in the water on discovery disputes which seem overly aggressive.  So I'm trying to figure out, really, how to get this case back moving again.

Can plaintiff tell me what the case is about now?  Is it just still about how much damage was done to the hospital?

MR. JAFFE:  Substantively, yes.  I think your Honor is correct, your Honor is correct that there are many pending discovery disputes at the moment.  I don't think they've changed the nature of the case, and I think we are making efforts to, number one, narrow the disputes as much as possible, and, number two, the discovery master did propose a new schedule that I think all the parties intend to stick to.  That's on the docket.  I think we're still waiting for your Honor's approval, but --

THE COURT:  When did that happen because I didn't --

MR. JAFFE:  April 17th is the date the discovery -- it's a discovery master order that proposes the remaining schedule.

THE COURT:  All right, that's number one.  I'll look at that.  Number two, which is essential here, and I'm faulting Todd & Weld, she issues a massive, massive, massive, a massive

order on, like, say, May 15th or May 16th, and you file a motion for a stay on a Friday night at about 6:00 o'clock, when all the documents were due that day.  Theoretically, I guess you had till midnight.  That is clearly an effort to delay. You didn't call my chambers.  You didn't tell us something like that was coming.  You didn't give us even a few days' notice, nothing.  Six o'clock on a Friday night, what was that about?

MR. JAFFE:  So, your Honor, I'll speak to it.  We came in recently, so it would only be fair, given that you fault Todd & Weld for that -- I'll let Mr. Launer speak to it if he wants to -- but to give a broad overview of that, the order was issued on May 14th.

THE COURT:  Why didn't someone object to it right away and tell me?

MR. JAFFE:  Because there was time necessary to analyze it and assess which parts we wanted to object to.  We actually did receive permission.  Mr. Launer reached out to the discovery master asking her for an extension of time till May 29th to file that objection, as well as to produce the documents that weren't going to be subject to the objection. And the stay motion really would not have made sense if not filed --

THE COURT:  No, you cannot file -- this is a flat ban: Don't ever do that again.  Nobody should ever file a motion for stay of a court official at 6:00 o'clock on a Friday night,

especially when so much effort is being put into this case. It's not fair to me.  It's not fair to my law clerk.  Did you expect me to spend the weekend doing it?  It took me two and a half weeks, and I don't even know the case, me personally, but --

MR. JAFFE:  I do apologize for that.  I think, you know, the miscalculation related to asking the discovery master permission to do so, but you're absolutely correct, your Honor, that's not something that --

THE COURT:  Now that that's gone by, I understand that this case involves a sophisticated -- and I've done some of my own research on it -- legal issue involving functional equivalent attorneys.  It's very difficult.  There's no First Circuit case on it.  To my knowledge, there's no -- well, there is no Supreme Judicial Court or Mass. Appeals Court case on it. We have one thoughtful non-precedential decision coming out of the Superior Court, I think Judge Saltzman did was thoughtful. I looked at the Restatement (Third) of Lawyers.  They don't even refer -- I mean, maybe -- you know, I'm old, so maybe I don't do research well enough, but apparently, as far as I could tell, given our research in chambers, there's not even a Restatement (Third) of Lawyers on it that uses that term.  So we've got a few random, non-precedential lower court cases. That's what I've got.

Now, it was a thoughtful opinion, and I'm not saying

it's wrong, from Judge Saltzman, but certainly the contours of the privilege are not well defined, to say the least; and in addition to which, the Restatement (Third) of Lawyers does refer to sometimes the agents of lawyers can sometimes have the privilege. So I'm not saying that at times CREF wasn't an agent of -- I'll still call it Steward rather than Kronfeld -- of Steward. But even all of the cases that plaintiff cites, no one seeks to provide an attorney-client privilege with an entire corporation that is not the corporation who is a party to the case, none.

So given the most generous, I decline, and find not only was the master not clearly erroneous, but she was right that you can't just, as I understand it, afford a privilege to an entire corporation, every employee in it, as in CREF. So that leaves the question, can individual members of it receive the privilege? And I think maybe yes, right? Individuals, maybe yes.

So I understand Mr. Kidney was given the privilege, and that's not being objected to. You in particular pushed one other person who is the CEO. Who is that?

MR. JAFFE: Mr. Gendron.

THE COURT: Mr. Gendron. I'm not going to redo that, if you want to move for reconsideration on him because he was the CEO. I looked at the page cites for all the other ones. You didn't prove the other ones were high-level, confidential

employees -- I forget the exact -- so that wasn't there.  But I did think that one could take a second look at Mr. Gendron.  Is this when he was CEO of CREF?  I'm not sure, is it worth another briefing round, or should we just leave him as someone like Mr. Kidney?  I'm telling you how I'm seeing it because I've done a lot of reading at this point on this case, because I need it to move.

MS. PELUSO:  Your Honor, I think defendants' primary issue is not simply whether Mr. Gendron, the CEO of CREF, is of the sort of "highly trusted" category where he could be considered a functional equivalent or an agent of Steward for purposes of the work.  It's whether the plaintiff has met their burden to prove, as the special master articulated, not only that they're the functional equivalent but that they were essential to the attorneys' ability to provide legal advice to the client.

THE COURT:  Well, let me put it this way:  If someone is the CEO of your major real estate arm, I don't know either, but that's why I'm giving them leave to brief it again before the master.  But all the other people mentioned -- I think there are four or five others -- I went and looked at the deposition cites -- they don't come close to meeting that burden.

So I'm not overturning the master with respect to the functional equivalence, but I'm going to do it without

prejudice for Gendron.  But you have another problem because if you read Salazar's opinion -- and I did think it was really well done -- one of the problems is, let's assume there were correspondence between Todd & Weld or -- it should cover in-house or -- I'm not sure why it excluded in-house lawyers if it was attorney-client privilege.  I mean, that seems to be appropriate, but you lose the privilege if it's disclosed to people who are not, I don't know, if it isn't necessary to disclose it to them.  So you remember that piece of *American Kitchen*?  You lose it.  So I don't know if all of these were on huge email chains and they were being disclosed to people for whom the privilege doesn't attach.

MR. JAFFE:  If I may, your Honor?

THE COURT:  Yes.

MR. JAFFE:  I think there's a few points to be made there.  Number one is, when you say large email chains, many of these are chains that contained Mr. Gendron, Mr. Kidney, and other high-level CREF employees.  And the consequence of treating other employees of CREF as not being subject to the privilege is that copying other CREF employees that are necessary to their conversation would be deemed a waiver, meaning if Mr. Kidney or Mr. Gendron were on an email, and people who worked for them, with them at CREF, some of the Steward email addresses were copied, according to the way the order is currently drafted, according to Order 22, there would

be a waiver based on those others.  And if you conceptualize, you know, an arm of the company --

THE COURT:  But can I just stop you right there.  You cannot say -- there is not one case that I've found that you cited that basically provides an entire corporation and all its employees that are separate from it with the attorney-client privilege.  It doesn't exist.  If anything, every case that's existed has turned this down.  So I understand functionally there may be communications directly with Kidney or Gendron -- I'm leaving that one open -- but you would have to be able to prove that the cc to everyone under the sun was critical.

You were the ones, not you personally but Todd & Weld and Steward were the ones who pressed me so hard, how important this is to the Commonwealth of Massachusetts to build this hospital again, you have to have this fast-paced.  You're being so aggressive on the assertion of this privilege and so tardy, according to the master, in the production of documents, you've lost credibility.

So I agree with the master's approach that this be a clawback situation, and if there are documents you particularly care about, object.  So I am not staying her order.  I'm allowing you to move to reconsider on Gendron.  So let's just say, the motion to reverse is denied without prejudice to seeking attorney-client -- what would you call it? -- privilege with respect to Mr. Gendron.  You may well be right

that there are certain of these emails that are essential, like, "Oh, we're going in to the Insurance Commission tomorrow, and can we really argue about parapet roofs?  What does the roofing guy say?"  And it may be that that's providing advice to an attorney.  I mean, I can see that.  But you can't just do a whole hog "everyone in CREF gets the privilege no matter what."

MR. JAFFE:  And, your Honor, we're not seeking everyone at CREF.

THE COURT:  It seemed like you did in the objection: "We think CREF gets the privilege."

MR. JAFFE:  We named five people.  I mean, I think there could be an argument.  I would call your Honor's attention to the Eighth Circuit case in *Bieter*, which is the case relied upon by most or all of the Massachusetts cases cited by the party, which actually speaks to that.  I'm just quoting from *Bieter*.  It says, "When applying the attorney-client privilege to a corporation or partnership, it's inappropriate to distinguish between those on the client's payroll and those who are instead, for whatever reason, employed as independent contractors."  And *Bieter* did treat, you know, this independent contractor that operated as an arm of the company as if it were part of the company.

THE COURT:  And that case involved a person.  It didn't involve an entire corporate entity, I think.  In any

event, that's not Massachusetts law.  A, we don't have Massachusetts law on point, but, B, I do think there's a strong argument for it because the SJC tends to follow the Restatement, and the Restatement includes agents, so, I mean, there's some basis for it.  I think both sides would want that.

MR. JAFFE:  If I can make one more point?

THE COURT:  This will slow it down forever.  I can't do a document by document.  I don't think the master can do a document by document.  I'm not giving you -- you had sought the privilege for all of CREF.  That is denied.

So now the question is, you sort of backpedalled a little bit in the motion with the six people, but then I looked at the page cites for the six people; you didn't prove they were highly trusted and intimate at the level that they get it for all communications.  But that isn't to say, as you said, in the *Bieter* case, that for specific communication, if it's specifically needed for particular attorney-client, you may be right, but, as I understand it, a lot of these are massive cc's.

MR. JAFFE:  If I might, your Honor, there are approximately 4,000 documents that are at issue here.  The attorneys in my firm have now reviewed the vast majority of them, and I can say that they are what one would look at and consider a truly privileged conversation, not with mass copies but with, you know, just as -- well, let me put it this way:

No one would ever question if these were Steward employees.

THE COURT:  How do you think this case can possibly be resolved?  And who's going to look at 4,000?  Page Kelley can't do it.  We're swamped in this court with immigration cases, Trump cases, and massive cases.  The master can't look at 4,000 documents.

MR. JAFFE:  I would submit that with the Court's guidance, an attorney could certify that we've looked at them and --

THE COURT:  I don't trust you, I don't trust you, okay, to do that because you took such an aggressive stand initially, not you personally but such an aggressive stand.

So there is no case in the United States of America that I know of that has an entire corporation that's an independent contractor and gives every employee in there attorney-client privilege.

Now, I'm not saying it never can happen.  Let's say you have Mr. Kidney, and, you know, let's say -- who would it be? -- Mr. Launer talking about an issue, and then they say, you know, "Ask the roofer."  I mean, maybe it falls under that as advice of a person.  I mean, that could potentially qualify.

MR. JAFFE:  I think these documents actually, you know, do --

THE COURT:  Why do you really care?  I'm being really blunt here.  Don't you want your money?

MR. JAFFE:  We do.  These are very privileged documents.

THE COURT:  I don't think they're very privileged. I've seen some of them.  They're not very privileged.  They're about the condition of the hospital, which is quintessentially at issue.

MR. JAFFE:  Your Honor is referring to documents attached to defendants' motion papers?  Those are not the nature of the CREF-only documents that are the subject of this objection.  Those are documents where only CREF and employees and attorneys were copied.

THE COURT:  All right, so this is what I'm going to do:  I'm affirming the master.  The objections are denied without prejudice to seeking the privilege with respect to Mr. Gendron.  I think a clawback makes the most sense, but it should be "attorneys' eyes only," not shown to clients.  And then I am hoping that you use discretion in how you're doing it.  And I think what Judge, you know, Judge -- I don't know what you call it, but Judge Hochberg used to be a judge in the Federal District of New Jersey -- could randomly sample it and see if it's being appropriately asserted.  But I think there's no real prejudice to you if it's "attorneys' eyes only."  And the exception to that would be anything that was just with Mr. Gendron because you may want to reassert that, you know, Gendron because he's the CEO.  But there was almost nothing about him in the papers you submitted to support the "highly

trusted," but I would have to believe a CEO was.  I just have to believe that.

So do the defendants -- is it one or two of you?  I forget.

MS. PELUSO:  It's two.

THE COURT:  Do the defendants object to Gendron being treated as a highly trusted individual?

MS. PELUSO:  Yes, for the reasons stated in our reply brief.

THE COURT:  You're then going to have another round of briefing.

MS. PELUSO:  But one piece of clarity I would ask from your Honor, if you don't mind, is, if the plaintiff seeks reconsideration from Judge Hochberg regarding Gendron, the defendants' position would be that production should occur subject to clawback, subject to "attorneys' eyes only," as your Honor has stated, so that we can move forward with reviewing documents, teeing up any clawback disputes with Judge Hochberg. We have expert reports due August 5th, and at this time, given the scope and the nature of the documents that we believe have been withheld, we're in a difficult position, particularly on the bad-faith allegations, without access to the discovery.

THE COURT:  I don't know.  What's sauce for the goose is sauce for the gander.  With you, was it Sedgwick?  Don't you have an independent contractor working with you?

MS. PELUSO:  There were independent -- there were third parties --

THE COURT:  Have you ever asserted the privilege with respect to any of them?

MS. PELUSO:  Not -- not significant privilege.  The special master analyzed that there were only I think about 65 documents withheld, and the special master ruled on that in the same ruling regarding the CREF records.

THE COURT:  I haven't looked at the rest of it.  So I think, if it's just with Kidney and Gendron, they don't need to be produced with attorneys, subject to the clawback and subject to the judge looking at that issue, but everything else should be produced subject to a clawback.  And I need this to get moving.  This case, what is it, it's a -- this case is literally the oldest case on my docket, and it's not even close.  How am I going to do summary judgment?  I have to believe that for every expert you produce, there's going to be a *Daubert* motion that's heavily litigated.  I have to believe that you're going to ask for 50 pages a side on summary judgment.  That's what I have to believe, and you've given me thousands of pages in the record.  How are you going to get this resolved?  And that's really why I wanted to see you in person here rather than just ruling what I was going to say.  Have you talked settlement at all?

MR. JAFFE:  I'm going to let Mr. Launer speak to that.

THE COURT:  You're the ones who came storming in to me:  "This has got to be resolved.  The health of the Southeastern Massachusetts is at stake."  It may have been not you, it may have been somebody else in your firm, but --

MR. LAUNER:  Yes, your Honor.  So for one, as I think your Honor knows, the case has been stayed for a number of years.  So while it started in late 2021, after your earlier decision was taken on appeal, the case was stayed until the SJC ruled.  So in terms of discovery, the case has only been going on for about 15 months.

So my firm, I assume -- I'm going to take your Honor at her word -- came storming in and saying that it had to move quickly --

THE COURT:  That was Mr. Cooper who --

MR. LAUNER:  So that was four years ago.  It was long before Steward declared bankruptcy.  It was while construction was still going on and while the money was in for new construction.  The landscape has changed since May of 2024 when Steward declared bankruptcy, and even more so since September 30 of '24 when Steward exited Massachusetts completely.  As for the timing, your Honor --

THE COURT:  So you don't care about the speed?

MR. LAUNER:  No, we absolutely care about the speed because, as we have explained many times, it is the creditors who are at issue here.  They are the plaintiff, and the trust

has been set up for the benefit of the creditors, who did not receive compensation under Steward's bankruptcy, or as much compensation as they could.  So we have been doing everything possible despite the --

THE COURT:  So -- I'm sorry.

MR. LAUNER:  I was going to say, despite the repeated statements by the discovery master, the case did get expanded, your Honor, by order number 1 which required plaintiffs to review 700,000 documents.  And so we have been one by one addressing orders.  But the plaintiff has done nothing to stall.  All we want to do is move this case forward.  The reason, just to address --

THE COURT:  Are you the one who filed at 6:00 o'clock on a Friday night?

MR. LAUNER:  I am, your Honor.  And as we told the discovery master, and as your Honor saw from the order, there were just in the rulings thirteen consultants.  And we had to parse through order number 22 --

THE COURT:  Are you frequently -- why didn't you call?  Why didn't you let us know?  Why didn't you do it a day when I had any chance whatsoever about thinking about the issues?

MR. LAUNER:  And I apologize for that, your Honor.  That was an oversight on our part, on my part.  We were operating under the fact that the discovery master approved the extension.  And so all I can say is I'm sorry for that, your

Honor.  It was not purposeful in any way.

THE COURT:  Well, it will never happen again.

MR. LAUNER:  That is correct.

THE COURT:  Because I'll just say "denied" to the whole thing, and I haven't done that.  I'm thinking seriously about the objections.

So at the end of this rainbow, we've got something going on here.  There will be the clawback as the master ordered, but it will be -- I don't know if she put this in for "attorneys' eyes only" at this point.

MR. JAFFE:  I think that's a very good idea, your Honor.  That helps.

THE COURT:  And the attorneys can challenge -- I sustain her order or I overrule the objection, whichever way you want to put it, on the not giving functional equivalent to all of CREF.  I looked at the record cites, and the other six people it wasn't proven on.  And the one that I'm just going to say the clawback, it was just communications involving Kidney, Gendron, and Todd & Weld or in-house counsel.  That can be privileged.

MR. JAFFE:  Your Honor, can I make one slight revision to that?

THE COURT:  Yes.

MR. JAFFE:  That the three other individuals that were identified, Mr. Van Ness, Kenyon, and Crowley, if those

individuals are copied and Mr. Gendron or Mr. Kidney is on the email, can we at least argue to the special master that that should not constitute a waiver of privilege merely because they're copied?  All three are high-level CREF employees that work --

THE COURT:  Well, you didn't support that.  And I went and read the deposition transcript.  I mean, it was like one line for every person.  I mean, there was hardly anything, so no.  But what you can argue is that they were essential to that communication as an agent.  But if they're routinely bucking it to all these people -- whoever was the genius who said "Just cc everything to in-house counsel," I know people do that, but it's not going to preserve your privilege.

MR. JAFFE:  Right, that certainly made the whole review process more difficult.

MS. PELUSO:  Your Honor, both emails I would argue should be produced subject to clawback, if they're copying other individuals for whom they have not met their burden before the special master and your Honor, in order to try to get the documents produced in a timely fashion.

THE COURT:  Right, they should be produced under the clawback "Attorneys eyes only."  But if it's just Gendron, Kidney, and Todd & Weld or in-house counsel, or whatever, and it's attorney-client, that should stay just privileged.  But I do think it should be a master's decision as to whether or not

Gendron qualifies.

MS. PELUSO:  And then, your Honor, could we have a timeframe for production for purposes of the schedule?  As I mentioned, we have rebuttal expert reports due August 5th.  That's the next looming deadline on the revised case calendar that Mr. Jaffe referred to earlier.

MR. JAFFE:  And I will note that there are other issues that remain in front of the discovery master where the discovery master's resolution in other parts of Order 22 require production by the parties of documents for, you know, sampling of documents review.  So it's not that this is the only item that's preventing discovery from being complete, at least with respect to --

THE COURT:  Why don't you just go back to her.  I mean, I'm now giving up on the speed thing.  I was trying to do it because I believe that Southeastern Massachusetts deserves a hospital and that it might affect the health of the people there; but if that's no longer at issue, I'm a little less intent.  And I did read the Boston Globe article about how NTT upped the price and someone made an offer, so, I mean, I think there's more going on than I had thought there was, so I'm going to be less worried about speed.

Now, there was...I don't know what else, if there was anything else.  Oh, I'm not going to always be taking any appeals.  It should go to the magistrate judge, Judge Kelley,

who's excellent at these things.  It just so happens, you have to understand how swamped this court is right now, not that you really care but --

MR. JAFFE:  We do appreciate your time, your Honor.

THE COURT:  The resources are dramatic, let's just say that.

Now, last but not least, you didn't answer my question. Have you gone to mediation?

MS. PELUSO:  There was a mediation in the case in January of 2025 before both sets of new counsel were involved in the case.  Since that time, the parties have exchanged names of potential mediators for a mediation that we, on Judge Hochberg's schedule, anticipated occurring in early 2027. The defendants, of course, are amenable to earlier discussions if plaintiff is amenable, but that is the nature of the current discussion.

THE COURT:  This is dragging on.

MR. JAFFE:  The scheduling order that I referred to at the beginning of the hearing, which is Docket 223, has a window to engage a mediator.  That opens in November of --

THE COURT:  Do you all agree with the proposed schedule?

MS. PELUSO:  I do think that some of the dates were aggressively set in order to maintain expeditious turnaround on things, mindful of the resources of the court, mindful of the

age of the case.  I think that given that some of these disputes are continuing to take some time to thoughtfully work themselves out, we could use more time on the schedule.  I think an August 5th rebuttal deadline for experts is going to necessitate that the supplemental disclosure on experts is more extensive than it ordinarily would be, and we --

THE COURT:  I tell you what, go back to the master on it.  I'm sorry, I missed that filing, so I didn't approve it, but --

THE CLERK:  Judge, just I'm looking for you just to see how we missed it, but it looks like, Counsel, I'm not sure if you saw it, but if it's discovery master 21.  It looks like the master signed it, I believe.  Is her name Faith Hochberg?

MS. PELUSO:  Yes.

THE COURT:  So she decided already.  I delegated to her that discretion.

MR. JAFFE:  It's framed as a recommendation, but if your Honor considers it a --

THE COURT:  I do.  Maryellen, put that on there that I adopt it, and then if you want to go back to her, that's fine.

THE CLERK:  Okay, I'll put "adopted" on the docket number.

THE COURT:  Thanks for checking that out, Maryellen.

THE CLERK:  Oh, you're welcome.

MS. PELUSO:  Your Honor, thank you for the grace on

the ability to go back to that.  We appreciate that, your Honor.

THE COURT:  Okay.  And I have one last housekeeping thing, and I know you don't care about this because you're not the only ones:  You're sealing everything.  The courts were hacked.  I don't know if you know that.  We were hacked, and as a result of it being hacked, we now -- it takes an enormous amount of time for me to download any sealed document.  It takes, like, four clicks, you know, to go back through it.  And for my docket clerk, it's very hard for her to file sealed documents.  And we're doing it for your protection, but I think attorneys -- so you're sealing everything under the sun, and I --

MR. JAFFE:  I would just say, your Honor, in this context, because we're fighting over privilege, it's kind of like --

THE COURT:  That's why I'm not yelling about the privilege, but other documents -- I mean, of course you have to, you waived the privilege, but other documents, I am ordering that with respect to other documents, that the chief, you know, the top litigator, not some young associate who's afraid of getting it wrong and getting yelled at, that the top litigator in each team say that it really is confidential, not the client, not the associate, not a paralegal, you know, the team, the litigation team look at it, because at this point I'm

demanding courtesy copies -- I'm killing entire forests in Maine -- because it's very hard for me to get to it, and it's very burdensome for my staff.  And it's not just you, so I'm not just picking on you on this one.  It's to protect real trade secrets and real private health information.

MR. JAFFE:  We take that seriously, your Honor.

MS. PELUSO:  Thank you for that guidance.

THE COURT:  All right, have a wonderful July 4th.  I hope not to see you again on something like this.  I think Judge Hochberg, who I knew when we were colleagues as Federal District Court judges, is one of the smartest people I know, and she's doing a great job, and I'm hoping we can work through this.  Thank you.

MS. PELUSO:  Thank you very much, your Honor.

THE COURT:  Okay, bye-bye.

(Adjourned, 10:11 a.m.)

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )


        I, Lee A. Marzilli, Official Federal Court Reporter,

do hereby certify that the foregoing transcript, Pages 1

through 25 inclusive, was recorded by me stenographically at

the time and place aforesaid in CA No. 21-11902-PBS, Mark

Kronfeld v. American Guarantee and Liability Insurance Company,

et al, and thereafter by me reduced to typewriting and is a

true and accurate record of the proceedings.

        Dated this 1st day of July, 2026.




                    /s/ Lee A. Marzilli
                    _____
                    LEE A. MARZILLI, CRR
                    OFFICIAL COURT REPORTER

# Exhibit B

Page 1

                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
         Mark Kronfeld, as Trustee    §
         of the SHC Creditor          §
         Litigation Trust,            §
                                      §
              Plaintiff,              §
                                      §    Civil Action No.
         v.                           §
                                      § 1:21-cv-11902 – PBS
         AMERICAN GUARANTEE AND        §
         LIABILITY INSURANCE          §
         COMPANY and ZURICH           §
         AMERICAN INSURANCE           §
         COMPANY,                     §
                                      §
              Defendants.             §
         *************************************************
                 ORAL AND VIDEOTAPED DEPOSITION OF
                           ROBERT GENDRON
                      7th day of April, 2026
         *************************************************
                    ORAL AND VIDEOTAPED DEPOSITION OF ROBERT
         GENDRON, produced as a witness at the instance of
         the Defendants, and duly sworn, was taken in the
         above-styled and numbered cause on the 7th day of
         April, 2026, from 9:38 a.m. to 6:29 p.m., before
         Daniel J. Skur, Notary Public and Certified
         Shorthand Reporter in and for the State of Texas,
         reported by stenographic means at the offices of
         Veritext Legal Solutions at 600 N Pearl Street,
         Suite 2230, Dallas, Texas, pursuant to the Federal
         Rules of Civil Procedure.
              Job No. CRCC7963299

Page 2

APPEARANCES

FOR PLAINTIFF:

Josh L. Launer, Esq.
Seth J. Robbins, Esq.
Todd & Weld LLP
One Federal Street
Boston, Massachusetts 02110
P 617-624-4748 | F 617-227-5777
jlauner@toddweld.com
srobbins@toddweld.com

FOR DEFENDANTS AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY AND ZURICH AMERICAN INSURANCE COMPANY:

Abigail L. Peluso, Esq.
Jaylen Minefield, Esq.
Riley Safer Holmes & Cancila LLP
1 S. Dearborn Street
Suite 2200
Chicago, Illinois 60603
P 312-471-8774 | F 312-471-8701
apeluso@rshc-law.com
jminefield@rshc-law.com

FOR THE WITNESS:

Erick M. Sandler, Esq.
Day Pitney
225 Asylum Street
Hartford, Connecticut 06103-1212
P 860-275-0138 | F 860-881-2459
emsandler@daypitney.com

ALSO PRESENT:  Amy Andrews - Via Zoom

Patrick Salvant, Videographer

Page 3

INDEX

1. Appearances............................  2
2. The Witness:
      ROBERT GENDRON
   Examination by Ms. Peluso........... 11, 309
   Examination by Mr. Launer.............. 301

3. Acknowledgement.......................... 313

4. Reporter's Certificate................... 314

5. Errata................................... 315

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 1 | Proof of Claim | 21 |
| | 6 pages | |
| Exhibit 2 | Project Authorization | 68 |
| | Bates No. | |
| | CREF-Norwood_0002178 | |
| | through 0002183 | |
| Exhibit 3 | Amendment to Project Authorization | 79 |
| | Bates No. | |
| | CREF-Norwood_0002204 | |
| | through 0002209 | |
| Exhibit 4 | Project Authorization | 89 |
| | Bates No. | |
| | CREF-Norwood_0002190 | |
| | through 0302196 | |
| Exhibit 5 | Amendment to Project Authorization | 93 |
| | Bates No. | |
| | CREF-Norwood_0002197 | |
| | through 0002203 | |

Page 4

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 6 | Amended and Restated Master Service Agreement | 95 |
| | Bates No. | |
| | CREF-Norwood_0002100 | |
| | through 0002121 | |
| Exhibit 7 | Master Service Agreement | 102 |
| | Bates No. | |
| | CREF-Norwood_0002126 | |
| | through 0002164 | |
| Exhibit 8 | CREF Org Chart | 112 |
| | Bates No. | |
| | CREF-Norwood_0000039 | |
| Exhibit 9 | 7/22/2020 Email Chain Regarding Notes | 116 |
| | Bates No. STEWARD01189211 | |
| | through 01189212 | |
| Exhibit 10 | Steward Health Care - Norwood Hospital MPT Property Repair and Maintenance Report | 125 |
| | Bates No. | |
| | CREF-Norwood_0001192 | |
| | through 0001214 | |
| Exhibit 11 | 3/9/2020 Mills Email to Mills Regarding NE Charter Update March 2020 | 137 |
| | Bates No. | |
| | CREF-Norwood_0000688 | |
| | through 0000689 | |
| Exhibit 12 | 3/9/2020 Mills Email to Mills Regarding NE Charter Update March 2020 | 144 |
| | Bates No. | |
| | CREF-Norwood_0000686 | |
| | through 0000687 | |

Page 5

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

| Number | Description | Page |
|--------|-------------|------|
| Exhibit 13 | December 2022 Email String Regarding NWC | 149 |
| | Bates No. STEWARD00192402 | |
| | through 00192412 | |
| Exhibit 14 | 7/7/2020 Gendron Email to Frey Regarding Steward Health Care System LLC Claim | 151 |
| | Bates No. STEWARD01188275 | |
| Exhibit 15 | 7/7/2020 Email String Regarding Norwood | 155 |
| | Bates No. STEWARD00761494 | |
| | through 00761495 | |
| Exhibit 16 | Steward, Norwood Hospital Team Structure | 160 |
| | Bates No. STEWARD01426068 | |
| | through 01426071 | |
| Exhibit 17 | 8/16/2020 Papa Email to O'Rorke and Others Regarding Steward Health Care Loss | 167 |
| | Bates No. STEWARD00001718 | |
| Exhibit 18 | 11/20/2020 Gendron Email to Portal Forwarding Emails Regarding Steward Master Lease Section 14.2(a) Extension Request | 171 |
| | Bates No. STEWARD01205205 | |
| | through 01205208 | |
| Exhibit 19 | Memo and Agreement | 178 |
| | Bates No. STEWARD00047754 | |
| | through 00047761 | |
| Exhibit 20 | 7/29/2020 Email String Regarding NE Region Updates | 186 |
| | Bates No. STEWARD00758540 | |
| | through 00758544 | |

2 (Pages 2 - 5)

Page 6

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

Number          Description          Page

Exhibit 21  6/30/2020 Email String     198
Regarding Hospital
Closing-Opportunities For
Reopening
Bates No. STEWARD00118517
through 00118520

Exhibit 22  7/6/2020 Email String     206
Regarding Radiology Equipment
At Norwood
Bates No. STEWARD00118673
through 00118674

Exhibit 23  7/7/2020 Gendron Email to     209
Polanowicz and Others
Regarding Do Not Distribute:
Norwood Slide Deck
Bates No. STEWARD00761524
through 00761535

Exhibit 24  8/5/2020 Crowley Email to     218
Gendron Regarding Can We
Review ASAP
Bates No. STEWARD00047506
through 00047512

Exhibit 25  6/9/2020 Email String     231
Regarding Lunch-Town Feedback
Bates No. STEWARD00762546
through 00762547

Exhibit 26  November 2020 Email String     238
Regarding Norwood Claim
Bates No. STEWARD00094428
through 0094436

Exhibit 27  11/20/2020 Lovelady Email to   242
Karam and Others Regarding
Please Use These
Documents-Re:  Board Meeting
Materials 12.01.2020
Bates No. STEWARD01362301
through 01362335

Page 7

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

Number          Description          Page

Exhibit 28  10/6/2020 Doyle Email to     250
Frumkin Forwarding Email
Regarding Update BI File and
Proposed Agenda
Bates No. STEWARD00460052

Exhibit 29  Spreadsheet, Norwood Post     257
Flood and Storm As-Was In
Code Compliant Restoration
1 page

Exhibit 30  2/5/2021 Email String     258
Regarding on Behalf of John M
Doyle/Steward Norwood
Hospital
Bates No. STEWARD00933926
through 00933933

Exhibit 31  March 2021 Email String     264
Regarding Norwood Hospital
CMS DPH Update
Bates No. STEWARD00833972
through 00833976

Exhibit 32  April 2021 Email String     268
Regarding Norwood Hospital
CMS DPH Follow-Up
Bates No. STEWARD00835601
through 00835604

Exhibit 33  5/11/2021 PowerPoint Deck,     270
Norwood Hospital Flood and
Storm
Bates No. STEWARD001059011
through 001059195

Exhibit 34  Gendron Script     274
Bates No. STEWARD01225898
through 01225902

Page 8

DEPOSITION EXHIBITS
ROBERT GENDRON
7th day of April, 2026

Number          Description          Page

Exhibit 35  2/23/2021 Norwood Hospital     275
Board of Directors Meeting
Minutes
Bates No. STEWARD01006718
through 01006719

Exhibit 36  12/1/2022 Hamner Letter to     277
Steward Health Care System
LLC
Bates No. STEWARD00884004
through 00884009

Exhibit 37  2/19/2023 Davis Email to     284
Gendron Regarding Steward
Cash Flow Information
Bates No. STEWARD00179172

Exhibit 38  MPT Exception Projects     287
Bates No. STEWARD00179173
through 00179175

Exhibit 39  GenHoldCo Ownership Timeline   294
Bates No.
CREF-Norwood_0002099

Page 9

P R O C E E D I N G S

VIDEOGRAPHER:  Good morning.  We are going on the record at 9:38 a.m. on April 7th, 2026.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and Internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Robert Gendron taken by counsel for the defendant in the matter of Mark Kronfeld as trustee of SHC Creditor Litigation Trust versus American Guarantee and Liability Insurance Company and Zurich American Insurance Company.  This case is filed in the United States District Court for the District of Massachusetts, Case Number 1:21-cv-11902–PBS.

The location of the deposition is Veritext Legal Solutions at 600 North Pearl Street, Suite 2230, Dallas, Texas 75201.  This depo is

3 (Pages 6 - 9)

Page 10

being conducted in person as well as remotely using virtual technology.

My name is Patrick Salvant representing Veritext, and I'm the videographer. The court reporter is Dan Skur, also from Veritext. I am not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. PELUSO: Good morning. Abigail Peluso on behalf of the defendants.

MR. MINEFIELD: Good morning. Jaylen Minefield on behalf of Defendants.

MR. SANDLER: Good morning. Erick Sandler from Day Pitney for the witness, Mr. Gendron.

MR. LAUNER: And good morning, Josh Launer from Todd & Weld on behalf of the plaintiff.

MR. ROBBINS: Seth Robbins from Todd &

Page 11

Weld on behalf of the plaintiff.

ROBERT GENDRON, having been duly cautioned and sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

(9:38 a.m.)

EXAMINATION

BY MS. PELUSO:

Q. Good morning.

A. Good morning, Abbie.

Q. Would you please state your name for the record?

A. Yes, Robert Gendron.

Q. And could you spell your last name?

A. Yes. G-E-N-D-R-O-N.

Q. Mr. Gendron, you and I have never met before today; is that correct?

A. That is correct.

Q. And we didn't discuss your testimony in any way before your deposition began just moments ago?

A. That is correct.

Q. You understand that you're under oath?

A. I do.

Q. And that means that you swear to tell

Page 12

the truth in response to questions the same as if we were in a courtroom and there was a jury and the judge present.

Do you understand that?

A. I do.

Q. Okay. Are you taking any medications, or are you under the influence of anything that would affect your ability to answer questions as truthfully as you can?

A. I am not.

Q. Are you represented by a lawyer at your deposition today?

A. I am.

Q. Who are you represented by?

A. Erick Sandler.

Q. And he's sitting beside you?

A. That is correct.

Q. Are you represented by either of the lawyers from Todd & Weld who are present at today's deposition?

A. No.

Q. Did you meet with any lawyer from Todd & Weld before today's deposition in preparation for your testimony?

A. I did.

Page 13

Q. And when did you meet with them?

A. Approximately 45 days ago, plus or minus.

Q. How long did you meet for?

A. Hour and a half, two hours.

MS. PELUSO: Counselor, are you going to assert privilege over that conversation?

MR. LAUNER: We are, yes.

MS. PELUSO: Will you instruct the witness not to answer questions regarding what took place during his one-and-a-half hour-long meeting with Todd & Weld lawyers in preparation for his deposition?

MR. SANDLER: Yes.

BY MS. PELUSO:

Q. Will you take your lawyer's instruction and not respond to questions from me regarding what was discussed with Todd & Weld attorneys in preparation for your deposition today?

A. I will.

Q. Okay. Did you review any documents to refresh your recollection in preparation for today's deposition?

A. I did.

Q. What did you review?

4 (Pages 10 - 13)

Page 14

A.   I reviewed some memos that were created from CREF to Steward and some email communications.

Q.   Do you recall with any specificity what you reviewed?

A.   It was a memo produced to Dr. de la Torre on -- beginning of August.  Some -- I don't remember any of the specifics off the top of my head.

Q.   Okay.  Did you review any financial information from Steward Health?

A.   I'm not sure I understand the question, "financial information."

Q.   Did you review any financial data in preparation for your testimony today?

A.   I probably need more definition about "financial data."

Q.   Did you review any Excel spreadsheets to refresh your recollection about Steward Health's financial condition?

A.   I did not.

Q.   Okay.  I understand that you're the founder and CEO of a company called CREF; is that right?

A.   That's correct.

Q.   When did you found CREF?

Page 15

A.   CREF was found -- founded in 2016.

Q.   In or around what month?

A.   I don't recall.

Q.   Does January sound correct?

A.   Usually -- I -- I recall a lot of our new filings with the State were in January around that time.

Q.   Okay.  So in or around January of 2016 --

A.   Correct.

Q.   -- is that fair?

You do need to wait for me to finish my question before you --

A.   I'm sorry.

Q.   -- answer --

A.   I'm sorry.

Q.   -- just to keep the court reporter's job easier.

A.   Sorry.

Q.   No, it's okay.  It's natural.

A.   Yeah.

Q.   But you just have to pause for a second, let me finish my question.  Okay?

A.   Okay.

Q.   Okay.  So in or around January of 2016

Page 16

is a fair time frame for when you founded CREF; is that fair?

A.   Correct.

Q.   Have you had an ownership interest in CREF at all points in time from January 2016 to present?

A.   Yes.

Q.   Do you also own a company called GenCon?

A.   I do not.

Q.   Have you ever owned a company called GenCon?

A.   I did.

Q.   When did you own that?

A.   I owned GenCon from approximately 2008 until 2021.  I believe January 1st was the date that we formally sold it.

Q.   And do you have any ownership interest in GenCon after January of 2021?

A.   No.

Q.   What about GenCon, Inc.?

A.   That's the same company.

Q.   Okay.  What about GenHoldCo?

A.   GenHoldCo is the holding company for the CREF entities.

Q.   And you own the holding company for the

Page 17

CREF entities, GenHoldCo?

A.   That's correct.

Q.   Okay.  And CREF entities, what are those?

A.   CREF entities consist of GenReal, Inc., GeniPG, GeniPM; and those were converted from corporations to LLCs around that time frame, end of 2020 to 2021.

Q.   What about CREF RES?

A.   Sorry, CREF GenReal became CREF RES during that -- that time period.

Q.   Okay.  And CREF CPM?

A.   Yeah, that's CREF CPM, Capital Program Management.  Sorry if I didn't say that.

Q.   That's okay.

CREF FPS?

A.   Yes.  IPG became FPS.  IPM became CPM.

Q.   Okay.

A.   So that was the evolution from GeniPG to GenFPS.

Q.   We'll go through a couple of those contracts --

A.   Yeah.

Q.   -- today --

THE REPORTER:  Do remember it's not a

5 (Pages 14 - 17)

Page 18

conversation. You have to wait for the question to finish. Go ahead.

MS. PELUSO: Thank you.

BY MS. PELUSO:

Q. We'll go through some of those contracts to get a little more clarity on some of those corporate names; but when you referred earlier to "CREF entities," the entities you just listed are what you were referring to as "CREF entities"; is that right?

A. That is correct.

Q. And each of those CREF entities are wholly owned by GenHoldCo; is that right?

A. That is correct.

Q. Do you have 100 percent ownership interest in GenHoldCo today?

A. I do.

Q. Okay. You understand that the plaintiff in this case, this lawsuit, is Mark Kronfeld, as trustee of the Steward Healthcare Litigation Trust; is that right?

A. I do.

Q. And you understand that generally Mr. Kronfeld's role, as trustee of the Steward Litigation Trust, is to investigate and file

Page 19

lawsuits on behalf of the trust for the beneficiaries of the trust?

MR. LAUNER: Objection.

BY MS. PELUSO:

Q. You can answer the question.

A. That's my understanding.

MS. PELUSO: Do you want to place any stipulations on the record?

MR. SANDLER: Yeah. I was -- yeah. So, yeah, can we use the usual stipulations, all objections, except as a motion to strike, reserve for trial, waive notary, and I believe we're doing 30 days?

MS. PELUSO: So waive all objections other than form, correct?

MR. SANDLER: Except for form, yes.

MS. PELUSO: Yeah. So stipulated.

BY MS. PELUSO:

Q. Okay. I'll repeat the question. And counsel may object. Unless you're instructed by your lawyers not to answer a question, the objections are for the record, and you may still answer.

A. Okay.

Q. Do you understand that?

Page 20

A. Yes.

Q. Okay. You understand generally that Mr. Kronfeld's role as trustee of the Steward Litigation Trust is to investigate and file lawsuits on behalf of the trust for the beneficiaries of the trust, correct?

MR. LAUNER: Objection.

A. Yes.

BY MS. PELUSO:

Q. Okay. You also understand that the beneficiaries of the litigation trust includes Steward's creditors who filed claims for recovery of debt or unpaid invoices in the bankruptcy proceeding, right?

MR. LAUNER: Objection.

A. Yes.

BY MS. PELUSO:

Q. And if the trustee recovers money in this lawsuit, those funds may be used to repay some of Steward's creditors in the bankruptcy. You understand that?

MR. SANDLER: Objection.

A. Yes.

BY MS. PELUSO:

Q. Isn't it true that there are multiple

Page 21

claims in the bankruptcy proceeding on behalf of the creditors that you have a personal financial interest in?

MR. SANDLER: Objection.

A. Yes.

BY MS. PELUSO:

Q. CREF and the CREF entities are creditors in the pending Steward bankruptcy proceeding; isn't that right?

A. Yes.

Q. I'd like to look at one example of a claim that was submitted by CREF in that bankruptcy proceeding, and we'll mark this as Gendron Exhibit 1.

MS. PELUSO: This is Tab 9.

(Gendron Exhibit 1 marked.)

BY MS. PELUSO:

Q. Okay. Mr. Gendron, I'm handing you what's been marked Gendron Exhibit 1. And this is one of the claims that was filed in the bankruptcy court in the Southern District of Texas. This is a publicly available document, dated August 22nd, 2024. Do you see that?

A. Yes.

Q. And you'll see at the -- at the first

6 (Pages 18 - 21)

Page 22

page, there is an identity of claim, and it lists the current creditor as CREF CPM, LLC. Do you see that?

A. Yes.

Q. And if you turn the page, please, to page 4 of the claim, you'll see a document entitled Addendum to Proof of Claim of CREF CPM, LLC. Do you see that?

A. Yes.

Q. And there's a section entitled Basis for Claim, correct?

A. Yes.

Q. And it states that: CREF CPM, LLC, asserts a claim against Steward Norwood Hospital, Inc., the debtor, in Case Number 24-90366, in the amount of $1,650,811.99. Do you see that?

A. Yes.

Q. And if you turn the page, you'll see a list of invoices; is that correct?

A. Yes.

Q. And through this proof of claim, you understand that CREF seeks to recover the balance of approximately 15 unpaid invoices that it sent to Norwood Hospital between November 2023 and April 2024, correct?

Page 23

A. Yes.

Q. Okay. And if you turn back to the third page that we were just looking at, entitled Addendum to Proof of Claim, the notices about that claim are directed to be sent to both CREF and to a lawyer at Day Pitney, right?

A. Correct.

Q. And that is the same law firm that's representing you at your deposition today, correct?

A. Correct.

Q. Mr. Gendron, are you aware that CREF actually filed 91 separate claims in the bankruptcy proceeding, seeking to recover funds owed to it by Steward or a Steward entity?

A. I'm aware that there was a significant amount of claims, but I did not know it was 91.

Q. Does it sound accurate to you that there are approximately 34 claims filed by CREF CPM, LLC?

A. Yes.

Q. And approximately 28 claims by CREF FPS, LLC?

A. Sounds accurate.

Q. And one claim by CREF International?

A. Potentially.

Q. And approximately 28 claims by CREF RES,

Page 24

LLC?

A. Yes.

Q. And each of those claims seek money from -- for various Steward hospital projects, not just work performed at Norwood Hospital, correct?

A. That is correct.

Q. Do you have any reason to dispute that there was over $123,000 for work done at Steward Sebastian River Medical Center?

MR. LAUNER: Objection.

MR. SANDLER: Objection.

A. I don't know if I understand the question.

BY MS. PELUSO:

Q. Are you aware of a claim submitted for work done by a CREF entity at Steward Sebastian River Medical Center?

A. I am not.

MR. LAUNER: Objection.

THE WITNESS: Sorry.

BY MS. PELUSO:

Q. You are aware that there were claims submitted for work done at various Steward entities, not just Norwood Hospital.

A. That is correct.

Page 25

Q. Okay. And the CREF entities actually filed claims in the Steward bankruptcy proceeding that's currently pending valued at over $27 million; isn't that right?

A. Sounds accurate.

Q. And those claims are still pending in the bankruptcy proceeding today, right?

A. That is correct.

Q. And the CREF and CREF-filed claims, in order to preserve CREF's right to recover money if the bankruptcy estate obtains funds to be used to pay creditors, right?

MR. LAUNER: Objection.

A. That is correct.

BY MS. PELUSO:

Q. And you understand that this lawsuit is one of the ways that the bankruptcy trustee is attempting to recover funds to pay creditors, including potentially CREF, right?

MR. LAUNER: Objection.

MR. SANDLER: Object.

A. I do.

BY MS. PELUSO:

Q. Isn't it true, sir, that you are personally financially invested in the outcome of

7 (Pages 22 - 25)

Page 26

this lawsuit?

MR. LAUNER: Objection.

MR. SANDLER: Objection.

A. Yes.

BY MS. PELUSO:

Q. Okay. Do you know what this lawsuit is about, what the merit or what -- I'm sorry, what the allegations are in the lawsuit?

A. The law -- can you be more specific? Sorry.

Q. The lawsuit currently pending, that you're being deposed in today, do you understand what the dispute is about?

A. I believe there's multiple disputes, so, you know, I'm not sure if I understand the specific question.

Q. What is your understanding of the various disputes at issue in this lawsuit?

A. The -- my understanding of the current lawsuit is a bad-faith claim against Zurich filed by Kronfeld.

Q. And you understand that there are two insurers at issue, American Guarantee or AGLIC or American Guarantee Insurance Company, as well as Zurich American, correct?

Page 27

A. I am aware that there was two separate policies, but I -- I'm not sure how the lawsuit is actually written.

Q. I may refer at various times to American Guarantee or Zurich. When I do that, it's to distinguish between the two policies at issue for MPT and Steward. Does that make sense to you?

A. Yes.

Q. Okay. Have you read the Second Amended Complaint that was filed in this case by the plaintiff?

A. I have not.

Q. Have you read the answer or the amended answer that was filed in this lawsuit?

A. I have not.

Q. Have you read any pleadings in this case?

A. Not in the last several years.

Q. Have you talked to any current or former CREF employees about your deposition today?

A. I have.

Q. Who have you spoken to?

A. Michael Crowley.

Q. And when did you speak with Michael Crowley about your deposition?

Page 28

A. Yesterday.

Q. How long was that conversation?

A. Hour and a half.

Q. And were you in person or by phone?

A. I was virtual under counsel.

Q. Counsel was present?

A. Correct.

Q. What did you say to Mr. Crowley, and what did Mr. Crowley say to you?

MR. SANDLER: Objection. Don't answer the question. It's privileged.

BY MS. PELUSO:

Q. Will you take your counsel's instruction not to answer questions about your communications with Michael Crowley in preparation for today's deposition?

A. I will.

Q. Okay. Did you speak with any other current or former CREF employees about your deposition today?

A. Jacob Frumkin.

Q. And who is he?

A. He is my SVP of finance operations.

Q. When did you speak with Mr. Frumkin?

A. Yesterday.

Page 29

Q. Was counsel present for that call?

A. No.

Q. And what did you say to Mr. Frumkin, and what did he say to you?

A. Just I will not be available tomorrow. I'm in a deposition.

Q. Okay. Did you talk with anyone else who is a current or former CREF employee about the substance of your testimony or about any topics that you thought you may be deposed about today?

A. I did not.

Q. Okay. Have you talked with any current or former Steward employees about your deposition today?

A. I have not.

Q. Have you spoken to Mr. John Doyle?

A. I have not.

Q. When is the last time you talked to Mr. Doyle?

A. 2023, plus or minus. I may be off by a few months, but...

Q. Sure. Approximates are fine.

A. Yeah.

Q. Have you talked to Dr. de la Torre?

A. I have not spoken to Dr. de la Torre

8 (Pages 26 - 29)

Page 30

since around Thanksgiving of this year -- last year, sorry, 2025.

Q. Have you had any conversations with Dr. de la Torre about this lawsuit?

A. I have not.

Q. Do you communicate in any way with Mr. Mark Rich?

A. I haven't. Mark Rich texted me about nine months ago, just checking in, but that was -- I haven't spoken to him in probably a year on the phone.

Q. Have you had any conversations with Mr. Rich about this lawsuit?

A. I have not.

Q. What about Dr. Octavio Diaz; do you have a relationship with him?

A. I have not spoken to Mr. -- Dr. Diaz in several years.

Q. Okay. Have you had any conversations with any CREF or Steward former or current contractors or consultants regarding this lawsuit or your deposition today?

MR. SANDLER: Objection to form.

MR. LAUNER: Objection.

A. I have not.

Page 31

BY MS. PELUSO:

Q. Have you reviewed any deposition transcripts in this case?

A. I reviewed Sal Perla's.

Q. Do you or does anyone at CREF, to your knowledge, have an ongoing working relationship with Consigli?

MR. LAUNER: Objection.

A. Working relationship, I would say maybe Patrick Murphy who runs our Boston office may have a working relationship with them.

BY MS. PELUSO:

Q. Do you know if Consigli is a current vendor or contractor or subcontractor for any CREF entities?

A. CREF does not subcontract work specifically, so no.

Q. Okay. Does CREF hire vendors?

A. CREF does not hire vendors. We make recommendations for our customers or clients to hire vendors.

Q. That's helpful, thank you.

Do you have an ongoing working relationship with anyone at Suffolk Construction?

A. I do not.

Page 32

Q. What about at Code Red?

A. I do not.

Q. What about at Continental Machinery?

A. I do not.

Q. Do you have any pending cases where NFA has been hired as a public adjuster on behalf of any of your clients?

A. I do not.

Q. Have you worked with NFA on claims other than the Steward Health Care claims?

A. I have not.

Q. Do you know Mark Kronfeld, the named plaintiff in this case, as trustee of the bankruptcy litigation trust?

A. Do I know that he is the trustee?

Q. Do you know him, do you know Mr. Kronfeld?

A. I do not.

Q. Have you ever spoken to him?

A. I have not.

Q. Did you review the subpoena and Notice of Deposition that was sent to your Counsel prior to your deposition today?

A. He had explained it to me at one point. We received it, but I don't recall reviewing it.

Page 33

Q. Did you review the attached request for the production of records?

A. I personally did not.

Q. And noting for the record that those requests have standing objections related to them, I'm just going to ask you about some efforts, if any, to collect records from your personal devices. Okay?

MR. SANDLER: I think efforts, to the extent there were any, would have been conducted by counsel, so I'm going to claim privilege over that.

MS. PELUSO: Okay.

MR. SANDLER: And pursuant to the objections, there hasn't been any production or collection in response to those requests for production.

MS. PELUSO: Okay. I'll ask the question. You let me know if you have an objection to this.

MR. SANDLER: Sure.

BY MS. PELUSO:

Q. Did you personally collect any records from any personal devices -- your cellphone, your personal computer -- not from CREF-held accounts -- in preparation for today's deposition?

9 (Pages 30 - 33)

Page 34

MR. SANDLER: You can answer "yes" or "no."

A. Can you ask the question one more time?

BY MS. PELUSO:

Q. Sure. Did you personally -- I'll start with this: Have you personally reviewed any documents that are stored on your personal cellphone or your personal computer -- not on CREF-controlled accounts -- in preparation for your deposition today?

A. No.

Q. Did you personally collect any records, text messages, emails, on your personal cellphone or your personal computer -- not on CREF-controlled accounts -- in preparation for your deposition today?

A. No.

Q. Do you have any text messages or personal communications on your cellphone that would not be on a CREF-controlled account that would relate in any way to the efforts to restore, rebuild, reconstruct Norwood Hospital?

MR. SANDLER: Objection to form. Answer "yes" or "no."

A. I don't know. No.

Page 35

BY MS. PELUSO:

Q. You don't know or no?

A. I don't know.

Q. Is it possible that you have text messages on your personal phone that relate to communications about efforts to restore or reconstruct or rebuild Norwood Hospital?

MR. SANDLER: Objection to form.

MR. LAUNER: Objection.

A. Yeah, I don't know.

BY MS. PELUSO:

Q. Did you have text message correspondence with Michael Crowley between June 28th, 2020, and September 2024 related to reconstruction efforts at Norwood Hospital?

MR. SANDLER: Objection to form.

A. Yeah, I don't know.

BY MS. PELUSO:

Q. Do you store your text messages in your cellphone in a way that they contain text messages going back as far as September 2024?

MR. SANDLER: Objection.

A. September 2024?

BY MS. PELUSO:

Q. Correct.

Page 36

A. I don't know how far they go back.

Q. Do you have iCloud backup on your cellphone?

A. I may. I don't know if it's for me or my family.

Q. Have you destroyed any records related to Norwood Hospital that are stored on your cellphone in the last month?

A. No.

Q. What about your personal computer; do you maintain records that are related to any of CREF's work at Norwood Hospital between June 28th of 2020 and September 2024 that would not be stored on a CREF-controlled account?

A. No. All of our documentation is stored on our SharePoint through the CREF.

Q. Did you have text message communications about work with Michael Crowley in general between June 28th, 2020, and September 2024?

MR. SANDLER: Objection.

A. Yeah, I don't know.

BY MS. PELUSO:

Q. Is communicating by text message part of your ordinary course of practice?

MR. SANDLER: Objection.

Page 37

A. Not ordinary course of action. Mostly phone calls.

BY MS. PELUSO:

Q. What about with Dr. de la Torre; do you text message with him?

MR. SANDLER: Objection. What time period?

BY MS. PELUSO:

Q. Do you text message with him now?

A. I do not.

Q. Did you -- did you exchange text messages with him, to your knowledge, between the time period of June 28th, 2020, and September of 2024?

A. I don't recall.

Q. What about with Scott Kenyon?

MR. SANDLER: Objection.

A. I don't recall.

BY MS. PELUSO:

Q. Is it possible?

MR. SANDLER: Objection.

A. Scott Kenyon generally wouldn't text me directly, so no. I don't recall, though.

BY MS. PELUSO:

Q. Okay. Who would you work most closely

10 (Pages 34 - 37)

Page 38

with at CREF related to CREF's work for Steward at Norwood Hospital?

A.    Michael Crowley.

Q.    Anyone besides Michael Crowley?

A.    Steve Van Ness every now and then.

Q.    Did you communicate with Stephen Van Ness by text message between June 28th, 2020, and September of 2024?

MR. SANDLER:  Objection.

A.    Yeah, I don't recall.

BY MS. PELUSO:

Q.    What about at Steward; who was your primary point of contact at Steward for the work that CREF did at Norwood Hospital?

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

A.    I probably need a time period because they had a -- they had a lot of changes.

BY MS. PELUSO:

Q.    That's fair.

In 2020, after the storm event on June 28th, 2020, who was your primary point of contact at Steward for any work that CREF did for Steward at Norwood Hospital?

A.    My primary contact was John Polanowicz.

Page 39

Q.    When did you last speak with Mr. Polanowicz?

A.    Three to four years ago.

Q.    I understand Mr. Polanowicz -- was he at Steward still in September of 2024, to your knowledge?

A.    I don't know if he was there in any capacity.

Q.    Did your primary point of contact change from Mr. Polanowicz to anyone else at Steward Health at any point in time prior to September 2024 but after the storm event in June of 2020?

A.    Yes.

MR. SANDLER:  Objection. Sorry.

MR. LAUNER:  Objection.

A.    Yes.

BY MS. PELUSO:

Q.    Who did it change to?

A.    Harry Bane.

Q.    And what was Mr. Bane's role?

A.    Harry Bane was brought in as the new regional president of New England.

Q.    Do you recall approximately when that took place?

A.    I do not.

Page 40

Q.    Do you recall if it was before or after, say, summer of 2021?

A.    I do not.

Q.    How often would you communicate with Mr. Bane prior to September of 2024, once he became your primary point of contact at Steward?

MR. LAUNER:  Objection.

MR. SANDLER:  Objection.

A.    Maybe once a month.

BY MS. PELUSO:

Q.    And just in general, what kinds of things were you discussing with Mr. Bane?

MR. SANDLER:  Objection.

A.    Overview of -- of projects and work ongoing in his region.

BY MS. PELUSO:

Q.    What projects was CREF working on with Steward that you were discussing with Mr. Bane?

MR. SANDLER:  Objection.

A.    Sorry.  What time period?

BY MS. PELUSO:

Q.    Prior to September of 2024.  You said "overview of projects."  I'm just wondering what projects you're referring to.

MR. LAUNER:  And objection.  Hold on one

Page 41

second.  To the extent that you were having conversations with Mr. Bane in the presence of counsel, with regards to whether it was at Norwood or on anything else on behalf of Steward, Plaintiff will be asserting privilege, and I've asked your counsel to instruct you not to answer.

A.    Okay.

BY MS. PELUSO:

Q.    Yeah, I think it would be helpful if you would -- if there are conversations where my question calls for a response --

A.    Uh-huh.

Q.    -- where an attorney was present for the communication, if you could tell us that, so that the objection can be properly lodged.

A.    Yes.

Q.    You'll be instructed not to answer, as I understand it, and we'll move on to a different conversation.

A.    Okay.

Q.    Okay.

A.    Can you ask the question one more time --

Q.    Sure.

A.    -- to make sure I answer it properly.

11 (Pages 38 - 41)

Page 42

Q. Sure. You testified that you spoke with Mr. Bane approximately once a month --

A. Uh-huh.

Q. -- between the time period of whenever he became the primary point of contact through approximately September 2024, and that one of the things you would discuss is an overview of projects --

A. Uh-huh.

Q. -- and ongoing work in his region. I just wanted a little bit more understanding of what you mean when you say that. What projects are you referring to?

A. Sure. So there was conversations regarding Norwood -- Norwood with counsel. In addition to that, there was a large initiative at St. Elizabeth's Medical Center that we would review the progress on. He oversaw the approximately eight to nine hospitals in New England, and the associated hundred plus or minus outpatient facilities, so there would be general updates about improvements to physician offices, hospitals, et cetera.

Q. Did you have any conversations with Mr. Bane between, say, approximately July of 2021

Page 43

and September of 2024 about Norwood Hospital that did not involve counsel?

A. I don't believe so.

Q. You mentioned that you spoke with him about once a month. Did you have monthly conversations with Mr. Bane that involved counsel?

A. I don't -- don't believe so.

Q. And when you say "counsel," are you referring to Steward Health in-house counsel or Todd & Weld?

A. Steward in-house counsel had engaged Todd & Weld, so it was Todd & Weld specifically.

Q. Okay. And I understand there will be an objection to those conversations and instruction not to answer based on those conversations. Is that correct, from counsel?

MR. LAUNER: That is correct.

BY MS. PELUSO:

Q. And, Mr. Gendron, you'll take your counsel's instruction to not answer questions about those conversations --

A. I will.

Q. -- correct? Okay.

Mr. Gendron, where did you attend college?

Page 44

A. The University of Massachusetts Amherst.

Q. When did you graduate?

A. 2005.

Q. Did you receive a degree?

A. I did.

Q. In what?

A. Finance.

Q. Have you obtained any graduate degrees since graduating from college?

A. I have not.

Q. What did you do after you graduated from college for work? What was your first job?

A. I did about a year and a half at a company called Conversant Communications doing sales.

Q. And I won't go through every job you had between then and 2016 when you founded CREF, but could you just give me kind of a general arc of what your professional experience was before you founded CREF?

A. Yeah. So did a few years. A year and a half of sales post-grad, and I went and started Gendron Construction around 2006 to 2007, and that eventually became GenCon. GenCon evolved into other services that would ultimately become CREF.

Page 45

So I guess I -- the other way -- Conversant Communications was the only job I had besides kind of self-employed.

Q. That's helpful. Thank you. GenCon you said eventually became CREF, but I understand from your testimony earlier that you sold your ownership interest in GenCon in approximately 2021; is that right?

A. That's correct.

Q. Who did you sell it to?

A. I sold GenCon to William Hobin, Justin Marks, and Matt Bellow, three employees.

Q. Three employees of GenCon?

A. That's correct. Sorry. I -- I got the names wrong. It was -- that was -- GenCon was Matt -- sorry, Justin Gonsalves -- sorry. I have to correct the record there.

Q. That's okay.

A. GenCon was split into two companies, so those three bought a portion of it, GenServe, and then GenCon was bought by Justin Gonsalves, John Shea, and Tim Lunt.

Q. In 2020, were there employees of GenCon, Inc., or GenCon, who were not employed also by CREF?

12 (Pages 42 - 45)

Page 46

MR. SANDLER: Objection.

BY MS. PELUSO:

Q. I'm just trying to understand if they were two separate entities or if they were related.

A. They were two separate entities.

Q. Did GenCon have employees who were not employees of CREF?

A. Yes.

Q. The three gentlemen who ended up purchasing GenCon, were they ever CREF employees?

A. No.

Q. Okay. And what kinds of services did GenCon provide to Steward prior to you selling it in June -- or in 2021 or thereabouts?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. GenCon provided construction manager at-risk services.

BY MS. PELUSO:

Q. Did they -- were those construction management services provided in locations other than Massachusetts?

A. At the time, no.

Q. And to the extent that services were provided to Steward Health Care by GenCon, were

Page 47

they provided at facilities other than Norwood Hospital?

A. Yes.

Q. And also at Norwood Hospital?

A. I don't know. I -- I don't recall if GenCon did stuff at Norwood Hospital or not. They were -- GenCon was one of four to five preferred -- preferred contractors that Steward used.

Q. Who were the others?

A. Suffolk Construction did major projects; KCD Contractors; I want to say Primetime. I -- I can't recall the other names of them.

Q. Is -- is GenServe a construction company or a company that you had any ownership affiliation with?

A. Yes.

Q. What's that company?

A. So GenServe was the services division of GenCon. That's why I gave you the six different names. Three bought one, three bought the other.

Q. I see. And so the first three names William Hobin, Justin Marks, and Matt --

A. Yes.

Q. -- bought GenServe.

A. That's correct.

Page 48

Q. Understood. Around the same time period in 2021?

A. They -- the negotiations started in about '19, and then it closed, I recall, Q1 of 2021.

Q. I'll represent to you that there are some documents that have been produced in this case that suggest that in July of 2020, GenServe was a vendor at Norwood Hospital following the flood. Does that sound accurate to you?

A. Yes.

Q. And both GenCon Service and GenServe received invoices for services at Norwood Hospital in 2020, and addressed to you at an address at 323 Manley Street in Massachusetts. Does that sound right?

A. Yes.

Q. Did GenCon and GenServe perform different services at Norwood Hospital following the June 2020 flood?

A. I don't know.

Q. What types of services would GenCon have provided at Norwood Hospital, based on your knowledge and experience with the services that were available?

Page 49

MR. SANDLER: Objection.

A. I'm not sure GenCon provided services at Norwood Hospital. GenCon Service, which is AKA GenServe, would have provided manpower, clean-out, demo, electrical, you know, service-related work.

BY MS. PELUSO:

Q. So if there are invoices that say GenCon Service --

A. Yes.

Q. -- is it fair to assume that those are for the corporate entity GenServe, not GenCon?

A. Correct.

Q. Okay. And there is no GenCon Service; is that right?

A. GenCon -- Gen- -- GenCon Service was the legal name for GenServe, which is the trade -- the d/b/a if you will.

Q. Okay. But when we're talking about the services division of GenCon, how would those be distinguished, if you know, in invoices?

For example, if there's an invoice for GenCon Service.

A. GenCon Service would be GenServe.

Q. Okay.

A. GenCon, Inc., would have been the GenCon

13 (Pages 46 - 49)

Page 50

Construction Management side.

Q. I see. And GenServe would have provided, I think you said, manpower. Can you explain what you mean by that?

A. You know, they were our services division, so whether it was labor, electrical, plumbing, you know, any type of services needs that -- that may have been related to the claim is my -- my assumption.

Q. Prior to selling GenServe in 2021, who paid GenServe for services performed at Norwood Hospital?

A. Steward.

MR. LAUNER: Objection.

BY MS. PELUSO:

Q. And do you know who your point of contact was at Steward for invoicing for GenServe prior to your selling GenServe in 2021?

MR. SANDLER: Objection.

A. I don't know.

BY MS. PELUSO:

Q. I'm hoping you can educate me some about CREF. What is CREF?

A. So CREF is a real estate and facilities professional services firm focused on healthcare

Page 51

and education.

Q. What kind of services are provided as a "professional services firm"? What do you mean by that?

A. So we have three divisions, which is planning, design, and construction, PDC, which has Owner's Project Management, capital planning, et cetera. We have regulatory and facilities which manages the regulatory program and oversight. And then we also have a real estate division that does lease administration and brokerage in some instances, but it's not our core business.

Q. Has CREF ever been a part of Steward Health Care service -- Steward Health Care overall? Has it ever been with -- under the corporate umbrella of Steward Health Care?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. No.

BY MS. PELUSO:

Q. How many employees approximately did CREF have when you founded it in or around January of 2016?

A. Probably about 12 to 15.

Q. How many do you have now?

Page 52

A. 50 to 60.

Q. Are CREF's employees located nationwide, or do you have particular geographic areas where your employees are located?

A. They're generally located in five offices throughout the U.S.

Q. Where are those offices located?

A. Boston, Tampa, Dallas, Salt Lake City. We have a satellite office in Nashville, but I wouldn't really call it a real office, just given healthcare.

Q. Understood. When you founded CREF, was Boston the primary location for CREF?

A. Yes.

Q. How long was that the case?

A. We ran Boston and Dallas as kind of equal offices after I relocated here, so I would say that still is the case.

Q. When did you relocate to Dallas?

A. In mid-2018.

Q. And is Dallas where you live now?

A. Yes.

Q. What's your address?

A. 6035 Desco Drive, D-E-S-C-O.

Page 53

Q. How long have you lived there?

A. Six years.

Q. It's your full-time residence, your primary residence?

A. Yes.

Q. When did you first meet Dr. de la Torre?

A. Around end of 2010 to beginning of 2011, that winter.

Q. How did you first meet?

A. GenCon was hired by Suffolk Construction to build a residence on Cape Cod. It ended up being his residence.

Q. Did you work with Dr. de la Torre on other projects between that construction project on Cape Cod and when CREF was formed in January of 2016?

A. Can you ask that again? I want to make sure I understand that.

Q. You worked with Dr. de la Torre on a construction project on Cape Cod. That's how you first met, right?

A. I worked for him, yes. He was the client.

Q. And then CREF did work for Steward after CREF was formed in or around 2016?

14 (Pages 50 - 53)

Page 54

A. Correct.

Q. Did you do any work for Dr. de la Torre in between those two time frames when the residence in Cape Cod began and when CREF was formed?

A. GenCon did a series of projects for Steward in the time period of 2012 to 2016.

Q. Do you know what those projects were?

A. I remember a few of them. We did a cupola project at Quincy Medical Center, which was the restoration of a 200- or a hundred-year-old cupola on top of a hospital. We performed a spine surgical suite at Boylston Street.

Q. Is that in Massachusetts?

A. That is.

We performed, I would say, four to six other projects in that time period that I recall.

Q. All at Steward-managed properties in Massachusetts?

A. Steward-owned properties, yes.

Q. You said "Steward-owned properties." Are you aware that in 2016 Medical Properties Trust agreed to a sale-leaseback and mortgaging transaction with Steward?

A. I am.

Q. And are you aware that through that

Page 55

transaction, Steward sold half of its Massachusetts hospitals to MPT subsidiaries, which then leased the properties back to Steward?

A. That's --

MR. SANDLER: Objection.

THE REPORTER: I'm sorry, your answer?

THE WITNESS: That is my understanding, yes.

BY MS. PELUSO:

Q. That included Norwood Hospital?

MR. SANDLER: Objection.

A. My recollection is there was a sequence of mortgages and sale leasebacks. I don't know where Norwood fell in that original deal.

BY MS. PELUSO:

Q. What was your understanding of the ownership of Norwood Hospital in or around June 28th of 2020?

A. That Medical Properties Trust owned the asset and Steward was a lessee.

Q. Do you understand, sitting here today, that that was part of the leaseback arrangement?

MR. SANDLER: Objection.

BY MS. PELUSO:

Q. That Steward originally owned Norwood

Page 56

Hospital and then sold it and leased it back from MPT?

A. Yes.

Q. Did you have work with Steward Health Care as a client as soon as you formed CREF?

A. I don't recall how the first engagement started.

Q. Do you recall if you had work from Steward Health Care at any point in 2016, CREF's first year of existence?

A. I recall -- I don't recall.

Q. What is the first Steward project that you recall a CREF entity working on?

A. We were brought in -- I recall being asked to negotiate the original contracts in 2018 by the general counsel's office of Steward who we reported to at that time. We had -- we had done some Owner's Project Management from, like, '16 to '17 under the GeniPM and shown some positive results, but I don't remember the specific projects.

Q. Okay. Fair enough.

Did you receive any initial funding from Dr. de la Torre or Steward for CREF?

A. I did not.

Page 57

Q. You founded CREF the same year that Steward and MPT agreed to the leaseback arrangement in Massachusetts. Are you aware of that?

MR. LAUNER: Objection.

A. Yes.

BY MS. PELUSO:

Q. Did that arrangement have any influence on your decision to form CREF?

MR. LAUNER: Objection.

A. My only recollection is that we saw an opportunity to expand our project management capabilities with the sale leaseback, but that's my only recollection of that.

BY MS. PELUSO:

Q. What opportunities did you see expanding as a result of that arrangement?

A. There was a lot of excitement about capital being allocated to invest in the Massachusetts facilities, and the general counsel's office had asked if we would be interested in supporting their national growth.

Q. And when you say capital being invested, what do you mean by that? By whom?

A. There -- I recall being a stipulation in the MPT original sale-leaseback mortgage deal in

15 (Pages 54 - 57)

Page 58

New England that there was going to be about a $200 million investment in capital relative to improving the Massachusetts hospitals.

Q. And capital being invested by MPT?

A. I'm not sure. I want to make sure I answer this properly --

Q. Sure.

A. -- but MPT would provide the funding as part of the sale leaseback, but ultimately, Steward, it would get added to their lease space is how the deal worked, you know. So Steward and MPT, I guess, both invested indirectly.

Q. Okay. You said there was a lot of excitement. By whom? Who was excited?

A. I think the entire CREF team and Steward team was very excited that there was going to be investment, growth, and -- and expansion.

Q. Who did you talk with at Steward about that?

A. The general counsel's office, which we reported to, Scott Kenyon, Patrick Murphy.

Q. Did you talk with Dr. de la Torre about that?

A. I don't recall him telling me much about any of that.

Page 59

Q. And do you recall who your contact was in the general counsel's office?

A. Yes.

Q. Who was it?

A. Joseph Maher.

Q. As of June 28th, 2020, who was CREF's biggest client?

A. Steward.

Q. Was Steward CREF's biggest client by a large margin between Steward and CREF's Number 2 client?

MR. SANDLER: Objection.

A. Yes.

BY MS. PELUSO:

Q. About how much annual revenue would you say CREF entities earned as a result of its relationship with Steward in 2020?

A. Our -- our annual MSA was, I recall, between 25 to $35 million.

Q. And do you know who CREF's second biggest client was in 2020?

A. I don't.

Q. Do you know how revenue compared for CREF's second biggest client?

A. Yeah. CREF was -- probably next biggest

Page 60

client, a million plus or minus.

Q. And approximately how many clients in 2020 did CREF have in that million-dollar range?

A. Not many.

Q. More or less than five?

A. Yes, less.

Q. Less than five. Less than three?

A. Maybe less than three, yes.

Q. When did you first meet Michael Crowley?

A. 2012.

Q. Have you worked together since then?

MR. SANDLER: Objection.

BY MS. PELUSO:

Q. Have you worked together continuously since you met in 2012?

MR. SANDLER: Objection.

A. No.

BY MS. PELUSO:

Q. When did you first begin working with Michael Crowley?

A. 2012.

Q. And did -- at what period -- you work with Michael Crowley today, correct?

A. I do.

Q. And so at what period of time between

Page 61

2012 and today did you and Michael Crowley not work together?

MR. SANDLER: Objection.

A. Michael Crowley left Steward Health Care 2014 or 2015, and then I recruited him back probably 2018, so that two- to three-year period.

BY MS. PELUSO:

Q. Do you know where he worked in the interim window before you recruited him back?

A. He -- my under -- my recollection is he worked at Athena Health Care, and then subsequently Tufts Medical Center.

Q. In 2018, you recruited him back to be an employee with CREF?

A. It may have been '17. I don't remember the exact timing, but yes.

Q. Somewhere in that window?

A. Yes.

Q. And has Michael Crowley been a CREF employee since that time, whether it was 2017 or 2018?

A. Yes.

Q. And he remains a CREF employee today.

A. Yes.

Q. What's his title at CREF?

16 (Pages 58 - 61)

Page 62

A.   He is an SVP.

Q.   Does he have an ownership interest in any of the CREF entities?

A.   He does not.

Q.   I saw he was listed as an officer on CREF International's Massachusetts corporate search?

A.   Uh-huh.

Q.   Is -- is he not an owner in CREF International?

MR. SANDLER:  Objection.

A.   He's not an owner.

BY MS. PELUSO:

Q.   Okay.  When did you last speak with Scott Kenyon?

A.   Probably around May, June 2024.

Q.   Has he ever been a CREF employee?

A.   Yes.

Q.   Is he still a CREF employee?

A.   He's not.

Q.   When did he leave CREF?

A.   He retired around the fall of '24 is my recollection.

Q.   So you spoke to him last -- shortly before his retirement?

Page 63

A.   Somewhere around like the bankruptcy timing.  I don't -- I don't recall the exact timing, but that six-month period, you know, was the last time we spoke verbally.

Q.   And when you say "the bankruptcy," you're talking about Steward Health Care's bankruptcy in 2024?

A.   That's correct.

THE WITNESS:  Sorry.

Sorry, Dan.

THE REPORTER:  You're doing good.  You're good.  Sorry, that was my fault.

BY MS. PELUSO:

Q.   Do you know if his retirement was related in any way to the announcement of bankruptcy proceedings by Steward Health?

A.   I know it definitively was not.

Q.   Okay.  Why do you say that?

A.   He put it on his signature for the last two years of his career, which we all thought was quite comical.  So he was reminding everybody he would not be around in two years, so he started that in 2022, is why I say that --

Q.   Okay.

A.   -- as confidently.

Page 64

Q.   That's a good reason to be confident.

A.   Yeah, it was an interesting when we saw his signature, and everybody asked what the date was, so...

Q.   Did -- were there any personnel decisions at CREF that were made as a result of Steward Health Care's announced bankruptcy?

A.   Personnel decisions like --

Q.   Layoffs or...

A.   Yes.

Q.   What happened?

A.   Well, I think given that some of the projects had been put on infinite delay, we -- we had to reduce our workforce size relative to the project management capabilities as a first step.

Q.   What projects are you referring to that were put on a, I think you said indefinite hold?

A.   Well, I think Norwood, Wadley Regional Medical Center were the two biggest.  There could have been 60 to 70 different active projects across the 30 hospitals.

Q.   60 to 70 active projects that were put on hold as a result of the bankruptcy or cash flow issues?

MR. SANDLER:  Objection.

Page 65

A.   I'm not exactly sure when stuff was put on hold relative to the bankruptcy.

BY MS. PELUSO:

Q.   Where is Wadley located?

A.   Texarkana.

Q.   And you said that there were staff reductions that were made as a result of projects being placed on hold.  Can you quantify that for me?  Do you know how many CREF staff or employees were...

A.   I don't know the exact number, no.

Q.   Was it more than five?

A.   Yes.

Q.   More than ten?

A.   Yes.

Q.   More than 20?

A.   I don't recall.

Q.   How many employees did CREF have, approximately, in December of 2022?

A.   Approximately a hundred.

Q.   Was there ever a time in CREF's history that it had more employees than it had then in December of 2022?

A.   I don't know.  It might have gone up or down off that hundred number, but it was -- floated

17 (Pages 62 - 65)

Page 66

around that number as the peak size.

Q. And when you say that "projects were put on hold," what's your understanding as to why those projects were put on hold?

MR. LAUNER: Objection.

A. I don't -- there -- there's a large quantity of projects, so I don't know if I understand, you --

BY MS. PELUSO:

Q. I asked you questions about projects that were put on hold as a result of Steward's bankruptcy --

A. Uh-huh.

Q. -- so I'm just trying to get a general understanding of your understanding of the impact of the bankruptcy on the projects.

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. Yeah. I -- my only -- my recollection is that once the transformation committee was put in place, they had suggested that most projects be paused where applicable until everyone got a grip on kind of the situation, but I don't remember the specifics of each project.

BY MS. PELUSO:

Page 67

Q. Okay. And sitting here today, what's your job title at CREF?

A. CEO.

Q. Knowing that you have lots of duties and responsibilities, how would you summarize your duties and responsibilities as CEO of CREF?

A. As chief executive officer?

Q. Yes.

A. Just oversight of the success of the business.

Q. Is that the same as what your title was in June of 2020?

A. Yes.

Q. And have your duties and responsibilities shifted in any significant way between June of 2020 and now?

MR. SANDLER: Objection.

A. No.

MS. PELUSO: It's been just over an hour.

Would you guys like a break?

MR. SANDLER: Sure.

MS. PELUSO: Okay. We'll take a five-minute break.

THE WITNESS: Do I take this off?

Page 68

VIDEOGRAPHER: We're off the record at 10:40 a.m. This is the end of File Number 1.

(Recess held.)

VIDEOGRAPHER: We're back on the record at 10:54 a.m. This is the beginning of File Number 2.

BY MS. PELUSO:

Q. Mr. Gendron, I'm going to show you what we'll mark as Gendron Exhibit 2. This is Bates stamped CREF Norwood_0002178.

(Gendron Exhibit 2 marked.)

MS. PELUSO: Thank you.

BY MS. PELUSO:

Q. This is a document entitled Project Authorization. And then below that, it says: Project Management Services New England and Central Divisions.

Do you see that?

A. I do.

Q. What is this document?

A. This was -- let me read it first.

(Witness reviews document.)

A. This document is the first MSA that CREF executed with Steward Health Care.

BY MS. PELUSO:

Page 69

Q. When you say "MSA," what do you mean?

A. Well, it's -- it's technically a Project Authorization, but we were asked to provide a project authorization for master services of project management from New England and Central Division.

Q. On the bottom right corner, there's a set of initials. Do you see that?

A. I do.

Q. One set is yours, correct?

A. That's correct.

Q. Do you know who the other initials are?

A. Appears to be Joseph Maher.

Q. That's the contact at the general counsel's office?

A. That's correct.

Q. And this contract, you said this is the first MSA with CREF. The contracting entity is GeniPM, Inc.

Do you see that?

A. I do.

Q. And GeniPM, Inc., is listed as the master contractor, right?

A. That's correct.

Q. I think you testified earlier, GeniPM,

18 (Pages 66 - 69)

Page 70

Inc., eventually became CREF by name, right?

A.   It was one of the entities that was rolled up into CREF.

Q.   Okay.  And so when you say this is the first MSA with CREF, that's because it's with an entity that eventually rolled up into CREF.

A.   Correct.

Q.   Thank you.  And was Mr. Maher your point of contact for this contract?

A.   Mr. Maher was.

Q.   Do you recall negotiating this contract with Steward Health?

A.   I don't recall the negotiations of this contract.

Q.   This one at the top says Project Management Services.  Just in general, what are the project management services that CREF provided to Steward pursuant to this master services agreement?

A.   Sorry.  The -- the question was?

Q.   What are the project management services?  What does that mean?  What did you actually do?

A.   So we would do planning, feasibility studies is one area.  We would manage the architectural, engineering and design phase, and

Page 71

then ultimately Owner's Project Management.

Q.   What is Owner's Project Management?

A.   Owner's Project Management is a project management service that is provided to clients to oversee the project coordination.

Q.   And what types of projects was CREF overseeing for Steward pursuant to this contract?  Construction projects?

A.   Most -- most capital projects have an element of construction, but I don't recall the specific ones.

Q.   You work in a specialized field, so some of the terms that you use may not be known to a common person, which is why I'm to ask you questions like this one.

A.   Okay.

Q.   What do you mean by "capital projects"?

A.   Capital projects, in this instance, generally -- where is that reference in here, just to make sure I answer this properly?

Q.   I'm not sure it is, but it's a term you just used when I asked you what are owner's project -- what is Owner's Project Management, and I then said:  Are you managing construction projects?  You said:  Most capital projects will

Page 72

have some sort of construction.

A.   Yes.

Q.   I'm wondering what you meant by "capital projects."

A.   So capital program management generally has a construction component, but being in healthcare, they're very complex projects.  So not only do you manage the construction aspect of it, there will be medical equipment, there will be signage, there will be other regulatory considerations in there.

So a capital project, in my definition, generally was more sophisticated than an operational or locally managed project, which would be like an OpEx project is how we would kind of designate that.

Q.   Okay.  You mentioned also feasibility studies.  What is a feasibility study as you used the term?

A.   A feasibility study is a process that we put in place to look at a project's scope, schedule, and budget to inform a business decision, in most cases.

Q.   And then at the top of this document on the first page, beside Project Management Services,

Page 73

it says:  New England and Central Divisions.

Do you see that?

A.   I do.

Q.   Did you have other Master Services Agreements with Steward Health Care for other regional divisions at this time period in or around January of 2018?

A.   No.

Q.   Looking at the first page at Paragraph 3, do you see a caption that says "Fees"?

A.   I do.

Q.   And the contract indicates that in consideration for performances of services, Steward shall pay to the contractor a fixed annual rate of fees.

Do you see that?  And, again, we're looking at the first page at Subsection 3.

A.   Yes.

Q.   And then it lists a breakdown of annual rates beginning January 1st, 2018, and breaking down by year ending in December of 2022.  Do you see that?

A.   I do.

Q.   Did this mean that CREF, pursuant to this contract, or GeniPM, which then became CREF,

19 (Pages 70 - 73)

Page 74

received at least that monthly installment payment regardless of scope of work performed in any particular year?

MR. SANDLER: Objection.

A. Yes. This was an FTE-based initial agreement.

BY MS. PELUSO:

Q. What is an FTE-based initial agreement?

A. So this agreement was -- what was negotiated was a lift-out strategy with the general counsel.

Q. What does that mean?

A. Generally, when an organization wants to expand a noncore service, which real estate and facilities was not Steward's core service at the time, they had identified to me that they had several employees that they felt were important to the business, but they wanted me to bring additional services, executive services in technology. So that's referred to in our industry as a "lift-out" where a client outsources a certain responsibility that's not their core business, but you take on certain employees as part of that process.

Q. When you said "they," referring to

Page 75

Steward, do you recall who at Steward Health you had conversations with about this lift-out strategy?

A. Joseph Maher was who executed the agreement with me.

Q. Do you recall conversations with anyone else about Steward Health about the decision to bring on CREF as an outside contractor as part of this lift-out strategy?

A. Scott Kenyon was involved in the negotiations, being a critical part of -- of the lift-out.

Q. What do you recall about Mr. Kenyon's involvement?

A. Just that this was in response to them buying the CHS facilities and our need to oversee that acquisition post-close.

Q. What are the CHS facilities?

A. I'll try my best --

Q. Okay.

A. -- here. Steward acquired, I believe, eight facilities from CHS in the time frame of 2017 after the MPT -- I believe it's after the MPT sale leaseback, and those facilities were Northside Medical Center, Trumbull Hospital, Sharon Regional,

Page 76

Sebastian River Medical Center, Melbourne Regional Medical Center. And there was probably another 80 to a hundred outpatient clinics that were associated with those assets they acquired from CHS.

Q. Just so I understand your testimony correctly, is it your memory that the acquisition of those facilities is part of what motivated Steward to enter into the Master Services Agreement that we've just marked as Gendron Exhibit 2?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. That is my understanding.

BY MS. PELUSO:

Q. Okay. And then the fixed fee here is an annual rate paid to CREF for these services provided pursuant to this Project Authorization, right?

A. That's correct.

Q. If fees exceeded the fixed fee, was there a provision to receive additional funds? Like if the work expanded in scope in a given period of time such that CREF's being underpaid by the contract, was there a way to receive additional funding from Steward?

Page 77

A. There was a -- there was a clause in one of -- I don't think the agreement came in -- I don't know if it was in this agreement. I think it was in '21 -- whereas there was a threshold of capital projects that would be managed over the course of the agreement that would have an additional fee if that threshold went over. My recollection is that was about 20 million for the original, and it evolved over time as we negotiated the additional agreements.

Q. Okay. We'll take a look at some additional contracts. Maybe we'll get to that provision. Did -- do you know approximately how many CREF employees were dedicated to providing services to Steward in 2018 related to this contract?

A. Well, on the back page, there was one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13. We probably also had another five to six shared services people that weren't here but served the contract as well.

Q. And the -- do you know who the individuals were who were dedicated pursuant to these titles at page 6 of Gendron Exhibit 2?

20 (Pages 74 - 77)

Page 78

A.   I could -- I obviously -- I mean, I was the national executive.  My recollection is Scott Kenyon was identified as the vice president.  I don't remember the rest of them.  You know, it changed over time, but I don't know who the originals were.

Q.   And did CREF dedicate 11 individuals pursuant to the project's authorization?

A.   Yes.

Q.   Okay.  Do you know if CREF maintains documentation as to who those individuals were?

A.   I don't recall.

Q.   Do you recall whether CREF performed any services for Steward at Norwood Hospital in 2018 or 2019 pursuant to this contract?

A.   I recall that there was a significant amount of work done in New England in 2018 and 2019, but I don't recall any specifics.

Q.   Do you recall if any of that work was conducted at Norwood Hospital?

A.   Slightly.  You know, like, I remember seeing Norwood on the list of something, but I don't remember what projects.

Q.   Okay.

MS. PELUSO:  Let's move on to what we'll

Page 79

mark as CREF -- I'm sorry, Gendron Exhibit 3.  It's Tab 67.

(Gendron Exhibit 3 marked.)

BY MS. PELUSO:

Q.   I think this is the next contract, and I'll represent to you it's CREF-Norwood_0002204.

And this appears to be an amendment to Project Authorization made as of August 27th, 2018, between Steward and GeniPM.  Do you see that at the top of the first page?

A.   I do.

Q.   And if you look at the second to last page -- I'm sorry, the third page of the document, you'll see a signature page, and that's at Bates Stamp 2206.

Do see that signature page?

A.   I do.

Q.   And your signature appears?

A.   Yes.

Q.   And, then, is -- whose signature appears on behalf of Steward Health Care System, LLC?

A.   My understanding is that's Joseph Maher, but I can't read it very well.

Q.   I see an M in the last name.

A.   Yeah.  I don't -- for some reason,

Page 80

there's no name under it, but yeah.

Q.   And if you look at the first page, you'll see again at Paragraph 3 there's a Fees provision.

A.   Uh-huh.

Q.   Do you see that?

A.   I do.

Q.   It looks like the -- the rates were increased in monthly installments for 2018, 2019, 2020, 2021, and 2022 versus the rates that were at issue in the exhibit we looked at prior, Gendron Exhibit 2, correct?

A.   Sorry, say that one more time.  I just want to make sure I'm tracking this.

Q.   Yes, of course.  It looks like the amendment to Project Authorization at Gendron Exhibit 3 increases the monthly installment payments for each year from 2018 to 2022.  Do you see that?

A.   I do.

Q.   Do you recall why the rates were increased?

A.   I do not, but I am going to -- I can read it, if you'd like to.

Q.   Sure.

Page 81

A.   Okay.

(Witness reviews document.)

A.   So this was an addendum -- sorry, one more just quick thing I noted.  The original number was 40.2 million in capital, which is in this, not 20.

BY MS. PELUSO:

Q.   Okay.

A.   I just wanted to correct that for the record when you asked me about the threshold for capital projects.

Q.   Okay.  Thank you.

A.   So, yeah, so we were -- we were asked to provide an addendum to the original project management Project Authorization to add an FTE for MPT reporting as indicated on the top of page 6.

Q.   And what was the role of the FTE for MPT reporting pursuant to this addenda?

A.   Sorry, say that one more time.

Q.   What was the role of the FTE who was assigned for purposes of MPT reporting?  What was that person's role?

A.   The role was to manage all of the reporting requirements of the projects relative to MPT funding.

21 (Pages 78 - 81)

Page 82

Q.   And that's where it says here at the top of page 6: One full-time assistant project manager/CREF reporting manager, to oversee the funding/cash flow process as it relates to corporate real estate and facilities.  Do you see that?

A.   Yes.

Q.   And it said that position will be -- will manage the reporting of internal cash flows project reports and external MPT tenant billing REIT transactions, et cetera?

A.   That's correct.

Q.   And that was a role that was paid for by Steward Health as part of this master services contract or a part of the addenda to the contract?

A.   That's correct.

Q.   What was, to the extent that you know, the -- CREF's role overseeing funding and cash flow processes for Steward as it relates to corporate real estate and facilities, and in particular with regard to MPT reporting?

A.   So MPT provided funding for capital projects through the sale leaseback or through funding agreements.  Those funding agreements had reporting requirements, and we acted as the -- I

Page 83

wouldn't say the accounting, but as the project reporting manager of all of those inflows and outflows of that project.

Q.   When MPT provided funding that CREF then oversaw, was the funding provided to Steward --

MR. SANDLER:  Objection.

BY MS. PELUSO:

Q.   -- or was it provided to CREF?

MR. SANDLER:  Objection.

You can answer if you understand.

A.   The funding was always provided to Steward.

BY MS. PELUSO:

Q.   And then CREF would oversee the funding or cash flow process as it relates to corporate real estate and facilities?

A.   Yeah.  I mean, cash flow is a bad word.  In retrospect, we -- we managed the reconciliation of -- of the projects.

Q.   And that began as of the date of this contract, August 27th of 2018?

A.   That's my recollection.

Q.   Did that continue through September of 2024?

A.   My understanding is it did continue for

Page 84

MPT funding projects.

Q.   Do you recall the individuals at CREF that were assigned to this role of assistant project manager or CREF reporting manager to oversee the funding or cash flow process as part of the MPT reporting?

A.   I'm -- I'm confident that it always has been a -- an employee named Alyson Brooks.

Q.   Is Ms. Brooks a current CREF employee?

A.   She is.

Q.   And what's her job title?

A.   I don't actually know the title, but she -- she works in our finance in kind of support function.

Q.   And between the date of this contract, August 27th, 2018, and the time of the bankruptcy in 2024, what was Ms. Brooks' role overseeing funding or cash flow process as it relates to corporate real estate and facilities?

MR. SANDLER:  Objection.

BY MS. PELUSO:

Q.   Okay.  Do you know which -- how she did that, what her function was?

A.   I'm not sure I understand the question.

Q.   I'm wondering what outputs she -- she

Page 85

created as part of her job, such that you're confident she was the one performing that function or doing that role.

A.   Yeah.  Yeah, so she would -- she would assemble the project data and coordinate that with Medical Properties Trust, as required by Steward.

Q.   Did she receive financial information from Steward to allow her to oversee funding and cash flow process?

MR. SANDLER:  Objection.

A.   I'm not sure I understand that.

BY MS. PELUSO:

Q.   What -- what data would Ms. Brooks or CREF receive to enable it to oversee the funding and cash flow process, as stated in this contract?

A.   So generally there would be an approved capital project.  That approved capital project would have a total project cost document.  That would be the basis of the capital approval, and then she was in charge of managing that total project cost reconciliation relative to any documents that MPT or Steward would request of us as a service provider.

Q.   Okay.  I'm going to come back to some of the reconciliation reporting in a little bit --

22 (Pages 82 - 85)

Page 86

A.   Uh-huh.

Q.   -- but just sticking with this contract for now.  I understand that following the flood event on June 28th, 2020, CREF was involved in managing the Norwood property for Steward, right?

A.   Correct.

Q.   And CREF was also involved with communications with the insurance companies related to the loss at Norwood Hospital for both MPT and Steward, right?

MR. SANDLER:  Objection.

A.   Answer -- can you ask the question again?

BY MS. PELUSO:

Q.   Yes.  CREF was also involved with communications with the insurance companies related to the loss at Norwood Hospital for both MPT and Steward, correct?

MR. SANDLER:  Objection.

A.   I think I would need a -- a definition of "involved," just because it was a lot of parties involved for that matter.

BY MS. PELUSO:

Q.   CREF, yourself, and -- yourself personally and other employees at CREF --

Page 87

A.   Yeah.

Q.   -- corresponded with the insurance companies on behalf of both Steward and MPT related to the loss at Norwood Hospital, right?

MR. SANDLER:  Objection.

A.   At times, yes.

(Clarification by the reporter.)

A.   Sorry.  At times.

BY MS. PELUSO:

Q.   Is this contract and this addendum to this contract what governed those services in 2020 and 2021?  And --

A.   I --

Q.   -- I can show you a contract from early 2021, but I'm just wondering what contract governed the services that were provided by CREF to Steward related to the flood event at Norwood Hospital?  Was it the project authorizations that we've been reviewing, or was there a separate contract specifically for those services?

A.   The services that CREF provided to Steward were emergency response/initial mitigation services.  This contract oversaw the project management and coordination of the claim that we were asked to do post-flood, but -- I guess does

Page 88

that answer your question?

Q.   I'm going to try to ask a better question.

A.   Okay.

Q.   Was there any additional written contracts, that you're aware of, between June 28th, 2020, and April of 2021, that governed CREF's work for Steward arising out of the flood event?

A.   Well, I don't -- I don't see the Project Authorization for GeniPG here.  So I think I would need to look at that exhibit, but generally, the IPG exhibit had management of insurance process and claims up until that large loss, if you will.

Q.   I'm going to come back to this question.  I want to flip through these contracts with you, and then ask you once you have them all in front of you.

A.   Okay.

Q.   Okay.  So we'll mark as an exhibit Gendron Exhibit 4.  And this is a Project Authorization with GeniPG?

A.   GeniPG.

Q.   GeniPG?

A.   Yeah.  Yeah.

Q.   Dated January 1st, 2018, Bates stamped

Page 89

CREF Norwood_0002190.

(Gendron Exhibit 4 marked.)

BY MS. PELUSO:

Q.   This is a real estate operations management services contract --

A.   That's correct.

Q.   -- between Steward and GeniPG, Inc., dated January 1st, 2018, so the same date as one of the contracts that we looked at for GeniPM --

A.   Uh-huh.

Q.   -- correct?

A.   That's correct.

Q.   And if you -- are you familiar with this document?

A.   I am.

Q.   And this is also for the New England and Central divisions.  If you look at the top under the heading.

A.   That's correct.

Q.   And what is GeniPG, as opposed to GeniPM?

A.   So GeniPM was project management services.  IPG was the previous name of our regulatory and facilities division.

Q.   And you owned GeniPG in January of 2018

23 (Pages 86 - 89)

Page 90

when this contract was executed?

A. I did.

Q. Did GeniPG have employees that were different than GeniPM employees, or did they overlap?

A. They were different.

Q. How many employees did GeniPG, Inc., have?

A. I'd have to understand the time frame of that question to answer that.

Q. When this contract was signed on January 1st, 2018, approximately how many employees did GeniPG have?

A. One, two three, four, five, six, seven, eight -- it was approximately 10 to 15.

Q. And you were counting on the last page of the exhibit at page 7.

A. That's correct.

Q. Is that to refresh your recollection on the staffing that was required as a part of this contract?

A. No. I knew that we had a few more than what this contract was that were serving other companies and expansion opportunities.

Q. Were any employees hired by Geni- --

Page 91

GeniPM or GeniPG to service these two contracts dated January 1st, 2018?

MR. SANDLER: Objection.

BY MS. PELUSO:

Q. Were there -- where there new hires to either GeniPM or GeniPG to fulfill the staffing requirements of the project authorizations which Steward executed in 2018?

MR. SANDLER: Objection.

A. I don't recall how many employees were part of the lift-out versus internal to CREF versus what we hired.

BY MS. PELUSO:

Q. Okay. But do you know if any -- if CREF acquired any new employees in order to service contracts with Steward Health?

MR. SANDLER: Objection.

A. Certainly over the course of the contracts.

BY MS. PELUSO:

Q. Okay. And this contract, the GeniPG, Inc., contract, did this roll up into a CREF contract at some point the way that the GeniPM contract did?

A. These all rolled up into the eventual

Page 92

kind of master services agreements, yes.

Q. Okay. And this document at Gendron Exhibit 7 has the same sets of initials at the bottom right-hand corner; is that correct?

A. Appears so, yes.

Q. Your initials?

A. Yes.

Q. And then if you look at the signature page at page 3?

MR. LAUNER: Do you mean Exhibit 4? I think you said Exhibit 7.

MS. PELUSO: Oh, yes, I did mean Exhibit 4.

MR. LAUNER: Okay.

MS. PELUSO: Thank you very much.

BY MS. PELUSO:

Q. We're looking at Exhibit 4, the document Bates stamped beginning 2190, for the record. This document at page 3 has a signature page. It lists you as president, correct?

A. Correct.

Q. And that's your signature?

A. That is.

Q. And then it lists Joseph Maher, Esquire, on behalf of Steward Health Care System; is that

Page 93

correct?

A. Yes.

Q. And this contract also has a fee provision at Paragraph 3 on the first page?

A. Yes.

Q. And it also has fees broken down by year through December of 2022?

A. Correct.

Q. And the fixed fee provided pursuant to the Project Authorization at Gendron Exhibit 4 is in addition to the fixed fee that GeniPM received from Steward pursuant to that Master Service Agreement?

A. That is correct.

Q. I'd now like to direct your attention to a new document we'll -- titled: Gendron Exhibit 5.

(Gendron Exhibit 5 marked.)

BY MS. PELUSO:

Q. And this is an amendment to Project Authorization, Bates stamped CREF Norwood_0002197.

A. Thank you.

Q. By its title, this is an amendment to Project Authorization, right?

A. Yes.

Q. And it's dated August 27th, 2018.

24 (Pages 90 - 93)

Page 94

A.   Correct.

Q.   And this one is between GeniPG and Steward, also for the New England and Central Division, right?

A.   Correct.

Q.   And on page 3, it contains a signature page that includes your signature as well as Mr. Maher's signature, correct?

A.   Yes.

Q.   At Paragraph 3, there are fees and, again -- again at a fixed annual rate.

Do you see that on page 1, Paragraph 3?

A.   Yes.

Q.   And if you compare those numbers to what we just looked at at Paragraph 3 of Exhibit 4, there was a rate increase year to year as of August 27th, 2018, right?

A.   Correct.

Q.   A pretty significant increase, correct?

A.   That is correct.

Q.   Do you know why the rates were increased so significantly in August of 2018?

A.   I'm trying to -- I believe that this was in the addition of the Southwest facilities, but I want to make sure I have all the contracts in front

Page 95

of me here because I don't recall specifically but at -- the addendums were at the request of additional services is my recollection, but I don't recall the specifics right now.

Q.   Okay.  This document says that it's for real estate operations management services in New England and Central Divisions, right?

A.   Yes.

Q.   Okay.

MS. PELUSO:  Let's take a look at Tab 16.

(Gendron Exhibit 6 marked.)

BY MS. PELUSO:

Q.   I'll hand you a new exhibit that we'll mark Gendron Exhibit 6.  This is Bates stamped CREF-Norwood_0002100.  This is an Amended and Restated Master Services Agreement, and it says it's made as of April 1st, 2021.  Do you see that at the top?

A.   I do.

Q.   And this one is between Steward Health Care System and what we'll call the CREF entities.

Do you see that?

A.   I do.

Q.   Is this Master Services Agreement a

Page 96

roll-up of the GeniPM and GeniPG contracts, meaning does it replace both of those, or is this in addition to, and those two contracts remain?

A.   This is -- let me give a second to read this.

Q.   Sure.  Yes, please.

A.   Sorry, I have to refresh myself.

Q.   Yes, please.

(Witness reviews document.)

MS. PELUSO:  Actually, why don't we go off the record for just a moment.  You can continue reviewing that.  I'm going to see if I can adjust the temperature.

VIDEOGRAPHER:  We're off the record at 11:33 a.m.

(Recess held.)

VIDEOGRAPHER:  We're back on the record at 11:39 a.m.  This is the beginning of File Number 2 -- or, excuse me, 3.

BY MS. PELUSO:

Q.   Okay.  Mr. Gendron, we're looking at Gendron Exhibit 6.  Do you still have that in front of you?

A.   I do.

Q.   And if you look at the first paragraph

Page 97

under "Witnesseth," it says:  Whereas, CPM, formerly known as GeniPM and Steward are parties to a certain Master Service Agreement.  Do you see that?

A.   Uh-huh.

Q.   So my question is:  Did the GeniPG contract also roll in to Gendron Exhibit 6, or was this only for what was previously the agreement with GeniPM?

A.   My recollection is that there was a series of project authorizations that started with GeniPM as the MSA as well, and the MSA was originally GeniPM added as GeniPG.  And then there was amendments made to them for additional services requested in additional regions throughout the course of '18, specifically the IASIS acquisition that eventually rolled up into this MSA.

Q.   Okay.  And when you say you believe there were amendments, you mean in writing?

A.   Yeah.  These amendments is what my recollection is.

Q.   Okay.  And you recall or believe that there may have been amendments between the document we're looking at at Gendron Exhibit 6 and what we previously looked at as Gendron Exhibits 4 and 5?

25 (Pages 94 - 97)

Page 98

A. No. These are the amendments I'm speaking of. They just refreshed my memory as we were going through with that.

The additional services was started with the MPT reporting. They then have asked us to do a lift-out of their biomedical and clinical engineering team, and then they bought 17 hospitals and properties from IASIS that were added to the original services.

Q. I see. A few moments ago, I asked you about what contract governed CREF's services --

A. Uh-huh.

Q. -- provided to Norwood Hospital between -- I'm sorry, provided to Steward related to Norwood Hospital between June 28th, 2020, and April of 2021.

A. Right.

Q. What contract is that?

A. So my answer is still the same, that there's two separate components of managing Norwood, is that the real estate and Operations Management Services as amended as Exhibit 5 oversaw the emergency response and mitigation, and the Project Management Services for the New England and Central Division, Exhibit 2 -- sorry, as amended --

Page 99

I want to make sure I say that right -- Exhibit 3 oversaw the project management and coordination of the claim itself as our duties.

Q. Were there any other written contracts that you're aware of that we're missing here that relate to the performance of duties by CREF for Steward related to Norwood Hospital prior to April 1st, 2021?

A. Not that I'm aware of or recall.

Q. Okay. Did CREF have a contract with MPT related to any work performed at Norwood Hospital or arising out of the loss event on June 28, 2020?

A. No.

Q. Page 3 of Gendron Exhibit 6 at Paragraph 4 contains an initial term. Do you see that?

A. Correct.

Q. And the current term of the agreement was extended until 11:59 p.m. on December 31st, 2027, correct?

A. That's correct.

Q. And then Paragraph 3(d) on page 2 -- so you'll see page 2, and then you'll see Subpart (d) says that Steward's engagement of contractor under this Project Authorization shall be as an

Page 100

independent contractor for the performance of services; is that right?

A. That's correct.

Q. And it goes on to say that nothing contained in this agreement shall be deemed or construed to create any association, partnership, joint venture, or relationship of principal and agent, master and servant, or employee -- employer and employee between contractor and Steward, correct?

A. That's what it says.

Q. And then it says: Or to provide a party with the right, power, or authority, whether express or implied, to create any or -- any duty or obligation on behalf of the other party. Right?

A. That's correct.

Q. Paragraph 7 of this contract, which begins on the bottom of page 6 and extends onto page 7, has a discussion of fees at Paragraph 7(a). Do you see that?

It says: Steward shall pay to contractor the fees in an amount and manner -- matter set forth in this agreement and the Project Authorization.

A. Yes.

Page 101

Q. Does CREF have any fixed-fee payment arrangements with Steward after this was signed on April -- in April of 2021?

A. Can you kind of explain to me what you mean about "fixed fee"?

Q. We looked at prior project authorizations that had fixed annual rates --

A. Yeah.

Q. -- with monthly payment installments set by year. Do you recall that?

A. Yes.

Q. Did CREF continue to have any contracts with Steward particularly related to Norwood Hospital or the Central Division in Massachusetts that maintained that fixed-fee structure?

A. The contract in '21, Exhibit 6, was transitioned from a FTE staff base to an asset-based agreement that was fixed based on the number of licensed beds of each facility, so the economics remained unchanged. It was actually a little bit of a savings from the overall roll-up. But they -- Steward had asked us to move towards a fixed fee based on assets instead of staffing in this contract.

Q. I see. And so there's still a fixed fee

26 (Pages 98 - 101)

Page 102

payment arrangement, but it's based on assets rather than dedicated activities --

A. That's correct.

Q. -- correct?

A. That's correct. Sorry. I'm sorry.

Q. Thank you.

A. I can't help myself sometimes.

Q. And then you may have answered this. I'm sorry if I'm confused. But did GeniPG still have its contract with Steward after GeniPM's contract became Steward exhibit -- or Gendron Exhibit 6?

A. GeniPM became CREF CPM, so the contract -- this contract became this contract.

Q. And the GeniPG contract?

A. Yeah. That became CREF FPS.

Q. Got it.

A. So all of these original project authorizations were rolled into this new agreement under the new nomenclature.

Q. That's very helpful. Thank you.

A. You're welcome.

Q. On those -- I'll now show you what we'll mark Gendron Exhibit 7.

(Gendron Exhibit 7 marked.)

Page 103

MS. PELUSO: And this is Bates stamped CREF-Norwood_0002126.

A. Thank you.

BY MS. PELUSO:

Q. Thank you. This is a Master Service Agreement made as of February 13th, 2023.

Do you see that?

A. I do.

Q. And it's among various Steward entities and the CREF entities; is that right?

A. That is correct.

Q. And if you look at the page ending 29 -- so it you look at the Bates numbers in the bottom right-hand corner of the page, 2129 -- oh, I'm sorry, 2149. You'll see a signature page listing your electronic signature on behalf of the CREF entities; is that right?

A. That's correct.

Q. And then if you turn the page, who signed on behalf of Steward Health Care System?

A. Mark Rich.

Q. Do you know what Mark Rich's role was with Steward Health Care System in February of 2023?

A. Well, this says treasurer. My

Page 104

understanding, he may or may not have been the CFO at that time. I -- he had a lot of different roles at Steward over the years, so don't hold me to that timing.

Q. Okay. Did you negotiate this Master Services Agreement at Gendron Exhibit 7 with Mr. Rich?

A. I have to review this one more time.

Q. Sure.

A. So give me some time, please.

(Witness reviews document.)

A. Okay. I'm ready.

BY MS. PELUSO:

Q. Okay.

MS. PELUSO: Sorry, do I have a question pending?

(Record read.)

MS. PELUSO: Thank you.

A. I don't recall negotiating this with Mr. Rich.

BY MS. PELUSO:

Q. Do you recall negotiating with anyone at Steward?

A. I'm not sure that there's a lot of business term changes in this, so I'm not sure

Page 105

there was a negotiation, in my recollection. My recollection is that on top of the '21 agreements, as they looked to sell the Utah market and potentially acquire the Florida Tenet market, they asked us to make our Master Services Agreements relative to the state, the regions, for acquisition purposes, but I don't -- there was -- I don't believe there was any economic negotiations on this.

Q. When you say "they," just for clarity, "they" were looking to sell the Utah market and acquire the Florida Tenet market, you're talking about Steward?

A. That's correct.

Q. And do you recall who at Steward you discussed that intention with?

A. I don't.

Q. Do you know why, in 2023, Steward was looking to sell their Utah market?

A. I don't.

Q. Is --

A. I remember Mike -- sorry.

To answer the question, I remember Mr. Crowley, who was running the Steward account day to day in '23, had suggested or implied that

27 (Pages 102 - 105)

Page 106

they had asked to do this, but I don't remember.

Q.   You said Mr. Crowley was running the Steward account day to day in 2023?

A.   That's correct.

Q.   Was Mr. Crowley running the Steward account day to day in 2022?

A.   There was a transition time when he and I transitioned to him.  I don't remember -- I don't think we had an exact date on it, but there was an overlap period between '22 and '23.

Q.   Were you running the Steward account day to day prior to Mr. Crowley?

A.   I'm not sure I would use the word "day to day."  I was the client executive in charge prior to Mr. Crowley.

Q.   Were you the client executive in charge of the Steward account from 2018 until it transitioned to Mr. Crowley, or was there someone else?

A.   I was.

Q.   And you believe the transition happened somewhere roughly in 2021 or 2022?

A.   Somewhere between '21 to '22.

Q.   Okay.  And for your services as client executive in charge of the Steward account, was

Page 107

your compensation arising out of the agreements that we've looked at today during your deposition?

A.   That's --

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

THE WITNESS:  Sorry.

A.   That is correct.

BY MS. PELUSO:

Q.   This Gendron Exhibit 7, does it stand apart from the Master Services Agreement that we looked at at Gendron Exhibit 6?

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

BY MS. PELUSO:

Q.   Does Gendron Exhibit -- let me rephrase my question.

Does Gendron Exhibit 6 remain operative once Gendron Exhibit 7 is executed in February 2023?

A.   I'm trying to think.  I want to understand the question so I answer it properly, so say it one more time.

Q.   Does Gendron Exhibit 6, the Amended and Restated Master Service Agreement made as of April 1st, 2021, remain operative once the Master

Page 108

Services Agreement as of February 13th, 2023, is executed?

A.   My recollection is that this Master Service Agreement be -- became the other regional operative Master Services Agreements becoming this inoperable.  Sorry.  Does that make sense?  So this --

Q.   Yeah, let me just make sure the record is clear, so let me ask my question again.

Does Exhibit 6, the Amended and Restated Master Service Agreement dated April 1st, 2021, remain operative once the Master Service Agreement at Gendron Exhibit 7 is executed on February 13th, 2023?

A.   Well, the technical answer is yes, because this manages 40 hospitals and this is Massachusetts only, so yes.

Q.   With regard to work at Norwood Hospital?

A.   My understanding is this is the -- is the -- is the agreement.

Q.   "This" meaning Gendron Exhibit 7?

A.   Exhibit 7, yes.

Q.   Is that agreement between CREF entities and Steward for work arising out of Norwood Hospital?

Page 109

A.   Yes.

Q.   And the other entities listed on the agreement beginning February 13th of 2023?

A.   That is correct.

Q.   Is CREF still compensated pursuant to the Amended and Restated Master Service Agreement at Exhibit 6 for work done in other facilities on behalf of Steward?

MR. SANDLER:  Objection.

A.   Say that one more time.

BY MS. PELUSO:

Q.   Gendron Exhibit 6, the agreement as of April 1st, 2021, does CREF still receive compensation from Steward related to services provided at any Steward facilities after it executed the Master Service Agreement on or about February 13th, 2023, at Gendron Exhibit 7?

MR. LAUNER:  Objection.

MR. SANDLER:  Objection.

A.   Sorry, can you ask that one more time?  I'm having trouble following that.

BY MS. PELUSO:

Q.   I'm just trying to figure out --

A.   Yeah.

Q.   -- how CREF gets paid by Steward, what

28 (Pages 106 - 109)

Page 110

contracts govern CREF's services by Steward at given periods of time.

A. Uh-huh.

Q. And so my question is: Once Gendron Exhibit 7 is signed -- I understand that's a regional agreement related to the specific Steward properties listed at the top of Gendron Exhibit 7 at page 1, right?

A. Correct.

Q. Are there other services that CREF continued to provide to Steward that were governed by the Amended and Restated Master Service Agreement at Gendron Exhibit 6?

A. Yes.

Q. And where were those services provided, to the best of your recollection?

A. Their regions changed over time, but there was a Utah Region, a Florida Region, a Texas Region, an Ohio/PA Region, and the Massachusetts Region. So they generally bifurcated their regions into those five. This is one of those regions, which is Massachusetts.

Q. Did CREF have any other contracts with Steward after February 13th of 2023 related to any services that CREF provided to Steward arising out

Page 111

of Norwood Hospital or the insurance claim?

A. CREF did not have any Norwood-specific agreements other than these MSAs in place. We do have a litigation support agreement with Todd & Weld --

Q. Okay.

A. -- for --

Q. And I'm not asking about that.

A. Yeah.

Q. Between June 28th, 2020, and May of 2024, to the best of your knowledge, approximately how much money did Steward, either as a parent company or any of Steward's facilities, pay to any of the CREF entities?

MR. SANDLER: Objection.

A. What was the time period?

BY MS. PELUSO:

Q. Between June 28th, 2020, and May of 2024.

MR. SANDLER: Objection.

A. Approximately a hundred million dollars.

BY MS. PELUSO:

Q. Prior to the flood event at Norwood Hospital on June 28th of 2020, to the best of your knowledge, approximately how much money would you

Page 112

say is the most amount of money that you believe that Steward paid to CREF in any given year prior to June 28th of 2020?

A. I don't recall.

Q. Could you give an approximation of what you think is the most amount of money that was received from Steward or any of the Steward entities by CREF or any of the CREF entities for any given year prior to June 28th of 2020?

A. I would give a range of 20 to $40 million.

Q. And then following the flood event on June 28th of 2020, what is the most amount of money, to the best of your knowledge and recollection, that Steward paid to CREF or any CREF entities in any given year?

A. 20 to $40 million.

Q. Okay. Okay. I'm going to switch topics, so we can put those contracts aside. You're welcome to look at them whenever you would like, but I think we're done with them.

I'm going to direct your attention to an exhibit we'll mark Gendron Exhibit 8.

MS. PELUSO: This is Tab 21.

(Gendron Exhibit 8 marked.)

Page 113

MS. PELUSO: And this is Bates stamped CREF-Norwood_000039.

BY MS. PELUSO:

Q. And this appears to be a document produced by CREF titled CREF Corporate Real Estates and Facilities updated November 6th, 2019. Do you see that?

A. I do.

Q. Is this an accurate depiction, to the best of your knowledge, of CREF's corporate tree as of November 6th, 2019?

(Witness reviews document.)

A. Yes.

BY MS. PELUSO:

Q. Do you recall if there were any changes or any significant changes to this corporate tree by the time we get to June 28th, 2020?

A. I don't recall.

Q. According to this, Mr. Kenyon and Mr. Van Ness, for example, they have equal titles, but they appear sort of under different arms; is that fair to say? Mr. Kenyon is listed as vice president CREF Operations looks like directly to the right of you.

A. That's correct.

29 (Pages 110 - 113)

Page 114

Q. And then below you, Mr. Van Ness is listed as Vice President Planning and Design; is that correct?

A. That is.

Q. Mr. Crowley is listed as Vice President CREF International. Do you see that?

A. I do.

Q. What was his role?

MR. SANDLER: Objection.

BY MS. PELUSO:

Q. In -- in June of 2020, Mr. Crowley seems to have been involved, along with you and other CREF employees, related to the flood at Norwood Hospital and to the aftermath. Is that fair to say?

A. Yes.

Q. Was that through his role as vice president of CREF International, or was that through a different role he held within the CREF entities?

A. It was a different role that he held. He was recruited by CREF to expand the international division around 2018, stayed in that role through 2020. COVID changed a lot of how we were implementing and managing, and he came back to

Page 115

manage the U.S. portfolio.

Q. Got it. Thank you.
That struck me as one thing that potentially changed --

A. Yeah.

Q. -- between November 6th, 2019, and June 28th, 2020.
And you're at the top of the tree here.

A. That's correct.

Q. You don't report to anyone within CREF. You are the CEO, correct?

A. That is correct.

Q. Who of the employees that are listed on Gendron Exhibit 8 are still employed at CREF?

A. Ms. Robbins, Mr. Van Ness, Mr. Crowley, Mr. Grise, Mr. Davis, Mr. Kidney, Mr. Patterson; and that's it.

Q. Okay. Okay. I think we're done with that exhibit.
When is the first time that you ever physically visited Norwood Hospital, as far as you can recall?

A. I'm having a real trouble, like, recollecting if it was the night of or the next day; but it was in or around the time -- the 48

Page 116

hours after the flood.

Q. You never visited Norwood Hospital prior to June 28th of 2020?

A. I may have. I don't, like, recall a specific instance, but I may have been there once or twice.

Q. Okay. Let's look at Tab 86.
(Gendron Exhibit 9 marked.)

BY MS. PELUSO:

Q. Mark for you Gendron Exhibit 9. This is an email exchange, Bates labeled STEWARD_01189211. And I'm going to direct your attention to the email at the bottom of the page dated July 22nd, 2020, at 8:28 a.m. from Salvatore Perla.
Do you see that?

A. I do.

Q. Who is Salvatore Perla? Do you know who -- where he worked on July 22nd, 2020?

A. Sal Perla was the president of Norwood Hospital.

Q. Has he ever been a CREF employee?

A. He has not.

Q. And you see Mr. Perla sent an email to yourself, to Mr. Polanowicz, and to Michael Callum?
Do you see that?

Page 117

A. I do.

Q. He sent you an email at an email address Robert.Gendron@Steward.org. Do you see that?

A. I do.

Q. How long prior to July of 2020, just approximately, did you have an email address at Steward.org?

A. I would say since the lift-out, the original lift-out in 2018.

Q. Since founding CREF, have you had email addresses for other clients or only for Steward, where you had an internal email address with the client's email name?

A. Not personally. Some of our staff have.

Q. Did you ever use any Steward email addresses other than Robert.Gendron@Steward.org?

A. Not to my recollection.

Q. And Mr. Polanowicz, I think we spoke about already. What's your understandings of Michael Callum's role at Steward in July of 2020?

A. Michael Callum's role -- my understanding of Dr. Callum's role was he was in charge of my -- to the best of my recollection, Steward Medical Group and physician oversight.

Q. Did you ever do any work through CREF

30 (Pages 114 - 117)

Page 118

directly with Steward Medical Group?

A. Yes.

Q. What was the nature of that work?

A. Physician medical office building fit-outs, oversight of that -- those capital projects, I should say.

Q. When you did oversight of capital projects for SMG facilities, were you hired by Steward, or were you hired by SMG? Do you recall?

A. Any work performed by CREF for Steward Medical Group would have been done under our MSAs as part of our -- our Master Services Agreement.

Q. As part of your Master Services Agreement with Steward?

A. That's correct.

Q. Okay. I'll let you review Mr. Perla's email to you, if you wouldn't mind, and then I'll ask you a couple questions.

A. Of course.

(Witness reviews document.)

A. Okay.

BY MS. PELUSO:

Q. Mr. Perla wrote, in part, in this email on July 22nd, 2020, a heading that says: 2014, Here is What Happened.

Page 119

Do you see that?

A. I do.

Q. And then he wrote that Steward, the hospital, did a massive layoff at Steward in 2014, right?

A. He did.

Q. And then if you turn the page, he commented that three months later, they considered a massive expansion of Norwood, and essentially the timing of that didn't sit well with the community, right?

A. It appears so.

Q. Do you know anything about any plans to expand Norwood Hospital in 2013 or 2014?

A. I do not.

Q. Are you aware of any plans to renovate Norwood Hospital prior to June of 2020?

MR. LAUNER: Objection.

A. Plans to renovate Norwood Hospital. Other than going back to the original answer of a few small deferred capital projects, no.

BY MS. PELUSO:

Q. Okay. Are you aware of any plans or discussions about decanting services from Norwood Hospital prior to June of 2020?

Page 120

A. I -- I'm not aware of those, no.

Q. Are you aware of any feasibility studies related to the maternity ward at Norwood Hospital prior to June of 2020?

A. Not personally.

Q. Impersonally? Indirectly?

A. I mean, my -- my team did a lot of feasibility study reports, and I didn't read all of them, so it's quite possible that my team may have done a feasibility study report, and I may have even been cc'd on it, but we -- hundreds of them across the country at the time.

Q. Sitting here today, you don't recall any particular studies that were done related to feasibility of Norwood Hospital prior to June of 2020?

A. No.

Q. Are you aware of any plans or discussions to acquire parking rights for a parking lot or building a parking lot at Norwood Hospital prior to June of 2020?

A. Slightly -- slightly recall discussions as MPT took deeded ownership of the properties and inbound inquiries from them about who the park -- other people that owned the parking lots were,

Page 121

given parking was always a challenge at hospitals. My recollection is it was like an old pizza shop right next to the trail there that an organization called Two Brothers or something like that owned, and there was always people trying to buy MPT's interest and MPT suggestions, Stewing -- Steward acquire those other interests, but I don't remember the details other than that.

Q. Okay. As part of this email to you and others in July of 2020, Mr. Perla wrote regarding parking garages: The past town officials believed parking garages would promote homelessness, gang activity, and theft.

Do you see that?

A. I do.

Q. Do you recall any conversations about that?

THE WITNESS: I'm sorry, sir.

THE REPORTER: Do you recall any conversations about that?

BY MS. PELUSO:

Q. Do you recall any conversations about past town officials believing parking garages would promote homelessness, gang activity, and theft?

A. I do not.

31 (Pages 118 - 121)

Page 122

Q. Mr. Perla then said that: There are new officials in town.

Do you see that, below the Parking Garage heading?

A. Yes.

Q. And he wrote: They will help us with placement of a garage on a new campus, and will not be an obstacle.

Do you see that?

A. I do.

Q. Do you understand the "they" he's referring to there, "they will help us" to mean the town of Norwood?

MR. LAUNER: Objection.

A. Yeah, I -- I don't know if I can answer what Sal was meaning in that -- in that instance.

BY MS. PELUSO:

Q. I'm wanting to know how you interpret what you received from Sal. Do you interpret Mr. Perla's email to you when he says "they will help us" to be a reference to the town of Norwood?

A. I do.

Q. And do you understand him -- did you interpret him to mean "us" with placement of a garage to mean Steward?

Page 123

A. Yes.

Q. And when he wrote "new campus," did you interpret that to mean the Norwood Hospital campus?

MR. LAUNER: Objection.

A. Yes.

BY MS. PELUSO:

Q. You forwarded Mr. Perla's email to Mr. Crowley. Do you see that?

A. I do.

Q. You copied Mr. Van Ness and Mr. Kenyon?

A. That's correct.

Q. Why did you send it to Mr. Crowley?

A. Mr. Crowley was brought in to help me manage the Norwood claim, and I was sending it to his attention relative to an overlay discussion that had percolated from Sal.

Q. "Relative to an overlay discussion," what do you mean by that?

A. My recollection is that Sal, at the Town's request or Sal's request, brought to our attention that the hospital is currently an existing nonconforming use by Massachusetts land code and zoning, and that the town thought it would be appropriate for Steward to be proactive in changing the zoning, which appeared to have been

Page 124

discussed in previous years prior to my involvement with Steward.

Q. You said that you reviewed Mr. Perla's deposition testimony before today?

A. I did.

Q. Did he testify about that topic?

A. I don't recall.

Q. Okay. And what -- when you say "overlay," what does overlay mean?

A. So in Massachusetts, zoning is quite complicated like healthcare, and most towns' hospitals are in zones that may be residential, and may be commercial, and may be industrial. They get existing nonconforming use based to the grandfathered situation; however, if you want to do a portico, a new CUP in the parking lot, any additions to it require full zoning approvals, and it's extremely restrictive to not be zoned for the proper anything, right, relative to your use.

Q. Do you know whether there were any efforts to receive a conforming use permit or change the permitting for Norwood Hospital by Steward prior to June of 2020?

A. I don't.

Q. And you said that you forwarded this to

Page 125

Mr. Crowley, in part, relative to an overlay discussion percolated by Sal?

A. Yeah.

Q. Do you recall anything else about that, that you haven't already testified about?

A. No.

Q. Are you aware of any analyses done regarding the profitability of Norwood Hospital prior to June 28th of 2020?

MR. LAUNER: Objection.

A. I'm aware of certain analysis that was done with the Steward's forensic accountant for the claim purposes.

BY MS. PELUSO:

Q. Are you aware of any that were done prior to June 28th, 2020?

MR. LAUNER: Objection.

A. I'm not.

BY MS. PELUSO:

Q. I'd like to show you now an exhibit that we'll mark Gendron Exhibit 10.

(Gendron Exhibit 10 marked.)

MS. PELUSO: It's Tab 70.

And this is a document Bates labeled CREF-Norwood_0001192, and it's titled Steward

32 (Pages 122 - 125)

Page 126

Health Care Norwood Hospital MPT Property Repair and Maintenance Report.

BY MS. PELUSO:

Q. Do you see that?

A. I do.

Q. And it's dated February 7th, 2017, correct?

A. Correct.

Q. This predates any of the Master Services Agreements that we looked at earlier, right?

A. That's true.

Q. And the location here is listed as Norwood Hospital?

A. That's correct.

Q. And there's a list of personnel on the first page. Do you see that?

A. I do.

Q. And you're listed there, right?

A. I am.

Q. As president and CEO of GenCon?

A. That's correct.

Q. Did GenCon -- does this refresh your recollection about whether GenCon did any work for Steward at Norwood Hospital in 2017 or 2018?

A. It does not.

Page 127

Q. Okay. Do you recall any MPT property repair and maintenance reports that were done regarding Norwood Hospital prior to June 28th of 2020?

A. I recall that there were property condition reports done by MPT prior to that, yes.

Q. And this particular one was produced by CREF.

Do you see that?

A. Sorry, which one?

Q. This -- this report was produced in this litigation by CREF. It contains a CREF --

A. Oh, sorry. Yeah.

Q. -- Bates stamp. Do you see that?

A. Yes.

Q. Meaning that it was stored in CREF's corporate records?

A. Yeah, we -- yeah, it would be common that we would have had these in our files relative to the assets we were managing.

Q. Okay. I'd like to direct your attention to pages 5 to 6 of this document --

MS. PELUSO: Gendron Exhibit 10, right?

THE WITNESS: Do you mind if I take a break real quick?

Page 128

MS. PELUSO: No.

THE WITNESS: I've got to use the restroom.

MS. PELUSO: Absolutely. We can --

THE WITNESS: I'm sorry.

MS. PELUSO: Absolutely.

THE WITNESS: I went from hot to cold.

VIDEOGRAPHER: We're off the record at 12:23 p.m. This is the end of File Number 3.

(Recess held.)

VIDEOGRAPHER: We're back on the record at 1:25 p.m. This is the beginning of File Number 4.

BY MS. PELUSO:

Q. Mr. Gendron, before the break, I showed you Gendron Exhibit 10. I'll get to that, but I'm going to ask you a couple of questions unrelated to this first.

You mentioned that you have a litigation agreement of some sort with Todd & Weld. Do you recall that?

A. Generally, yes.

Q. What is the nature of that agreement?

MR. SANDLER: Objection to form.

A. My understanding is a consulting

Page 129

agreement to provide support for the litigation.

BY MS. PELUSO:

Q. What kind of support for the litigation?

A. I don't know the exact scope of it. You know, Michael negotiated it on behalf of CREF with -- with -- to support Todd & Weld for that matter.

MR. LAUNER: That's fine.

BY MS. PELUSO:

Q. Michael Crowley?

A. Yes.

Q. Are there services that you are providing pursuant to that agreement?

MR. SANDLER: Him, personally?

MS. PELUSO: Yes.

MR. SANDLER: You can answer.

A. I don't know.

BY MS. PELUSO:

Q. Are you being compensated for your time today?

A. I'm not billing for my time.

Q. Would the agreement, to your knowledge, allow you to bill for your time today?

A. It may have. I don't actually know. We didn't look at it that way. I mean, I'm here as a

33 (Pages 126 - 129)

Page 130

third-party witness, so I didn't really -- I wouldn't bill for something in that regard.

Q. Okay.

MS. PELUSO: I think that's all I have on that.

MR. LAUNER: Okay. Thank you.

MS. PELUSO: You're welcome.

BY MS. PELUSO:

Q. Okay. Let's look back at Gendron Exhibit 10.

We were looking at page 5 of the exhibit before the break, which is Bates stamped 1196.

Do you see that?

A. I see page 5, yes.

Q. And in the bottom right-hand corner, you'll see that Bates stamp ending 1196.

A. Correct.

Q. And the heading here is "Follow-Up Items."

Do you see that?

A. Yes.

Q. And the first issue listed on this page of this document has a center column called "Response," and it says: There are multiple roof types on the hospital. Several roofs are leaking,

Page 131

out of warranty, and at the end of their useful life.

Do you see that?

A. I do.

Q. And then a few lines down -- oh, and in the "Details" column on the right-hand side, there's a "Priority" categorization there. Do you see that?

A. Yes.

Q. And it says Priority 4, and then in parens "High," right?

A. Yes.

Q. Do you know what those priority categorizations are?

A. I don't know without reading the full report one more time to see if there's a legend. So if you want to give me a few minutes, I'll review it.

Q. It's okay. I just was wondering if -- if, based on your personal knowledge, sitting here today, you happen to know what those indicate, what those priority designations indicate.

A. Not without just making an assumption on it.

Page 132

Q. Okay. Did -- do you know if CREF designated those priority designations? I assume that it's -- MPT is part of the MPT Property Repair and Maintenance Report. Is that your assumption as well?

A. My assumption is that Cecil Ingram Properties and Alan Meadows were engaged by MPT to do these property condition assessments on behalf of MPT.

Q. Okay. If you look down to Column 4 -- or Row 4, rather.

A. Okay.

Q. There's an issue that says: There appears to be some slab movement in one patient care area. And, again, the prioritization of that issue is 4, or high.

Do you see that?

A. I do.

Q. And then the next row, there's a column that says: Replace stained ceiling tiles after leaks have been repaired. Ceiling tile types should match in each area. Do you see that?

A. I do.

Q. And what priority designation was that issue assigned?

Page 133

A. High.

Q. And then also in the next row, it says: Asphalt drive in parking areas have numerous areas of failure. Do you see that?

A. I do.

Q. And what priority was that assigned?

A. High.

Q. With regard to the "stained ceiling tiles after leaks have been repaired," do you understand that to be a reference to water damage sustained to ceiling tiles leaving behind water stains which damage was caused to -- by leaks in the roof?

A. I can't attribute that specifically to roofs. Historically, that could be a sprinkler escutcheon, could have been a leak from a patient toilet above it. I guess it depends on where in the hospital that is located.

Q. But fair to say that "stained ceiling tiles after leaks" refer to stains in the ceiling from water damage?

A. That's correct.

Q. And this was identified at a February 7th, 2017, inspection, correct?

A. Yes.

34 (Pages 130 - 133)

Page 134

Q. So that's over three years before the flood at Norwood Hospital?

A. That's correct.

Q. Are you aware of any work done to replace stained ceiling tiles at Norwood Hospital between February 2017 and June 28th, 2020?

A. Not personally.

Q. If we turn the page to page 6 of this document, Bates labeled 1197, you'll see a "General Comments" section. Do you see that?

A. Yes.

Q. And it reads, in part: Steward is working on a corporate plan for roofs, window, and paving issues that will cover a three- to five-year period.

Do you see that?

A. I do.

Q. It says: The roofs are a major source of problems for the Norwood Hospital. Leaks are frequent, and it is difficult to trace and repair the leaks, in part, due to numerous ballasted roofs.

Right?

A. That's correct.

Q. What's a ballasted roof?

Page 135

A. Ballasted roof generally refers to a rubber substrated roof that has rocks on top of it to keep -- I don't know the exact reason of ballast, but to maintain the roofs. That was a system that was used quite commonly in hospitals.

Q. Do you know which of the buildings at Norwood Hospital had ballasted roofs prior to the storm event in June 2020?

A. I do not.

Q. You do know that Norwood Hospital was a campus with multiple buildings, correct?

A. That's correct.

Q. And is it fair to say that Draper and Lorusso were the main hospital buildings?

A. Those were the main names that were associated with the two largest blocks of buildings, in my recollection.

Q. Was the ER part of either of those two buildings, or was it its own building? Do you know?

A. I don't recall if it was incorporated into Lorusso or if it was a stand-alone addition.

Q. To your knowledge, were the roofs at Norwood Hospital replaced between February 2017 and June 28th, 2020?

Page 136

A. My only recollection of roof improvements was a corporate plan that was with a group called Tremco that Scott Kenyon managed. I don't know what hospitals got new roofs at what time.

Q. Okay. And so just to be clear, you were unaware of whether the -- any roofs were replaced on any of the Norwood Hospital buildings between February 2017 and June 28th, 2020?

A. That's correct.

Q. At page 6, there's also -- I'm sorry, page 7, the next page, you'll see the heading Building Envelope. Do you see that?

A. Uh-huh.

Q. Just in very general terms, what's your understanding of what a "building envelope" is?

A. A building envelope, in my general opinion, is the -- consists of the exterior facade and roofs associated with the interior -- exterior skin of a building.

Q. And according to this report in February 2017, what was the written response with regard to the general condition of the building envelope at Norwood Hospital?

A. This report states: Poor. There are

Page 137

several immediate repair needs.

Q. And to your knowledge, was the building envelope at Norwood Hospital repaired between February 2017 and June 28th of 2020?

A. I don't recall.

MS. PELUSO: 10/22.

I'll mark our next exhibit as Gendron Exhibit 11.

(Gendron Exhibit 11 marked.)

BY MS. PELUSO:

Q. And this is CREF-Norwood_0000688. And I'll represent to you that this appears to be an email from JacquelineMills@CREF, dated March 9th, 2020, Subject line: ME charter update, March 2020.

Do you see that?

A. I do.

Q. Who is Jacqueline Mills?

A. Jacqueline Mills was a CREF project administrator.

Q. Do you know approximately when she stopped working at CREF?

A. I don't.

Q. Do you know what a charter update is, as referred to in the subject line of this email?

A. I do.

35 (Pages 134 - 137)

Page 138

Q. What is it?

A. Project charters were scope, schedule, and budget updates that CREF used to communicate to Steward.

Q. And this one is for the Norwood Hospital campus, right?

A. I need a minute to read it, but --

Q. Oh, yes, please go ahead. But I'll -- I'll direct your attention to the fourth line where it says Building.

A. Yes.

Q. And then below that, it says: Project Draper Building. Do you see that?

A. Yes.

Q. And then below that, it says: Project Draper Roof Replacement.

A. Yes.

Q. And then it has a "CREF PM" several lines down, and it lists Micah Page. Do you see that?

A. I do.

Q. Is "PM" project manager?

A. That is correct.

Q. Was Micah Page at the time a CREF full-time employee who worked as a project manager?

Page 139

A. Yes.

Q. Mr. Page; is that right?

A. Yes.

Q. Is Mr. Page still employed with CREF?

A. He is.

Q. Does he still work in the capacity as a project manager?

A. I believe he's been promoted to a senior project manager.

Q. And then if you look at the bottom of the first page of this document, you'll see Funding Approval. Do you see that?

A. Yes.

Q. And it has a date of November 15th, 2018.

A. Correct.

Q. Do you know what the "funding approval" means? And what I'm asking is: What funding and provided by whom?

(Witness reviews document.)

A. MPT provided a facility for capital improvements that we aforementioned as part of the initial sale leaseback. It appears that this project was identified as part of those initial fundings, and this would have been the date at

Page 140

which it was approved by the capital committee.

Q. Do you recall approximately how much facility was provided for capital as part of those initial fundings by MP- -- MPT?

A. My recollection is that there was a $200 million investment in the Massachusetts and Central facilities committed.

Q. And that $200 million was maintained by Steward; is that right?

A. That's correct.

Q. Did CREF have direct access to those funds, or were the funds expended only through Steward?

A. Expended only through Steward.

Q. And the capital committee, do you recall who that was comprised of?

A. It changed over time, but relative to this period, my recollection was the capital committee included, at a minimum, the local regional presidents, the -- a representative from the head of finance, and this was -- I recall during the period of COVID specifically that it was chaired by Dr. Joseph Weinstein.

Q. Do you know what his authority was as the chair of the capital committee?

Page 141

A. I don't know the exact authority that Steward had provided them internally, but generally it was the review and approval of certain capital projects.

Q. Do you happen to know how Steward or where Steward maintained the capital received from MPT for capital projects?

A. I do not.

MR. LAUNER: Objection.

Sorry.

BY MS. PELUSO:

Q. Do you know how much capital for projects in Massachusetts in the Central Division Steward maintained from MPT in or around June of 2020?

MR. LAUNER: Objection.

A. My recollection is that from the period of 2018 to 2020, they expended and paid and we reconciled approximately the full 200 million in deferred capital investments.

BY MS. PELUSO:

Q. Do you know if there was any additional investments made by MPT once that reconciliation occurred?

MR. LAUNER: Objection.

36 (Pages 138 - 141)

Page 142

A.   I -- I don't know if I understand that totally.  Maybe you could ask it again.

BY MS. PELUSO:

Q.   Let me ask this:  Do you know if, in July of 2020, Steward had capital in an account that was given by MPT as an investment for capital projects in Massachusetts?

A.   I do not.

MR. LAUNER:  Objection.

THE WITNESS:  Sorry.

A.   I do not.

BY MS. PELUSO:

Q.   Is it possible that they did, and you don't know or --

A.   There may have been a balance of the 200 by July of 2020.  I don't remember the exact time frame when all these projects finished, but I do know the objective was always to invest that money in deferred capital projects from that time period.  I just don't know when it ended.

Q.   And when you said "deferred capital projects," what do you mean?  How would you explain that to a layperson?

A.   Well, almost every hospital in New England, let alone Massachusetts, has a -- are old

Page 143

facilities.  And over time, there's capital for envelopes, for parking lots, and others that are referred to as deferred capital that eventually get done as routine maintenance as deferred capital is assessed.

Q.   Do you happen to know, prior to June 28th of 2020, how much of the $200 million -- approximately $200 million from MPT was expended on deferred capital projects at Norwood Hospital?

A.   I do not know the specific Norwood number.

Q.   Do you have a general understanding of how much of that money was expended at Norwood Hospital?

A.   No, I -- all I remember is that approximately a hundred of that 200 was invested in Massachusetts, but I -- I don't remember by campus.

Q.   Okay.  Looking back again at the exhibit that we've marked as Gendron Exhibit 11, this is for the Draper roof replacement.  Do you know if this work was performed, if the Draper building roof was replaced?

A.   I don't know.  It appears that, based on this timing -- I would have to see a charter update from after this to see if it was complete.

Page 144

Q.   Okay.  But you don't have a personal recollection of work done at the Draper building by CREF or GenCon?

A.   Well, I know for a fact CREF or GenCon wouldn't do that because GenCon and CREF don't do roof replacements, but I -- it would have been done by Tremco, but I don't have personal knowledge of that.

Q.   Okay.  And if it had been done by Tremco in this hypothetical world of the work having been done, appreciating that you don't know if it was done or not, would CREF have managed or oversaw Tremco as part of its Master Services Agreement with Steward?

A.   Yes.

Q.   Okay.

MS. PELUSO:  Let's look at Tab 71.

(Gendron Exhibit 12 marked.)

Marked as Gendron Exhibit 12, this is a document CREF-Norwood_0000686.

BY MS. PELUSO:

Q.   And this is a Charter Update from March 9th 2020.  Do you see that?

A.   I do.

Q.   And the campus listed here, again, is

Page 145

Norwood Hospital.  Do you see that at the third line?

A.   I do.

Q.   And the Purpose, as listed here, says:  The wall surfaces of several buildings where brick and mortar are present have failed and allow penetration of water, damaging the interior of several buildings.

Do you see that?

A.   I do.

Q.   And if you look at the Scope Summary, it says:  The Gale Norwood Hospital Facade Evaluation Report, which are recommended to be completed in the next four years.  This includes what appears to be the most critical locations.

Do you see that?

A.   I do.

Q.   Are you familiar with the Gale Norwood Hospital Facade Evaluation Report that's referred to in this exhibit?

A.   I'm not familiar with the specifics of it, but I remember hearing about it.

Q.   Did you know that there were areas at Norwood Hospital that, by March of 2020, had been identified as having failed in allowing for

37 (Pages 142 - 145)

Page 146

penetration of water, damaging the interior of several buildings?

A. I don't recall.

Q. If you look at the next page of the exhibit --

A. Uh-huh.

Q. -- the second page, Bates labeled 687 --

A. Yeah.

Q. -- you'll see there's funding approval there from April 8th of 2019. Do you see that?

A. I do.

Q. Is it your understanding that that, again, is a reference to funding from the MPT investment for deferred capital projects that you referenced for the prior exhibit?

A. That's my understanding of how that work was funded.

Q. And then it has "Construction Value" here.

Do you see that?

A. I do.

Q. And then below that, "TPC"?

A. That's right.

Q. Is that total project cost?

A. That is.

Page 147

Q. Can you tell from this whether the funding approval -- oh, you can.

The approved funding, then, is for the total project cost, not the construction value; is that right?

A. That's correct.

Q. And Micah Page is again listed as the CREF PM for this particular project charter?

A. Yes.

Q. The anticipated completion date for this -- according to this document, at least -- is May 18th, 2020; is that right?

A. That's correct.

Q. Do you know whether this work was actually performed to repair the exterior of Norwood Hospital?

A. I don't personally know.

Q. Do you have any information about it one way or another?

A. I do not.

Q. Do you know if there were any capital expenditures planned for Norwood Hospital for 2020 that were not completed prior to the loss event?

A. I don't recall seeing anything at Norwood other than kind of deferred capital

Page 148

updates.

Q. Okay. Do you recall how you first learned that there was a storm event that impacted Norwood Hospital on June 28th, 2020?

A. My recollection is I got a call from Scott Kenyon.

Q. Do you recall if that was the date of the storm?

A. I do recall it being -- I believe it was a Sunday that he had called me and just given me an update that they were evacuating the hospital.

Q. Did you reside in Massachusetts at that point in time?

A. I did not.

Q. Were you in Texas when he called you?

A. No. I was in Massachusetts.

Q. Do you recall for what purpose you were in Massachusetts?

A. Visiting family.

Q. Do you recall what Mr. Kenyon said to you on that initial call other than they were evacuating the hospital?

A. I don't remember anything besides kind of him giving me an update that there was a significant event going on and just wanted to give

Page 149

me a heads-up as he would do from time to time.

Q. Following the storm on June 28th, 2020, CREF managed the Norwood insurance loss for both Steward and MPT, correct?

A. I wouldn't say we managed it for MPT. We helped coordinate it for MPT, but we -- we project managed I guess is one way to say it.

Q. Would you agree that CREF managed the Norwood insurance loss and redevelopment at Norwood Hospital?

MR. LAUNER: Objection.

A. That's kind of a broad question. That had different components and different time frames, so I guess it -- we would need to kind of unwrap that a little bit.

BY MS. PELUSO:

Q. Okay. Show you an exhibit at Tab 57.

(Gendron Exhibit 13 marked.)

BY MS. PELUSO:

Q. I'm going to show you an exhibit that we'll mark Gendron Exhibit 13, and this is an email. I'm going to direct your attention to one of the attachments, but it's Bates labeled STEWARD00192402. And to orient you, I'll represent to you that this is an email dated December 15th,

38 (Pages 146 - 149)

Page 150

2022, including you on the copy line, but I'm going to direct your attention to a document attached which, if you look at the Bates numbers on the bottom, is 192411 and you'll see a CREF document that begins "To whom it may concern."

A.   Yes.

Q.   This appears to be a document signed by you as CEO of CREF and addressed in response to an audit that was performed.  Do you recall preparing this document?

A.   I do.

Q.   And at the beginning, you said, CREF has been managing Steward's real estate assets for the last five years and is responsible for their capital program management, facilities management, and real estate oversight.

Do you see that?

A.   I do.

Q.   You also said we have also managed the Norwood insurance loss and redevelopment.  Do you see that?

A.   I do.

Q.   And you were referring to CREF when you wrote "we," correct?

A.   That's right.

Page 151

Q.   Okay.  Is that a fair statement, that CREF managed the Norwood insurance loss and redevelopment?

A.   For Steward, yes.

Q.   Okay.  You can put that document aside for now.  I'm going to show you a document that we'll mark Gendron Exhibit 14.

(Gendron Exhibit 14 marked.)

BY MS. PELUSO:

Q.   And this is marked STEWARD01188275, and this is an email from you to Jason Frey at MPT dated July 7th, 2020.  Do you see that?

A.   I do.

Q.   Who's Jason Frey?  Do you recall what his role was at MPT in July of 2020?

A.   Jason Frey's role at MPT, my recollection, was the director of asset management at MPT.

Q.   Had you worked with him on any property issues prior to July 7th of 2020, as best as you can recall?

A.   Yeah, I recall working with Mr. Frey over -- from 2018 on through 2020.

Q.   Do you recall any specific projects that you worked on together?

Page 152

A.   I recall working on the St. Elizabeth expansion project.  He would be involved in the Wadley development project at Texarkana we aforementioned, Sebastian River Medical Center.

Q.   Had you ever worked with Mr. Frey on any claims submitted to an insurance company before?

A.   CREF had worked with Mr. Frey and MPT on several insurance claims.

Q.   Any insurance -- any insurance claims in particular that you can recall?

A.   There was one I recall at Port Arthur, Texas.  Sorry.

Q.   Was it of a particularly complex nature?

MR. SANDLER:  Objection.

A.   I don't recall the specifics besides a grading/water intrusion type issue that was ongoing, if you will, relative to just the facility.

BY MS. PELUSO:

Q.   And did that Port Arthur, Texas insurance claim involve both MPT and Steward?

A.   I don't believe there was a business interruption component, but there may have been.  I remember being in discussions about it but I don't -- I don't remember the full details of it.

Page 153

Q.   Has CREF had any contracts with MPT?

A.   CREF has had two to three direct contracts with MPT over time.

Q.   Any that related to work in Massachusetts?

A.   No.

Q.   Any currently?

A.   No.

Q.   When was the last time that CREF had a Master Services Agreement or contract with MPT directly?

MR. SANDLER:  Objection.

A.   It's been at least two years.

BY MS. PELUSO:

Q.   Okay.  In this email to Mr. Frey, you wrote:  There's a very real need for us to be fully coordinated on all insurance and other related issues as we move forward.  Do you see that?

A.   Yes.

Q.   Who are you referring to when you said "we"?  Or us to be fully coordinated as we move forward.

A.   I appear to be referencing us working on behalf of Steward in the "we" sense.

Q.   Were you saying that Steward and MPT

39 (Pages 150 - 153)

Page 154

need to be fully coordinated?

A.   I'd like to read the memo for a second --

Q.   Of course.

A.   -- in totality and then give me -- I'll come back to that.

(Witness reviews document.)

A.   Sorry.  Can you ask me the question again?

BY MS. PELUSO:

Q.   Sure.  Were you stating to Mr. Frey that MPT and Steward needed to be fully coordinated on insurance and other related issues moving forward?

A.   That is my -- my recollection of this, yes.

Q.   Can you please read what you wrote behind point number 3?

A.   MPT has informally asked Steward to manage the claim.  We need to understand in writing exactly what MPT is asking us to do and to make sure whatever is needed to comply with the lease from a legal perspective is put in place.

Q.   Do you recall sending this email to Mr. Frey?

A.   Not specifically, but now reading it.

Page 155

Q.   Does it refresh your recollection of sending the email?

A.   No.

Q.   Okay.  I'm going to hand you another exhibit, Gendron Exhibit 15.

(Gendron Exhibit 15 marked.)

BY MS. PELUSO:

Q.   And this is STEWARD00761494.  Give you a second to review that.

(Witness reviews document.)

A.   Okay.

BY MS. PELUSO:

Q.   I'll direct your attention to the email that you received from Mr. Aldag.  Am I saying that right, Aldag?

A.   I believe so.

Q.   From July 7th, 2020, 8:15 p.m.  It's at the bottom of that first page and goes on to the second page.  Do you see that?

A.   Yes.

Q.   You received this email from Mr. Aldag after your email exchange with Mr. Frey at MPT, right?

A.   Yes.

Q.   Mr. Aldag was the chairman and CEO of

Page 156

MPT; is that right?

A.   Yes.

Q.   Was he Mr. Frey's boss?

A.   I don't believe directly, but I believe ultimately as the CEO he was.

Q.   The Subject line of this email is Norwood.

A.   Uh-huh.

Q.   Mr. -- is that yes?

A.   Yes.  Sorry.

Q.   Thank you.  Mr. Aldag told you:  This is your show and they're to provide you with whatever you need.  Right?

A.   Yes.

Q.   And you understood that when he said they are to provide you with whatever you need, he was referring to employees at MPT, right?

A.   Correct.

Q.   And then the next email is a response from you.  Do you see that at 9:45 p.m.?

A.   Yes.

Q.   And you wrote, in part, we had some initial challenges with coordination of the two claims and understanding clear communication protocols.  Do you see that?

Page 157

A.   I do.

Q.   And then you said:  Rosa and Jason have taken the necessary steps to ensure alignment is now in place.  Do you see that?

A.   I do.

Q.   Do you recall what you were referring to regarding what necessary steps were taken to ensure alignment?

A.   My recollection of this communication was relative to Mr. Polanowicz asking us to bring on an adjuster and how that related to the lessor/lessee relationship on how the claims were going to be managed going forward.

Q.   Can you explain to me what you mean by that?

A.   What portion?

Q.   What -- you said Mr. Polanowicz talked about the lease and the impact of a public adjuster on how claims would be coordinated moving forward.  I don't really understand what you mean by that.

A.   My recollection is Mr. Polanowicz, after having a conversation with Mr. Frey, understood that MPT via Chrissy were going to use Sedgwick to be the adjuster of their portion of the claim, and Steward executive team didn't think that that was

40 (Pages 154 - 157)

Page 158

the best path forward. And we had reached -- they had asked me to reach out to Mr. Frey on bringing on a public adjuster.

Q. For both the MPT and Steward claims.

A. For the MPT property claim, and then the Steward claim relative to personal property or real property.

Q. Okay. And you said that the Steward executive team didn't think it was a good idea to use Sedgwick, right? Who were you referring to when you say "the Steward executive team"?

A. My recollection is Dr. de la Torre and John Polanowicz.

Q. Did you speak with John Polanowicz prior to sending this email to Mr. Aldag at 9:45 p.m. on July 7th, 2020?

MR. SANDLER: Objection.

A. I don't recall.

BY MS. PELUSO:

Q. Did Mr. -- is Mr. Polanowicz the one who informed you that the Steward executive team didn't think it was a good idea to use Sedgwick as the adjuster?

A. I don't recall.

Q. Did you speak with Dr. de la Torre about

Page 159

the decision to use NFA?

A. Dr. de la Torre or the board of directors at Steward referred NFA to me.

Q. The gentleman at First Bristol, does that sound right?

A. Mr. Karam.

Q. Referred NFA to you?

A. That's correct.

Q. And Mr. Karam was on Steward's board of directors?

A. That's correct.

Q. You told Mr. Aldag that you would work with the team on structure and plan tomorrow. Do you see that?

A. Yes.

Q. And did you do that? Did you report back to Mr. Aldag, as far as you can recall, on July 8th, 2020?

A. I don't recall reporting back to him.

Q. Okay. Do you recall any other discussions that you had with Mr. Aldag at MPT regarding the team and structure or the plan with regard to the two insurance claims?

A. I don't recall.

Q. Okay. We'll mark as Gendron Exhibit 16

Page 160

a PowerPoint presentation, Bates labeled STEWARD01426. I'm sorry. I'll say that again. 01426068.

(Gendron Exhibit 16 marked.)

BY MS. PELUSO:

Q. This is a PowerPoint presentation titled: Norwood Hospital Team Structure. And the only page of this that I'm going to ask you about is the second page that has Steward/MPT at the top.

MR. LAUNER: Abbie, do you know if this was a standalone document or had a parent email?

MS. PELUSO: I don't know.

BY MS. PELUSO:

Q. Mr. Gendron, have you ever seen this document before?

A. I have.

Q. Okay. And it's titled -- at least this particular slide, is titled: Communication Plan Responsibility Matrix. Do you see that?

A. I do.

Q. And it has an event date, June 28th, 2020, in the top right-hand page -- on the top right-hand corner of that page?

A. Yeah.

Q. Did you create this document?

Page 161

A. I believe our team did. I don't know if I personally did or not.

Q. Your team at CREF, you mean?

A. Yes.

Q. And was this a accurate depiction of the communication plan and responsibility matrix for the Steward/MPT insurance claims?

A. I believe it was our alignment for communication plans that we constructed in that first two weeks.

Q. And at any point, did this change and -- during the period of time when you were actively engaged with the insurance companies prior to the filing litigation?

A. You know, that's -- I'd have to study this a little bit more --

Q. Sure.

A. -- so I could answer that question.

Q. I'll ask you just some general questions about it.

A. Okay.

Q. You'll see your name at the top.

A. Yes.

Q. And there are four categories below your name, insurance, legal, financial, and CREF; is

41 (Pages 158 - 161)

Page 162

that right?

A. That's correct.

Q. And did you maintain a role supervising or monitoring the insurance, legal, and financial branches?

A. I did not --

Q. What --

A. -- maintain a role overseeing them. My job was to aggregate the different informations that came through the streams, and then provide executive summaries of them.

Q. And the communication plan here, is that what that's a reference to?

A. Apparently, yeah. I don't -- I don't -- is there any other context of dates on this document?

Q. There's not any on the version that I've shown to you.

A. Okay.

Q. The CREF side on the right-hand side has three employees below, Mr. Doncaster, Mr. Kenyon, and Mr. Crowley. Do you see that?

A. I do.

Q. Was Mr. Doncaster a CREF employee?

A. He was.

Page 163

Q. What was his role, if any, related to the flood event at Norwood or any communications with the insurance companies related to either the property or the business interruption claim?

A. In my recollection of Mr. Doncaster's role was to be the on-site leadership relative to coordination of all activities and mitigation and closeout or box-out or whatever that word is that was used, essentially managing the day-to-day activities of the site of Norwood post-loss.

Q. Do you know how long he held that role for?

A. I do not, no.

Q. Is he still employed by CREF?

A. He is not.

Q. Do you recall approximately when he stopped working with CREF?

A. I don't recall.

Q. Was it before or after mid-2021?

A. Potentially. I don't know if I can answer that honestly.

Q. Okay. And then below the CREF employees, there are a couple of names of consultants.

A. That's right.

Page 164

Q. BR+A, Array, and EH+E. Do you see that?

A. That's correct.

Q. And each of these consultants were hired to assess damages at Norwood Hospital, correct?

A. That's correct.

Q. At least in part, right? And did they report to CREF?

A. They -- they did not report -- I wouldn't say they reported to us. They reported their findings to Steward. You know, this, again, was my -- my recollection, as I'm looking at this, is this is how communications, not a reporting org chart, just to be clear.

Q. Yeah, that's helpful. Thank you.

A. Okay. So...

Q. So they reported their findings to Steward?

A. That's right.

Q. But information was potentially culled or aggregated by CREF?

A. We would organize it for Steward, and then present it. The -- the -- I asked the date here because it would be important to understand because NFA in certain people took different roles here (indicated).

Page 165

MR. LAUNER: Just so we have a record, it's August 10th, 2020.

MS. PELUSO: Thank you.

BY MS. PELUSO:

Q. Mr. Launer has informed me that this is from August 10th of 2020 --

A. Okay.

Q. -- which is very helpful. Thank you.

A. Thank you.

MR. LAUNER: Excuse me. The 15th. Sorry.

MS. PELUSO: August of 2020.

A. Okay.

BY MS. PELUSO:

Q. And in terms of communication plans, you see NFA is listed underneath the insurance bucket, ultimately rolls up to you for communication plans and responsibilities under this matrix, not reporting its findings necessarily, but in terms of communication.

A. That's correct.

Q. And the same is true for Marsh Risk Consulting?

A. That's correct.

Q. Have you worked on other insurance

42 (Pages 162 - 165)

Page 166

claims with NFA?

A.   I have not.

Q.   Do you have an ongoing relationship through CREF with NFA?

A.   I do not.

Q.   When is the last time you spoke with Ron Papa?

A.   I think Ron Papa called me about a year and a half ago.

Q.   What did he say to you, and what did you say to him?

A.   He was asking me how the family was and checking in and letting me know that he had taken back ownership of NFA, which I think he had sold at one point.

Q.   Did you have any conversations with him about this lawsuit or the loss at Norwood Hospital?

A.   No.  He -- I remember him saying something about the storm verse flood determination, you know, around that time period, but I -- I don't recall what he said.  I didn't put much thought into it, to be honest with you.

Q.   Okay.  And what about Marsh Risk Consulting or Marsh FAC, have you worked with Robby Grider or Marsh FAC on any other claims?

Page 167

A.   I have not.

Q.   Have you spoken to Mr. Grider about this lawsuit or about the loss event at Norwood Hospital since the filing of the lawsuit, as best as you can recall?

A.   Have not spoken to Mr. Grider in probably two years, and that was even email communications just relative to BI questions.

Q.   Okay.  Do you agree that by August of 2020, MPT had delegated full authority to Steward to act as its agent in all matters related to the claim under the MPT policy?

MR. LAUNER:  Objection.

MR. SANDLER:  Objection.

A.   No.

BY MS. PELUSO:

Q.   You disagree with that?

A.   Yes.

Q.   I'm going to show you Gendron Exhibit 17.

(Gendron Exhibit 17 marked.)

BY MS. PELUSO:

Q.   This is STEWARD1718, and this is an email from Mr. Papa to Sedgwick, Amy O'Rorke at Sedgwick, dated August 16th of 2020.

Page 168

Do you see that?

A.   I do.

Q.   And I'll direct your attention -- well, first, you're copied on this email along with Mark Graves at Zurich.  Do you see that?

A.   I do.

Q.   And the second paragraph here begins with "You may recall."  Do you see that?

A.   I do.

Q.   And Mr. Papa wrote, copying you, that: Steward and MPT communicated directly to Mark Graves at Zurich but MPT had delegated full authority to Steward to act as its agent in all matters related to the claim under the MPT policy.  Do you see that?

A.   I do.

Q.   Did you ever correct that understanding that was given to Sedgwick and Zurich by Mr. Papa on August 16th of 2020?

A.   I did not.

Q.   What about it do you disagree with?

A.   Well, "all matters" is a very broad sense.  They had asked -- MPT had delegated to Steward -- my recollection was that they would manage and coordinate the claim on behalf of MPT,

Page 169

but "all matters" meant, in my mind, negotiations or approvals, which is not "all matters."

Q.   So the delegated authority from MPT to Steward, how would you define it?

A.   You know, my definition -- well, "delegated authority" was MPT engaged NFA to be the lead adjuster on their claim.  "Authority" was Steward to help communicate and be the project manager of the claim is how I would define it.

Q.   Okay.  And "the project manager of the claim," what do you mean by that?

A.   To administer access, requests for documentation as necessary or -- or any of the other project management components that fit into Owner's Project Management.

Q.   Okay.

MS. PELUSO:  Okay.  Let's mark as Gendron Exhibit 18 Tab 41.

You mentioned the lease between Steward and MPT earlier when you were discussing the communication with Mr. Polanowicz.  Do you recall that testimony.

A.   Yes.

Q.   Were you familiar with the lease between Steward and MPT in or around July, August,

43 (Pages 166 - 169)

Page 170

September of 2020?

A.    I was familiar with the master lease structure in general, and we had -- I had seen it from time to time, but "familiar" in the sense that I knew it existed and I knew it had certain components of it that would affect CREF's ability to serve Steward.

Q.    Which parts of the lease can you recall would influence or affect CREF's ability to serve Steward?

A.    So we -- Stew- -- we, CREF, managed Steward's real estate portfolio, and under the sale leaseback, MPT was the ultimate owner of certain assets that we would have to manage on the behalf of Steward as subtenants, whether they're physicians, laboratories, et cetera.

So we -- we generally would make sure that we were in compliance with the master lease before entering into any sublease agreements, is what I recall spending most of my time on.

Q.    I see.  Okay.  This email is unrelated to that but --

A.    Yeah.

Q.    -- a different part of the lease.

MS. PELUSO:  This is Gendron Exhibit 18,

Page 171

which is STEWARD01205205.

(Gendron Exhibit 18 marked.)

BY MS. PELUSO:

Q.    Okay.  And you'll see this begins with an email from you to Mr. Portal dated November 20th, 2020, at 9:58 a.m.  Do you see that?

A.    I do.

Q.    Do you continue to have any relationship with Mr. Portal?

A.    I do not.

Q.    Have you spoken to him recently?

A.    I have not.

Q.    Approximately when do you think is the last time you talked to him?

A.    2023, maybe early -- yeah, '23.

Q.    Have you reviewed his testimony in this case?

A.    I have not.

Q.    I'm going to direct your attention to the attachment to this email, which is dated August 28th, 2020, and is a correspondence between Mr. Doyle and Mr. Hamner at MPT.

A.    Uh-huh.

Q.    Are you familiar with this attachment?

A.    I need a second to read it one more

Page 172

time.

Q.    Yeah, please go ahead.

(Witness reviews document.)

THE REPORTER:  If you're going to read aloud --

THE WITNESS:  I'm sorry.

(Witness reviews document.)

A.    Okay.

BY MS. PELUSO:

Q.    Okay.  The first page of the email attachment you wrote to Mr. Portal and you discussed an extension.  Do you see that?

A.    I do.

Q.    Do you know what you were referring to when you discussed the extension that we processed earlier in the claim relative to the master lease expires next week?

A.    I do recall.

Q.    What is it?

A.    I recall that shortly after the loss, we referenced the master lease to understand the tenant/landlord responsibilities relative to a potential loss of this magnitude and engaging Nathalie Hibble from the Steward's general counsel's office to help understand how that may

Page 173

affect the lessor-lessee relationship; whereas, she flagged to us that --

THE WITNESS:  Is this okay?

MR. SANDLER:  Is it a privilege issue?

MR. LAUNER:  Is it information you learned from Ms. Hibble?

THE WITNESS:  Yes.

MR. LAUNER:  Then, no.  It is.  It's not okay to talk about information you learned from counsel.

I'm going to start:  Can you ask your question again to make sure that --

MS. PELUSO:  I just wanted to know what he was referring to when he talked about this extension in this email.

THE WITNESS:  I don't think it's an issue.

MR. LAUNER:  Well, was the information you learned about the need for the extension coming from Counsel?

THE WITNESS:  Yes.

MR. LAUNER:  Let's go off the record for a minute.

MS. PELUSO:  Sure.

VIDEOGRAPHER:  We're off the record at

44 (Pages 170 - 173)

Page 174

2:20 p.m.

(Recess held.)

VIDEOGRAPHER: We're back on the record at 2:28 p.m. This is the beginning of File Number 5.

MR. SANDLER: Before we proceed, Mr. Gendron, my instruction to you is when answering Counsel's questions to not disclose in your answers any of the content of any legal advice that was provided by Steward's legal counsel at the time concerning, in this instance, the lease or, more generally, any contracts or legal documents.

THE WITNESS: Okay.

BY MS. PELUSO:

Q.   Mr. Gendron, I assume you'll follow your Counsel's instruction with regard to what he just informed you.

A.   I will.

Q.   Okay. Okay. So returning now to Gendron Exhibit 18 and looking at the attachment.

Do you see an attachment from --

A.   Oh, this one.

Q.   Sorry.

-- August 28th, 2020?

A.   I do.

Page 175

Q.   When you wrote Mr. Portal an email on November 20th referring to an extension in the master lease, were you referring to Section 14.2(a) of the Master Lease Agreement as referred to in the August 28th, 2020, correspondence?

A.   Yes.

Q.   Okay. In part, what the Master Lease Agreement provides, as stated in this exhibit, is that the lessee shall elect by giving written notice to the lessor within 60 days following the date of such destruction, one of the following: One, to restore such casualty impacted property to substantially the same condition as existed immediately before the damage or destruction or, 2, in part, to terminate this lease, correct?

A.   That is what 14.2 A says, yes.

Q.   And you understand the lessee is Steward Health?

A.   Yes.

Q.   And the lessor is MPT?

A.   Correct.

Q.   You understood in 2020 that the decision whether to restore the property to its -- "substantially the same condition as existed immediately before the damage or destruction" was

Page 176

Steward's decision to make under this lease provision, correct?

MR. LAUNER: Objection.

A.   I'm not sure I understand that question, so say that one more time.

BY MS. PELUSO:

Q.   You understood in 2020 that the decision whether to restore Norwood Hospital "to substantially the same condition as existed immediately before the damage or destruction" was the lessee's election to make, correct?

MR. LAUNER: Objection.

A.   I understood that this clause gave them that right as an election, but it had to be decided by MPT and Steward, given the magnitude of this loss.

BY MS. PELUSO:

Q.   This -- this clause gave Steward the right to elect to restore Norwood property "to substantially the same condition as existed immediately before the damage or destruction," correct? That's what the lease says.

A.   That's what the lease says.

MR. LAUNER: Objection.

I'm sorry.

Page 177

A.   That's what the lease says, yes.

BY MS. PELUSO:

Q.   Okay. And the lessee, Steward, at this point in time had until November 28th, 2020, to provide written notice of its election, correct?

A.   Up and to this time on the August 20th date?

Q.   (Nods head.)

A.   I'd have to read this one more time to make sure that's the proper date here.

Q.   I'll direct your attention to the paragraph below where we were just looking on the August 28th, 2020, letter. You'll see a sentence that says: Lessee shall have until November 28th, 2020, to provide written notice to the lessor of its election.

Do you see that?

A.   Correct.

Q.   And "its election" refers to Steward Health, correct?

A.   That is correct.

Q.   And this provision was extended, as far as you know?

A.   My understanding is this was extended several times.

45 (Pages 174 - 177)

Page 178

Q. Okay. That's all the questions I have about that document for now.

MS. PELUSO: I'll move on to a document that we'll mark Gendron Exhibit 19. This is Tab 74.

(Gendron Exhibit 19 marked.)

BY MS. PELUSO:

Q. We talked a little bit about the retention of NFA. I'm just going to show you a document related to that topic.

MS. PELUSO: And this, for the record, is STEWARD47754.

BY MS. PELUSO:

Q. Mr. Gendron, if you look at the second to last page of this document, you'll see a signature page dated August 11th, 2020.

A. Yes.

Q. Is that your signature that appears below Steward Health Care System, LLC?

A. That is.

Q. Did you hire NFA to represent both MPT and Steward?

A. My recollection -- I need to read this real quick again. I haven't seen this in a very long time, so I need some time.

Page 179

Q. Okay.

(Witness reviews document.)

A. Okay.

BY MS. PELUSO:

Q. Okay. This document, Gendron Exhibit 19, includes NFA's agreement to act as Steward and MPT's public insurance adjuster in connection with those two listed insurance policies, right?

A. That's correct.

Q. And it's addressed to you, correct?

A. That's correct.

Q. And you signed on behalf of Steward?

A. I did.

Q. The last page of the document lists your title as EVP Global Real Estate. Do you see that?

A. Yes.

Q. Did you hold yourself out as a Steward employee?

A. I did not.

Q. Why did you sign this document -- and I think I've seen this in other documents, where you signed as -- on behalf of Steward rather than listing your title as founder or CEO of CREF?

A. We had a signature policy with the

Page 180

general counsel's office of Steward, and they gave me certain authorities to execute proposals, and this is how it was identified.

Q. Do you know if that signature authority was ever committed to writing, or was it a verbal agreement that you made over a course of time with the general counsel's office?

A. I don't recall. I remember there being a very big focus on this in '19, '20 relative -- in -- in getting agreement on it, but I don't -- I believe it was in writing, but I don't remember.

Q. Okay. And do you recall who within Steward had a focus on the issue of your signature authority?

A. I recall that -- I mean, when did -- this -- my recollection is the general counsel's office, but I don't remember who brought it up.

Q. Okay. In any event, this document, Gendron Exhibit 19, are those your initials that appear in the bottom right-hand corner?

A. Yes.

Q. And if you look at the fourth page of the exhibit Bates label ending in 57.

A. Uh-huh.

Q. Do you see where NFA lists what its fees

Page 181

will be for representing Steward and MPT?

A. I do.

Q. And it lists fees for property losses, and it lists fees for business income/extra expenses. Do you see that?

A. I do.

Q. And for the property claim, according to this, NFA was paid a certain percentage of the amount recovered for the property claim?

A. My recollection of this was the fees negotiated for property losses were negotiated between Michael Crowley and Larry Portal, for the property loss of MPT and the property -- real property component of the Steward claim specifically, and then there was a separate fee given that we had a -- hired Marsh to do the business income policy.

Q. Just so that I understand what you just said, the business income section of this NFA agreement --

A. Uh-huh.

Q. -- states: $600,000 flat fee to be paid in increments of. Do you see that?

A. Yes.

Q. Do you know who negotiated that with

46 (Pages 178 - 181)

Page 182

NFA?

A. I don't recall.

Q. Do you know who decided the brackets for the property loss fees for NFA?

A. I do not recall specifically, no.

Q. Were you involved in any discussions regarding what those brackets are for NFA's fees, based on the amount collected on property losses?

A. I remember seeing them and -- and approving them prior to executing this, relative to agreeing with them, for that matter, but I don't recall how they were negotiated.

Q. NFA received a higher percentage of recovery, the more that's collected under the Property Loss category, correct?

A. Yes.

Q. Do you recall any discussions at any point in time with anyone, other than counsel, regarding the fact that NFA received more money, depending on how much was recovered for property losses?

A. I do not recall.

Q. Okay. That's all I have for that. Do you recall the decision to engage Marsh FAC to usher the BI and property claims?

Page 183

A. I'm not sure I recall the absolute decision per se. I do recall Steward's CFO referring us to Robby Grider.

Q. Who was Steward's CFO at the time of that referral?

A. John Doyle.

Q. And Mr. Doyle referred you or someone else at CREF for purposes of engaging Marsh?

A. My recollection is Mr. Doyle referred Michael or I, Mr. Grider's name, state -- excuse me, stating that he had worked with Robby on other claims in the past, and we should speak with him about assistance.

Q. To your knowledge, had Mr. Crowley ever worked with Robby before, Mr. Grider?

A. To my knowledge, no.

Q. And Marsh was ultimately engaged for both the BI and property claims; is that right?

A. Marsh, the tech- -- they -- they were engaged for the BI claim. I think NFA and Marsh both had a component of the property claims. I don't -- I -- I don't recall where their divisions lied, but there was a portion of it whereas NFA was managing inventories and Steward policies relative to equipment, but Marsh had a component of that as

Page 184

well.

Q. Do you know what Marsh's role was on the property claim, if any?

A. I don't recall.

Q. Okay. Ultimately your -- Marsh's work on the BI claim, do you know under whose control or direction that work took place?

A. My recollection is that he worked hand in hand with the Steward regional CFO/finance team on constructing kind of the model, if you will, of -- of the loss, but we would help facilitate at CREF information back and forth, but the -- I think John Doyle had ultimate authority over that.

Q. Anyone else on John Doyle's team that you can recall being involved in kind of ushering the BI claim or directing any of the work of Marsh?

A. I don't remember the CFO's name at Norwood Hospital. I want to say Lisa, but --

Q. Lisa Martin?

A. Sounds familiar. I believe that she was intimately involved during the initial processes.

Q. Okay. Did you have any role in compiling financial data to provide to Marsh or providing any inputs for Marsh's analysis on behalf of Steward or MPT?

Page 185

A. I'm not sure I understand that question. I -- it look -- I don't recall the full Marsh model six years later.

Q. Sure.

A. But there may have been -- I don't remember if the Marsh model had remediation expenses and whatnot in there. But if there were project costs, we would definitively compile expenses relative to the box-out or other stuff relative to the operations of the business. We were more so just moving information back and forth as necessary.

Q. Okay. That's helpful, and I'll ask a more specific question. Did you have any involvement in providing information related to the business interruption costs, the operational costs, the allocations within Norwood to Marsh for analysis?

A. We were definitively on a lot of the communications, mostly coordinating the work, but I don't recall having a specific role, nor would we, like, of compiling the substance of it.

Q. Okay. And is it your recollection that the office that kind of held that role was John Doyle and his team?

47 (Pages 182 - 185)

Page 186

A. Yes.

Q. I'm going to show you an exhibit that we'll mark as Gendron Exhibit 20.

(Gendron Exhibit 20 marked.)

MS. PELUSO: Tab 24.

Can you tell me how much time we've been on the record?

Thank you.

BY MS. PELUSO:

Q. And this is an email chain that begins with page STEWARD758540.

VIDEOGRAPHER: Three hours, 41 minutes.

MS. PELUSO: Thank you.

BY MS. PELUSO:

Q. And it -- they go in reverse chronological order, as email chains tend to do. I'll start with the first one, which is on the last page ending on document Page Number 44.

(Witness reviews document.)

BY MS. PELUSO:

Q. Do you see there an email from you to Steven Van Ness, copying several other individuals, dated June 29th, 2020, at 8:35 a.m.?

A. Yes.

Q. That's the day after, the morning after

Page 187

the loss event at Norwood Hospital, correct?

A. That's correct.

Q. I think we've talked about most of these individuals, but who's Mr. Rougas, Andy?

A. Mr. Rougas was a architect of the planning design division of CREF under Steve Van Ness.

Q. And Mr. Davis?

A. Mr. Davis was the head of capital program management at CREF.

Q. Mr. Staples?

A. He was a project manager at CREF.

Q. Mr. Kenyon we've spoken about. So all of the individuals on this email have Steward email addresses, but they're all CREF employees; is that right?

A. That's correct.

Q. At least as of -- I'm sorry. At least --

A. Sorry.

Q. At least as of June 29th, 2020, all of the email recipients on this first email are CREF employees.

A. That's correct.

Q. And in the email that you wrote, I'm

Page 188

going to direct your attention to the third sentence. You wrote: I'll be working with MPT and the insurance company to manage the claim.

Do you see that?

A. Yeah.

Q. And then you said: However, our DLT wants conceptual plans in a week to meet with Charlie and the City of Norwood to expedite permissions on what we want to do.

Do you see that?

A. I do.

Q. RDLT, is that a reference to Dr. de la Torre?

A. That is correct.

Q. Was that a common acronym used as shorthand for Dr. de la Torre?

A. Yes.

Q. When you wrote that -- in the sentence before, you wrote: However, we've been asked to look at an immediate conceptual scope schedule and budget to rebuild the campus. Do you see that?

A. I do.

Q. Who were you referring to when you said "we," CREF?

A. CREF has been asked to look at, yes.

Page 189

Q. And when you said "rebuild the campus," are you referring to Norwood Hospital?

A. For campus, yes.

Q. Do you know who Charlie is that Dr. de la Torre wants to meet in a week with Charlie?

A. I do.

Q. Who is that?

A. My recollection is Charlie Baker reached out to Dr. de la Torre after the loss asking how he could help.

Q. Who is Charlie Baker?

A. Charlie Baker was the governor of Massachusetts.

Q. And you wrote that Dr. de la Torre "wants conceptual plans."

What did you mean by "conceptual plans"?

A. My recollection of conceptual plans is he wanted to have, as he always did, every option necessary for his review situationally.

We didn't have a plan at this point -- this was the day after the loss -- but we did know it was a significant event and the -- my recollection is Mr. Baker and the State of Massachusetts were extremely concerned with losing

48 (Pages 186 - 189)

Page 190

the hospital in the middle of the COVID crisis, and it would -- very common for Ralph to reach out directly in this instance and just say, Do everything you can to figure this out.

Q. And the question was: What did you mean by conceptual plan? And you said Dr. de la Torre would want "every option." What do you mean by that?

A. We hadn't really evaluated at that point, so my recollection of conceptual is to figure out what the options were to reopen and rebuild the campus, but we didn't know at this point.

Q. Okay. And then you see you have a bullet point list of five line items there. Do you see that?

A. I do.

Q. And the first one says: Demo Lorusso. Right?

A. Correct.

Q. And the second one says: Keep ED, question mark.

A. Correct.

Q. You didn't contain a question mark after the first bullet, right? It just says: Demo

Page 191

Lorusso, no question mark.

A. Yeah.

Q. And then you wrote: Do we need to acquire the purchase rights on that parking lot? Correct?

A. I did.

Q. What parking lot are you referring to?

A. Probably the one that we aforementioned that had additional capacity across the street.

Q. And you recall that we looked at one of the MPT property assessments where it was discussed that there was significant damage that needed to be repaired at the Norwood Hospital parking lot, right?

Do you recall that?

A. Yeah. I don't know what Norwood parking lot that was, but yes.

Q. Okay. And when you said: Do we need to acquire the purchase rights on that parking lot, you're talking about CREF on behalf of Steward?

A. I was using Steward in the "we" tense there.

Q. You then wrote: Move BOI to Norwood. Right?

A. Correct.

Page 192

Q. Is BOI beneficial ownership interest?

A. It is not. It's the Boston Orthopedic Institute.

Q. Oh, good. See. Boston Orthopedic Institute, what's that?

A. It was an orthopedic institute that they had started opening up in Weston that we decided we should think about incorporating into the Norwood plans as we thought through the planning exercise.

Q. Do you know if, ultimately, by 2023, Boston Orthopedic Institute was planned to become part of Norwood Hospital?

A. There was a plan for the redevelopment/replacement hospital campus, if you will, to have an ambulatory surgery building, an ASB, that would have components of the so-called BOI as we knew it to this date.

Q. Okay. What -- was the BOI going to exist outside of Norwood Hospital for Steward had the plans come to fruition that developed in 2023?

A. It was talked about for six, seven years. So I'm not sure it was even fully approved for the 2023 ASB, but it -- the business plan was never finalized on that.

Q. Okay. And the -- moving the BOI to

Page 193

Norwood was talked about for several years prior to 2020?

A. Moving the BOI was talked about opening at almost all of the campuses at some point.

Q. Understood. And then you wrote: Decant psych from Norwood/Good Sam to Middleboro. JP and RDLT are reviewing BP today. Do you see that?

A. Yes.

Q. What did you mean by "decant psych"?

A. There was a large focus by the government of Massachusetts, specifically the Department of Public Health, to maintain psychological beds during the COVID crisis. There had -- Steward was the largest psych -- inpatient psych bed provider in all of New England at the time. The loss of those beds from Norwood was a real big focus of DPH given the crisis and mental-health issues.

So my recollection is part of that call from Ralph that was mentioned was: We need to figure out how to open more psych beds immediately. The State has been asking for that.

Q. And so you referred to decant as a temporary solution to house additional psych patients or residents as necessary, not remove the

49 (Pages 190 - 193)

Page 194

psych ward from Norwood Hospital all together?

A. Well, we didn't really have a full plan at that point, in my recollection. What I did know is that after the significance of the event, they were not going to open up anytime soon given, kind of, our eyes on the site. So we had to find a different solution for this, the ED, and a few other things.

Q. Yeah, we'll talk about that, but the question is for the psych beds in particular, did the 2023 plans for the new campus at Norwood include the same or lesser or more psych beds?

A. Less.

Q. By how many?

A. I don't recall.

Q. And so, ultimately, the decision was to reduce the number of psych beds at Norwood Hospital moving forward with -- when the new campus was announced?

MR. SANDLER: Objection.

A. That's my recollection.

BY MS. PELUSO:

Q. Okay. And JP here, is that a reference to Mr. Polanowicz or Mr. Pierro?

A. John Polanowicz.

Page 195

Q. Have you seen a reference to JP2?

A. Yes.

Q. Is that Mr. Pierro?

A. That is my understanding.

Q. Okay. And you said that they're reviewing BP today?

What's BP?

A. There was a psychologic -- psychiatric hospital that had become available for purchase in Middleboro that was ongoing, and there was a business plan that was circulated from the New England Steward operations team that they were reviewing.

Q. That predates the storm?

A. That's correct.

Q. Okay. Okay. And do you see, then, Mr. Crowley responded to your email at 11:13 a.m. on June 29th? And that's just on the next page forward ending on page 43 of the Bates stamp.

A. Yes.

Q. Mr. Crowley referenced documents to the share drive and then said: This is a good starting point to refresh the status of what the thinking was in 2013 related to a campus plan.

Do you see that?

Page 196

A. I do.

Q. Do you know what Mr. Crowley was referring to when he talked about a 2013 campus plan?

A. I do not.

Q. You'll see, then, Ms. Meunier responded to Mr. Crowley with a citation link for the documents.

Do you see that?

A. Yes.

Q. And then you responded on June 29th at 2:27 p.m., and you said: Dana, in part, can you and/or Sean find the actual Stantec site plan of Norwood? Do you see that?

A. I do.

Q. Do you know what that's a reference to, the "Stantec site plan of Norwood"?

A. Stantec was our civil engineer of record for Massachusetts. So the Stantec site plan would be the survey of the Norwood campus itself.

Q. Do you know when that survey was prepared?

A. My understanding is those were done as part of the MPT sale leaseback, said period 2015 to '18; but I don't recall the exact date.

Page 197

Q. Is it your understanding that that was the purpose for creating the site plan, was as part of the leaseback due diligence arrangement?

A. Yeah. My understanding is that they needed to have accurate surveys of every property for title and deed purposes as they entertained the mortgage and sale leasebacks.

Q. So your reference to the Stantec site plan is not related to Mr. Crowley's statement about what the thinking was in 2013 related to a campus plan?

A. It was not.

Q. Okay. Are you aware of any community impact studies that were performed prior to the flood in June 2020 related to Norwood Hospital?

A. Prior to the flood?

Q. Yes.

A. I don't recall community impact studies prior to the flood.

Q. Okay.

MS. PELUSO: That is a good moment for a five-minute break, if you don't mind.

VIDEOGRAPHER: We're off the record at 3:01 p.m.

(Recess held.)

50 (Pages 194 - 197)

Page 198

VIDEOGRAPHER:  We're back on the record at 3:11 p.m.

MS. PELUSO:  Okay.  Thank you.

BY MS. PELUSO:

Q.  Mr. Gendron, I'm going to hand you what's been marked Gendron Exhibit 21.  It is STEWARD00118517.

A.  Okay.

(Gendron Exhibit 21 marked.)

BY MS. PELUSO:

Q.  And this is an email chain that begins on the first page with an email from Mr. Perla to you dated June 30th, 2020.  Do you see that?

A.  Sorry, the first page of the packet or the back page?  Yeah, on the first page, I see.

Q.  But it starts with at the top the header information is from Mr. Perla to you dated June 30th, 2020?

A.  Yes.

Q.  Okay.  I'm going to direct your attention to the last email on this page which continues onto the second page, which is an email from Mr. Perla to you and Mr. Pierro copying Mr. Polanowicz.  Do you see that?

A.  I do.

Page 199

Q.  And the Subject line is:  Hospital closings opportunity for -- opportunities for reopening.

Do you see that?

A.  I do.

Q.  As part of that email, Mr. Perla wrote Reopening Plan.  Do you see that?

A.  I do.

Q.  And he says:  Hello, everyone.  Here is some preliminary feedback from Bob Gendron today.  Right?

A.  I do.

Q.  And then he lists 11 items below?

A.  I see those.

Q.  For example, at Bullet Point 1, he said:  The Draper building in better shape than expected.  Right?

A.  He does.

Q.  And at Point 3, he says:  ER not damaged, can reopen.  Just need medical gases and suction, right?

A.  He does.

Q.  He also says that:  The cath lab was not damaged and can reopen, just need medical gases and suction, right?

Page 200

A.  He does.

Q.  He says:  The maternity was not damaged.  30-plus beds can be a med/surg unit.  Do you see that?

A.  I do.

Q.  He says:  Endoscopy not damaged, can reopen, correct?

A.  Yes.

Q.  He also wrote:  All psych beds in good shape, 61 psych beds.  Unit 36 has med gas and could do medical as well once med gas available, right?

A.  Yes.

Q.  And then he writes:  Guild building not damaged and operating now?

A.  Correct.

Q.  Do you recall where the Guild building was located?

A.  We called it the Guild building, and it's across the street.  It's not owned by MPT.

Q.  Is it owned by Steward?

A.  It is not.

Q.  Do you know who owned it in 2020?

A.  I don't.  There was a -- it did transact around 2016 to '18 to a new third-party landlord.

Page 201

I just remember because we had to do, like, all the estoppels because Steward had a lot of sublease space in that building.

And I think what you'll see is they're referring to is what -- some outpatient facilities that had licensed services in it get grandfathered in there, even if it's not owned by them.

Q.  I see.  Okay.  And then Item 10:  Foxboro not damaged and operating now.

Do you know what Foxboro is?

A.  I believe Foxboro is referring to the cancer center that's also on Norwood's license that is in Foxboro, Massachusetts.

Q.  And was that an MPT-owned Steward-leased property, as best as you know?

A.  I -- I can't recall if Foxboro was owned by MPT or Healthcare Trust of America, which was another large master landlord of Steward.

Q.  I'm sorry.  Can you say that name again?

A.  HTA, Healthcare Trust of America.

Q.  Do you know how many properties Steward had that were HTA properties in Massachusetts?

A.  My recollection is that they did a sale leaseback with HTA, circa 2012, for approximately five to six medical office buildings.

51 (Pages 198 - 201)

Page 202

Q. Did CREF perform services for Steward at those five to six medical office buildings?

A. They did.

Q. And were those services pursuant to the same Master Services Agreements we looked at earlier?

A. Yes.

Q. Do you recall any significant capital projects at any of those locations?

A. I'll be -- think in a second -- I'll need a second to think about that. I can't think of any off the top of my head, but there certainly were office renovations. Generally, they were medical office buildings, suites. And so there were certainly some Quest labs that I recall being involved in the implementation of when Steward outsourced their lab services to Quest at some point.

Q. Fair to say that CREF's work under the HTA properties for Steward was less significant than CREF's work for Steward under the MPT properties.

A. Yes.

Q. Okay. You responded to Mr. Perla's email at Gendron Exhibit 21 at 8:55 p.m. on

Page 203

July 30th. Do you see that?

A. I do.

Q. And in your response to Mr. Perla, you didn't correct any of the summary that he provided in the email below to Mr. Pierro and Mr. Polanowicz and yourself, correct?

A. Not in this email, no.

Q. You said that you would be starting weekly calls, and that you plan to outline a short-term 60- to 90-day to get partial reopening. Do you see that?

A. I do.

Q. Steward never chose to engage in a partial reopening at any time prior to September 30th, 2024, right?

MR. LAUNER: Objection.

A. Say that again.

BY MS. PELUSO:

Q. You agree that Steward never chose to engage in any partial reopening of Norwood Hospital at any time prior to September 30th of 2024?

MR. LAUNER: Objection.

A. I do not agree with that.

BY MS. PELUSO:

Q. What partial reopening did Steward

Page 204

engage in at Norwood Hospital prior to September 30th of 2024?

THE REPORTER: You'll have to say that again.

MS. PELUSO: Yeah, sure.

BY MS. PELUSO:

Q. What partial reopening of Norwood Hospital occurred prior to September 30th of 2024?

A. We use -- you used the word "engage," not did they do. We engaged in significant discussions for a partial reopening of the hospital.

Q. I understand. Thank you for correcting me. Was there ever a partial reopening of Norwood Hospital prior to September 30th, 2024?

A. No.

Q. In this email on June 30th, 2020, you also wrote: Let's keep the potential plans at the ELT level to ensure we don't get ahead of the insurance process, correct?

A. I did.

Q. "ELT" is a reference to Steward's executive leadership team?

A. That's correct.

Q. Who did that consist of in June of 2020?

Page 205

A. ELT level in this context was referring to John Polanowicz, John Pierro, Sal, Dr. Joseph Weinstein, Dr. Mike Callum, potentially IT. I don't remember how involved they were at this point. Those are who I recall that being.

Q. Dr. de la Torre?

A. He was not involved in meetings that we were having relative to the -- to the ELT, for that matter.

Q. Was he a member of Steward's executive leadership team, though?

A. I -- I think "ELT" is used in two different definitions here. He was certainly part of Steward's executive leadership team. He -- in reference to this email, I was very politely telling Sal like stop saying stuff because we don't know anything yet. It's the day after the loss here. So he -- it appeared he was taking stuff out of context.

Q. Okay. But what you wrote to Mr. Perla on June 30th was: Let's keep the potential plans at the ELT level to ensure we don't get ahead of the insurance process, correct?

A. That's correct.

Q. Okay. I'll move on to Gendron

Page 206

Exhibit 22, Tab 31.

(Gendron Exhibit 22 marked.)

BY MS. PELUSO:

Q.   And this is Bates labeled STEWARD00118673.  And this is a July 6th, 2020, email exchange, beginning with an email from you to Mr. Polanowicz, copying others at 7:48 p.m.  Do you see that?

A.   I do.

Q.   Okay.  I'm going to start with the email from Mr. Polanowicz to you, if you could review that.

A.   The second email in?

Q.   First, Mr. Perla writes an email.

A.   Yeah.

Q.   And then Mr. Polanowicz responds to that email.

A.   Okay.

(Witness reviews document.)

A.   Go ahead.

BY MS. PELUSO:

Q.   Okay.  You received an email from Mr. Perla at 8:18 p.m. on July 6th, 2020.  Do you see that email at the bottom of the page ending in Bates label 73?

Page 207

A.   I do.

Q.   And then Mr. Polanowicz respond to Mr. Perla's email.  Do you see that?

A.   I do.

Q.   And he kept Mr. Perla in the copy line.  Do you see that?

A.   I do.

Q.   You then responded to Mr. Perla -- I'm sorry, Mr. Polanowicz's email at 7:48 p.m.  Do you see that?

A.   I do.

Q.   You did not include Mr. Perla on that email exchange, correct?

A.   I did not.

Q.   And you did include Mr. Van Ness, Mr. Kidney, and Mr. Kenyon.

A.   That's correct.

Q.   Are Mr. Van Ness, Mr. Kidney, and Mr. Kenyon all CREF employees as of July 6th --

A.   They are.

Q.   -- 2020?  Mr. Perla was not a CREF employee, right?

A.   That is correct.

Q.   And you wrote, in part:  We haven't reviewed the full plan with the local team, as

Page 208

we're allowing you and JP2 to message the appropriate programming.  Do you see that?

A.   I do.

Q.   And "JP2," is that a reference to Mr. Pierro?

A.   Yes.

Q.   What was Mr. Pierro's role?

A.   My recollection is Mr. Pierro was the cheap -- chief operating officer of the Northeast Region for Steward.

Q.   You wrote:  We haven't reviewed the full plan.  Do you recall what you were referring to when you referred to the "full plan"?

A.   I don't recall.

Q.   You also wrote with the local team.  Do you know who you were referring to when you said "the local team"?

A.   Most likely Sal and their team specifically is -- is what I'm guessing, but I don't fully recall.

Q.   And you wrote:  I don't believe everyone is aware of the strategy to abort the Lorusso building at this time.  Do you see that?

A.   I do.

Q.   Okay.  We'll move on to a new exhibit,

Page 209

Gendron 23, Tab 32.

(Gendron Exhibit 23 marked.)

BY MS. PELUSO:

Q.   This is STEWARD00761524.  Thank you.  And, Mr. Gendron, I'll give you a chance to review it.  I'll tell you that, for the record, it's an email from you to a group of people on July 7th, 2020, at 10:01 a.m., and the Subject line is:  Do not distribute Norwood slide deck.  And then there's a slide deck attached to the email.

A.   Okay.

(Witness reviews document.)

BY MS. PELUSO:

Q.   And for your review, just so that you're clear, I'm only going to ask you about the slide that you referred to in your email, so Slide 9, which ends with page number 34 in the bottom right-hand corner.

(Witness reviews document.)

A.   Okay.  Go ahead.

BY MS. PELUSO:

Q.   Okay.  You wrote on July 7th, 2020, to this group of people on the Gendron Exhibit 23:  Please review Slide Number 9 on priority service line programs.  Do you see that?

53 (Pages 206 - 209)

Page 210

A.  I do.

Q.  And then you wrote:  We'll move the call from tomorrow to Thursday, as Wednesday will be focused on MPT.  Do you see that?

A.  I do.

Q.  Does that mean that the same team, or parts of this same team, had MPT-related activities that would occupy Wednesday, July 8th?

A.  My recollection is, given this was shortly one week after the initial loss, MPT asked to send a team up to the hospital, and our team would generally support them in terms of meeting them at site.  That's my -- my recollection.

Q.  Okay.  Let's look at Slide 9.  As I said, that's the slide that ends with Bates No. 34, which I think has a 3.2 above it, which is a bigger number, easier to find.

A.  Yeah.

Q.  You see this?  It says:  Priority Service Line Programs.

A.  Yeah.

Q.  Do you know -- did you prepare this slide deck?

A.  My recollection was Steve Van Ness prepared this following our meeting with the said

Page 211

group that's on the cc thread.

Q.  Okay.  The first line item is: Reactivate Existing Emergency Department.  Correct?

A.  Yes.

Q.  And the existing emergency department was never reactivated, correct?

A.  That's correct.

Q.  And the next bullet is Imaging, and it says:  Replace mobile MRI with mobile correct.  Do you see that?

A.  I do.

Q.  Do you know if that ever occurred?

A.  It did not.

Q.  And the next line is:  Endoscopy. Reactivate Existing Five Procedure Rooms.  Do you see that?

A.  I do.

Q.  Did that ever occur?

A.  No.

Q.  Under Behavioral Health, it says: Reactivate Draper 3.  To your knowledge, did that ever occur?

A.  No.

Q.  The med/surg 36 beds, it says:  Convert Draper to maternity/adult psych.

Page 212

Do you know what that's referring to?

A.  I don't.

Q.  And then "Day Surgery," it says:  Locate in former day surgery or in cath lab.

Do you know if that ever occurred?

A.  It did not.

Q.  Ultimately, Steward decided to raze Norwood Hospital and build a new hospital in its place rather than activate any of the existing units or services, correct?

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

A.  MPT, did you say?

BY MS. PELUSO:

Q.  I said Steward.

A.  Steward.  I think MPT made the decision ultimately.

Q.  What's the basis of your understanding that MPT made that decision?

A.  The -- my recollection is the letter that they had sent to Zurich to formally inform them that that decision was finally made.

Q.  And sitting here today, it's your opinion that that was MPT's decision, not Steward's decision with MPT's approval?

Page 213

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

A.  I don't think -- sitting here today, I believe it was a joint decision that they made over the course of time based on the circumstances.

BY MS. PELUSO:

Q.  Okay.  So it was a joint decision between Steward and MPT.  That's your --

A.  That's correct.

Q.  -- understanding.  And that's based on what?

A.  Based on how long it took to come to that decision throughout this whole process and based on the fact that MPT owned the asset, so it was ultimately their decision whether they were going to fund it or not.

Q.  Did MPT, to your knowledge, conduct any feasibility studies related to options for Norwood Hospital?

A.  I don't know.

Q.  To your knowledge, did MPT prepare any memos that discussed different profitable options for rightsizing or modernizing Norwood Hospital?

A.  I'm not -- I'm not aware of any.

Q.  To the extent that CREF prepared any

54 (Pages 210 - 213)

Page 214

work on conceptual plans or options, did CREF do that at Steward's direction?

A. Yes.

Q. Do you agree that one of the reasons that the emergency department was not reopened was because it would drain available insurance money that could be used for the actual long-term plan to build a new hospital?

MR. LAUNER: Objection.

A. I do not.

BY MS. PELUSO:

Q. Why not?

A. Because you added the "to build a new hospital," which was not a consideration that went into the ED evaluation at that time.

Q. Would you agree that the -- one of the reasons that the emergency department was not reopened is because it would drain insurance available for the actual long-term plan for Norwood Hospital?

MR. LAUNER: Objection.

A. I believe the main factor for the ED not opening was the unfit safety and consultant reports that we received that would not ensure life safety systems were there. I do believe that there was an

Page 215

analysis done that the ED would not be profitable as a stand-alone ED without the ancillary services as well.

BY MS. PELUSO:

Q. I just want to make sure I have a clear answer to this question. Do you agree that part of the reason that the emergency department was not reopened is because it would drain insurance available for the actual long-term plan for Norwood Hospital?

MR. SANDLER: Objection --

MR. LAUNER: Objection, asked and answered.

MR. SANDLER: -- asked and answered.

MR. LAUNER: Guess we both went to law school.

MR. SANDLER: His answer to the previous question answered exactly the question you just posed to him.

MS. PELUSO: I don't believe that it was responsive to the question.

BY MS. PELUSO:

Q. And I'd like you to answer the question I asked. You can answer unless your attorney instructs you not to.

Page 216

MR. SANDLER: I disagree with that characterization. If you have anything to add to your prior answer, you can respond.

A. I do not.

BY MS. PELUSO:

Q. I don't believe there's an answer to the question on the record, so I'll ask it again: Do you agree that part of the reason -- at least part of the reason that the emergency department was not reopened at Norwood Hospital is because it would drain available insurance money for the actual long-term plan for Norwood Hospital?

MR. LAUNER: Objection; asked and answered.

MR. SANDLER: Same objection.

BY MS. PELUSO:

Q. Do you agree?

A. No.

Q. Okay. I'm going to switch topics.

Are you aware that American Guarantee provided approximately $97.4 million in insurance proceeds to Steward between July 2020 and December of 2022?

A. Yes.

Q. Was CREF involved in managing the

Page 217

$97.4 million that Steward received from American Guarantee in insurance proceeds?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. I'm not sure I understand the question of "managing," so I want to make sure I do.

BY MS. PELUSO:

Q. What, if any, role did CREF have in overseeing, expending, managing the $97.4 million that Steward received from American Guarantee?

MR. LAUNER: Objection.

A. CREF coordinated Robby Grider as necessary, relative to any of our services; however, we did not manage any of the expenses or cash that came into Steward from that policy.

MS. PELUSO: Bless you.

BY MS. PELUSO:

Q. Do you know how the $97 million that Steward received was expended?

A. I do not.

Q. Do you have any idea who would know how the $97.4 million in insurance proceeds was expended by Steward Health?

A. I would assume their CFO.

MS. PELUSO: Tab 36.

55 (Pages 214 - 217)

Page 218

BY MS. PELUSO:

Q. I'll show you now -- we'll mark as Gendron Exhibit 24. I believe this is the memo that you disclosed that you reviewed to refresh your recollection prior to your deposition today.

(Gendron Exhibit 24 marked.)

BY MS. PELUSO:

Q. This version, at least, begins at STEWARD Bates label 47506, and the cover email here is from Mr. Crowley to you dated August 5th of 2020, Subject line: Can you review ASAP. Do you see that?

A. Yes.

Q. And Mr. Crowley provided a few comments and one highlighted area for clarification on the attached memo; is that right?

A. It appears so.

Q. That's what he wrote here, just --

A. Yes.

Q. -- to be clear. He said: Just a few minor comments and one highlighted area for clarification.

Do you see that?

A. I do.

Q. Are you familiar with this memo, at

Page 219

least this version of it dated August 5th, 2020?

A. I am.

Q. Have you ever seen a final copy of this memo that was sent to Dr. de la Torre?

A. I have.

MR. LAUNER: Objection.

BY MS. PELUSO:

Q. Do you know if this was -- this memo, this August 5th, 2020, memo was transmitted electronically to Dr. de la Torre?

MR. SANDLER: This version?

MS. PELUSO: Any version of the Norwood Strategic Planning memo dated August 5th, 2020. So either this version or what became the final version of this memorandum.

A. I don't know if it was distributed electronically to him.

BY MS. PELUSO:

Q. Do you know if Dr. de la Torre received a version of this August 5th, 2020, memo in substantially similar format, maybe incorporating the red lines that's at issue in Gendron Exhibit 24?

A. Sorry. Would the red lines be included?

Q. I assume the red lines would have been

Page 220

taken out before it went to Dr. de la Torre.

A. Yeah, I don't -- I don't know if I can answer the final version without seeing a copy of it six years later -- five and a half, sorry.

Q. You have reviewed the final version of this memorandum?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

MR. SANDLER: Time period?

A. I don't -- I don't recall which version I've reviewed.

MS. PELUSO: I'm just curious if -- if the witness is aware whether there is a final version that was transmitted to Dr. de la Torre.

BY MS. PELUSO:

Q. Can you answer that question, Mr. Gendron?

MR. LAUNER: Objection.

A. I cannot answer it.

BY MS. PELUSO:

Q. Okay. Sitting here today, do you know if you ever transmitted to Dr. de la Torre this memorandum?

A. I've reviewed this memorandum with him. I can say that.

Page 221

Q. Okay. When did you review it with Dr. de la Torre?

A. You know, based on the date, I would say of -- in or around August 5th, 2020.

Q. And where were you when you reviewed it with him?

A. Most likely at the Steward Dallas office is my best guess, but that is a guess.

Q. You were both in person?

A. That's my recollection.

Q. Do you recall if there was anyone else present?

A. Potentially John Polanowicz. I wouldn't generally speak with Dr. de la Torre without John, the regional VP, in the room.

Q. Did you have many -- did you have more than this one conversation with Dr. de la Torre about strategic planning at Norwood Hospital at in-person meetings at the Steward Dallas office?

A. Not to my recollection.

Q. And when you say you reviewed this with Dr. de la Torre, do you recall how you reviewed it? Did you give him a copy? Did you use an electronic presentation?

A. I don't recall.

56 (Pages 218 - 221)

Page 222

Q.   Were you the primary author of this document?

A.   I was the primary author of all of the information assembly of this document, yes.

Q.   Do you recall who assisted by providing you with any components that you then assembled?

A.   I do recall -- I do recall having CREF team member support identification of the fixed asset cost component of this for each option.  I haven't reviewed this in full, though.  I mean, I -- I did read it a few weeks ago, but I got to read it again now, so...

Q.   Okay.  Take your time.

(Witness reviews document.)

A.   I've reviewed it.

BY MS. PELUSO:

Q.   Okay.  Great.  The last line on the first page says:  As a result of the current situation, we've identified four scenarios on how this could play out and the associated capital necessary to rebuild, restore, et cetera.  Do you see that?

A.   I do.

Q.   And then is it fair to say that's -- that's sort of the purpose of this memo is to lay

Page 223

out four options and the associated capital that would be necessary for each of those four options, at least based on what the information that you had at the time in August of 2020?

A.   I would say the purpose of the memo was Dr. de la Torre's concern that MPT didn't have enough insurance to do any project, and we -- he needed to do a push-pull analysis about what that would mean from 50 to 150.

Q.   What do you mean by a "push-pull analysis"?

A.   Well, I mean at this point, we don't have any analysis from the insurance company, the consultant reports, the adjusters.  So all we can do is show what a $50 million payout or what a max flood policy payout would do, but what we could control was what would be the cost for the different options, as we laid out in the four.

Q.   Do you know who ultimately was responsible for negotiating capital contributions from MPT for the new hospital at Norwood Hospital's campus?

A.   Say that one more time.

Q.   Do you know ultimately whether anyone at Steward negotiated with MPT for capital funding for

Page 224

the new hospital at Norwood?

MR. LAUNER:  Objection.

A.   My understanding is those were negotiated between the CEOs of both organizations, but that's my understanding.

BY MS. PELUSO:

Q.   Okay.  You were not personally involved in negotiations with MPT for funding the new hospital at Norwood campus?

MR. LAUNER:  Objection.

A.   I was not negotiating.  I presented information to both sides, and they negotiated.  I would present funding requests after some of the initial interim funding purposes; but no, I didn't negotiate the numbers besides educating them on what the project budgets were.

BY MS. PELUSO:

Q.   Okay.  Let's take a look at Option 1, which is at page 47508.  And do you see this option is for a replacement hospital/full coverage model?

A.   Yes.

Q.   And the memo indicates that:  This model contemplates a complete replacement hospital as is, and assuming local, State, and federal code compliance can be maintained, right?

Page 225

A.   Yes.

Q.   And then there's a second option on the next page, Option 2?

A.   Yes.

Q.   And this says:  IDEAL outcome/right-sized new market hospital build, right?

A.   Correct.

Q.   IDEAL is all caps.  Do you know if that's an acronym?

A.   It's not.

Q.   And so "IDEAL" there just means optimal?

A.   Correct.

Q.   And it says that:  This model contemplates a new construction state-of-the-art facility that would reorganize its service offerings and bed capacity to maximize value to Steward, correct?

A.   Correct.

Q.   And in this summary section below, did you write:  This would be an ideal situation for Steward?

MR. SANDLER:  Objection.

A.   Yes.

BY MS. PELUSO:

Q.   And then you wrote -- and then you

57 (Pages 222 - 225)

Page 226

wrote: Assuming we had adequate coverage and buy-in from the insurance company, right?

A. Yes.

Q. And then in parentheses, it says: Buy-in will be negotiated based on Option 3, agreed-upon cost structure and proceeds used to execute against Option 2. Do you see that?

A. I do.

Q. Did you write that parenthetical?

A. I don't know. It looks like it's a comment from somebody, so I don't recall if I wrote that or not. It's underlined in this...

Q. The -- the second part: And proceeds used to execute --

A. Yes.

Q. -- against Option 2 appears to be an edit?

A. It does appear to be an edit.

Q. Do you understand this to mean that negotiations for Option 3 would -- would be had with the insurance company, and then proceeds recovered from the insurance company would be used to execute Option 2?

MR. LAUNER: Objection.

A. I understood this to mean that we don't

Page 227

have enough information to fully move forward with a new hospital build, so we need to proceed with Option 3, you know, concurrently at the advice of our adjusters, and evaluate as the consultant reports come in.

BY MS. PELUSO:

Q. Other than counsel, have you discussed that testimony that you just gave with any other person, including Michael Crowley?

A. No.

Q. Option --

MR. SANDLER: I'm just going to make an objection to that last question. Thanks.

BY MS. PELUSO:

Q. Option 3 on the next page is titled: Restoration Of Existing Asset, Plus New CUP/SF. Do you see that?

A. Yes.

Q. And does "CUP" here stand for central utility plant?

A. It does.

Q. And what does the "SF" stand for?

A. I don't recall.

Q. The first sentence reads: This model contemplates the scenario in which the insurance

Page 228

company will advise to reopen the existing structure and make building code upgrades by reworking mechanicals and building a new CUP. Do you see that?

A. Yes.

Q. Was it your understanding that building a new CUP, a new central utility plant, was part of a building code upgrade?

A. It's my recollection that at this time period, the initial response from Code Red was that the fire department, the -- and the building commissioner had deemed the existing utilities in the basement as hazardous, and we started entertaining how we would build a new central utility plant to support any type of opening.

Q. So moving the electrical and utilities above grade was part of an anticipated code compliance requirement.

A. Yes.

Q. Then under "The Summary," do you see the second bullet? Could you read that for the record, please?

A. If we had more coverage on the property side, we would pull the code upgrades lever on the policy with supporting documentation from local,

Page 229

State, and federal officials.

Q. Do you know what you meant when you wrote "code upgrades lever"?

A. I don't recall.

Q. Were you aware that the Zurich and American Guarantee insurance policy had a provision for increased cost of construction to comply with required code?

MR. LAUNER: Objection.

A. I was really only aware of when NFA was advising who probably -- who also gave me some guidance, if you will, on the policy itself, but I don't recall that specifics.

BY MS. PELUSO:

Q. And so the choice of word here "lever on the policy," you don't recall -- you don't recall the basis for that particular language?

A. I don't recall.

Q. Okay. And then Option 4 says: Restoration to Market Size. Do you see that?

A. I do.

Q. And it says: This model contemplates a hybrid of maximizing insurance proceeds under Option 3, correct?

A. Yes.

58 (Pages 226 - 229)

Page 230

Q. But reducing our service lines to ensure we meet the market demand and close certain underperforming services.

A. Correct.

Q. And closing certain underperforming services includes psych, right?

A. Yes.

Q. And OB, which is obstetrics?

A. That's correct.

Q. And then you wrote: In an effort to rebuild a, quote, right-size hospital with the funds provided under the current insurance policy, right?

A. That's correct.

Q. And then under "The Summary," you wrote, in part, that: This fourth option would allow us to maximize insurance proceeds under the replacement cost model plus code upgrades, but downsize the facility to better represent the market program, as outlined in Option 2, right?

A. Yes.

Q. Each of the four scenarios outlined in this memo contemplated significant investment in the reconstruction from MPT, right?

A. Yes.

Page 231

Q. And each scenario contemplated significant investment from MPT in excess of even the high-end insurance recovery for MPT, right?

A. Yes.

Q. And the audience of this memo, with the strategic options for the future of Norwood Hospital, funding for the projects, and insurance payouts was Steward's CEO, Dr. Ralph de la Torre, right?

A. Yes.

Q. Do you know if Mr. Crowley participated in the meeting that you and Mr. Polanowicz had to review this memo?

A. I do not.

Q. Okay. You can put that aside. We'll go on to Gendron Exhibit 25. It's Tab 34.

(Gendron Exhibit 25 marked.)

BY MS. PELUSO:

Q. This is STEWARD762546. And this begins at the top with an email from Mr. Polanowicz to yourself, Mr. Perla, Mr. Pierro, on July 9th, 2020, at 9:39 a.m.

Do you see that?

A. I do.

Q. And you wrote an email to

Page 232

Mr. Polanowicz, Mr. Perla, Mr. Pierro, copying John Doyle and Robert Guyon at 10:31 a.m. Do you see that?

A. I do.

Q. Who is Mr. Guyon?

A. Mr. Guyon is an advisor, Norwood resident/Norwood board member.

Q. Is he a Steward employee; do you know?

A. He was a former Steward executive that had to leave for health issues but was part of their finance and audit consulting group.

Q. Okay. In this email, you wrote, in part: As we have been discussing internally, we need to be cautious over the next four to six weeks of not publicizing the new build as it will deter and change the mindset of the insurance claim adjusters and ultimately cost us.

That's what you wrote, correct?

A. That's right.

Q. And you did not publicize the new build in July of 2020, correct?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. Well, I'm not sure this refers to a new build as a full replacement hospital.

Page 233

BY MS. PELUSO:

Q. Was there any publication that you're aware of at any time in 2020 that publicized a new build of any kind at Norwood Hospital?

A. I don't know.

Q. Okay. You can put that aside.

By November of 2020, Steward, potentially in conjunction with MPT, decided that the best plan forward was to raze Norwood Hospital and build a new hospital and parking structure on the Norwood Hospital campus, correct?

MR. LAUNER: Objection.

A. That is not correct.

BY MS. PELUSO:

Q. What's incorrect about it?

A. They had not made any decisions to do that and nor could they until they got agreement from Zurich that they would pay the sublimits to make that decision good forward.

Q. What is your basis to say that they could not make a decision until receiving the sublimit from Norwood -- from Zurich? What's --

A. My basis is that MPT's representative, Larry Portal, said: We will not move forward with any decisions regarding a new build until Zurich --

59 (Pages 230 - 233)

Page 234

we have some alignment with Zurich, which they did not have any at that time.

Q. When did Mr. Portal say that?

A. My recollection is leading up to the mid-December call with Brian Rushlau and Jimmy Johnson and the insurance commissioner.

Q. Were you on the call where Mr. Portal said that?

A. I was on the call when Mr. Portal or -- or myself -- I don't remember who did -- said that to Jimmy Johnson and Brian Rushlau.

Q. Did Mr. Portal make that representation internally to Steward, to MPT, or to CREF without insurance adjusters on the line, to your knowledge?

A. Mr. Portal -- I'm not sure Mr. Portal did. That might have been a discussion over his head.

Q. Did you have any conversations -- you, personally -- with anyone at MPT that aligns with the testimony you just provided without an insurance representative on the phone?

MR. LAUNER: Objection.

MR. SANDLER: Objection.

A. I don't recall.

BY MS. PELUSO:

Page 235

Q. So the only conversation you recall is Mr. Portal telling the insurance adjuster that they would not make a decision without receipt of the full sublimit on the MPT policy?

A. Well, I didn't -- no. They didn't say, We wouldn't make a decision.

They said, We would like to move forward with the redevelopment of the campus, but we need commitment from Zurich to pay the sublimits to move forward with that.

Q. And your testimony that the decision could not have been made, absent receipt of the sublimit from Zurich, is based on that conversation that you were present for where Mr. Portal relayed that to Zurich?

A. Well, my testimony is that was discussed at that, but the guidance from Dr. de la Torre to me was until him and MPT aligned on the insurance policies, they would not make a decision on the hospital.

Q. When did Dr. de la Torre say that to you?

A. Multiple times. I don't -- I don't recall the exact time, but as -- the fall of -- fall and spring of 2020 to 2021.

Page 236

Q. In the spring of 2021, Dr. de la Torre had that conversation with you?

A. That conversation -- those con- -- that conversation happened, in my recollection, several times from Q4 2020 throughout the beginning half of 2021.

Q. When is the first time that you recall having that conversation with Dr. de la Torre in Q4 of 2020?

A. I don't recall the exact timing.

Q. Do you recall where you were?

A. I don't.

Q. Do you recall where he was?

A. I do not.

Q. Do you recall if you were in person or by telephone?

A. I don't.

Q. Did you take any notes of that conversation?

A. I did not.

Q. And when is the last time that you recall having a conversation of that nature with Dr. de la Torre?

A. Probably around -- the last time I remember having a conversation with him is when --

Page 237

around the time that MPT formally notified Zurich around August of 2021.

Q. It's your testimony that no decision was made to replace Norwood Hospital prior to August of 2021?

A. I'm not aware of --

MR. LAUNER: Objection.

A. Yeah, it's my testimony that I'm not aware that MPT and Steward made a decision to do that.

BY MS. PELUSO:

Q. Prior to August of 2021?

A. Well, I don't know. I told you I don't know when they made that decision, so it's not my testimony that that was the decision date. It was just -- it was a rolling decision, but I don't know when they finalized it.

Q. What's the latest date in your mind that you think is when the decision was made?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. Yeah, I can't answer that.

BY MS. PELUSO:

Q. Was it in the first quarter of 2021?

MR. LAUNER: Objection.

60 (Pages 234 - 237)

Page 238

A.   I can't answer that.  I don't know.

BY MS. PELUSO:

Q.   Okay.  I'll show you what we'll mark as Gendron Exhibit 27 -- oh, 26, Gendron Exhibit 26.

MS. PELUSO:  This is Tab 42, and this is STEWARD94428.

(Gendron Exhibit 26 marked.)

MS. PELUSO:  Thank you.

BY MS. PELUSO:

Q.   You'll see there at the top there's an email from you to Mr. Harrison Bane dated November 21st, 2020, at 3:48 p.m.  Do you see that?

A.   I do.

Q.   And you said:  See attached deck from October 14th.  Do you see that?

A.   I do.

Q.   And this is in response to Mr. Bane asking you to please send him the Norwood deck that you reviewed, right?

A.   Yes.

Q.   We talked about Mr. Bane a little bit earlier this morning, but by November of 2020, what's your understanding of what his role is at Steward with regard to the Norwood claim?

A.   Harry Bane was the regional president of

Page 239

the New England Region with Norwood Hospital and -- being one of the nine hospitals that rolled up to him in that role.

Q.   Do you recall any conversations that you had with Mr. Bane about this PowerPoint presentation that's attached to your email on November 21st?

A.   Give me a second to review this one.  I haven't seen this one.

(Witness reviews document.)

A.   Sorry.  Go again.

BY MS. PELUSO:

Q.   Do you recall any conversations that you had with Mr. Bane about the slide deck that's attached to this November 21st email?

A.   I do not.

Q.   Do you know who created this Steward Health Care System Norwood Update Presentation?

A.   I do not.

Q.   Do you know if you created it?

A.   I wasn't really good at slide decks, so I would have to say that somebody facilitated this for me.

Q.   Okay.  And Mr. Bane requested that you send him the Norwood deck that we reviewed.

Page 240

Does that indicate to you that at some point in time prior to November 21st, 2020, you reviewed this Norwood Update deck with Mr. Bane?

A.   It tracks with what I would have reviewed with him relative to getting him up to speed on Norwood.

Q.   Okay.  And I'll direct your attention to the fifth slide of this document, and you'll see a slide titled "Insurance Projections."

A.   Yes.

Q.   And then there's a high case and a low case.

A.   That's correct.

Q.   And that relates to MPT's investment in the new -- I'm sorry, MPT's investment in Norwood Hospital depending on MPT's insurance recovery; is that right?

A.   Yes.

Q.   And in both of these scenarios, you anticipated reconstruction of campus to market size, right?

A.   Correct.

Q.   That's Option 4 from your August 5th memo to Dr. de la Torre?

A.   I'm not sure that that tracks to that

Page 241

memo.  You know, reconstruction is kind of a general term, so I'm -- I'm not sure that those four things -- specifically that Option 4 is that exact thing.

Q.   What does "to market size" mean?

A.   I don't know.  I don't recall.

Q.   Looking at Slide 7, just two slides in --

A.   Uh-huh.

Q.   -- do you see there's a slide there that has "Array" in the bottom right-hand corner?

A.   It does.

Q.   Did you engage Array Architects on Steward's behalf?

A.   Steve Van Ness engaged Array Architects immediately after the loss.

Q.   And the title of this is "Proposed New Hospital Site Section Diagrams."  Do you see that?

A.   Yes.

Q.   And it contains what looks to be a parking structure in the top left-hand side?

A.   That's correct.

Q.   And a hospital with six stories plus a basement?

A.   That's correct.

61 (Pages 238 - 241)

Page 242

Q. And then a separate central energy plant.

A. That's correct.

Q. To your knowledge, was this diagram created by Array provided to American Guarantee or Zurich in 2020 or in 2021?

A. I don't know.

Q. To your knowledge, was this diagram ever public -- published publicly at any time in 2020 or early 2021?

MR. LAUNER: Objection.

A. Not to my knowledge. We generally wouldn't publicize planning documents.

BY MS. PELUSO:

Q. Those are confidential internal documents?

A. Yeah. I mean, they're -- we wouldn't publish a proposal or planning documents to the public in general just because they weren't approved.

Q. And they're also marked "Privileged and Confidential," correct?

A. They are.

Q. I'll turn to Tab 43.

(Gendron Exhibit 27 marked.)

Page 243

BY MS. PELUSO:

Q. I'm handing to you what we'll mark Gendron Exhibit 27, STEWARD01362301.

A. Thank you.

Q. You'll see there's an email from Ms. Julie Lovelady, to a group of people, and you'll see you're the second to last person copied in the copy line.

A. Yep.

Q. And this relates to December 2020 board materials.

A. Correct.

Q. I'm going to ask you a couple of questions just about the recipients in this email. Does this appear to you to be, in the To line, members of the board at Steward Health?

A. For the top up here?

Q. Yeah. And maybe we can just go one at a time. JimKaram@firstbristol?

A. Yes.

Q. Do you understand he's the -- he was a board member --

A. Yes.

Q. -- at Steward Health Care? And that's the person that we discussed earlier who

Page 244

recommended NFA; is that right?

A. Correct.

Q. HerbertMcMaster@standford. Was he a Steward board member?

A. At my -- my recollection at this time, yes.

Q. John Boehner, was he a Steward board member?

A. Yes.

Q. Is that the same John Boehner, former speaker of the house?

A. It is.

Q. HerbHoltz@Steward, do you know if he was a Steward board member?

A. You skipped a couple there. Do you want those?

Q. Dr. Callum, I think we've discussed already. Dr. de la Torre we've discussed already. And then the next one is Herb Holtz.

A. Yeah, Dr. Callum's a -- a board member. Herb Holtz is -- I -- I don't know if Herb was formally on the board, or if he was there in a general counsel capacity. I don't know their full -- full board of director --

Q. Oh, okay.

Page 245

A. -- kind of structure. I just -- I know those first three were the independent board directors.

Q. I see. And then the others are either internal Steward or Steward and board members?

A. Yeah. And it appears that John Doyle and Laura Totorella were the CFO and the COO at the time, and then the rest are administrators or support personnel.

Q. Okay. Did you at any time have a board seat for Steward Health Care?

A. I did not.

Q. Dr. Octavio Diaz is listed here. Do you see him?

A. I do.

Q. And what was your understanding of his role, if any, related to Steward's Norwood claim in 2020 or 2021?

A. Dr. Diaz ended up becoming the chief medical officer of Steward corporate when -- in -- I wouldn't say replace, but took over Joe Weinstein's role as the CMO. So his role as the CMO would be -- I don't know how Steward organized their business, but in my mind was to manage the local CMOs and the physicians that reported up

62 (Pages 242 - 245)

Page 246

through those local CMOs, chief medical officers.

So he would -- he would have been involved in the medical operations capacity of Norwood specifically.

Q. In your involvement in working on Steward's behalf at Norwood Hospital between June of 2020 and, say, end of 2022, did you interact often with Dr. Diaz?

A. I personally did not.

Q. According to the third page of this exhibit, you'll see a board meeting agenda?

A. Okay.

Q. And it appears that you provided an update to the Steward board at that board meeting.

A. Yeah. I'm not -- I'm not sure. I haven't seen the -- the minutes, but I'm not sure if we did the full update or not.

Q. Okay.

A. My recollection is I would prepare presentations like this, and then I would just say not necessary, but I did provide this update to present to the board.

Q. And the update is included on the next page at STEWARD ending 330. There's a Norwood Hospital board meeting presentation?

Page 247

A. Yeah. Give me a second to look through this; but yes --

Q. Okay.

A. -- is the first answer. Yes.

Q. And is this a presentation that you or individuals at your direction at CREF prepared for the Norwood update at the board meeting?

A. Yes.

Q. Okay. I'll direct your attention to Slide 4 of this deck, which ends Bates No. 33.

A. Yes.

Q. And this is titled: Claim Submission MPT and Steward, December 4th. Do you see that?

A. Yup.

Q. And if you look, it has a bullet at the bottom that said: Steward policy BI/contents, time element portion, is driven by a 36-month duration. Do you see that?

A. I do.

Q. Do you know where that 36-month duration came from?

A. My recollection in assembling this information is I got direction from NFA or Marsh to project out what the durations of the policy were at the time, but that -- that's my recollection.

Page 248

Q. So your understanding is that the 36 months was driven by policy language?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. That's -- that's my very limited recollection, but I don't recall fully.

BY MS. PELUSO:

Q. Okay. And then looking at the fifth slide, there are rebuild projections. Fixed Asset MPT is the title. Do you see that?

A. Yes.

Q. And you wrote: The goal is maximize claim to rebuild market size facility, 130 plus or minus beds, right?

A. Yes.

Q. Meaning maximize -- when you wrote "maximize claim," is that maximize MPT and Steward's recovery under their respective insurance policies?

MR. LAUNER: Objection.

A. Appears so.

BY MS. PELUSO:

Q. And the -- I don't know if it's a footnote or a numbered 2 at the bottom of this slide: Specifically noted that market size

Page 249

includes reduction of services, behavioral, et cetera, right?

A. That's what it says, yes.

Q. And then if we look at the last page of this, there's a document called Long-Term Planning.

A. Correct.

Q. And then if you look in faint language at the bottom of that image, it says: Illustrative site plan, right?

A. That's correct.

Q. And that shows a -- a hospital building, a parking structure, correct?

A. That's correct.

Q. And a garden in the front and on the side.

And then do you know what CEP stands for?

A. I think that's Central Energy Plant. For some reason, they decided to switch the U with the E.

Q. Okay. That's all I have for that.

Were you involved in putting together the statement of loss that was submitted to the insurance companies for Steward and MPT in December of 2020?

63 (Pages 246 - 249)

Page 250

A. Involved.

Q. What role, if any, did you have in compiling information or authoring any of the submissions to either Zurich or American Guarantee in December of 2020 as part of the proof of claim or statement of loss?

A. I don't recall having a significant role besides reading it.

Q. Okay. Were you involved in any of the financial analysis that was conducted to determine what to seek for the business interruption claim for Steward?

A. I mean, I was involved in the sense that I was on email communications. But besides coordinating and putting Robby in touch with the right people at Steward's finance and operations team, I don't recall being part of any of that financial background of the claim, if you will.

Q. Okay.

MS. PELUSO: Tab 72.

(Gendron Exhibit 28 marked.)

BY MS. PELUSO:

Q. We'll mark as Gendron Exhibit 28 STEWARD00124417 -- I'm sorry, 72. I'm looking at the wrong one. I'm in the wrong place. I'll

Page 251

strike that. That was the wrong citation.

Okay. Gendron Exhibit 28 is document STEWARD00460052. And this is what appears to be an email that begins with a header from John Doyle to Jacob Frumkin on October 6th of 2020. But then the preceding email is from you to Mr. Lombardo on October 5th, 2020, at 4:04 p.m.

Do you see that?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Thank you. Who is Patrick Lombardo?

A. Patrick Lombardo was the head of HR. At this time, I believe he took over supply chain as well. I say that because during the COVID crisis, certain executives had different additional roles is my recollection.

Q. Head of HR for Steward?

A. Correct.

Q. And the Subject line here is: Updated BI file and proposed agenda. Do you see that?

A. I do.

Q. There's a proposed agenda below here. Do you think this is an agenda you created?

A. No.

Page 252

Q. Who do you think created that?

A. I most likely flipped this from Robby Grider to them, is how I almost always did the BI communications.

Q. Okay. Understanding your role was, in part, coordination?

A. Yeah.

Q. Did you have any firsthand knowledge of any of the nine items on this proposed agenda?

A. I got to read through this. I -- I -- I --

Q. Yeah, that's a big question. So please take your time.

A. Please.

(Witness reviews document.)

A. Okay. Sorry. Ask your question again.

BY MS. PELUSO:

Q. I'd like to ask you about any of these items if you have personal knowledge of what any of them mean. I'm not sure we can do it one at a time. But did you -- do you have any memory of a discussion on the overall explanation of business interruption calculations and methodology?

A. I don't.

Q. Do you have any memory or personal

Page 253

information regarding high level walk-through of the claim schedules?

A. I do not.

Q. Do you have any knowledge or personal information regarding a discussion regarding the impact of continuing operations at Norwood?

A. The only thing I remember about number 3, and this goes to number 4, is Mr. Lombardo asking for updates on the ongoing furloughs, warn notices, and other HR-related components of the situation, just given it had been three or four months since this. So I -- I answered that for number 3 and 4, but I kind of jumped ahead of you there. I'm sorry.

Q. No, that's okay. When you reference "furloughs," do you know what employees were impacted by furloughs from Steward?

A. I -- I use the word "furlough" from my own experience, but I don't know if there were -- like if there was layoffs, if there was furloughs. I -- there being the COVID crisis, I don't know how Norwood fit into that. I was not involved in how it was construed.

Q. Do you know what categories of employees would have been impacted by it regardless of

64 (Pages 250 - 253)

Page 254

whether it was a furlough or a termination?

A. I don't. As I look at this agenda, all I recall is the shuffle game of moving physicians, employees, and any other FTEs around to different open positions relative to transfers and other items that were being discussed about Norwood at the time, but I -- I was kind of lost on these things, to be honest with you. It was not my realm.

Q. The shuffle of physicians and other FTEs, what are you referring to?

A. There is a certain amount of medical staff that works at the acute care hospitals. Without Norwood being operational at the time, there was a lot of discussions between the medical officer and Lombardo and others about do they go to Good Sam, do they go to St. Elizabeth's. I just remember those discussions happening, but I don't know much about it.

Q. Okay. And the medical director at that point was Dr. Diaz?

A. I don't recall if Dr. Weinstein was still there as a -- as the national, but there was a transition at some period between '20 and '21.

Q. The -- Number 6, impact of corporate and

Page 255

SMG allocations, do you know what that refers to?

A. I do not.

Q. Do you know what "SMG allocations" are?

A. My understanding --

MR. LAUNER: Objection. Go ahead.

THE WITNESS: I'm sorry.

A. My understanding is that Steward Medical Group, SMG, had certain physician subsidies and -- and allocations in their budgets, but that's all I know.

BY MS. PELUSO:

Q. Okay. Do you know -- do you know if the arrangement with SMG was contractual?

A. I do not.

MR. LAUNER: Objection.

BY MS. PELUSO:

Q. Do you have any information about how physicians were compensated by Steward Health, in particular, at Norwood Hospital?

A. I do not.

Q. Okay.

MR. LAUNER: And objection.

Sorry, I was late.

BY MS. PELUSO:

Q. And I think you've answered this now,

Page 256

but I just want to make sure: Do you have any knowledge or information of the impact of corporate and SMG allocations on the business interruption calculation or methodology?

MR. LAUNER: Objection.

A. Not to my recollection.

BY MS. PELUSO:

Q. Okay. Line Item 7 here is: How will the business interruption loss analysis change or evolve over time? Is that something that you have any firsthand information about or any discussions you recall having related to that topic?

A. No, I don't recall.

Q. Okay.

MR. SANDLER: Can we take a break --

MS. PELUSO: Yeah.

MR. SANDLER: -- if you're going on after --

MS. PELUSO: We can take a break now.

VIDEOGRAPHER: We're off the record at 4:25 p.m. This is the end of File Number 5.

(Recess held.)

VIDEOGRAPHER: We're back on the record at 4:51 p.m. This is the beginning of File Number 7.

Page 257

BY MS. PELUSO:

Q. I'm going to direct your attention to a new exhibit.

MS. PELUSO: We'll mark Gendron Exhibit 29, Tab 60.

(Gendron Exhibit 29 marked.)

MS. PELUSO: I'll represent for the record the Bates number doesn't appear on our printed version, which I think is how it printed; but it's STEWARD01540928.

BY MS. PELUSO:

Q. This appears to be a document entitled "Project Details Project Schedule"?

A. Boy.

Q. It's a little hard to read.

A. I've got good eyes. Give me a sec. I think I do still.

MR. SANDLER: Is there any indication as to when this was created?

MS. PELUSO: Yeah. I can give you the cover, but my questions for the witness will be pretty limited, so let's just do this first.

BY MS. PELUSO:

Q. The project name on this document is: Norwood Post Flood and Storm As-Was In Code

65 (Pages 254 - 257)

Page 258

Compliant Restoration.

Mr. Gendron, have you ever seen this chart before today?

MR. LAUNER: Objection.

A. I have to study this for a second.

BY MS. PELUSO:

Q. Sure.

MR. LAUNER: Until we know the date, I'm just going to put a standing objection on the record because I think this could be from any time.

MS. PELUSO: Fair enough. We can move to a different document and find the date of this one and come back.

Is that okay with you, Jaylen?

MR. MINEFIELD: (No audible answer.)

THE WITNESS: So --

MS. PELUSO: So we'll put that --

THE WITNESS: -- are we tabling --

MS. PELUSO: -- aside.

THE WITNESS: -- this for a second? Okay.

MS. PELUSO: Yes. We'll move on to Gendron Exhibit 30, Tab 49.

(Gendron Exhibit 30 marked.)

MS. PELUSO: And this is STEWARD933926.

Page 259

BY MS. PELUSO:

Q. And this is the February 5th, 2021, submission from Steward to Zurich, American Guarantee, titled: On behalf of John M. Doyle, Steward Norwood Hospital. Do you see that?

A. I do.

Q. And Kelly Pink transmitted this on or about February 5th, 2021; is that correct?

A. Yes.

Q. Do you know who Kelly Pink is?

A. Kelly Pink was an executive administrator for John Doyle.

Q. Did you have any involvement in preparing the February 5th, 2021, submission to American Guarantee on Steward's behalf?

A. Do you mind if I read this real quick just to --

Q. I don't.

A. -- glance at it?

(Witness reviews document.)

A. Okay. Sorry. Can we start again?

BY MS. PELUSO:

Q. Yes, of course.

Did you have any involvement in preparing the February 5th, 2021, submission from

Page 260

Steward to American Guarantee?

A. When you say "you," are you speaking about me personally or CREF?

BY MS. PELUSO:

Q. I am. I'm speaking about you personally.

A. My recollection is simply reviewing it prior to be submitting, but not being part of the construction of it.

Q. Okay. Did you author any portion of the February 5th, 2021, letter that begins at STEWARD Bates label ending 29?

A. My recollection was that this was authored under the advice of counsel at this time of the loss.

Q. Okay.

A. I don't --

Q. Did -- did any -- putting aside conversations with counsel, to your knowledge, did anyone from CREF author any parts of this submission?

A. I do not recall who actually authored it.

Q. Okay. The Sworn Statement and Proof of Loss Interim, as titled at the second page of this

Page 261

document, is signed by John Doyle. Do you see that?

A. I do.

Q. Do you see that, in the bold print above Mr. Doyle's signature, there is a sentence that says: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading information concerning any fact material thereto commits a fraudulent insurance act?

Do you see that?

A. I do.

Q. Have you ever had -- other than with counsel, have you ever had any conversations with John Doyle or with anyone at Steward about this language in the Interim Proof of Loss?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. No.

BY MS. PELUSO:

Q. Were you aware that, in 2020, the insurance policies from both American Guarantee and Zurich had a policy -- had a provision in the

66 (Pages 258 - 261)

Page 262

policy that said the policy is void if the insured at any time intentionally conceals or misrepresents a material fact?

A. Yes.

MR. SANDLER: Objection.

MR. LAUNER: Objection.

BY MS. PELUSO:

Q. Were you aware of that policy provision is the question.

Did you know in 2020 that the policies contained a provision that said that the policy is void if the insured at any time intentionally conceals or misrepresents a material fact?

MR. SANDLER: Objection.

A. Yeah, I'm not sure it ever came up in any of the discussions, no.

BY MS. PELUSO:

Q. Okay. Did you ever have any discussions with anyone at Steward, CREF, or MPT regarding provisions that could void the policy if material information was concealed or withheld from the insurance companies?

MR. LAUNER: Objection.

A. If there was any discussions, it would have been under the advice of counsel.

Page 263

BY MS. PELUSO:

Q. Okay. The third page of the record contains a Claim Summary. Did you, personally, have any involvement in putting together the chart that's entitled "Claim Summary, Steward Health Care"?

A. I did not.

Q. Do you know the details of how any of these figures were calculated?

A. Well, the -- how they were calculated relative to the remediation cleanup and building component as well as some of the business personal property was managed by NFA, so I don't -- how they constructed it, I don't know.

Q. Okay.

A. The time element losses were constructed by Robby Grider.

Q. Did you provide any instruction to Robby Grider as to how to calculate the time element losses or what data to consider?

MR. LAUNER: Objection.

A. I don't recall all of the communications with Robby Grider. There may have been some email back and forth about people asking questions and me forwarding it, but I don't remember.

Page 264

BY MS. PELUSO:

Q. Did you provide -- did you provide any assumptions or data points that Mr. Grider was or was to not include in the time element loss calculation?

MR. LAUNER: Objection.

A. I don't recall.

BY MS. PELUSO:

Q. Do you know who Marsh received their instructions from in terms of how to calculate or what to consider when calculating the time element losses?

MR. LAUNER: Objection.

A. I think we answered that question earlier.

My recollection is Lisa Martin, John Doyle, and the finance team.

BY MS. PELUSO:

Q. Okay. Thank you. And I apologize if you answered that before.

A. No, that's fine. I just wanted to say it out loud.

MS. PELUSO: We'll mark as Gendron Exhibit 31, Tab -- a document, STEWARD00833972.

(Gendron Exhibit 31 marked.)

Page 265

BY MS. PELUSO:

Q. Mr. Gendron, this is an April 25th, 2021, email from Roxanne Rocco at the Centers For Medicare and Medicaid Services. Do you see that?

A. I do.

Q. And you're copied on this correspondence?

A. I am.

Q. Did you have any involvement in direct communications with CMS regarding Norwood Hospital on Steward's behalf?

A. I was involved in three to four conference calls that they had set up, to answer that. I don't believe I gave much input on the calls from my recollection. Dr. Weinstein and then Harry Bane did most of the discussions.

Q. Okay. I'll direct your attention to the last page of this document, and the attachment here is titled "Norwood Hospital Regulatory Update On Mitigation, Damage Assessment, and Hospital Strategic Planning Initiatives" dated March 24th, 2021. Do you see that?

A. No. Sorry. Can you lead me to it? What page is that?

Q. Yes, on the third page of the exhibit,

67 (Pages 262 - 265)

Page 266

the first page of the attachment.

A. Oh, yes.

Q. Ends, for the record, at Bates No. 74. You see that Norwood Hospital Regulatory Update On Mitigation, Damage Assessment, and Hospital Strategic Planning Initiatives, March 24th, 2021?

A. I do.

Q. Did you author any portion of this regulatory update to CMS as best as you can recall?

A. I did not recall -- I do not recall authoring this document.

Q. But this appears to be a true and accurate copy of the submission that was made to CMS on Steward's behalf in correspondence that you were copied on, correct?

A. Yeah, I'd have to read the email thread. Give me a second.

Q. Sure.

(Witness reviews document.)

A. Yeah, my recollection was this is authored by Andrew Levine from Summit Health Law Partners who managed CMS on behalf of Steward.

BY MS. PELUSO:

Q. Okay. Did you review this submission that was made to CMS before it was submitted by

Page 267

Steward's lawyer to CMS in March of 2021?

A. I do not recall.

Q. And now I'll direct your attention to the last page of this submission.

A. Uh-huh.

Q. Under "Regulatory Analysis and Conclusions," do you see that heading?

A. I do.

Q. Steward, through its lawyer, represented to CMS that, quote: It is readily apparent that the buildings cannot be reasonably repaired or restored to safe and consistently reliable operations.

Do you see that?

A. I do.

Q. And Steward went on to say: As a result, the hospital has launched a strategic initiative for the design of a replacement hospital at the site and for the submission of a determination of need with DPH for approval to build a replacement hospital, right?

A. Yes.

Q. And that was in March of 2021.

A. That's correct.

Q. Are you aware that Steward hired

Page 268

consultants to work on designs for a replacement hospital in 2020?

A. I am.

Q. And to conduct a feasibility study for Norwood Hospital for a replacement hospital in 2020?

A. Yes.

Q. I'll also direct your attention to Exhibit Gendron 32, Tab 52.

(Gendron Exhibit 32 marked.)

BY MS. PELUSO:

Q. Before I show you the exhibit, Mr. Gendron, did you have any conversations that you can recall with anyone at Steward or at MPT or at CREF about the decision not to tell American Guarantee or Zurich what was told to CMS in March of 2021?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. I don't recall.

BY MS. PELUSO:

Q. Is it possible you did have those conversations and you don't recall them?

MR. LAUNER: Objection.

MR. SANDLER: Objection.

Page 269

A. I don't know.

BY MS. PELUSO:

Q. Okay. Gendron Exhibit 32 is STEWARD00835601. And this is another email from Mr. Levine to CMS copying you and others on April 15th of 2021. Do you see that?

A. Yes.

Q. Harrison Bane is also included on this email?

A. Yes.

Q. And Ms. Hibble, an internal lawyer at Steward, right?

A. Yes.

Q. No one from MPT is included on this email, correct?

A. That is correct.

Q. And on April 15th of 2021, Steward informed CMS that the hospital building at Norwood cannot be renovated but rather a new structure is required, right?

A. Yes.

Q. And Mr. Levine, on Steward's behalf, ended his email, in part, by saying: We look forward to working with you throughout the process for building of the replacement hospital, right?

68 (Pages 266 - 269)

Page 270

A.   Yes.

Q.   Mr. Gendron, you attended a May 11th, 2021, meeting between the consultants hired by MPT and Steward and the insurance companies, right?

A.   What was the date of that meeting?

Q.   May 11th, 2021.

A.   What was the meeting?  Sorry.

Q.   I'll show you an exhibit, Tab 77.  Mark this Gendron Exhibit 33.

(Gendron Exhibit 33 marked.)

BY MS. PELUSO:

Q.   And this is a long PowerPoint presentation beginning STEWARD1059011.  And do you see this is a presentation dated May 11th, 2021?

A.   Yes.

Q.   And do you see the first slide, it states:  Opening statement by Mr. Portal at Medical Properties Trust?

A.   Yes.

Q.   And then the second slide is dated [sic] Opening Statement Robert Gendron?

A.   Yes.

Q.   Do you recall this meeting on May 11th, 2021?

A.   Is this the mediation meeting?

Page 271

Q.   I don't know how you would classify it.  I think it was an adjustment meeting that involved many consultants on both sides from the insurance company as well as Steward and MPT.

A.   Oh, This is -- this is the alignment meeting that we held jointly at the hotel.

Q.   I don't know where it was located.

A.   I remember it a little bit, yeah.

Q.   Okay.  And did you or did anyone at CREF at your direction compile this PowerPoint presentation, which includes summaries of various work conducted by Steward consultants related to their assessments of Norwood Hospital?

A.   I'm going to need to review this briefly.  Sorry.

Q.   Sure.  Of course.

(Witness reviews document.)

A.   Can you ask me that question again now?

BY MS. PELUSO:

Q.   Do you know who prepared this PowerPoint presentation?

A.   I do not.

Q.   Do you recall reviewing it prior to the May 11th, 2021, meeting?

MR. SANDLER:  Objection.

Page 272

A.   I recall -- I recall there being this presentation, but I don't -- I don't recall reviewing the substance of it.

BY MS. PELUSO:

Q.   You recall there being this presentation at the meeting on May 11th, is that what you're saying?

A.   Yes.

Q.   Okay.  And I'll direct your attention to page 9, slide number 9, ending with STEWARD Bates label 20.  Do you know who authored this slide, Requirements For Hospital Construction?

A.   I do not.

Q.   Do you have any reason to believe it would have been CREF or Steward?

MR. SANDLER:  Objection.

A.   I don't, whether it was NFA, CREF, or Steward.

BY MS. PELUSO:

Q.   Okay.  And the last bullet here reads:  Once we know the full scope and cost of the damages, we can determine our path forward and develop the most cost-effective, detailed plan to restore Norwood Hospital to its preloss condition and capacity as expeditiously as possible, right?

Page 273

A.   That's correct.

Q.   Do you recall having any discussions with anyone at Steward or at MPT or at NFA prior to May 11th, 2021 about the decision not to disclose the plans to build a replacement hospital at Norwood Hospital?

MR. SANDLER:  Objection.

MR. LAUNER:  Objection.

A.   No.

BY MS. PELUSO:

Q.   Do you recall that you gave an opening statement on Steward's behalf as indicated at slide 2?

A.   I do.

Q.   And did you create a script prior to giving the presentation?

A.   I did.

Q.   Have you reviewed that prior to your deposition today?

A.   I don't recall.  I remember seeing a couple, but I don't know if it was from that meeting.

Q.   Okay.

MS. PELUSO:  Get Tab 78.  And this is STEWARD01225898.  And then we'll mark this Gendron

69 (Pages 270 - 273)

Page 274

Exhibit 34.

(Gendron Exhibit 34 marked.)

BY MS. PELUSO:

Q.   And, Mr. Gendron, I'll represent to you that the metadata from this document indicates that it was created on or about May 10th of 2021 and saved by you and titled R Gendron Opening Statement Version 4.

A.   Okay.

MR. LAUNER:  I'll just put on the record, because I know for a fact, there is a parent email that says the exact same thing that goes with this document.

MS. PELUSO: Okay.  Good.

BY MS. PELUSO:

Q.   Is this a true and correct copy of the script that you prepared prior to the May 11th, 2021, meeting?

A.   I have to read it again.

(Witness reviews document.)

A.   Go back to the question now.

BY MS. PELUSO:

Q.   Is this a true and correct copy of the script that you prepared for your opening statement for the May 11th, 2021, --

Page 275

A.   It appears to be so.

MR. LAUNER:  Objection.

MS. PELUSO:  That's all I have on that document.

We'll mark Gendron Exhibit 35, Tab 80.

(Gendron Exhibit 35 marked.)

BY MS. PELUSO:

Q.   This is STEWARD1006718, and this is Norwood Hospital board of directors meeting minutes from February 23rd of 2021.  Do you see that?

A.   I do.

Q.   And do you see in the middle of the page, there's a heading that says Norwood Hospital Real Estate Update?

A.   Yes.

Q.   And then it lists Mr. Bane and yourself?

A.   Yes.

Q.   And then do you see your name at the bottom of the page?

A.   Yes.

Q.   And the minutes indicate a statement from you that there is a commitment of MPT, the building owner, to fund this themselves and figure out the insurance issues later.  Do you see that?

A.   Yes.

Page 276

Q.   And that's what you represented to the board, at least in summary, on or about February 23rd of 2021?

A.   We represented that they had agreed to fund the design efforts to the board at that point, Harry Bane and I.

Q.   MPT ultimately agreed to fund hundreds of millions of dollars for the Norwood reconstruction efforts prior to resolution of the insurance issues, correct?

MR. LAUNER:  Objection.

A.   Yes.

BY MS. PELUSO:

Q.   Are you aware, for example, that on or about December 1st of 2022, MPT agreed to fund to Steward $250 million to be incurred during calendar year 2023 for the Norwood Hospital project?

MR. LAUNER:  Objection.

A.   Yes.

BY MS. PELUSO:

Q.   Did -- we discussed earlier the way that Steward would receive capital from MPT for projects.

Did that structure apply similarly to the $250 million, meaning did Steward receive the

Page 277

money directly from MPT?

MR. LAUNER:  Objection.

A.   Ask the question one more time.

BY MS. PELUSO:

Q.   Did CREF have any role in managing the $250 million from MPT to Steward for the Norwood Hospital replacement hospital?

MR. LAUNER:  Objection.

A.   The $250 million, as I remember from 2022, was a commitment letter.  They agreed to fund the architectural, engineering, and design efforts as an interim step to keep the ball moving, but the -- I'm not sure what the exact number was that they funded, but they funded that similarly to other capital projects, to answer the first question.

BY MS. PELUSO:

Q.   Okay.  And then the December 2022 arrangement was a promissory note; is that fair?

MR. LAUNER:  Objection.

BY MS. PELUSO:

Q.   Let's take a look at it.

MS. PELUSO:  Can you look at Tab 56?

We'll mark this Gendron Exhibit 36.

(Gendron Exhibit 36 marked.)

70 (Pages 274 - 277)

Page 278

MR. LAUNER: Ever?

MS. PELUSO: Yeah, I'll withdraw the question. I'll rephrase.

BY MS. PELUSO:

Q. I'm handing you Gendron Exhibit 36. This is Bates labeled STEWARD884004.

I'll give you a second to review that.

A. Was there any email communications with this one?

Q. No. I'm just going to ask you about this particular document dated December 1st, 2022, and I'll direct your attention to the last page, Exhibit A.

And really, my only question is: Is this your understanding of the summary of terms for the project funding for the new property or project at Norwood Hospital between MPT and Steward?

MR. LAUNER: Objection.

A. I'm going to have to read this in a little more detail.

(Witness reviews document.)

A. Okay. Sorry. Go ahead.

BY MS. PELUSO:

Q. Are you familiar with this document?

A. Somewhat. I recall it a little bit.

Page 279

Q. Does Exhibit A, to your knowledge, at STEWARD009 contain the summary of terms for the project funding between MPT and Steward?

MR. LAUNER: Objection.

A. My recollection is that this is the initial terms they came to an agreement on the funding.

BY MS. PELUSO:

Q. Did you have any involvement in negotiating any of those terms?

A. Involvement by creating project budgets that probably substantiated the $250 million ask; but, no, I did not negotiate this directly with MPT.

Q. And the budgets would have been prepared by CREF related to the construction efforts; is that fair?

A. CREF would have provided a total project cost document as part of a feasibility study.

Q. Okay. And this is signed by -- at page 4 by Christopher Dunleavy?

A. Correct.

Q. By this point, was he the chief financial officer for Steward?

A. He was.

Page 280

Q. Did he replace Mr. Doyle?

A. He did.

Q. And did he remain the chief financial officer through September of 2024, as far as you know?

A. My recollection is that he left at the end of 2023, but I don't know the exact timing.

Q. Okay. To your knowledge, did Steward receive any funding from MPT for construction of a new hospital at the Norwood campus at any point prior to May of 2024?

A. Yes.

Q. Do you know approximately how much money?

A. I don't recall the exact numbers, no.

Q. Do you know if it was plus or minus a hundred million dollars?

A. I don't know if I can answer that accurately, but it was significant amount. I remember it being more than 50, but I don't remember the exact number.

Q. Okay. And did CREF have any involvement in tracking the expenditures of that money?

A. Yes.

Q. What was CREF's role?

Page 281

A. CREF was the owner's project manager of the project.

Q. And is it fair to say Steward received the money, though, from MPT?

A. Yes. The funding would go from MPT direct to Steward.

Q. Okay. Okay. I think we're done with that document, so you can put that aside.

I have just a couple of questions that are more vocabulary than anything.

A. Okay.

Q. We've seen correspondence beginning no later than 2022 that CREF was involved in tracking cash flow and project capital for Steward.

Does that sound right to you?

A. Say that one more time.

Q. Was CREF involved in tracking cash flow and project capital for Steward?

A. CREF was involved with tracking capital project cash flow, so cash flows relative to the capital budget that was approved and then reconciliation, but I just want to make sure I delineate the cash flows just relative to the project disbursements.

Q. That's helpful.

71 (Pages 278 - 281)

Page 282

So to the extent that CREF is tracking cash flow for Steward, it's relative to particular project capital?

A. That's correct.

Q. Was CREF doing any tracking for Steward as an enterprise related to Steward's month-to-month cash flow generally outside of project capital?

A. Not to my knowledge.

Q. Okay. We've seen some documents called -- that reference a "hot list." Do you know what that is?

A. Hot list. My recollection of the hot list was vendors that Kenyon was managing.

Q. And do you know why they were referred -- why those vendors or those invoices were referred to as a "hot list"?

A. I don't.

Q. With regard to CREF's role with Steward, do you know what straw-man reports were?

A. That does not ring a bell to me.

Q. Okay. At one point, it appears that you may have asked Mr. Dunleavy for retrospective and prospective information on rent payments to MPT.

Do you recall that?

Page 283

A. I don't recall asking Mr. Dunleavy for that.

Q. Do you know -- do you have any reason to know why, in 2022, CREF would have asked for retrospective and prospective information on rent payments to MPT?

MR. SANDLER: Objection.

MR. LAUNER: Objection.

A. I don't recall.

BY MS. PELUSO:

Q. Were you involved in weekly meetings with the FP&A group at Steward in 2022?

A. FP&A standing for Financial Planning and Analysis?

Q. I believe so.

A. I don't believe I was participating in weekly meetings with FP&A.

Q. Did you have any interaction with financial planning and analytics within Steward in 2022 -- in 2022?

A. Yeah. We would work with them hand in hand relative to managing budgets for Steward as part of our role.

Q. Managing budgets for particular capital projects?

Page 284

A. In operational budgets. So we provided facility management oversight through Scott Kenyon, Tom Grise and our regulatory and facilities team where they would work hand in hand with FP&A to manage the budgeting process for the local hospitals.

MS. PELUSO: Mark this Gendron Exhibit 37.

(Gendron Exhibit 37 marked.)

MS. PELUSO: And this is STEWARD179172.

And can I also have the attachment?

Thanks.

Do we only have these -- we only have two -- three copies, so I'm going to ask you two to share this just for this questioning.

BY MS. PELUSO:

Q. This is an email from Mr. Davis to you dated February 19th, 2022. Do you see that?

A. I do.

Q. And here is one of the times where he says: The straw-man files currently represent stopping work on all projects that we can.

Do you see that?

A. I do.

Q. Do you have any recollection of what

Page 285

that's about?

A. I don't, but let me read this.

MR. LAUNER: Two separate exhibits.

MS. PELUSO: I'm marking them separately.

A. Ask the question again, please.

BY MS. PELUSO:

Q. Mr. Davis refers to straw-man files. He says: The straw-man files currently represent stopping work on all projects that we can.

Do you see that?

A. I do.

Q. Do you -- does that refresh your memory of what straw-man files --

A. It does a little bit.

So when Mr. Dunleavy came onboard as the CFO, he wanted to get a full understanding of all the capital projects that were in process. Scott Davis, at the time, oversaw all of the budgets that rolled up for the Steward account under Capital Program Management, and he was working with Chris Dunleavy's team on reconciling an update for Mr. Dunleavy, who was new to the position is my recollection.

Q. And the reference to stop work or

72 (Pages 282 - 285)

Page 286

"stopping work on all projects that we can" --

A.   Uh-huh.

Q.   -- did you have an understanding by February of '22 that Steward was experiencing cash flow troubles in paying their vendors?

MR. LAUNER:  Objection.

MR. SANDLER:  Objection.

A.   I recall -- I recall more so Mr. Dunleavy trying to get his head wrapped around funding sources, and '22, I don't believe -- I don't remember this being kind of a stop all work versus he wanted to validate the business plans that he was inheriting on all the projects, but that was my recollection just from reading this.

BY MS. PELUSO:

Q.   Do you have any recollection independent from reading this about Steward's ability to pay vendors for ongoing projects, not at Norwood but at other projects?

A.   You know, having been a vendor of theirs for 12 years, there were certain times where their accounts receivable had grown from terms 60 to 90 to 120 to 50.  So it was a little bit of the status quo in some regard on how they managed payments over time.  I don't remember this being that

Page 287

situation though.

(Gendron Exhibit 38 marked.)

BY MS. PELUSO:

Q.   I'm going to hand you what we've marked Gendron Exhibit 38.

A.   Okay.

Q.   And I'll represent to you this email that we just looked at says:  The word file is attempting to get a rough summary of the MPT exception projects.  Do you see that?

A.   Sorry.  Where is that in here?

Q.   In the email from Mr. Davis at the second to last line of the first paragraph beginning "the word file."  He wrote:  The word file is attempting to get a rough summary of the MPT --

A.   Yes.

Q.   -- exception projects.  I'll represent to you that Gendron Exhibit 38 is a copy of that word file that was attached to Mr. Davis's email.

A.   Okay.

Q.   This document is titled "MPT Exception Projects."  Do you know what that means, what an MPT Exception Project is?

A.   We tracked MPT projects--we being

Page 288

CREF--for Steward on different terms, so MPT Exception Projects, in that reference, was generally associated with having a separate approval from a previously approved deferred capital budget, the 200 million that we went over earlier, so exception project essentially meant that this was a funded project that was presented to MPT for exception funding.

Q.   I see.  And if you look through this Word document, it contains over a dozen MPT exception projects and then a status for those projects.  Do you see that?

A.   I do.

Q.   And for some of those projects, for example on the second page, the RRMC EP Lab?

A.   Yeah.

Q.   It says:  Next steps, halt design of project and reassess in December of 2022, right?

A.   I see that.

Q.   And then Norwood Hospital Replacement Hospital, is it your understanding that Norwood Hospital is a reference to Norwood Hospital?

A.   Yes.

Q.   And it also says:  Halt design of project and reassess in December of 2022?

Page 289

A.   I see that, yes.

Q.   And the RRMC EP Lab, do you know what that is?

A.   Rockland [sic] Regional Medical Center Electrophysiology Lab.

Q.   Do you know where that is physically located?

A.   Rockledge, Florida.

Q.   And SLMC BHU Expansion, do you see that?

A.   I do.

Q.   And it also says:  Next steps halt design of project and reassess in December of 2022?

A.   Correct.

Q.   Was SLMC BHU Expansion?

A.   Salt Lake Medical Center Behavioral Health Unit Expansion.

Q.   And that's in Salt Lake City, Utah, I --

A.   Correct.

Q.   -- presume?  And then SLMC Tempe.

A.   I apologize.  That's not Salt Lake.  It has the same acronym, so I'm confusing myself because I saw the one below it.  I believe it's St. Luke's Medical Center, which is in Phoenix, Arizona.

Q.   Okay.  And then the next one is SLMC

73 (Pages 286 - 289)

Page 290

Tempe?

A. Tempe was a separate facility on the St. -- I want to say -- I want to say this right, St. Luke's Medical Center license, but it was a separate facility, correct.

Q. And the next steps there are: Do not proceed with design?

A. Correct.

Q. And then the next one is SLMC Tempe IR Suite Replacement?

A. Yes.

Q. And that is also a project related to that St. Luke's Medical Center in Tempe?

A. Correct.

Q. And the next steps are also: Halt design of project and reassess in December of 2022, correct?

A. That's correct.

Q. And SAH ORs, do you know what that refers to?

A. Yes.

Q. What is that?

A. St. Anne's Hospital ORs.

Q. Where was St. Anne's Hospital?

A. Fall River, Massachusetts.

Page 291

Q. And then SJMC ED projects, do you know what that stands for?

A. St. Joseph's Medical Center in Houston, Texas.

Q. Okay. I have no further questions about that exhibit.

MS. PELUSO: Do you want these?

MR. LAUNER: You don't need them?

(Discussion held outside the hearing of the reporter.)

BY MS. PELUSO:

Q. Can you hand me your stack of marked exhibits? I want to show you one we reviewed before, and I don't want to call it by the wrong number. Thank you very much.

A. Welcome.

MS. PELUSO: Do you know which one it is?

MR. LAUNER: I think so.

MS. PELUSO: You're correct.

BY MS. PELUSO:

Q. I'm going to hand you back Gendron Exhibit 13 which we've looked at previously, and I'll direct your attention again to the portion that you authored that begins at STEWARD00192411,

Page 292

the letter that begins "To whom it may concern."

A. Correct.

Q. And I'm going to direct your attention to the sentence that follows the first full paragraph under Norwood MPT Insurance Reimbursements. You wrote: Steward made rent payments from June 2020 through end of October 2022, all of which were covered by MPT's rent loss insurance. So MPT just recently reimbursed Steward for those payments and associated facility costs per the master lease clause below.

Do you see that?

A. I do.

Q. And if you look at the bottom of the page, you'll see some calculations there for base rent and facility expenses paid to MPT since loss of facility.

Do you see that?

A. I do.

Q. Do you know how much money MPT reimbursed to Steward for rent payments that were made by Steward from June of 2020 through the end of October 2022?

MR. LAUNER: Objection.

Page 293

A. I don't recollect, but I'm happy to read through this and see if I can...

(Witness reviews document.)

A. Can you ask me the question again?

BY MS. PELUSO:

Q. Do you know how much money MPT reimbursed to Steward for rent payments that Steward made from June 2020 through the end of October 2022?

MR. LAUNER: Objection.

A. I don't know the exact number relative to the rent and reimbursements. My recollection was that there was no agreement on whether that was going to be allocated to the funding or added to the lease base, which was an open item at the time and still remained open relative to how the existing lease base and all of the interim payments that were made in '22, but I don't know exact number that they received.

BY MS. PELUSO:

Q. Do you have an estimate of whether it was more or less than $20 million?

A. You know, all I can say is what I wrote and they agreed to reimburse approximately $32 million. I just don't know if I ever saw a

74 (Pages 290 - 293)

Page 294

reconciliation of that.

Q.   Okay.  The statement that Steward's rent payments were covered by MPT's rent loss insurance, what was that based on?

A.   That was based on guidance from NFA in managing their policy and advising us on the policies.

Q.   Do you know whether -- well, withdraw that question.  We can put that aside.

As part of the bankruptcy filing made by Steward Health Care System, the chief restructuring officer submitted that CREF was paid approximately $37 million in management fees by Steward from May of 2023 to May of 2024.  Does that sound accurate to you?

A.   Yes.

MS. PELUSO:  Tab 58.  Thank you.  Oh, yes.  I'll give these back to you.  39.

BY MS. PELUSO:

Q.   I'll show you what we'll mark as Gendron Exhibit 39.  This is a CREF document, CREF-Norwood_0002099.

(Gendron Exhibit 39 marked.)

BY MS. PELUSO:

Q.   And in bold at the top, it says:

Page 295

GenHoldCo LLC Ownership Timeline.  Do you see that?

A.   I do.

Q.   What is this document?

A.   This document is a timeline, from my recollection, was produced in response to a Zurich request.

Q.   And is it your understanding that's the reason that the document was created was to respond to the Zurich request, or was the document in existence and then provided in response to a Zurich request?  I just want to make sure I understand.

A.   I believe it was created specifically for that request.

Q.   Is it accurate?

A.   Is this accurate?  Yes.

Q.   And according to this, on December 31st of 2020, you owned a hundred percent of the issue and outstanding membership shares of CREF stock of CREF RES LLC, CREF CPM LLC, and CREF FPS and exchanged the CREF stock for 100 percent of the outstanding membership shares in GenHoldCo LLC, correct?

A.   That's correct.

Q.   And I think according to one of the contracts we looked at earlier, is it accurate that

Page 296

CREF FPS, CREF RES, and CREF CPM all became wholly-owned subsidiaries of GenHoldingCo?

A.   Yes.

Q.   On April 21st of 2021, Dr. de la Torre purchased a 40 percent outstanding membership interest in GenHoldCo?

A.   That's correct.

Q.   How much did he pay?

A.   $4 million.

Q.   Why did you sell him 40 percent of the membership interest in GenHoldCo on April 1st of 2021?

A.   We were planning on expanding the CREF model globally.  I recall Dr. de la Torre being one of the most hundred most influential people in healthcare, was highlighting the JPMorgan conference, and we thought that his investment would help scale our business internationally and with our technology.

Q.   And then on August 22nd of 2024, you and GenHoldCo LLC repurchased the entire 40 percent membership interest held by Ralph de la Torre, correct?

A.   That is correct.

Q.   And just to be clear, it says Robert

Page 297

Gendron and GenHoldCo LLC, and in August of 2024, you were the 100 percent owner of GenHoldCo LLC, correct?

A.   Sorry.  Say that one more time.  I didn't track that.

Q.   Of the 60 percent remaining outstanding membership interest in GenHoldCo, as of August 22nd, 2024, you owned that 60 percent interest.

A.   That's correct.

Q.   And so on August 22nd of 2024, you then were 100 -- you were the member who owned 100 percent of the membership interest again --

A.   That's correct.

Q.   -- in GenHoldCo.  How much did you pay to repurchase the 40 percent from Dr. de la Torre?

A.   8 million.

Q.   Why did you repurchase it from him for $8 million?

A.   It's safe to say that my thesis for the original investment did not play out as hoped, and the bankruptcy and the PR associated with it had negative adverse effects on our ability to grow CREF, and I approached him saying I wanted to buy my interest back.

75 (Pages 294 - 297)

Page 298

Q. You're aware that Steward filed for bankruptcy in May 2024?

A. I am.

Q. Do you know, of the $37 million that Steward paid CREF from May 2023 to May 2024, how much, if any, of that money was given to Dr. de la Torre as a 40 percent owner of Gen holding company?

A. Zero.

Q. Did he ever earn any money other than the repurchase price by nature of his ownership in GenHoldCo?

MR. SANDLER: Objection.

A. Dr. de la Torre did not receive any compensation -- any profit interest from his ownership period from -- from '21 to 2024.

BY MS. PELUSO:

Q. But he did make a 200 percent return on his investment when you repurchased the shares for $8 million, correct?

MR. SANDLER: Objection.

A. That is true.

BY MS. PELUSO:

Q. Are you aware that the bankruptcy trustee, who is the plaintiff in this case, has

Page 299

filed a lawsuit against Dr. de la Torre and Mark Rich and others?

A. I have read that.

Q. You've read the Second Amended Complaint filed against those individuals?

A. I have.

Q. And so you understand that the Trustee, Mark Kronfeld, brought a lawsuit seeking to address harm caused by Steward insiders, including at least $3.4 billion in avoidable transfers and damages? That's the allegation?

A. Yes.

Q. And you understand that Mark Kronfeld, the plaintiff in this case as well as in the case against Dr. de la Torre, alleges that Dr. de la Torre and others siphoned money from Steward for personal benefit and to the detriment of Steward's now creditors, correct?

A. I'm aware of that allegation.

Q. Do you know if your financial arrangement with Dr. de la Torre related to GenHoldingCo has ever been the subject of the -- of an investigation by Mark Kronfeld?

A. I do not.

MS. PELUSO: If we could take a

Page 300

five-minute break, I think I'm about done. I just want to look at my notes to make sure.

VIDEOGRAPHER: We're off the record at 5:53 p.m. This is the end of File Number 7.

(Recess held.)

VIDEOGRAPHER: We're back on the record at 6:14 p.m. This is the beginning of File Number 8.

MS. PELUSO: Mr. Gendron, the parties have some outstanding disputes related to production of documents, which may require us to seek to depose you a second time, and so we will reserve our right to hold open today's deposition. But with that, I have no further questions.

MR. SANDLER: I'll put on the record I'm not agreeing that Mr. Gendron will come back for another day of deposition. He's been here since 9:30 this morning. He has reserved prior days for this deposition, and Counsel decided to move forward today notwithstanding the pending discovery disputes between the parties.

So if you want to make the request, I'm sure you'll direct that to me later, but I just want to make the record clear that I'm not agreeing to that at this time.

Page 301

MS. PELUSO: Noted.

MR. LAUNER: On behalf of the plaintiff, we just have a few questions.

EXAMINATION

BY MR. LAUNER:

Q. Mr. Gendron, can you please take out Exhibit 30?

A. I can try. No, you're good. Okay.

Q. Do you recall earlier today Counsel was asking you questions about statements that were made in March and April to CMS? Do you recall those questions?

A. Yes.

Q. And you recall Counsel asked you questions about Exhibit 30, which is the February 5th letter from Mr. Doyle to Zurich?

A. I do.

Q. If you can turn your attention to the third page of that letter, it ends in Bates 3931.

A. Okay.

Q. And so, obviously, there's a number of companies listed at the top of the page, but can you just read the first full sentence of that paragraph beginning with "These building damage assessments"?

76 (Pages 298 - 301)

Page 302

A.   Yes.  "These building damage assessments reveal what any even limited fair investigation would reveal, that the property damage at Norwood Hospital is devastating and that it is readily apparent that the buildings cannot be reasonably repaired or restored to safe and consistently reliable operations but instead must be rebuilt."

Q.   Thank you.  And that was February of 2021, correct?

A.   That's correct.

Q.   Now, I'd like to turn your attention to Exhibit 34.

A.   I think I'm missing Number 34 somehow.

MR. SANDLER:  Do you want me to find it for you?

A.   Yes.

BY MR. LAUNER:

Q.   Do you recall Counsel asking you questions about this document?

A.   I do.

Q.   Your so-called "script" before the May 11th presentation?

A.   Correct.

Q.   Do you recall if you read from this script actually during the May 11th presentation?

Page 303

A.   I do recall having this script and reading from it.

Q.   If you can turn to the fourth page of the document that ends in Bates 5901.

A.   Yeah.

Q.   I'm going to direct your attention to the top of the page.  And the script states:  We know that Zurich thinks our proposed scope is all about Steward wanting a brand new hospital.  Absolutely not.  This is about Steward and MPT wanting a hospital that works like the one we had on June 27th, 2020, and will be safe for patient care.

Do you see that?

A.   Yes.

Q.   What did you mean by that?

A.   What I meant by that was we needed to get a hospital built that would be code compliant and have life safety systems in place that would pass the musters of all the AHJs.  That's my recollection.

Q.   Is there anything inconsistent in what you've stated here as to what Mr. Doyle stated in his letter to Zurich on February 5th, 2021?

MS. PELUSO:  Objection.

Page 304

A.   Can you ask that again?

BY MR. LAUNER:

Q.   Sure.  Is your statement here -- do you view it in any way inconsistent with Mr. Doyle's statement that he made in his February 5th letter to Zurich?

MS. PELUSO:  Objection.

A.   No.

BY MR. LAUNER:

Q.   Can I turn your attention to Exhibit 21, please?

A.   Okay.

Q.   Do you recall Counsel asking you some questions about this document earlier today?

A.   Give me a second, please.

Yes.

Q.   And there -- specifically I want to draw your attention to the email from you on June 30, 2020, at 8:55 p.m., and you were asked about this earlier.

The last sentence says:  Also, let's keep the potential plans at the ELT level to ensure we don't get ahead of the insurance process.

Do you see that?

A.   I do.

Page 305

Q.   What did you mean by that?

A.   I meant that we were evaluating a bunch of different scenarios, being only the second day after the loss, and that we needed to focus on the assessments in the mitigation process, as I kind of laid out in my 1, 2, 3 strategy, and it was just way too premature to be talking about any planning exercises.

Q.   Can I turn your attention to Exhibit 25, please?

A.   Yes.

Q.   You were asked earlier some questions about this email and particularly the one at the top that you sent to -- on July 9th at 10:31 a.m. that you sent to John Polanowicz, Mr. Perla, and Mr. Pierro.

Do you see that email?

A.   I do.

Q.   And you were asked to read a sentence in that email that says:  As we have been discussing internally, we need to be cautious over the next four to six weeks of not publicizing the new build as it will deter and change the mindset of the insurance claim adjusters and ultimately cost us.

Do you see that?

77 (Pages 302 - 305)

Page 306

A. I do.

Q. What did you mean by that?

A. My recollection was -- from this thread, we were being asked to build a freestanding ED or open a remote ED, and we did not really understand what the scope was of that yet, so we needed to stay focused on mitigating the claim going back to the 1, 2, 3 strategy is what I meant.

Q. Were you trying in any way to suggest that information be concealed or kept from the insurance companies?

MS. PELUSO: Objection.

A. No.

BY MR. LAUNER:

Q. Were you trying in any way to misrepresent any -- that information be misrepresented to the insurance companies?

MS. PELUSO: Objection.

A. No.

BY MR. LAUNER:

Q. And, again, July 9th is 11 days after the loss?

A. That's correct.

Q. At any time in your work on adjusting -- or not -- excuse me, not adjusting the claim but

Page 307

during the claim process, did anyone ever tell you to keep or conceal or misrepresent information to the insurance companies?

MS. PELUSO: Objection.

A. Not to my recollection.

BY MR. LAUNER:

Q. I think you said earlier that you hadn't read Defendant's amended answer in that -- in this case; is that correct?

A. Yeah. I don't recall reading that.

Q. Are you aware -- so I guess it would be fair to say that you're not aware through that amended answer that defendants have essentially implicated you in a scheme to conceal information from the insurance companies. Are you aware of that?

MS. PELUSO: Objection.

A. I am aware of what I was briefed by my Counsel on as the new affirmative defense.

MR. SANDLER: Okay.

THE WITNESS: Yeah.

MR. SANDLER: You can stop there.

BY MR. LAUNER:

Q. I don't want to know anything about your conversations --

Page 308

A. Yeah.

Q. -- with Counsel. I guess -- a yes-or-no question: Are you aware that you have been -- that the defendants have implicated you in such a scheme? Just a yes-or-no question.

A. Yes.

MS. PELUSO: Objection.

BY MR. LAUNER:

Q. Okay. Do you deny those allegations that you were part of a scheme to conceal information from the insurance companies?

MS. PELUSO: Objection.

A. Yes.

BY MR. LAUNER:

Q. Why do you deny those allegations?

MS. PELUSO: Objection.

A. Because it didn't happen and it's -- it's kind of insulting, but at the end of the day...

MR. LAUNER: I have no further questions.

MS. PELUSO: I have just a couple related to those questions, Mr. Gendron, but I'll be previous.

FURTHER EXAMINATION

Page 309

BY MS. PELUSO:

Q. Mr. Launer just showed you Exhibit 13 and directed you to some language that was used by Mr. Doyle in his submission to American Guarantee in February of 2021. Do you recall that question?

MR. LAUNER: I think you meant 34.

MS. PELUSO: I'm sorry. Exhibit 30 --

MR. LAUNER: You said --

MS. PELUSO: Exhibit 34?

MR. SANDLER: No.

MR. LAUNER: 30. Excuse me.

Well, you said 13. Sorry.

MS. PELUSO: Thank you.

BY MS. PELUSO:

Q. Exhibit 30. And he directed your attention to the sentence where the submission wrote that the property damage at Norwood Hospital is devastating and that it is readily apparent that the buildings cannot be reasonably repaired or restored to safe and consistently reliable operations and, instead, must be rebuilt, right?

A. That's correct.

Q. That's the sentence that Mr. Launer asked you about?

A. Yes.

78 (Pages 306 - 309)

Page 310

Q.   I'd like to direct your attention again to Exhibit 31, which is the March 24th, 2021, email from Mr. Levine to CMS.

Again, I'll direct your attention to the last page of that exhibit.  The second sentence of this submission to CMS in March of 2021 contains this language, correct:  It is readily apparent that the buildings cannot be reasonably repaired or restored to safe and consistently reliable operations, correct?

A.   Sorry.  You're going to have to point me to that one.

Q.   Sure.

A.   I lost --

Q.   In the fourth bullet point, the last page of the exhibit ending in Bates No. 976, the second sentence is:  It is readily apparent that the buildings cannot be reasonably repaired or restored to safe and consistently reliable operations.  Right?

A.   That's what it says, yes.

Q.   That is the same part of the first sentence of Mr. Doyle's February 2021 submission to American Guarantee, correct?

A.   That's correct.

Page 311

Q.   But to CMS, Steward said, quote:  As a result, the hospital has launched a strategic initiative for the design of a replacement hospital at the site and for the submission of a determination of need with DPH for approval to build a replacement hospital.  Correct?

A.   That's correct.

Q.   That is not what Mr. Doyle said to American Guarantee, correct?

A.   That is correct.

MS. PELUSO:  I don't have any further questions.

MR. LAUNER:  No more questions.

MR. SANDLER:  Before we go off the record, I realized I didn't have my mic on when I talked after -- did you get it on the record, my statement?

THE REPORTER:  (Nods head.)

MR. SANDLER:  Thank you.

THE REPORTER:  I nodded my head.  Yes.

(Laughter.)

VIDEOGRAPHER:  We're off the record at 6:29 p.m.  This is the end of File Number 8.

(Off video record.)

THE REPORTER:  Mr. Launer, do you need a

Page 312

copy of this transcript?

MR. LAUNER:  Yes, PDF is fine, both condensed version.  I believe we don't need -- we can have it early next week.

THE REPORTER:  Mr. Sandler, do you need a copy of this transcript?

MR. SANDLER:  Yes, please.

(Gendron recessed sine die at 6:29 p.m.)

Page 313

ACKNOWLEDGMENT

I, ROBERT GENDRON, hereby acknowledge that I have read the transcript of my testimony taken under oath in my deposition on 7th day of April, 2026; that the transcript is a true, complete and correct record of my testimony; and that the answers on the record as given by me are true and correct.

_____

ROBERT GENDRON

Signed and subscribed to before me this _____ day of _____, 2026

_____

Notary Public

79 (Pages 310 - 313)

Page 314

REPORTER'S CERTIFICATION

I, DANIEL J. SKUR, CSR and Notary Public in and for the State of Texas, hereby certify that the witness was duly sworn and that this transcript is a true record of the testimony given by the witness;

That pursuant to Rule 30 of the Federal Rules of Civil Procedure, signature of the witness was not reserved by the witness or other party before the conclusion of the deposition;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to by me this day, the 8th day of April, 2026.

Daniel J. Skur, CSR
Notary Public, State of Texas
My Commission Expires 7/7/2026
Veritext Legal Solutions
Texas Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, TX 76102
800-336-4000

Page 315

ERRATA SHEET FOR THE TRANSCRIPT OF:
ROBERT GENDRON
CASE NAME:
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
§
Mark Kronfeld, as Trustee   §
of the SHC Creditor          §
Litigation Trust,            §
Plaintiff,                   §
v.                           §  Civil Action No.
§
AMERICAN GUARANTEE AND       § 1:21-cv-11902 – PBS
LIABILITY INSURANCE          §
COMPANY and ZURICH           §
AMERICAN INSURANCE           §
COMPANY,                     §
Defendants.                  §

DEP DATE:  7th day of April, 2026

Pg. LN.  Now Reads    Should Read    Reason

___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____

_____
ROBERT GENDRON

Page 316

Erick M. Sandler, Esq.

emsandler@daypitney.com

April 8, 2026

RE: Kronfeld, Mark, Etc. v. American Guarantee And Liability

4/7/2026, Robert Gendron (#7963299)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

80 (Pages 314 - 316)

**[& - 13th]**                                                                         Page 1

| & | | | |
|---|---|---|---|
| **&**  2:4,11 10:24 10:25 12:19,22 13:12,18 43:10 43:12,12 111:4 128:20 129:6 | **0002203**  3:24<br>**0002204**  3:18 79:6<br>**0002209**  3:18<br>**00047512**  6:16<br>**00047761**  5:21<br>**001059195**  7:21 | **1**  2:11 3:2,12 7:8 9:14 21:14 21:16,19 68:2 94:12 110:8 199:15 224:18 305:6 306:8 | **112**  4:9<br>**116**  4:11<br>**11902**  1:6 9:22 315:8<br>**1196**  130:12,16<br>**1197**  134:9 |

**0**

**0000039**  4:10
**000039**  113:2
**0000686**  4:23 144:20
**0000687**  4:23
**0000688**  4:19 137:11
**0000689**  4:20
**0001192**  4:16 125:25
**0001214**  4:16
**0002099**  8:15 294:22
**0002100**  4:5 95:16
**0002121**  4:6
**0002126**  4:8 103:2
**0002164**  4:8
**0002178**  3:15 68:10
**0002183**  3:15
**0002190**  3:20 89:1
**0002197**  3:23 93:20

**00118520**  6:6
**00118674**  6:9
**00179175**  8:13
**00192412**  5:5
**00758544**  5:24
**00761495**  5:10
**00761535**  6:13
**00762547**  6:18
**00833976**  7:15
**00835604**  7:18
**00884009**  8:9
**00933933**  7:12
**0094436**  6:21
**01006719**  8:6
**01189211** 116:11
**01189212**  4:13
**01205208**  5:19
**01225902**  7:23
**01362335**  6:25
**01426068**  160:3
**01426071**  5:13
**02110**  2:5
**0302196**  3:21
**06103-1212** 2:18

**1,650,811.99.** 22:16
**10**  4:14 90:15 125:21,22 127:23 128:16 130:10 201:8
**10/22**  137:6
**10/6/2020**  7:4
**100**  18:15 295:20 297:2 297:12,12
**102**  4:7
**10:01**  209:8
**10:31**  232:2 305:14
**10:40**  68:2
**10:54**  68:5
**10th**  165:2,6 274:6
**11**  3:5 4:17 77:20 78:7 137:8,9 143:19 199:13 306:21
**11/20/2020** 5:16 6:22

**11:13**  195:17
**11:33**  96:15
**11:39**  96:18
**11:59**  99:19
**11th**  178:16 270:2,6,14,23 271:24 272:6 273:4 274:17 274:25 302:22 302:25
**12**  4:21 51:24 77:20 144:18 144:19 286:21
**12.01.2020**  6:24
**12/1/2022**  8:7
**120**  286:23
**123,000**  24:8
**125**  4:14
**12:23**  128:9
**13**  5:4 77:20 149:18,21 291:23 309:2 309:12
**130**  248:13
**137**  4:17
**13th**  103:6 108:1,13 109:3 109:17 110:24

**[14 - 2020]**

**14** 5:6 151:7,8
**14.2** 5:18 175:3
  175:16
**144** 4:21
**149** 5:4
**14th** 238:15
**15** 5:9 22:23
  51:24 90:15
  155:5,6
**150** 223:9
**151** 5:6
**155** 5:9
**15th** 139:14
  149:25 165:10
  269:6,17
**16** 5:11 56:18
  95:11 159:25
  160:4
**160** 5:11
**1600** 314:19
**167** 5:14
**16th** 167:25
  168:19
**17** 5:14 56:19
  61:15 98:7
  167:20,21
**171** 5:16
**178** 5:20
**18** 5:16 97:16
  169:18 170:25
  171:2 174:20
  196:25 200:25
**186** 5:22

**18th** 147:12
**19** 5:20 48:4
  178:4,6 179:6
  180:9,19
**192411** 150:4
**198** 6:4
**19th** 284:18
**1:21** 1:6 9:22
  315:8
**1:25** 128:12
**1st** 16:15 73:20
  88:25 89:8
  90:12 91:2
  95:18 99:8
  107:25 108:11
  109:13 276:15
  278:11 296:11

**2**

**2** 3:2,3,14
  59:10 68:6,9
  68:11 76:10
  77:25 80:12
  96:19 98:25
  99:22,23
  175:14 225:3
  226:7,16,23
  230:20 248:24
  273:13 305:6
  306:8
**2/19/2023** 8:10
**2/23/2021** 8:4
**2/5/2021** 7:9

**20** 5:22 65:16
  77:8 81:6
  112:10,17
  180:9 186:3,4
  254:24 272:11
  293:22
**200** 54:10 58:1
  140:6,8 141:19
  142:15 143:7,8
  143:16 288:5
  298:18
**2005** 44:3
**2006** 44:23
**2007** 44:23
**2008** 16:14
**2010** 53:7
**2011** 53:7
**2012** 54:6
  60:10,15,21
  61:1 201:24
**2013** 119:14
  195:24 196:3
  197:10
**2014** 61:5
  118:24 119:4
  119:14
**2015** 61:5
  196:24
**2016** 15:1,9,25
  16:5 44:17
  51:23 53:16,25
  54:6,21 56:9
  200:25

**2017** 61:20
  75:22 126:6,24
  133:24 134:6
  135:24 136:9
  136:22 137:4
**2018** 52:21
  56:15 61:6,13
  61:21 73:7,20
  77:16 78:14,17
  79:8 80:9,18
  83:21 84:16
  88:25 89:8,25
  90:12 91:2,8
  93:25 94:17,22
  106:17 114:23
  117:9 126:24
  139:15 141:18
  151:23
**2019** 78:15,18
  80:9 113:6,11
  115:6 146:10
**2020** 4:18,22
  6:19 17:8
  35:13 36:13,19
  37:13 38:7,21
  38:22 39:12
  45:23 48:8,14
  48:20 55:18
  59:6,17,21
  60:3 67:12,16
  80:10 86:4
  87:11 88:7
  98:15 99:12
  111:10,18,24

**[2020 - 21]**                                                                 Page 3

112:3,9,13
113:17 114:11
114:24 115:7
116:3,13,18
117:5,20
118:24 119:17
119:25 120:4
120:16,21
121:10 124:23
125:9,16 127:4
134:6 135:8,25
136:9 137:4,14
137:14 141:15
141:18 142:5
142:16 143:7
144:23 145:24
147:12,22
148:4 149:2
151:12,15,20
151:23 155:17
158:16 159:18
160:22 165:2,6
165:12 167:10
167:25 168:19
170:1 171:6,21
174:24 175:5
175:22 176:7
177:4,13,15
178:16 186:23
187:21 193:2
197:15 198:13
198:18 200:23
204:17,25
206:5,23

207:21 209:8
209:22 216:22
218:11 219:1,9
219:13,20
221:4 223:4
231:21 232:21
233:3,7 235:25
236:5,9 238:12
238:22 240:2
242:6,9 243:10
245:18 246:7
249:25 250:5
251:5,7 261:23
262:10 268:2,6
292:7,23 293:8
295:17 303:12
304:19
**2021**   7:13,16
16:15,18 17:8
40:2 42:25
45:7 46:14
48:2,5 50:10
50:18 80:10
87:12,15 88:7
95:18 98:16
99:8 101:3
106:22 107:25
108:11 109:13
163:19 235:25
236:1,6 237:2
237:5,12,24
242:6,10
245:18 259:2,8
259:14,25

260:11 265:3
265:22 266:6
267:1,23
268:17 269:6
269:17 270:3,6
270:14,24
271:24 273:4
274:6,18,25
275:10 276:3
296:4,12 302:9
303:24 309:5
310:2,6,23
**2022**   5:4 63:23
65:19,23 73:21
80:10,18 93:7
106:6,22 150:1
216:23 246:7
276:15 277:10
277:18 278:11
281:13 283:4
283:12,20,20
284:18 288:18
288:25 289:12
290:16 292:8
292:24 293:9
**2023**   22:24
29:20 103:6,24
105:18 106:3
107:19 108:1
108:14 109:3
109:17 110:24
171:15 192:10
192:20,23
194:11 276:17

280:7 294:14
298:5
**2024**   21:23
22:25 35:14,21
35:23 36:13,19
37:14 38:8
39:5,11 40:5
40:22 42:6
43:1 62:16
63:7 83:24
84:17 111:11
111:19 203:15
203:21 204:2,8
204:15 280:4
280:11 294:14
296:20 297:1,8
297:11 298:2,5
298:16
**2025**   30:2
**2026**   1:12,18
3:10 4:2 5:2
6:2 7:2 8:2 9:4
313:5,14
314:13 315:12
316:3
**2027**   99:20
**206**   6:7
**209**   6:10
**20th**   171:6
175:2 177:6
**21**   3:12 6:4
77:4 101:16
105:2 106:23
112:24 198:6,9

**[21 - 32]**                                                                                    Page 4

202:25 254:24 298:16 304:10
**2129** 103:14
**2149** 103:15
**218** 6:14
**2190** 92:18
**21st** 238:12 239:7,15 240:2 296:4
**22** 6:7 106:10 106:23 206:1,2 286:4,10 293:18
**2200** 2:12
**2206** 79:15
**2230** 1:23 9:25
**225** 2:17
**22nd** 21:22 116:13,18 118:24 296:20 297:8,11
**23** 6:10 105:25 106:10 171:15 209:1,2,23
**231** 6:17
**238** 6:19
**23rd** 275:10 276:3
**24** 6:14 62:22 186:5 218:3,6 219:23
**24-90366** 22:15
**242** 6:22

**24th** 265:21 266:6 310:2
**25** 6:17 59:19 231:16,17 305:9
**250** 7:4 276:16 276:25 277:6,9 279:12
**257** 7:7
**258** 7:9
**25th** 265:2
**26** 6:19 238:4,4 238:7
**264** 7:13
**268** 7:16
**27** 6:22 25:4 238:4 242:25 243:3
**270** 7:19
**274** 7:22
**275** 8:4
**277** 8:7
**27th** 79:8 83:21 84:16 93:25 94:17 303:12
**28** 7:4 23:20,25 99:12 250:21 250:23 251:2
**284** 8:10
**287** 8:12
**28th** 35:13 36:12,19 37:13 38:7,22 55:18 59:6 86:4 88:6

98:15 111:10 111:18,24 112:3,9,13 113:17 115:7 116:3 125:9,16 127:3 134:6 135:25 136:9 137:4 143:7 148:4 149:2 160:21 171:21 174:24 175:5 177:4,13,14
**29** 7:7 103:12 257:5,6 260:12
**294** 8:14
**29th** 186:23 187:21 195:18 196:11
**2:20** 174:1
**2:27** 196:12
**2:28** 174:4

**3**

**3** 3:6,16 73:10 73:17 79:1,3 80:3,17 92:9 92:19 93:4 94:6,10,12,15 96:19 99:1,14 99:22 128:9 154:17 199:19 211:21 226:5 226:20 227:3 227:15 229:24

253:8,13 305:6 306:8
**3.2** 210:16
**3.4** 299:10
**3/9/2020** 4:17 4:21
**30** 7:9 19:13 64:21 200:3 258:23,24 301:7,15 304:18 309:7 309:11,15 314:5 316:16
**300** 314:19
**301** 3:5
**309** 3:5
**30th** 198:13,18 203:1,15,21 204:2,8,15,17 205:21
**31** 7:13 206:1 264:24,25 310:2
**312-471-8701** 2:13
**312-471-8774** 2:13
**313** 3:6
**314** 3:7
**315** 3:8
**31st** 99:19 295:16
**32** 7:16 209:1 268:9,10 269:3

[32 - 7]                                                              Page 5

293:25
**323** 48:14
**33** 7:19 247:10
270:9,10
**330** 246:24
**34** 7:22 23:18
209:17 210:15
231:16 274:1,2
302:12,13
309:6,9
**35** 8:4 59:19
275:5,6
**36** 8:7 200:10
211:24 217:25
247:17,20
248:2 277:24
277:25 278:5
**37** 8:10 284:8,9
294:13 298:4
**38** 8:12 287:2,5
287:19
**39** 8:14 294:18
294:21,23
**3931** 301:19
**3:01** 197:24
**3:11** 198:2
**3:48** 238:12

**4**

**4** 3:7,19 22:6
88:20 89:2
92:10,13,17
93:10 94:15
97:25 99:15

128:13 131:10
132:10,11,16
229:19 240:23
241:3 247:10
253:8,13 274:8
279:21 296:9
**4/7/2026** 316:5
**40** 108:16
112:11,17
296:5,10,21
297:16 298:7
**40.2** 81:5
**41** 169:18
186:12
**42** 238:5
**43** 195:19
242:24
**44** 186:18
**45** 13:2
**47506** 218:9
**47508** 224:19
**48** 115:25
**49** 258:23
**4:04** 251:7
**4:25** 256:21
**4:51** 256:24
**4th** 247:13

**5**

**5** 3:8,22 93:16
93:17 97:25
98:22 127:22
130:11,14
174:5 256:21

**5/11/2021** 7:19
**50** 52:1 223:9
223:15 280:20
286:23
**52** 268:9
**56** 277:23
**57** 149:17
180:23
**571** 314:19
**58** 294:17
**5901** 303:4
**5:53** 300:4
**5th** 218:10
219:1,9,13,20
221:4 240:23
251:7 259:2,8
259:14,25
260:11 301:16
303:24 304:5

**6**

**6** 3:13 4:4
77:25 81:16
82:2 95:12,15
96:22 97:7,24
99:14 100:18
101:16 102:12
107:11,17,23
108:10 109:7
109:12 110:13
127:22 134:8
136:11 254:25
**6/30/2020** 6:4

**6/9/2020** 6:17
**60** 52:1 64:20
64:22 175:10
203:10 257:5
286:22 297:6,8
**600** 1:22 9:24
**600,000** 181:22
**6035** 52:25
**60603** 2:12
**61** 200:10
**617-227-5777**
2:5
**617-624-4748**
2:5
**6571** 314:16
**67** 79:2
**68** 3:14
**687** 146:7
**6:14** 300:7
**6:29** 1:18
311:23 312:8
**6th** 113:6,11
115:6 206:5,23
207:19 251:5

**7**

**7** 4:7 90:17
92:3,11 100:17
100:19,19
102:24,25
104:6 107:9,18
108:13,21,22
109:17 110:5,7
136:12 241:7

**[7 - acknowledgement]**                                           Page 6

256:8,25 300:4
**7/22/2020**  4:11
**7/29/2020**  5:22
**7/6/2020**  6:7
**7/7/2020**  5:6,9
  6:10
**7/7/2026**
  314:18
**70**  64:20,22
  125:23
**71**  144:17
**72**  250:20,24
**73**  206:25
**74**  178:5 266:3
**75201**  9:25
**76102**  314:20
**77**  270:8
**78**  273:24
**79**  3:16
**7963299**  316:5
**7:48**  206:7
  207:9
**7th**  1:12,17
  3:10 4:2 5:2
  6:2 7:2 8:2 9:3
  126:6 133:24
  151:12,20
  155:17 158:16
  209:7,22 313:4
  315:12

**8**

**8**  4:9 112:23,25
  115:14 297:17

297:19 298:20
  300:8 311:23
  316:3
**8/16/2020**  5:14
**8/5/2020**  6:14
**80**  76:2 275:5
**800-336-4000**
  314:20
**86**  116:7
**860-275-0138**
  2:18
**860-881-2459**
  2:18
**89**  3:19
**8:15**  155:17
**8:18**  206:23
**8:28**  116:14
**8:35**  186:23
**8:55**  202:25
  304:19
**8th**  146:10
  159:18 210:8
  314:13

**9**

**9**  4:11 21:15
  116:8,10
  209:16,24
  210:14 272:10
  272:10
**90**  203:10
  286:22
**91**  23:12,16

**93**  3:22
**95**  4:4
**97**  217:18
**97.4**  216:21
  217:1,9,22
**976**  310:16
**9:30**  300:18
**9:38**  1:18 9:3
  11:6
**9:39**  231:22
**9:45**  156:20
  158:15
**9:58**  171:6
**9th**  137:13
  144:23 231:21
  305:14 306:21

**a**

**a.m.**  1:18 9:3
  11:6 68:2,5
  96:15,18
  116:14 171:6
  186:23 195:17
  209:8 231:22
  232:2 305:14
**abbie**  11:10
  160:10
**abigail**  2:10
  10:16
**ability**  12:8
  170:6,9 286:17
  297:23
**abort**  208:22

**above**  1:17
  133:17 210:16
  228:17 261:4
  316:6
**absent**  235:12
**absolute**  183:1
**absolutely**
  128:4,6 303:10
**access**  140:11
  169:12
**account**  34:20
  36:14 105:24
  106:3,6,11,17
  106:25 142:5
  285:20
**accountant**
  125:12
**accounting**
  83:1
**accounts**  33:24
  34:9,15 286:22
**accuracy**  316:9
**accurate**  23:17
  23:22 25:5
  48:10 113:9
  161:5 197:5
  266:13 294:14
  295:14,15,25
**accurately**
  280:19
**acknowledge**
  313:2
**acknowledge...**
  3:6

**[acknowledgment - agree]** Page 7

**acknowledg...** 313:1 316:12
**acquire** 105:4 105:12 120:19 121:7 191:4,19
**acquired** 75:21 76:4 91:15
**acquisition** 75:17 76:7 97:16 105:6
**acronym** 188:15 225:9 289:21
**act** 167:11 168:13 179:6 261:12
**acted** 82:25
**action** 1:5 10:7 37:1 314:9,11 315:7
**activate** 212:9
**active** 64:20,22
**actively** 161:12
**activities** 102:2 163:7,10 210:7
**activity** 121:13 121:24
**actual** 196:13 214:7,19 215:9 216:11
**actually** 23:12 25:1 27:3 70:22 84:12 96:10 101:20

129:24 147:15 260:22 302:25
**acute** 254:13
**add** 81:15 216:2
**added** 58:10 97:13 98:8 214:13 293:14
**addenda** 81:18 82:15
**addendum** 22:7 23:4 81:3 81:14 87:10
**addendums** 95:2
**addition** 42:16 93:11 94:24 96:3 135:22
**additional** 74:19 76:21,25 77:7,10,12 88:5 95:3 97:14,15 98:4 141:22 191:9 193:24 251:16
**additions** 124:17
**address** 48:14 52:24 117:2,6 117:12 299:8
**addressed** 48:14 150:8 179:11

**addresses** 117:11,16 187:15
**adequate** 226:1
**adjust** 96:12
**adjuster** 32:6 157:11,18,24 158:3,23 169:7 179:7 235:2
**adjusters** 223:14 227:4 232:17 234:14 305:24
**adjusting** 306:24,25
**adjustment** 271:2
**administer** 10:6 169:12
**administration** 51:11
**administrator** 137:19 259:12
**administrators** 245:8
**adult** 211:25
**adverse** 297:23
**advice** 174:9 227:3 260:14 262:25
**advise** 228:1
**advising** 229:11 294:6

**advisor** 232:6
**affect** 12:8 170:6,9 173:1
**affiliation** 47:14
**affiliations** 10:14
**affirmative** 307:19
**aforemention...** 139:22 152:4 191:8
**aftermath** 114:14
**agenda** 7:5 246:11 251:21 251:23,24 252:9 254:2
**agent** 100:8 167:11 168:13
**aggregate** 162:9
**aggregated** 164:20
**aglic** 26:23
**ago** 11:21 13:2 30:9 39:3 98:10 166:9 222:11
**agree** 9:12 149:8 167:9 203:19,23 214:4,16 215:6 216:8,17

**agreed** 54:22 57:2 226:6 276:4,7,15 277:10 293:24

**agreeing** 182:11 300:16 300:24

**agreement** 4:4 4:7 5:20 70:18 74:6,8,9 75:5 76:9 77:2,3,6 93:13 95:17,25 97:3,8 99:18 100:5,23 101:18 102:19 103:6 104:6 107:10,24 108:1,4,11,12 108:20,23 109:3,6,12,16 110:6,13 111:4 118:12,14 128:20,23 129:1,13,22 144:13 153:10 175:4,8 179:6 180:6,10 181:20 233:17 279:6 293:13

**agreements** 73:5 77:10 82:24,24 92:1 105:2,5 107:1 108:5 111:3

126:10 170:19 202:5

**ahead** 18:2 138:8 172:2 204:19 205:22 206:20 209:20 253:13 255:5 278:22 304:23

**ahjs** 303:20

**aka** 49:3

**alan** 132:7

**aldag** 155:14 155:15,21,25 156:11 158:15 159:12,17,21

**aligned** 235:18

**alignment** 157:3,8 161:8 234:1 271:5

**aligns** 234:19

**allegation** 299:11,19

**allegations** 26:8 308:9,15

**alleges** 299:15

**allocated** 57:18 293:14

**allocations** 185:17 255:1,3 255:9 256:3

**allotted** 316:19

**allow** 85:8 129:23 145:6 230:16

**allowing** 145:25 208:1

**aloud** 172:5

**alyson** 84:8

**ambulatory** 192:15

**amended** 4:4 27:9,13 95:16 98:22,25 107:23 108:10 109:6 110:12 299:4 307:8,13

**amendment** 3:16,22 79:7 80:16 93:19,22

**amendments** 97:14,19,20,23 98:1

**america** 201:17 201:20

**american** 1:7,8 2:8,8 9:18,19 26:23,24,25 27:4 216:20 217:1,10 229:6 242:5 250:4 259:3,15 260:1 261:24 268:15 309:4 310:24 311:9 315:8,10 316:4

**amherst** 44:1

**amount** 22:16 23:16 78:17

100:22 112:1,6 112:13 181:9 182:8 254:12 280:19

**amy** 2:21 167:24

**analyses** 125:7

**analysis** 125:11 184:24 185:18 215:1 223:8,11 223:13 250:10 256:9 267:6 283:14

**analytics** 283:19

**ancillary** 215:2

**andrew** 266:21

**andrews** 2:21

**andy** 187:4

**anne's** 290:23 290:24

**announced** 64:7 194:19

**announcement** 63:15

**annual** 59:15 59:18 73:14,19 76:16 94:11 101:7

**answer** 12:8 13:10 15:15 19:5,21,23 27:13,14 28:10 28:14 34:1,24

41:6,17,25
43:15,20 55:6
58:6 71:20
83:10 86:12
88:1 90:10
98:19 105:23
107:21 108:15
119:20 122:15
129:16 161:18
163:21 215:6
215:17,23,24
216:3,6 220:3
220:16,19
237:22 238:1
247:4 258:15
265:13 277:15
280:18 307:8
307:13
**answered**
102:8 215:13
215:14,18
216:14 253:12
255:25 264:14
264:20
**answering**
174:8
**answers** 174:9
313:7
**anticipated**
147:10 228:17
240:20
**anytime** 194:5
**apart** 107:10

**apeluso** 2:13
**apologize**
264:19 289:20
**apparent**
267:10 302:5
309:18 310:7
310:17
**apparently**
162:14
**appear** 113:21
153:23 180:20
226:18 243:15
257:8
**appearance**
10:11
**appearances**
3:2 10:13
**appeared**
123:25 205:18
**appears** 69:13
79:7,18,20
92:5 113:4
119:12 132:14
137:12 139:23
143:23 145:14
150:7 178:18
218:17 226:16
245:6 246:13
248:21 251:3
257:12 266:12
275:1 282:22
**applicable**
66:22 316:8

**application**
261:8
**apply** 276:24
**appreciating**
144:11
**approached**
297:24
**appropriate**
123:24 208:2
**approval** 85:19
139:12,17
141:3 146:9
147:2 212:25
267:20 288:4
311:5
**approvals**
124:17 169:2
**approved**
85:16,17 140:1
147:3 192:22
242:20 281:21
288:4
**approving**
182:10
**approximately**
13:2 16:14
22:23 23:18,20
23:25 39:23
42:2,6,18,25
45:7 51:21
60:2 65:19,20
77:14 90:12,15
111:11,21,25
117:6 137:20

140:2 141:19
143:8,16
163:16 171:13
201:24 216:21
280:13 293:24
294:12
**approximates**
29:22
**approximation**
112:5
**april** 1:12,18
3:10 4:2 5:2
6:2 7:2,16 8:2
9:3 22:25 88:7
95:18 98:16
99:8 101:3,3
107:25 108:11
109:13 146:10
265:2 269:6,17
296:4,11
301:11 313:5
314:13 315:12
316:3
**arc** 44:18
**architect** 187:5
**architects**
241:13,15
**architectural**
70:25 277:11
**area** 70:24
132:15,22
218:15,21
**areas** 52:3
133:3,3 145:23

**arising** 88:8 99:12 107:1 108:24 110:25

**arizona** 289:24

**arms** 113:21

**arrangement** 55:22 57:2,7 57:16 102:1 197:3 255:13 277:19 299:21

**arrangements** 101:2

**array** 164:1 241:11,13,15 242:5

**art** 225:14

**arthur** 152:11 152:20

**asap** 6:15 218:11

**asb** 192:16,23

**aside** 112:19 151:5 231:15 233:6 258:19 260:18 281:8 294:9

**asked** 41:5 56:15 57:20 64:3 66:10 69:3 71:22 81:10,13 87:25 98:5,10 101:22 105:5 106:1 154:18 158:2

164:22 168:23 188:19,25 210:10 215:12 215:14,24 216:13 282:23 283:4 301:14 304:19 305:12 305:19 306:4 309:24

**asking** 111:8 139:18 154:20 157:10 166:12 189:10 193:22 238:18 253:9 263:24 283:1 301:10 302:18 304:13

**aspect** 72:8

**asphalt** 133:3

**assemble** 85:5

**assembled** 222:6

**assembling** 247:22

**assembly** 222:4

**assert** 13:7

**asserting** 41:5

**asserts** 22:14

**assess** 164:4

**assessed** 143:5

**assessment** 265:20 266:5

**assessments** 132:8 191:11

271:13 301:25 302:1 305:5

**asset** 55:20 101:18 151:17 213:14 222:9 227:16 248:9

**assets** 76:4 101:23 102:1 127:20 150:13 170:14

**assigned** 81:21 84:3 132:25 133:6

**assistance** 183:13

**assistant** 82:2 84:3

**assisted** 222:5

**associated** 42:20 76:4 135:16 136:19 222:20 223:1 288:3 292:11 297:22

**association** 100:6

**assume** 49:10 132:2 174:15 217:24 219:25

**assuming** 224:24 226:1

**assumption** 50:9 131:24 132:4,6

**assumptions** 264:3

**asylum** 2:17

**athena** 61:11

**attached** 33:1 150:2 209:10 218:16 238:14 239:6,15 287:20 316:11

**attachment** 171:20,24 172:11 174:20 174:21 265:18 266:1 284:11

**attachments** 149:23

**attempting** 25:18 287:9,15

**attend** 43:24

**attended** 270:2

**attention** 93:15 112:22 116:12 123:15,21 127:21 138:9 149:22 150:2 155:13 168:3 171:19 177:11 188:1 198:21 240:7 247:9 257:2 265:17 267:3 268:8 272:9 278:12 291:24 292:3 301:18 302:11

303:6 304:10 304:18 305:9 309:16 310:1,4

**attorney** 10:15 41:13 215:24 314:10 316:13

**attorneys** 13:18 314:9

**attribute** 133:14

**audible** 258:15

**audience** 231:5

**audio** 9:11

**audit** 150:9 232:11

**august** 14:6 21:22 79:8 83:21 84:16 93:25 94:17,22 165:2,6,12 167:9,25 168:19 169:25 171:21 174:24 175:5 177:6,13 178:16 218:10 219:1,9,13,20 221:4 223:4 237:2,4,12 240:23 296:20 297:1,8,11

**author** 222:1,3 260:10,20 266:8

**authored** 260:14,22 266:21 272:11 291:25

**authoring** 250:3 266:11

**authorities** 180:2

**authority** 100:13 140:24 141:1 167:10 168:13 169:3,6 169:7 180:4,14 184:13

**authorization** 3:14,17,19,22 68:15 69:3,4 76:17 78:8 79:8 80:16 81:15 88:10,21 93:10,20,23 99:25 100:24

**authorizations** 87:18 91:7 97:11 101:7 102:19

**authorized** 10:6

**available** 21:22 29:5 48:25 195:9 200:11 214:6,19 215:9 216:11 316:6

**avoidable** 299:10

**aware** 23:11,15 24:15,22 27:1 54:21,25 57:3 88:6 99:5,9 119:16,23 120:1,2,18 125:7,11,15 134:4 197:13 208:22 213:24 216:20 220:13 229:5,10 233:3 237:6,9 261:23 262:8 267:25 276:14 298:1 298:24 299:19 307:11,12,15 307:18 308:3

**b**

**b** 49:17

**back** 23:2 35:21 36:1 55:3 56:1 61:5 61:9,13 68:4 77:18 85:24 88:14 96:17 114:25 119:20 128:11 130:9 143:18 154:6 159:17,19 166:14 174:3 184:12 185:11

198:1,15 256:23 258:13 263:24 274:21 291:22 294:18 297:25 300:6 300:16 306:7

**background** 250:18

**backup** 36:2

**bad** 26:20 83:17

**baker** 189:9,12 189:13,24

**balance** 22:22 142:15

**ball** 277:12

**ballast** 135:4

**ballasted** 134:21,25 135:1,7

**bane** 39:19,21 40:5,12,18 41:2 42:2,25 43:6 238:11,17 238:21,25 239:5,14,24 240:3 265:16 269:8 275:16 276:6

**bane's** 39:20

**bankruptcy** 20:13,20 21:1 21:8,12,20 23:12 25:2,7

**[bankruptcy - best]** Page 12

25:11,17 32:14
63:1,5,7,16
64:7,23 65:2
66:12,16 84:16
294:10 297:22
298:2,24
**base** 101:17
292:16 293:15
293:17
**based** 43:15
48:23 74:5,8
101:18,18,23
102:1 124:14
131:21 143:23
182:8 213:5,10
213:12,14
221:3 223:3
226:5 235:13
294:4,5
**basement**
228:13 241:24
**basis** 22:10
85:19 212:18
229:17 233:20
233:23
**bates** 3:14,17
3:20,23 4:5,7
4:10,12,15,19
4:22 5:5,8,10
5:12,15,19,21
5:23 6:6,9,12
6:15,18,20,24
7:6,11,14,17,20
7:22 8:5,8,11

8:13,15 68:9
79:14 88:25
92:18 93:20
95:15 103:1,13
113:1 116:11
125:24 127:14
130:12,16
134:9 146:7
149:23 150:3
160:1 180:23
195:19 206:4
206:25 210:15
218:9 247:10
257:8 260:12
266:3 272:10
278:6 301:19
303:4 310:16
**becoming**
108:5 245:19
**bed** 193:15
225:16
**beds** 101:19
193:13,16,21
194:10,12,17
200:3,9,10
211:24 248:14
**began** 11:20
54:4 83:20
**beginning**
10:14 14:6
53:7 68:5
73:20 92:18
96:18 109:3
128:12 150:12

174:4 206:6
236:5 256:24
270:13 281:12
287:14 300:7
301:24
**begins** 100:18
150:5 168:7
171:4 186:10
198:11 218:8
231:19 251:4
260:11 291:25
292:1
**behalf** 7:10
10:17,19,24
11:1 19:1 20:5
21:1 32:6 41:4
79:21 87:3
92:25 100:15
103:16,20
109:8 129:5
132:8 153:24
168:25 170:14
179:13,23
184:24 191:20
241:14 246:6
259:4,15
265:11 266:14
266:22 269:22
273:12 301:2
**behavioral**
211:20 249:1
289:15
**believe** 16:15
19:12 26:14

43:3,7 75:21
75:23 94:23
97:18,22 105:8
106:21 112:1
139:8 148:9
152:22 155:16
156:4,4 161:1
161:8 180:11
184:20 201:11
208:21 213:4
214:22,25
215:20 216:6
218:3 251:14
265:14 272:14
283:15,16
286:10 289:22
295:12 312:3
**believed** 121:11
**believing**
121:23
**bell** 282:21
**bellow** 45:12
**beneficial**
192:1
**beneficiaries**
19:2 20:6,11
**benefit** 299:17
**best** 75:19
110:16 111:11
111:24 112:14
113:10 117:23
151:20 158:1
167:4 201:15
221:8 233:9

[best - building]                                        Page 13

266:9

**better** 88:2
199:16 230:19

**bhu** 289:9,14

**bi** 7:5 167:8
182:25 183:18
183:20 184:6
184:16 247:16
251:21 252:3

**bifurcated**
110:20

**big** 180:9
193:17 252:12

**bigger** 210:16

**biggest** 59:7,9
59:21,24,25
64:19

**bill** 129:23
130:2

**billing** 82:10
129:21

**billion** 299:10

**biomedical**
98:6

**bit** 42:11 85:25
101:21 149:15
161:16 178:8
238:21 271:8
278:25 285:15
286:23

**bless** 217:16

**blocks** 135:16

**board** 6:23 8:4
159:2,9 232:7

243:10,16,22
244:4,7,14,20
244:22,24
245:2,5,10
246:11,14,14
246:22,25
247:7 275:9
276:2,5

**bob** 199:10

**boehner** 244:7
244:10

**boi** 191:23
192:1,17,18,25
193:3

**bold** 261:4
294:25

**boss** 156:3

**boston** 2:5
31:10 52:8,13
52:17 192:2,4
192:11

**bottom** 69:7
92:4 100:18
103:13 116:13
130:15 139:10
150:4 155:18
180:20 206:24
209:17 241:11
247:16 248:24
249:8 275:19
292:15

**bought** 45:20
45:21 47:20,20
47:24 98:7

**box** 163:8
185:9

**boy** 257:14

**boylston** 54:12

**bp** 193:7 195:6
195:7

**br** 164:1

**brackets** 182:3
182:7

**branches** 162:5

**brand** 303:9

**break** 67:21,24
127:25 128:15
130:12 197:22
256:15,19
300:1

**breakdown**
73:19

**breaking** 73:20

**brian** 234:5,11

**brick** 145:5

**briefed** 307:18

**briefly** 271:15

**bring** 74:18
75:8 157:10

**bringing** 158:2

**bristol** 159:4

**broad** 149:12
168:22

**broken** 93:6

**brokerage**
51:11

**brooks** 84:8,9
84:17 85:13

**brothers** 121:4

**brought** 39:21
56:14 123:13
123:20 180:17
299:8

**bucket** 165:16

**budget** 72:22
138:3 188:21
281:21 288:5

**budgeting**
284:5

**budgets** 224:16
255:9 279:11
279:15 283:22
283:24 284:1
285:19

**build** 53:11
212:8 214:8,13
225:6 227:2
228:14 232:15
232:20,25
233:4,10,25
267:21 273:5
305:22 306:4
311:6

**building** 118:4
120:20 135:19
136:13,16,17
136:20,23
137:2 138:10
138:13 143:21
144:2 192:15
199:16 200:14
200:17,19

**[building - care's]**                                                    Page 14

201:3 208:23
228:2,3,6,8,11
249:11 263:11
269:18,25
275:23 301:24
302:1
**buildings**  135:6
135:11,14,17
135:19 136:8
145:5,8 146:2
201:25 202:2
202:14 267:11
302:5 309:19
310:8,18
**built**  303:18
**bullet**  190:15
190:25 199:15
211:8 228:21
247:15 272:20
310:15
**bunch**  305:2
**business**  51:12
67:10 72:22
74:18,22
104:25 152:22
163:4 181:4,17
181:19 185:10
185:16 192:23
195:11 245:24
250:11 252:22
256:3,9 263:12
286:12 296:18
**buy**  121:5
226:2,5 297:24

**buying**  75:16

**c**

**c**  2:1 9:1 52:25
**calculate**
263:19 264:10
**calculated**
263:9,10
**calculating**
264:11
**calculation**
256:4 264:5
**calculations**
252:23 292:16
**calendar**
276:16
**call**  29:1 52:10
95:22 148:5,21
193:19 210:2
234:5,7,9
291:14
**called**  14:22
16:8,10 44:14
121:4 130:23
136:3 148:10
148:15 166:8
192:16 200:19
249:5 282:11
302:21
**calls**  37:2 41:11
203:9 265:13
265:15
**callum**  116:24
205:3 244:17

**callum's**
117:20,21,22
244:20
**camera**  9:7
**campus**  122:7
123:2,3 135:11
138:6 143:17
144:25 188:21
189:1,3 190:12
192:14 194:11
194:18 195:24
196:3,20
197:11 223:22
224:9 233:11
235:8 240:20
280:10
**campuses**
193:4
**cancer**  201:12
**cancila**  2:11
**capabilities**
57:12 64:15
**capacity**  39:8
139:6 191:9
225:16 244:23
246:3 272:25
**cape**  53:11,15
53:20 54:4
**capital**  17:13
51:7 57:18,22
58:2,4 71:9,17
71:18,25 72:3
72:5,12 77:5
81:5,11 82:22

85:17,17,19
118:5,7 119:21
139:21 140:1,3
140:15,18,25
141:3,6,7,12,20
142:5,6,19,21
143:1,3,4,9
146:14 147:21
147:25 150:15
187:9 202:8
222:20 223:1
223:20,25
276:22 277:15
281:14,18,19
281:21 282:3,8
283:24 285:18
285:20 288:5
**caps**  225:8
**caption**  73:10
**care**  4:14 5:7
5:15 8:7 32:10
46:25 51:14,14
51:16 56:5,9
61:4,11 68:24
73:5 79:21
92:25 95:22
103:20,23
126:1 132:15
178:19 239:18
243:24 245:11
254:13 263:6
294:11 303:13
**care's**  63:6 64:7

**[career - charter]** Page 15

**career** 63:20
**case** 9:20,22
  18:19 22:15
  27:10,17 31:3
  32:13 48:7
  52:16,19
  171:17 240:11
  240:12 298:25
  299:14,14
  307:9 315:3
**cases** 32:5
  72:23
**cash** 8:11 64:23
  82:4,9,18
  83:15,17 84:5
  84:18 85:9,15
  217:15 281:14
  281:17,20,20
  281:23 282:2,7
  286:4
**casualty** 175:12
**categories**
  161:24 253:24
**categorization**
  131:7
**categorizations**
  131:15
**category**
  182:15
**cath** 199:23
  212:4
**cause** 1:17
  314:10

**caused** 133:12
  299:9
**cautioned** 11:3
**cautious**
  232:14 305:21
**cc** 211:1
**cc'd** 120:11
**cecil** 132:6
**ceiling** 132:20
  132:21 133:8
  133:11,19,20
  134:5
**cellphone**
  33:23 34:8,13
  34:19 35:20
  36:3,8
**center** 24:9,17
  42:17 54:9
  61:12 64:19
  75:25 76:1,2
  130:23 152:4
  201:12 289:4
  289:15,23
  290:4,13 291:3
**centers** 265:3
**central** 68:16
  69:5 73:1
  89:17 94:3
  95:7 98:25
  101:14 140:7
  141:13 227:19
  228:7,14 242:1
  249:18

**ceo** 14:22 67:3
  67:6 115:11
  126:20 150:8
  155:25 156:5
  179:24 231:8
**ceos** 224:4
**cep** 249:16
**certain** 74:21
  74:23 97:3
  125:11 141:3
  164:24 170:5
  170:13 180:2
  181:8 230:2,5
  251:16 254:12
  255:8 286:21
**certainly** 91:18
  202:12,15
  205:13
**certificate** 3:7
**certification**
  314:1
**certified** 1:19
**certify** 314:3,8
**cetera** 42:23
  51:8 82:11
  170:16 222:21
  249:2
**cfo** 104:1 183:2
  183:4 184:9
  217:24 245:7
  285:17
**cfo's** 184:17
**chain** 4:11
  186:10 198:11

  251:14
**chains** 186:16
**chair** 140:25
**chaired** 140:23
**chairman**
  155:25
**challenge** 121:1
**challenges**
  156:23
**chance** 209:5
**change** 39:9,18
  124:22 161:11
  232:16 256:9
  305:23
**changed** 78:5
  110:17 114:24
  115:4 140:17
**changes** 38:18
  104:25 113:15
  113:16 316:10
**changing**
  123:25
**characterizati...**
  216:2
**charge** 85:20
  106:14,16,25
  117:23
**charlie** 188:8
  189:4,6,9,12,13
**chart** 4:9
  164:13 258:3
  263:4
**charter** 4:18,21
  137:14,23

143:24 144:22 147:8

**charters** 138:2

**cheap** 208:9

**checking** 30:9 166:13

**chicago** 2:12

**chief** 67:7 208:9 245:19 246:1 279:23 280:3 294:11

**choice** 229:15

**chose** 203:13 203:19

**chris** 285:21

**chrissy** 157:23

**christopher** 279:21

**chronological** 186:16

**chs** 75:16,18,22 76:5

**circa** 201:24

**circulated** 195:11

**circumstances** 213:5

**citation** 196:7 251:1

**city** 52:8 188:8 289:17

**civil** 1:5,24 196:18 314:6 315:7

**claim** 3:12 5:7 6:20 21:12 22:1,6,7,11,14 22:21 23:4,5 23:23 24:15 26:20 33:11 50:8 87:24 99:3 111:1 123:14 125:13 152:21 154:19 157:24 158:5,6 163:4 167:12 168:14,25 169:7,9,11 172:16 181:7,9 181:14 183:20 184:3,6,16 188:3 232:16 238:24 245:17 247:12 248:13 248:17 250:5 250:11,18 253:2 261:8 263:3,5 305:24 306:7,25 307:1

**claims** 20:12 21:1,20 23:12 23:16,18,20,25 24:3,22 25:2,6 25:9 32:9,10 88:13 152:6,8 152:9 156:24 157:12,19 158:4 159:23

161:7 166:1,25 182:25 183:12 183:18,21

**clarification** 87:7 218:15,22

**clarity** 18:6 105:10

**classify** 271:1

**clause** 77:1 176:13,18 292:12

**clean** 49:4

**cleanup** 263:11

**clear** 108:9 136:6 156:24 164:13 209:15 215:5 218:20 296:25 300:24

**client** 53:23 56:5 59:7,9,11 59:21,24 60:1 74:21 106:14 106:16,24

**client's** 117:13

**clients** 31:20 32:7 60:2 71:4 117:11

**clinical** 98:6

**clinics** 76:3

**close** 75:17 230:2

**closed** 48:4

**closely** 37:25

**closeout** 163:8

**closing** 6:5 230:5

**closings** 199:2

**cmo** 245:22,23

**cmos** 245:25 246:1

**cms** 7:14,17 265:10 266:9 266:14,22,25 267:1,10 268:16 269:5 269:18 301:11 310:3,6 311:1

**cod** 53:11,15,20 54:4

**code** 7:8 32:1 123:23 224:24 228:2,8,10,17 228:24 229:3,8 230:18 257:25 303:18

**cold** 128:7

**collect** 33:7,22 34:12

**collected** 182:8 182:14

**collection** 33:15

**college** 43:25 44:9,12

**column** 130:23 131:6 132:10 132:19

**[come - conceal]**

| | | | |
|---|---|---|---|
| **come** 85:24 88:14 154:6 192:20 213:12 227:5 258:13 300:16 | **commonly** 135:5 | 306:11,17 307:3,15 308:11 | **completed** 145:13 147:23 316:16 |
| **comical** 63:21 | **communicate** 30:6 38:6 40:4 138:3 169:8 | **company** 1:8,9 2:8,9 9:19,20 14:22 16:8,10 16:21,23,25 | **completion** 147:10 |
| **coming** 173:19 | **communicated** 168:11 | 26:24 44:14 47:13,14,17 | **complex** 72:7 152:13 |
| **comment** 226:11 | **communicating** 36:23 | 111:13 152:6 188:3 223:13 | **compliance** 170:18 224:25 228:18 |
| **commented** 119:8 | **communication** 41:14 156:24 157:9 160:18 161:6,9 162:12 165:15,17,20 169:21 | 226:2,21,22 228:1 261:7 271:4 298:8 315:9,10 | **compliant** 7:8 258:1 303:18 |
| **comments** 134:10 218:14 218:21 | | **compare** 94:14 | **complicated** 124:11 |
| **commercial** 124:13 | **communicati...** 14:2 28:14 34:19 35:6 36:17 44:14 45:2 86:8,16 163:2 164:12 167:8 185:20 250:14 252:4 263:22 265:10 278:8 | **compared** 59:23 | **comply** 154:21 229:7 |
| **commission** 314:18 | | **compensated** 109:5 129:19 255:18 | **component** 72:6 152:23 181:14 183:21 183:25 222:9 263:12 |
| **commissioner** 228:12 234:6 | | **compensation** 107:1 109:14 298:15 | **components** 98:20 149:13 169:14 170:6 192:16 222:6 253:10 |
| **commitment** 235:9 275:22 277:10 | | **compile** 185:8 271:10 | **comprised** 140:16 |
| **commits** 261:11 | **community** 119:10 197:13 197:18 | **compiling** 184:23 185:22 250:3 | **computer** 33:24 34:8,14 36:10 |
| **committed** 140:7 180:5 | **companies** 45:19 86:8,16 87:3 90:24 161:13 163:3 249:24 262:22 270:4 301:22 | **complaint** 27:10 299:4 | **con** 236:3 |
| **committee** 66:20 140:1,15 140:19,25 | | **complete** 143:25 224:23 313:6 | **conceal** 307:2 307:14 308:10 |
| **common** 71:14 127:18 188:15 190:2 | | | |

[concealed - continuously]                                    Page 18

concealed 262:21 306:10

conceals 261:10 262:2 262:13

conceptual 188:7,20 189:16,17,18 190:6,10 214:1

concern 150:5 223:6 292:1

concerned 189:25

concerning 174:11 261:11

conclusion 314:7

conclusions 267:7

concurrently 227:3

condensed 312:3

condition 14:19 127:6 132:8 136:23 175:13 175:24 176:9 176:20 272:24

conduct 213:17 268:4

conducted 9:6 10:1 33:10 78:20 250:10 271:12

conference 265:13 296:17

confident 64:1 84:7 85:2

confidential 242:15,22

confidently 63:25

conforming 124:21

confused 102:9

confusing 289:21

conjunction 233:8

connecticut 2:18

connection 9:8 179:8

consider 263:20 264:11

consideration 73:13 214:14

considerations 72:11

considered 119:8

consigli 31:7,13

consist 17:5 204:25

consistently 267:12 302:6 309:20 310:9 310:19

consists 136:18

constructed 161:9 263:14 263:16

constructing 184:10

construction 31:24 44:23 46:17,20 47:10 47:13 50:1 51:6 53:10,14 53:20 71:8,10 71:24 72:1,6,8 146:18 147:4 225:14 229:7 260:9 272:12 279:16 280:9

construed 100:6 253:23

consultant 214:23 223:14 227:4

consultants 30:21 163:24 164:3 268:1 270:3 271:3,12

consulting 128:25 165:23 166:24 232:11

contact 38:13 38:23,25 39:9 40:6 42:5 50:17 59:1 69:14 70:9

contain 35:20 190:24 279:2

contained 100:5 262:11

containing 261:9

contains 94:6 99:15 127:12 241:20 263:3 288:10 310:6

contemplated 230:23 231:1

contemplates 224:23 225:14 227:25 229:22

content 174:9

contents 247:16

context 162:15 205:1,19

continental 32:3

continue 9:11 83:23,25 96:11 101:12 171:8

continued 110:11

continues 198:22

continuing 253:6

continuously 60:14

**contract** 69:17
70:9,11,14
71:7 73:12,25
76:24 77:17,22
78:15 79:5
82:15,15 83:21
84:15 85:15
86:2 87:10,11
87:14,15,19,23
89:5 90:1,11
90:21,23 91:21
91:22,23,24
93:3 97:7
98:11,18 99:10
100:17 101:16
101:24 102:10
102:11,14,14
102:14,15
153:10
**contracting**
69:18
**contractor**
31:14 69:23
73:14 75:8
99:24 100:1,9
100:22
**contractors**
30:21 47:8,11
**contracts** 17:22
18:5 56:15
77:12 88:6,15
89:9 91:1,16
91:19 94:25
96:1,3 99:4

101:12 110:1
110:23 112:19
153:1,3 174:12
295:25
**contractual**
255:13
**contributions**
223:20
**control** 184:6
223:17
**controlled** 34:9
34:14,20 36:14
**conversant**
44:14 45:1
**conversation**
13:7 18:1 28:2
41:19 157:22
221:17 235:1
235:13 236:2,3
236:4,8,19,22
236:25
**conversations**
30:3,12,19
41:2,10 42:14
42:24 43:6,14
43:15,21 75:2
75:6 121:16,20
121:22 166:16
234:18 239:4
239:13 260:19
261:16 268:13
268:23 307:25
**convert** 211:24

**converted** 17:6
**coo** 245:7
**coordinate**
85:5 149:6
168:25
**coordinated**
153:17,21
154:1,12
157:19 217:12
**coordinating**
185:20 250:15
**coordination**
71:5 87:24
99:2 156:23
163:7 252:6
**copied** 123:10
168:4 243:7
265:6 266:15
**copies** 284:14
316:14
**copy** 150:1
207:5 219:3
220:3 221:23
243:8 266:13
274:16,23
287:19 312:1,6
**copying** 168:10
186:22 198:23
206:7 232:1
269:5
**core** 51:12
74:15,22
**corner** 69:7
92:4 103:14

130:15 160:23
180:20 209:18
241:11
**corporate** 18:7
49:11 51:15
62:6 82:5,19
83:15 84:19
113:5,10,16
127:17 134:13
136:2 245:20
254:25 256:2
**corporations**
17:7
**correct** 11:17
11:18,22 12:17
14:24 15:4,10
16:3 17:2
18:11,14 19:15
20:6 22:11,19
22:25 23:7,9
23:10 24:5,6
24:25 25:8,14
26:25 28:7
35:25 43:16,17
43:23 45:9,14
45:17 47:25
49:12 54:1
60:23 63:8
69:10,11,16,24
70:7 76:19
80:12 81:9
82:12,16 86:6
86:18 89:6,11
89:12,19 90:18

92:4,20,21
93:1,8,14 94:1
94:5,8,18,19,20
99:17,20,21
100:3,10,16
102:3,4,5
103:11,18
105:14 106:4
107:7 109:4
110:9 113:25
114:3 115:9,11
115:12 118:15
123:11 126:7,8
126:14,21
130:17 133:22
133:24 134:3
134:24 135:11
135:12 136:10
138:23 139:16
140:10 147:6
147:13 149:4
150:24 156:18
159:8,11 162:2
164:2,4,5
165:21,24
168:17 175:15
175:21 176:2
176:11,22
177:5,18,20,21
179:10,11,12
182:15 187:1,2
187:17,24
188:14 190:20
190:23 191:5

191:25 195:15
200:7,16 203:4
203:6 204:20
204:24 205:23
205:24 207:13
207:17,23
211:3,6,7,9
212:10 213:9
225:7,12,17,18
229:24 230:4,9
230:14 232:18
232:21 233:11
233:13 240:13
240:22 241:22
241:25 242:3
242:22 243:12
244:2 249:6,10
249:12,13
251:19 259:8
266:15 267:24
269:15,16
273:1 274:16
274:23 276:10
279:22 282:4
289:13,18
290:5,8,14,17
290:18 291:20
292:2 295:22
295:23 296:7
296:23,24
297:3,10,14
298:20 299:18
302:9,10,23
306:23 307:9

309:22 310:7
310:10,24,25
311:6,7,9,10
313:6,8
**correcting**
  204:13
**correctly** 76:7
**corresponded**
  87:2
**corresponden...**
  35:12 171:21
  175:5 265:7
  266:14 281:12
**cost** 85:18,21
  146:24 147:4
  222:9 223:17
  226:6 229:7
  230:18 232:17
  272:21,23
  279:19 305:24
**costs** 185:8,16
  185:16 292:11
**counsel** 9:16
  10:12 19:20
  28:5,6 29:1
  32:22 33:11
  41:3,6 42:15
  43:2,6,8,9,11
  43:16 74:11
  173:10,20
  174:10 182:18
  227:7 244:23
  260:14,19
  261:16 262:25

300:19 301:9
301:14 302:18
304:13 307:19
308:2 314:8
316:14
**counsel's** 28:13
  43:20 56:16
  57:19 58:20
  59:2 69:15
  172:25 174:8
  174:16 180:1,7
  180:16
**counselor** 13:6
**counting** 90:16
**country** 120:12
**couple** 17:21
  118:18 128:17
  163:23 243:13
  244:15 273:21
  281:9 308:22
**course** 36:24
  37:1 77:6
  80:15 91:18
  97:16 118:19
  154:4 180:6
  213:5 259:23
  271:16
**court** 1:1 9:21
  10:4 15:17
  21:21 315:4
**courtroom** 12:2
**cover** 134:14
  218:9 257:21

**[coverage - cref's]**                                      Page 21

| | | | |
|---|---|---|---|
| **coverage** | 4:16,19,23 | 71:6 73:24,25 | 151:2 152:7 |
| 224:20 226:1 | 8:15 14:2,22 | 75:8 76:16 | 153:1,2,9 |
| 228:23 | 14:25 15:1 | 77:15 78:7,10 | 161:3,25 |
| **covered**  292:8 | 16:1,5,24 17:1 | 78:13 79:1,6 | 162:20,24 |
| 294:3 | 17:3,5,9,10,10 | 82:3 83:4,8,14 | 163:14,17,22 |
| **covid**  114:24 | 17:12,13,16 | 84:2,4,9 85:14 | 164:7,20 166:4 |
| 140:22 190:1 | 18:8,9,12 21:7 | 86:4,7,15,24,25 | 170:11 179:24 |
| 193:13 251:15 | 21:7,12 22:2,7 | 87:16,21 89:1 | 183:8 184:12 |
| 253:21 | 22:13,22 23:5 | 91:11,14,22 | 187:6,10,12,15 |
| **cpm**  17:12,13 | 23:11,18,20,23 | 93:20 95:16,22 | 187:22 188:24 |
| 17:17 22:2,7 | 23:25 24:16 | 99:6,10 101:1 | 188:25 191:20 |
| 22:13 23:18 | 25:1,9,9,19 | 101:12 102:13 | 202:1 207:19 |
| 97:1 102:13 | 27:20 28:19 | 102:16 103:2 | 207:21 213:25 |
| 295:19 296:1 | 29:8 30:20 | 103:10,16 | 214:1 216:25 |
| **crcc7963299** | 31:5,14,16,18 | 108:23 109:5 | 217:8,12 222:7 |
| 1:25 | 31:19 33:24 | 109:13,25 | 234:13 247:6 |
| **create**  100:6,14 | 34:9,14,20 | 110:10,23,25 | 260:3,20 |
| 160:25 273:15 | 36:14,16 38:1 | 111:2,14 112:2 | 262:19 268:15 |
| **created**  14:1 | 38:14,23 40:17 | 112:8,8,15,15 | 271:9 272:15 |
| 85:1 239:17,20 | 44:17,20,25 | 113:2,5,5,23 | 272:17 277:5 |
| 242:5 251:24 | 45:5,25 46:7 | 114:6,13,18,19 | 279:16,18 |
| 252:1 257:19 | 46:10 50:23,23 | 114:22 115:10 | 280:22 281:1 |
| 274:6 295:8,12 | 50:24 51:13,22 | 115:14 116:21 | 281:13,17,19 |
| **creating**  197:2 | 52:13,14 53:15 | 117:10,25 | 282:1,5 283:4 |
| 279:11 | 53:24,25 54:4 | 118:10 125:25 | 288:1 294:12 |
| **creditor**  1:3 | 56:5,13,24 | 127:8,12,12 | 294:21,22 |
| 9:17 22:2 | 57:1,8 58:15 | 129:5 132:1 | 295:18,19,19 |
| 315:6 | 59:16,25 60:3 | 137:11,13,18 | 295:19,20 |
| **creditors**  20:12 | 61:14,19,23,25 | 137:21 138:3 | 296:1,1,1,13 |
| 20:20 21:2,7 | 62:3,6,9,17,19 | 138:18,24 | 297:24 298:5 |
| 25:12,18 | 62:21 64:6 | 139:4 140:11 | **cref's**  25:10 |
| 299:18 | 65:9,18 67:2,6 | 144:3,4,5,12,20 | 36:12 38:1 |
| **cref**  3:15,18,20 | 68:10,23 69:18 | 147:8 149:3,8 | 52:2 56:9 59:6 |
| 3:23 4:5,8,9,10 | 70:1,3,5,6,17 | 150:4,8,12,23 | 59:9,10,20,24 |

65:21 76:23 82:18 88:7 98:11 110:1 113:10 127:16 170:6,9 202:19 202:21 280:25 282:19

**crisis** 190:1 193:13,17 251:15 253:21

**critical** 75:11 145:15

**crowley** 6:14 27:23,25 28:8 28:9,15 35:13 36:18 38:3,4 60:9,20,23 61:1,4,19 105:24 106:2,5 106:12,15,18 114:5,11 115:15 123:8 123:12,13 125:1 129:10 162:22 181:12 183:14 195:17 195:21 196:2,7 218:10,14 227:9 231:11

**crowley's** 197:9

**cs** 316:15

**csr** 314:2,17

**culled** 164:19

**cup** 124:16 227:16,19 228:3,7

**cupola** 54:9,11

**curious** 220:12

**current** 22:2 26:19 27:19 28:19 29:8,12 30:20 31:13 84:9 99:18 222:18 230:12

**currently** 25:3 26:11 123:21 153:7 284:21 285:9

**customers** 31:20

**cv** 1:6 9:22 315:8

**d**

**d** 3:1 9:1 11:15 49:17 52:25 99:22,23

**dallas** 1:23 9:25 52:8,17 52:20,22 221:7 221:19

**damage** 133:10 133:12,21 175:14,25 176:10,21 191:12 265:20 266:5 301:24

302:1,3 309:17

**damaged** 199:20,24 200:2,6,15 201:9

**damages** 164:4 272:22 299:10

**damaging** 145:7 146:1

**dan** 10:5 63:10

**dana** 196:12

**daniel** 1:19 314:2,17

**data** 14:13,16 85:5,13 184:23 263:20 264:3

**date** 16:15 64:3 83:20 84:15 89:8 106:9 139:14,25 147:10 148:7 160:21 164:22 175:11 177:7 177:10 192:17 196:25 221:3 237:15,18 258:8,12 270:5 315:12

**dated** 21:22 88:25 89:8 91:2 93:25 108:11 116:13 126:6 137:13 149:25 151:12

167:25 171:5 171:20 178:16 186:23 198:13 198:17 218:10 219:1,13 238:11 265:21 270:14,20 278:11 284:18

**dates** 162:15

**davis** 8:10 115:16 187:8,9 284:17 285:8 285:19 287:12

**davis's** 287:20

**day** 1:12,17 2:17 3:10 4:2 5:2 6:2 7:2 8:2 10:21 23:6 105:25,25 106:3,3,6,6,11 106:12,13,14 115:25 163:9,9 186:25 189:22 203:10 205:17 212:3,4 300:17 305:3 308:19 313:4,14 314:13,13 315:12

**daypitney.com** 2:19 316:2

**days** 13:2 19:13 175:10 300:18 306:21 316:16

[de - deposition]

**de** 14:6 29:24
29:25 30:4
37:4 53:6,13
53:19 54:2
56:24 58:22
158:12,25
159:2 188:13
188:16 189:5
189:10,15
190:6 205:6
219:4,10,19
220:1,14,22
221:2,14,17,22
223:6 231:8
235:17,21
236:1,8,23
240:24 244:18
296:4,14,22
297:16 298:7
298:14 299:1
299:15,16,21
**deal** 55:14
57:25 58:11
**dearborn** 2:11
**debt** 20:13
**debtor** 22:15
**decant** 193:5,9
193:23
**decanting**
119:24
**december** 5:4
65:19,23 73:21
93:7 99:19
149:25 216:22

234:5 243:10
247:13 249:24
250:5 276:15
277:18 278:11
288:18,25
289:12 290:16
295:16
**decided** 176:14
182:3 192:7
212:7 233:8
249:19 300:19
**decision** 57:8
72:22 75:7
159:1 175:22
176:1,7 182:24
183:2 194:16
212:16,19,22
212:24,25
213:4,7,13,15
233:19,21
235:3,6,11,19
237:3,9,14,15
237:16,19
268:15 273:4
**decisions** 64:6
64:8 233:16,25
**deck** 6:12 7:19
209:9,10
210:23 238:14
238:18 239:14
239:25 240:3
247:10
**decks** 239:21

**dedicate** 78:7
**dedicated**
77:15,24 102:2
**deed** 197:6
**deeded** 120:23
**deemed** 100:5
228:12
**defendant** 9:16
**defendant's**
307:8
**defendants**
1:10,16 2:8
10:17,19
307:13 308:4
315:11
**defense** 307:19
**deferred**
119:21 141:20
142:19,21
143:3,4,9
146:14 147:25
288:4
**define** 169:4,9
**definition**
14:15 72:12
86:20 169:5
**definitions**
205:13
**definitively**
63:17 185:8,19
**defraud** 261:7
**degree** 44:4
**degrees** 44:8

**delay** 64:13
**delegated**
167:10 168:12
168:23 169:3,6
**delineate**
281:23
**demand** 230:2
**demo** 49:5
190:18,25
**deny** 308:9,15
**dep** 315:12
**department**
193:12 211:3,5
214:5,17 215:7
216:9 228:11
**depending**
182:20 240:16
**depends** 9:7
133:17
**depiction** 113:9
161:5
**depo** 9:25
**deponent**
316:13
**depose** 300:12
**deposed** 26:12
29:10
**deposing**
316:13
**deposition** 1:11
1:14 3:9 4:1
5:1 6:1 7:1 8:1
9:5,15,23
11:20 12:12,20

12:23 13:13,19 13:23 23:9 27:20,25 28:16 28:20 29:6,13 30:22 31:2 32:22,23 33:25 34:10,15 107:2 124:4 218:5 273:19 300:13 300:17,19 313:4 314:7

**desco** 52:25

**description** 3:11 4:3 5:3 6:3 7:3 8:3

**design** 51:6 70:25 114:2 187:6 267:18 276:5 277:11 288:17,24 289:12 290:7 290:16 311:3

**designate** 72:16

**designated** 132:2

**designation** 132:24

**designations** 131:23 132:2

**designs** 268:1

**destroyed** 36:6

**destruction** 175:11,14,25 176:10,21

**detail** 278:20

**detailed** 272:23

**details** 121:8 131:6 152:25 257:13 263:8

**deter** 232:15 305:23

**determination** 166:20 267:20 311:5

**determine** 250:10 272:22

**detriment** 299:17

**devastating** 302:4 309:18

**develop** 272:23

**developed** 192:20

**development** 152:3

**devices** 33:7,23

**diagram** 242:4 242:8

**diagrams** 241:18

**diaz** 30:15,17 245:13,19 246:8 254:21

**die** 312:8

**different** 41:18 47:19 48:19 64:20 90:4,6 104:2 113:21

114:19,21 149:13,13 162:9 164:24 170:24 194:7 205:13 213:22 223:18 251:16 254:4 258:12 288:1 305:3

**difficult** 134:20

**diligence** 197:3

**direct** 93:15 112:22 116:12 127:21 138:9 140:11 149:22 150:2 153:2 155:13 168:3 171:19 177:11 188:1 198:20 240:7 247:9 257:2 265:9,17 267:3 268:8 272:9 278:12 281:6 291:24 292:3 300:23 303:6 310:1,4

**directed** 23:5 309:3,15

**directing** 184:16

**direction** 184:7 214:2 247:6,23 271:10

**directly** 37:23 113:23 118:1

153:11 156:4 168:11 190:3 277:1 279:13

**director** 151:17 244:24 254:20

**directors** 8:4 159:3,10 245:3 275:9

**disagree** 167:17 168:21 216:1

**disbursements** 281:24

**disclose** 174:8 273:4

**disclosed** 218:4

**discovery** 300:20

**discuss** 11:19 42:7

**discussed** 13:18 105:16 124:1 172:12,15 191:11 213:22 227:7 235:16 243:25 244:17 244:18 254:6 276:21

**discussing** 40:12,18 169:20 232:13 305:20

**discussion** 100:19 123:15

**[discussion - dr]**                    Page 25

123:17 125:2
234:16 252:22
253:5 291:9

**discussions**
119:24 120:19
120:22 152:24
159:21 182:6
182:17 204:11
254:15,18
256:11 262:16
262:18,24
265:16 273:2

**dispute**  24:7
26:13

**disputes**  26:14
26:18 300:10
300:21

**distinguish**
27:6

**distinguished**
49:20

**distribute**  6:11
209:9

**distributed**
219:16

**district**  1:1,2
9:21,21 21:21
315:4,4

**division**  47:18
49:19 50:6
51:10 69:6
89:24 94:4
98:25 101:14
114:23 141:13

187:6

**divisions**  51:5
68:17 73:1,6
89:17 95:7
183:22

**dlt**  188:6

**document**
21:22 22:6
68:14,20,22,23
72:24 79:13
81:2 85:18
89:14 92:2,17
92:19 93:16
95:5 96:9
97:23 104:11
113:4,12
118:20 125:24
127:22 130:23
134:9 139:11
139:20 144:20
147:11 150:2,4
150:7,10 151:5
151:6 154:7
155:10 160:11
160:15,25
162:16 172:3,7
178:2,3,10,15
179:2,5,15,21
180:18 186:18
186:19 206:19
209:12,19
222:2,4,14
239:10 240:8
249:5 251:2

252:15 257:12
257:24 258:12
259:20 261:1
264:24 265:18
266:11,19
271:17 274:5
274:13,20
275:4 278:11
278:21,24
279:19 281:8
287:22 288:10
293:3 294:21
295:3,4,8,9
302:19 303:4
304:14

**documentation**
36:15 78:11
169:13 228:25

**documents**
6:23 13:21
34:7 48:7
85:22 174:12
179:22 195:21
196:8 242:13
242:16,18
282:10 300:11

**doing**  19:12
44:14 63:11
85:3 282:5

**dollar**  60:3

**dollars**  111:21
276:8 280:17

**doncaster**
162:21,24

**doncaster's**
163:5

**downsize**
230:19

**doyle**  7:4,10
29:16,19
171:22 183:6,7
183:9 184:13
185:25 232:2
245:6 251:4
259:4,12 261:1
261:17 264:17
280:1 301:16
303:23 309:4
311:8

**doyle's**  184:14
261:5 304:4
310:23

**dozen**  288:10

**dph**  7:14,17
193:17 267:20
311:5

**dr**  14:6 29:24
29:25 30:4,15
30:17 37:4
53:6,13,19
54:2 56:24
58:22 117:22
140:23 158:12
158:25 159:2
188:13,16
189:5,10,15
190:6 205:2,3
205:6 219:4,10

**[dr - email]**                                                    Page 26

219:19 220:1 220:14,22 221:2,14,17,22 223:6 231:8 235:17,21 236:1,8,23 240:24 244:17 244:18,20 245:13,19 246:8 254:21 254:22 265:15 296:4,14 297:16 298:7 298:14 299:1 299:15,16,21

**drain** 214:6,18 215:8 216:11

**draper** 135:13 138:13,16 143:20,21 144:2 199:16 211:21,25

**draw** 304:17

**drive** 52:25 133:3 195:22

**driven** 247:17 248:2

**due** 134:21 197:3

**duly** 1:16 11:3 314:3

**dunleavy** 279:21 282:23 283:1 285:16

285:23 286:9

**dunleavy's** 285:22

**duration** 247:17,20

**durations** 247:24

**duties** 67:4,6 67:14 99:3,6

**duty** 100:14

**e**

**e** 2:1,1 3:1 9:1,1 11:15 52:25 164:1 249:20

**earlier** 18:7 45:6 69:25 126:10 169:20 172:16 202:6 238:22 243:25 264:15 276:21 288:6 295:25 301:9 304:14 304:20 305:12 307:7

**early** 87:14 171:15 242:10 312:4

**earn** 298:10

**earned** 59:16

**easier** 15:18 210:17

**economic** 105:8

**economics** 101:20

**ed** 190:21 194:7 214:15 214:22 215:1,2 291:1 306:4,5

**edit** 226:17,18

**educate** 50:22

**educating** 224:15

**education** 51:1

**effective** 272:23

**effects** 297:23

**effort** 230:10

**efforts** 33:6,9 34:21 35:6,14 124:21 276:5,9 277:11 279:16

**eh** 164:1

**eight** 42:19 75:22 77:19 90:15

**either** 12:18 91:6 111:12 135:18 163:3 219:14 245:4 250:4

**elect** 175:9 176:19

**election** 176:11 176:14 177:5 177:16,19

**electrical** 49:5 50:6 228:16

**electronic** 103:16 221:23

**electronically** 219:10,17

**electrophysio...** 289:5

**element** 71:10 247:17 263:16 263:19 264:4 264:11

**elizabeth** 152:1

**elizabeth's** 42:17 254:17

**elt** 204:19,22 205:1,8,12,22 304:22

**email** 4:11,17 4:21 5:4,6,9,14 5:16,22 6:4,7 6:10,14,17,19 6:22 7:4,4,9,13 7:16 8:10 14:2 116:11,12,23 117:2,2,6,10,12 117:13,15 118:17,23 121:9 122:20 123:7 137:13 137:24 149:22 149:25 151:11 153:15 154:23 155:2,13,21,22

156:6,19 158:15 160:11 167:7,24 168:4 170:21 171:5 171:20 172:10 173:15 175:1 186:10,16,21 187:14,14,22 187:22,25 195:17 198:11 198:12,21,22 199:6 202:25 203:5,7 204:17 205:15 206:6,6 206:10,13,14 206:17,22,24 207:3,9,13 209:7,10,16 218:9 231:20 231:25 232:12 238:11 239:6 239:15 243:5 243:14 250:14 251:4,6 263:23 265:3 266:16 269:4,9,15,23 274:12 278:8 284:17 287:7 287:12,20 304:18 305:13 305:17,20 310:2

**emails** 5:17 34:13

**emergency** 87:22 98:23 211:3,5 214:5 214:17 215:7 216:9

**employed** 45:3 45:24 115:14 139:4 163:14 314:8

**employee** 29:8 61:14,20,23 62:17,19 84:8 84:9 100:8,9 116:21 138:25 162:24 179:19 207:22 232:8 314:10

**employees** 27:20 28:19 29:13 45:12,13 45:23 46:6,7 46:10 51:21 52:2,4 65:9,18 65:22 74:17,23 77:15 86:25 90:3,4,7,12,25 91:10,15 114:13 115:13 156:17 162:21 163:23 187:15 187:23 207:19 253:16,24 254:4

**employer** 100:8

**emsandler** 2:19 316:2

**enable** 85:14

**ended** 46:9 53:11 142:20 245:19 269:23

**endoscopy** 200:6 211:14

**ends** 209:17 210:15 247:10 266:3 301:19 303:4

**energy** 242:1 249:18

**engage** 182:24 203:13,20 204:1,9 241:13

**engaged** 43:11 132:7 161:13 169:6 183:17 183:20 204:10 241:15

**engagement** 56:6 99:24

**engaging** 172:23 183:8

**engineer** 196:18

**engineering** 70:25 98:7 277:11

**england** 39:22 42:19 58:1

68:16 69:5 73:1 78:17 89:16 94:3 95:7 98:24 142:25 193:15 195:12 239:1

**ensure** 157:3,7 204:19 205:22 214:24 230:1 304:22

**enter** 76:9

**entering** 170:19

**enterprise** 282:6

**entertained** 197:6

**entertaining** 228:14

**entire** 58:15 296:21

**entities** 16:24 17:1,3,5 18:8,8 18:9,12 21:7 24:24 25:1 31:15 46:4,5 59:16 62:3 70:2 95:22 103:9,10,17 108:23 109:2 111:14 112:8,8 112:16 114:20

**entitled** 22:6,10 23:3 68:14

257:12 263:5
**entity** 23:14
  24:16 49:11
  56:13 69:18
  70:6
**envelope**
  136:13,16,17
  136:24 137:3
**envelopes**
  143:2
**ep** 288:15
  289:2
**equal** 52:18
  113:20
**equipment** 6:8
  72:9 183:25
**er** 135:18
  199:19
**erick** 2:16
  10:20 12:15
  316:1
**errata** 3:8
  315:1 316:11
  316:13,16
**erratas** 316:15
**escutcheon**
  133:16
**esq** 2:3,3,10,10
  2:16 316:1
**esquire** 92:24
**essentially**
  119:9 163:9
  288:6 307:13

**estate** 25:11
  50:24 51:10
  74:14 82:5,20
  83:16 84:19
  89:4 95:6
  98:21 150:13
  150:16 170:12
  179:16 275:14
**estates** 113:5
**estimate**
  293:21
**estoppels** 201:2
**et** 42:22 51:8
  82:11 170:16
  222:21 249:2
**evacuating**
  148:11,22
**evaluate** 227:4
**evaluated**
  190:9
**evaluating**
  305:2
**evaluation**
  145:12,19
  214:15
**event** 38:21
  39:12 86:4
  87:17 88:8
  99:12 111:23
  112:12 135:8
  147:23 148:3
  148:25 160:21
  163:2 167:3
  180:18 187:1

189:23 194:4
**eventual** 91:25
**eventually**
  44:24 45:5
  70:1,6 97:17
  143:3
**everybody**
  63:21 64:3
**evolution** 17:19
**evolve** 256:10
**evolved** 44:24
  77:9
**evp** 179:16
**exact** 61:16
  63:2 65:11
  106:9 129:4
  135:3 141:1
  142:16 196:25
  235:24 236:10
  241:4 274:12
  277:13 280:7
  280:15,21
  293:11,18
**exactly** 65:1
  154:20 215:18
**examination**
  3:5,5 11:7
  301:4 308:25
**example** 21:11
  49:21 113:20
  199:15 276:14
  288:15
**exceeded** 76:20

**excel** 14:17
**except** 19:11,16
**exception** 8:12
  287:10,18,22
  287:24 288:2,6
  288:8,11
**excess** 231:2
**exchange** 37:11
  116:11 155:22
  206:6 207:13
**exchanged**
  295:20
**excited** 58:14
  58:16
**excitement**
  57:17 58:14
**excuse** 96:19
  165:10 183:10
  306:25 309:11
**execute** 180:2
  226:7,14,23
**executed** 68:24
  75:4 90:1 91:8
  107:18 108:2
  108:13 109:16
**executing**
  182:10
**executive** 67:7
  74:19 78:2
  106:14,16,25
  157:25 158:9
  158:11,21
  162:11 204:23
  205:10,14

232:9 259:11
**executives**
 251:16
**exercise** 192:9
**exercises** 305:8
**exhibit** 3:12,14
 3:16,19,22 4:4
 4:7,9,11,14,17
 4:21 5:4,6,9,11
 5:14,16,20,22
 6:4,7,10,14,17
 6:19,22 7:4,7,9
 7:13,16,19,22
 8:4,7,10,12,14
 21:14,16,19
 68:9,11 76:10
 77:25 79:1,3
 80:11,12,17
 88:11,12,19,20
 89:2 90:17
 92:3,10,11,13
 92:17 93:10,16
 93:17 94:15
 95:12,14,15
 96:22 97:7,24
 98:22,25 99:1
 99:14 101:16
 102:11,12,24
 102:25 104:6
 107:9,11,15,17
 107:18,23
 108:10,13,21
 108:22 109:7
 109:12,17

110:5,7,13
112:23,23,25
115:14,19
116:8,10
125:20,21,22
127:23 128:16
130:10,11
137:7,8,9
143:18,19
144:18,19
145:20 146:5
146:15 149:17
149:18,20,21
151:7,8 155:5
155:5,6 159:25
160:4 167:20
167:21 169:18
170:25 171:2
174:20 175:8
178:4,6 179:6
180:19,23
186:2,3,4
198:6,9 202:25
206:1,2 208:25
209:2,23 218:3
218:6 219:23
231:16,17
238:4,4,7
242:25 243:3
246:11 250:21
250:23 251:2
257:3,5,6
258:23,24
264:24,25

265:25 268:9
268:10,12
269:3 270:8,9
270:10 274:1,2
275:5,6 277:24
277:25 278:5
278:13 279:1
284:8,9 287:2
287:5,19 291:6
291:23 294:21
294:23 301:7
301:15 302:12
304:10 305:9
309:2,7,9,15
310:2,5,16
**exhibits** 3:9 4:1
 5:1 6:1 7:1 8:1
 97:25 285:3
 291:13
**exist** 192:19
**existed** 170:5
 175:13,24
 176:9,20
**existence** 56:10
 295:10
**existing** 123:22
 124:14 211:3,5
 211:15 212:9
 227:16 228:1
 228:12 293:17
**expand** 57:11
 74:14 114:22
 119:14

**expanded**
 76:22
**expanding**
 57:15 296:13
**expansion**
 58:17 90:24
 119:9 152:2
 289:9,14,16
**expected**
 199:16
**expedite** 188:8
**expeditiously**
 272:25
**expended**
 140:12,14
 141:18 143:8
 143:13 217:19
 217:23
**expending**
 217:9
**expenditures**
 147:22 280:23
**expenses** 181:5
 185:7,9 217:14
 292:17
**experience**
 44:19 48:24
 253:19
**experiencing**
 286:4
**expires** 172:17
 314:18
**explain** 50:4
 101:4 142:22

157:14
**explained**
32:24
**explanation**
252:22
**express** 100:14
**extended** 99:19
177:22,24
**extends** 100:18
**extension** 5:18
172:12,15
173:15,19
175:2
**extent** 33:10
41:1 46:24
82:17 213:25
282:1
**exterior** 136:18
136:19 147:15
**external** 82:10
**extra** 181:4
**extremely**
124:18 189:25
**eyes** 194:6
257:16

**f**

**f** 2:5,13,18
**fac** 166:24,25
182:24
**facade** 136:18
145:12,19
**facilitate**
184:11

**facilitated**
239:22
**facilities** 42:21
47:1 50:24
51:8 57:19
74:15 75:16,18
75:22,24 76:8
82:5,20 83:16
84:19 89:24
94:24 109:7,15
111:13 113:6
118:8 140:7
143:1 150:15
201:5 284:3
**facility** 101:19
139:21 140:3
152:18 225:15
230:19 248:13
284:2 290:2,5
292:11,17,18
**fact** 144:4
182:19 213:14
261:11 262:3
262:13 274:11
**factor** 214:22
**failed** 145:6,25
**fails** 316:18
**failure** 133:4
**faint** 249:7
**fair** 15:11 16:1
16:2 38:20
49:10 56:22
113:22 114:14
133:19 135:13

151:1 202:19
222:24 258:11
277:19 279:17
281:3 302:2
307:12
**faith** 26:20
**fall** 62:22
235:24,25
290:25
**false** 261:9
**familiar** 89:13
145:18,21
169:24 170:2,4
171:24 184:20
218:25 278:24
**family** 36:5
148:19 166:12
**far** 35:21 36:1
115:21 159:17
177:22 280:4
**fault** 63:12
**feasibility**
70:23 72:17,18
72:20 120:2,8
120:10,15
213:18 268:4
279:19
**february** 103:6
103:23 107:19
108:1,13 109:3
109:17 110:24
126:6 133:24
134:6 135:24
136:9,22 137:4

259:2,8,14,25
260:11 275:10
276:3 284:18
286:4 301:16
302:8 303:24
304:5 309:5
310:23
**federal** 1:23 2:4
224:24 229:1
314:5
**fee** 76:15,20
77:7 93:3,9,11
101:1,5,15,23
101:25 181:15
181:22
**feedback** 6:17
199:10
**fees** 73:10,15
76:20 80:3
93:6 94:10
100:19,22
180:25 181:3,4
181:10 182:4,7
294:13
**fell** 55:14
**felt** 74:17
**field** 71:12
**fifth** 240:8
248:8
**figure** 109:23
190:4,11
193:21 275:23
**figures** 263:9

**file** 7:5 18:25
20:4 68:2,5
96:18 128:9,12
174:4 251:21
256:21,24
287:8,14,15,20
300:4,7 311:23
**filed** 9:20 20:12
21:20 23:12,18
25:2,9 26:20
27:10,14 298:1
299:1,5
**files** 127:19
261:7 284:21
285:8,9,14
**filing** 161:14
167:4 294:10
**filings** 15:6
**final** 219:3,14
220:3,5,13
**finalized**
192:24 237:17
**finally** 212:22
**finance** 28:23
44:7 84:13
140:21 184:9
232:11 250:16
264:17
**financial** 14:9
14:12,13,16,19
21:2 85:7
161:25 162:4
184:23 250:10
250:18 279:24

280:3 283:13
283:19 299:20
**financially** 10:7
25:25 314:10
**find** 194:6
196:13 210:17
258:12 302:14
**findings** 164:10
164:16 165:19
**fine** 29:22
129:8 264:21
312:2
**finish** 15:12,23
18:2
**finished** 142:17
**fire** 228:11
**firm** 23:8 50:25
51:3 314:19
**first** 21:25
44:12 47:21
53:6,9,21 56:6
56:10,12 60:9
60:19 64:15
68:21,23 69:18
70:5 72:25
73:9,17 79:10
80:2 93:4
96:25 115:20
126:16 128:18
130:22 139:11
148:2 155:18
159:4 161:10
168:4 172:10
186:17 187:22

190:18,25
198:12,14,15
206:14 211:2
222:18 227:24
236:7 237:24
245:2 247:4
257:22 266:1
270:16 277:15
287:13 292:4
301:23 310:22
**firstbristol**
243:19
**firsthand** 252:8
256:11
**fit** 118:5 169:14
253:22
**five** 47:7 52:5
60:5,7 65:12
67:24 77:19,20
90:14 110:21
134:14 150:14
190:15 197:22
201:25 202:2
211:15 220:4
300:1
**fixed** 73:14
76:15,20 93:9
93:11 94:11
101:1,5,7,15,18
101:23,25
222:8 248:9
**flagged** 173:2
**flat** 181:22

**flip** 88:15
**flipped** 252:2
**floated** 65:25
**flood** 7:7,19
48:9,20 86:3
87:17,25 88:8
111:23 112:12
114:13 116:1
134:2 163:2
166:19 197:15
197:16,19
223:16 257:25
**florida** 105:4
105:12 110:18
289:8
**flow** 8:11 64:23
82:4,18 83:15
83:17 84:5,18
85:9,15 281:14
281:17,20
282:2,7 286:5
**flows** 82:9
281:20,23
**focus** 180:9,13
193:10,17
305:4
**focused** 50:25
210:4 306:7
**follow** 7:17
130:18 174:15
**following** 48:9
48:19 86:3
109:21 112:12
149:2 175:10

175:11 210:25

**follows** 11:5 292:4

**footnote** 248:24

**forensic** 125:12

**form** 19:15,16 30:23 34:23 35:8,16 57:8 128:24

**formally** 16:16 212:21 237:1 244:22

**format** 219:21

**formed** 53:15 53:25 54:4 56:5

**former** 27:19 28:19 29:8,13 30:20 212:4 232:9 244:10

**formerly** 97:2

**fort** 314:20

**forth** 100:23 184:12 185:11 263:24

**forward** 153:18 153:22 154:13 157:13,19 158:1 194:18 195:19 227:1 233:9,19,24 235:7,10 269:24 272:22 300:20

**forwarded** 123:7 124:25

**forwarding** 5:17 7:4 263:25

**found** 14:25 15:1

**founded** 15:1 16:1 44:17,20 51:22 52:13 57:1

**founder** 14:22 179:24

**founding** 117:10

**four** 39:3 47:7 54:15 77:19 90:14 145:14 161:24 222:19 223:1,2,18 230:22 232:14 241:3 253:11 265:12 305:22

**fourth** 138:9 180:22 230:16 303:3 310:15

**foxboro** 201:9 201:10,11,13 201:16

**fp&a** 283:12,13 283:17 284:4

**fps** 17:16,17 23:20 102:16 295:19 296:1

**frame** 16:1 17:7 75:22 90:9 142:17

**frames** 54:3 149:13

**fraudulent** 261:12

**freestanding** 306:4

**frequent** 134:20

**frey** 5:7 151:11 151:14,22 152:5,7 153:15 154:11,24 155:22 157:22 158:2

**frey's** 151:16 156:3

**front** 88:16 94:25 96:22 249:14

**fruition** 192:20

**frumkin** 7:4 28:21,24 29:3 251:5

**fte** 74:5,8 81:15 81:17,20 101:17

**ftes** 254:4,11

**fulfill** 91:6

**full** 53:3 82:2 124:17 131:16 138:25 141:19

152:25 167:10 168:12 185:2 194:2 207:25 208:11,13 222:10 224:20 232:25 235:4 244:23,24 246:17 272:21 285:17 292:4 301:23

**fully** 153:16,21 154:1,12 192:22 208:20 227:1 248:6

**function** 84:14 84:23 85:2

**fund** 213:16 275:23 276:5,7 276:15 277:10

**funded** 146:17 277:14,14 288:7

**funding** 56:23 58:8 76:25 81:25 82:4,18 82:22,24,24 83:4,5,11,14 84:1,5,18 85:8 85:14 139:11 139:17,18 146:9,13 147:2 147:3 223:25 224:8,13,14 231:7 278:16

**[funding - generally]**                                   Page 33

279:3,7 280:9
281:5 286:10
288:8 293:14
**fundings**
139:25 140:4
**funds**  20:19
23:13 25:11,18
76:21 140:12
140:12 230:12
**furlough**
253:18 254:1
**furloughs**
253:9,16,17,20
**further**  291:5
300:14 308:20
308:25 311:11
314:8,9
**future**  231:6

**g**

**g**  9:1 11:15
**gale**  145:12,18
**game**  254:3
**gang**  121:12,24
**garage**  122:4,7
122:25
**garages**  121:11
121:12,23
**garden**  249:14
**gas**  200:10,11
**gases**  199:20,24
**gen**  49:15
298:7

**gencon**  16:8,11
16:14,18,20
44:24,24 45:4
45:7,11,13,15
45:19,21,23,24
46:6,10,13,17
46:25 47:6,7
47:19 48:12,18
48:22 49:2,3,7
49:11,13,15,15
49:19,22,23,25
49:25 53:10
54:5 126:20,22
126:23 144:3,4
144:5
**gendron**  1:12
1:15 3:4,10 4:1
5:1,6,16 6:1,10
6:14 7:1,22 8:1
8:10 9:15
10:22 11:2,13
11:16 21:13,16
21:18,19 23:11
43:19,24 44:23
68:8,9,11
76:10 77:25
79:1,3 80:11
80:16 88:20
89:2 92:2
93:10,16,17
95:12,15 96:21
96:22 97:7,24
97:25 99:14
102:11,24,25

104:6 107:9,11
107:15,17,18
107:23 108:13
108:21 109:12
109:17 110:4,7
110:13 112:23
112:25 115:14
116:8,10
125:21,22
127:23 128:15
128:16 130:9
137:7,9 143:19
144:18,19
149:18,21
151:7,8 155:5
155:6 159:25
160:4,14
167:19,21
169:18 170:25
171:2 174:7,15
174:20 178:4,6
178:14 179:5
180:19 186:3,4
198:5,6,9
199:10 202:25
205:25 206:2
209:1,2,5,23
218:3,6 219:22
220:17 231:16
231:17 238:4,4
238:7 242:25
243:3 250:21
250:23 251:2
257:4,6 258:2

258:23,24
264:23,25
265:2 268:9,10
268:13 269:3
270:2,9,10,21
273:25 274:2,4
274:7 275:5,6
277:24,25
278:5 284:7,9
287:2,5,19
291:22 294:20
294:23 297:1
300:9,16 301:6
308:23 312:8
313:2,11 315:2
315:24 316:5
**general**  36:18
40:11 42:21
44:18 56:16
57:19 58:20
59:2 66:14
69:14 70:16
74:10 134:9
136:15,17,23
143:12 161:19
170:3 172:24
180:1,7,16
241:2 242:19
244:23
**generally**  18:23
20:2 37:22
52:5 71:19
72:5,13 74:13
85:16 88:11

110:20 128:22 135:1 141:2 170:17 174:12 202:13 210:12 221:14 242:12 282:7 288:3

**genfps** 17:20

**genholdco** 8:14 16:22,23 17:1 18:13,16 295:1 295:21 296:6 296:11,21 297:1,2,7,15 298:12

**genholdingco** 296:2 299:22

**geni** 90:25

**genipg** 17:6,19 88:10,21,22,23 89:7,20,25 90:3,7,13 91:1 91:6,21 94:2 96:1 97:6,13 102:9,15

**genipm** 17:6 56:19 69:19,22 69:25 73:25 79:9 89:9,21 89:22 90:4 91:1,6,23 93:11 96:1 97:2,9,12,13 102:13

**genipm's** 102:10

**genreal** 17:5,10

**genserve** 45:20 47:13,18,24 48:8,12,18 49:4,11,16,23 50:2,10,11,17 50:18

**gentleman** 159:4

**gentlemen** 46:9

**geographic** 52:3

**getting** 180:10 240:5

**give** 44:18 96:4 104:10 112:5 112:10 131:18 148:25 154:5 155:8 209:5 221:23 239:8 247:1 257:16 257:20 266:17 278:7 294:18 304:15

**given** 52:10 64:12 76:23 110:2 112:2,9 112:16 121:1 142:6 148:10 168:18 176:15 181:16 193:17 194:5 210:9

253:11 298:6 313:7 314:4

**giving** 148:24 175:9 273:16

**glance** 259:19

**global** 179:16

**globally** 296:14

**go** 9:12 17:21 18:2,5 36:1 44:16 96:10 138:8 172:2 173:22 186:15 206:20 209:20 231:15 239:11 243:18 254:16 254:17 255:5 274:21 278:22 281:5 311:14

**goal** 248:12

**goes** 100:4 155:18 253:8 274:13

**going** 9:3 13:6 33:6,11 35:21 58:1,16 68:8 80:23 85:24 88:2,14 96:12 98:3 112:18,22 116:12 119:20 128:17 148:25 149:20,22 150:1 151:6 155:4 157:13 157:13,23

160:8 167:19 171:19 172:4 173:11 178:9 186:2 188:1 192:18 194:5 198:5,20 206:10 209:15 213:16 216:19 227:12 243:13 256:17 257:2 258:9 271:14 278:10,19 284:14 287:4 291:22 292:3 293:14 303:6 306:7 310:11

**gonsalves** 45:16,21

**good** 9:2 10:16 10:18,20,23 11:9,10 63:11 63:12 64:1 158:9,22 192:4 193:6 195:22 197:21 200:9 233:19 239:21 254:17 257:16 274:14 301:8

**govern** 110:1

**governed** 87:11 87:15 88:7 98:11 110:11

**government** 193:11

**governor** 189:13

**grad** 44:22

**grade** 228:17

**grading** 152:16

**graduate** 44:2 44:8

**graduated** 44:11

**graduating** 44:9

**grandfathered** 124:15 201:6

**graves** 168:5,12

**great** 222:17

**grider** 166:25 167:2,6 183:3 183:15 217:12 252:3 263:17 263:19,23 264:3

**grider's** 183:10

**grip** 66:22

**grise** 115:16 284:3

**group** 117:24 118:1,11 136:3 209:7,23 211:1 232:11 243:6 255:8 283:12

**grow** 297:23

**grown** 286:22

**growth** 57:21 58:17

**guarantee** 1:7 2:8 9:18 26:23 26:24 27:5 216:20 217:2 217:10 229:6 242:5 250:4 259:4,15 260:1 261:24 268:16 309:4 310:24 311:9 315:8 316:4

**guess** 45:1 58:12 87:25 133:17 149:7 149:14 215:15 221:8,8 307:11 308:2

**guessing** 208:19

**guidance** 229:12 235:17 294:5

**guild** 200:14,17 200:19

**guyon** 232:2,5 232:6

**guys** 67:21

**h**

**half** 13:5,11 28:3 44:13,22 55:1 166:9 220:4 236:5

**halt** 288:17,24 289:11 290:15

**hamner** 8:7 171:22

**hand** 92:4 95:14 103:14 130:15 131:6 155:4 160:22 160:23 162:20 180:20 184:8,9 198:5 209:18 241:11,21 283:21,22 284:4,4 287:4 291:12,22

**handing** 21:18 243:2 278:5

**happen** 131:22 141:5 143:6 308:17

**happened** 64:11 106:21 118:25 236:4

**happening** 254:18

**happy** 293:1

**hard** 257:15

**harm** 299:9

**harrison** 238:11 269:8

**harry** 39:19,21 238:25 265:16 276:6

**hartford** 2:18

**hazardous** 228:13

**head** 14:8 140:21 177:8 187:9 202:12 234:17 251:13 251:18 286:9 311:18,20

**header** 198:16 251:4

**heading** 89:18 118:24 122:4 130:18 136:12 267:7 275:13

**heads** 149:1

**health** 4:14 5:7 5:15 8:7 14:10 32:10 39:11 43:9 46:25 51:14,14,16 56:4,9 61:4,11 63:6,16 64:7 68:24 70:12 73:5 75:1,7 79:21 82:14 91:16 92:25 95:21 103:20 103:23 126:1 175:18 177:20 178:19 193:12 193:18 211:20 217:23 232:10 239:18 243:16

243:24 245:11 255:18 263:5 266:21 289:16 294:11

**health's** 14:18

**healthcare** 18:20 50:25 52:11 72:7 124:11 201:17 201:20 296:16

**heard** 9:9

**hearing** 145:22 291:9

**held** 33:24 68:3 96:16 114:19 114:21 128:10 163:11 174:2 185:24 197:25 256:22 271:6 291:9 296:22 300:5

**hello** 199:9

**help** 102:7 122:6,12,21 123:13 169:8 172:25 184:11 189:11 296:18

**helped** 149:6

**helpful** 31:22 41:9 45:4 102:21 164:14 165:8 185:13 281:25

**herb** 244:19,21 244:21

**herbertmcma...** 244:3

**herbholtz** 244:13

**hibble** 172:24 173:6 269:11

**high** 131:12 132:16 133:1,7 231:3 240:11 253:1

**higher** 182:13

**highlighted** 218:15,21

**highlighting** 296:16

**hire** 31:18,19 31:21 178:21

**hired** 32:6 53:10 90:25 91:12 118:8,9 164:3 181:16 267:25 270:3

**hires** 91:5

**historically** 133:15

**history** 65:21

**hobin** 45:11 47:22

**hold** 40:25 64:17,23 65:2 65:8 66:3,4,11 104:3 179:18

300:13

**holding** 16:23 16:25 298:8

**holmes** 2:11

**holtz** 244:19,21

**homelessness** 121:12,24

**honest** 166:22 254:8

**honestly** 163:21

**hoped** 297:21

**hoping** 50:22

**hospital** 4:14 5:11 6:4 7:11 7:13,16,19 8:4 22:14,24 24:4 24:5,24 34:22 35:7,15 36:7 36:12 38:2,14 38:24 43:1 47:2,4,6 48:9 48:13,19,23 49:3 50:12 54:11 55:10,17 56:1 75:25 78:14,20 86:9 86:17 87:4,17 98:13,15 99:7 99:11 101:14 108:18,25 111:1,24 114:14 115:21 116:2,20 119:4

119:14,17,19 119:25 120:3 120:15,20 123:3,21 124:22 125:8 126:1,13,24 127:3 130:25 133:18 134:2,5 134:19 135:7 135:10,14,24 136:8,24 137:3 138:5 142:24 143:9,14 145:1 145:12,19,24 147:16,22 148:4,11,22 149:10 160:7 164:4 166:17 167:3 176:8 184:18 187:1 189:2 190:1 191:13 192:12 192:14,19 194:1,17 195:9 197:15 199:1 203:20 204:1,8 204:12,15 210:11 212:8,8 213:19,23 214:8,14,20 215:10 216:10 216:12 221:18 223:21 224:1,9 224:20,23

225:6 227:2 230:11 231:7 232:25 233:4,9 233:10,11 235:20 237:4 239:1 240:16 241:18,23 246:6,25 249:11 255:19 259:5 265:10 265:19,20 266:4,5 267:17 267:18,21 268:2,5,5 269:18,25 271:13 272:12 272:24 273:5,6 275:9,13 276:17 277:7,7 278:17 280:10 288:20,21,22 288:22 290:23 290:24 302:4 303:9,11,18 309:17 311:2,3 311:6

**hospital's** 223:21

**hospitals** 42:19 42:22 55:2 58:3 64:21 98:7 108:16 121:1 124:12 135:5 136:4

239:2 254:13 284:6

**hot** 128:7 282:11,13,13 282:17

**hotel** 271:6

**hour** 13:5,11 28:3 67:20

**hours** 13:5 116:1 186:12

**house** 43:9,11 193:24 244:11

**houston** 291:3

**hr** 251:13,18 253:10

**hta** 201:20,22 201:24 202:20

**huh** 41:12 42:3 42:9 62:8 66:13 80:5 86:1 89:10 97:5 98:12 110:3 136:14 146:6 156:8 171:23 180:24 181:21 241:9 251:9 267:5 286:2

**hundred** 42:20 54:10 65:20,25 76:3 111:21 143:16 280:17 295:17 296:15

**hundreds** 120:11 276:7

**hybrid** 229:23

**hypothetical** 144:10

### i

**iasis** 97:16 98:8

**icloud** 36:2

**idea** 158:9,22 217:21

**ideal** 225:5,8 225:11,20

**identification** 222:8

**identified** 74:16 78:3 133:23 139:24 145:25 180:3 222:19

**identity** 22:1

**illinois** 2:12

**illustrative** 249:8

**image** 249:8

**imaging** 211:8

**immediate** 137:1 188:20

**immediately** 175:14,25 176:10,21 193:21 241:16

**impact** 66:15 157:18 197:14

197:18 253:6 254:25 256:2

**impacted** 148:3 175:12 253:17 253:25

**impersonally** 120:6

**implementati...** 202:16

**implementing** 114:25

**implicated** 307:14 308:4

**implied** 100:14 105:25

**important** 74:17 164:23

**improvements** 42:22 136:2 139:22

**improving** 58:2

**inbound** 120:24

**include** 194:12 207:12,15 264:4

**included** 55:10 140:19 219:24 246:23 269:8 269:14

**includes** 20:11 94:7 145:14 179:6 230:6 249:1 271:11

including 10:12 25:19 150:1 227:9 299:9

income 181:4 181:17,19

inconsistent 303:22 304:4

incorporated 135:21

incorporating 192:8 219:21

incorrect 233:15

increase 94:16 94:19

increased 80:9 80:22 94:21 229:7

increases 80:17

increments 181:23

incurred 276:16

indefinite 64:17

independent 100:1 245:2 286:16

indicate 131:22 131:23 240:1 275:21

indicated 81:16 164:25 273:12

indicates 73:12 224:22 274:5

indication 257:18

indirectly 58:12 120:6

individuals 77:24 78:7,11 84:2 186:22 187:4,14 247:6 299:5

industrial 124:13

industry 74:20

infinite 64:13

inflows 83:2

influence 12:7 57:7 170:9

influential 296:15

inform 72:22 212:21

informally 154:18

information 8:11 14:10,12 85:7 147:18 164:19 173:5,9 173:18 184:12 185:11,15 198:17 222:4 223:3 224:12 227:1 247:23 250:3 253:1,5

255:17 256:2 256:11 261:9 261:10 262:21 282:24 283:5 306:10,16 307:2,14 308:11

informations 162:9

informed 158:21 165:5 174:17 269:18

ingram 132:6

inheriting 286:13

initial 56:23 74:5,8 87:22 99:15 139:23 139:24 140:4 148:21 156:23 184:21 210:10 224:14 228:10 279:6

initials 69:8,12 92:3,6 180:19

initiative 42:16 267:18 311:3

initiatives 265:21 266:6

inoperable 108:6

inpatient 193:14

input 265:14

inputs 184:24

inquiries 120:24

insiders 299:9

inspection 133:24

installment 74:1 80:17

installments 80:9 101:9

instance 1:15 71:18 116:5 122:16 174:11 190:3

instances 51:12

institute 192:3 192:5,6,11

instruct 13:9 41:6

instructed 19:20 41:17

instruction 13:16 28:13 43:14,20 174:7 174:16 263:18

instructions 264:10

instructs 215:25

insulting 308:18

insurance 1:7,8 2:8,9 9:19,19

26:24 86:8,16 87:2 88:12 111:1 149:3,9 150:20 151:2 152:6,8,9,9,21 153:17 154:13 159:23 161:7 161:13,25 162:4 163:3 165:16,25 179:7,8 188:3 204:20 205:23 214:6,18 215:8 216:11,21 217:2,22 223:7 223:13 226:2 226:21,22 227:25 229:6 229:23 230:12 230:17 231:3,7 232:16 234:6 234:14,21 235:2,18 240:9 240:16 248:18 249:24 261:7,8 261:12,24 262:22 270:4 271:3 275:24 276:10 292:5,9 294:3 304:23 305:24 306:11 306:17 307:3 307:15 308:11 315:9,10

**insured** 262:1 262:12
**insurers** 26:23
**intent** 261:6
**intention** 105:16
**intentionally** 262:2,12
**interact** 246:7
**interaction** 283:18
**interest** 16:4,17 18:16 21:3 45:7 62:2 121:6 192:1 296:6,11,22 297:7,9,13,25 298:15
**interested** 10:8 57:20 314:10
**interesting** 64:2
**interests** 121:7
**interim** 61:9 224:14 260:25 261:18 277:12 293:17
**interior** 136:19 145:7 146:1
**internal** 82:9 91:11 117:12 242:15 245:5 269:11

**internally** 141:2 232:13 234:13 305:21
**international** 23:23 62:10 114:6,18,23
**international's** 62:6
**internationally** 296:18
**internet** 9:7
**interpret** 122:18,19,24 123:3
**interruption** 152:23 163:4 185:16 250:11 252:23 256:3,9
**intimately** 184:21
**intrusion** 152:16
**inventories** 183:24
**invest** 57:18 142:18
**invested** 25:25 57:22 58:4,12 143:16
**investigate** 18:25 20:4
**investigation** 299:23 302:2

**investment** 58:2,17 140:6 142:6 146:14 230:23 231:2 240:14,15 296:17 297:21 298:19
**investments** 141:20,23
**invoice** 49:21
**invoices** 20:13 22:19,23 48:13 49:7,20 282:16
**invoicing** 50:17
**involve** 43:2 152:21
**involved** 43:6 75:10 86:4,7 86:15,21,22 114:12 152:2 182:6 184:15 184:21 202:16 205:4,7 216:25 224:7 246:3 249:22 250:1,9 250:13 253:22 265:12 271:2 281:13,17,19 283:11
**involvement** 75:14 124:1 185:15 246:5 259:13,24 263:4 265:9

**[involvement - justin]**

279:9,11
280:22
**ipg** 17:17 88:12
89:23
**ipm** 17:17
**ir** 290:9
**issue** 26:18,23
27:6 80:11
130:22 132:13
132:16,25
152:16 173:4
173:17 180:13
219:22 295:17
**issues** 64:24
134:14 151:20
153:18 154:13
193:18 232:10
275:24 276:10
**item** 201:8
211:2 256:8
293:15
**items** 130:19
190:15 199:13
252:9,19 254:6

**j**

**j** 1:19 2:3 314:2
314:17
**jacob** 28:21
251:5
**jacqueline**
137:17,18
**jacquelinemills**
137:13

**january** 15:4,6
15:8,25 16:5
16:15,18 51:22
53:15 73:7,20
88:25 89:8,25
90:12 91:2
**jason** 151:11
151:14,16
157:2
**jaylen** 2:10
10:18 258:14
**jimkaram**
243:19
**jimmy** 234:5,11
**jlauner** 2:6
**jminefield** 2:14
**job** 1:25 15:17
44:12,16 45:2
67:2 84:11
85:1 162:9
**joe** 245:21
**john** 7:10 29:16
38:25 45:21
158:13,14
183:6 184:13
184:14 185:25
194:25 205:2,2
221:13,14
232:2 244:7,10
245:6 251:4
259:4,12 261:1
261:17 264:17
305:15

**johnson** 234:6
234:11
**joint** 100:7
213:4,7
**jointly** 271:6
**joseph** 59:5
69:13 75:4
79:22 92:24
140:23 205:2
**joseph's** 291:3
**josh** 2:3 10:23
**jp** 193:6 194:23
**jp2** 195:1 208:1
208:4
**jpmorgan**
296:16
**judge** 12:3
**julie** 243:6
**july** 42:25 48:8
116:13,18
117:5,20
118:24 121:10
142:5,16
151:12,15,20
155:17 158:16
159:18 169:25
203:1 206:5,23
207:19 209:7
209:22 210:8
216:22 231:21
232:21 305:14
306:21
**jumped** 253:13

**june** 35:13
36:12,19 37:13
38:7,22 39:12
46:14 48:20
55:18 59:6
62:16 67:12,16
86:4 88:6
98:15 99:12
111:10,18,24
112:3,9,13
113:17 114:11
115:7 116:3
119:17,25
120:4,15,21
124:23 125:9
125:16 127:3
134:6 135:8,25
136:9 137:4
141:14 143:7
148:4 149:2
160:21 186:23
187:21 195:18
196:11 197:15
198:13,18
204:17,25
205:21 246:6
292:7,23 293:8
303:12 304:18
**jury** 12:2
**justin** 45:12,16
45:21 47:22

**k**

**karam** 6:22 159:6,9

**kcd** 47:11

**keep** 15:17 135:3 190:21 204:18 205:21 277:12 304:22 307:2

**kelly** 259:7,10 259:11

**kenyon** 37:16 37:22 58:21 62:15 75:10 78:3 113:19,22 123:10 136:3 148:6,20 162:21 187:13 207:16,19 282:14 284:2

**kenyon's** 75:13

**kept** 207:5 306:10

**kidney** 115:16 207:16,18

**kind** 44:18 45:2 51:2 52:17 66:23 72:15 84:13 92:1 101:4 129:3 147:25 148:23 149:12,14 184:10,15

185:24 194:5 233:4 241:1 245:1 253:13 254:7 286:11 305:5 308:18

**kinds** 40:11 46:12

**knew** 90:22 170:5,5 192:17

**know** 23:16 24:12 26:6,15 31:13 32:12,15 32:16,16 33:18 34:25 35:2,3 35:10,17 36:1 36:4,21 39:7 47:5 48:21 49:5,20 50:5,7 50:16,20 54:7 55:13 58:11 59:20,23 61:8 63:3,14,17 65:9,11,24 66:7 69:12 77:3,14,23 78:4,5,10,21 82:17 84:12,22 91:14 94:21 103:22 105:18 116:17 119:13 122:15,18 124:20 129:4,5 129:17,24 131:14,16,22

132:1 135:3,6 135:10,20 136:4 137:20 137:23 139:17 140:24 141:1,5 141:12,22 142:1,4,14,18 142:20 143:6 143:10,20,23 144:4,11 145:23 147:14 147:17,21 160:10,12 161:1,15 163:11,20 164:10 166:13 166:20 169:5 172:14 173:13 177:23 180:4 181:25 182:3 184:2,6 189:4 189:22 190:12 191:16 192:10 194:3 196:2,16 196:21 200:23 201:10,15,21 205:17 208:16 210:22 211:12 212:1,5 213:20 217:18,21 219:8,16,19 220:2,21 221:3 223:19,24 225:8 226:10

227:3 229:2 231:11 232:8 233:5 237:13 237:14,16 238:1 239:17 239:20 241:1,6 242:7 244:13 244:21,23 245:1,23 247:20 248:23 249:16 253:16 253:19,21,24 254:19 255:1,3 255:10,12,12 258:8 259:10 262:10 263:8 263:14 264:9 269:1 271:1,7 271:20 272:11 272:21 273:21 274:11 280:5,7 280:13,16,18 282:11,15,20 283:3,4 286:20 287:23 289:2,6 290:19 291:1 291:17 292:21 293:6,11,18,23 293:25 294:8 298:4 299:20 303:8 307:24

**knowing** 67:4

**knowingly** 261:6

[knowledge - launer]                                    Page 42

**knowledge**
31:6 37:12
39:6 48:24
111:11,25
112:14 113:10
129:22 131:21
135:23 137:2
144:7 183:14
183:16 211:21
213:17,21
234:14 242:4,8
242:12 252:8
252:19 253:4
256:2 260:19
279:1 280:8
282:9
**known**  71:13
97:2
**kronfeld**  1:3
9:17 18:19
26:21 32:12,17
299:8,13,23
315:5 316:4
**kronfeld's**
18:24 20:3

**l**

**l**  2:3,10
**la**  14:6 29:24
29:25 30:4
37:4 53:6,13
53:19 54:2
56:24 58:22
158:12,25

159:2 188:13
188:16 189:5
189:10,15
190:6 205:6
219:4,10,19
220:1,14,22
221:2,14,17,22
223:6 231:8
235:17,21
236:1,8,23
240:24 244:18
296:4,14,22
297:16 298:7
298:14 299:1
299:15,16,21
**lab**  199:23
202:17 212:4
288:15 289:2,5
**label**  180:23
206:25 218:9
260:12 272:11
**labeled**  116:11
125:24 134:9
146:7 149:23
160:1 206:4
278:6
**labor**  50:6
**laboratories**
170:16
**labs**  202:15
**laid**  223:18
305:6
**lake**  52:8
289:15,17,20

**land**  123:22
**landlord**
172:22 200:25
201:18
**language**
229:17 248:2
249:7 261:18
309:3 310:7
**large**  42:16
59:10 66:6
88:13 193:10
201:18
**largest**  135:16
193:14
**larry**  181:12
233:24
**late**  255:23
**latest**  237:18
**laughter**
311:21
**launched**
267:17 311:2
**launer**  2:3 3:5
10:23,24 13:8
19:3 20:7,15
24:10,19 25:13
25:20 26:2
30:24 31:8
35:9 38:16
39:15 40:7,25
43:17 46:16
50:14 51:18
57:4,9 66:5,18
76:12 92:10,14

107:5,13
109:18 119:18
122:14 123:4
125:10,17
129:8 130:6
141:9,16,25
142:9 149:11
160:10 165:1,5
165:10 167:13
173:5,8,18,22
176:3,12,24
203:16,22
212:12 213:2
214:9,21
215:12,15
216:13 217:4
217:11 219:6
220:8,18 224:2
224:10 226:24
229:9 232:23
233:12 234:22
237:7,21,25
242:11 248:4
248:20 255:5
255:15,22
256:5 258:4,8
261:20 262:6
262:23 263:21
264:6,13
268:19,24
273:8 274:10
275:2 276:11
276:18 277:2,8
277:20 278:1

**[launer - line]** Page 43

278:18 279:4 283:8 285:3 286:6 291:8,19 292:25 293:10 301:2,5 302:17 304:2,9 306:14 306:20 307:6 307:23 308:8 308:14,20 309:2,6,8,11,23 311:13,25 312:2

**laura** 245:7

**law** 23:8 26:9 215:15 266:21

**law.com** 2:13 2:14

**lawsuit** 18:19 20:19 25:16 26:1,6,8,11,18 26:20 27:2,14 30:4,13,21 166:17 167:3,4 299:1,8

**lawsuits** 19:1 20:5

**lawyer** 12:11 12:22 23:6 267:1,9 269:11

**lawyer's** 13:16

**lawyers** 12:19 13:12 19:21

**lay** 222:25

**layoff** 119:4

**layoffs** 64:9 253:20

**layperson** 142:23

**lead** 169:7 265:23

**leadership** 163:6 204:23 205:11,14

**leading** 234:4

**leak** 133:16

**leaking** 130:25

**leaks** 132:21 133:9,12,20 134:19,21

**learned** 148:3 173:6,9,19

**lease** 5:18 51:11 58:10 154:21 157:18 169:19,24 170:2,8,18,24 172:16,21 174:11 175:3,4 175:7,15 176:1 176:22,23 177:1 292:11 293:15,17

**leaseback** 54:22 55:22 57:2,12,25 58:9 75:24 82:23 139:23

170:13 196:24 197:3 201:24

**leasebacks** 55:13 197:7

**leased** 55:2 56:1 201:14

**leave** 62:21 232:10

**leaving** 133:11

**left** 61:4 241:21 280:6

**legal** 1:22 9:24 49:16 154:22 161:25 162:4 174:9,10,12 314:18 316:23

**legend** 131:17

**lessee** 55:20 157:12 173:1 175:9,17 177:3 177:14

**lessee's** 176:11

**lesser** 194:12

**lessor** 157:12 173:1 175:10 175:20 177:15

**letter** 8:7 177:13 212:20 260:11 277:10 292:1 301:16 301:19 303:24 304:5

**letting** 166:13

**level** 204:19 205:1,22 253:1 304:22

**lever** 228:24 229:3,15

**levine** 266:21 269:5,22 310:3

**liability** 1:7 2:8 9:18 315:9 316:4

**license** 201:12 290:4

**licensed** 101:19 201:6

**lied** 183:23

**life** 131:2 214:24 303:19

**lift** 74:10,21 75:2,9,12 91:11 98:6 117:8,9

**likely** 208:18 221:7 252:2

**limited** 248:5 257:22 302:2

**line** 137:14,24 138:9 145:2 150:1 156:6 190:15 199:1 207:5 209:8,25 210:20 211:2 211:14 218:11 222:17 234:14 243:8,15

251:20 256:8 287:13

**lines** 131:5 138:19 219:22 219:24,25 230:1

**link** 196:7

**lisa** 184:18,19 264:16

**list** 22:19 78:22 126:15 190:15 282:11,13,14 282:17

**listed** 18:8 62:5 69:22 109:2 110:7 113:22 114:2,5 115:13 126:12,18 130:22 144:25 145:4 147:7 165:16 179:8 245:13 301:22

**listing** 103:15 179:24

**lists** 22:1 73:19 92:20,24 138:19 179:15 180:25 181:3,4 199:13 275:16

**litigation** 1:4 9:17 18:20,25 20:4,11 32:14 111:4 127:12 128:19 129:1,3

161:14 315:6

**little** 18:6 42:11 85:25 101:21 149:15 161:16 178:8 238:21 257:15 271:8 278:20,25 285:15 286:23

**live** 52:22

**lived** 53:1

**llc** 5:7 8:8 22:2 22:7,13 23:18 23:21 24:1 79:21 178:19 295:1,19,19,21 296:21 297:1,2

**llcs** 17:7

**llp** 2:4,11

**ln** 315:13

**local** 140:19 207:25 208:15 208:17 224:24 228:25 245:25 246:1 284:5

**locally** 72:14

**locate** 212:3

**located** 52:2,4 52:5,7 65:4 133:18 200:18 271:7 289:7

**location** 9:23 52:14 126:12

**locations** 46:21 145:15 202:9

**lodged** 41:15

**lombardo** 251:6,12,13 253:8 254:16

**long** 13:4,11 28:2 52:16 53:1 117:5 163:11 178:25 213:12 214:7 214:19 215:9 216:12 249:5 270:12

**look** 21:11 72:21 77:11 79:12 80:2 88:11 89:17 92:8 95:10 96:25 103:12 103:13 112:20 116:7 129:25 130:9 132:10 139:10 144:17 145:11 146:4 150:3 178:14 180:22 185:2 188:20,25 210:14 224:18 247:1,15 249:4 249:7 254:2 269:23 277:22 277:23 288:9 292:15 300:2

**looked** 80:11 89:9 94:15

97:25 101:6 105:3 107:2,11 126:10 191:10 202:5 287:8 291:23 295:25

**looking** 23:3 73:9,17 92:17 96:21 97:24 105:11,19 130:11 143:18 164:11 174:20 177:12 241:7 248:8 250:24

**looks** 80:8,15 113:23 226:10 241:20

**lorusso** 135:14 135:22 190:18 191:1 208:22

**losing** 189:25

**loss** 5:15 86:9 86:17 87:4 88:13 99:12 147:23 149:3,9 150:20 151:2 163:10 166:17 167:3 172:20 172:23 176:16 181:13 182:4 182:15 184:11 187:1 189:10 189:22 193:16 205:17 210:10 241:16 249:23

**[loss - manages]**                                                    Page 45

250:6 256:9 260:15,25 261:18 264:4 292:9,17 294:3 305:4 306:22

**losses** 181:3,11 182:8,21 263:16,20 264:12

**lost** 254:7 310:14

**lot** 15:5 38:18 57:17 58:13 86:21 104:2,24 114:24 120:7 120:20,20 124:16 185:19 191:4,7,13,17 191:19 201:2 254:15

**lots** 67:4 120:25 143:2

**loud** 264:22

**lovelady** 6:22 243:6

**low** 240:11

**luke's** 289:23 290:4,13

**lunch** 6:17

**lunt** 45:22

**m**

**m** 2:16 7:10 79:24 259:4

316:1

**machinery** 32:3

**made** 64:6 65:7 79:8 95:18 97:14 103:6 107:24 141:23 180:6 212:16 212:19,22 213:4 233:16 235:12 237:4,9 237:14,19 266:13,25 292:6,23 293:8 293:18 294:10 301:11 304:5

**magnitude** 172:23 176:15

**maher** 59:5 69:13 70:8,10 75:4 79:22 92:24

**maher's** 94:8

**main** 135:14,15 214:22

**maintain** 36:11 135:4 162:3,8 193:12

**maintained** 101:15 140:8 141:6,14 224:25

**maintains** 78:10

**maintenance** 4:15 126:2 127:2 132:4 143:4

**major** 47:10 134:18

**make** 27:7 31:19 41:25 53:17 58:5 71:20 80:14 94:25 99:1 105:5 108:6,8 154:20 170:17 173:12 176:1 176:11 177:10 215:5 217:6 227:12 228:2 233:19,21 234:12 235:3,6 235:19 256:1 281:22 295:11 298:18 300:2 300:22,24

**making** 131:24

**man** 282:20 284:21 285:8,9 285:14

**manage** 70:24 72:8 81:23 82:9 115:1 123:14 154:19 168:25 170:14 188:3 217:14 245:24 284:5

**managed** 54:17 72:14 77:5 83:18 136:3 144:12 149:3,5 149:7,8 150:19 151:2 157:13 170:11 263:13 266:22 286:24

**management** 17:14 46:21 50:1 51:7 56:18 57:11 64:15 68:16 69:5 70:16,17 70:20 71:1,2,3 71:4,23 72:5 72:25 81:15 87:24 88:12 89:5,22 95:6 98:22,24 99:2 150:15,15 151:17 169:14 169:15 187:10 284:2 285:21 294:13

**manager** 46:17 82:3,3 83:2 84:4,4 138:22 138:25 139:7,9 169:9,10 187:12 281:1

**manages** 51:9 108:16

**managing** 71:24 85:20 86:5 98:20 114:25 127:20 150:13 163:9 183:24 216:25 217:6,9 277:5 282:14 283:22 283:24 294:6

**manley** 48:15

**manner** 100:22

**manpower** 49:4 50:3

**march** 4:18,22 7:13 137:13,14 144:22 145:24 265:21 266:6 267:1,23 268:16 301:11 310:2,6

**margin** 59:10

**mark** 1:3 9:16 18:19 21:13 30:7,8 32:12 68:9 79:1 88:19 95:15 102:24 103:21 103:22 112:23 116:10 125:21 137:7 149:21 151:7 159:25 168:4,11 169:17 178:4 186:3 190:22

190:24 191:1 218:2 238:3 243:2 250:23 257:4 264:23 270:8 273:25 275:5 277:24 284:7 294:20 299:1,8,13,23 315:5 316:4

**marked** 21:16 21:19 68:11 76:10 79:3 89:2 93:17 95:12 102:25 112:25 116:8 125:22 137:9 143:19 144:18 144:19 149:18 151:8,10 155:6 160:4 167:21 171:2 178:6 186:4 198:6,9 206:2 209:2 218:6 231:17 238:7 242:21 242:25 250:21 257:6 258:24 264:25 268:10 270:10 274:2 275:6 277:25 284:9 287:2,4 291:12 294:23

**market** 105:3,4 105:11,12,19

225:6 229:20 230:2,20 240:20 241:5 248:13,25

**marking** 285:4

**marks** 45:12 47:22

**marsh** 165:22 166:23,24,25 181:16 182:24 183:8,17,19,20 183:25 184:16 184:23 185:2,6 185:17 247:23 264:9

**marsh's** 184:2 184:5,24

**martin** 184:19 264:16

**massachusetts** 1:2 2:5 9:21 44:1 46:22 48:15 54:13,18 55:1 57:3,19 58:3 62:6 101:14 108:17 110:19,22 123:22 124:10 140:6 141:13 142:7,25 143:17 148:12 148:16,18 153:5 189:14 189:25 193:11

196:19 201:13 201:22 290:25 315:4

**massive** 119:4 119:9

**master** 4:4,7 5:17 69:4,23 70:18 73:4 76:9 82:14 92:1 93:12 95:17,25 97:3 100:8 103:5 104:5 105:5 107:10,24,25 108:3,5,11,12 109:6,16 110:12 118:12 118:13 126:9 144:13 153:10 170:2,18 172:16,21 175:3,4,7 201:18 202:5 292:11

**match** 132:22

**material** 261:11 262:3 262:13,20

**materially** 261:9

**materials** 6:24 243:11

**maternity** 120:3 200:2

211:25
**matrix** 160:19 161:6 165:18
**matt** 45:12,15 47:22
**matter** 9:16 86:22 100:23 129:7 182:11 205:9
**matters** 167:11 168:14,22 169:1,2
**max** 223:15
**maximize** 225:16 230:17 248:12,16,17 248:17
**maximizing** 229:23
**meadows** 132:7
**mean** 42:12 50:4 51:3 57:23 69:1 70:21 71:17 73:24 74:12 78:1 83:17 92:10,12 97:19 101:5 120:7 122:12,24,25 123:3,18 124:9 129:25 142:22 157:14,20 161:3 169:11 180:15 189:17

190:5,7 193:9 210:6 222:10 223:9,10,12 226:19,25 241:5 242:17 250:13 252:20 303:16 305:1 306:2
**meaning** 96:1 108:21 122:16 127:16 248:16 276:25
**means** 1:21 11:25 139:18 225:11 287:23
**meant** 72:3 169:1 229:2 288:6 303:17 305:2 306:8 309:6
**mechanicals** 228:3
**med** 200:3,10 200:11 211:24
**media** 9:14
**mediation** 270:25
**medicaid** 265:4
**medical** 24:9 24:17 42:17 54:9,21 55:19 61:12 64:19 72:9 75:25 76:1,2 85:6

117:24 118:1,4 118:11 152:4 199:20,24 200:11 201:25 202:2,14 245:20 246:1,3 254:12,15,20 255:7 270:17 289:4,15,23 290:4,13 291:3
**medicare** 265:4
**medications** 12:6
**meet** 12:22 13:1,4 53:6,9 60:9 188:7 189:5 230:2
**meeting** 6:23 8:4 13:11 210:12,25 231:12 246:11 246:14,25 247:7 270:3,5 270:7,23,25 271:2,6,24 272:6 273:22 274:18 275:9
**meetings** 205:7 221:19 283:11 283:17
**melbourne** 76:1
**member** 205:10 222:8 232:7

243:22 244:4,8 244:14,20 297:12
**members** 243:16 245:5
**membership** 295:18,21 296:5,11,22 297:7,13
**memo** 5:20 14:5 154:2 218:3,16,25 219:4,8,9,13,20 222:25 223:5 224:22 230:23 231:5,13 240:24 241:1
**memorandum** 219:15 220:6 220:23,24
**memory** 76:7 98:2 252:21,25 285:13
**memos** 14:1 213:22
**mental** 193:18
**mentioned** 43:4 72:17 128:19 169:19 193:20
**merit** 26:7
**message** 35:12 36:17,23 37:5 37:9 38:7 208:1

messages 34:13 34:18 35:5,19 35:20 37:12
met 11:16 53:21 60:15
metadata 274:5
methodology 252:23 256:4
meunier 196:6
mic 311:15
micah 138:19 138:24 147:7
michael 27:23 27:25 28:15 35:13 36:18 38:3,4 60:9,20 60:23 61:1,4 61:19 116:24 117:20,21 129:5,10 181:12 183:10 227:9
mid 52:21 163:19 234:5
middle 190:1 275:12
middleboro 193:6 195:10
mike 105:22 205:3
million 25:4 58:2 59:19 60:1,3 77:8 81:5 111:21

112:11,17 140:6,8 141:19 143:7,8 216:21 217:1,9,18,22 223:15 276:16 276:25 277:6,9 279:12 280:17 288:5 293:22 293:25 294:13 296:9 297:17 297:19 298:4 298:20
millions 276:8
mills 4:17,17 4:21,21 137:17 137:18
mind 118:17 127:24 169:1 197:22 237:18 245:24 259:16
mindset 232:16 305:23
minefield 2:10 10:18,19 258:15
minimum 140:19
minor 218:21
minus 13:3 29:20 42:20 60:1 248:14 280:16
minute 67:24 138:7 173:23

197:22 300:1
minutes 8:5 131:18 186:12 246:16 275:9 275:21
misleading 261:10
misrepresent 306:16 307:2
misrepresented 306:17
misrepresents 262:2,13
missing 99:5 302:13
mitigating 306:7
mitigation 87:22 98:23 163:7 265:20 266:5 305:5
mobile 211:9,9
model 184:10 185:2,6 224:20 224:22 225:13 227:24 229:22 230:18 296:14
modernizing 213:23
moment 96:11 197:21
moments 11:20 98:10

money 20:18 24:3 25:10 111:12,25 112:1,6,14 142:18 143:13 182:19 214:6 216:11 277:1 280:14,23 281:4 292:21 293:6 298:6,10 299:16
monitoring 162:4
month 15:2 36:8 40:9 42:2 43:5 63:3 247:17,20 282:7,7
monthly 43:5 74:1 80:9,17 101:9
months 29:21 30:9 119:8 248:2 253:12
morning 9:2 10:16,18,20,23 11:9,10 186:25 238:22 300:18
mortar 145:6
mortgage 57:25 197:7
mortgages 55:13

**[mortgaging - necessary]**

| | | | |
|---|---|---|---|
| **mortgaging** 54:22 | 139:21 140:4 141:7,14,23 | 248:10,17 249:24 262:19 | **n** |
| **motion** 19:11 | 142:6 143:8 | 268:14 269:14 | **n** 1:22 2:1 3:1 |
| **motivated** 76:8 | 146:13 149:4,5 | 270:3 271:4 | 9:1 11:15,15 |
| **move** 41:18 | 149:6 151:11 | 273:3 275:22 | **name** 10:3 |
| 78:25 101:22 | 151:15,16,18 | 276:7,15,22 | 11:11,14 49:16 |
| 153:18,21 | 152:7,21 153:1 | 277:1,6 278:17 | 70:1 79:24 |
| 178:3 191:23 | 153:3,10,25 | 279:3,14 280:9 | 80:1 89:23 |
| 205:25 208:25 | 154:12,18,20 | 281:4,5 282:24 | 117:13 161:22 |
| 210:2 227:1 | 155:22 156:1 | 283:6 287:9,16 | 161:25 183:10 |
| 233:24 235:7,9 | 156:17 157:23 | 287:22,24,25 | 184:17 201:19 |
| 258:11,22 | 158:4,5 159:21 | 288:1,8,10 | 257:24 275:18 |
| 300:19 | 160:9 161:7 | 292:5,9,17,21 | 315:3 |
| **movement** | 167:10,12 | 293:6 303:10 | **named** 32:12 |
| 132:14 | 168:11,12,14 | **mpt's** 121:5 | 84:8 |
| **moving** 154:13 | 168:23,25 | 179:7 212:24 | **names** 18:7 |
| 157:19 185:11 | 169:3,6,20,25 | 212:25 233:23 | 45:15 47:12,20 |
| 192:25 193:3 | 170:13 171:22 | 240:14,15,16 | 47:21 135:15 |
| 194:18 228:16 | 175:20 176:15 | 292:8 294:3 | 163:23 |
| 254:3 277:12 | 178:21 181:1 | **mri** 211:9 | **nashville** 52:9 |
| **mp** 140:4 | 181:13 184:25 | **msa** 59:18 | **nathalie** 172:24 |
| **mpt** 4:14 8:12 | 188:2 191:11 | 68:23 69:1,18 | **national** 57:21 |
| 27:7 55:2 56:2 | 196:24 200:20 | 70:5 97:12,12 | 78:2 254:23 |
| 57:2,25 58:4,8 | 201:14,17 | 97:17 | **nationwide** |
| 58:11 75:23,23 | 202:21 210:4,7 | **msas** 111:3 | 52:2 |
| 81:16,17,21,25 | 210:10 212:13 | 118:11 | **natural** 15:20 |
| 82:10,21,22 | 212:16,19 | **multiple** 20:25 | **nature** 118:3 |
| 83:4 84:1,6 | 213:8,14,17,21 | 26:14 130:24 | 128:23 152:13 |
| 85:22 86:9,17 | 223:6,21,25 | 135:11 235:23 | 236:22 298:11 |
| 87:3 98:5 | 224:8 230:24 | **murphy** 31:10 | **ne** 4:18,21 5:23 |
| 99:10 120:23 | 231:2,3 233:8 | 58:21 | **necessarily** |
| 121:6 126:1 | 234:13,19 | **musters** 303:20 | 165:19 |
| 127:1,6 132:3 | 235:4,18 237:1 | | **necessary** |
| 132:3,7,9 | 237:9 247:13 | | 157:3,7 169:13 |

185:12 189:20 193:25 217:13 222:21 223:2 246:21

**need** 14:15 15:12 38:17 75:16 86:20 88:11 138:7 149:14 153:16 154:1,19 156:13,16 171:25 173:19 178:23,25 191:3,18 193:20 199:20 199:24 202:11 227:2 232:14 235:8 267:20 271:14 291:8 305:21 311:5 311:25 312:3,5

**needed** 154:12 154:21 191:12 197:5 223:8 303:17 305:4 306:6

**needs** 50:7 137:1

**negative** 297:23

**negotiate** 56:15 104:5 224:15 279:13

**negotiated** 74:10 77:9 129:5 181:11 181:11,25 182:12 223:25 224:4,12 226:5

**negotiating** 70:11 104:19 104:22 223:20 224:11 279:10

**negotiation** 105:1

**negotiations** 48:3 70:13 75:11 105:8 169:1 224:8 226:20

**neither** 314:8

**ness** 38:5,7 113:20 114:1 115:15 123:10 186:22 187:7 207:15,18 210:24 241:15

**never** 11:16 116:2 192:24 203:13,19 211:6

**new** 15:6 39:21 39:22 42:19 58:1 68:16 69:5 73:1 78:17 89:16 91:5,15 93:16

94:3 95:6,14 98:24 102:19 102:20 122:1,7 123:2 124:16 136:4 142:24 193:15 194:11 194:18 195:11 200:25 208:25 212:8 214:8,13 223:21 224:1,8 225:6,14 227:2 227:16 228:3,7 228:7,14 232:15,20,24 233:3,10,25 239:1 240:15 241:17 257:3 269:19 278:16 280:10 285:23 303:9 305:22 307:19

**nfa** 32:5,9 159:1,3,7 164:24 165:16 166:1,4,14 169:6 178:9,21 180:25 181:8 181:19 182:1,4 182:13,19 183:20,23 229:10 244:1 247:23 263:13 272:17 273:3 294:5

**nfa's** 179:6 182:7

**night** 115:24

**nine** 30:9 42:19 77:19 239:2 252:9

**nodded** 311:20

**nods** 177:8 311:18

**nomenclature** 102:20

**nonconforming** 123:22 124:14

**noncore** 74:14

**north** 9:24

**northeast** 208:9

**northside** 75:24

**norwood** 3:15 3:18,20,23 4:5 4:8,10,14,16,19 4:23 5:9,11 6:8 6:12,20 7:7,10 7:13,16,19 8:4 8:15 22:14,24 24:5,24 34:22 35:7,15 36:7 36:12 38:2,14 38:24 41:3 42:15,15 43:1 47:1,4,6 48:9 48:13,19,23 49:3 50:11

55:10,14,17,25
64:18 68:10
78:14,20,22
79:6 86:5,9,17
87:4,17 89:1
93:20 95:16
98:13,15,21
99:7,11 101:13
103:2 108:18
108:24 111:1,2
111:23 113:2
114:13 115:21
116:2,19 119:9
119:14,17,19
119:24 120:3
120:15,20
122:13,21
123:3,14
124:22 125:8
125:25 126:1
126:13,24
127:3 134:2,5
134:19 135:7
135:10,24
136:8,24 137:3
137:11 138:5
143:9,10,13
144:20 145:1
145:12,18,24
147:16,22,25
148:4 149:3,9
149:9 150:20
151:2 156:7
160:7 163:2,10

164:4 166:17
167:3 176:8,19
184:18 185:17
187:1 188:8
189:2 191:13
191:16,23
192:8,12,19
193:1,6,16
194:1,11,17
196:14,17,20
197:15 203:20
204:1,7,14
209:9 212:8
213:18,23
214:19 215:9
216:10,12
219:12 221:18
223:21 224:1,9
231:6 232:6,7
233:4,9,11,22
237:4 238:18
238:24 239:1
239:18,25
240:3,6,15
245:17 246:4,6
246:24 247:7
253:6,22 254:6
254:14 255:19
257:25 259:5
265:10,19
266:4 268:5
269:18 271:13
272:24 273:6
275:9,13 276:8

276:17 277:6
278:17 280:10
286:18 288:20
288:21,22
292:5 294:22
302:3 309:17
**norwood's**
201:12
**notary** 1:19
19:12 313:17
314:2,17
**note** 9:5 277:19
316:10
**noted** 81:4
248:25 301:1
**notes** 4:12
236:18 300:2
**notice** 32:21
175:10 177:5
177:15
**notices** 23:4
253:10
**noticing** 10:15
**notified** 237:1
**noting** 33:4
**notwithstandi...**
300:20
**november** 6:19
22:24 113:6,11
115:6 139:14
171:6 175:2
177:4,14 233:7
238:12,22
239:7,15 240:2

**number** 3:11
4:3 5:3 6:3 7:3
8:3 9:22 22:15
59:10 65:11,25
66:1 68:2,5
81:4 96:19
101:19 128:9
128:12 143:11
154:17 174:4
186:18 194:17
209:17,24
210:17 253:7,8
253:13 254:25
256:21,24
257:8 272:10
277:13 280:21
291:15 293:11
293:19 300:4,7
301:21 302:13
311:23
**numbered** 1:17
248:24
**numbers** 94:14
103:13 150:3
224:15 280:15
**numerous**
133:3 134:21
**nwc** 5:4

**o**

**o** 9:1 11:15
52:25
**o'rorke** 5:14
167:24

**oath** 10:6 11:23
  313:4
**ob** 230:8
**object** 19:20
  25:21
**objection** 19:3
  20:7,15,22
  21:4 24:10,11
  24:19 25:13,20
  26:2,3 28:10
  30:23,24 31:8
  33:18 34:23
  35:8,9,16,22
  36:20,25 37:6
  37:17,21 38:9
  38:15,16 39:14
  39:15 40:7,8
  40:13,19,25
  41:15 43:14
  46:1,15,16
  49:1 50:14,19
  51:17,18 55:5
  55:11,23 57:4
  57:9 59:12
  60:12,16 61:3
  62:11 64:25
  66:5,17,18
  67:17 74:4
  76:11,12 83:6
  83:9 84:20
  85:10 86:11,19
  87:5 91:3,9,17
  107:4,5,12,13
  109:9,18,19

111:15,20
114:9 119:18
122:14 123:4
125:10,17
128:24 141:9
141:16,25
142:9 149:11
152:14 153:12
158:17 167:13
167:14 176:3
176:12,24
194:20 203:16
203:22 212:11
212:12 213:1,2
214:9,21
215:11,12
216:13,15
217:3,4,11
219:6 220:7,8
220:18 224:2
224:10 225:22
226:24 227:13
229:9 232:22
232:23 233:12
234:22,23
237:7,20,21,25
242:11 248:3,4
248:20 255:5
255:15,22
256:5 258:4,9
261:19,20
262:5,6,14,23
263:21 264:6
264:13 268:18

268:19,24,25
271:25 272:16
273:7,8 275:2
276:11,18
277:2,8,20
278:18 279:4
283:7,8 286:6
286:7 292:25
293:10 298:13
298:21 303:25
304:7 306:12
306:18 307:4
307:17 308:7
308:12,16
**objections** 10:9
  19:11,14,22
  33:5,14
**objective**
  142:18
**obligation**
  100:15
**obstacle** 122:8
**obstetrics**
  230:8
**obtained** 44:8
**obtains** 25:11
**obviously** 78:1
  301:21
**occupy** 210:8
**occur** 211:18
  211:22
**occurred**
  141:24 204:8
  211:12 212:5

**octavio** 30:15
  245:13
**october** 238:15
  251:5,7 292:8
  292:24 293:9
**offerings**
  225:16
**office** 31:10
  52:9,10 56:16
  57:20 58:20
  59:2 69:15
  118:4 172:25
  180:1,7,17
  185:24 201:25
  202:2,13,14
  221:7,19
**officer** 62:5
  67:7 208:9
  245:20 254:16
  279:24 280:4
  294:12
**officers** 246:1
**offices** 1:21
  42:22 52:6,7
  52:18
**officials** 121:11
  121:23 122:2
  229:1
**oh** 92:12
  103:14 127:13
  131:5 138:8
  147:2 174:22
  192:4 238:4
  244:25 266:2

**[oh - opening]** Page 53

271:5 294:17
**ohio** 110:19
**okay** 12:6
13:21 14:9,21
15:8,20,23,24
15:25 16:22
17:3,12,15,18
18:18 19:19,24
20:2,10 21:18
23:2 25:1 26:6
27:9 28:18
29:7,12 30:19
31:18 33:8,12
33:17 37:25
41:7,20,21
43:13,23 45:18
46:12 49:13,18
49:24 56:22
58:13 62:14
63:18,24 67:1
67:23 70:4
71:16 72:17
75:20 76:15
77:11 78:10,24
81:1,8,12
84:22 85:24
88:4,18,19
91:14,21 92:2
92:14 95:5,9
96:21 97:18,22
99:10 104:5,12
104:14 106:24
111:6 112:18
112:18 115:18

115:18 116:7
118:16,21
119:23 121:9
124:8 127:1,21
130:3,6,9
131:20 132:1
132:10,12
136:6 143:18
144:1,9,16
148:2 149:17
151:1,5 153:15
155:4,11 158:8
159:20,25
160:17 161:21
162:19 163:22
164:15 165:7
165:13 166:23
167:9 169:10
169:16,17
170:21 171:4
172:8,10 173:3
173:9 174:13
174:19,19
175:7 177:3
178:1 179:1,3
179:5 180:12
180:18 182:23
184:5,22
185:13,23
190:14 191:18
192:18,25
194:23 195:5
195:16,16
197:13,20

198:3,8,20
201:8 202:24
205:20,25
206:10,18,22
208:25 209:11
209:20,22
210:14 211:2
213:7 216:19
220:21 221:1
222:13,17
224:7,18
229:19 231:15
232:12 233:6
238:3 239:24
240:7 244:25
245:10 246:12
246:18 247:3,9
248:8 249:21
250:9,19 251:2
252:5,16
253:15 254:20
255:12,21
256:8,14
258:14,21
259:21 260:10
260:16,24
262:18 263:2
263:15 264:19
265:17 266:24
269:3 271:9
272:9,20
273:23 274:9
274:14 277:18
278:22 279:20

280:8,22 281:7
281:7,11
282:10,22
287:6,21
289:25 291:5
294:2 301:8,20
304:12 307:20
308:9
**old** 54:10 121:2
142:25
**onboard**
285:16
**once** 40:5,9
42:2 43:5
66:20 88:16
107:18,25
108:12 110:4
116:5 141:23
200:11 272:21
**ones** 71:11
**ongoing** 31:6
31:23 40:15
42:10 152:17
166:3 195:10
253:9 286:18
**open** 193:21
194:5 254:5
293:15,16
300:13 306:5
**opening** 192:7
193:3 214:23
228:15 270:17
270:21 273:11
274:7,24

**[operating - ownership]** Page 54

**operating**
200:15 201:9
208:9
**operational**
72:14 185:16
254:14 284:1
**operations**
28:23 89:4
95:6 98:21
113:23 185:10
195:12 246:3
250:16 253:6
267:13 302:7
309:21 310:10
310:20
**operative**
107:17,25
108:5,12
**opex** 72:15
**opinion** 136:18
212:24
**opportunities**
6:5 57:15
90:24 199:2
**opportunity**
57:11 199:2
**opposed** 89:20
**optimal** 225:11
**option** 189:19
190:7 222:9
224:18,19
225:2,3 226:5
226:7,16,20,23
227:3,11,15

229:19,24
230:16,20
240:23 241:3
**options** 190:11
213:18,22
214:1 223:1,2
223:18 231:6
**oral** 1:11,14
**order** 25:10
91:15 186:16
**ordinary** 36:24
37:1
**org** 4:9 164:12
**organization**
74:13 121:3
**organizations**
224:4
**organize**
164:21
**organized**
245:23
**orient** 149:24
**original** 55:14
56:15 57:25
77:9 81:4,14
98:9 102:18
117:9 119:20
297:21
**originally**
55:25 97:13
**originals** 78:6
**ors** 290:19,23
**orthopedic**
192:2,4,6,11

**outcome** 10:8
25:25 225:5
314:11
**outflows** 83:3
**outline** 203:9
**outlined** 230:20
230:22
**outpatient**
42:20 76:3
201:5
**outputs** 84:25
**outs** 118:5
**outside** 75:8
192:19 282:7
291:9
**outsourced**
202:17
**outsources**
74:21
**outstanding**
295:18,21
296:5 297:6
300:10
**overall** 51:14
101:21 252:22
**overlap** 90:5
106:10
**overlay** 123:15
123:17 124:9,9
125:1
**oversaw** 42:18
83:5 87:23
98:22 99:2
144:12 285:19

**oversee** 71:5
75:16 82:3
83:14 84:5
85:8,14
**overseeing** 71:7
82:18 84:17
162:8 217:9
**oversight** 51:9
67:9 117:24
118:5,7 150:16
284:2
**overview** 40:14
40:23 42:7
**owed** 23:13
**own** 16:8,13,25
135:19 253:19
**owned** 16:10
16:14 18:13
54:19,20 55:19
55:25 89:25
120:25 121:4
200:20,21,23
201:7,14,16
213:14 295:17
296:2 297:8,12
**owner** 62:9,12
170:13 275:23
297:2 298:7
**owner's** 51:7
56:18 71:1,2,3
71:22,23
169:15 281:1
**ownership** 8:14
16:4,17 18:15

**[ownership - partial]**

| | | | |
|---|---|---|---|
| 45:6 47:14 55:17 62:2 120:23 166:14 192:1 295:1 298:11,16 | 100:18,19 103:12,14,15 103:19 110:8 116:13 119:7 126:16 130:11 130:14,22 134:8,8 136:11 136:12,12 138:19,24 139:2,4,11 146:4,7 147:7 155:18,19 160:8,9,22,23 172:10 178:15 178:16 179:15 180:22 186:11 186:18,18 195:18,19 198:12,14,15 198:15,21,22 206:24 209:17 222:18 224:19 225:3 227:15 246:10,24 249:4 260:25 263:2 265:18 265:24,25 266:1 267:4 272:10 275:13 275:19 278:12 279:21 288:15 292:16 301:19 301:22 303:3,7 310:5,16 | **pages**  3:13 127:22 **paid**  50:11 76:16 82:13 109:25 112:2 112:15 141:18 181:8,22 292:17 294:12 298:5 **papa**  5:14 166:7,8 167:24 168:10,18 **paragraph** 73:10 80:3 93:4 94:10,12 94:15 96:25 99:15,22 100:17,19 168:7 177:12 287:13 292:5 301:24 **parens**  131:11 **parent**  111:12 160:11 274:12 **parentheses** 226:4 **parenthetical** 226:9 **park**  120:24 **parking**  120:19 120:19,20,25 121:1,11,12,23 122:3 124:16 133:3 143:2 | 191:4,7,13,16 191:19 233:10 241:21 249:12 **part**  36:23 51:13 55:22 58:9 74:23 75:8,11 76:8 82:14,15 84:5 85:1 90:20 91:11 118:12 118:13,23 121:9 125:1 132:3 134:12 134:21 135:18 139:22,24 140:3 144:13 156:22 164:6 170:24 175:7 175:15 192:12 193:19 196:12 196:24 197:2 199:6 205:13 207:24 215:6 216:8,8 226:13 228:7,17 230:16 232:10 232:13 250:5 250:17 252:6 260:8 269:23 279:19 283:23 294:10 308:10 310:22 **partial**  203:10 203:14,20,25 |

**p**

**p**  2:1,1,5,13,18 9:1

**p.m.**  1:18 99:19 128:9,12 155:17 156:20 158:15 174:1,4 196:12 197:24 198:2 202:25 206:7,23 207:9 238:12 251:7 256:21,24 300:4,7 304:19 311:23 312:8

**pa**  110:19

**packet**  198:14

**page**  3:11 4:3 5:3 6:3 7:3,8 8:3 22:1,5,6,18 23:3 72:25 73:9,17 77:18 77:25 79:10,13 79:13,14,16 80:2 81:16 82:2 90:16,17 92:9,9,19,20 93:4 94:6,7,12 99:14,22,23

**[partial - peluso]** Page 56

| | | | |
|---|---|---|---|
| 204:7,11,14 | **path** 158:1 | **pdf** 312:2 | 89:3 91:4,13 |
| **participants** 9:8 | 272:22 | **peak** 66:1 | 91:20 92:12,15 |
| **participated** 231:11 | **patient** 132:14 133:16 303:12 | **pearl** 1:22 9:24 | 92:16 93:18 |
| **participating** 283:16 | **patients** 193:25 | **peluso** 2:10 3:5 10:16,17 11:8 | 95:10,13 96:10 96:20 103:1,4 |
| **particular** 52:3 74:3 82:20 120:14 127:7 147:8 152:10 160:18 194:10 229:17 255:19 278:11 282:2 283:24 | **patrick** 2:22 10:3 31:10 58:21 251:12 251:13 | 13:6,9,15 18:3 18:4 19:4,7,14 19:17,18 20:9 20:17,24 21:6 21:15,17 24:14 24:21 25:15,23 26:5 28:12 | 104:13,15,18 104:21 107:8 107:14 109:11 109:22 111:17 111:22 112:24 113:1,3,14 114:10 116:9 |
| **particularly** 101:13 152:13 305:13 | **patterson** 115:16 **pause** 15:22 **paused** 66:22 | 31:1,12 33:12 33:17,21 34:4 35:1,11,18,24 | 118:22 119:22 121:21 122:17 123:6 125:14 |
| **parties** 9:12 86:21 97:2 300:9,21 314:8 | **paving** 134:14 **pay** 25:12,18 73:14 100:21 111:13 233:18 | 36:22 37:3,8 37:19,24 38:11 38:19 39:17 40:10,16,21 | 125:19,23 126:3 127:23 128:1,4,6,14 |
| **partners** 266:22 | 235:9 286:17 296:8 297:15 | 41:8 43:18 46:2,19 49:6 50:15,21 51:20 | 129:2,9,15,18 130:4,7,8 137:6,10 |
| **partnership** 100:6 | **paying** 286:5 **payment** 74:1 101:1,9 102:1 | 55:9,15,24 57:6,14 59:14 60:13,18 61:7 | 141:11,21 142:3,12 144:17,21 |
| **parts** 170:8 210:7 260:20 | **payments** 80:18 282:24 283:6 286:24 | 62:13 63:13 65:3 66:9,25 67:19,23 68:7 | 149:16,19 151:9 152:19 153:14 154:10 |
| **party** 10:7 100:12,15 130:1 200:25 314:6 | 292:7,10,22 293:7,17 294:3 | 68:12,13,25 74:7 76:14 78:25 79:4 | 155:7,12 158:19 160:5 160:12,13 |
| **pass** 303:20 | **payout** 223:15 223:16 | 81:7 83:7,13 | 165:3,4,12,14 167:16,22 |
| **past** 121:11,23 183:12 | **payouts** 231:8 **pbs** 1:6 9:22 315:8 **pdc** 51:6 | 84:21 85:12 86:14,23 87:9 | 169:17 170:25 171:3 172:9 |

**[peluso - permissions]**

173:13,24
174:14 176:6
176:17 177:2
178:3,7,11,13
179:4 186:5,9
186:13,14,20
194:22 197:21
198:3,4,10
203:18,24
204:5,6 206:3
206:21 209:3
209:13,21
212:14 213:6
214:11 215:4
215:20,22
216:5,16 217:7
217:16,17,25
218:1,7 219:7
219:12,18
220:12,15,20
222:16 224:6
224:17 225:24
227:6,14
229:14 231:18
233:1,14
234:25 237:11
237:23 238:2,5
238:8,9 239:12
242:14 243:1
248:7,22
250:20,22
252:17 255:11
255:16,24
256:7,16,19

257:1,4,7,11,20
257:23 258:6
258:11,17,19
258:22,25
259:1,22 260:4
261:22 262:7
262:17 263:1
264:1,8,18,23
265:1 266:23
268:11,21
269:2 270:11
271:19 272:4
272:19 273:10
273:24 274:3
274:14,15,22
275:3,7 276:13
276:20 277:4
277:17,21,23
278:2,4,23
279:8 283:10
284:7,10,16
285:4,7 286:15
287:3 291:7,11
291:17,20,21
293:5,20
294:17,19,24
298:17,23
299:25 300:9
301:1 303:25
304:7 306:12
306:18 307:4
307:17 308:7
308:12,16,22
309:1,7,9,13,14

311:11
**pending** 21:8
25:3,6 26:11
32:5 104:16
300:20
**penetration**
145:7 146:1
**people** 77:21
120:25 121:5
164:24 209:7
209:23 243:6
250:16 263:24
296:15
**percent** 18:15
295:17,20
296:5,10,21
297:2,6,8,13,16
298:7,18
**percentage**
181:8 182:13
**percolated**
123:16 125:2
**perform** 48:18
202:1
**performance**
99:6 100:1
**performances**
73:13
**performed** 24:5
50:11 54:11,15
74:2 78:13
99:11 118:10
143:21 147:15
150:9 197:14

**performing**
85:2
**period** 17:11
37:7,13 38:17
40:20 42:4
48:1 54:6,16
60:22,25 61:6
63:3 73:6
76:23 106:10
111:16 134:15
140:18,22
141:17 142:19
161:12 166:20
196:24 220:9
228:10 254:24
298:16
**periods** 110:2
**perla** 116:14,17
116:19,23
118:23 121:10
122:1 198:12
198:17,23
199:6 203:3
205:20 206:14
206:23 207:5,8
207:12,21
231:21 232:1
305:15
**perla's** 31:4
118:16 122:20
123:7 124:3
202:24 207:3
**permissions**
188:9

[permit - plus]                                                    Page 58

permit   124:21
permitting
  124:22
person   10:1
  28:4 71:14
  221:9,19 227:9
  236:15 243:7
  243:25 261:6,7
person's   81:22
personal   21:2
  33:7,23,24
  34:7,8,13,14,19
  35:5 36:10
  131:21 144:1,7
  158:6 252:19
  252:25 253:4
  263:12 299:17
personally
  25:25 33:3,22
  34:5,6,12
  86:25 117:14
  120:5 129:14
  134:7 147:17
  161:2 224:7
  234:19 246:9
  260:3,6 263:3
personnel   64:5
  64:8 126:15
  245:9
perspective
  154:22
pg   315:13
phase   70:25

phoenix   289:23
phone   28:4
  30:11 35:5
  37:2 234:21
physically
  115:21 289:6
physician
  42:22 117:24
  118:4 255:8
physicians
  170:16 245:25
  254:3,10
  255:18
pierro   194:24
  195:3 198:23
  203:5 205:2
  208:5,8 231:21
  232:1 305:16
pierro's   208:7
pink   259:7,10
  259:11
pitney   2:17
  10:21 23:6
pizza   121:2
place   9:12
  13:11 19:7
  39:24 66:21
  72:21 111:3
  154:22 157:4
  184:7 212:9
  250:25 303:19
placed   65:8
placement
  122:7,24

plaintiff   1:5 2:2
  10:24 11:1
  18:18 27:11
  32:13 41:4
  298:25 299:14
  301:2 315:7
plan   134:13
  136:2 159:13
  159:22 160:18
  161:6 162:12
  189:21 190:6
  192:13,23
  194:2 195:11
  195:24 196:4
  196:13,17,19
  197:2,9,11
  199:7 203:9
  207:25 208:12
  208:13 214:7
  214:19 215:9
  216:12 233:9
  249:9 272:23
planned   147:22
  192:11
planning   51:6
  51:7 70:23
  114:2 187:6
  192:9 219:13
  221:18 242:13
  242:18 249:5
  265:21 266:6
  283:13,19
  296:13 305:7

plans   119:13
  119:16,19,23
  120:18 161:9
  165:15,17
  188:7 189:16
  189:17,18
  192:9,20
  194:11 204:18
  205:21 214:1
  273:5 286:12
  304:22
plant   227:20
  228:7,15 242:2
  249:18
play   222:20
  297:21
pleadings
  27:16
please   6:23 9:5
  10:10 11:11
  22:5 96:6,8
  104:10 138:8
  154:16 172:2
  209:24 228:22
  238:18 252:12
  252:14 285:6
  301:6 304:11
  304:15 305:10
  312:7
plumbing   50:7
plus   13:2 29:20
  42:20 60:1
  200:3 227:16
  230:18 241:23

248:13 280:16
**pm** 138:18,22 147:8
**point** 32:24 38:13,22 39:9 39:11 40:6 42:5 50:16 56:9 70:8 91:23 148:13 154:17 161:11 166:15 177:4 182:18 189:21 190:10,13,15 193:4 194:3 195:23 199:15 199:19 202:18 205:5 223:12 240:2 254:21 276:5 279:23 280:10 282:22 310:11,15
**points** 16:5 264:3
**polanowicz** 6:11 38:25 39:2,4,10 116:24 117:18 157:10,17,21 158:13,14,20 169:21 194:24 194:25 198:24 203:5 205:2 206:7,11,16 207:2 221:13

231:12,20 232:1 305:15
**polanowicz's** 207:9
**policies** 27:2,6 179:9 183:24 235:19 248:19 261:24 262:10 294:7
**policy** 167:12 168:14 179:25 181:17 217:15 223:16 228:25 229:6,12,16 230:12 235:4 247:16,24 248:2 261:25 262:1,1,8,11,20 294:6
**politely** 205:15
**poor** 136:25
**port** 152:11,20
**portal** 5:17 171:5,9 172:11 175:1 181:12 233:24 234:3,7 234:9,12,15,15 235:2,14 270:17
**portfolio** 115:1 170:12
**portico** 124:16
**portion** 45:20 157:16,24

183:23 247:17 260:10 266:8 291:24
**posed** 215:19
**position** 82:8 285:23
**positions** 254:5
**positive** 56:19
**possible** 35:4 37:20 120:9 142:13 268:22 272:25
**post** 7:7 44:22 75:17 87:25 163:10 257:25
**potential** 172:23 204:18 205:21 304:22
**potentially** 23:24 25:19 105:4 115:4 163:20 164:19 205:3 221:13 233:8
**power** 100:13
**powerpoint** 7:19 160:1,6 239:5 270:12 271:10,20
**pr** 297:22
**practice** 36:24
**preceding** 251:6

**predates** 126:9 195:14
**preferred** 47:7 47:8
**preliminary** 199:10
**preloss** 272:24
**premature** 305:7
**preparation** 12:23 13:12,19 13:22 14:14 28:15 33:25 34:9,15
**prepare** 210:22 213:21 246:19
**prepared** 196:22 210:25 213:25 247:6 271:20 274:17 274:24 279:15
**preparing** 150:9 259:14 259:25
**presence** 41:2
**present** 2:21 10:12 12:3,19 16:6 28:6 29:1 41:13 145:6 164:22 221:12 224:13 235:14 246:22
**presentation** 160:1,6 221:24

239:6,18
246:25 247:5
270:13,14
271:11,21
272:2,5 273:16
302:22,25
**presentations**
246:20
**presented**
224:11 288:7
**preserve** 25:10
**president** 39:22
78:3 92:20
113:23 114:2,5
114:18 116:19
126:20 238:25
**presidents**
140:20
**presume**
289:19
**pretty** 94:19
257:22
**previous** 89:23
124:1 215:17
308:24
**previously** 97:8
97:25 288:4
291:23
**price** 298:11
**primary** 38:13
38:22,25 39:9
40:6 42:5
52:14 53:4
222:1,3

**primetime**
47:11
**principal** 100:7
**print** 261:4
**printed** 257:9,9
**prior** 32:22
39:11 40:5,22
46:13 50:10,18
80:11 99:7
101:6 106:12
106:15 111:23
112:2,9 116:2
117:5 119:17
119:25 120:4
120:15,21
124:1,23 125:9
125:16 127:3,6
135:7 143:6
146:15 147:23
151:20 158:14
161:13 182:10
193:1 197:14
197:16,19
203:14,21
204:1,8,15
216:3 218:5
237:4,12 240:2
260:8 271:23
273:3,15,18
274:17 276:9
280:11 300:18
**prioritization**
132:15

**priority** 131:7
131:10,14,23
132:2,24 133:6
209:24 210:19
**privilege** 13:7
33:11 41:5
173:4
**privileged**
28:11 242:21
**proactive**
123:24
**probably** 14:15
30:10 38:17
51:24 59:25
61:6 62:16
76:2 77:20
167:7 191:8
229:11 236:24
279:12
**problems**
134:19
**procedure** 1:24
211:15 314:6
**proceed** 174:6
227:2 290:7
**proceeding**
10:10 20:14
21:1,8,13
23:13 25:2,7
314:9
**proceedings**
63:16
**proceeds**
216:22 217:2

217:22 226:6
226:13,21
229:23 230:17
**process** 72:20
74:24 82:4
83:15 84:5,18
85:9,15 88:12
204:20 205:23
213:13 269:24
284:5 285:18
304:23 305:5
307:1
**processed**
172:15
**processes** 82:19
184:21
**produced** 1:15
14:5 48:7
113:5 127:7,11
295:5
**production**
33:2,14,16
300:11
**professional**
44:19 50:25
51:3
**profit** 298:15
**profitability**
125:8
**profitable**
213:22 215:1
**program** 17:13
51:9 72:5
150:15 187:10

230:20 285:21
**programming**
208:2
**programs**
209:25 210:20
**progress** 42:18
**project** 3:14,16
3:19,22 51:7
53:14,20 54:9
56:12,18 57:11
64:15 66:24
68:14,16 69:2
69:4,5 70:15
70:17,20 71:1
71:2,3,3,5,23
71:23 72:12,14
72:15,25 76:17
79:8 80:16
81:14,15 82:2
82:10 83:1,3
84:4 85:5,17
85:17,18,21
87:18,23 88:9
88:20 89:22
91:7 93:10,19
93:23 97:11
98:24 99:2,25
100:23 101:6
102:18 137:18
138:2,12,15,22
138:25 139:7,9
139:24 146:24
147:4,8 149:7
152:2,3 169:8

169:10,14,15
185:8 187:12
223:7 224:16
247:24 257:13
257:13,24
276:17 278:16
278:16 279:3
279:11,18
281:1,2,14,18
281:20,24
282:3,8 287:24
288:6,7,18,25
289:12 290:12
290:16
**project's** 72:21
78:8
**projections**
240:9 248:9
**projects** 8:12
24:4 40:14,17
40:23,24 42:8
42:12 47:10
53:14 54:5,7
54:16 56:21
64:13,16,20,22
65:7 66:2,4,7
66:10,16,21
71:6,8,9,17,18
71:25,25 72:4
72:7 77:5
78:23 81:11,24
82:23 83:19
84:1 118:6,8
119:21 141:4,7

141:13 142:7
142:17,19,22
143:9 146:14
151:24 202:9
231:7 276:23
277:15 283:25
284:22 285:10
285:18 286:1
286:13,18,19
287:10,18,23
287:25 288:2
288:11,12,14
291:1
**promissory**
277:19
**promote**
121:12,24
**promoted**
139:8
**proof** 3:12 22:7
22:21 23:4
250:5 260:24
261:18
**proper** 124:19
177:10
**properly** 41:15
41:25 58:6
71:20 107:21
**properties**
54:17,19,20,21
55:3,19 85:6
98:8 110:7
120:23 132:7
201:21,22

202:20,22
270:18
**property** 4:14
86:5 126:1
127:1,5 132:3
132:8 151:19
158:5,6,7
163:4 175:12
175:23 176:19
181:3,7,9,11,13
181:13,14
182:4,8,15,20
182:25 183:18
183:21 184:3
191:11 197:5
201:15 228:23
263:13 278:16
302:3 309:17
**proposal**
242:18
**proposals**
180:2
**proposed** 7:5
241:17 251:21
251:23 252:9
303:8
**prospective**
282:24 283:5
**protocols**
156:25
**provide** 46:13
58:8 69:3
81:14 100:12
110:11 129:1

**[provide - question]**

156:12,16
162:10 177:5
177:15 184:23
246:21 263:18
264:2,2
**provided** 46:17
46:21,25 47:1
48:23 49:2,4
50:3 51:2
70:17 71:4
76:17 82:22
83:4,5,8,11
87:16,21 93:9
98:13,14
109:15 110:15
110:25 139:19
139:21 140:3
141:2 174:10
203:4 216:21
218:14 230:12
234:20 242:5
246:13 279:18
284:1 295:10
**provider** 85:23
193:15
**provides** 175:8
**providing**
77:15 129:13
184:24 185:15
222:5
**provision** 76:21
77:13 80:4
93:4 176:2
177:22 229:6

261:25 262:8
262:11
**provisions**
262:20
**psych** 193:6,9
193:14,15,21
193:24 194:1
194:10,12,17
200:9,10
211:25 230:6
**psychiatric**
195:8
**psychologic**
195:8
**psychological**
193:13
**public** 1:19
32:6 157:18
158:3 179:7
193:12 242:9
242:19 313:17
314:2,17
**publication**
233:2
**publicize**
232:20 242:13
**publicized**
233:3
**publicizing**
232:15 305:22
**publicly** 21:22
242:9
**publish** 242:18

**published**
242:9
**pull** 223:8,10
228:24
**purchase** 191:4
191:19 195:9
**purchased**
296:5
**purchasing**
46:10
**purpose** 145:4
148:17 197:2
222:25 223:5
261:10
**purposes** 81:21
105:7 125:13
183:8 197:6
224:14
**pursuant** 1:23
33:13 70:18
71:7 73:24
76:17 77:24
78:8,15 81:18
93:9,12 109:5
129:13 202:4
314:5
**push** 223:8,10
**put** 63:19 64:13
64:17,22 65:1
66:2,4,11,20
72:21 112:19
151:5 154:22
166:21 231:15
233:6 258:9,17

274:10 281:8
294:9 300:15
**putting** 249:22
250:15 260:18
263:4

**q**

**q1** 48:4
**q4** 236:5,8
**quality** 9:6,7
**quantify** 65:8
**quantity** 66:7
**quarter** 237:24
**quest** 202:15
202:17
**question** 14:11
15:13,23 18:1
19:5,19,21
24:13 26:16
28:11 33:18
34:3 41:11,22
70:19 84:24
86:12 88:1,3
88:14 90:10
97:6 104:15
105:23 107:16
107:21 108:9
110:4 149:12
154:8 161:18
173:12 176:4
185:1,14 190:5
190:22,24
191:1 194:10
215:6,18,18,21

215:23 216:7 217:5 220:16 227:13 252:12 252:16 262:9 264:14 271:18 274:21 277:3 277:16 278:3 278:14 285:6 293:4 294:9 308:3,5 309:5

**questioning** 284:15

**questions** 12:1 12:8 13:10,17 28:14 43:20 66:10 71:15 118:18 128:17 161:19 167:8 174:8 178:1 243:14 257:21 263:24 281:9 291:5 300:14 301:3,10,12,15 302:19 304:14 305:12 308:21 308:23 311:12 311:13

**quick** 81:4 127:25 178:24 259:16

**quincy** 54:9

**quite** 63:21 120:9 124:10 135:5

**quo** 286:24

**quote** 230:11 267:10 311:1

**r**

**r** 2:1 9:1 11:15 274:7

**radiology** 6:8

**ralph** 190:2 193:20 231:8 296:22

**ran** 52:17

**range** 60:3 112:10

**rate** 73:14 76:16 94:11,16

**rates** 73:20 80:8,10,21 94:21 101:7

**rather** 102:2 132:11 179:23 212:9 269:19

**raze** 212:7 233:9

**rdlt** 188:12 193:7

**reach** 158:2 190:2

**reached** 158:1 189:9

**reactivate** 211:3,15,21

**reactivated** 211:6

**read** 27:9,13,16 68:21 79:23 80:24 96:4 104:17 120:8 138:7 154:2,16 171:25 172:4 177:9 178:23 222:11,11 228:21 252:10 257:15 259:16 266:16 274:19 278:19 285:2 293:1 299:3,4 301:23 302:24 305:19 307:8 313:3 315:13 316:9

**readily** 267:10 302:4 309:18 310:7,17

**reading** 131:16 154:25 250:8 286:14,17 303:2 307:10

**reads** 134:12 227:24 272:20 315:13

**ready** 104:12

**real** 50:24 51:10 52:10 74:14 82:5,20 83:16 84:19 89:4 95:6 98:21 113:5

115:23 127:25 150:13,16 153:16 158:6 170:12 178:24 179:16 181:13 193:17 259:16 275:14

**realized** 311:15

**really** 52:10 130:1 157:20 190:9 194:2 229:10 239:21 278:14 306:5

**realm** 254:9

**reason** 24:7 64:1 79:25 135:3 215:7 216:8,9 249:19 272:14 283:3 295:8 315:13 316:11

**reasonably** 267:11 302:5 309:19 310:8 310:18

**reasons** 214:4 214:17

**reassess** 288:18 288:25 289:12 290:16

**rebuild** 34:22 35:7 188:21 189:1 190:12 222:21 230:11

[rebuild - recollection]                                        Page 64

| | | | |
|---|---|---|---|
| 248:9,13 | 151:21,22,24 | 256:12,13 | 281:3 293:19 |
| **rebuilt** 302:7 | 152:1,10,11,15 | 260:22 263:22 | **receiving** |
| 309:21 | 154:23 157:6 | 264:7 266:9,10 | 233:21 |
| **recall** 14:3 15:3 | 158:18,24 | 266:10 267:2 | **recently** 171:11 |
| 15:5 32:25 | 159:17,19,20 | 268:14,20,23 | 292:9 |
| 37:15,18,23 | 159:24 163:16 | 270:23 271:23 | **recess** 68:3 |
| 38:10 39:23 | 163:18 166:21 | 272:1,1,2,5 | 96:16 128:10 |
| 40:1 47:5,12 | 167:5 168:8 | 273:2,11,20 | 174:2 197:25 |
| 48:4 54:16 | 169:21 170:8 | 278:25 280:15 | 256:22 300:5 |
| 56:6,8,11,11,13 | 170:20 172:18 | 282:25 283:1,9 | **recessed** 312:8 |
| 56:14 57:24 | 172:20 180:8 | 286:8,8 296:14 | **recipients** |
| 58:24 59:1,18 | 180:12,15 | 301:9,11,14 | 187:22 243:14 |
| 63:2 65:17 | 182:2,5,12,17 | 302:18,24 | **recollect** 293:1 |
| 70:11,13 71:10 | 182:22,24 | 303:1 304:13 | **recollecting** |
| 75:1,6,13 | 183:1,2,22 | 307:10 309:5 | 115:24 |
| 78:12,13,16,18 | 184:4,15 185:2 | **receipt** 235:3 | **recollection** |
| 78:19 80:21 | 185:21 191:10 | 235:12 316:17 | 13:22 14:18 |
| 84:2 91:10 | 191:15 194:15 | **receivable** | 55:12 57:10,13 |
| 95:1,4 97:22 | 196:25 197:18 | 286:22 | 61:10 62:23 |
| 99:9 101:10 | 200:17 201:16 | **receive** 44:4 | 66:19 77:8 |
| 104:19,22 | 202:8,15 205:5 | 56:23 76:21,25 | 78:2 83:22 |
| 105:15 112:4 | 208:12,14,20 | 85:7,14 109:13 | 90:19 95:3 |
| 113:15,18 | 220:10 221:11 | 124:21 276:22 | 97:10,21 105:1 |
| 115:22 116:4 | 221:22,25 | 276:25 280:9 | 105:2 108:3 |
| 118:9 120:13 | 222:5,7,7 | 298:14 | 110:16 112:15 |
| 120:22 121:16 | 226:11 227:23 | **received** 32:25 | 117:17,23 |
| 121:19,22 | 229:4,13,16,16 | 48:13 74:1 | 121:2 123:19 |
| 124:7 125:4 | 229:18 234:24 | 93:11 112:7 | 126:23 135:17 |
| 127:1,5 128:21 | 235:1,24 236:7 | 122:19 141:6 | 136:1 140:5,18 |
| 135:21 137:5 | 236:10,11,13 | 155:14,21 | 141:17 144:2 |
| 140:2,15,21 | 236:15,22 | 182:13,19 | 148:5 151:17 |
| 146:3 147:24 | 239:4,13 241:6 | 206:22 214:24 | 154:14 155:1 |
| 148:2,7,9,17,20 | 248:6 250:7,17 | 217:1,10,19 | 157:9,21 |
| 150:9 151:14 | 254:3,22 | 219:19 264:9 | 158:12 163:5 |

164:11 168:24 178:23 180:16 181:10 183:9 184:8 185:23 189:9,18,24 190:10 193:19 194:3,21 201:23 208:8 210:9,13,24 212:20 218:5 221:10,20 228:9 234:4 236:4 244:5 246:19 247:22 247:25 248:6 251:17 256:6 260:7,13 264:16 265:15 266:20 279:5 280:6 282:13 284:25 285:24 286:14,16 293:12 295:5 303:21 306:3 307:5

**recommendat...** 31:20

**recommended** 145:13 244:1

**reconciled** 141:19

**reconciliation** 83:18 85:21,25 141:23 281:22

294:1

**reconciling** 285:22

**reconstruct** 34:22 35:7

**reconstruction** 35:14 230:24 240:20 241:1 276:9

**record** 9:3,13 10:14 11:12 19:8,22 33:4 45:17 68:1,4 81:10 92:18 96:11,14,17 104:17 108:8 128:8,11 165:1 173:22,25 174:3 178:11 186:7 196:18 197:23 198:1 209:6 216:7 228:21 256:20 256:23 257:8 258:10 263:2 266:3 274:11 300:3,6,15,24 311:15,16,22 311:24 313:6,7 314:3,10

**recorded** 9:10 9:15

**recording** 9:6 9:11

**records** 33:2,7 33:22 34:12 36:6,11 127:17

**recover** 22:22 23:13 25:10,18

**recovered** 181:9 182:20 226:22

**recovers** 20:18

**recovery** 20:12 182:14 231:3 240:16 248:18

**recruited** 61:5 61:9,13 114:22

**red** 32:1 219:22 219:24,25 228:10

**redevelopment** 149:9 150:20 151:3 192:14 235:8

**reduce** 64:14 194:17

**reducing** 230:1

**reduction** 249:1

**reductions** 65:7

**refer** 27:4 133:20

**reference** 71:19 122:21 133:10 146:13 162:13 188:12 194:23 195:1 196:16

197:8 204:22 205:15 208:4 253:15 282:11 285:25 288:2 288:22

**referenced** 146:15 172:21 195:21 316:6

**referencing** 153:23

**referral** 183:5

**referred** 18:7 74:20 137:24 143:3 145:19 159:3,7 175:4 183:7,9 193:23 208:13 209:16 282:16,17

**referring** 18:9 40:24 42:13 43:9 64:16 74:25 122:12 150:23 153:20 156:17 157:6 158:10 172:14 173:14 175:2,3 183:3 188:23 189:2 191:7 196:3 201:5,11 205:1 208:12 208:16 212:1 254:11

**refers** 135:1 177:19 232:24

255:1 285:8 290:20

**refresh** 13:22 14:18 90:19 96:7 126:22 155:1 195:23 218:4 285:13

**refreshed** 98:2

**regard** 82:21 108:18 130:2 133:8 136:23 159:23 174:16 238:24 282:19 286:24

**regarding** 4:12 4:18,21 5:4,7,9 5:14,17,23 6:4 6:8,11,14,17,20 6:22 7:5,10,13 7:16 8:10 13:10,17 30:21 42:15 121:10 125:8 127:3 157:7 159:22 182:7,19 233:25 253:1,5 253:5 262:19 265:10

**regardless** 74:2 253:25

**regards** 41:3

**region** 5:23 40:15 42:10 110:18,18,19

110:19,20 208:10 239:1

**regional** 39:22 64:18 73:6 75:25 76:1 108:4 110:6 140:20 184:9 221:15 238:25 289:4

**regions** 97:15 105:6 110:17 110:20,21

**registration** 314:19

**regulatory** 51:8 51:9 72:10 89:24 265:19 266:4,9 267:6 284:3

**reimburse** 293:24

**reimbursed** 292:10,22 293:7

**reimburseme...** 292:6 293:12

**reit** 82:11

**relate** 34:21 35:5 99:6

**related** 10:6 33:5 35:14 36:6,11 38:1 46:4 49:5 50:8 63:15 77:16

86:8,16 87:3 87:17 98:14 99:7,11 101:13 109:14 110:6 110:24 114:13 120:3,14 153:4 153:17 154:13 157:11 163:1,3 167:11 168:14 178:10 185:15 195:24 197:9 197:10,15 210:7 213:18 245:17 253:10 256:12 271:12 279:16 282:6 290:12 299:21 300:10 308:23 314:8

**relates** 82:4,19 83:15 84:18 240:14 243:10

**relationship** 30:16 31:6,9 31:11,24 59:17 100:7 157:12 166:3 171:8 173:1

**relative** 58:2 64:14 65:2 81:24 85:21 105:6 123:15 123:17 124:19 125:1 127:19

140:17 152:17 157:10 158:6 163:6 167:8 172:16,22 180:9 182:10 183:24 185:9 185:10 205:8 217:13 240:5 254:5 263:11 281:20,23 282:2 283:22 293:11,16 314:9

**relayed** 235:14

**reliable** 267:12 302:7 309:20 310:9,19

**relocate** 52:20

**relocated** 52:18

**remain** 96:3 107:17,25 108:12 280:3

**remained** 101:20 293:16

**remaining** 297:6

**remains** 61:23

**remediation** 185:6 263:11

**remember** 14:7 17:25 54:8 56:20 61:15 66:23 78:4,21 78:23 105:22

105:23 106:1,8
121:7 142:16
143:15,17
145:22 148:23
152:24,25
166:18 180:8
180:11,17
182:9 184:17
185:6 201:1
205:4 234:10
236:25 253:7
254:18 263:25
271:8 273:20
277:9 280:20
280:21 286:11
286:25
**reminding**
63:21
**remote** 306:5
**remotely** 10:1
10:13
**remove** 193:25
**renovate**
119:16,19
**renovated**
269:19
**renovations**
202:13
**rent** 282:24
283:5 292:6,9
292:17,22
293:7,12 294:2
294:3

**reopen** 190:11
199:20,24
200:7 228:1
**reopened** 214:5
214:18 215:8
216:10
**reopening** 6:5
199:3,7 203:10
203:14,20,25
204:7,11,14
**reorganize**
225:15
**repair** 4:14
126:1 127:2
132:3 134:20
137:1 147:15
**repaired**
132:21 133:9
137:3 191:13
267:11 302:6
309:19 310:8
310:18
**repay** 20:19
**repeat** 19:19
**rephrase**
107:15 278:3
**replace** 96:2
132:20 134:5
211:9 237:4
245:21 280:1
**replaced**
135:24 136:7
143:22

**replacement**
138:16 143:20
192:14 224:20
224:23 230:18
232:25 267:18
267:21 268:1,5
269:25 273:5
277:7 288:20
290:10 311:3,6
**replacements**
144:6
**report** 4:15
115:10 120:10
126:2 127:11
131:17 132:4
136:21,25
145:13,19
159:16 164:7,8
**reported** 1:21
56:17 58:21
164:9,9,16
245:25
**reporter** 1:20
10:5 17:25
55:6 63:11
87:7 121:19
172:4 204:3
291:10 311:18
311:20,25
312:5
**reporter's** 3:7
15:17 314:1
**reporting**
81:16,18,21,24

82:3,9,21,25
83:2 84:4,6
85:25 98:5
159:19 164:12
165:19
**reports** 82:10
120:8 127:2,6
214:23 223:14
227:5 282:20
**represent** 48:6
79:6 137:12
149:24 178:21
230:19 257:7
274:4 284:21
285:9 287:7,18
**representation**
234:12
**representative**
140:20 233:23
234:21
**represented**
12:11,14,18
267:9 276:1,4
**representing**
10:3 23:9
181:1
**repurchase**
297:16,18
298:11
**repurchased**
296:21 298:19
**request** 5:18
33:1 85:22
95:2 123:20,20

295:6,9,11,13
300:22
**requested**
97:15 239:24
**requests** 33:5
33:15 169:12
224:13
**require** 124:17
300:11
**required** 85:6
90:20 229:8
269:20
**requirement**
228:18
**requirements**
81:24 82:25
91:7 272:12
**res** 17:9,10
23:25 295:19
296:1
**reserve** 19:11
300:13
**reserved**
300:18 314:6
**reside** 148:12
**residence** 53:3
53:4,11,12
54:3
**resident** 232:7
**residential**
124:12
**residents**
193:25

**resolution**
276:9
**respective**
248:18
**respond** 13:17
207:2 216:3
295:8
**responded**
195:17 196:6
196:11 202:24
207:8
**responds**
206:16
**response** 12:1
33:15 41:11
75:15 87:22
98:23 130:24
136:22 150:8
156:19 203:3
228:10 238:17
295:5,10
**responsibilities**
67:5,6,15
165:18 172:22
**responsibility**
74:22 160:19
161:6
**responsible**
150:14 223:20
**responsive**
215:21
**rest** 78:4 245:8
**restated** 4:4
95:17 107:24

108:10 109:6
110:12
**restoration** 7:8
54:10 227:16
229:20 258:1
**restore** 34:21
35:6 175:12,23
176:8,19
222:21 272:24
**restored**
267:12 302:6
309:20 310:9
310:19
**restrictive**
124:18
**restroom** 128:3
**restructuring**
294:11
**result** 57:16
59:16 64:6,23
65:7 66:11
222:18 267:17
311:2
**results** 56:20
**retention** 178:9
**retired** 62:22
**retirement**
62:25 63:14
**retrospect**
83:18
**retrospective**
282:23 283:5
**return** 298:18
316:13,16

**returning**
174:19
**reveal** 302:2,3
**revenue** 59:15
59:23
**reverse** 186:15
**review** 6:15
13:21,25 14:9
14:13,17 32:21
33:1 42:17
104:8 118:16
131:19 141:3
155:9 189:20
206:11 209:5
209:14,24
218:11 221:1
231:13 239:8
266:24 271:14
278:7 316:7
**reviewed** 14:1
14:4 31:2,4
34:6 124:3
171:16 207:25
208:11 218:4
220:5,11,24
221:5,21,22
222:10,15
238:19 239:25
240:3,5 273:18
291:13
**reviewing**
32:25 87:19
96:12 193:7
195:6,13 260:7

**[reviewing - rolling]**

271:23 272:3
**reviews** 68:22
  81:2 96:9
  104:11 113:12
  118:20 139:20
  154:7 155:10
  172:3,7 179:2
  186:19 206:19
  209:12,19
  222:14 239:10
  252:15 259:20
  266:19 271:17
  274:20 278:21
  293:3
**reworking**
  228:3
**rich** 30:7,8,13
  103:21 104:7
  104:20 299:2
**rich's** 103:22
**right** 14:23
  18:10,13,21
  20:14 21:9
  23:6 25:4,7,10
  25:12,19 45:8
  48:16 49:14
  53:21 69:7,23
  70:1 76:18
  86:5,10 87:4
  92:4 93:23
  94:4,17 95:4,7
  98:17 99:1
  100:2,13,15
  103:10,14,17

110:8 113:24
119:5,11 121:3
124:19 126:10
126:18 127:23
130:15 131:6
131:12 134:23
138:6 139:2
140:9 146:23
147:5,12
150:25 155:15
155:23 156:1
156:13,17
158:10 159:5
160:22,23
162:1,20
163:25 164:6
164:18 176:14
176:19 179:9
180:20 183:18
187:16 190:19
190:25 191:14
191:24 199:11
199:17,21,25
200:12 203:15
207:22 209:18
218:16 224:25
225:5,6 226:2
230:6,11,13,20
230:24 231:3,9
232:19 238:19
240:17,21
241:11 244:1
248:14 249:2,9
250:16 267:21

269:12,20,25
270:4 272:25
281:15 288:18
290:3 300:13
309:21 310:20
**rights** 120:19
  191:4,19
**rightsizing**
  213:23
**riley** 2:11
**ring** 282:21
**risk** 46:18
  165:22 166:23
**river** 24:9,17
  76:1 152:4
  290:25
**robbins** 2:3
  10:25,25
  115:15
**robby** 166:24
  183:3,11,15
  217:12 250:15
  252:2 263:17
  263:18,23
**robert** 1:12,14
  3:4,10 4:1 5:1
  6:1 7:1 8:1
  9:15 11:2,13
  232:2 270:21
  296:25 313:2
  313:11 315:2
  315:24 316:5
**robert.gendron**
  117:3,16

**rocco** 265:3
**rockland** 289:4
**rockledge**
  289:8
**rocks** 135:2
**role** 18:24 20:3
  39:20 81:17,20
  81:22,23 82:13
  82:18 84:3,17
  85:3 103:22
  114:8,17,19,21
  114:24 117:20
  117:21,22
  151:15,16
  162:3,8 163:1
  163:6,11 184:2
  184:22 185:21
  185:24 208:7
  217:8 238:23
  239:3 245:17
  245:22,22
  250:2,7 252:5
  277:5 280:25
  282:19 283:23
**roles** 104:2
  164:24 251:16
**roll** 91:22 96:1
  97:7 101:21
**rolled** 70:3,6
  91:25 97:17
  102:19 239:2
  285:20
**rolling** 237:16

**rolls** 165:17
**ron** 166:7,8
**roof** 130:24
  133:13 134:25
  135:1,2 136:1
  138:16 143:20
  143:22 144:6
**roofs** 130:25
  133:15 134:13
  134:18,22
  135:4,7,23
  136:4,7,19
**room** 221:15
**rooms** 211:15
**rosa** 157:2
**rougas** 187:4,5
**rough** 287:9,15
**roughly** 106:22
**routine** 143:4
**row** 132:11,19
  133:2
**roxanne** 265:3
**rrmc** 288:15
  289:2
**rshc** 2:13,14
**rubber** 135:2
**rule** 314:5
**rules** 1:24
  314:6
**running** 105:24
  106:2,5,11
**runs** 31:10
**rushlau** 234:5
  234:11

**s**

**s** 2:1,11 9:1
  52:25
**safe** 267:12
  297:20 302:6
  303:12 309:20
  310:9,19
**safer** 2:11
**safety** 214:23
  214:24 303:19
**sah** 290:19
**sal** 31:4 116:19
  122:16,19
  123:16,19
  125:2 205:2,16
  208:18
**sal's** 123:20
**sale** 54:22
  55:13 57:12,25
  58:9 75:23
  82:23 139:23
  170:12 196:24
  197:7 201:23
**sales** 44:15,22
**salt** 52:8
  289:15,17,20
**salvant** 2:22
  10:3
**salvatore**
  116:14,17
**sam** 193:6
  254:17

**sandler** 2:16
  10:20,21 12:15
  13:14 19:9,16
  20:22 21:4
  24:11 25:21
  26:3 28:10
  30:23 33:9,13
  33:20 34:1,23
  35:8,16,22
  36:20,25 37:6
  37:17,21 38:9
  38:15 39:14
  40:8,13,19
  46:1,15 49:1
  50:19 51:17
  55:5,11,23
  59:12 60:12,16
  61:3 62:11
  64:25 66:17
  67:17,22 74:4
  76:11 83:6,9
  84:20 85:10
  86:11,19 87:5
  91:3,9,17
  107:4,12 109:9
  109:19 111:15
  111:20 114:9
  128:24 129:14
  129:16 152:14
  153:12 158:17
  167:14 173:4
  174:6 194:20
  212:11 213:1
  215:11,14,17

  216:1,15 217:3
  219:11 220:7,9
  225:22 227:12
  232:22 234:23
  237:20 248:3
  256:15,17
  257:18 261:19
  262:5,14
  268:18,25
  271:25 272:16
  273:7 283:7
  286:7 298:13
  298:21 300:15
  302:14 307:20
  307:22 309:10
  311:14,19
  312:5,7 316:1
**satellite** 52:9
**saved** 274:7
**savings** 101:21
**saw** 57:10 62:5
  64:2 289:22
  293:25
**saying** 153:25
  155:14 166:18
  205:16 269:23
  272:7 297:24
**says** 68:15
  70:15 73:1,10
  82:1 95:5,17
  97:1 99:24
  100:11,12,21
  103:25 118:24
  122:20 130:24

| | | | |
|---|---|---|---|
| 131:10 132:13 | **scheme** 307:14 | 190:21 198:22 | 114:6 116:15 |
| 132:20 133:2 | 308:5,10 | 202:10,11 | 116:23,25 |
| 134:18 138:10 | **school** 215:16 | 206:13 225:2 | 117:3 119:1 |
| 138:12,15 | **scope** 72:21 | 226:13 228:21 | 121:14 122:3,9 |
| 145:4,12 | 74:2 76:22 | 239:8 243:7 | 123:8 126:4,16 |
| 175:16 176:22 | 129:4 138:2 | 247:1 258:5,20 | 127:9,14 |
| 176:23 177:1 | 145:11 188:20 | 260:25 266:17 | 130:13,14,16 |
| 177:14 190:18 | 272:21 303:8 | 270:20 278:7 | 130:20 131:3,8 |
| 190:21,25 | 306:6 | 287:13 288:15 | 131:17 132:17 |
| 199:9,19,23 | **scott** 37:16,22 | 299:4 300:12 | 132:22 133:4 |
| 200:2,6 210:19 | 58:21 62:15 | 304:15 305:3 | 134:9,10,16 |
| 211:9,20,24 | 75:10 78:3 | 310:5,17 | 136:12,13 |
| 212:3 222:18 | 136:3 148:6 | **section** 5:18 | 137:15 138:13 |
| 225:5,13 226:4 | 284:2 285:18 | 22:10 134:10 | 138:19 139:11 |
| 229:19,22 | **screen** 9:9 | 175:3 181:19 | 139:12 143:24 |
| 249:3,8 261:6 | **script** 7:22 | 225:19 241:18 | 143:25 144:23 |
| 274:12 275:13 | 273:15 274:17 | **sedgwick** | 145:1,9,16 |
| 284:21 285:9 | 274:24 302:21 | 157:23 158:10 | 146:9,10,20 |
| 287:8 288:17 | 302:25 303:1,7 | 158:22 167:24 | 150:4,17,21 |
| 288:24 289:11 | **se** 183:2 | 167:25 168:18 | 151:12 153:18 |
| 294:25 296:25 | **sean** 196:13 | **see** 21:23,25 | 155:19 156:20 |
| 304:21 305:20 | **search** 62:7 | 22:2,6,8,16,18 | 156:25 157:4 |
| 310:21 | **seat** 245:11 | 47:21 50:2 | 159:14 160:19 |
| **scale** 296:18 | **sebastian** 24:9 | 57:15 68:18 | 161:22 162:22 |
| **scenario** | 24:16 76:1 | 69:8,20 73:2 | 164:1 165:16 |
| 227:25 231:1 | 152:4 | 73:10,16,22 | 168:1,5,8,15 |
| **scenarios** | **sec** 257:16 | 79:9,14,16,24 | 170:21 171:4,6 |
| 222:19 230:22 | **second** 15:22 | 80:3,6,19 82:5 | 172:12 174:21 |
| 240:19 305:3 | 27:9 41:1 | 88:9 94:12 | 177:13,17 |
| **schedule** 72:22 | 59:20,24 79:12 | 95:18,23 96:12 | 178:15 179:16 |
| 138:2 188:20 | 96:4 146:7 | 97:3 98:10 | 180:25 181:5 |
| 257:13 | 154:3 155:9,19 | 99:15,23,23 | 181:23 186:21 |
| **schedules** | 160:9 168:7 | 100:20 101:25 | 188:4,10,21 |
| 253:2 | 171:25 178:14 | 103:7,15 113:7 | 190:14,16 |

192:4 193:7
195:16,25
196:6,9,14
198:13,15,24
199:4,7,14
200:3 201:4,8
203:1,11 206:8
206:24 207:3,6
207:10 208:2
208:23 209:25
210:4,19
211:10,16
218:12,23
222:22 224:19
226:7 227:17
228:4,20
229:20 231:23
232:3 238:10
238:12,14,15
240:8 241:10
241:18 243:5,7
245:4,14
246:11 247:13
247:18 248:10
251:8,21 259:5
261:1,4,13
265:4,22 266:4
267:7,14 269:6
270:14,16
275:10,12,18
275:24 284:18
284:23 285:11
287:10 288:9
288:12,19

289:1,9 292:13
292:16,19
293:2 295:1
303:14 304:24
305:17,25
**seeing** 78:22
147:24 182:9
220:3 273:20
**seek** 24:3
250:11 300:12
**seeking** 23:13
299:8
**seeks** 22:22
**seems** 114:11
**seen** 9:8 160:14
170:3 178:24
179:22 195:1
219:3 239:9
246:16 258:2
281:12 282:10
**self** 45:3
**sell** 45:10 105:3
105:11,19
296:10
**selling** 46:13
50:10,18
**send** 123:12
210:11 238:18
239:25
**sending** 123:14
154:23 155:2
158:15
**senior** 139:8

**sense** 27:7
108:6 153:24
168:23 170:4
250:13
**sent** 22:23 23:5
32:22 116:23
117:2 212:21
219:4 305:14
305:15 316:14
**sentence**
177:13 188:2
188:18 227:24
261:5 292:4
301:23 304:21
305:19 309:16
309:23 310:5
310:17,23
**separate** 23:12
27:1 46:4,5
87:19 98:20
181:15 242:1
285:3 288:3
290:2,5
**separately**
285:5
**september**
35:14,21,23
36:13,19 37:13
38:8 39:5,11
40:5,22 42:6
43:1 83:23
170:1 203:15
203:21 204:1,8
204:15 280:4

**sequence** 55:12
**series** 54:5
97:11
**servant** 100:8
**serve** 170:7,9
**served** 77:22
**service** 4:4,7
48:12 49:3,5,8
49:13,15,22,23
51:14 71:4
74:14,15 85:23
91:1,15 93:12
97:3 103:5
107:24 108:4
108:11,12
109:6,16
110:12 209:24
210:20 225:15
230:1
**services** 44:25
46:12,18,21,24
47:18 48:13,19
48:22,24 49:2
49:19 50:5,7
50:11,25 51:2
51:3 68:16
69:4 70:16,17
70:18,21 72:25
73:4,13 74:19
74:19 76:9,16
77:16,21 78:14
82:14 87:11,16
87:20,21,23
89:5,23 92:1

95:3,6,17,25 97:14 98:4,9 98:11,22,24 100:2 104:6 105:5 106:24 107:10 108:1,5 109:14 110:1 110:10,15,25 118:12,13 119:24 126:9 129:12 144:13 153:10 201:6 202:1,4,5,17 212:10 215:2 217:13 230:3,6 249:1 265:4

**serving** 90:23

**set** 69:8,10 100:23 101:9 265:13

**seth** 2:3 10:25

**sets** 92:3

**seven** 77:19 90:14 192:21

**several** 27:18 30:18 74:17 130:25 137:1 138:18 145:5,8 146:2 152:8 177:25 186:22 193:1 236:4

**sf** 227:16,22

**shape** 199:16 200:10

**share** 195:22 284:15

**shared** 77:21

**sharepoint** 36:16

**shares** 295:18 295:21 298:19

**sharon** 75:25

**shc** 1:3 9:17 315:6

**shea** 45:22

**sheet** 315:1 316:11

**shifted** 67:15

**shop** 121:2

**short** 203:10

**shorthand** 1:20 188:16

**shortly** 62:24 172:20 210:10

**show** 68:8 87:14 102:23 125:20 149:17 149:20 151:6 156:12 167:19 178:9 186:2 218:2 223:15 238:3 268:12 270:8 291:13 294:20

**showed** 128:15 309:2

**shown** 56:19 162:18

**shows** 249:11

**shuffle** 254:3 254:10

**sic** 270:20 289:4

**side** 50:1 131:6 162:20,20 228:24 241:21 249:15

**sides** 224:12 271:3

**sign** 179:21 316:12

**signage** 72:10

**signature** 63:19 64:3 79:14,16 79:18,20 92:8 92:19,22 94:6 94:7,8 103:15 103:16 178:16 178:18 179:25 180:4,13 261:5 314:6,16

**signed** 90:11 101:2 103:20 110:5 150:7 179:13,23 261:1 279:20 313:13 316:19

**significance** 194:4

**significant** 23:15 67:15 78:16 94:19

113:16 148:25 189:23 191:12 202:8,20 204:10 230:23 231:2 250:7 280:19

**significantly** 94:22

**similar** 219:21

**similarly** 276:24 277:14

**simply** 260:7

**sine** 312:8

**siphoned** 299:16

**sir** 25:24 121:18

**sit** 119:10

**site** 163:6,10 194:6 196:13 196:17,19 197:2,8 210:13 241:18 249:9 267:19 311:4

**sitting** 12:16 55:21 67:1 120:13 131:21 212:23 213:3 220:21

**situation** 66:23 124:15 222:19 225:20 253:11 287:1

**situationally** 189:20

**six** 47:19 53:2 54:15 63:3 77:19,21 90:14 185:3 192:21 201:25 202:2 220:4 232:14 241:23 305:22

**size** 64:14 66:1 229:20 230:11 240:21 241:5 248:13,25

**sized** 225:5

**sjmc** 291:1

**skin** 136:20

**skipped** 244:15

**skur** 1:19 10:5 314:2,17

**slab** 132:14

**slide** 6:12 160:18 209:9 209:10,15,16 209:24 210:14 210:15,23 239:14,21 240:8,9 241:7 241:10 247:10 248:9,25 270:16,20 272:10,11 273:12

**slides** 241:7

**slightly** 78:21 120:22,22

**slmc** 289:9,14 289:19,25 290:9

**small** 119:21

**smg** 118:8,9 255:1,3,8,13 256:3

**sold** 16:16 45:6 45:11 55:1 56:1 166:14

**solution** 193:24 194:7

**solutions** 1:22 9:24 314:18 316:23

**somebody** 226:11 239:22

**somewhat** 278:25

**soon** 56:5 194:5

**sophisticated** 72:13

**sorry** 15:14,16 15:19 17:10,14 24:20 26:7,10 30:2 39:14 40:20 45:14,16 45:16 55:6 63:9,10,12 70:19 79:1,13 80:13 81:3,19 87:8 96:7

98:14,25 102:5 102:5,9 103:15 104:15 105:22 107:6 108:6 109:20 121:18 127:10,13 128:5 136:11 141:10 142:10 152:12 154:8 156:10 160:2 165:11 172:6 174:23 176:25 187:18,20 198:14 201:19 207:9 219:24 220:4 239:11 240:15 250:24 252:16 253:14 255:6,23 259:21 265:23 270:7 271:15 278:22 287:11 297:4 309:7,12 310:11

**sort** 72:1 113:21 128:20 222:25

**sound** 15:4 23:17 48:10,15 159:5 281:15 294:14

**sounds** 23:22 25:5 184:20

**source** 134:18

**sources** 286:10

**southern** 21:21

**southwest** 94:24

**space** 58:10 201:3

**speak** 27:24 28:18,24 39:1 62:14 158:14 158:25 183:12 221:14

**speaker** 244:11

**speaking** 98:2 260:2,5

**specialized** 71:12

**specific** 26:9,15 56:20 71:11 110:6 111:2 116:5 143:10 151:24 185:14 185:21

**specifically** 31:17 43:12 87:20 95:1 97:16 133:14 140:22 154:25 181:15 182:5 193:11 208:19 241:3 246:4 248:25 295:12 304:17

| | | | |
|---|---|---|---|
| **specificity** 14:3 | **staff** 65:6,9 | 206:10 259:21 | **stating** 154:11 |
| **specifics** 14:7 | 101:17 117:14 | **started** 44:22 | 183:11 |
| 66:24 78:18 | 254:13 | 48:3 56:7 | **status** 195:23 |
| 95:4 145:21 | **staffing** 90:20 | 63:22 97:11 | 286:23 288:11 |
| 152:15 229:13 | 91:6 101:23 | 98:4 192:7 | **stay** 306:7 |
| **speed** 240:6 | **stained** 132:20 | 228:13 | **stayed** 114:23 |
| **spell** 11:14 | 133:8,19 134:5 | **starting** 195:22 | **stenographic** |
| **spending** | **stains** 133:12 | 203:8 | 1:21 |
| 170:20 | 133:20 | **starts** 198:16 | **step** 64:15 |
| **spine** 54:11 | **stamp** 79:15 | **state** 1:20 | 277:12 |
| **split** 45:19 | 127:14 130:16 | 10:10,13 11:11 | **stephen** 38:6 |
| **spoke** 42:1 43:4 | 195:19 | 15:6 105:6 | **steps** 157:3,7 |
| 62:24 63:4 | **stamped** 68:10 | 183:10 189:24 | 288:17 289:11 |
| 117:18 166:6 | 88:25 92:18 | 193:22 224:24 | 290:6,15 |
| **spoken** 27:22 | 93:20 95:15 | 225:14 229:1 | **steve** 38:5 |
| 29:16,25 30:10 | 103:1 113:1 | 314:2,17 | 187:6 210:24 |
| 30:17 32:19 | 130:12 | **stated** 85:15 | 241:15 |
| 167:2,6 171:11 | **stand** 107:9 | 175:8 303:23 | **steven** 186:22 |
| 187:13 | 135:22 215:2 | 303:23 | **stew** 170:11 |
| **spreadsheet** | 227:19,22 | **statement** | **steward** 4:14 |
| 7:7 | **standalone** | 151:1 197:9 | 5:7,11,15,17 |
| **spreadsheets** | 160:11 | 249:23 250:6 | 7:10 8:7,10 |
| 14:17 | **standford** | 260:24 261:8 | 14:2,10,18 |
| **spring** 235:25 | 244:3 | 270:17,21 | 18:20,24 20:3 |
| 236:1 | **standing** 33:5 | 273:12 274:7 | 21:8 22:14 |
| **sprinkler** | 258:9 283:13 | 274:24 275:21 | 23:14,14 24:4 |
| 133:15 | **stands** 249:16 | 294:2 304:3,5 | 24:8,16,23 |
| **srobbins** 2:6 | 291:2 | 311:17 | 25:2 27:7 |
| **st** 42:17 152:1 | **stantec** 196:13 | **statements** | 29:13 30:20 |
| 254:17 289:23 | 196:17,18,19 | 301:10 | 32:10 38:1,12 |
| 290:3,4,13,23 | 197:8 | **states** 1:1 9:20 | 38:13,23,24 |
| 290:24 291:3 | **staples** 187:11 | 22:13 136:25 | 39:5,10 40:6 |
| **stack** 291:12 | **start** 34:5 | 181:22 270:17 | 40:18 41:4 |
| | 173:11 186:17 | 303:7 315:4 | 43:9,11 46:13 |

**[steward - steward's]**

| | | | |
|---|---|---|---|
| 46:25 47:8 | 108:24 109:8 | 181:14 183:24 | 269:17 270:4 |
| 50:13,17 51:13 | 109:14,15,25 | 184:9,25 | 271:4,12 |
| 51:14,16 53:24 | 110:1,6,11,24 | 187:14 191:20 | 272:10,15,18 |
| 54:6,17,19,20 | 110:25 111:12 | 191:21 192:19 | 273:3 276:16 |
| 54:23 55:1,3 | 112:2,7,7,15 | 193:14 195:12 | 276:22,25 |
| 55:20,25 56:4 | 116:11 117:11 | 200:21 201:2 | 277:6 278:17 |
| 56:9,12,16,24 | 117:15,20,24 | 201:14,18,21 | 279:3,24 280:8 |
| 57:2 58:10,11 | 118:1,9,10,14 | 202:1,16,20,21 | 281:3,6,14,18 |
| 58:15,18 59:8 | 119:3,4 121:6 | 203:13,19,25 | 282:2,5,19 |
| 59:9,10,17 | 122:25 123:24 | 208:10 212:7 | 283:12,19,22 |
| 61:4 63:6,16 | 124:2,23 | 212:15,16 | 285:20 286:4 |
| 64:7 68:24 | 125:25 126:24 | 213:8 216:22 | 288:1 292:6,10 |
| 70:12,18 71:7 | 134:12 138:4 | 217:1,10,15,19 | 292:22,23 |
| 73:5,13 75:1,1 | 140:9,13,14 | 217:23 218:9 | 293:7,8 294:11 |
| 75:7,21 76:9 | 141:2,5,6,14 | 221:7,19 | 294:13 298:1,5 |
| 76:25 77:16 | 142:5 144:14 | 223:25 225:17 | 299:9,17 303:9 |
| 78:14 79:9,21 | 149:4 151:4 | 225:21 232:8,9 | 303:10 311:1 |
| 82:14,19 83:5 | 152:21 153:24 | 233:7 234:13 | **steward's** |
| 83:12 85:6,8 | 153:25 154:12 | 237:9 238:24 | 20:12,20 66:11 |
| 85:22 86:5,10 | 154:18 157:25 | 239:17 243:16 | 74:15 99:24 |
| 86:18 87:3,16 | 158:4,6,8,11,21 | 243:24 244:4,7 | 111:13 125:12 |
| 87:22 88:8 | 159:3 160:9 | 244:13,14 | 150:13 159:9 |
| 89:7 91:8,16 | 161:7 164:10 | 245:5,5,11,20 | 170:12 172:24 |
| 92:25 93:12 | 164:17,21 | 245:23 246:14 | 174:10 176:1 |
| 94:3 95:21 | 167:10 168:11 | 246:24 247:13 | 183:2,4 204:22 |
| 97:2 98:14 | 168:13,24 | 247:16 249:24 | 205:10,14 |
| 99:7 100:9,21 | 169:4,8,19,25 | 250:12 251:18 | 212:24 214:2 |
| 101:2,13,22 | 170:7,10,15 | 253:17 255:7 | 231:8 241:14 |
| 102:10,11 | 175:17 176:15 | 255:18 259:3,5 | 245:17 246:6 |
| 103:9,20,23 | 176:18 177:3 | 260:1,11 | 248:18 250:16 |
| 104:3,23 | 177:19 178:19 | 261:17 262:19 | 259:15 265:11 |
| 105:13,15,18 | 178:22 179:7 | 263:5 266:22 | 266:14 267:1 |
| 105:24 106:3,5 | 179:13,18,23 | 267:9,16,25 | 269:22 273:12 |
| 106:11,17,25 | 180:1,13 181:1 | 268:14 269:12 | 282:6 286:17 |

294:2 299:18

**steward.org** 117:7,16

**steward.org.** 117:3

**steward0000...** 5:15

**steward0004...** 6:15

**steward0004...** 5:21

**steward0009...** 6:20

**steward0010...** 7:20

**steward0011...** 6:6 198:7

**steward0011...** 6:9 206:5

**steward0012...** 250:24

**steward0017...** 8:11

**steward0017...** 8:13

**steward0019...** 5:5 149:24

**steward0019...** 291:25

**steward0046...** 7:6 251:3

**steward0075...** 5:23

**steward0076...** 5:10 155:8

**steward0076...** 6:12 209:4

**steward0076...** 6:18

**steward0083...** 7:14 264:24

**steward0083...** 7:17 269:4

**steward0088...** 8:8

**steward009** 279:2

**steward0093...** 7:11

**steward0100...** 8:5

**steward0118...** 5:8 151:10

**steward0118...** 4:12

**steward0120...** 5:19 171:1

**steward0122...** 7:22 273:25

**steward0136...** 6:24 243:3

**steward01426** 160:2

**steward0142...** 5:12

**steward0154...** 257:10

**steward1006...** 275:8

**steward1059...** 270:13

**steward1718** 167:23

**steward179172** 284:10

**steward47754** 178:12

**steward758540** 186:11

**steward762546** 231:19

**steward884004** 278:6

**steward933926** 258:25

**steward94428** 238:6

**stewing** 121:6

**sticking** 86:2

**stipulated** 19:17

**stipulation** 57:24

**stipulations** 19:8,10

**stock** 295:18,20

**stop** 205:16 285:25 286:11 307:22

**stopped** 137:21 163:17

**stopping** 284:22 285:10 286:1

**store** 35:19

**stored** 34:7 36:7,13,15 127:16

**stories** 241:23

**storm** 7:7,20 38:21 39:12 135:8 148:3,8 149:2 166:19 195:14 257:25

**strategic** 219:13 221:18 231:6 265:21 266:6 267:17 311:2

**strategy** 74:10 75:3,9 208:22 305:6 306:8

**straw** 282:20 284:21 285:8,9 285:14

**streams** 162:10

**street** 1:22 2:4 2:11,17 9:24 48:15 54:12 191:9 200:20 314:19

**strike** 19:11 251:1

**string** 5:4,9,22 6:4,7,17,19 7:9

**[string - sure]**

7:13,16

**struck** 115:3

**structure** 5:12 101:15 159:13 159:22 160:7 170:3 226:6 228:2 233:10 241:21 245:1 249:12 269:19 276:24

**studies** 70:24 72:18 120:2,14 197:14,18 213:18

**study** 72:18,20 120:8,10 161:15 258:5 268:4 279:19

**stuff** 47:6 65:1 185:9 205:16 205:18

**styled** 1:17

**subcontract** 31:16

**subcontractor** 31:14

**subject** 137:14 137:24 156:6 199:1 209:8 218:11 251:20 299:22

**sublease** 170:19 201:2

**sublimit** 233:22 235:4,13

**sublimits** 233:18 235:9

**submission** 247:12 259:3 259:14,25 260:21 266:13 266:24 267:4 267:19 309:4 309:16 310:6 310:23 311:4

**submissions** 250:4

**submitted** 21:12 24:15,23 152:6 249:23 266:25 294:12

**submitting** 260:8

**subpart** 99:23

**subpoena** 32:21

**subscribed** 313:13 314:13

**subsection** 73:17

**subsequently** 61:11

**subsidiaries** 55:2 296:2

**subsidies** 255:8

**substance** 29:9 185:22 272:3

**substantially** 175:13,24 176:9,20 219:21

**substantiated** 279:12

**substrated** 135:2

**subtenants** 170:15

**success** 67:9

**suction** 199:21 199:25

**suffolk** 31:24 47:10 53:10

**suggest** 48:8 306:9

**suggested** 66:21 105:25

**suggestions** 121:6

**suite** 1:23 2:12 9:25 54:12 290:10 314:19

**suites** 202:14

**summaries** 162:11 271:11

**summarize** 67:5

**summary** 145:11 203:4 225:19 228:20 230:15 263:3,5 276:2 278:15

279:2 287:9,15

**summer** 40:2

**summit** 266:21

**sunday** 148:10

**supervising** 162:3

**supply** 251:14

**support** 84:13 111:4 129:1,3 129:6 210:12 222:8 228:15 245:9

**supporting** 57:21 228:25

**sure** 14:11 26:15 27:2 29:22 33:20 34:5 41:24,25 42:1,14 49:2 53:18 58:5,5,7 65:1 67:22 71:20,21 80:14 80:25 84:24 85:11 94:25 96:6 99:1 104:9,24,25 106:13 108:8 154:11,21 161:17 170:17 173:12,24 176:4 177:10 183:1 185:1,4 192:22 204:5 215:5 217:5,6

232:24 234:15
240:25 241:2
246:15,16
252:20 256:1
258:7 262:15
266:18 271:16
277:13 281:22
295:11 300:2
300:23 304:3
310:13

**surfaces** 145:5

**surg** 200:3
211:24

**surgery** 192:15
212:3,4

**surgical** 54:12

**survey** 196:20
196:21

**surveys** 197:5

**sustained**
133:11

**svp** 28:23 62:1

**swear** 11:25

**switch** 112:18
216:19 249:19

**sworn** 1:16
11:3 260:24
314:3,13

**system** 5:7 8:7
79:21 92:25
95:22 103:20
103:23 135:5
178:19 239:18
294:11

**systems** 214:25
303:19

**t**

**tab** 21:15 79:2
95:11 112:24
116:7 125:23
144:17 149:17
169:18 178:5
186:5 206:1
209:1 217:25
231:16 238:5
242:24 250:20
257:5 258:23
264:24 268:9
270:8 273:24
275:5 277:23
294:17

**tabling** 258:18

**take** 9:12 13:16
28:13 43:19
67:23,25 74:23
77:11 95:10
127:24 222:13
224:18 236:18
252:13 256:15
256:19 277:22
299:25 301:6

**taken** 1:16 9:15
157:3,7 166:13
220:1 313:4
314:9

**talk** 29:7 58:18
58:22 173:9

194:9

**talked** 27:19
29:12,18,24
157:17 171:14
173:14 178:8
187:3 192:21
193:1,3 196:3
238:21 311:16

**talking** 49:18
63:6 105:12
191:20 305:7

**tampa** 52:8

**team** 5:12
58:15,16 98:7
120:7,9 157:25
158:9,11,21
159:13,22
160:7 161:1,3
184:9,14
185:25 195:12
204:23 205:11
205:14 207:25
208:15,17,18
210:6,7,11,11
222:8 250:17
264:17 284:3
285:22

**tech** 183:19

**technical**
108:15

**technically**
69:2

**technology**
10:2 74:20

296:19

**telephone**
236:16

**tell** 11:3,25
41:14 147:1
186:6 209:6
268:15 307:1

**telling** 58:24
205:16 235:2

**tempe** 289:19
290:1,2,9,13

**temperature**
96:13

**temporary**
193:24

**ten** 65:14 77:20

**tenant** 82:10
172:22

**tend** 186:16

**tenet** 105:4,12

**tense** 191:21

**term** 71:21
72:19 99:15,18
104:25 203:10
214:7,19 215:9
216:12 241:2
249:5

**terminate**
175:15

**termination**
254:1

**terms** 71:13
136:15 165:15
165:19 210:12

264:10 278:15
279:2,6,10
286:22 288:1
**testified** 11:5
42:1 69:25
125:5
**testify** 124:6
**testimony**
11:19 12:24
14:14 29:9
45:6 76:6
124:4 169:22
171:16 227:8
234:20 235:11
235:16 237:3,8
237:15 313:3,6
314:3 316:9,17
**texarkana** 65:5
152:3
**texas** 1:20,23
9:25 21:21
110:18 148:15
152:12,20
291:4 314:2,17
314:19
**text** 34:13,18
35:4,12,19,20
36:17,23 37:5
37:9,11,22
38:7
**texted** 30:8
**thank** 18:3
31:22 45:4
68:12 70:8

81:12 92:15
93:21 102:6,21
103:3,5 104:18
115:2 130:6
156:11 164:14
165:3,8,9
186:8,13 198:3
204:13 209:4
238:8 243:4
251:12 264:19
291:15 294:17
302:8 309:13
311:19
**thanks** 227:13
284:12
**thanksgiving**
30:1
**theft** 121:13,24
**theirs** 286:20
**thereabouts**
46:14
**thereto** 261:11
**thesis** 297:20
**thing** 81:4
115:3 241:4
253:7 274:12
**things** 40:12
42:7 194:8
241:3 254:8
**think** 33:9 41:9
50:3 58:15
64:12,17,18
69:25 77:2,3
79:5 86:20

88:10 92:11
106:9 107:20
112:6,21
115:18 117:18
130:4 157:25
158:9,22 166:8
166:14 171:13
173:16 179:22
183:20 184:12
187:3 192:8
201:4 202:10
202:11,11
205:12 210:16
212:16 213:3
237:19 244:17
249:18 251:24
252:1 255:25
257:9,17
258:10 264:14
271:2 281:7
291:19 295:24
300:1 302:13
307:7 309:6
**thinking**
195:23 197:10
**thinks** 303:8
**third** 23:2
79:13 130:1
145:1 188:1
200:25 246:10
263:2 265:25
301:19
**thought** 29:10
63:20 123:23

166:22 192:9
296:17
**thread** 211:1
266:16 306:3
**three** 39:3
45:12,13,20
46:9 47:20,20
47:21 51:5
60:7,8 61:6
77:19 90:14
119:8 134:1,14
153:2 162:21
186:12 245:2
253:11 265:12
284:14
**threshold** 77:4
77:7 81:10
**throckmorton**
314:19
**thursday** 210:3
**tile** 132:21
**tiles** 132:20
133:9,11,20
134:5
**tim** 45:22
**time** 10:10 15:7
16:1,5 17:7,11
29:18 34:3
37:7,13 38:17
39:11 40:20
41:23 42:4
46:23 48:1
53:3 54:3,6,16
56:17 60:25

61:20 63:4
65:21 73:6
74:16 75:22
76:23 77:9
78:5 80:13
81:19 82:2
84:16 90:9
104:2,8,10
106:7 107:22
109:10,20
110:2,17
111:16 113:17
115:20,25
120:12 129:19
129:21,23
131:17 136:5
138:24,25
140:17 142:16
142:19 143:1
148:13 149:1,1
149:13 153:3,9
161:12 166:6
166:20 170:4,4
170:20 171:14
172:1 174:11
176:5 177:4,6
177:9 178:25
178:25 180:6
182:18 183:4
186:6 193:16
203:14,21
208:23 213:5
214:15 220:9
222:13 223:4

223:23 228:9
233:3 234:2
235:24 236:7
236:21,24
237:1 240:2
242:9 243:19
244:5 245:8,10
247:16,25
251:14 252:13
252:21 254:7
254:14 256:10
258:10 260:14
262:2,12
263:16,19
264:4,11 277:3
281:16 285:19
286:25 293:15
297:4 300:12
300:25 306:24
316:18
**timeframe**
316:8
**timeline** 8:14
295:1,4
**times** 27:4 87:6
87:8 177:25
235:23 236:5
284:20 286:21
**timing** 61:16
63:2,3 104:4
119:10 143:24
236:10 280:7
**title** 61:25 67:2
67:11 84:11,12

93:22 179:16
179:24 197:6
241:17 248:10
**titled** 93:16
113:5 125:25
160:7,17,18
227:15 240:9
247:12 259:4
260:25 265:19
274:7 287:22
**titles** 77:25
113:20
**today** 11:17
12:12 13:19
14:14 17:24
18:16 23:9
25:7 26:12
27:20 28:20
29:10,14 30:22
32:23 34:10,16
55:21 60:23
61:1,23 67:1
107:2 120:13
124:4 129:20
129:23 131:22
193:7 195:6
199:10 212:23
213:3 218:5
220:21 258:3
273:19 300:20
301:9 304:14
**today's** 12:19
12:23 13:23
28:15 33:25

300:13
**todd** 2:4 10:24
10:25 12:19,22
13:12,18 43:10
43:12,12 111:4
128:20 129:6
**toddweld.com**
2:6,6
**together** 60:11
60:14 61:2
151:25 194:1
249:22 263:4
**toilet** 133:17
**told** 156:11
159:12 237:13
268:16
**tom** 284:3
**tomorrow** 29:5
159:13 210:3
**took** 13:10
39:24 120:23
164:24 184:7
213:12 245:21
251:14
**top** 14:7 54:11
70:15 72:24
79:10 81:16
82:1 89:17
95:19 105:2
110:7 115:8
135:2 160:9,22
160:22 161:22
198:16 202:12
231:20 238:10

**[top - two]**                                    Page 82

241:21 243:17
294:25 301:22
303:7 305:14
**topic**  124:6
178:10 256:12
**topics**  29:9
112:19 216:19
**torre**  14:6
29:24,25 30:4
37:4 53:6,13
53:19 54:2
56:24 58:22
158:12,25
159:2 188:13
188:16 189:5
189:10,15
190:6 205:6
219:4,10,19
220:1,14,22
221:2,14,17,22
231:8 235:17
235:21 236:1,8
236:23 240:24
244:18 296:4
296:14,22
297:16 298:7
298:14 299:1
299:15,16,21
**torre's**  223:6
**total**  85:18,20
146:24 147:4
279:18
**totality**  154:5

**totally**  142:2
**totorella**  245:7
**touch**  250:15
**towards**  101:22
**town**  6:17
121:11,23
122:2,13,21
123:23
**town's**  123:20
**towns**  124:11
**tpc**  146:22
**trace**  134:20
**track**  297:5
**tracked**  287:25
**tracking**  80:14
280:23 281:13
281:17,19
282:1,5
**tracks**  240:4,25
**trade**  49:16
**trail**  121:3
**transact**  200:24
**transaction**
54:23 55:1
**transactions**
82:11
**transcript**
312:1,6 313:3
313:5 314:3
315:1 316:6,19
**transcripts**
31:3
**transfers**  254:5
299:10

**transformation**
66:20
**transition**
106:7,21
254:24
**transitioned**
101:17 106:8
106:18
**transmitted**
219:9 220:14
220:22 259:7
**treasurer**
103:25
**tree**  113:10,16
115:8
**tremco**  136:3
144:7,9,13
**trial**  19:12
**trouble**  109:21
115:23
**troubles**  286:5
**true**  20:25
25:24 126:11
165:22 266:12
274:16,23
298:22 313:5,8
314:3
**trumbull**  75:25
**trust**  1:4 9:18
18:20,25 19:1
19:2 20:4,5,6
20:11 32:14
54:21 55:19
85:6 201:17,20

270:18 315:6
**trustee**  1:3 9:17
18:20,24 20:3
20:18 25:17
32:13,15
298:25 299:7
315:5
**truth**  11:4,4,4
12:1
**truthfully**  12:9
**try**  75:19 88:2
301:8
**trying**  46:3
66:14 94:23
107:20 109:23
121:5 286:9
306:9,15
**tufts**  61:12
**turn**  22:5,18
23:2 103:19
119:7 134:8
242:24 301:18
302:11 303:3
304:10 305:9
**twice**  116:6
**two**  13:5 26:22
27:1,6 45:19
46:4,5 54:3
61:6 63:20,22
64:19 77:19
90:14 91:1
96:3 98:20
121:4 135:16
135:18 153:2

153:13 156:23
159:23 161:10
167:7 179:8
205:12 241:7
284:14,14
285:3
**tx** 314:20
**type** 50:7
152:16 228:15
**types** 48:22
71:6 130:25
132:21

**u**

**u** 249:19
**u.s.** 52:6 115:1
**uh** 41:12 42:3,9
62:8 66:13
80:5 86:1
89:10 97:5
98:12 110:3
136:14 146:6
156:8 171:23
180:24 181:21
241:9 251:9
267:5 286:2
**ultimate**
170:13 184:13
**ultimately**
44:25 58:9
71:1 156:5
165:17 183:17
184:5 192:10
194:16 212:7

212:17 213:15
223:19,24
232:17 276:7
305:24
**umbrella** 51:16
**unaware** 136:7
**unchanged**
101:20
**under** 11:23
12:7 28:5
51:15 56:19
61:10 80:1
89:17 97:1
99:24 102:20
113:21 118:11
165:18 167:12
168:14 170:12
176:1 182:14
184:6 187:6
202:19,21
211:20 228:20
229:23 230:12
230:15,17
248:18 260:14
262:25 267:6
285:20 292:5
313:4
**underlined**
226:12
**underneath**
165:16
**underpaid**
76:24

**underperfor...**
230:3,5
**understand**
11:23 12:4
14:11,21 18:18
18:23 19:25
20:2,10,21
22:22 24:12
25:16 26:12,15
26:22 39:4
41:18 43:13
45:5 46:3
53:18 55:21
66:8 76:6
83:10 84:24
85:11 86:3
90:9 107:21
110:5 122:11
122:23 133:10
142:1 154:19
157:20 164:23
172:21,25
175:17 176:4
181:18 185:1
204:13 217:5
226:19 243:21
295:11 299:7
299:13 306:5
**understanding**
19:6 26:17,19
42:11 55:7,16
66:3,15,15
76:13 79:22
83:25 104:1

108:19 117:22
128:25 136:16
143:12 146:12
146:16 156:24
168:17 177:24
195:4 196:23
197:1,4 212:18
213:10 224:3,5
228:6 238:23
245:16 248:1
252:5 255:4,7
278:15 285:17
286:3 288:21
295:7
**understandings**
117:19
**understood**
48:1 52:12
156:15 157:22
175:22 176:7
176:13 193:5
226:25
**unfit** 214:23
**unit** 9:14 200:3
200:10 289:16
**united** 1:1 9:20
315:4
**units** 212:10
**university** 44:1
**unpaid** 20:13
22:23
**unrelated**
128:17 170:21

**[unwrap - want]**

| | | | |
|---|---|---|---|
| **unwrap** 149:14 | 214:7 226:6,14 | 103:9 271:11 | **videographer** |
| **update** 4:18,21 | 226:22 309:3 | **vendor** 31:14 | 2:22 9:2 10:4 |
| 7:5,14 137:14 | 316:19 | 48:9 286:20 | 68:1,4 96:14 |
| 137:23 143:24 | **useful** 131:1 | **vendors** 31:18 | 96:17 128:8,11 |
| 144:22 148:11 | **usher** 182:25 | 31:19,21 | 173:25 174:3 |
| 148:24 239:18 | **ushering** | 282:14,16 | 186:12 197:23 |
| 240:3 246:14 | 184:15 | 286:5,18 | 198:1 256:20 |
| 246:17,21,23 | **using** 10:1 | **venture** 100:7 | 256:23 300:3,6 |
| 247:7 265:19 | 191:21 | **verbal** 180:5 | 311:22 |
| 266:4,9 275:14 | **usual** 19:10 | **verbally** 63:4 | **videotaped** |
| 285:22 | **usually** 15:5 | **verify** 316:9 | 1:11,14 |
| **updated** 113:6 | **utah** 105:3,11 | **veritext** 1:22 | **view** 304:4 |
| 251:20 | 105:19 110:18 | 9:24 10:4,5 | **virtual** 10:2 |
| **updates** 5:23 | 289:17 | 314:18 316:14 | 28:5 |
| 42:21 138:3 | **utilities** 228:12 | 316:23 | **virtually** 9:6 |
| 148:1 253:9 | 228:16 | **veritext.com** | **visited** 115:21 |
| **upgrade** 228:8 | **utility** 227:20 | 316:15 | 116:2 |
| **upgrades** 228:2 | 228:7,15 | **verse** 166:19 | **visiting** 148:19 |
| 228:24 229:3 | | **version** 162:17 | **vocabulary** |
| 230:18 | **v** | 218:8 219:1,11 | 281:10 |
| **use** 6:23 19:10 | | 219:12,14,15 | **void** 262:1,12 |
| 71:13 106:13 | **v** 1:6 315:7 | 219:20 220:3,5 | 262:20 |
| 117:15 123:22 | 316:4 | 220:10,14 | **vp** 221:15 |
| 124:14,19,21 | **validate** 286:12 | 257:9 274:8 | |
| 128:2 157:23 | **value** 146:18 | 312:3 | **w** |
| 158:10,22 | 147:4 225:16 | **versus** 9:18 | |
| 159:1 204:9 | **valued** 25:3 | 80:10 91:11,11 | **wadley** 64:18 |
| 221:23 253:18 | **van** 38:5,6 | 286:12 | 65:4 152:3 |
| **used** 20:19 | 113:20 114:1 | **vice** 78:3 | **wait** 15:12 18:1 |
| 25:11 47:8 | 115:15 123:10 | 113:22 114:2,5 | **waive** 19:12,14 |
| 71:22 72:18 | 186:22 187:6 | 114:17 | **walk** 253:1 |
| 135:5 138:3 | 207:15,18 | **video** 9:11,15 | **wall** 145:5 |
| 163:9 188:15 | 210:24 241:15 | 311:24 | **want** 19:7 |
| 204:9 205:12 | **various** 24:4,23 | | 47:11 53:17 |
| | 26:18 27:4 | | 58:5 80:14 |

[want - work]                                                Page 85

88:15 94:25
99:1 107:20
124:15 131:18
184:18 188:9
190:7 215:5
217:6 244:15
256:1 281:22
290:3,3 291:7
291:13,14
295:11 300:2
300:22,24
302:14 304:17
307:24
**wanted** 42:11
74:18 81:9
148:25 173:13
189:19 264:21
285:17 286:12
297:24
**wanting** 122:18
303:9,11
**wants** 74:13
188:7 189:5,16
**ward** 120:3
194:1
**warn** 253:9
**warranty** 131:1
**water** 133:10
133:11,21
145:7 146:1
152:16
**way** 11:20 30:6
34:21 35:20
45:1 63:15

67:15 76:24
91:23 129:25
147:19 149:7
276:21 304:4
305:7 306:9,15
**ways** 25:17
**we've** 76:10
87:18 107:2
143:19 186:6
187:3,13
188:19 222:19
244:17,18
281:12 282:10
287:4 291:23
**wednesday**
210:3,8
**week** 172:17
188:7 189:5
210:10 312:4
**weekly** 203:9
283:11,17
**weeks** 161:10
222:11 232:14
305:22
**weinstein**
140:23 205:3
254:22 265:15
**weinstein's**
245:22
**welcome**
102:22 112:20
130:7 291:16
**weld** 2:4 10:24
11:1 12:19,23

13:12,18 43:10
43:12,12 111:5
128:20 129:6
**went** 44:22
77:7 128:7
214:14 215:15
220:1 267:16
288:5
**weston** 192:7
**whatnot** 185:7
**wholly** 18:13
296:2
**william** 45:11
47:22
**window** 61:9
61:17 134:13
**winter** 53:8
**withdraw**
278:2 294:8
**withheld**
262:21
**witness** 1:15
2:15 3:3 9:9
10:21 13:10
24:20 55:7
63:9 67:25
68:22 81:2
96:9 104:11
107:6 113:12
118:20 121:18
127:24 128:2,5
128:7 130:1
139:20 142:10
154:7 155:10

172:3,6,7
173:3,7,16,21
174:13 179:2
186:19 206:19
209:12,19
220:13 222:14
239:10 252:15
255:6 257:21
258:16,18,20
259:20 266:19
271:17 274:20
278:21 293:3
307:21 314:3,4
314:6,6 316:8
316:10,12,18
**witnesseth** 97:1
**wondering**
40:23 72:3
84:25 87:15
131:20
**word** 83:17
106:13 163:8
204:9 229:15
253:18 287:8
287:14,14,20
288:10
**work** 24:5,8,16
24:23 31:16
36:12,18 37:25
38:1,13,23
40:14 42:10
44:12 49:5
53:13,24 54:2
56:4,8 60:22

**[work - years]**                                                      Page 86

61:1 71:12
74:2 76:22
78:17,19 88:7
99:11 108:18
108:24 109:7
117:25 118:3
118:10 126:23
134:4 139:6
143:21 144:2
144:10 146:16
147:14 153:4
159:12 184:5,7
184:16 185:20
202:19,21
214:1 268:1
271:12 283:21
284:4,22
285:10,25
286:1,11
306:24
**worked**  32:9
53:19,22 58:11
60:11,14 61:8
61:11 116:18
138:25 151:19
151:25 152:5,7
165:25 166:24
183:11,15
184:8
**workforce**
64:14
**working**  31:6,9
31:11,23 40:17
56:13 60:19

134:13 137:21
151:22 152:1
153:23 163:17
188:2 246:5
269:24 285:21
**works**  84:13
254:13 303:11
**world**  144:10
**worth**  314:20
**wrapped**  286:9
**write**  225:20
226:9
**writes**  200:14
206:14
**writing**  97:19
154:19 180:5
180:11
**written**  27:3
88:5 99:4
136:22 175:9
177:5,15
**wrong**  45:15
250:25,25
251:1 291:14
**wrote**  118:23
119:3 121:10
122:6 123:2
150:24 153:16
154:16 156:22
168:10 172:11
175:1 187:25
188:2,18,19
189:15 191:3
191:23 193:5

199:6 200:9
204:18 205:20
207:24 208:11
208:15,21
209:22 210:2
218:18 225:25
226:1,11 229:3
230:10,15
231:25 232:12
232:18 248:12
248:16 287:14
292:6 293:23
309:17

|  x  |
|---|

**x**  3:1

|  y  |
|---|

**yeah**  15:21
17:13,23 19:9
19:9,10,17
29:23 35:10,17
36:21 38:10
41:9 44:21
59:25 64:2
66:19 79:25
80:1 81:13
83:17 85:4,4
87:1 88:24,24
97:20 101:8
102:16 108:8
109:24 111:9
115:5 122:15
125:3 127:13
127:18,18

146:8 151:22
160:24 162:14
164:14 170:23
171:15 172:2
188:5 191:2,16
194:9 197:4
198:15 204:5
206:15 210:18
210:21 220:2
237:8,22
242:17 243:18
244:20 245:6
246:15 247:1
252:7,12
256:16 257:20
262:15 266:16
266:20 271:8
278:2 283:21
288:16 303:5
307:10,21
308:1
**year**  30:1,2,10
44:13,21 54:10
56:10 57:1
61:6 73:21
74:3 80:18
93:6 94:16,16
101:10 112:2,9
112:16 134:14
166:8 276:17
**years**  27:18
30:18 39:3
44:21 53:2
63:20,22 104:3

**[years - zurich]**                                                                 Page 87

124:1 134:1
145:14 150:14
153:13 167:7
185:3 192:22
193:1 220:4
286:21
**yep**  243:9
**yesterday**  28:1
  28:25
**yup**  247:14

**z**

**zero**  298:9
**zoned**  124:18
**zones**  124:12
**zoning**  123:23
  123:25 124:10
  124:17
**zoom**  2:21
**zurich**  1:8 2:8
  9:19 26:20,25
  27:5 168:5,12
  168:18 212:21
  229:5 233:18
  233:22,25
  234:1 235:9,13
  235:15 237:1
  242:6 250:4
  259:3 261:25
  268:16 295:5,9
  295:10 301:16
  303:8,24 304:6
  315:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit C

# CREF – Corporate Real Estate & Facilities

Updated: November 6, 2019

**Gendron**
**Senior Vice President**
CREF -Corporate
Real Estate & Facilities

**Kenyon**
**Vice President**
CREF Operations

**Robbins**
**Vice President**
Administration

**Dopson**
**Director**
Human Resources

### Signing Authority Caps

| | | |
|---|---|---|
| Senior VP | - | $3M |
| VP of Operations | - | $1M |
| Division VP's | - | $500K |
| Senior Directors | - | $250k |
| Directors | - | $50K |

**Nicholas**
Vice President
Business Development

**Van Ness**
Vice President
Planning & Design

**Crowley**
Vice President
CREF International

**Hardy Director**
Avitable Director
Real Estate Development

**Evatz**
Vice President
Contract & Lease Management

**Doncaster**
Vice President
Operations / Analytics

**Grice**
Vice President
Regulatory

**Davis**
Vice President
Kidney
Senior Director
Project Management

**Open**
Finance

R.Jardin
C.Kidney
S. Murray
J.Patterson
L.Scow

DIRECTORS

**Samia**
Senior Director
AP / CIP

**Nogle**
Senior Director
Finance Analytics

Confidential

EXHIBIT 8 GENDRON

PENGAD 800-631-6989

CREF-Norwood_0000039

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 207 of 267

# Exhibit D

# In the Matter of:

*Steward Health Care System LLC vs*

*American Guarantee, et al.*

*Christopher Kidney*

*June 01, 2022*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 210 of 267

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 3

I N D E X

Deposition of:   Direct  Cross  Redirect Recross

CHRISTOPHER KIDNEY

By Mr. Mutch    4

E X H I B I T S

No.                      Page

Exhibit 40  Spreadsheet printout    4

Exhibit 41  PRIME Restoration & Remediation
Equipment/Dehumidifiers Drying
Log Worksheet            4

---

UNITED STATES DISTRICT COURT

FOR THE COMMONWEALTH OF MASSACHUSETTS

Civil Action No. 1:21-cv-11902-PBS

- - - - - - - - - - - - - - - - - - - - - - x

STEWARD HEALTH CARE SYSTEM, LLC

Plaintiff,

v.

AMERICAN GUARANTEE AND LIABILITY INSURANCE

COMPANY and ZURICH AMERICAN INSURANCE COMPANY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - x

CONTINUED EXAMINATION UNDER OATH of
CHRISTOPHER KIDNEY, taken on behalf of the
Insurer, pursuant to the notice, before Julie A.
Mercier, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Robins Kaplan
LLP, 800 Boylston Street, Suite 2500, Boston,
Massachusetts, on June 1, 2022, commencing at
3:05 p.m.

---

Page 2

APPEARANCES:

ROBINS KAPLAN LLP
By Jonathan D. Mutch, Esq.
By Ryan MacDonald, Esq.
800 Boylston Street
Suite 2500
Boston, Massachusetts  02199
(617) 267-2300
For American Guarantee and Liability Insurance
Company.

TODD & WELD LLP
By David H. Rich, Esq.
One Federal Street
Boston, Massachusetts  02110
(617) 720-2626
drich@toddweld.com
For the Plaintiff.

ALSO PRESENT:  Mark Graves - American Guarantee
and Liability Insurance Company

---

Page 4

P R O C E E D I N G S

(Exhibits 40 & 41 marked
for identification)

CHRISTOPHER KIDNEY,

a witness called for examination by counsel for
the Plaintiff, being satisfactorily identified by
the production of his driver's license, being
first duly sworn, was examined and testified as
follows:

DIRECT EXAMINATION

BY MR. MUTCH:

Q.  Mr. Kidney, thank you for sitting for
this examination under oath.  You do understand,
as you were just sworn, that your testimony is
subject to the pains and penalties of perjury?

A.  Yes, I do.

Q.  Are you under any -- let me ask it
differently.

Do you have any medical conditions or
prescriptions that, without going into any
specifics, would in any way impair your ability to
give thorough and accurate answers to questions?

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 5

A. No, I do not.

Q. I don't have a lot of questions, however, if any of them are unclear, you don't understand, let me know and I'll reask.

A. Perfect.

Q. I'm aiming to be done before 4:00, but if you want a quick break, let me know and we'll take one.

A. No. Whatever you need. Whatever you need.

Q. What else? If you don't ask me to rephrase, I'm going to assume you understood the question. Does that sound okay?

A. Yes.

Q. Let's talk quickly. I think it's -- we know you, but, you know, what is your current title at Steward?

A. Sure. I'm the Director of Emergency Project Management managing emergencies across the United States.

Q. More than just Norwood Hospital?

A. Yes.

Q. What was your title when the loss happened on June 28, 2020?

Page 6

A. Director of Capital Project Management.

Q. What's that in a nutshell?

A. Basically working for Corporate Real Estate and Facilities, CREF, to support Steward with their capital projects.

Q. How long have you been with Steward in totality?

A. Approximately since 2016 -- with CREF, 2016, 2017.

Q. And what is your understanding, not looking for a legally accurate description precisely, but what is your understanding of the relationship between CREF, on the one hand, and Steward Health Care, LLC on the other?

A. So Steward has outsourced its Capital Project Management to CREF.

Q. Was CREF formed for that purpose, to handle projects -- capital projects?

A. Yes, one of the reasons.

Q. Any others?

A. Not that I'm aware of. You know, that's the main sole purpose.

Q. Is it fair to say that CREF and Steward are -- what am I trying to say? Is it fair to say

Page 7

that they're linked, they're affiliated entities?

A. I wouldn't go as far as saying that. Maybe I don't understand what you're asking, but we are paid to provide this support with their Capital Project Management. And my new job as Director of Emergency Project Management is still inside of Capital Project Management.

Q. If I recall correctly, and you'll tell me if I'm wrong, Mr. Soucy explained that at the time of the loss, Steward was CREF's only customer or only client. Is that how you recall it?

A. No. But also I'm pretty focused on what I'm doing. CREF is a very large company, and they are advancing on multiple fronts I'm imagining.

Q. So fair to say at least now, CREF is working for health care organizations other than just Steward?

A. That's my understanding.

Q. And at the time of the loss, would it be fair to say that Steward was CREF's primary client, only client or one of many?

A. I would say primary. I mean that's my understanding.

Page 8

Q. Yes. Where were you before you joined CREF in 2016?

A. Working for a company called JenCon who was a construction management firm.

Q. JenCon, if I recall correctly, was involved in some emergency response at Norwood Hospital; is that correct?

A. No. That's a different group called GenServe.

Q. Okay. Thank you. While you were at JenCon, had you worked with or for Steward Health Care at all?

A. Yes.

Q. What sort of projects had you done with Steward while you were at JenCon?

A. We had in Massachusetts developed projects around expansion of their business -- you know, their business opportunities through capital investments, building ORs, managing renovations.

Q. How long, sort of working backwards, you went in 2016 from JenCon to CREF. When did you join JenCon?

A. In 2014.

Q. And where were you before JenCon?

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 9

A. I was working with my father. We specialized in building churches and built churches across the country.

Q. Do you remember -- of course you remember. What was the name of that company or organization?

A. Alpha Construction.

Q. Where was Alpha based out of?

A. Rochester, Massachusetts.

Q. Where is Rochester, Massachusetts?

A. Down near Wareham. Down near -- Southern Massachusetts.

Q. Quickly on your educational background, what was your highest level of education?

A. I have a degree in social work.

Q. Where did you get that?

A. Eastern Nazarene College.

Q. When did you graduate?

A. Man, you're bringing me back. 1994.

Q. How did you go from that degree into construction? Was it a family connection?

A. Yeah. It's multi-generational, back through great grandparents.

Q. Cool. Any professional licenses or

Page 10

certifications?

A. You know, construction supervisor's license. You know, besides that, that's the primary certification.

Q. Let's talk about the day of the loss, June 28, 2020. Were you at Norwood Hospital on that day?

A. I was, yeah. The flood happened around 4:30, and I was on site by 6:30.

Q. I'm going to be asking you some pretty focused questions today as part of this examination under oath. And, in particular, we're going to focus on what I think we all understand is supplies, so I'll just to explain my understanding of that, I want to see if you're on the same page.

With Mr. Soucy, we covered what I'll call -- what we called medical diagnostic equipment, and we covered what we've called biomedical equipment.

A. Okay.

Q. And my understanding, tell me if you agree, please, is what is left in terms of contents is supplies. Is that correct or is that

Page 11

your understanding that we've got imaging, we've got biomed and then we've got supplies?

A. No. More specifically it would probably be referred to as FF&E, furniture, fixture and equipment would be part of it, and then there's the hospital for their operational purposes have, for lack of a better term, disposable supplies, supplies that are used and when they're done, they're disposed of.

Q. So diagnostic and biomed would fit into FF&E?

A. In a very broad sense, that's my understanding.

Q. And so what I'm curious about today is the -- I'm still calling it supplies. Do you know what I mean when I use that term, disposables?

A. Yeah. Yeah. What's on here.

Q. Correct. Exactly. So let's talk about that. So -- the last thing, so, in other words, today's examination we are not talking about, you know, business income loss. We're not talking about the flood issue. This is focused on just trying to get some understanding of what's in the claim that is contained in that large spreadsheet

Page 12

printout that you tapped, which is going to be marked as Exhibit 40. Fair enough?

A. Yes.

Q. So if I ask a question, it's not my intention to be asking you about the business income claim or the flood issue. This examination under oath is not intended to go there.

That stated, the spreadsheet that is before you, it's got a sticker on it. It says Exhibit 40. The larger spreadsheet printout that says Exhibit 40, I'm going to ask about that right now. Again, I understand this is a printout of an electronic spreadsheet, but do you recognize that document as containing Steward Health Care's claim for supplies?

A. Yes, I do.

Q. Did you help assemble this spreadsheet?

A. I was peripherally involved in supporting the gathering of the information. This document was provided to us.

Q. And by whom was that document provided to you?

A. This bit of information, I believe, was pulled out of MEDITECH, is my understanding, and

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 13

that's the financial system that Steward uses for managing these kind of inventory items.

Q. My understanding is that broadly speaking, there are two kinds of supplies that were at Norwood Hospital. There were some supplies there from manufacturers who provided them on a consignment basis, as I understand it, and other supplies that were the property of Steward Health Care; is that correct?

A. That's my basic understanding. Obviously my experience is in capital project management and building. It's not in inventory, but my understanding is that is true that there -- there might be more than that. I just don't know.

Q. And I'm going to break my questions down between those two categories, and let's talk about consignment supplies first to the extent you know.

I understand that Stryker, Alcon and probably a few others, meaning, other manufacturers, did have consignment supplies at Norwood Hospital on the day of the loss, June 28, 2020. Is that consistent with your understanding?

A. I would believe that to be true.

Page 14

Q. Do you know what happened to the consignment supplies that were at Norwood Hospital on June 28th after the event?

A. Not in detail. Not specifically. I know that there had been some communications with the hospital, the consignment firms, whether that be Stryker had reached out to them wanting to take their things back.

Q. Is it your understanding that, in fact, the consignment suppliers did take back their supplies post-loss?

A. It would be -- it would be my understanding that that happened. I don't know what was taken. The understanding with that is that it was clearly communicated to them that these supplies were in these areas that were catastrophically impacted. I don't know which areas they took them from, and I don't know the classification exactly of what types of supplies -- consignment supplies that were taken.

Q. Do you have any knowledge about what the consignment supply manufacturers may have done with those supplies that they did take back after the loss?

Page 15

A. I do not.

Q. So whether they were destroyed or put in service somewhere else or whatever, you don't know; is that correct?

A. No. No. We do know that they weren't repurposed in Steward.

Q. Right. To the best of your understanding, the supplies claim reflected in Exhibit 40 does not include any consignment supplies, in other words, materials that were at Norwood Hospital on consignment?

A. I couldn't speak to that. I think that there might be someone else that could -- there's a lot of pieces here, you know, so I don't know if Item 365 was consignment versus whatever without itemizing it.

Q. Who might know because -- well, let me ask the question differently.

If there was a piece of equipment, a supply -- sorry. If there was a supply at Norwood Hospital on the date of the loss and it was the property of a consignment supplier, do you agree that it should not be in the claim?

A. Yes.

Page 16

Q. Okay.

A. I mean that's my understanding of it. That if it belonged to someone else, unless it was damaged and they said, "We want you to pay us for it."

Q. Who -- and understanding there's no way you could and we're not going to try, go through Exhibit 40 today to know whether there's any consignment supplies in there, who at Steward or CREF or anywhere might know or be able to determine whether there's any consignment supplies in the supply claim?

A. Norwood Hospital's staffing is pretty interesting right now in that the hospital is closed. So the people that were those people are no longer either with Norwood and have been reassigned to another facility or transferred to another hospital network. There are -- typically the way that supplies and inventory come into the hospital is they come in through the loading dock in Receiving, and then travel from Receiving to Central Stores managed by the material manager. And then from there, the Material Managing Department distributes them throughout, so if you

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 17

-- if I was just to be thinking out loud that the material manager or whoever's that person right now that Norwood -- I know that their material manager doesn't work for Norwood anymore. The woman that supported us in gathering this information is also no longer with Norwood. She's moved to another area, I understand, but it would be the material manager, maybe the chief financial officer. There wasn't one at the time of the flood, so there was more of, lack for a better term, director of finance or accounting, so that might be a place to start.

Q. And presumably because we have a printout, there's a spreadsheet or database that would -- well, there's a spreadsheet or database somewhere concerning supplies, correct?

A. I would think what you have, you have it. So this information is stored in MEDITECH. You can see here there's some documentation where it talks about perpetual inventory. There's also what's called "just-in-time inventory," and really the perpetual inventory is something that's managed periodically throughout the year whether it's quarterly. I know it's not monthly, but

Page 18

there's a time where they reassess what's in the hospital, and then with MEDITECH and all the vendors that supply these supplies, they define a par, a high and a low. And when they hit their low, things are automatically ordered. I do believe MEDITECH is the document that is used to track that, and this is my understanding is this is the MEDITECH document.

Q. Got it. Last question on consignment. Fair to say that it is Steward's intent not to include consignment supplies in its supply claim unless, as you stated, a consignment supplier put Steward -- a statement that they expected Steward to pay for it; is that correct?

A. Yes.

Q. Okay. So let's talk about Steward's supplies. And here what I think I'd like to do is divide the Steward-owned supplies into that which was in the basement and that which was elsewhere in the hospital. And it is my understanding, please let me know if you agree or not, that supplies that were in the basement were accepted as covered by American Guarantee as part of the claim; is that your understanding?

Page 19

A. I would hope so.

Q. And it is, in fact, right?

A. Yes.

Q. Okay. Are you -- because lawyers ask everything twice, are you aware of any supplies that were in the basement that were not accepted as covered by American Guarantee?

A. I'm not aware of that.

Q. So for supplies that were on floors other than the basement, it's my understanding that essentially all of the supplies that were in the hospital have been included in the claim for supplies; is that accurate?

A. If it's not 100 percent, it might be something less than that.

Q. But close to, right?

A. It could be. It could be. The primary volume of supplies are in the areas that had significant evidence of topdown water, flooding, uncontrolled heat and humidity.

Q. You identified, if I'm hearing correctly, sort of three reasons why supplies would be included in the claim, and they include flooding, topdown water and heat and humidity; is

Page 20

that correct?

A. Yeah. And it might not be in that order.

Q. Understood. And my follow-up was going to be, are there any other reasons why, if you know, an item that we're calling supplies would have been or was included in Steward's claim for supplies?

A. We had -- we've had multiple groups supporting this effort of defining the damage to these supplies. That included multiple reports from J.S. Held, but also Environmental Health and Engineering, EH&E. And in that also there was investigation of the environmental conditions that these supplies were put underneath, the duration that they were expected to have been underneath that. They also looked at during this process of investigating these supplies, looked at the discovery of discoloration on the packaging in multiple areas of the hospital, and that was assessed, tested and both EH&E and J.S. Held came to an agreement of, there was particulate on these supplies.

I don't want to lose the track -- lose

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 21

track of during typical hospital operations, these supplies are protected. They are protected in areas that have very strict -- strict temperature and humidity requirements. They are in areas of significant restricted access. The definition of how these supplies need to be protected is clearly described in multiple authorities, the FGI and ASHRAE, talking about the temperature and humidity requirements for these storage spaces during normal operations. To get access to these rooms you have to be fully suited up with hair nets, face masks, booties, Tyvek suits to go into these areas. So what these supplies were exposed to was far and above what would be found acceptable by the regulatory authorities that hold us accountable to this, the authorities that set the standards for this that are accepted across the United States, but also for Steward. It would not be acceptable for us to deny the fact that these systems -- these supplies were dramatically impacted.

Q. Is it Steward's position that the supplies -- and, again, I'm leaving aside the stuff in the basement that's been accepted, but

Page 22

for Steward-owned supplies, other than the basement, is it Steward's position that they were damaged, let's say, within the first 48 hours after the flood event by exposure to higher than normal humidity and/or temperature?

A. Yes.

Q. And so in Steward's view --

A. Sorry to interrupt. It's in addition to some of the other items about the particulate that we discovered on the systems or the supplies.

Q. And that's kind of what I'm getting at because my understanding is that the presence of particulates has been identified by Steward as a basis for claiming -- using the word -- including it in its insurance claim as damage, and that particulate presence or the particulate matter took more than 48 hours to develop on the supplies. That's my understanding, so I'm trying to understand if -- you know, is it because of particulates over time or is it Steward's view that all the supplies were, you know, I don't mean to be flip, but, you know, a goner, damaged, I should say, in the first two days or does it depend on the supplies, somewhere in between? Do

Page 23

you understand my question?

A. I do. I do. I think that in the first window of time in the first days with the uncontrolled heat and humidity, the fact that in those first days the building was unsafe to be in. There was a lot of presence, physical presence of fire departments walking through these areas with their suits on bringing particulate with them from -- I'm not saying that's what it was, but just dust and debris. Remember, you have to be suited up in hygenic clothes as you're entering these spaces.

Ceilings had collapsed in these spaces. The temperature was documented, and the humidity was documented, and in those hours, that noncompliance with the standards set for hospital operations those first 48 hours were the death-no of those supplies. The particulate didn't help.

Q. Okay. And, again, without -- don't mean to suggest that American Guarantee necessarily agrees with this position, but I'm trying to -- and you're helping, understand Steward's position. And what I hear you saying is that in the first 48 hours post-loss, it's

Page 24

Steward's position that all of the supplies were irretrievably damaged and -- you know, physically damaged; is that correct?

A. Yes. Physically damaged in that these environmental conditions that they were exposed to were far beyond what the authorities that define what -- how we need to manage those, the manufacturers. Our environmental consultants that we brought on to help us understand the things that we don't understand, their specialty and their guidance supported our decision that these were impacted to a place where they would never be appropriate to be repurposed for not only Steward use but anyone's use.

Q. So did Steward make -- I think I know the answer, but I need to ask. Did Steward make any effort to collect supplies not in the basement and to put them in an environment that was other than where they were at the time that the June 28 loss happened?

A. In the primary areas where the supplies were stored, it was catastrophic damage, and they were beyond the ability for us to repurpose them. In those early days, let's remember that it wasn't

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 25

until the end of the second day, June the 29th where we still had patients in the hospital. There was a central focus on safety of patients and staff. We did everything we could in those early days to protect and return that space as much as we could with our abilities to a stable condition. That doesn't mean that it fixed it. We just worked extremely hard to stabilize this.

Q. My question is a little more focused which is, did Steward, you know, collect, gather supplies. And not the stuff in the basement but above, post-loss to try to reduce, mitigate, prevent any further damage from happening?

A. I'm not exactly aware if -- some did. I know that there was in the very early day -- days an effort to gather medications because it was an unsecured hospital environment, so they were gathered and brought by the pharmacist to, I believe, the pharmacy. That's my understanding.

Q. If I can just stop you there. That was for purposes of managing controlled substances potentially; is that right?

A. Yes.

Q. Okay. Sorry. Please continue.

Page 26

A. Going up to, you know, the OR and gathering those supplies that were in that environment where the ceilings had collapsed, we did not move those supplies.

Q. Did the -- if I understood your testimony, the presence of particulates, therefore, was not a factor in Steward's view for including supplies or not in its claim reflected in Exhibit 40; is that correct?

A. No. If anything, it strengthened and reinforced our regional position that the temperature and humidity that this was exposed to was what was the original and a significant source of damage to these supplies.

Q. Why would particulates matter if in Steward's position supplies were damaged within the first couple of days post-loss?

A. Well, because the burden of proof is on the insured to prove the loss. And in this time we discovered, you know, I think it was -- I'm just trying to remember. I think it was September, October, around that time where we started discovering the black spots on the supplies, we brought it to the insurer's attention

Page 27

and as a group went through the process of working together to try to assess what those black particulate was. We continued to do everything we could to document the damage to these supplies.

Q. What, if anything, did Steward do with respect to supplies to try to prevent damage from happening after the loss of that day?

A. In the days -- in the days following the loss, we brought in multiple companies to help us try to remove the water and dry. At that point we deployed dehumidifiers, fans, spot coolers, things like that to try to reduce the relative humidity, that reduced uncontrolled temperature. In the week following the loss, we brought in 12 large air handlers with the support of Meridian. Meridian was mobilized on the 29th of June by the insurance company to support us with installing temperature control devices to help dry. Meridian was able to bring in very large, desiccant dehumidification equipment that helped dry this environment out.

We also installed temperature and humidity logs -- loggers. I think that was the next week after that was installed, and that was

Page 28

used to real-time track the temperature and humidity throughout the duration until right around the first of the year.

Q. Was anything done after the loss happened that was specific to the supplies that were, again, floors above the basement to try to prevent or reduce damage to supplies? I appreciate your answer. It's helpful. I'm wondering if anything was done that was specific to the supplies after the loss happened?

A. Yeah. It wouldn't have been something I physically supported. I'm not aware of it. Supplies being relocated, you can't kill something twice.

Q. So I'll represent -- you know, let me say it differently.

What is your understanding of why you believe that the supplies were damaged? I mean physically damaged after the loss event occurred.

A. So the -- there's different purposes behind the temperature and the humidity requirements. There's an increased risk of mold growth, fungal growth, bacterial growth. A lot of these things are me being -- learning from EH&E,

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 29

learning from our industrial hygienist on why these things are important.  Really it comes down to, you know, the reason why we believe these things were damaged was because of what they were exposed to in the early days.

Q.  Okay.  And other than the reports that you've already identified, which actually were from both Steward and from American Guarantee, do you have any documents, reports, you know, or other evidence that Steward relied on for concluding that its supplies in the floors above the basement were physically damaged from the June 28 event?

A.  Yeah.  We've supplied everything we have.

Q.  Okay.  Can you look please at what's in front of you.  It's the larger but much thinner spreadsheet printout that is marked for identification as Exhibit 41.

A.  Okay.

Q.  And it bears -- the print is small.  On top it states, PRIME Restoration & Remediation LLC and GenCon Services, Inc.; do you see that?

A.  I do.

Page 30

Q.  Have you seen this printout before?

A.  I've seen something similar.  I can't tell you if I've seen this one.

Q.  My understanding is that Exhibit 41 is a log of temperature and humidity in various areas of the building.  And if I'm reading it correctly, it starts at some point on June 30, 2020; does that look right to you?

A.  It does.

Q.  Do you know what the basis for this information is?

A.  I believe PRIME Restoration, what they did in the early days, they had installed dehumidification units.  These dehumidification units, I believe, have real stats on them that document at least in the local area, next to that dehumidifier, the return air coming into it, and typically it will have a relative humidity reading on it.  And I think that's what they did.

Q.  Do you know whether -- let me ask the question.  I'm wondering if you have any information about whether or not the data on Exhibit 41 is or is not accurate.

A.  I don't.  I mean one of the things that

Page 31

I would do is, we -- you know, there was an assumption that it was accurate and that there would be periodic times where I know that Meridian was also tracking temp. and humidity both -- I think, it was Chase from Meridian was documenting that, so I would have -- I haven't been supplied with that documentation, but that might be one way to look at this.

Q.  Right.  That would be a different set of data?

A.  Could be, yeah.  And it's not necessarily how -- we'd have to -- we couldn't assume that the readings that Chase took were at the same locations.

Q.  Understood.  Let's take a quick break.  I want to chat with my colleagues to see if we have anymore questions.

(Recess taken.)

BY MR. MUTCH:

Q.  Just some follow-ups.

Mr. Kidney, Exhibit 41 and the temperature and humidity measurements inside the hospital after the loss, do you have any data that shows what the relative humidity and temperatures

Page 32

were inside the hospital building in the time from when the loss happened to when we have our first readings for June 30, 2020?

A.  Yeah.  Well, I do, but it's different than this.  So in our EH&E's report, I provided them a photograph in the first two days in OR11.  We were at this point still trying to figure out -- figure out what's going on with this hospital.  The hospital was basically closed down by the City, and we were just in a massive triage mode, so at that point I took a photograph in OR11 that showed the relative humidity.  I can't remember exactly the hour, but at 79 percent RH.  And the temperature, I can't remember what that was, but the humidity is the primary vector of damage is my basic understanding from what I remember.

Q.  And other than that one photograph in OR11, do you have any other data regarding humidity and temperature from the time of the loss to these first recordings, June 30th on Exhibit 41?

A.  Yeah.  I do not.  I do not.

Q.  Do you have any specifications from the manufacturers of any supplies as to their humidity

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 33

and temperature storage parameters?

A. I'd have to look. I'd have to look at what EH&E was able to gather from their engagement.

Q. Are you aware of any specifications from manufacturers about storage parameters, humidity and temperature, other than what EH&E has in its report?

A. Each one of these items is going to have its own temperature and humidity requirements. There might be some that when the -- the major concern for the increased humidity is actually lost to the adhesion of a Bandaid. Some of it might be something different. I know that they -- I know that's information that the FGI and ASHRAE clearly state what these need to be inside, you know, for the temp and humidity requirements.

Q. No. Appreciate that. My question is more focused, and it is, are you aware of any specifications, manufacturer, government, otherwise, other than what's in your consultant's report?

A. Yes. Yeah, I know that they exist. I can't cite them verbatim for you.

Page 34

Q. Okay. You think there are some, but you don't know what they are, fair enough?

A. I would -- I'd be confident that there are.

Q. Got it. Fair to say that you're not personally an expert in storage of hospital supplies, that's not your area, correct?

A. It wouldn't be my expertise.

Q. Last question, and I think I asked this before, but --

A. Can I go on?

Q. Sure.

A. Is that I wasn't the one that exclusively made the decision that these were impacted.

Q. Who else was involved in that decision?

A. We had -- EH&H was provided the documentation, the CREF leadership was involved with that understanding based on the recommendations and the guidance provided to us by our industrial health hygienist.

Q. Okay. And I think I did ask this before, but I'll ask it again. What is Steward's basis for stating that the supplies were

Page 35

physically damaged in the first couple days after the loss?

A. One of the biggest challenges for hospitals is what's called surgical site infections, and what that is is that is something that is -- something that's tracked by regulatory authorities. It's tracked by doctors. It's tracked by hospitals, and it is a key metric of the hospital's ability to provide safe and effective medical care to their patients. That's something that you can't take too easily. You have to be -- that's why they have such restrictive access to these areas where the supplies are stored, and it -- these supplies -- this -- let's think about it simply. I think we've said it before talking about the grandmother factor. We have empirical data from our hygienists, J.S. Held showing that there's damage in the particulate. We have data showing that we far exceeded the temperature and humidity requirements in the first 36, 48 hours. With that and the catastrophic damage that these supplies were exposed to, being impacted by the elevated level of humidity and then later on to find out

Page 36

that there was particulate. The particulate wasn't tested for in the early days. It was only specifically tested for later. With all that information, it is -- it would be unacceptable for Steward to ask these patients that we would be taking care of to take on the risk of infection. That's kind of a muddy way of saying that protecting -- protecting the interest of the patient needs to be our top priority. And with everything we know about these supplies, it would be unethical to utilize them for patient care.

Q. So fair to say that protecting the interest of patients was the foremost factor in claiming all of the supplies in the hospital above the basement; is that fair to say?

A. I don't think there'd be any other way to say it.

MR. MUTCH: All right. I want to reserve rights as with our prior witness, but I have nothing further for today. Thank you.

THE WITNESS: Thank you, Jon.

MR. RICH: Great.

(Whereupon, the examination under oath adjourned at 3:56 p.m.)

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Page 37

CERTIFICATE

Commonwealth of Massachusetts

Suffolk ss.

I, Julie A. Mercier, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that CHRISTOPHER KIDNEY, the witness whose examination under oath is hereinbefore set forth, was duly sworn by me and that such examination under oath is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this _____ day of _____, 2022.

Notary Public

My commission expires:

September 2, 2022

Page 38

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA SHEET & SIGNATURE

INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Jonathan Mutch, Esq.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record.

INSTRUCTIONS TO DEPONENT

After reading this volume of your examination under oath, please indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.  Add additional sheets if necessary.  Please refer to the above instructions for errata sheet distribution information.

Page 39

PLEASE ATTACH TO THE EXAMINATION UNDER OATH OF

CHRISTOPHER KIDNEY

CASE:  STEWARD v. AMERICAN GUARANTEE

DATE TAKEN:  JUNE 1, 2022

ERRATA SHEET

Please refer to page 38 for errata sheet instructions and distribution instructions.

PAGE    LINE   CHANGE    REASON

_____

_____

_____

_____

_____

_____

_____

I have read the foregoing transcript of my examination under oath and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this ____ day of _____, 2022.

_____

CHRISTOPHER KIDNEY

Steward Health Care System LLC vs American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 220 of 267

Christopher Kidney
June 01, 2022

**1**

**100**
19:14
**12**
27:14
**1994**
9:19

**2**

**2014**
8:23
**2016**
6:8,9 8:2,21
**2017**
6:9
**2020**
5:24 10:6
13:23 30:7
32:3
**28**
5:24 10:6
13:22 24:19
29:13
**28th**
14:3
**29th**
25:1 27:16

**3**

**30**
30:7 32:3
**30th**
32:20
**36**
35:21
**365**
15:15
**3:56**
36:24

**4**

**40**
4:2 12:2,10,11
15:9 16:8 26:9
**41**
4:2 29:19
30:4,23 31:21
32:21

**48**
22:3,17 23:17,
24 35:21
**4:00**
5:6
**4:30**
10:9

**6**

**6:30**
10:9

**7**

**79**
32:13

**A**

**abilities**
25:6
**ability**
4:23 24:23
35:9
**acceptable**
21:14,19
**accepted**
18:22 19:6
21:17,24
**access**
21:5,10 35:13
**accountable**
21:16
**accounting**
17:11
**accurate**
4:24 6:11
19:13 30:23
31:2
**addition**
22:8
**adhesion**
33:13
**adjourned**
36:24
**advancing**
7:14
**affiliated**
7:1
**agree**
10:23 15:22
18:21

**agreement**
20:22
**agrees**
23:21
**aiming**
5:6
**air**
27:15 30:17
**Alcon**
13:19
**Alpha**
9:7,8
**American**
18:23 19:7
23:20 29:8
**and/or**
22:5
**answers**
4:24
**anymore**
17:4 31:17
**anyone's**
24:14
**Approximately**
6:8
**area**
17:7 30:16
34:7
**areas**
14:16,18
19:18 20:20
21:3,4,13 23:7
24:21 30:5
35:13
**ASHRAE**
21:8 33:16
**assemble**
12:17
**assess**
27:2
**assessed**
20:21
**assume**
5:12 31:13
**assumption**
31:2
**attention**
26:24
**authorities**
21:7,15,16
24:6 35:7

**automatically**
18:5
**aware**
6:21 19:5,8
25:14 28:12
33:5,19

**B**

**back**
9:19,22 14:8,
10,23
**background**
9:13
**backwards**
8:20
**bacterial**
28:23
**Bandaid**
33:13
**based**
9:8 34:19
**basement**
18:19,22 19:6,
10 21:24 22:2
24:17 25:11
28:6 29:12
36:15
**basic**
13:10 32:16
**basically**
6:3 32:9
**basis**
13:7 22:14
30:10 34:24
**bears**
29:21
**belonged**
16:3
**biggest**
35:3
**biomed**
11:2,10
**biomedical**
10:20
**bit**
12:23
**black**
26:23 27:2
**booties**
21:12
**break**
5:7 13:15

**31:15**
**bring**
27:19
**bringing**
9:19 23:8
**broad**
11:12
**broadly**
13:3
**brought**
24:9 25:18
26:24 27:9,14
**building**
8:19 9:2 13:12
23:5 30:6 32:1
**built**
9:2
**burden**
26:18
**business**
8:17,18 11:21
12:5

**C**

**call**
10:18
**called**
4:6 8:3,8
10:18,19
17:21 35:4
**calling**
11:15 20:6
**capital**
6:1,5,15,18
7:5,7 8:18
13:11
**care**
6:14 7:17 8:12
13:9 35:10
36:6,11
**Care's**
12:14
**catastrophic**
24:22 35:22
**catastrophically**
14:17
**categories**
13:16
**ceilings**
23:13 26:3

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 221 of 267

Christopher Kidney
June 01, 2022

**central**
16:22 25:3
**certification**
10:4
**certifications**
10:1
**challenges**
35:3
**Chase**
31:5,13
**chat**
31:16
**chief**
17:8
**CHRISTOPHER**
4:4
**churches**
9:2,3
**cite**
33:24
**City**
32:10
**claim**
11:24 12:6,14
15:8,23 16:12
18:11,24
19:12,23 20:7
22:15 26:8
**claiming**
22:14 36:14
**classification**
14:19
**client**
7:11,22
**close**
19:16
**closed**
16:15 32:9
**clothes**
23:11
**collapsed**
23:13 26:3
**colleagues**
31:16
**collect**
24:17 25:10
**College**
9:17
**communicated**
14:15

**communications**
14:5
**companies**
27:9
**company**
7:13 8:3 9:5
27:17
**concern**
33:12
**concluding**
29:11
**condition**
25:7
**conditions**
4:21 20:14
24:5
**confident**
34:3
**connection**
9:21
**consignment**
13:7,17,21
14:2,6,10,20,
22 15:9,11,15,
22 16:9,11
18:9,11,12
**consistent**
13:23
**construction**
8:4 9:7,21
10:2
**consultant's**
33:21
**consultants**
24:8
**contained**
11:24
**contents**
10:24
**continue**
25:24
**continued**
27:3
**control**
27:18
**controlled**
25:21
**Cool**
9:24
**coolers**
27:11

**Corporate**
6:3
**correct**
8:7 10:24
11:18 13:9
15:4 17:16
18:14 20:1
24:3 26:9 34:7
**correctly**
7:8 8:5 19:22
30:6
**counsel**
4:6
**country**
9:3
**couple**
26:17 35:1
**covered**
10:17,19
18:23 19:7
**CREF**
6:4,8,13,16,
17,23 7:13,16
8:2,21 16:10
34:18
**CREF's**
7:10,21
**curious**
11:14
**current**
5:16
**customer**
7:10

——————

**D**

——————

**damage**
20:10 22:15
24:22 25:13
26:14 27:4,6
28:7 32:15
35:18,22
**damaged**
16:4 22:3,22
24:2,3,4 26:16
28:18,19 29:4,
12 35:1
**data**
30:22 31:10,
23 32:18
35:17,19
**database**
17:14,15

**date**
15:21
**day**
10:5,7 13:22
25:1,15 27:7
**days**
22:23 23:3,5
24:24 25:5,16
26:17 27:8
29:5 30:13
32:6 35:1 36:2
**death-no**
23:17
**debris**
23:10
**decision**
24:11 34:14,
16
**define**
18:3 24:6
**defining**
20:10
**definition**
21:5
**degree**
9:15,20
**dehumidification**
27:20 30:14
**dehumidifier**
30:17
**dehumidifiers**
27:11
**deny**
21:19
**Department**
16:24
**departments**
23:7
**depend**
22:24
**deployed**
27:11
**description**
6:11
**desiccant**
27:19
**destroyed**
15:2
**detail**
14:4

**determine**
16:11
**develop**
22:17
**developed**
8:16
**devices**
27:18
**diagnostic**
10:18 11:10
**differently**
4:20 15:18
28:16
**DIRECT**
4:12
**director**
5:18 6:1 7:6
17:11
**discoloration**
20:19
**discovered**
22:10 26:20
**discovering**
26:23
**discovery**
20:19
**disposable**
11:8
**disposables**
11:16
**disposed**
11:9
**distributes**
16:24
**divide**
18:18
**dock**
16:20
**doctors**
35:7
**document**
12:14,20,21
18:6,8 27:4
30:16
**documentation**
17:19 31:7
34:18
**documented**
23:14,15
**documenting**
31:5

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 222 of 267

Christopher Kidney
June 01, 2022

**documents**
29:9
**dramatically**
21:20
**driver's**
4:8
**dry**
27:10,18,20
**duly**
4:9
**duration**
20:15 28:2
**dust**
23:10

**E**

**early**
24:24 25:5,15
29:5 30:13
36:2
**easily**
35:11
**Eastern**
9:17
**education**
9:14
**educational**
9:13
**effective**
35:10
**effort**
20:10 24:17
25:16
**EH&E**
20:13,21
28:24 33:3,7
**EH&E's**
32:5
**EH&H**
34:17
**electronic**
12:13
**elevated**
35:23
**emergencies**
5:19
**emergency**
5:18 7:6 8:6
**empirical**
35:17
**end**

25:1
**engagement**
33:4
**Engineering**
20:13
**entering**
23:11
**entities**
7:1
**environment**
24:18 25:17
26:3 27:21
**environmental**
20:12,14 24:5,
8
**equipment**
10:19,20 11:5
15:19 27:20
**essentially**
19:11
**Estate**
6:4
**event**
14:3 22:4
28:19 29:13
**evidence**
19:19 29:10
**examination**
4:6,12,15
10:12 11:20
12:6 36:23
**examined**
4:9
**exceeded**
35:20
**exclusively**
34:14
**Exhibit**
12:2,10,11
15:9 16:8 26:9
29:19 30:4,23
31:21 32:21
**exhibits**
4:2
**exist**
33:23
**expansion**
8:17
**expected**
18:13 20:16
**experience**
13:11

**expert**
34:6
**expertise**
34:8
**explain**
10:14
**explained**
7:9
**exposed**
21:13 24:5
26:12 29:5
35:23
**exposure**
22:4
**extent**
13:17
**extremely**
25:8

**F**

**face**
21:12
**Facilities**
6:4
**facility**
16:17
**fact**
14:9 19:2
21:19 23:4
**factor**
26:7 35:17
36:13
**fair**
6:23,24 7:16,
21 12:2 18:10
34:2,5 36:12,
15
**family**
9:21
**fans**
27:11
**father**
9:1
**FF&E**
11:4,11
**FGI**
21:7 33:15
**figure**
32:7,8
**finance**
17:11

**financial**
13:1 17:8
**find**
35:24
**fire**
23:7
**firm**
8:4
**firms**
14:6
**fit**
11:10
**fixed**
25:7
**fixture**
11:5
**flip**
22:22
**flood**
10:8 11:22
12:6 17:10
22:4
**flooding**
19:19,24
**floors**
19:9 28:6
29:11
**focus**
10:13 25:3
**focused**
7:12 10:11
11:22 25:9
33:19
**follow-up**
20:4
**follow-ups**
31:20
**foremost**
36:13
**formed**
6:17
**found**
21:14
**front**
29:17
**fronts**
7:14
**fully**
21:11
**fungal**
28:23

**furniture**
11:4

**G**

**gather**
25:10,16 33:3
**gathered**
25:18
**gathering**
12:19 17:5
26:2
**Gencon**
29:23
**Genserve**
8:9
**give**
4:24
**goner**
22:22
**government**
33:20
**graduate**
9:18
**grandmother**
35:16
**grandparents**
9:23
**great**
9:23 36:22
**group**
8:8 27:1
**groups**
20:9
**growth**
28:23
**Guarantee**
18:23 19:7
23:20 29:8
**guidance**
24:11 34:20

**H**

**hair**
21:11
**hand**
6:13
**handle**
6:18
**handlers**
27:15

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 223 of 267

Christopher Kidney
June 01, 2022

**happened**
5:24 10:8
14:1,13 24:20
28:5,10 32:2
**happening**
25:13 27:7
**hard**
25:8
**health**
6:14 7:17 8:11
12:14 13:9
20:12 34:21
**hear**
23:23
**hearing**
19:21
**heat**
19:20,24 23:4
**Held**
20:12,21
35:18
**helped**
27:20
**helpful**
28:8
**helping**
23:22
**high**
18:4
**higher**
22:4
**highest**
9:14
**hit**
18:4
**hold**
21:15
**hope**
19:1
**hospital**
5:21 8:7 10:6
11:6 13:5,22
14:2,6 15:11,
21 16:14,18,
20 18:2,20
19:12 20:20
21:1 23:16
25:2,17 31:23
32:1,8,9 34:6
36:14
**hospital's**
16:13 35:9

**hospitals**
35:4,8
**hour**
32:13
**hours**
22:3,17 23:15,
17,24 35:21
**humidity**
19:20,24 21:4,
8 22:5 23:4,14
26:12 27:13,
23 28:2,21
30:5,18 31:4,
22,24 32:12,
15,19,24 33:7,
10,12,17
35:20,24
**hygenic**
23:11
**hygienist**
29:1 34:21
**hygienists**
35:18

___

**I**

___

**identification**
4:3 29:19
**identified**
4:7 19:21
22:13 29:7
**imaging**
11:1
**imagining**
7:15
**impacted**
14:17 21:21
24:12 34:15
35:23
**impair**
4:23
**important**
29:2
**include**
15:9 18:11
19:23
**included**
19:12,23 20:7,
11
**including**
22:14 26:8
**income**
11:21 12:6

**increased**
28:22 33:12
**industrial**
29:1 34:21
**infection**
36:6
**infections**
35:5
**information**
12:19,23 17:6,
18 30:11,22
33:15 36:4
**inside**
7:7 31:22 32:1
33:16
**installed**
27:22,24
30:13
**installing**
27:17
**insurance**
22:15 27:17
**insured**
26:19
**insurer's**
26:24
**intended**
12:7
**intent**
18:10
**intention**
12:5
**interest**
36:8,13
**interesting**
16:14
**interrupt**
22:8
**inventory**
13:2,12 16:19
17:20,21,22
**investigating**
20:18
**investigation**
20:14
**investments**
8:19
**involved**
8:6 12:18
34:16,18
**irretrievably**
24:2

**issue**
11:22 12:6
**item**
15:15 20:6
**itemizing**
15:16
**items**
13:2 22:9 33:9

___

**J**

___

**J.S.**
20:12,21
35:18
**Jencon**
8:3,5,11,15,
21,22,24
**job**
7:5
**join**
8:22
**joined**
8:1
**Jon**
36:21
**June**
5:24 10:6
13:22 14:3
24:19 25:1
27:16 29:13
30:7 32:3,20
**just-in-time**
17:21

___

**K**

___

**key**
35:8
**Kidney**
4:4,14 31:21
**kill**
28:13
**kind**
13:2 22:11
36:7
**kinds**
13:4
**knowledge**
14:21

___

**L**

___

**lack**

11:7 17:10
**large**
7:13 11:24
27:15,19
**larger**
12:10 29:17
**lawyers**
19:4
**leadership**
34:18
**learning**
28:24 29:1
**leaving**
21:23
**left**
10:23
**legally**
6:11
**level**
9:14 35:24
**license**
4:8 10:3
**licenses**
9:24
**linked**
7:1
**LLC**
6:14 29:22
**loading**
16:20
**local**
30:16
**locations**
31:14
**log**
30:5
**loggers**
27:23
**logs**
27:23
**long**
6:6 8:20
**longer**
16:16 17:6
**looked**
20:17,18
**lose**
20:24
**loss**
5:23 7:10,20
10:5 11:21
13:22 14:24

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 224 of 267

Christopher Kidney
June 01, 2022

15:21 24:20 26:19 27:7,9, 14 28:4,10,19 31:23 32:2,19 35:2

**lost**
33:13

**lot**
5:2 15:14 23:6 28:23

**loud**
17:1

**low**
18:4,5

___

**M**

___

**made**
34:14

**main**
6:22

**major**
33:12

**make**
24:15,16

**Man**
9:19

**manage**
24:7

**managed**
16:22 17:23

**management**
5:19 6:1,16 7:5,6,7 8:4 13:12

**manager**
16:22 17:2,4,8

**managing**
5:19 8:19 13:2 16:23 25:21

**manufacturer**
33:20

**manufacturers**
13:6,21 14:22 24:8 32:24 33:6

**marked**
4:2 12:2 29:18

**masks**
21:12

**Massachusetts**
8:16 9:9,10,12

**massive**
32:10

**material**
16:22,23 17:2, 3,8

**materials**
15:10

**matter**
22:16 26:15

**meaning**
13:20

**measurements**
31:22

**medical**
4:21 10:18 35:10

**medications**
25:16

**MEDITECH**
12:24 17:18 18:2,6,8

**Meridian**
27:15,16,18 31:3,5

**metric**
35:8

**mitigate**
25:12

**mobilized**
27:16

**mode**
32:10

**mold**
28:22

**monthly**
17:24

**move**
26:4

**moved**
17:7

**muddy**
36:7

**multi-generational**
9:22

**multiple**
7:14 20:9,11, 20 21:7 27:9

**MUTCH**
4:13 31:19 36:18

___

**N**

___

**Nazarene**
9:17

**necessarily**
23:21 31:12

**nets**
21:11

**network**
16:18

**noncompliance**
23:16

**normal**
21:10 22:5

**Norwood**
5:21 8:6 10:6 13:5,22 14:2 15:11,20 16:13,16 17:3, 4,6

**nutshell**
6:2

___

**O**

___

**oath**
4:15 10:12 12:7 36:23

**occurred**
28:19

**October**
26:22

**officer**
17:9

**operational**
11:6

**operations**
21:1,10 23:17

**opportunities**
8:18

**OR11**
32:6,11,18

**order**
20:3

**ordered**
18:5

**organization**
9:6

**organizations**
7:17

**original**
26:13

**ORS**
8:19

**outsourced**
6:15

___

**P**

___

**p.m.**
36:24

**packaging**
20:19

**paid**
7:4

**pains**
4:17

**par**
18:4

**parameters**
33:1,6

**part**
10:11 11:5 18:23

**particulate**
20:22 22:9,16 23:8,18 27:3 35:19 36:1

**particulates**
22:13,20 26:6, 15

**patient**
36:9,11

**patients**
25:2,3 35:10 36:5,13

**pay**
16:4 18:14

**penalties**
4:17

**people**
16:15

**percent**
19:14 32:13

**Perfect**
5:5

**periodic**
31:3

**periodically**
17:23

**peripherally**
12:18

**perjury**
4:17

**perpetual**
17:20,22

**person**
17:2

**personally**
34:6

**pharmacist**
25:18

**pharmacy**
25:19

**photograph**
32:6,11,17

**physical**
23:6

**physically**
24:2,4 28:12, 19 29:12 35:1

**piece**
15:19

**pieces**
15:14

**place**
17:12 24:12

**Plaintiff**
4:7

**point**
27:10 30:7 32:7,11

**position**
21:22 22:2 23:21,23 24:1 26:11,16

**post-loss**
14:11 23:24 25:12 26:17

**potentially**
25:22

**precisely**
6:12

**prescriptions**
4:22

**presence**
22:12,16 23:6 26:6

**pretty**
7:12 10:10 16:13

**prevent**
25:13 27:6 28:7

**primary**
7:21,23 10:4

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 225 of 267

Christopher Kidney
June 01, 2022

19:17 24:21
32:15
**PRIME**
29:22 30:12
**print**
29:21
**printout**
12:1,10,12
17:14 29:18
30:1
**prior**
36:19
**priority**
36:9
**process**
20:17 27:1
**production**
4:8
**professional**
9:24
**project**
5:19 6:1,16
7:5,6,7 13:11
**projects**
6:5,18 8:14,17
**proof**
26:18
**property**
13:8 15:22
**protect**
25:5
**protected**
21:2,6
**protecting**
36:8,12
**prove**
26:19
**provide**
7:4 35:9
**provided**
12:20,21 13:6
32:5 34:17,20
**pulled**
12:24
**purpose**
6:17,22
**purposes**
11:7 25:21
28:20
**put**
15:2 18:12
20:15 24:18

**Q**

**quarterly**
17:24
**question**
5:13 12:4
15:18 18:9
23:1 25:9
30:21 33:18
34:9
**questions**
4:24 5:2 10:11
13:15 31:17
**quick**
5:7 31:15
**quickly**
5:15 9:13

**R**

**reached**
14:7
**reading**
30:6,18
**readings**
31:13 32:3
**real**
6:3 30:15
**real-time**
28:1
**reask**
5:4
**reason**
29:3
**reasons**
6:19 19:22
20:5
**reassess**
18:1
**reassigned**
16:17
**recall**
7:8,11 8:5
**Receiving**
16:21
**recess**
31:18
**recognize**
12:13
**recommendati
ons**
34:20

**recordings**
32:20
**reduce**
25:12 27:12
28:7
**reduced**
27:13
**referred**
11:4
**reflected**
15:8 26:8
**regional**
26:11
**regulatory**
21:15 35:6
**reinforced**
26:11
**relationship**
6:13
**relative**
27:12 30:18
31:24 32:12
**relied**
29:10
**relocated**
28:13
**Remediation**
29:22
**remember**
9:4,5 23:10
24:24 26:21
32:12,14,16
**remove**
27:10
**renovations**
8:19
**rephrase**
5:12
**report**
32:5 33:8,22
**reports**
20:11 29:6,9
**represent**
28:15
**repurpose**
24:23
**repurposed**
15:6 24:13
**requirements**
21:4,9 28:22
33:11,17
35:21

**reserve**
36:19
**respect**
27:6
**response**
8:6
**Restoration**
29:22 30:12
**restricted**
21:5
**restrictive**
35:13
**return**
25:5 30:17
**RH**
32:13
**RICH**
36:22
**rights**
36:19
**risk**
28:22 36:6
**Rochester**
9:9,10
**rooms**
21:10

**S**

**safe**
35:9
**safety**
25:3
**satisfactorily**
4:7
**sense**
11:12
**September**
26:22
**service**
15:3
**Services**
29:23
**set**
21:16 23:16
31:9
**showed**
32:12
**showing**
35:18,19
**shows**
31:24

**significant**
19:19 21:5
26:13
**similar**
30:2
**simply**
35:15
**site**
10:9 35:4
**sitting**
4:14
**small**
29:21
**social**
9:15
**sole**
6:22
**sort**
8:14,20 19:22
**Soucy**
7:9 10:17
**sound**
5:13
**source**
26:13
**Southern**
9:12
**space**
25:5
**spaces**
21:9 23:12,13
**speak**
15:12
**speaking**
13:4
**specialized**
9:2
**specialty**
24:10
**specific**
28:5,9
**specifically**
11:3 14:4 36:3
**specifications**
32:23 33:5,20
**specifics**
4:23
**spot**
27:11
**spots**
26:23

Steward Health Care System LLC vs
American Guarantee, et al.

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 226 of 267

Christopher Kidney
June 01, 2022

spreadsheet
  11:24 12:8,10,
  13,17 17:14,
  15 29:18
stabilize
  25:8
stable
  25:6
staff
  25:4
staffing
  16:13
standards
  21:17 23:16
start
  17:12
started
  26:23
starts
  30:7
state
  33:16
stated
  12:8 18:12
statement
  18:13
states
  5:20 21:18
  29:22
stating
  34:24
stats
  30:15
Steward
  5:17 6:4,6,14,
  15,23 7:10,18,
  21 8:11,15
  12:14 13:1,9
  15:6 16:9
  18:13 21:18
  22:13 24:13,
  15,16 25:10
  27:5 29:8,10
  36:5
Steward's
  18:10,16 20:7
  21:22 22:2,7,
  20 23:23 24:1
  26:7,16 34:23
Steward-
owned
  18:18 22:1

sticker
  12:9
stop
  25:20
storage
  21:9 33:1,6
  34:6
stored
  17:18 24:22
  35:14
Stores
  16:22
strengthened
  26:10
strict
  21:3
Stryker
  13:19 14:7
stuff
  21:24 25:11
subject
  4:17
substances
  25:21
suggest
  23:20
suited
  21:11 23:10
suits
  21:12 23:8
supervisor's
  10:2
supplied
  29:14 31:6
supplier
  15:22 18:12
suppliers
  14:10
supplies
  10:14,24 11:2,
  8,15 12:15
  13:4,6,8,17,21
  14:2,11,16,19,
  20,23 15:8,10
  16:9,11,19
  17:16 18:3,11,
  17,18,22 19:5,
  9,11,13,18,22
  20:6,8,11,15,
  18,23 21:2,6,
  13,20,23 22:1,
  10,18,21,24

23:18 24:1,17,
  21 25:11 26:2,
  4,8,14,16,24
  27:4,6 28:5,7,
  10,13,18
  29:11 32:24
  34:7,24 35:14,
  22 36:10,14
supply
  14:22 15:20
  16:12 18:3,11
support
  6:4 7:4 27:15,
  17
supported
  17:5 24:11
  28:12
supporting
  12:19 20:10
surgical
  35:4
sworn
  4:9,16
system
  13:1
systems
  21:20 22:10

_____

T
_____

taking
  36:6
talk
  5:15 10:5
  11:18 13:16
  18:16
talking
  11:20,21 21:8
  35:16
talks
  17:20
tapped
  12:1
temp
  31:4 33:17
temperature
  21:3,8 22:5
  23:14 26:12
  27:13,18,22
  28:1,21 30:5
  31:22 32:14,
  19 33:1,7,10
  35:20

temperatures
  31:24
term
  11:7,16 17:11
terms
  10:23
tested
  20:21 36:2,3
testified
  4:9
testimony
  4:16 26:6
there'd
  36:16
thing
  11:19
things
  14:8 18:5 24:9
  27:12 28:24
  29:2,4 30:24
thinking
  17:1
thinner
  29:17
time
  7:10,20 17:9
  18:1 22:20
  23:3 24:19
  26:19,22 32:1,
  19
times
  31:3
title
  5:17,23
today
  10:11 11:14
  16:8 36:20
today's
  11:20
top
  29:22 36:9
topdown
  19:19,24
totality
  6:7
track
  18:7 20:24
  21:1 28:1
tracked
  35:6,7,8
tracking
  31:4

transferred
  16:17
travel
  16:21
triage
  32:10
true
  13:13,24
types
  14:19
typical
  21:1
typically
  16:18 30:18
Tyvek
  21:12

_____

U
_____

unacceptable
  36:4
unclear
  5:3
uncontrolled
  19:20 23:4
  27:13
underneath
  20:15,16
understand
  4:15 5:4 7:3
  10:13 12:12
  13:7,19 17:7
  22:19 23:1,22
  24:9,10
understanding
  6:10,12 7:19,
  24 10:15,22
  11:1,13,23
  12:24 13:3,10,
  13,23 14:9,13,
  14 15:8 16:2,6
  18:7,20,24
  19:10 22:12,
  18 25:19
  28:17 30:4
  32:16 34:19
understood
  5:12 20:4 26:5
  31:15
unethical
  36:11
United
  5:20 21:18

Steward Health Care System LLC vs
American Guarantee, et al.

Christopher Kidney
June 01, 2022

Case 1:21-cv-11902-PBS    Document 286    Filed 08/11/26    Page 227 of 267



**units**
30:14,15
**unsafe**
23:5
**unsecured**
25:17
**utilize**
36:11

_____

**V**
_____

**vector**
32:15
**vendors**
18:3
**verbatim**
33:24
**versus**
15:15
**view**
22:7,20 26:7
**volume**
19:18

_____

**W**
_____

**walking**
23:7
**wanting**
14:7
**Wareham**
9:11
**water**
19:19,24
27:10
**week**
27:14,24
**whoever's**
17:2
**window**
23:3
**woman**
17:5
**wondering**
28:9 30:21
**word**
22:14
**words**
11:19 15:10
**work**
9:15 17:4
**worked**
8:11 25:8

**working**
6:3 7:17 8:3,
20 9:1 27:1
**wrong**
7:9

_____

**Y**
_____

**year**
17:23 28:3

# Exhibit E

| **From:** | Hibble, Nathalie[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=244F72DA1750477A98DC65B6970018D5-NATHALIE HIBBLE] |
|---|---|
| **Sent:** | Tue 6/30/2020 1:49:56 PM (UTC-05:00) |
| **To:** | hcooper@toddweld.com[hcooper@toddweld.com] |
| **Cc:** | Gendron, Robert[Robert.Gendron@steward.org]; Rich, David H.[drich@toddweld.com]; Schulz, Michele[michele.schulz@steward.org] |
| **Subject:** | FW: [EXTERNAL]  RE: Introduction - Norwood Hospital / Zurich |

Michele, could you please schedule a call tomorrow?  Thanks, Nathalie

---

**From:** Hibble, Nathalie
**Sent:** Tuesday, June 30, 2020 2:49 PM
**To:** Cooper, Howard <hcooper@toddweld.com>; Gendron, Robert <Robert.Gendron@steward.org>; Holtz, Herb <Herb.Holtz@steward.org>
**Cc:** Rich, David H. <drich@toddweld.com>
**Subject:** RE: [EXTERNAL] RE: Introduction - Norwood Hospital / Zurich

Howard, I can do 12:30-2 EST tomorrow.  I'll take Herb off of this string and ask Michele to schedule a call for us.  Thanks, Nathalie

---

**From:** Cooper, Howard [mailto:hcooper@toddweld.com]
**Sent:** Tuesday, June 30, 2020 2:12 PM
**To:** Gendron, Robert <Robert.Gendron@steward.org>; Holtz, Herb <Herb.Holtz@steward.org>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>; Rich, David H. <drich@toddweld.com>
**Subject:** RE: [EXTERNAL] RE: Introduction - Norwood Hospital / Zurich


Hi Bob and Nathalie –

I am in a mediation tomorrow in RI. I will have breaks including at lunch time so if you give me a couple of windows when you are available after 11 am I will make one work. I would like to include my partner, David Rich, on our call.

Best,

Howard

---

**From:** Gendron, Robert <Robert.Gendron@steward.org>
**Sent:** Monday, June 29, 2020 7:59 PM
**To:** Cooper, Howard <hcooper@toddweld.com>; Holtz, Herb <Herb.Holtz@steward.org>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Subject:** RE: [EXTERNAL] RE: Introduction - Norwood Hospital / Zurich

Good evening Howard,

It's very nice to e-meet you.  I'm going to head to Norwood tomorrow to inspect the damage.  We expect this to be a significant BI and Property claim as it appears the hospital will be closed for a minimum of 4-6 months.  I have attached our policy and an abstract of coverages for some light reading in the meanwhile.  Are you available Wednesday to catch up so I can debrief you on the situation?  If so please send me some blocks of time and I'll have my EA set it up.

Sincerely,

Bob
508-317-1260

Bob Gendron
Executive Vice President
Corporate Real Estate
Steward Health Care System LLC
1900 N. Pearl Street, Dallas, TX 75201
Email: Robert.Gendron@steward.org

---

**From:** Cooper, Howard <hcooper@toddweld.com>
**Sent:** Monday, June 29, 2020 2:50 PM
**To:** Holtz, Herb <Herb.Holtz@steward.org>; Gendron, Robert <Robert.Gendron@steward.org>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Subject:** [EXTERNAL] RE: Introduction - Norwood Hospital / Zurich

Hi Bob. Good to meet you.  If for some reason you do not get me on my cell please shoot me an email and I will get back to you.

Thanks.

---

**From:** Holtz, Herb <Herb.Holtz@steward.org>
**Sent:** Monday, June 29, 2020 3:37 PM
**To:** Gendron, Robert <Robert.Gendron@steward.org>; Cooper, Howard <hcooper@toddweld.com>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Subject:** Introduction - Norwood Hospital / Zurich

Bob and Howard – Through this email I want to introduce you and place you in touch with each other.  I remain available to you both for anything that may arise in this matter.

Bob – Howard has received the thumbnail sketch from me as to what happened at Norwood and that we are looking at an insurance coverage analysis and claim for which we will need guidance.  Howard's cell is 617-875-8250.  Howard is a founding member of Todd & Weld; he is currently handling several critical matters for us, including the Hlatky insurance coverage claim against Zurich.

Howard – Bob says he will call you but that he does not need to do so today; he will call in the next day or so.  At this point, Bob wants to get you up to speed on what happened, what his tentative plans are for this managing the prospective insurance claim, and to have you ready to offer advice and analysis with respect to pressing the policy coverage.  Bob oversees all Steward's RE holdings system wide, nationally and internationally.  Bob's cell is 508-317-1260.

I am copying Nathalie as well.

Thanks, Herb

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

# Exhibit F

# Norwood Hospital
# Team Structure

CONFIDENTIAL

STEWARD01534552

7583484_00018189



CONFIDENTIAL

STEWARD01534553
7583484_00018189

Communication Plan
Responsibility Matrix

# Zurich (BI/Property*)



*Assumes MPT claim admin

Privileged and Confidential

CONFIDENTIAL

STEWARD01534554

7583484_00018189

Communication Plan
Responsibility Matrix

# NFA



Case 1:21-cv-11902-PBS   Document 286   Filed 08/11/26   Page 236 of 267

CONFIDENTIAL

STEWARD01534555

7583484_00018189

# Exhibit G

Mr. Robert Gendron

Executive Vice President – Corporate Real Estate and Facilities

Steward Health Care System LLC ("Steward")


Mr. Gendron:

Jim and I would like to thank you and your entire Steward team in taking the time today to meet with us and tour the damaged areas. You obviously have a very talented group with yourself, Michael, Scott, Chris and Sean.  This letter will confirm the terms upon which National Fire Adjustment Co., Inc. ("NFA") will represent Steward and Medical Properties Trust, Inc. ("MPT") in connection with the losses suffered at Steward Norwood Hospital, Inc. ("Norwood Hospital").  For the avoidance of doubt, NFA will act as Steward and MPT's public insurance adjuster in connection with following two insurance policies:

1. Policy Number PPR0281010-03
   Insured:  Medical Property Trust, Inc.
   Insurer:  Zurich American Insurance Co.

2. Policy Number ZMD1393138-00
   Insured: Steward Health Care System LLC
   Insurer: American Guarantee & Liability Insurance Co.

 The losses (water intrusion and flood) at Norwood Hospital ("Losses") represent a very complicated claim that has many moving parts. We have handled similar losses and NFA can bring a team of senior level adjusters to serve as your advocate in quantifying all component parts of the claim and interface with Zurich's adjusters and "experts" to make a significant difference in the settlement.

4824-5523-3223 1

CONFIDENTIAL

STEWARD00048085

7583484_00150616

We can assist you and your team to make prudent decisions on short and long-term goals and what the impact is on the coverages for both of the Zurich policies. The initial days are critical in forming a time line on actions that would provide a strategy to meet those goals.

Your NFA team would consist of Ron Papa, Jim Roof, John McCoulf and Joe Charrier who, combined, have over 150 years of large loss adjusting experience. We would bring in the necessary NFA staff to assist in the scope and pricing of the various parts of the losses and to work with the "experts" Zurich brings in to view the loss from their perspective.

NFA will provide the following services to Steward and MPT:

- Do a complete and thorough analysis of both of the two policies identified above and help Steward and MPT develop a strategy to maximize the advantages of these coverages;
- Interface with the Zurich adjusters to help set adequate reserves and adjusting protocols, and a path forward;
- Work with Zurich's personnel to assist Steward and MPT in receiving meaningful partial payments;
- Provide periodic written progress reports to Steward and MPT via email identifying significant issues and progress on various aspects of the claim;
- Have periodic conference calls and meetings with the NFA, Steward and MPT teams to discuss significant issues that need to be addressed and the progress of various aspects of the ongoing claim;
- NFA will coordinate with Continental Machinery, and other vendors to determine the scope and pricing of medical equipment and surgical instruments;
- Work with Robert Grider, with Marsh Risk Consulting, to develop projections for loss of revenues and extra expense costs. We

4824-5523-3223 1

CONFIDENTIAL

STEWARD00048086

7583484_00150616

would also team with Grider in dealing with MD&D, the insurance company's forensic accountants;

- Have NFA's building consultants and Continental Machinery interface with JS Held to develop the appropriate scope and pricing for damages to the building and leasehold improvements;

- Coordinate the various vendors for HVAC, telephone systems, IT infrastructure, generators, electrical grids, oxygen systems and boilers to get repair/replacement costs for the loss and damage.

- Coordinate with Zurich's "experts" and make a concerted effort to explain the scope, pricing and projections of the damages from the insured's perspective;

- Package and present all estimates, inventories, equipment analysis, and BI/EE projections to Steward and MPT for your approval, prior to sending to Zurich's adjuster;

- Be available for meetings as requested by Steward and MPT officers or team to provide periodic updates.;

- Include Steward and MPT on all material communications unless or until either Steward or MPT objects in writing to such communications being shared with the other party;

- Both Steward and MPT have agreed to have NFA represent them with respect to the Losses as their public adjusters. In the event that NFA, Steward and/or MPT believe that a conflict of interest exists with NFA representing both Steward and MPT with respect to the Losses, then the party or parties believing the conflict of interest exists will raise the issue to the others. Both Steward and MPT, as of the date of this Agreement, believe no conflict of interest exists with NFA representing both Steward and MPT with respect to the Losses;

- In the event of a conflict of interest that precludes NFA from continuing to represent both Steward and MPT, NFA will continue

4834-5523-3223.1

CONFIDENTIAL

STEWARD00048087

7583484_00150616

representing Steward, MPT or neither, depending upon the option agreed upon by Steward and MPT with the default being neither if Steward and MPT cannot agree;Keep confidential all information and communications about this matter unless directed otherwise by Steward and MPT; and

- Provide those additional reasonable and customary services typically provided by public adjusters.

NFA fees for representing Steward/MPT would be as follows:

**Property Losses, etc.:**

0 to $50,000,000 collected: 1.75%

$50,000,001 to $75,000,000 collected: 2% of those dollars

$75,000,001 and above collected: 3.25% of those dollars

**Business Income/Extra Expenses:**

$600K flat fee to be paid in increments of:

$100K/month for the first three months of the engagement

$25K/month for the next twelve months of the engagement

NFA will absorb all of NFA's expenses related to this matter. NFA will attempt to have Continental Machinery paid directly or indirectly by Zurich.

We stand ready to respond to get our team on the ground and running as soon as possible.

4824-5523-3223.1

CONFIDENTIAL

NFA, at its sole cost and expense, shall procure and maintain such policies of comprehensive general liability (CGL) insurance, professional liability, and other insurance as shall be necessary to insure against any claim or claims for damage arising by reason of NFA's services provided under this Agreement.  Such policies of insurance, unless the parties hereto shall agree otherwise in writing, shall be in limits of not less than:

- CGL – $1,000,000 per occurrence for bodily injury and property damage with a $2,000,000 aggregate;
- Umbrella/Excess – $5,000,000 per occurrence/aggregate
- Professional Liability – An amount of $5,000,000  to cover losses due to, caused by or in any way related to any errors and omissions by NFA in connection with or in any way related to this assignment.

NFA agrees to have Steward and MPT added as additional insureds on the CGL and Umbrella/Excess policies on a primary basis (with no requirement of contribution from any insurance available to Steward and MPT).  Upon request, NFA shall furnish certificates of insurance indicating coverage.  NFA agrees to notify Steward and MPT immediately upon notification from the insurance carrier that such insurance may be cancelled.

 Steward or MPT may terminate or cancel this contract with or without cause.  Steward or MPT may terminate this contract without cause by providing written notice by email to NFA fourteen (14) days before the effective date of the termination.  In the event Steward or MPT terminates this contract without cause, NFA shall be entitled to (i) the full amount of funds it would otherwise be due and owing to it in "Business Income/Income Expenses" identified above and (ii) 100% of the fees which would otherwise be owed for "Property Losses" based on amounts actually recovered by Steward or MPT prior to the effective date of the termination and 50% of the fees which would otherwise be

4824-5523-3223.1

CONFIDENTIAL

STEWARD00048089

7583484_00150616

owed for "Property Losses" based on amounts actually recovered by Steward or MPT subsequent to the effective date of the termination.

Steward or MPT may terminate this contract with cause by providing NFA with a written notice of termination by email. Upon receipt of a notice of termination with cause, NFA shall have five business days to cure any defaults. In the event NFA fails to cure its defaults, the termination with cause shall be deemed effective as of the fifth day after Steward or MPT has provided written notice of termination with cause. In the event Steward or MPT terminates this contract with cause, NFA shall be entitled to compensation consistent with the value of its effort undertaken in securing insurance proceeds as Steward and MPT's representative prior to termination.


Any disputes arising in connection with the fees charged or the services rendered pursuant to this agreement shall first be submitted for resolution by mediation to a party selected by mutual agreement of the parties. In the event the dispute cannot be resolved by mediation, the dispute shall be resolved by binding arbitration to be conducted in Boston, Massachusetts, by JAMS. Judgment on the award of the arbitrator may be entered in any court having jurisdiction. Each party shall bear its own attorneys' fees and expenses incurred in relation to the mediation and/or arbitration, regardless of which party prevails. This engagement is made under and shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts.

We look forward to representing Steward and MPT and serving your needs during this most important engagement.

4824-5523-3223.1

CONFIDENTIAL

STEWARD00048090

7583484_00150616

Accepted By:

Steward Health Care System LLC

_____    August 11, 2020


Medical Properties Trust, Inc.

_____    August 14, 2020
            EVP + COO

National Fire Adjustment Co. Inc.

_____    August 11, 2020


4824-5523-3223.1

CONFIDENTIAL

STEWARD00048091

7583484_00150616



## NATIONAL FIRE ADJUSTMENT CO., INC.
CORPORATE HEADQUARTERS
One NFA Park, Amherst NY 14228-1187
(716) 689-7700
Toll Free: 1-800-777-3333, Fax: (716) 689-7768

### *MASSACHUSETTS AGREEMENT*

Date: August 11, 2020

The insured (s) Steward Health Care Systems LLC/Medical Properties Trust INC.
Hereby retain National Fire Adjustment Co., Inc. to assist in the preparation, presentation and
adjustment of all applicable claims for the loss or damage, caused by Flood and Water intrusion
at **800 Washington Street, Norwood, Massachusetts 02062.** This occurred on or about **June
28, 2020.**

And agree to pay National Fire Adjustment Co., Inc. upon settlement and payment of claim a fee
of "See fee schedule in proposal" (not to exceed ten (10%) percent) of the amount collected,
adjusted, or otherwise received and or issued by the involved Insurance Company (ies),
including salvage proceeds, if applicable, regardless to whom said loss is payable.

In consideration of such services, in connection therewith I (we) hereby assign, to the National
Fire Adjustment Co., Inc. the above per centum of the money due, or to grow due by reason of
such loss under any and all policies covering the above.

YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR FURTHER OBLIGATON
BY CAUSING A WRITTEN NOTICE OF YOUR CANCELLATION TO BE DELIVERED IN
PERSON, BY TELEGRAM OR FACSIMILE TRANSMISSIONS BY OVERNIGHT EXPRESS
DELIVERY OR CERTIFIED OR REGISTERED UNITED STATES MAIL, TO THE ADDRESS
OF THE PUBLIC INSURANCE ADJUSTER SPECIFIED IN THIS CONTRACT, WITHIN 3
CALENDAR DAYS OF THE DATE THAT YOU RECEIVE THIS CONTRACT. THIS CONTRACT
THEREAFTER MAY BE REVOKED BY THE INSURED WHO SIGNED IT, OR THEIR
DESIGNEE, AT ANY TIME, SUBJECT TO THE PUBLIC INSURANCE ADJUSTER'S
ASSERTION OF A FEE LIEN UPON INSURANCE PROCEEDS OFFERED OR SECURED
THROUGH HIS EFFORTS AS THE INSURED'S REPRESENTATIVE. IF YOU CANCEL THIS
AGREEMENT YOU WILL REMAIN LIABLE FOR REASONABLE AND NECESSARY
EMERGENCY OUT-OF-POCKET EXPENSES OR SERVICES WHICH WERE PAID FOR OR
INCURRED BY THE PUBLIC INSURANCE ADJUSTER DURING SAID 3 DAY PERIOD TO
PROTECT THE INTRESTS OF THE INSURED.

I/WE HAVE READ THE ABOVE AGREEMENT BEFORE SIGNING

EVP, Global Real Estate     8/11/20

_____     _____
Steward Health Care Systems LLC     (Date)

EVP+COO     8/14/2020

_____     _____
Medical Properties Trust INC.     (Date)

By: _____  PRESIDENT     8/11/20

(Signature of Public Insurance Adjuster)     (Date)

EACH PARTY SHALL RECEIVE A COPY OF THIS CONTRACT

CONFIDENTIAL

STEWARD00048092

7583484_00150616

# Exhibit H

| **From:** | Hibble, Nathalie[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=244F72DA1750477A98DC65B697 0018D5-NATHALIE HIBBLE] |
|---|---|
| **Sent:** | Fri 7/10/2020 8:18:27 AM (UTC-05:00) |
| **To:** | Gendron, Robert[Robert.Gendron@steward.org] |
| **Cc:** | Crowley, Michael[Michael.Crowley@steward.org]; hcooper@toddweld.com[hcooper@toddweld.com]; Rich, David H.[drich@toddweld.com]; Kenyon, Scott[Scott.Kenyon@steward.org] |
| **Subject:** | RE: [EXTERNAL]  RE: Steward Internal Policy Questions to get everyone on the same page |
| **Attachment:** | MPT _1_Policy_2020.pdf |

Hi Bob,

When you have the contract for NFA as the public adjuster please send it over.  Bob, will NFA be acting as a public adjuster under both policies?  Howard, Herb would like you to review and revise the agreement as necessary before it is executed.

Since MPT is the First Named Insured on the property policy, but Bob/Steward is managing the claim, we'll need something from MPT which authorizes Steward to work with this public adjuster on their behalf.  This authorization could be inserted into the contract with the public adjuster.

Thanks,
Nathalie

---

**From:** Gendron, Robert <Robert.Gendron@steward.org>
**Sent:** Thursday, July 9, 2020 10:22 PM
**To:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Cc:** Crowley, Michael <Michael.Crowley@steward.org>; hcooper@toddweld.com; Rich, David H. <drich@toddweld.com>; Kenyon, Scott <Scott.Kenyon@steward.org>
**Subject:** RE: [EXTERNAL] RE: Steward Internal Policy Questions to get everyone on the same page

Nathalie,

   I apologize for the delay on the response re: Public Adjuster; however, the team (MPT/Steward) did meet with Ron Papas from NFA Wednesday on site.  We found their initial recommendations and strategy extremely helpful.  Michael and I were able to come to business terms with them today and will send you their term proposed contract tomorrow morning for review.  We will need to discuss how to manage the MPT property representation between me and them as their contract is more property focused.

   One other important item that came out of the discussions was the legal review of both policies related to coverages, etc.  It appears we have a unique circumstance whereas we will have control and access to two policies with similar coverages.  Understanding how these overlap and coverage limits will help drive the initial strategy of allocations, reserves, etc.

Thank you for all your help,

Bob Gendron
Executive Vice President
Corporate Real Estate
Steward Health Care System LLC
1900 N. Pearl Street, Dallas, TX 75201
Email: Robert.Gendron@steward.org

---

**From:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Sent:** Wednesday, July 8, 2020 11:22 AM
**To:** Gendron, Robert <Robert.Gendron@steward.org>
**Cc:** Crowley, Michael <Michael.Crowley@steward.org>; Steven Richards (steven.richards@optisure.com) <steven.richards@optisure.com>; hcooper@toddweld.com; Rich, David H. <drich@toddweld.com>; Kenyon, Scott <Scott.Kenyon@steward.org>
**Subject:** FW: [EXTERNAL] RE: Steward Internal Policy Questions to get everyone on the same page

Bob,

We'd like to authorize the public adjuster and Marsh to speak with Steve Richards so he can help manage the claim along the way.

I know you've engaged Marsh for the BI/personal property claim.  Do you know who we will be engaging as a public adjuster for the MPT property claim?

We'll need to ask Marsh and the public adjuster we engage to include Steve on correspondence.

As Sedgwick will be the claim adjuster for Zurich (via Mark Graves at Zurich), we'll need to identify who will be corresponding with them from the Steward side.

Thanks,
Nathalie

---

**From:** Hibble, Nathalie
**Sent:** Wednesday, July 8, 2020 10:05 AM
**To:** Cooper, Howard <hcooper@toddweld.com>; Steven Richards <steven.richards@optisure.com>; Kenyon, Scott <Scott.Kenyon@steward.org>; Gendron, Robert <Robert.Gendron@steward.org>; Crowley, Michael <Michael.Crowley@steward.org>; Doncaster, Ronald <ronald.doncaster@steward.org>; 'robert.l.grider@marsh.com' <robert.l.grider@marsh.com>
**Subject:** RE: [EXTERNAL] RE: Steward Internal Policy Questions to get everyone on the same page

Steve,

In addition to the request below, we want to confirm proper notice under MPT's policy as well.  The policy is attached.  We understand that the claim number from Zurich American Insurance Company is: Medical Properties Trust, Inc. - Claim No.: 5630054103 - Date of Loss: 6/28/2020

Steward (with this group's assistance) will be managing <u>both</u> claims under <u>both</u> policies from this point forward.

---

**From:** Cooper, Howard <hcooper@toddweld.com>
**Sent:** Wednesday, July 8, 2020 9:43 AM
**To:** Steven Richards <steven.richards@optisure.com>; Kenyon, Scott <Scott.Kenyon@steward.org>; Gendron, Robert <Robert.Gendron@steward.org>; Crowley, Michael <Michael.Crowley@steward.org>; Doncaster, Ronald <ronald.doncaster@steward.org>; 'robert.l.grider@marsh.com' <robert.l.grider@marsh.com>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Subject:** [EXTERNAL] RE: Steward Internal Policy Questions to get everyone on the same page

Steve –

Can you please confirm that all necessary notices to any Steward insurer has been sent and send me a copy of the notice? Is there a claim number for the Steward claim under its policy? I know that Zurich is the insurer for both Steward and MPT but I assume they will be assigned different claim numbers for their different policies.

Thanks.

Howard

---

**From:** Steven Richards <steven.richards@optisure.com>
**Sent:** Tuesday, July 7, 2020 4:39 PM
**To:** Kenyon, Scott <Scott.Kenyon@steward.org>; Gendron, Robert <Robert.Gendron@steward.org>; Crowley, Michael <Michael.Crowley@steward.org>; Doncaster, Ronald <ronald.doncaster@steward.org>; 'robert.l.grider@marsh.com' <robert.l.grider@marsh.com>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>; Cooper, Howard <hcooper@toddweld.com>
**Subject:** RE: Steward Internal Policy Questions to get everyone on the same page

Hi all,

Just had a typo pointed out on the attached spreadsheet.  The combined Property/BI limit should read 850,000,000 – not 850,000. Update attached.

Best,
Steve

**Steven Richards**
*Managing Director*
*Richards Robinson Sheppard Insurance*



www.optisure.com      steven.richards@optisure.com

Please remember we cannot bind or change coverage via email.  This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. For your protection, please note insurance coverage cannot be bound or changed via voice mail, email, fax or online via our website, and is not effective until confirmed directly with a licensed agent. In addition, the sender does not intend that this email, including any related emails, to be a transaction or transactions by electronic means subject to the Massachusetts Uniform Electronic Transactions Act or any such similar act or law, unless expressly stated otherwise in the body of the email by the sender.

Scott.Kenyon@steward.org                     Robert.Gendron@steward.org
Michael.Crowley@steward.org
ronald.doncaster@steward.org                  robert.l.grider@marsh.com
Nathalie.Hibble@steward.org                   hcooper@toddweld.com

Scott.Kenyon@steward.org





# Exhibit I

| | |
|---|---|
| **From:** | Cooper, Howard[hcooper@toddweld.com] |
| **Sent:** | Thur 10/8/2020 11:13:28 AM (UTC-05:00) |
| **To:** | Gendron, Robert (Bob)[Robert.Gendron@steward.org] |
| **Cc:** | Hibble, Nathalie[Nathalie.Hibble@steward.org]; Rich, David H.[drich@toddweld.com]; Crowley, Michael[Michael.Crowley@steward.org]; Kenyon, Scott[Scott.Kenyon@steward.org]; rpapa@nfa.com[rpapa@nfa.com]; Polanowicz, John[John.Polanowicz@steward.org] |
| **Subject:** | [EXTERNAL]  RE: Attorney Client Privileged:  Insurance Discussions |

Well done, Bob. I think this sounds very promising.  Obviously, we should strategize about the meeting.  Best, Howard

---

**From:** Gendron, Robert (Bob) <Robert.Gendron@steward.org>
**Sent:** Thursday, October 8, 2020 12:01 PM
**To:** Cooper, Howard <hcooper@toddweld.com>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>; Rich, David H. <drich@toddweld.com>; Crowley, Michael <Michael.Crowley@steward.org>; Kenyon, Scott <Scott.Kenyon@steward.org>; rpapa@nfa.com; Polanowicz, John <John.Polanowicz@steward.org>
**Subject:** Attorney Client Privileged: Insurance Discussions

**Team,**

**I spoke with Tom Walsh from the Insurance commissioner's office today and went over the following points.  The key takeaway is that the commissioner's office is looking to speak with both sides of the claim and set up a conference call between myself and their executives to talk through how we can bring this claim to resolution in record time due to the nature of the facility and it's importance to the State of Massachusetts.**

- Reviewed parties involved (MPT and Steward) and our REIT/Ownership structure
- Steward has Business Interruption/Contents policy with Zurich and our REIT (Medical Properties Trust) has a Property Policy with Zurich
    - Reviewed Flood Limits and discussed Policy coverage re: Flood and Additional Coverage
    - Reviewed Cease and Desist letter and Letter of Coverage noting additional coverages
- Shortly after the loss, MPT and Steward built an interdisciplinary team of Adjusters, Healthcare Engineers/Architects, and Life Safety Specialists
- We worked with our preferred vendors, city of Norwood to evacuate patients and mitigate the building immediately without incident
- We originally looked at a 3-phase opening of ED, Support Services, and critical care services
- That plan was quickly foiled in our opinion due to the nature and severity of the loss (As evidenced by video from news **I sent him link)
- Main Electrical Switchgear Failure, Fire Alarm System Failure, and Cease & Desist by AHJ (City of Norwood) were major drivers in code compliance and discussions with AHJ
- During these first 30-60 days of mitigation and assessments, Zurich and their adjusters took a fairly strong position of reopening immediately.  Steward/MPT had life safety concerns &

determined the extent of loss was much greater
• Zurich had inconsistent representation and communication early in the process but has improved recently
• We have invited Zurich to visit the site multiple times as the decision maker
• The new adjuster "Cliff" has actually been helpful since we had a meeting with all key stakeholders (AHJ, Owners, Insurance, etc.) in determining that this is a significant loss (Last Week)
• Zurich has engaged Sub-rogation counsel and we believe Zurich is starting to understand the magnitude of the loss


I did not discuss:

1. Specifics on team members
2. Letters and cooperation discussions
3. Non-renewal of policy



At the end of the day, We Steward and MPT would like to acknowledge that this is loss that will exceed loss limits and start working on some resolution to bring this hospital back online. We are under a lot of pressure from all angles to start rebuilding and we can't afford this to drag on when in our minds its pretty clear that this is a maximum loss.

We do appreciate the magnitude of the loss and the timeframes generally associated with a claim of this magnitude. Agreeing on a minimum of loss limits will allow us to invest the restoration/rebuild of the facility ASAP.

Our adjusters have made great strides in last few weeks and we don't want to lose momentum but would appreciate your guidance on shortening the process of claim resolution and scope agreement.

Bob

NOTICE: This email may contain PRIVILEGED and CONFIDENTIAL information and is intended only for the use of the specific individual(s) to which it is addressed. It may contain Protected Health Information or Personally Identifiable Information that is privileged and confidential. Protected Health Information and Personally Identifiable Information may only be used or disclosed in accordance with law and you may be subject to penalties under law for improper use or further disclosure of the Protected Health Information or Personally Identifiable Information in this email. If you are not an intended recipient of this email, you are hereby notified that any unauthorized use, dissemination or copying of this email or the information contained in it or attached to it is strictly prohibited. If you have received this email in error, please delete it and immediately notify the person named above by reply email. Thank you.

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby

notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

# Exhibit J

| | |
|---|---|
| **From:** | Cooper, Howard[hcooper@toddweld.com] |
| **Sent:** | Tue 7/7/2020 11:16:05 AM (UTC-05:00) |
| **To:** | Gendron, Robert[Robert.Gendron@steward.org] |
| **Cc:** | Hibble, Nathalie[Nathalie.Hibble@steward.org]; Rich, David H.[drich@toddweld.com]; Crowley, Michael[Michael.Crowley@steward.org]; Cooper, Howard[hcooper@toddweld.com] |
| **Subject:** | RE: [EXTERNAL]  American Guarantee and Liability Insurance Company - Steward Health Care System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020 |

Bob –

Here is the suggested email we talked about to MTP. Please edit as you see fit.

Thanks.

Howard

Dear _____-

As I am sure you will agree, there is a very real need here for all of us to be fully coordinated on all insurance and other related issues as we move forward.  Timely communication and transparency is essential given the number of moving parts.  To that end, I ask that you help me with the following:

1.  We need a copy of any MPT insurance policy which provide coverage here, and copies of all notices of the claim given to the insurers.

2. We understand that funds in the amount of $5 million have been advanced by an insurer to date to MPT. We need to understand for what purpose, and under what coverages, these funds have been advanced. We need to set up a mechanism to be kept apprised of this type of information as we go forward.

3. MPT has asked Steward to manage the claim. We need to understand in writing exactly what MPT is asking us to do and make sure that whatever is needed to comply with the lease from a legal perspective is put in place.

4. We need to be sure that we are in the loop, that we are on all communications and invited to attend all meetings. I understand there is a meeting tomorrow. Where and when is it?

5. Steward has its own public adjustor and consultant and they too need to be kept in the loop. We think it would be helpful to set up a meeting of Steward, its consultant, MPT and Sedgewick as soon as reasonably possible to discuss information flow.

I will call you to follow up on this, but wanted to give you a heads up before I did.

Thanks in advance for your help.

**From:** Gendron, Robert <Robert.Gendron@steward.org>
**Sent:** Tuesday, July 7, 2020 10:57 AM
**To:** Cooper, Howard <hcooper@toddweld.com>
**Cc:** Hibble, Nathalie <Nathalie.Hibble@steward.org>; Rich, David H. <drich@toddweld.com>;
Crowley, Michael <Michael.Crowley@steward.org>
**Subject:** FW: [EXTERNAL] American Guarantee and Liability Insurance Company - Steward Health Care
System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020
**Importance:** High

**From:** Mark Graves <mark.graves@zurichna.com>
**Sent:** Tuesday, July 7, 2020 10:47 AM
**To:** Frumkin, Jacob <Jacob.Frumkin@steward.org>; Kenyon, Scott <Scott.Kenyon@steward.org>
**Cc:** Doncaster, Ronald <ronald.doncaster@steward.org>; Sarah Finnegan
<sarah.finnegan@optisure.com>; Steven Richards <steven.richards@optisure.com>; Gendron, Robert
<Robert.Gendron@steward.org>; Amy ORorke <Amy.ORorke@sedgwick.com>
**Subject:** [EXTERNAL] American Guarantee and Liability Insurance Company - Steward Health Care
System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020
**Importance:** High

Jacob & Scott,

We had internal computer system issues yesterday; so, the advance check did not get processed
yesterday, but it is being processed today.  It will be issued and sent to your attention via FedEx. Once
I have the tracking number information I will forward to your attention.

Let me know of any questions.

Thanks,



**Mark A. Graves, AIC, CPCU, AIC-M, RPA, PCLS**
*AVP, Executive General Adjuster*
Zurich North America
1299 Zurich Way
Schaumburg, Illinois 60196

**Office:** 920-457-2257
**Mobile:** 920-912-3832
**Email:** mark.graves@zurichna.com

zurichna.com

**From:** Frumkin, Jacob <Jacob.Frumkin@steward.org>
**Sent:** Friday, July 03, 2020 5:46 AM
**To:** Kenyon, Scott <Scott.Kenyon@steward.org>
**Cc:** Mark Graves <mark.graves@zurichna.com>; Doncaster, Ronald <ronald.doncaster@steward.org>;
Sarah Finnegan <sarah.finnegan@optisure.com>; Steven Richards <steven.richards@optisure.com>;
Gendron, Robert <Robert.Gendron@steward.org>
**Subject:** Re: [EXTERNAL] American Guarantee and Liability Insurance Company - Steward Health Care
System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020

Thanks, Scott and Mark. One minor change to address:

> Steward Health Care System
> Attn: Jacob Frumkin, VP Finance
>
> 1900 N Pearl St
> Suite 2400
>
> Dallas TX  75201

**Jacob Frumkin**
VP, Finance
Steward Health Care
------------------------------------------
Phone (c): 704-890-4970
Jacob.Frumkin@steward.org

-
NOTICE: This e-mail may contain PRIVILEGED and CONFIDENTIAL information and is intended only for the use of the specific individual(s) to which it is addressed. It may contain Protected Health Information (PHI) that is privileged and confidential. PHI may be used or disclosed in accordance with law and you may be subject to penalties under law for improper use or further disclosure of the PHI in this e-mail. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use, dissemination or copying of this e-mail or the information contained in it or attached to it is strictly prohibited. If you have received this e-mail in error, please delete it and immediately notify the person named above by reply e-mail. Thank you.

> On Jul 3, 2020, at 12:50 AM, Kenyon, Scott <Scott.Kenyon@steward.org> wrote:

> Thank you

> Confirmed with Jacob Frumkin, VP Finance, please FEDEX the check to

Steward Health Care System
Attn: Jacob Frumkin, VP Finance
Suite 2400
Dallas TX  75201

If you could provide a tracking number, that would be great

Thank you so much
Scott

**Scott E. Kenyon, MHA, Vice President**
**Steward Health Care, National Corporate Real Estate & Facilities**
508-468-7837  *cell,*  scott.kenyon@steward.org
*Dallas, Texas*

*"Work With A Sense of Urgency"*
*"Practice Good Email Etiquette"*
*4/20/2023*

---

**From:** Mark Graves <mark.graves@zurichna.com>
**Sent:** Thursday, July 2, 2020 8:59 PM
**To:** Doncaster, Ronald <ronald.doncaster@steward.org>; Kenyon, Scott <Scott.Kenyon@steward.org>
**Cc:** Sarah Finnegan <sarah.finnegan@optisure.com>; Steven Richards <steven.richards@optisure.com>
**Subject:** [EXTERNAL] American Guarantee and Liability Insurance Company - Steward Health Care System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020
**Importance:** High

Ron & Scott,

I would like to thank you for taking the time to speak with me this evening about the Norwood Hospital flood occurrence. Please accept this email as confirmation that I have been assigned as your American Guarantee and Liability Insurance Company ("AGLIC") claims professional for the above referenced claim file (Please note the new claim number).  Although I am available to discuss and answer any questions, I will be working closely with Amy O'Rorke of Sedgwick as she is the designated independent adjuster on the Steward Health Care System LLC policy.  As we discussed this evening, AGLIC has retained several consultants to assist in the investigation and handling of the claim.  I am glad to hear the interaction between the AGLIC retained consultants and Steward, as well as the Steward retained contractors, has been both professional and productive.

In addition, as we discussed, AGLIC would like to issue a general advance payment towards the Steward Health Care System claim in the amount of $5,000,000.  Please advise if Steward would like it issued by check or by wire transfer, and provide the necessary details to have the payment processed.

Throughout the claim process, I am available from 8:00 AM until 5:00 PM CST Monday through Friday via phone at (920) 457-2257 or via email at mark.graves@zurichna.com. Please be sure to reference the above mentioned claim number on all correspondence.

I value your thoughts, concerns, and am committed to fair, accurate, and timely service. If you have any questions regarding the contents of this email, or any other matters you wish to discuss, please feel free to contact me directly. I look forward to working with you and resolving this claim for Steward as quickly as possible.

Please enjoy your July 4ᵗʰ Holiday weekend!

Thanks,


&lt;image001.jpg&gt;    **Mark A. Graves, AIC, CPCU, AIC-M, RPA, PCLS**
*AVP, Executive General Adjuster*
Zurich North America
1299 Zurich Way
Schaumburg, Illinois 60196


**Office:** 920-457-2257
**Mobile:** 920-912-3832
**Email: mark.graves@zurichna.com**


zurichna.com


****************** PLEASE NOTE ******************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.
****************** PLEASE NOTE ******************
This message, along with any attachments, is for the designated recipient(s) only and may contain privileged, proprietary, or otherwise confidential information. If this message has reached you in error, kindly destroy it without review and notify the sender immediately. Any other use of such misdirected e-mail by you is prohibited. Where allowed by local law, electronic communications with Zurich and its affiliates, including e-mail and instant messaging (including content), may be scanned for the purposes of information security and assessment of internal compliance with company policy.

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and

permanently delete the original and any copy of this e-mail message and any printout thereof.
To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

# Exhibit K

**Sent:**          Mon 12/14/2020 2:09:56 PM (UTC-06:00)

**To:**            Crowley, Michael[Michael.Crowley@steward.org]

**Cc:**            Hibble, Nathalie[Nathalie.Hibble@steward.org]; Cooper,
                   Howard[hcooper@toddweld.com]; Rich, David H.[drich@toddweld.com]

**Subject:**       Attorney/Client Privileged

**Attachment:**    12-17 Meeting.docx

Michael

See attached summary and discussion points we discussed over the last few weeks.  Please review
and let me know if you have any comments/questions and we can distribute to Larry.


Bob

Case 1:21-cv-11902-PBS     Document 286     Filed 08/11/26     Page 265 of 267

# Exhibit L

| **From:** | Hibble, Nathalie[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=244F72DA1750477A98DC65B697 0018D5-NATHALIE HIBBLE] |
| **Sent:** | Fri 7/3/2020 1:47:37 PM (UTC-05:00) |
| **To:** | Gendron, Robert[Robert.Gendron@steward.org] |
| **Cc:** | Crowley, Michael[Michael.Crowley@steward.org]; hcooper@toddweld.com[hcooper@toddweld.com]; Rich, David H.[drich@toddweld.com] |
| **Subject:** | FW: Privileged:  Attorney/Client Norwood Insurance |
| **Attachment:** | FW: [EXTERNAL]  FW: Electronically Reported Claim - Steward Health Care System Llc - I-3970722/S-3970722P1 |
| **Attachment:** | Steward property policy dec pages.pdf |
| **Attachment:** | RE: [EXTERNAL]  American Guarantee and Liability Insurance Company - Steward Health Care System LLC - Claim No.: 5630054105 - Date of Loss: 6/28/2020 |
| **Attachment:** | [EXTERNAL]  RE: Norwood claim |

Hi Bob, for these purposes we can copy Todd & Weld as they are going to assist the team in the proper management of the claim.  I've copied Howard and David here.

I sent Howard et al my initial review of Section 14 of the Master Lease on Wednesday but they will provide additional guidance on that front as necessary in light of the points you've made below. Howard can you send that guidance along as soon as you have it so Bob can manage this process with MPT/the insurer?

As it relates to the policy, I was under the impression we had the property policy (not the BI policy) from the team.  I may have that wrong however so let me go back to the emails I have from the team on this.  Howard, is that your understanding as well?

---

**From:** Gendron, Robert
**Sent:** Friday, July 03, 2020 1:43 PM
**To:** Hibble, Nathalie <Nathalie.Hibble@steward.org>
**Cc:** Crowley, Michael <Michael.Crowley@steward.org>
**Subject:** Privileged: Attorney/Client Norwood Insurance

Nathalie,

   As a follow up to our discussion the other day, Steward has been working with MPT to assemble the notifications and claim numbers for both policies.  I'm assuming I should send these emails to you without copying ToddWeld and let you decide on external counsel.

There have been a few items that have come to light:

   1.  Steward has the BI/Contents policy that has been shared and has hired Robby Girder from Marsh as our representative on that claim

2.  MPT is the technical insured of the property policy and we do not currently have access to that policy.  I have requested the policy and notification of claim from MPT and will send upon receipt.

3.  MPT has engaged 3rd party representation from Sedgewick, whom is also representing the Insurer.  I advised that Steward is not comfortable with this position and asked for further clarification of the expectations of Steward per section 14 of the master lease.  I also advised that Steward would prefer to hire a 3rd party independent adjuster to represent the property claim if MPT expects us to manage the process.

4.  I'm attaching some recent communication of the BI notification and initial "non-binding" upfront payments notification.


In conclusion,

Can you please provide a summary of Steward's legal responsibilities as it relates to the Master Lease provisions of section 14.  There appears to be a gap in strategy on the property insured side and it could have material effects on Steward's management of the claims process.


Regards,


Bob Gendron
Executive Vice President
Corporate Real Estate
Steward Health Care System LLC
1900 N. Pearl Street, Dallas, TX 75201
Email: Robert.Gendron@steward.org