**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARK KRONFELD, as Trustee of the SHC Creditor Litigation Trust,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 1:21-cv-11902 –PBS |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S OBJECTION TO DISCOVERY MASTER ORDER NO. 26**

In his objection, Plaintiff exaggerated the scope of this dispute by claiming his objection allows him to "safeguard the attorney-client privilege over more than 1,700 communications." Dkt. 285 at 1. Not so. Order No. 26—the subject of this objection—required production of a subset of 200 records containing communications between Robert Gendron (CEO of third-party CREF) and Steward's counsel. The remaining 1,549 emails—each involving other third-party CREF employees, not just Mr. Gendron or Mr. Kidney—were required to be produced following Order No. 22. Dkt. 237. The Discovery Master recently reiterated that the "*200 [email communications] that are only with either Kidney or Gendron and Todd & Weld may continue to be withheld until Magistrate Judge Kelley rules on Gendron's status. Every other document is overdue for production, subject to clawback for work product claims*." **Exhibit A**, hereto (Aug. 15, 2026 email from Discovery Master Hochberg) (emphasis in original). In recognition of this, on August 17, 2026, Plaintiff agreed to produce these 1,549 records subject to clawback by August 18, 2026.

Plaintiff should also be required to produce the subset of 200 records containing communications with Mr. Gendron. The Discovery Master correctly ruled that Mr. Gendron is a third party and is not the functional equivalent of a Steward employee for purposes of the attorney-client privilege. The objection to Order No. 26 should be overruled.

## FACTUAL BACKGROUND

### I. CREF

CREF is a "real estate and facilities professional services firm focused on healthcare and education." *See* Pl. Ex. B**,** Gendron Tr. at 50:24–51:1. It was founded in 2016 by Robert Gendron, its CEO. *Id.* at 14:21–15:1. CREF has three divisions: (1) planning, design, and construction, (2) regulatory and facilities, and (3) real estate. *Id.* at 51:2–12. As of 2026, CREF had 50 to 60 employees across five offices throughout the United States. *Id.* at 51:25–52:11.

Mr. Gendron testified that he had performed general contracting work for Steward before CREF's founding. He met Steward's then CEO Ralph de la Torre in 2010 when one of his companies was hired to build a private residence for de la Torre. *Id.* at 53:6–12. Thereafter, Steward hired several of Mr. Gendron's companies to perform contracting work at its properties. In 2017, Steward asked Mr. Gendron to formulate a "lift-out" strategy to remove certain real estate functions from Steward employees and facilitate outsourcing of a portion of its real estate and facilities management functions to CREF. *Id.* at 74:9–76:13.

This "lift-out" was performed under a series of contractual agreements, first entered into in January 2018. *See* Dkt. 260-2, 260-3, 260-4, 260-5. In April 2021, CREF and Steward renegotiated CREF's master services agreement. Dkt. 260-6. That agreement specifically stated that "Steward's engagement of Contractor [CREF] under any Project Authorization shall be as an independent contractor for the performance of the Services." *Id.* at ¶ 3(d). The agreement further stated that, "[n]othing contained in this Agreement shall be deemed or construed to create any

association, partnership, joint venture, or relationship of principal and agent, master and servant, or employer and employee between Contractor and Steward, or to provide a Party with the right, power, or authority, whether expressed or implied, to create any duty or obligation on behalf of the other Party." *Id.* As the Discovery Master noted, "the individuals who worked for CREF, including Mr. Gendron, were explicitly disavowed by both Steward and CREF as being either 'agents' or 'employees' of Steward, from the very outset of the relationship." Order. No. 26 at 3.

## II. Mr. Gendron's Responsibilities Relating to the Norwood Hospital Insurance Claim.

All Steward work performed by CREF and Mr. Gendron after the June 2020 flood at Norwood Hospital—including emergency response, mitigation, project management, and coordination of the insurance claim—was governed by the master services agreements. *See* Gendron Tr. at 98:10–99:13.

CREF employees—including Mr. Gendron—were part of a "project management team" that oversaw and coordinated Steward's other third-party contractors as they inspected and assessed the damage at Norwood Hospital. CREF provided emergency response and initial mitigation services, along with project management and coordination of the insurance claim. *Id.* at 86:20–87:25. Mr. Gendron testified that Steward hired consultants to assist with the claim, and that CREF organized and presented the consultants' information to Steward. *Id.* at 164:3–22.

At his deposition, Mr. Gendron repeatedly disclaimed having significant decision-making authority on behalf of Steward. Mr. Gendron specifically denied: holding himself out as a Steward employee (Gendron Tr. at 179:18–180:3); hiring vendors for clients, rather than making recommendations on vendors (*id.* at 31:18–21); managing any of the $97.4 million of insurance proceeds that Steward received from American Guarantee (*id.* at 216:20–217:24); negotiating funding with MPT for Steward (*id.* at 223:24–224:16); or having any role with accountants in

addressing Steward's business-interruption claim other than to "facilitate at CREF information back and forth" (*id.* at 184:5–185:22).

**III. Mr. Gendron's Business Relationship with Mr. de la Torre.**

The Discovery Master also correctly noted that Mr. Gendron and Steward's CEO (Mr. de la Torre) "became business investment shareholders, together benefitting financially from the entire business success of CREF. As Mr. Gendron testified at his deposition, in April 2021, Steward CEO Ralph de la Torre personally purchased a 40% interest in Gendron's wholly-owned company GenHoldCo (the parent of CREF) for $4 million to Gendron. In August 2024, as Steward Health Care was failing and filing for bankruptcy under Mr. de la Torre's leadership, Gendron re-purchased de la Torre's entire 40% of GenHoldCo interest for $8 million to Mr. de la Torre." Order No. 26 at 3 (citations omitted). The Discovery Master also noted that Steward paid CREF $37 million between May 2023 and its May 2024 bankruptcy. *Id.* Thus, "the relationship between Gendron and Steward can hardly be described as one of a 'functional employee' and employer. Gendron and de la Torre were business partners in CREF, which got a lucrative contract to be paid with Norwood Hospital's funds." *Id.* at 3–4.

**PROCEDURAL BACKGROUND**

On August 17, 2026, counsel for Plaintiff informed Defendants that they had instructed their vendor to prepare the production of 1,549 communications that "include Todd & Weld, Kidney and/or Gendron and at least one other CREF employee." Plaintiff has since represented that these records will be produced on August 18, 2026. Therefore, at issue in this dispute are 200 records withheld pending resolution of this Objection.

Below is a brief chronology of key events:

- May 14, 2026—over three months ago—the Discovery Master issued Order No. 22, finding that all CREF personnel, other than Chris Kidney, are third parties. *See* Order No. 22 at 37 and 39 (requiring production of all withheld third-party CREF

communications, unless there was a direct work product request or response to request from Todd & Weld or the email was for the purpose of legal advice and between CREF employee Chris Kidney, Steward, and counsel); *see also* Ex. A.

- Plaintiff filed an objection to Order No. 22. Dkt. 237. In that objection, Plaintiff conceded that Order No. 22 mandated production of over 4,000 email communications. Dkt. 237 at 3 ("This part of Order No. 22 (the 'CREF Ruling') mandates that Plaintiff produce more than 4,000 communications that are protected by the attorney-client privilege and the work product doctrine."); Tr. of Mot. H'rg at 12:20-21 ("If I might, Your Honor, there are approximately 4,000 documents that are at issue here.").

- Following a hearing on June 26, 2026, Plaintiff's objection to Order No. 22 was overruled, except that the District Court allowed Plaintiff to seek reconsideration of Mr. Gendron's status. Dkt. 267; Tr. of Mot. H'rg at 8:24–9:1.

  Given the volume of improperly withheld emails, Plaintiff *specifically asked the Court* for leave to revisit whether the attorney-client privilege permitted withholding communications that copied other third-party CREF employees. Tr. of Mot. H'rg at 19:24-20:5. This Court denied that request and—like the Discovery Master—required Plaintiff to produce emails including other CREF third parties, regardless of whether Mr. Gendron or Mr. Kidney were also on the correspondence. *Id.* at 16:9-13 ("if it's **just with Kidney and Gendron**, they don't need to be produced . . . **but everything else should be produced subject to clawback**."); *see also id.* at 19 ("I looked at the record cites, and the other six [CREF] people it wasn't proven on . . . if it was **just communications involving Kidney, Gendron, and Todd & Weld** or in-house counsel. That can be privileged."); *id.* at 20:21-24 ("Right, they should be produced under the clawback 'Attorneys eyes only.' But if it's **just Gendron, Kidney, and Todd & Weld** or in-house counsel . . . that should just stay privileged."). Plaintiff was required to complete that production by July 20, 2026. Jaffee Decl., Dkt. 285-1, ¶ 9.

- On July 13, 2026, Plaintiff moved the Discovery Master to reconsider Mr. Gendron's status. Defendants responded on July 24, 2026. **Exhibit B**, hereto.

- On July 20, 2026, Plaintiff failed to comply with Order No. 22, and he disclosed that he continued to withhold 1,549 emails that included Mr. Kidney or Mr. Gendron *and* other third-party CREF employees, in direct violation of Order No. 22, as affirmed by this Court.

- On July 25, 2026, Defendants moved to compel compliance with Order No. 22 and for sanctions.

- On August 11, 2026, the Discovery Master issued Order No. 26, denying Plaintiff's motion to reconsider Mr. Gendron's status.

The Discovery Master also noted that she continues to review withheld documents that were submitted *in camera* by Plaintiff, and that the ongoing review revealed that Plaintiff engaged in a "pattern of continued excess-claiming of privilege," which "strongly weighs against any further withholding of Gendron's communications." *Id.* at 6. The Discovery Master found that the "opposing party cannot be expected to try its case without ever seeing documents that it has a right to see and ask about at depositions, and rely upon in its motion for summary judgment. And this over-withholding has caused unnecessary expenses to Defendants; delays to the Court; far too many rulings needed from the Discovery Master; and, worst of all, the prospect that there are still potentially hundreds or over 1,000 privileged documents still being withheld." *Id.* at 7.

Against that backdrop—including Plaintiff's improper withholding more than 1,500 emails involving third parties in violation of Order No. 22—the Discovery Master ordered that the withheld documents be "produced forthwith, without further delay, and not later than August 17, 2026."

- On August 6, 2026, Plaintiff moved to stay compliance with Order No. 26, and he filed his objection on August 11, 2026. Dkt. 282; Dkt. 285.

- On August 14, 2026, Defendants submitted a letter brief to the Discovery Master seeking a ruling that Defendants' pending motion to compel production was not moot and that Plaintiff was obligated to produce the 1,549 communications that include third-party CREF employees other than just Mr. Gendron or Mr. Kidney. **Ex. A** at 5. On August 16, 2026, the Discovery Master stated the following: "Judge Saris did NOT give [Plaintiff] leave to seek reconsideration of other personnel of CREF, as ordered in Order No. 22. Order 26 ONLY ruled on [Plaintiff's] motion to reconsider Gendron's status. Although the Order further explained and reiterated what is required to be produced pursuant to Order No. 22, its only new ruling was to deny [Plaintiff's] motion to reconsider as to Gendron's status. ONLY Gendron's emails with Todd & Weld, which <u>exclude</u> any other CREF personnel (other than Kidney), are stayed to be considered by Magistrate Judge Kelley. . . . *The 200 [withheld email communications] that are only with either Kidney or Gendron and Todd & Weld may continue to be withheld until Magistrate Judge Kelley rules on Gendron's status. <u>Every other document is overdue for production</u>, subject to clawback for work product claims*." **Ex. A** (emphasis in original).

## ARGUMENT[1]

### I. Plaintiff Has Not Met His Burden to Establish that Gendron Satisfies the Seldom-Applied "Functional Equivalent" Exception.

Plaintiff's evidence shows, at most, that Mr. Gendron coordinated communications and contractors—not the high-level, trusted decision-making required by the narrow functional-equivalent exception. Defendants do not dispute that Mr. Gendron managed communications on Steward's behalf regarding its insurance claim, facilitated communications between Steward and other third-party contractors, had a Steward email address, or oversaw its real estate functions. Nor do Defendants dispute his longstanding relationship with Steward's CEO Ralph de la Torre, including Mr. de la Torre's personal investment in CREF. Objection at 8. "But close collaboration is not enough to invoke the functional-equivalent doctrine." *United States ex rel. Long v. Janssen Biotech, Inc.*, 788 F. Supp. 3d 167, 172 (D. Mass. 2025). Plaintiff's objection ignores Mr. Gendron's testimony that he lacked the sort of "high-level, trusted decision-making or guiding role, equivalent to that of an employee[.]" Order No. 22 at 35 (quoting *America's Test Kitchen, Inc. v. Kimball*, No. 1684CV03325BLS2, 35 Mass. L. Rptr. 75, at *2 (Mass. Super. Apr. 2, 2018)). Considering Mr. Gendron's testimony, the contractual agreements between CREF and Steward, his business relationship with Mr. de la Torre, and the applicable case law, the Discovery Master correctly concluded that Plaintiff failed to establish that Mr. Gendron was the "functional equivalent" of a Steward employee.

Plaintiff also overstates an exception that the First Circuit has never adopted and courts apply narrowly. *See* Objection at 5–7; *see also Janssen Biotech, Inc.*, 788 F. Supp. 3d at 171

[1] Under Rule 53(f), the Court decides de novo all objections to findings of fact and conclusions of law made or recommended by a master. Fed. R. Civ. P. 53(f)(3) & (4). However, "the court may set aside a master's ruling on a procedural matter only for an abuse of discretion." Fed. R. Civ. P. 53(f)(5).

("[T]he First Circuit has not adopted the functional equivalent doctrine. This Court will nevertheless assume that under certain circumstances, third party agents may essentially operate as employees, and that the disclosure to them of otherwise privileged communications will not waive the privilege.") (internal citations omitted); *Lynx Sys. Devs., Inc. v. Zebra Enter. Solutions Corp.*, No. 15-12297-GAO, 2018 WL 1532614, at *4 (D. Mass. Mar. 28, 2018) ("As an initial matter, I note that the [functional-equivalent] doctrine has not been adopted within this Circuit or applied within this District."); *see also* Objection at 7 n.3.

Those cases that have recognized the existence of the exception have stressed how narrow it is. Indeed, the attorney-client privilege is "well-established and its rationale straightforward. By safeguarding communications between client and lawyer, the privilege encourages full and free discussion, better enabling the client to conform his conduct to the dictates of the law and to present legitimate claims and defenses if litigation ensues." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.*), 348 F.3d 16, 22 (1st Cir. 2003) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Still, "the privilege is not limitless, and courts must take care to apply it only to the extent necessary to achieve its underlying goals." *Id.* at 22 (citing *In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d 563, 571 (1st Cir. 2001)). "In other words, the attorney-client privilege must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." *Id.* (citing *United States v. Nixon*, 418 U.S. 683, 709–10 (1974)); *see also Cavallaro v. United States*, 153 F. Supp. 2d 52, 57 (D. Mass. 2001) (citation omitted) ("Although the attorney-client privilege is well established, it is narrowly construed because any expansion of the privilege hinders the Court in its search for truth."), *aff'd* 284 F.3d 236 (1st Cir. 2002). The general rule is that disclosing attorney-client

communications to a third party breaks the privilege. Order No. 22 at 13 (citing *Cavallaro v. United States*, 284 F.3d 236, 246–47 (1st Cir. 2002)).

A contractor does not become the functional equivalent of its client for privilege purposes simply because that client occupies most of the contractor's time. *See Janssen Biotech, Inc.*, 788 F. Supp. 3d at 172 ("But close collaboration is not enough to invoke the functional-equivalent doctrine. It is incumbent on the party asserting the privilege to put forth sufficient evidence to demonstrate that specific third-party individuals did in fact function as employees at the relevant time[.]"). An agency relationship is not enough to satisfy the standard. *See Banco do Brasil, S.A. v. 275 Washington Street Corp.*, No. 09-11343-NMG, 2012 WL 1247756, at *5–6 (D. Mass. Apr. 12, 2012) (rejecting application of functional equivalent doctrine even though individual acted as party's agent). Rather, a third party must have acted "in a high-level, trusted decision-making or guiding role, equivalent to that of an employee[.]" Order No. 22 at 35 (quoting *America's Test Kitchen*, 35 Mass. L. Rptr. 75, at *2).

Mr. Gendron's testimony confirms that he did not occupy the "high-level, trusted decision-making or guiding role" that is required to satisfy the narrow "functional equivalent" exception. He denied holding himself out as a Steward employee. Gendron Tr. at 179:18–180:3; *see also* Gendron Tr. at 51:13–19 (testifying that CREF has never been a part of Steward). Instead, he followed Steward's direction in performing CREF's contracted work, consistent with the terms of the various contractual agreements that Steward executed with CREF, which expressly described CREF as an independent contractor without agency status.

This was particularly true on the Norwood Hospital insurance claim. Mr. Gendron and his team "project managed" Steward's response. *Id.* at 150:19–151:4. Mr. Gendron testified that he and his team provided emergency response and initial mitigation services, along with project

management and coordination of the insurance claim. *Id.* at 86:20–87:25. Mr. Gendron explained that Steward hired consultants to assist with the claim, and that CREF organized and presented information from the consultants to Steward. *Id.* at 164:3–22. Mr. Gendron did not decide strategy with regard to the insurance claim, and he did not manage any of the $97.4 million of insurance proceeds that Steward received from American Guarantee. *Id.* at 216:20–217:24.

Plaintiff's evidence falls far short of carrying his burden that Mr. Gendron satisfies the seldom-applied "functional equivalent" standard.

**II. Communication with Gendron Was Not Necessary for the Rendition of Legal Advice.**

Even if Mr. Gendron satisfied the functional-equivalent standard, under Massachusetts law Plaintiff still must show that his involvement was necessary to facilitate legal advice. The functional equivalent doctrine does not mean "that all communications regarding legal advice with consultants who perform functions similar to employees will be privileged." *America's Test Kitchen*, 35 Mass. L. Rptr. 75, at *2. "Even if a consultant is the functional equivalent of an employee for some purposes, distribution of legal advice or other attorney-client communications to the consultant will only be privileged if the client needed the consultant to help facilitate the rendition of legal advice by the lawyer or the implementation of that advice by the client." *Id.*

Plaintiff identifies no reason why Mr. Gendron's presence was necessary to facilitate *legal advice* to Steward from Steward's lawyers. The "attorney-client privilege extends to communications between corporate officers and in-house counsel, but the communications must relate to legal matters, not business strategy or negotiation." *EEOC v. Texas Roadhouse, Inc.*, No. 11-cv-11732- DJC, 2015 WL 14031521, at *2 (D. Mass. Dec. 2, 2015) (citing *United States v. Windsor Cap. Corp.*, 524 F. Supp. 2d 74, 81 (D. Mass. 2007) (privilege does not apply when in-house counsel is engaged in nonlegal work, including business or technical advice unrelated to any legal issues)).

Mr. Gendron helped prepare and submit an insurance claim, which "may be reasonably considered to be business advice, rather than legal advice." Order No. 22 at 20. Here, "[t]he vast majority of the function of CREF employees was gathering and relaying information sought by counsel" and "[s]cope, budget and schedule are not the types of activities that require 'translation' for the attorney and client to seek or understand legal advice given." Order No. 22 at 36. This is insufficient to cloak him within the "functional equivalent" privilege. *See, e.g.*, *Burke v. Gen. Hosp. Corp.*, No. 1784CV02876, 2019 WL 6197040, at *8 (Mass. Super. Ct. May 3, 2019) (rejecting application of "functional equivalent" doctrine to public media consultant whose involvement in communications was "to address a public relations issue, and not necessarily to aid the legal team in addressing any particular legal risk, exposure, or lawsuit.")

Indeed, the emails Plaintiff cites do not show that Mr. Gendron's involvement was "necessary" to facilitate the provision of legal advice at all. Instead, they show:

- He communicated with MPT to coordinate the two entities' insurance claims and relayed that information to Steward's in-house and outside counsel. (Pl. Ex. J); (Pl. Ex. L)
- He transmitted information and questions received from Steward's other third-party contractors, including NFA. (Pl. Ex. H)
- He sought Steward's input and guidance on how to proceed with the insurance claim, deferring to Steward's decisions. (Pl. Ex. L) (seeking Steward's analysis of its legal responsibilities under the master lease with MPT and noting that differences in strategy with MPT "could have material effects on Steward's management of the claims process").

Communicating with counsel is not enough. *See Banco do Brasil*, 2012 WL 1247756, at *6 (D. Mass. Apr. 12, 2012) (that broker "served as the direct contact and liaison" with counsel was not enough to establish functional equivalent standard). These discrete examples do not show that for each and every one of the withheld communications that Mr. Gendron's involvement was "necessary" to facilitate legal, rather than business, advice. Plaintiff has not carried his burden.

## III. Plaintiff Misstates the Scope of Order No. 26.

Plaintiff also attempts to attack Order No. 26 on the grounds that it is improperly punitive. Objection at 17–20. This misstates the scope of Order No. 26, and does not justify overruling the Discovery Master's conclusions regarding Mr. Gendron's status.

When correctly framed, including Plaintiff's continued withholding of records in violation of Court orders, it is clear why the Discovery Master ordered "forthwith" production. Order No. 26; *see also* **Ex. A**.[2] Order No. 26 was not "punitive" as asserted by Plaintiff. Rather, it was a reasoned response to Plaintiff's continued discovery misconduct and delays.[3] As this Court is aware, Plaintiff's discovery misconduct has repeatedly delayed this case. *See, e.g.,* Dkt. 253 at 2–3; Order No. 26 at 6–7. Depositions remain paused because of the volume of withheld documents, the unresolved privilege and work product disputes, leaving fact discovery effectively stayed. As the Discovery Master noted, Defendants cannot defend the case without access to materials they "ha[ve] a right to see and ask about at depositions, and rely upon in [their] motion for summary judgment." Dkt. 281 at 7. The withheld documents present the "prospect that there are still potentially hundreds or over 1,000 unprivileged documents still being withheld." *Id.* Defendants still must take *many* fact depositions, some of which must occur before Defendants can disclose experts. The Discovery Master therefore properly ordered forthwith production of the 1,549 emails that are "overdue for production" and the subset of 200 emails that include Mr. Gendron's (not Mr. Kidney's) direct communications with counsel, without third parties.

---

[2] Although Plaintiff agreed to produce 1,549 records, any attempts by Plaintiff to continue to revisit Order No. 22 should be rejected. As the Discovery Master recently reiterated, the 1,549 records were required to be produced when Judge Saris affirmed Order No. 22. **Ex. A**.

[3] Discovery abuses, including overwithholding records as privileged, and violations of court orders are grounds for sanctions. Defendants sought sanctions before the Discovery Master, which motion is pending. Defendants expressly reserve all rights to seek any appropriate relief, including sanctions pursuant to Fed. R. Civ. P. 37.

Production is subject to attorneys' eyes only (as stipulated by the parties, Dkt. 280), and to clawback as ordered by the Discovery Master. Order No. 26 at 7 ("Given the factors discussed above, there shall be no blanket withholding of the Gendron communications, nor selective withholding based on the "functional equivalent" or any other grounds. . . . Plaintiff shall therefore produce, subject to clawback, the 1,749 withheld communications involving Mr. Gendron, regardless of whether Mr. Kidney or an attorney is on the communication."). If Plaintiff produces records, and if the Court ultimately rules in Plaintiff's favor as to any of those records, they can be clawed back. That is precisely what the Confidentiality Stipulation, the Court's June 26 ruling, Order No. 22 and Order No. 26, and Federal Rule of Evidence 502(d) contemplate.

## CONCLUSION

Plaintiff cannot justify withholding the 1,549 overdue emails (not presently before this Court) or the subset of 200 communications involving just Mr. Gendron and Steward's counsel (not other third-party CREF employees). Plaintiff has not carried his burden that Mr. Gendron was both the functional equivalent of a Steward employee and necessary to facilitate legal advice. The Court should therefore overrule Plaintiff's Objection to Discovery Master Order No. 26, and require production of the withheld communications, subject to the existing attorneys' eyes only and clawback protections.

Dated: August 18, 2026

Respectfully submitted,

*/s/Ronald S. Safer*

Ronald S. Safer (pro hac vice)
Amy C. Andrews (pro hac vice)
Abigail L. Peluso (pro hac vice)
Lucas T. Rael (pro hac vice)

RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn Street, Suite 2200
Chicago, Illinois 60603
Tel: (312) 471-8700
rsafer@rshc-law.com
aandrews@rshc-law.com
apeluso@rshc-law.com
lrael@rshc-law.com

Jonathan D. Mutch, Esq. (BBO No. 634543)
Timothy Wenger (BBO No. 674087)
ROBINS KAPLAN LLP
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel: (617) 267-2300
JMutch@RobinsKaplan.com
TWenger@RobinsKaplan.com

Michael Menapace (BBO No. 568841)
Wiggin and Dana, LLP
20 Church Street
Hartford, Connecticut 06103
Telephone: (860) 297-3733
Facsimile: (860) 297-3799
mmenapace@wiggin.com

*Attorneys for Defendants American Guarantee and Liability Insurance Company and Zurich American Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, a copy of the foregoing document was filed with the Court via the ECF filing system. As such, this document will be electronically sent to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

*/s/Ronald S. Safer*