UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARK KRONFELD, as Trustee of the SHC
Creditor Litigation Trust,
Plaintiff,

v. CIVIL ACTION NO. 21-11902-PBS

AMERICAN GUARANTEE AND
LIABILITY INSURANCE COMPANY and
ZURICH AMERICAN INSURANCE COMPANY,

Defendants.

MEMORANDUM AND ORDER ON PLAINTIFF'S
OBJECTION TO DISCOVERY MASTER'S ORDER NO. 25 (#271)

KELLEY, U.S.M.J.

## I. Introduction.

The Plaintiff objects to Order No. 25, in which the Special Master found that three emails were not privileged and cannot be clawed back. This case concerns an insurance coverage dispute that arose after a storm caused significant water damage to Norwood Hospital on June 28, 2020. Steward Healthcare System LLC ("Steward") leased the hospital from Medical Properties Trust, Inc. ("MPT"), which owned the hospital buildings. After the storm, MPT sought recovery from Zurich American Insurance Company ("Zurich"), its insurer, for losses primarily due to damage to the structure and building systems of the hospital. Steward sought recovery from American Guarantee and Liability Insurance Company ("AGLIC"), its insurer, primarily for business personal property, business interruption, and medical equipment losses. (#224 [Discovery Master's Order No. 22] at 10-11.)

Steward made its Initial Claims Submission on December 4, 2020. *Id*. at 11. On February 5, 2021, during the claim adjustment process, Steward served a 93A letter on the Defendants,

together with an Interim Proof of Loss Statement to the insurer. *Id*. Before Steward made a claim and continuing through the adjustment process, AGLIC made payments to Steward. *Id*. During the adjustment of Steward's claim, AGLIC paid Steward over $97 million in insurance proceeds, including over $91 million for business interruption damages through July 15, 2022. (#279 at 2-3.)

On March 11 and 12, 2021, the parties and numerous third-party consultants retained by Steward attended adjustment meetings at Norwood Hospital. (#224 at 11.) The consultants included the recipients of the emails at issue here, namely, Consigli Construction Co., Inc. ("Consigli"), Array Architects, Inc. ("Array"), BR+A (an engineering firm), and National Fire Association ("NFA") (Steward's independent adjuster in this case). (#270 at 1 n.1, #224 at 11, 32.) As the Special Master found, most of the third-parties were first hired to do "actual work planning the site remediation and/or rebuilding of the damaged physical premises and machinery following the flood event; after that initial period of work, certain of them were engaged for litigation consulting at a later date." (#224 at 16.)

In June 2021, MPT unsuccessfully mediated its claim against Zurich. *Id*. at 11. In October 2021, Zurich filed a lawsuit against MPT, seeking declaratory judgment that the damage to the hospital was the result of a "Flood," and was therefore subject to a "Flood Sublimit." *Id*.

In October 2021, Steward submitted an Updated Statement of Loss to AGLIC, and then filed this lawsuit on November 23, 2021, suing both AGLIC and Zurich, AGLIC's parent company (collectively, the "Defendants"), for AGLIC's alleged failure to indemnify Steward. *Id.* at 11.

There was a lengthy delay in the case because in November 2022, it was stayed pending an appeal of the Court's Order that all damage to Norwood Hospital was the result of a "Flood" as defined in the relevant insurance policy. (#51.) Steward filed an interlocutory appeal; the question

of policy interpretation was certified to the Massachusetts Supreme Judicial Court; and in July 2024, the Supreme Judicial Court held that the damage to the hospital was not capped by the "Flood Sublimit" in the policy. (#224 at 11-12.)

In May 2024, Steward declared bankruptcy and in November 2025, District Judge Saris allowed Steward's motion to substitute Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust, in its place as the Plaintiff in this matter. (#172.)

The MPT claim was settled in November 2024.[1] (#224 at 12.)

Discovery in this case began in January 2025. After significant motion practice, the parties agreed to engage a discovery master. *See* ##141, 142. On July 18, 2025, Judge Saris appointed the Honorable Faith S. Hochberg (ret.) as Special Master, giving her authority to "make any order, finding, report or recommendation on any and all discovery and preservation of evidence issues and disputes" that arose. (#149 at 2.)

In order to understand the Special Master's findings in Order No. 25, at issue here, one must consider her findings in an earlier Order, No. 22, from May 2026, in which she considered the "thousands of pages in multiple briefs and extraordinarily voluminous exhibits [submitted by the parties] on the overarching issues of privilege and work product protection for communications involving third-parties." (#224 at 1.) In the Order, she painstakingly analyzed whether communications with the thirteen third-parties who assisted Steward in the insurance claim process and in preparing for litigation in this case were privileged, and at what point in time any privilege

---

[1]As the Special Master found, Steward's and MPT's claims were "inextricable and adjusted together," (#224 at 6), and although the emails at issue here refer to "the ongoing legal efforts related to the MPT claim," and "the MPT/Steward legal teams," (#271-6 at 6 [under seal]), this court, like the Special Master, concludes that Plaintiff has sufficiently established that common-interest protection between MPT and Steward applies to the emails, (#224 at 14, 32), and Steward may assert attorney-client privilege and work product protection with regard to them.

attached. *Id*. at 3-39.

She began the review by considering the Plaintiff's factual support for withholding documents as privileged. *Id*. at 16. She considered whether the consultants were experts whose communications would be privileged under the "derivative privilege" doctrine, citing *United States v. Kovel*, 296 F.2d 918, 922 (2nd Cir. 1961). (#224 at 3, 13, 17.) She found that the declaration of Steward's then in-house counsel, Nathalie Hibble, Esq., submitted in support of Steward's assertion of privilege over communications with the third-parties, was "stunningly bare-bones," as it merely recited the same conclusory sentence repeatedly without any explanation. *Id*. at 16. The Special Master concluded: "The effort of Attorney Hibble to sustain Steward's burden to justify withholding thousands of documents is so thin as to be barely beyond a summary legal conclusion, barren of any of the types of factual explanations found in the caselaw when derivative privilege is claimed." *Id*.

The Special Master went on to review the engagement letters for the third-parties which had been produced by the Plaintiff at her request. *Id* at 16-17. She concluded that Consigli, Array, and BR+A, whose representatives were included on the emails at issue here, were not retained by counsel before April 2022 as non-testifying expert consultants engaged for litigation assistance. In other words, communications with them were not privileged at the time of the emails, which were sent in 2021. *Id*. at 21, 23, 25-6. She found that representatives of NFA, Steward's independent adjuster in this case, who were also included on the emails, might have engaged in privileged communications when communicating directly with outside counsel. *Id*. at 32. She also considered whether communications with employees of CREF, a third-party engaged by Steward, were privileged. While she carved out an exception for communications directly with counsel by one CREF employee, Chris Kidney, who authored the emails at issue here, she found that

communications with CREF employees in general were not privileged. *Id.* at 35-36.

The Plaintiff objected Order No. 22 insofar as it denied privilege protection to the communications of certain high-level employees of CREF. (#237-16 at 8-9 [under seal]).[2] The Plaintiff did not make any argument concerning the Special Master's finding that communications with "Steward's 13 other consultants" were not privileged, but reserved the right to object to the Special Master's conclusions regarding those entities "as those issues crystallize." *Id.* at 19-20.

The Plaintiff provided the emails at issue here pursuant to Order No. 22 to the Defendants on May 29, 2026. (#271 at 11.) The Plaintiff notified the Defendants on June 4, 2026, that it was seeking to claw back the first email and on June 10, 2026, expanded the request to include the two follow-up emails. (#270 at 1.) The Special Master issued "Order No. 25: Clawback Documents," on July 7, 2025, holding that the emails were not protected and could not be clawed back. *Id.* at 11. Plaintiff objected on July 14, 2026 (#271); the Defendants responded on July 28, 2026 (#279). Judge Saris referred the objection to this court. (#276.) After careful consideration under the de novo standard of review, the Plaintiff's objection is overruled and Order No. 25 is adopted by this court.

II. <u>Federal Rule of Civil Procedure 53, "Masters."</u>

Section III, "Review by the Court," of the "Order Appointing the Honorable Faith S. Hochberg as Discovery Master," states that the court's review of any ruling issued by the Discovery Master is to be consistent with the provisions of Fed. R. Civ. P. 53(f). (#149 at 4.)

Rule 53(f), "Action on the Master's Order, Report, or Recommendations[,]" provides, in relevant part, that:

---

[2] Judge Saris denied the objection, except she allowed the Plaintiff to seek to assert privilege over communications involving one high-ranking executive of CREF. (#268 at 14.)

> . . .
>
> (3) *Reviewing Factual Findings.* The court must decide de novo all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that:
>
> (A) the findings will be reviewed for clear error; or
>
> (B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final.[[3]]
>
> (4) *Reviewing Legal Conclusions.* The court must decide de novo all objections to conclusions of law made or recommended by a master.
>
> . . .

Fed. R. Civ. P. 53(f). *See Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*, 512 F. Supp. 3d 196, 238 (D. Mass. 2020) ("deciding de novo" all objections submitted in response to Special Master's findings of fact and conclusions of law) (emphasis in original); *see also* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2612 (3d ed., Westlaw updated Apr. 2026) (objections "must be specific and clearly identify a factual or legal error in the report and recommendation.").

III. Applicable Law.

1. Work Product Protection.

The work product doctrine was first articulated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947) and is codified in Fed. R. Civ. P. 26(b)(3). A document is protected if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation." *State v. Maine v. U.S. Dept. of Interior,* 298 F.3d 60, 68 (1st Cir. 2002) (emphasis in original). It encompasses documents prepared by a party, their attorney or their representative. *In re Grand Jury Subpoena*,

---

[3] The parties have made no such stipulation.

220 F.R.D. 130, 141 (D. Mass. 2004). The doctrine does not protect documents that are prepared in the ordinary course of business or that would have been prepared irrespective of litigation. *State of Maine,* 298 F.3d at 70. Work product protection is not waived if it is merely produced to a third party, rather, it is waived if the documents "are used in a manner contrary to the doctrine's purpose[,]" for example, where disclosure is made to an adversary. *Bryan Corp. v. ChemWerth, Inc.*, 296 F.R.D. 31, 40 (D. Mass. 2013). The party seeking work product protection has the burden of establishing that it applies. *In re Grand Jury,* 220 F.R.D. at 140.

Courts distinguish between "opinion" work product, that is, materials which contain "the mental impressions, conclusions, opinion, or legal theories of an attorney," and "ordinary" work product, which includes everything else that is eligible for protection as work product. *In re Grand Jury*, 220 F.R.D. at 144. Opinion work product is afforded greater protection than ordinary work product. *Id*. at 144-145

Fed. R. Evid. 26(b)(3) permits discovery of ordinary work product when a party "has substantial need for the materials and cannot obtain, without undue hardship, their substantial equivalent by other means." *Doe v. Lahey Health System, Inc.*, 2020 WL 13561720, at *3 (D. Mass. Aug. 12, 2020) (citing Fed. R. Civ. P. 26(b)(3)(A)). "The meaning of 'substantial need' is not well-developed." *Id. at* *3 (citing *F.T.C. v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 154 (D.C. Cir. 2015 (collecting cases)). "At minimum, the term implies a standard elevated from that of mere discoverability: some 'special showing' of a unique quality must be present." *Id.* (citing Fed. R. Civ. P. 26(b)(3) advisory committee notes) (other citations omitted).

"Opinion work product ... falls under a 'near absolute' protection from disclosure." *Roy v. FedEx Ground Package Sys., Inc.* Case No. 3:17-cv-30116-KAR, 2023 WL 7116755, at *3 (D.

Mass. Oct. 27, 2023) (quoting *United States v. Cadden*, Criminal Action No. 14-10363-RGS, 2015 WL 5737144, at *2 (D. Mass. Sept. 30, 2015) (citation omitted)).

2. Attorney-Client Privilege.

In brief, the attorney-client privilege protects communications made in confidence between an attorney and a client for the purpose of obtaining legal advice, unless the privilege is waived. *United States v. Joint Active Systems, Inc.,* 19-mc-91053-ADB, 2020 WL 9747574, at *3 (D. Mass. Apr. 28, 2020) (citing *In re Grand Jury Subpoena Custodian of Records, Newparent, Inc.*, 274 F.3d 563, 571 (1st Cir. 2001)) (other citation omitted). In Order No. 22, the Special Master applied the "functional equivalent" doctrine in deciding whether communications with Chris Kidney, who worked for CREF, were privileged. (#224 at 13.) When a client is a corporation, the attorney-client privilege protects communications seeking or providing legal advice between the corporation's employees and counsel. *Id*. (citing *U.S. ex. rel. Long v. Janssen Biotech, Inc.*, 788 F. Supp. 3d 167, 170 (D. Mass. 2025)). When an outside consultant to a business is the "functional equivalent" of an employee of the business and plays an important role in the business's obtaining legal advice from an attorney, the attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant is involved in those communications.[4] (#224 at 13) (citing *America's Test Kitchen, Inc. v. Kimball et al.*, 35 Mass. L. Rptr. 75, 2018 WL 2049490, at *2. (Mass. Super. Ct. Apr. 2, 2018).

---

[4] The "functional equivalent" doctrine has not been addressed by any appellate court in Massachusetts. In *Long*, 788 F. Supp. 3d at 171, District Judge Saylor, noted that the First Circuit has not adopted the functional-equivalent doctrine, nevertheless assumed that "under certain circumstances, third-party agents may essentially operate as employees, and that the disclosure to them of otherwise-privileged communications will not waive the privilege." *Id.* (citing *Lynx System Developers, Inc. v. Zebra Enterprise Solutions Corp.*, 15-cv-12297-GAO, 2018 WL 1532614, at *4 (D. Mass. March 18, 2018)). This court agrees with the Special Master that the "functional equivalent" doctrine applies to certain of Chris Kidney's communications in the circumstances presented here.

IV. Order No. 25 (#270).

A. Facts.

The first email in dispute is dated July 14, 2021; the two follow-up emails are dated July 18 and July 26, 2021. (#270 at 1.) As noted above, Chris Kidney, who was Senior Director of Emergency Project Management at CREF, sent the emails. (#271-6 [under seal].) CREF is a real estate development and facilities manager that is a separate company from Steward, but which, as the Special Master noted, "interestingly" was 40% owned by Steward's former CEO. (#224 at 34.) "Plaintiff describes CREF as the equivalent of Steward's corporate real estate division, except that Norwood Hospital does not employ the CREF employees. Instead, it pays CREF for their work. CREF employees interacted regularly with defendants and their agents during the claim submission and adjustment process." *Id*. The Special Master found that Mr. Kidney's role at CREF, which was like that of a corporate management executive, made him a "functional employee" of Steward in certain narrow circumstances, that is, his status as a third-party would not destroy privilege if he was included on a communication that was otherwise privileged, such as one between lawyers. *Id*. at 35.

Mr. Kidney sent the three emails at issue here to thirteen people and copied two others. Most of the recipients worked for Steward's construction and engineering vendors such as Steward's contractor NFA, Steward's architectural contractor Array, Steward's construction contractor Consigli, and Steward's engineering contractor BR+A. In addition, two CREF employees, and Nathalie Hibble, Steward's in-house attorney, received the emails. (#270 at 1 n.1.) Todd & Weld represented Steward at the time and no attorneys from that firm were copied. *Id*.

The emails are attached to Plaintiff's objection. *See* #271-6 [under seal]. The gist of the first email is that Mr. Kidney had just had a call with the "MPT/Steward Legal Teams" who wanted

"deliverables" from the consultants, to "advance next steps with the ongoing legal efforts related to the MPT claim." *Id.* at 6. The MPT attorneys were looking for "a greater accuracy in the cost model tied to what we know today and additionally causation issues." *Id.* The "Consigli As-Was and Code Estimates" needed to be updated, as the attorneys "want[ed] to prove the loss based on facts not assumptions." *Id.* The "legal team" was asking the consultants "what it would take to get the Estimate to a defensible position, both time and cost." *Id.* Mr. Kidney then listed what the consultants would need to do to provide "the deliverable." *Id*. The other two emails followed up on this first one. *See id*. at 5-6.

As stated above, the Plaintiff provided the emails pursuant to Order No. 22 on May 29, 2026, and sought to claw the first one back six days later, on June 4, 2026. (#271 at 11.) The Plaintiff argues Mr. Kidney's out-going emails are work product and are also protected by the attorney-client privilege. (#271 at 1.) There is no claim of privilege as to the responses to the emails.

Many copies of the emails were previously produced in this litigation well before the Plaintiff's production on May 29, 2026. Consigli produced 44 copies of the emails in November 2025; BR+A produced two copies in January 2026; and NFA produced 35 copies in March 2026. (#279 at 5, #270 at 2, 6.)

2. Legal Analysis.

The Special Master applied the factors delineated in *Amgen Inc. v. Hoechst Marion Roussel, Inc*, 190 F.R.D. 287, 291 (D. Mass. 2000) that a court should consider in deciding whether inadvertent disclosure constitutes waiver of privilege: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to

recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, (5) the overriding interest of fairness and justice."

First, the Special Master found that the precautions Plaintiff took to prevent inadvertent disclosure were not reasonable. (#270 at 3.) It took the Plaintiff four months to notice that Consigli had produced 44 copies of the emails, and it did so only on the eve of Consigli's 30(b)(6) deposition. *Id*. The Special Master noted that this was not a case where the Plaintiff was unaware of privilege concerns with regard to Consigli's production; to the contrary, the Plaintiff specifically instructed Consigli to withhold documents on that basis and Consigli's disclosures were the subject of disputes aired with the Discovery Master. *Id*. at 4.

The Discovery Master found that the Plaintiff took too long to discover the error. *Id.* at 5 ("[T]here is no justifiable basis for waiting four months to notice any of the over 50 copies of these emails that were produced by multiple third-party vendors."). She further questioned whether the disclosure was "inadvertent" where so many duplicates of the emails were produced. *Id.* at 6. In short, the Special Master found that the Plaintiff did not meet its burden of proof on *Amgen* factors (1), (2) and (4). (#270 at 5.)

The Special Master also questioned whether the first email even was work product, that is, whether it could be said to have been created because of the prospect of litigation, where it clearly evidenced Steward's ongoing effort, in collaboration with its vendors, to supplement its insurance claim, rather than seeking or providing legal advice or direction. *Id*. at 7-8. She noted that the emails were sent shortly after an unsuccessful June 22, 2021, mediation session between the parties, at a time when the Plaintiff was focused on the insurance claim adjustment process and the assessment of the insurance loss. *Id*. That effort continued for many months and litigation did not commence until October of that year. *Id*. Thus, the Special Master found, the emails would have

been sent anyway, because Steward would have asked its contractors to base their input into the insurance proof of loss on "facts not assumptions" whether litigation was anticipated or not. *Id*. at 8. The responses to the emails, where the third parties set out budgets and schedules for the rebuilding of the hospital, reinforced this conclusion. *Id*.

The second and third emails could not be said to be work product because "these documents convey no mention of lawyers and are mere follow-ups about the cost and schedule information that the contractors were to provide." *Id*. at 9.

Finally, the Special Master found that even if the emails were prepared in anticipation of litigation and the Plaintiff had met its burden to claim work product protection, the Defendants have a substantial need for them and are entitled to them under Fed. R. Civ. P. 26(b)(3)(A), since the Defendants must rebut a claim of "bad faith" in the insurance adjustment process based on Stewards' alleged actions during the claim adjustment period. (#270 at 9.) The emails are relevant to this effort; and the Defendant can only access them through discovery. *Id*. at 9.

The Special Master concluded that the emails are not protected by the attorney-client privilege because they were not written for the purpose of obtaining or providing legal advice. *Id*. at 10. Rather, "the July 14 email is a communication among Steward's third-party contractors, including Mr. Kidney's employer CREF, about improving the accuracy of their insurance claim submission, and ensuring that it is made based upon facts and not assumptions." *Id*. Because the privilege does not protect disclosure of underlying facts communicated to an attorney, and because there is no claim that the responses, which consist of facts concerning the insurance claim submission, are privileged, "the issue in this clawback motion is solely whether the outgoing request from Mr. Kidney to elicit facts meets the criteria to be attorney-client privileged." *Id*. The Special Master found that it did not. *Id*. Finally, she noted that none of the vendors'

communications with Steward were privileged at the time of the emails: "A vendor is not an agent of the entity who asks it to do work." *Id*.

The fact that in-house counsel Ms. Hibble was copied on the emails did not mean the emails were privileged, because, as the Special Master found in prior Orders, Ms. Hibble routinely was copied on emails at the direction of Mr. Kidney, whether communications were privileged or not. *Id*. at 8.

V. <u>The Plaintiff's Objection</u>.

A. <u>Amgen Factors</u>.

To repeat, the Special Master found that, assuming that the documents were privileged, the Plaintiff had failed to meet its burden under *Amgen* to demonstrate by a preponderance of the evidence that the documents should retain their privileged status. (#270 at 6.) She found that the Plaintiff had not met its burden on "the reasonableness of the precautions taken to prevent inadvertent disclosure," "the amount of time it took the producing party to recognize its error," and "the extent of the inadvertent disclosure." *Id*. at 3, 5 (citing *Amgen*, 190 F.R.D. at 291). The Plaintiff challenges this finding (#271 at 12-13), but this court agrees with the Special Master's analysis.

First, contrary to the Plaintiff's assertion that it took the Plaintiff only four days to realize the emails had been produced, the production of numerous copies of the emails by Consigli and two other consultants months before the Plaintiff produced the email started the clock running on the timing analysis. *See United States ex rel. Omni Healthcare, Inc. v. MD Spine Solutions LLC*, 736 F. Supp. 3d 75, 84 (D. Mass. June 7, 2024) (holding that party's argument that it acted promptly to claw back documents five days after learning about disclosure "d[id] little to explain" the lengthy delay before the attempted clawback).

The production of the emails by Consigli in November 2025 is the correct starting point for the analysis because the Plaintiff was on notice that Consigli's discovery should be reviewed for privilege. As the Special Master found, "Privilege claims and disputes pertaining to the Consigli documents were ever-present in the discovery disputes in this case." (#270 at 4 & n.2) The Special Master cited a letter from the Plaintiff to Consigli dated March 17, 2025, instructing Consigli that any materials prepared after February 2021 were protected from disclosure, which of course signifies that the Plaintiff thought that Consigli was in possession of privileged documents and was concerned enough about their disclosure to notify Consigli in writing not to produce them. *Id*. In addition, as the Special Master noted, arguments about these instructions to Consigli were made at a hearing in October 2025, after which the Discovery Master entered Order No. 4 (#158), ordering Consigli to produce certain documents to the Defendants. (#270 at 4.) The Special Master cited other motions and arguments made by the parties about Consigli's productions. *Id*. at 4-5 & n.5-6. Her conclusion that "[t]his history was more than sufficient to alert Plaintiff to the importance of reviewing Consigli's November 2025 production to Defendants" is well-supported by the record. *Id*. at 5.

In addition, the Special Master's finding that the precautions taken to prevent disclosure were not reasonable is clearly correct. Her finding is based on the number of emails produced over time and the length of time that Steward took to try to claw them back, but this court also notes the Plaintiff's failure to explain at all what precautions it took to prevent the disclosure. Indeed, Consigli, two other consultants, and then the Plaintiff produced this email, over 50 times in total. One may draw the inference that when the emails were reviewed for privilege, multiple reviewers concluded that they were not privileged, just as the Special Master did.

B. Work Product Protection.

The Plaintiff states that the Special Master erred because the Order "asserts that the Three Emails could not have been written in anticipation of litigation because a mediation had failed in late June 2020." (#271 at 3.) The first problem with this argument is that the Order does not say this. The Special Master correctly noted that mediation between the parties ended unsuccessfully on June 22, 2021, and the first email issued shortly after, on July 21. (#270 at 7.) She found that after the failed mediation session, "the parties returned with their full attention to the insurance claim adjustment process and the assessment of the insurance loss." *Id*. She concluded that in light of what the emails said and the factual situation in this case, "it is not at all clear that Plaintiff has fairly shown that the July 14 Email was created 'because of the prospect of litigation.'" *Id*. (citing *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 144 F.R.D. 600, 605 (D. Mass. 1992)).

The Plaintiff asserts that litigation was more, not less likely, after the mediation failed. (#271 at 3.) Certainly it is true that after a failed mediation, a legal team might start to prepare for litigation. Here, however, the emails themselves make clear that the focus of the effort was to straighten out the insurance claim, which obviously needed to be revised. As the Defendants point out, when Consigli "revisited its as-was repair cost estimate, it cut the cost of the estimate from approximately $180 million to approximately $78 million." (#279 at 4.) This court agrees with the Special Master that at the time of the emails the team was focused on the insurance claim adjustment process and the assessment of the insurance loss. (#270 at 7.) Mr. Kidney clearly conveys this purpose in the first email (#271-6 at 6-7 [under seal]), and the answers to the emails reinforce the inference. Thus the emails were not prepared "because of" the prospect of litigation.

The Plaintiff also argues that it was not within Steward's "ordinary business operations" to create the emails, because Steward was "in the business of running hospitals, not supporting" insurance claims. (#271 at 5-7.) This argument borders on the absurd. Steward beyond question

had an insurance claim to make and necessarily had to support it with "facts, not assumptions" about its losses. Given the size of the claim, Steward would have had a legal team involved in the claims process whether litigation was imminent or not. The magnitude of the loss in this matter made it particularly important for Steward to get its loss figures in order, which they clearly were not at the time of the emails.

The Plaintiff asserts that the emails constitute "opinion work product" because they "reveal[] the MPT and Steward legal teams' mental impressions and thoughts on the information they believed was important and necessary for litigating the case." (#271 at 7-8.) But as the Special Master found, the emails expressed purpose ties back to the insurance claim submission and "does not significantly help Plaintiff meet its burden of proof to show work product privilege; these statements are more indictive of the ongoing effort by Steward, in collaboration with its vendors, to supplement its insurance claim Proof of Loss statement with defensible positions in seeking the insurance claim payout." (#270 at 8.) The fact that the first email references a meeting Mr. Kidney had with the "MPT/Steward Legal Teams" and states that the lawyers want to "advance next steps with the ongoing legal efforts related to the MPT claim" does not alter the overall thrust of the email, which is to ask thirteen people working for several third-party consultants to revise cost estimates. (#271-6 at 6 [under seal].) Even if the email communicates a message from the attorneys, namely, that the estimates needed to be revised to prove the loss "based on facts not assumptions[,]" that message does not merit opinion work product protection. *Id.*; *see San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1015 (1st Cir. 1988) ("[N]ot every item which may reveal some inkling of a lawyer's mental impressions, conclusions, opinions, or legal theories is protected as opinion work product. Were the doctrine to sweep so massively, the exception would hungrily swallow up the rule.").

This court also agrees with the Special Master's finding that even if a "colorable claim" could be made that the emails were ordinary work product and entitled to protection, they still would be discoverable because the Defendants could only acquire the information in them through the discovery process and the Defendants have a substantial need for them. (#270 at 9.) The court disagrees with the Plaintiff that the emails "are ***not*** essential to any disputed issue in this case." (emphasis in original). (#271 at 9.) The emails bear directly on whether, as the Plaintiff claims, the Defendants engaged in "bad faith" in the insurance adjustment claims process by deliberately "slow-walking" the claims. (#270 at 9.) The Special Master correctly found that these emails are "directly probative of [the] factual dispute" between the parties as to whether the claim was processed improperly slowly or "whether the revised insurance claim submission based on 'fact, not assumptions,' was a factor in the timeline of the claims processing." *Id*. The Plaintiff's statement that the Defendants could find this information out in depositions (#271 at 9) is wrong. As the Defendants state, "Deposition testimony is no substitute for the contemporaneous written instructions that both kicked off the consultants' revised work and explained why it was needed." (#279 at 13.)

Finally, even if one were to find that the materials here were protected as opinion work product, the Plaintiff waived that privilege. Opinion work product waiver occurs "when documents are used in a manner contrary to the doctrine's purpose, when disclosure substantially increases the opportunity for potential adversaries to obtain the information." *Murphy v. Harmatz*, 13-cv-12839-MAP, 2016 WL 7104831, at *6 (D. Mass. Dec. 5, 2016) (internal quotation marks omitted) (quoting *Bryan Corp.*, 296 F.R.D. at 40). By sending the email to thirteen people who were not protected by privilege, Mr. Kidney greatly increased the Defendant's chances of discovering them, which in fact they did, multiple times.

VI. The Attorney-Client Privilege.

In arguing that the emails are protected by the attorney-client privilege, the Plaintiff completely ignores the fact that in Order No. 22, the Special Master found that at the time of the emails, the consultants who were copied on the emails did not have a relationship with the Plaintiff such that communications with them were privileged. *See* #224 at 21, 23, 25-6; *Long*, 788 F. Supp. 3d at 171 ("The inclusion of external consultants, marketing agents, and advisors on emails—even those containing otherwise-privileged communication—will normally amount to a waiver of the attorney-client privilege as to those documents."). To be clear, the Plaintiff bears the burden to show that the emails are privileged and that the privilege has not been waived. *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2023). The proof must consist of competent evidence, not conclusory statements or generalized assertions. *Woods Hole Oceanographic Institution v. ATS Specialized, Inc.*, Civ. Action No. 17-12301-NMG, 2022 WL 18028105, at *3 (D. Mass. May 17, 2022) (citing *Precision Airmotive Corp. v. Ryan Ins. Servs, Inc.*, No. 2:10-mc-244-HJR, 2011 WL 148818, at *8 (D. Me. Jan. 17, 2011)). If a party fails to "adduce sufficient facts to permit the court to conclude with reasonable certainty that the privilege applies, its burden is not met." *Woods Hole Oceanographic*, 2022 WL 18028105, at *3 (quoting *Precision Airmotive*, 2011 WL 148818, at *8).

As explained above, in Order No. 22, the Special Master found that the Plaintiff did next to nothing to carry its burden to establish privilege protection over communications with the vendors in question here. (#224 at 16-17.) She had to request the agreements with the vendors, as the Plaintiff had not provided them to her, and she reviewed the agreement each vendor had with Steward in an effort to understand whether there was privilege protection afforded to them, and at what point in time any protection was in force. *Id.* at 17. The Plaintiff objected to that Order on the

basis of her findings related to CREF but made no argument concerning the privilege as applied to communications with any of the other consultants, “reserv[ing] the right to further object to the Special Master’s conclusions “as those issues crystallize.” (#237-16 at 19-20 [under seal].) Those issues have crystallized now. Once again, the Plaintiff has failed to meet its burden to show that communications with the consultants who received the emails were privileged.

## VII. Conclusion.

For the above reasons, the Court overrules Kronfeld’s objection and adopts Discovery Master Order No. 25 (#271) in its entirety.

August 28, 2026

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge