**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 1:21-cv-11902 – PBS |

**PLAINTIFF'S OBJECTION TO MAGISTRATE'S ORDER ADOPTING DISCOVERY MASTER ORDER NO. 26 (ECF NO. 297)**

Plaintiff Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust, respectfully objects to the Magistrate Judge's Order dated August 28, 2026 (ECF No. 297) (the "**Magistrate Order**"), which overruled Plaintiff's Objection to Discovery Master Order No. 26 (ECF No. 285) and adopted the Discovery Master's findings in Order No. 26 (ECF No. 281). The Magistrate Order is contrary to law because it erroneously strips attorney-client privilege from more than 1,700 communications between Steward and its counsel on the ground that Robert Gendron—the CEO of CREF, the company that served as Steward's functional real estate department—is not a "functional equivalent" of a Steward employee. That conclusion was legally and factually wrong when made by the Discovery Master, and it remains wrong now. For the reasons set forth below and in Plaintiff's prior briefing, the Magistrate Order should be reversed.

## I. FACTUAL & PROCEDURAL BACKGROUND

This dispute arises from a series of discovery rulings concerning Plaintiff's privilege assertions over communications involving CREF, a third-party company that served as Steward's functional internal real estate department. The sequence of briefing and rulings leading to Order No. 26 is summarized below.

**A. Order No. 22 and the CREF Privilege Dispute.**

On May 14, 2026, Discovery Master Hochberg issued Order No. 22 (ECF No. 224), a 39-page ruling that addressed disputes over the withholding of communications involving thirteen third-party consultants, including CREF. Order No. 22 ruled on a consultant-by-consultant basis and imposed different requirements for each. As relevant here, Section IV(B) of Order No. 22 addressed privilege assertions for communications involving CREF employees. The Discovery Master found that CREF employee Christopher Kidney qualified as a "functional equivalent" of a Steward employee because he "acted 'in a high-level, trusted decision-making or guiding role,'" "maintained [a] steward.org email address[]," and "regularly worked in collaboration with Steward employees and counsel." Order No. 22 at 35. However, the Discovery Master declined to extend the same status to Robert Gendron, CREF's CEO, finding that Plaintiff had not made an adequate showing as to him at that time. Order No. 22 at 35–36.

**B. Plaintiff's Objection and This Court's Ruling.**

On May 29, 2026, Plaintiff filed an objection to Section IV(B) of Order No. 22, challenging the exclusion of senior CREF employees—most notably Robert Gendron—from functional equivalent status. On June 26, 2026, this Court held a hearing on Plaintiff's objection. The Court affirmed Order No. 22 but expressly permitted Plaintiff to "move to reconsider on Gendron." Tr. of Mot. Hr'g at 10:18. The Court specifically distinguished direct Gendron/Kidney/counsel communications, stating that "if it's just with Kidney and Gendron" and counsel, those communications "don't need to be produced" subject to the Discovery Master deciding whether Gendron qualifies. *Id.* at 14:11–14. The Court also directed that documents being produced subject to clawback be produced as Attorneys' Eyes Only. *See* Decl. of Yonah Jaffe in Support of Plaintiff's Objection to Discovery Master Order No. 26 ¶ 8, Dkt. 285-1 ("**Jaffe Decl.**").

On July 13, 2026, Plaintiff filed a motion for reconsideration with the Discovery Master, supported by extensive evidence demonstrating that Gendron satisfies every criterion the Discovery Master applied to Kidney in granting functional equivalent status. Jaffe Decl. ¶ 9; *see*

*also* Ex. 1 to Objection, Dkt. 286.[1] Defendants filed their opposition on July 24, 2026. Jaffe Decl. ¶ 14.

**C. Order No. 26.**

On August 4, 2026, the Discovery Master issued Order No. 26 (ECF No. 281), denying Plaintiff's motion for reconsideration. Order No. 26 concluded that Gendron "is not a 'functional employee'" and that "[d]isclosure of purported attorney-client communications to Mr. Gendron shall be treated as disclosures to a third party, which is what he was." Order No. 26 at 7, Dkt. 281. Order No. 26 required Plaintiff to produce, subject to clawback, 1,749 withheld communications involving Gendron "regardless of whether Mr. Kidney or an attorney is on the communication." *Id.* at 7. Order No. 26 further directed that communications involving Kidney could only be withheld if "only Mr. Kidney and Todd & Weld and/or Foley Hoag attorneys are on the email"—meaning that if any other CREF personnel or any third-party consultant appeared on the communication, it must be produced, even if the communication was otherwise between Steward and its attorneys seeking or providing legal advice. Order No. 26 set a production deadline of August 7, 2026—three days after issuance and four days before the seven-day objection period expired under the Order Appointing the Discovery Master.

**D. Plaintiff's Emergency Motion to Stay.**

On August 6, 2026, Plaintiff filed an Emergency Motion to Stay Order No. 26 (ECF No. 282), which specifically sought a stay of Plaintiff's compliance with Order No. 26. This Court allowed the stay that same day and directed that Plaintiff's objection be filed by August 11, 2026. *See* Order Allowing Pl.'s Emergency Mot. to Stay Order No. 26 (ECF No. 284). On August 11, 2026, Plaintiff filed its Objection to Discovery Master Order No. 26 (ECF No. 285).

---

[1] Exhibit 1 to Objection (ECF No. 286) is Plaintiff's motion for reconsideration and the attached Exhibits A through L, filed with the Discovery Master on July 13, 2026. Jaffe Decl. ¶ 3. Citations to Exhibits A through L herein refer to those exhibits. *See* Ex. 1 to Objection, Dkt. 286.

### E. The Magistrate Order.

On August 28, 2026, Magistrate Judge M. Page Kelley entered the Magistrate Order (ECF No. 297), an electronic order overruling Plaintiff's Objection to Discovery Master Order No. 26 and adopting the Discovery Master's findings "after de novo review." The Magistrate Order states, in relevant part:

> The court need not repeat in detail the Discovery Master's well-founded findings which rely heavily on previous Orders upheld by this court. Her finding that communications including Robert Gendron, CEO of third-party consultant CREF, are not privileged under the "functional equivalent" doctrine are unassailable and will not be disturbed. As she found, there is a contemporaneous document between Gendron and Steward that "explicitly disclaims that Gendron's or CREF's role" creates any relationship between the two companies that would warrant the application of the "functional equivalent" doctrine; Gendron himself testified that he did not have the type of high-level decision-making authority that would warrant such a designation; Gendron was not in an employee or agency relationship with Steward; and he was at all times acting as an owner of CREF in its role as a consultant to Steward in connection with the clean-up, design, and rebuild planning of Norwood Hospital after the storm. In short, the Special Master's order that "there shall be no blanket withholding of the Gendron communications, nor selective withholding based on the 'functional equivalent' or any other grounds," [281] at 7, is upheld. The Gendron documents must be produced forthwith and not later than September 7, 2026.

Plaintiff produced the documents in accordance with the Magistrate Order. This objection follows.

## II. STANDARD OF REVIEW

The Court reviews the Magistrate Judge's Order under the "clearly erroneous or contrary to law" standard. *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court is left with the "definite and firm conviction that a mistake has been made." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). An order is "contrary to law" if it fails to apply or misapplies relevant statutes, case law, or rules of procedure. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 91 (3d Cir. 1992). Where a district court's review "turns on a pure question of law, that review is plenary under the 'contrary to law' branch of the Rule 72(a) standard." *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010) (collecting authority). Indeed, "for questions of law, there is no practical

difference between review under Rule 72(a)'s 'contrary to law' standard and review under Rule 72(b)'s de novo standard." *Id.*

Where a privilege ruling "largely turns on a legal question," review is de novo. *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 22 (1st Cir. 2011). Because the assertion of attorney-client privilege "involves both law and law-application issues," a challenge to the scope or application of the privilege presents strictly legal questions that are reviewed de novo. *In re Grand Jury Proc.*, 417 F.3d 18, 21 (1st Cir. 2005). Neither the Magistrate Judge nor the Discovery Master is owed deference on legal conclusions—including the application of the functional-equivalent doctrine to the undisputed facts.

## III. <u>ARGUMENT</u>

The Magistrate Order should be reversed. The functional-equivalent doctrine preserves privilege where a non-employee plays an integral role in the client's receipt of legal advice, and the undisputed record establishes that Gendron—Kidney's superior, and the executive Steward entrusted with the Norwood loss—satisfies every criterion the Discovery Master applied to Kidney, and more. Neither the Discovery Master nor the Magistrate Judge applied that standard. Order No. 26 treated CREF's formal contractor status as dispositive, ignored or mischaracterized the undisputed record, and converted (unfounded) concerns about over-withholding into a categorical waiver of privilege; the Magistrate Order then adopted those findings in a summary electronic order that never addressed Plaintiff's arguments or the evidence supporting them.

### A. The Functional Equivalence Doctrine Preserves Attorney-Client Privilege Where a Client's Agent Is Integral to the Rendering of Legal Advice.

The functional-equivalent doctrine stems from the Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383, 392 (1981), which recognized that a corporation's attorney-client privilege must protect the communications between the corporation's employees and the "attorneys seeking to render legal advice to the client corporation."

Building on that principle, the Eighth Circuit in *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994), extended the corporate attorney-client privilege to communications between a company's

counsel and a non-employee—an independent contractor, consultant, or other agent—who, because of the person's relationship to the company, is "in all relevant respects the functional equivalent of an employee." The court reasoned that, "just as '[m]iddle-level—and indeed lower-level—employees . . . would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to . . . actual or potential difficulties,' so too would nonemployees who possess a 'significant relationship to the [client] and the [client]'s involvement in the transaction that is the subject of legal services.'" *Id.* (first quoting *Upjohn*, 449 U.S. at 391; and then quoting John E. Sexton, *A Post-Upjohn Consideration of the Corporate Attorney–Client Privilege*, 57 N.Y.U. L. Rev. 443, 498 (1982)) (alterations in original). Accordingly, using too narrow a definition of "representative of the client" would prevent counsel from "confer[ring] confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Id.* The Eighth Circuit held that "when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors" where the "communications in question [fall] within the scope of [their] duties, were made at the behest of [their] superior, and were made for the purpose of seeking legal advice" for the client. *Id.* at 938–40.

Other federal courts of appeals have since adopted the functional-equivalent doctrine. *See United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010) ("We find the reasoning in *Bieter* persuasive and adopt its principles in the Ninth Circuit."); *F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (extending attorney-client privilege protections to client's "public relations and government affair consultants"). And several district courts have applied it even where the test has not been formally adopted in their circuits. *See Dialysis Clinic, Inc. v. Medley*, 567 S.W.3d 314, 320–23 (Tenn. 2019) (collecting cases). Notably, no circuit has rejected the

functional-equivalent doctrine.[2] *See, e.g.*, *Walsh v. CSG Partners, LLC*, 544 F. Supp. 3d 389, 392 (S.D.N.Y. 2021) (explaining that the Second Circuit "has not yet adopted" the functional-equivalent doctrine); *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 457 n.2 (E.D. Pa. 2012) (noting that the "Third Circuit has not yet had the opportunity to address" the functional-equivalent doctrine).

While the Massachusetts Supreme Judicial Court has yet to explicitly adopt the functional-equivalent doctrine, several Massachusetts courts have applied the doctrine or its logic. In *America's Test Kitchen, Inc. v. Kimball*, No. 1684CV03325BLS2, 2018 WL 2049490 (Mass. Super. Apr. 2, 2018), the court "agree[d] with the legal premises" of the functional equivalent doctrine, finding that it "necessarily follows from the general principle that the privilege encompasses confidential communications 'made to or shared with necessary agents of the attorney or the client.'" *Id.*, at *1–2 (quoting *Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc.*, 449 Mass. 609, 616 (2007)); *see also One Ledgemont LLC v. Town of Lexington Zoning Bd. of Appeal*s, No. 13 PS 477585(GHP), 2014 WL 2854788, at *2 (Mass. Land Ct. June 23, 2014) ("While this functional equivalent analysis is not yet chiseled deeply into the decisions of Massachusetts' appellate courts, there is good reason to conclude that our Supreme Judicial Court, if and when presented with the occasion, would apply and follow this line of Federal Court jurisprudence.").[3] Accordingly, for purposes of applying the attorney-client privilege, an individual consultant who "plays a 'pivotal role' in matters as to which the business obtains legal advice from an attorney" is a "functional equivalent of an employee" of the client corporation, and "the attorney-client privilege protecting communications between the business and its counsel is not lost merely because the consultant is

[2] Order No. 26 references—without citation—a "First Circuit[] ruling that it does not validate [the functional-equivalent] doctrine." Order No. 26 at 2. Plaintiff is not aware of any such First Circuit decision.

[3] In the June 26 Ruling, although the Court acknowledged that there are no precedential First Circuit cases adopting the functional equivalent doctrine, the Court nevertheless found Justice Salinger's opinion in *America's Test Kitchen* particularly persuasive, describing the decision as "thoughtful" and "really well done." *See* June 26, 2026 Hr'g Tr. at 6:14–17, 25; 9:2–3.

involved in, copied on, or becomes privy to those communications." *America's Test Kitchen*, 2018 WL 2049490, at *2 (citation omitted).

To determine whether a third-party contractor meets the requirements of the functional-equivalent doctrine, courts consider several factors that ask whether the consultant acted "in a high-level, trusted decision-making or guiding role" for the corporate client. *Id.*; *see also Burke v. Gen. Hosp. Corp.*, No. 1784CV02876, 2019 WL 6197040, at *8 (Mass. Super. May 3, 2019) (listing factors courts consider supportive of the application of the functional equivalence doctrine, including a consultant "having a long involvement with the client's business"; "being a key decision leader for the client"; "having authority to make decisions and statements on the client's behalf"; and "conferring frequently with the client and/or its attorneys"); *see also* Order No. 22 at 35 (considering whether the employee: "acted 'in a high-level, trusted decision-making or guiding role'"; "maintained [a] steward.org email address[]"; and "regularly worked in collaboration with Steward employees and counsel" (quoting *America's Test Kitchen*, 2018 WL 2049490, at *2)).

**B. On De Novo Review, Gendron Satisfies the Functional-Equivalent Doctrine.**

Because the Court reviews the legal conclusions underlying the Magistrate Order de novo, it should independently determine whether Gendron functioned, in the relevant matters, in a high-level, trusted decision-making or guiding role equivalent to that of a Steward employee. The record confirms that he did: as CREF's CEO, Gendron occupied a high-level, trusted role, worked regularly and directly with Steward's employees and counsel, and served as a key decision-maker and adviser to Steward.

**1. Gendron's decade-long relationship with Steward.**

Gendron is exactly the kind of high-level, highly trusted agent the functional equivalence doctrine contemplates. He met Ralph de la Torre, Steward's CEO, in or around late 2010, when GenCon (his prior company) was hired to build de la Torre's Cape Cod residence. Ex. B at 53:6–12. From 2012 to 2016, Steward hired GenCon to complete a "series of projects" at Steward's Massachusetts hospitals. *Id.* at 54:2–6. So, by the time Gendron founded CREF in 2016, he had already been working closely with Steward and its CEO for years. *See Burke*, 2019 WL 6197040,

at *8 (listing "having a long involvement with the client's business" as a factor supporting functional equivalence status). Notably, Gendron, as CREF's CEO, sat "at the top of the [CREF corporate] tree," including above Christopher Kidney, to whom functional-equivalent status applies. Ex. B at 115:6–12 (confirming Gendron "do[es]n't report to anyone within CREF" because he is the CEO); *see also* Ex. C.

In 2018, Steward and CREF executed a "lift-out" strategy by which Steward outsourced all of its real estate and facilities management functions to CREF, with Gendron serving as the "client executive in charge" of the Steward account until 2021 or 2022. Ex. B at 74:9–76:13, 106:14–23, 117:8–9; Ex. D at 6:10–16 ("Steward has outsourced its Capital Project Management to CREF."). As a result, Gendron managed "all of Steward's [real estate] holdings system wide, nationally and internationally." Ex. E. The fact that Gendron was the head of Steward's "major real estate arm," June 26, 2026 Hr'g Tr. at 8:17–20, and that Steward did not have an internal real estate and facilities management department after the lift-out supports application of the functional-equivalent doctrine to Gendron, *see, e.g.*, *Dialysis Clinic, Inc.*, 567 S.W.3d at 325 (holding that functional-equivalent doctrine applies to third-party property manager where it "operated as the 'property management department'" of the client corporation); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 215 (S.D.N.Y. 2001) (finding functional-equivalent doctrine applicable to outside public relations firm where corporation itself had insufficient internal resources to perform that function); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No. CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4–5 (C.D. Cal. July 20, 2011) (finding public relations firm to be functional equivalent of an employee where the firm "essentially function[ed] as [the client's] public relations department"); *MLC Automotive, LLC v. Town of S. Pines*, No. 1:05cv1078, 2007 WL 128945, at *2–4 (M.D.N.C. Jan. 11, 2007) (finding that engineer hired for development of an auto park was the functional equivalent of an employee since it was a specialized role that no employee or other agent of the company fulfilled).

Steward was CREF's "biggest client by a large margin": the CREF entities earned between $25 and $35 million annually from the Steward relationship. Ex. B at 59:15–19. At his deposition,

Gendron could not even name CREF's next largest client, but testified that the client annually generated only "a million plus or minus." *Id.* at 59:6–60:1. Indeed, as part of the lift-out, Gendron—like Kidney—received a Steward email address. *Id.* at 117:5–14. Gendron did not maintain a comparable address for any other CREF client. *Id.* Put differently, Steward was not just one of CREF's clients; it was CREF's business.

**2. Steward entrusted Gendron with handling the Norwood crisis.**

Having worked closely with Gendron for nearly a decade, Steward unsurprisingly turned to Gendron to manage the Norwood crisis and its aftermath, and Gendron became an integral part of the company's executive-level response to the crisis.

On the day of the flood, Gendron was informed of the "significant event going on" and that Steward was "evacuating the hospital." Ex. B at 148:2–149:1. After the flood, John Polanowicz, Steward's Chief Operating Officer, became Gendron's "primary contact" at Steward, *id.* at 38:21–25, but it was still "very common for Ralph [de la Torre] to reach out directly" to Gendron "just to say, [d]o everything you can to figure this out," *id.* at 189:15–190:4. In August 2020, Gendron met in person with de la Torre and Polanowicz to review CREF's Norwood Strategic Planning memorandum. *Id.* at 220:25–221:15. Then, in December 2020, the Steward board invited Gendron to their meeting to update them on the situation at Norwood. *Id.* at 243:2–247:8. Gendron gave another Norwood Hospital update to Steward's board alongside Harry Bane, Steward's Regional President of the New England Region, in February 2021. *Id.* at 275:8–276:6; *see also id.* at 238:21–239:3 ("Harry Bane was the regional president of the New England Region with Norwood Hospital . . . being one of the nine hospitals that rolled up to him in that role.").

Gendron's central role in Steward's management of the flood and its aftermath is obvious in the record: Plaintiff has produced over 8,000 emails between Gendron and members of Steward's executive leadership or in-house counsel between June 28, 2020, and April 23, 2024, meaning Gendron averaged six emails a day with Steward's executives or counsel after the flood.

### 3. Gendron had authority to act for Steward and implement legal strategy.

After years of working shoulder-to-shoulder with Steward's leadership, Gendron occupied a position of authority within the organization. Steward's executives regularly deferred to Gendron when making operational decisions and empowered him to act on Steward's behalf. *See Burke*, 2019 WL 6197040, at *8 (listing "being a key decision leader for the client;" "having authority to make decisions and statements on the client's behalf;" and "conferring frequently with the client and/or its attorneys" as factors supporting functional equivalence status).

That authority is perhaps best illustrated by Gendron's extensive role in managing the Norwood Hospital insurance claims. Gendron sat at the top of the Steward team that was formed to address the crisis at Norwood after the flood, as reflected in an internal Steward PowerPoint titled Norwood Hospital Team Structure, which placed "Steward Executive VP Bob Gendron" at the top of the communications matrix with "insurance, legal, financial and CREF" all below him. Ex. F.

Steward's general counsel's office also gave Gendron "certain authorities to execute proposals" on Steward's behalf. Ex. B at 179:21–180:3. And he did so by signing as ***Steward's*** Executive Vice President of Global Real Estate. *Id.*; *see also* Ex. G. For instance, when Steward wanted to engage a public adjuster, the "Steward executive team"—namely, de la Torre and Polanowicz—asked Gendron to interface with MPT about bringing on a public adjuster. Ex. B at 157:17–158:13. When Steward decided to hire NFA as their public adjuster, "de la Torre or the board of directors at Steward referred NFA to [Gendron]." *Id.* at 158:25–159:3. Gendron negotiated and agreed to terms with NFA. There was no pushback from Steward; in-house counsel merely asked for the agreement so it could be reviewed and revised "as necessary before it is executed." Ex. H. When the contract with NFA was finalized, it was Gendron, not a Steward employee, who executed the document on Steward's behalf. Ex. G; *see also Burke*, 2019 WL 6197040, at *8 (listing "holding itself out as the client's agent and/or spokesperson" as factor supporting a consultant's functional equivalence status).

Steward's deference to Gendron extended beyond internal decision making; Steward regularly entrusted Gendron to represent Steward externally as well. At the Zurich mediation, it was Gendron, not outside counsel, not another Steward executive—and not Kidney—who delivered Steward's opening statement from a script he worked with counsel to prepare. Ex. B at 270:12–22, 273:11–17. Gendron personally met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative. Ex. I.

In sum, Gendron acted, and Steward treated him, not just as the functional equivalent of an employee but as a corporate insider. He made decisions for Steward, spoke for Steward to regulators and counterparties, and worked alongside Steward's in-house and outside counsel to develop and execute Steward's legal strategy.

**4. Gendron worked closely with Steward's counsel because he was integral to the team handling the insurance claim.**

Beyond his operational authority, Gendron was deeply integrated into the legal work involved in responding to the Norwood flood. Gendron repeatedly drafted, revised, and finalized documents implementing legal advice from Steward's in-house and outside counsel. The records reflect a similar pattern: counsel supplied legal analysis, and Gendron combined that with his subject-matter expertise to formulate and dictate correspondence, project directives, and Steward's larger strategy. *See Burke*, 2019 WL 6197040, at *8 (listing "drafting documents incorporating legal advice received from the client's attorneys" and "helping to fit the client's actions into a legal framework" as factors supporting a consultant's functional equivalence status).

Within twenty-four hours of the June 28, 2020 flood, Gendron was communicating with Steward's executive leadership, including Herb Holtz, Steward's General Counsel, about how to remediate damage to Norwood Hospital. Holtz connected Gendron with Todd & Weld so that Gendron could get Todd & Weld "up to speed on . . . *his* tentative plans for managing" the insurance claim. Ex. E (emphasis added). In an email to Gendron and Todd & Weld in July 2020, Nathalie Hibble explained the need to coordinate with MPT because "MPT is the First Named Insured . . . but ***Bob/Steward is managing the claim***." Ex. H (emphasis added); *see also MLC Automotive*,

2007 WL 128945, at *2–4 (finding that engineer was functional equivalent of client where engineer communicated directly with the company's attorneys as their primary source of information about the property); *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV 05-5155 (AKT), 2008 WL 5231831, at *2–3 (E.D.N.Y. Dec. 11, 2008) (holding construction management contractor was the functional equivalent of an employee of the client company where the contractor was the company's "eyes and ears" on day-to-day supervision of a project).

To guide Steward's strategy during the crisis, Gendron himself identified legal problems and brought them to counsel for analysis and resolution. Shortly after the flood, Gendron wrote to Hibble identifying several concerns, and asking counsel to "provide a summary of Steward's legal responsibilities as it relates to the Master Lease provisions of section 14" so he could resolve what he identified as a "gap in strategy." Ex. L. Hibble responded, looping in Todd & Weld and instructing them to respond to Gendron's request so "Bob can manage this process." *Id.* A week later, Gendron further instructed Steward and Todd & Weld to review the interplay between MPT and Steward's insurance policies so that he could prepare an "initial strategy." Ex. H; *see also Dialysis Clinic, Inc.*, 567 S.W.3d at 325 (reasoning that property management firm's "involvement in the management of the [client's] properties makes it precisely the sort of entity with which [the client's] attorneys would like to communicate because [the property manager] possesses information that the attorneys need and that [the client] does not have").

Gendron was not only involved in drafting documents prepared by counsel, but he was also responsible for finalizing them. Following Hibble's early directive to coordinate with MPT, Todd & Weld drafted correspondence for Gendron to edit and send under his own name. In July 2020, Todd & Weld sent Gendron a draft email to MPT stating, "Here is the suggested email we talked about to MTP [sic]. Please edit as you see fit." Ex. J. The contents of that email were explicitly legal and reflect that Steward, through Gendron, was seeking to understand, among other things, "whatever is needed to comply with the [MPT] lease from a legal perspective." *Id.* Gendron's communications with Steward's counsel in preparation for the Zurich mediation follow a similar pattern. In preparation for the mediation, following "discuss[ions] over the last few weeks"

Gendron prepared a detailed summary of Steward's negotiating positions, and solicited "comments/questions" from Todd & Weld and Steward in-house counsel before he submitted it to the mediator. Ex. K.

### C. Both the Magistrate Order and Order No. 26 Commit Reversible Error.

The Magistrate Order adopted the Discovery Master's findings in their entirety in a brief electronic order that did not address Plaintiff's arguments or the record evidence supporting them. It rests instead on findings that themselves cite no substantive case law applying the functional-equivalent doctrine. The Magistrate Order and the underlying Order No. 26 should be reversed for three independent reasons: (1) they treat formal contractor status as dispositive of functional equivalence, without citing any case law; (2) they ignore or mischaracterize undisputed facts that directly satisfy the functional-equivalence inquiry; and (3) they improperly convert (unfounded) concerns about over-withholding into a categorical waiver of otherwise privileged communications.

#### 1. The Magistrate Order incorrectly treats formal contractor status as dispositive.

The Magistrate Order declares the Discovery Master's findings "unassailable" and states that they "will not be disturbed." It then recites four of those findings: (1) a "contemporaneous document" that "explicitly disclaims" any relationship supporting functional equivalence; (2) Gendron's testimony that he lacked "the type of high-level decision-making authority" the doctrine requires; (3) that Gendron "was not in an employee or agency relationship with Steward"; and (4) that he "was at all times acting as an owner of CREF in its role as a consultant to Steward." The first, third, and fourth findings all rest on the same formalistic premise—that CREF's contractual status as an independent contractor forecloses functional equivalence—and the second rests on a mischaracterization of the testimony. *See infra* Section III.C.2. An order that neither addresses the strongest evidence in the record nor applies the correct legal standard is contrary to law.

Begin with the contractual disclaimer, which drove the analysis below. Order No. 26 treated the CREF-Steward agreement's disavowal of any "association, partnership, joint venture, or

relationship of principal or agent, master or servant, or employer and employee" as effectively dispositive, holding that before the functional-equivalent doctrine could even be applied, "Plaintiff would first have to overcome the explicit disavowal of agency status for Mr. Gendron and CREF personnel generally." Order No. 26 at 4; *see also id.* at 6 (crediting the "contemporaneous document" as "entitled to great weight"). The Magistrate Order adopted that reasoning wholesale, listing the same "contemporaneous document" as the first basis for affirmance.

That approach inverts the inquiry. The disclaimer establishes only that CREF was not formally employed by Steward—a fact no one disputes, and the very premise from which the functional-equivalent analysis begins. It says nothing about whether Gendron functioned as Steward's equivalent in seeking, receiving, and implementing legal advice about the Norwood claim. As the name of the doctrine suggests, the proper inquiry is functional, not formal, and formalistic labels cannot displace the undisputed evidence that Gendron actually functioned as Steward's executive-level decision-maker in connection with the Norwood loss.

Courts applying the doctrine have said as much, holding that a consultant's self-selected or contractually-assigned label does not control the privilege analysis. *See, e.g.*, *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2010) (holding "outside consultant" was a functional employee despite the fact that he was not formally an employee and disavowed an agency relationship); *Waste Admin. Servs., Inc. v. Krystal Co.*, No. E2017-01094-COA-R9-CV, 2018 WL 4673616, at *5 (Tenn. Ct. App. Sept. 27, 2018) (concluding that "[d]espite the categorical provisions of the parties' written agreements disclaiming agency, we cannot ignore the parties' actual course of conduct"); *Frank v. Morgans Hotel Grp. Mgmt. LLC*, 66 Misc. 3d 770, 775, 116 N.Y.S.3d 889 (N.Y. Sup. Ct. 2020) (declining to "exalt form over substance" and finding that functional-equivalent doctrine applies). The Magistrate Order's related observation that Gendron was not an "employee" of Steward therefore states the obvious and proves nothing. The entire purpose of the functional-equivalent doctrine is to preserve privilege where formal employment or agency status is absent. If the absence of that status were dispositive, the doctrine would serve no purpose.

### 2. The Magistrate Order ignores or mischaracterizes undisputed facts directly relevant to the inquiry.

In finding that "Gendron was not in an employee or agency relationship with Steward" and that "he was at all times acting as an owner of CREF in its role as a consultant to Steward," the Magistrate Order never engages the undisputed record bearing directly on the functional-equivalence inquiry. That record establishes that Gendron signed contracts on Steward's behalf using a Steward executive title; that he maintained an @steward.org email address; that he sat at the apex of Steward's internal "Norwood Hospital Team Structure," above Kidney, whom the Discovery Master found to be a functional equivalent; that he delivered Steward's opening statement at the Zurich mediation; and that he met with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative. The orders either ignore this evidence, understate it, or discount it by reference to criteria found nowhere in prior orders.

The Magistrate Order ignores undisputed evidence that Gendron acted as Steward's agent in external negotiations and executed binding agreements on Steward's behalf using a Steward title. The NFA engagement letter—the public-adjuster agreement for the insurance claim at the center of this dispute—was addressed to "Mr. Robert Gendron, Executive Vice President - Corporate Real Estate and Facilities, Steward Health Care System LLC," and Gendron signed it on Steward's behalf. Ex. G. When asked at his deposition why he signed using a Steward title rather than as "founder or CEO of CREF," Gendron explained that Steward's general counsel's office "gave me certain authorities to execute proposals, and this is how it was identified." Ex. B at 179:21–180:3. Gendron also negotiated the agreement's terms with NFA; Steward's in-house counsel asked only that the agreement be provided so that it could be reviewed and revised "as necessary before it is executed." Ex. H. And when NFA notified the insurers that it had been retained, its August 2020 letter directed Zurich and American Guarantee to copy "Robert Gendron, Executive Vice President, Global Corporate Real Estate & Facilities, Steward Health Care System LLC." Ex. G. Neither the Magistrate Order nor Order No. 26 addresses any of this evidence.

The orders below likewise draw the wrong inference from Gendron's co-ownership of CREF. Order No. 26 emphasized that Gendron "was a co-investor with Mr. De la Torre in CREF." Order No. 26 at 5. But rather than undermining the functional-equivalence analysis, that fact underscores just how intertwined CREF and Steward were.[4] The ownership structure reflects that Steward's most senior executive trusted Gendron's firm to manage all of Steward's real estate operations—including the most complex and high-stakes insurance claim in the company's history. Functional equivalence does not require independence; it requires integration and trust. *See America's Test Kitchen*, 2018 WL 2049490, at *2 ("functional equivalent of an employee" determined by whether individual "plays a 'pivotal role' in matters as to which the business obtains legal advice").

Where the orders do engage the record, they mischaracterize it. In finding that Gendron lacked "high-level decision-making authority for Steward's *legal* decisions," Order No. 26 relies on Gendron's deposition testimony that "he did not have a specific role with *accounting* firm Marsh" and that he did not manage the insurance *proceeds* that Steward received from Defendants. Order No. 26 at 5 (emphasis added). That is legally, logically, and factually incorrect. Legally, the functional-equivalent inquiry asks whether the individual "acted 'in a high-level, trusted decision-making or *guiding* role.'" *America's Test Kitchen*, 2018 WL 2049490, at *2 (emphasis added). It does not require ultimate authority, and a rule that did would exclude nearly every corporate agent short of the board of directors. Logically, Order No. 26 conflates managing a claim with managing its proceeds. Gendron testified his role was to direct the submission and prosecution of Steward's claim—not to disburse insurance funds after Steward received them. And that Gendron had no defined role with an accounting firm retained to quantify a business-interruption loss says nothing about whether he served in a trusted, guiding role as to Steward's legal decisions, and Order No.

[4] Steward and CREF's businesses were so intertwined that even Defendants initially thought several CREF employees were Steward employees. *See* Order No. 22 at 35 ("[D]uring the first hearing between the Discovery Master and the Parties, . . . Defendants admitted that they initially thought that several high-level CREF employees were actually Steward employees, until Steward informed them otherwise.").

26 never explains how the one bears on the other. Factually, neither of Gendron's two isolated concessions can be squared with the balance of the record, which Order No. 26 ignores: Gendron prepared legal strategy memoranda, negotiated directly with MPT and the insurers, represented Steward at mediation, and met with state regulators on Steward's behalf. *See supra* Section III.B.

The orders also measure Gendron against a criterion that appears nowhere in the Discovery Master's prior orders or the case law. Order No. 26 faulted Gendron for not "work[ing] on the premises," Order No. 26 at 5, a requirement that appeared nowhere in Order No. 22. The premise is also factually wrong: Gendron relocated to Dallas to align with Steward's headquarters and opened CREF offices in proximity to Steward's core operations. Ex. B at 52. More fundamentally, the "premises" criterion has no basis in the caselaw. The functional-equivalent inquiry focuses on the individual's role, authority, and integration with the client's operations—not on which physical office he happened to occupy. Order No. 26's after-the-fact introduction of this factor is both arbitrary and unsupported.

Finally, the orders discount undisputed evidence by understating it. Order No. 26 describes Gendron as having "presented a few slides at the mediation," Order No. 26 at 5, when in fact he delivered Steward's opening statement at the Zurich mediation from a script he developed with counsel, met personally with the Massachusetts Insurance Commissioner's Office as Steward's and MPT's representative, and prepared Steward's detailed negotiating-position summary for submission to the mediator. *See supra* Section III.B.3. The same is true of the disparity among CREF's clients: Steward was not merely "a significant portion of CREF's portfolio," as Order No. 26 puts it, but generated $25 million to $35 million annually and dwarfed CREF's next-largest client, which Gendron could not even name. Ex. B at 59:6–60:1. And Gendron maintained a Steward email address, which he had for no other CREF client. *Id.* at 117:5–14. Neither order addresses any of this evidence.

### 3. Order No. 26 incorrectly relies on purported over-withholding to justify a categorical privilege waiver.

Order No. 26 concludes with a sweeping, punitive directive: "the communication on which Mr. Gendron is copied, or on which he is the recipient or sender, are not privileged, subject to claw back," and Plaintiff must "produce, subject to clawback, the 1,749 withheld communications involving Mr. Gendron, regardless of whether Mr. Kidney or an attorney is on the communication." Order No. 26 at 7. Production was required "forthwith, without further delay, and not later than August 7, 2026"—three days after issuance, and four days before the objection period under the Order Appointing the Discovery Master expired. Order No. 26 further directed that communications involving Kidney could be withheld only if "only Mr. Kidney and Todd & Weld and/or Foley Hoag attorneys are on the email," stripping privilege from any attorney-client communication that included even one additional CREF employee or consultant, however plainly the communication sought or conveyed legal advice. Its stated rationale confirms the punitive character of that relief: Order No. 26 invokes Plaintiff's purported "pattern of continued excess-claiming of privilege" and "too much 'blanket withholding'" to justify a categorical waiver that dispenses with document-by-document privilege analysis altogether. *Id.* at 6.

That approach is especially consequential here, because the documents at issue are direct communications between Mr. Gendron and counsel concerning legal advice, litigation strategy, and mediation—precisely what the attorney-client privilege exists to protect. *See Upjohn*, 449 U.S. at 389 (attorney-client privilege "encourages full and free discussion, better enabling the client to conform his conduct to the dictates of the law"); *Hanover Ins. Co.*, 449 Mass. at 616. Stripping privilege from more than 1,700 such communications solely because a functional equivalent was copied undermines the very interests the privilege is designed to serve.

The waiver is also irreversible. Courts have long recognized that compelled disclosure of privileged material is irreparable harm, because once disclosed the privilege cannot be restored. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014) ("[A]ppeal after final judgment will often come too late because the privileged materials will already have been

released."); *In re FirstEnergy Corp.*, 154 F.4th 431, 441 (6th Cir. 2025) ("There is no way to unring those disclosure bells."); *Am. Nat'l Bank & Trust Co. v. Equitable Life Assurance Soc'y of U.S.*, 406 F.3d 867, 875 (7th Cir. 2005) (reversing discovery sanction that "forced [the defendant] to turn over privileged information to its litigation adversary").

Order No. 26 also rests on a fundamental misapprehension of Plaintiff's extensive good-faith efforts to comply with Order No. 22. As the Jaffe Declaration details, Plaintiff met every agreed-upon deadline, made rolling productions beyond what Order No. 22 required, voluntarily reassessed its privilege positions and produced additional documents, and reduced its privilege log from 9,666 entries to 5,097—nearly half—through careful, document-by-document review. Jaffe Decl. ¶¶ 6–11, 22–26, 36–37. Order No. 26 treated that diligence as evidence of wrongdoing rather than good faith. *Id.* ¶ 28. But refining a privilege log demonstrates diligence, not malfeasance, and penalizing Plaintiff for voluntarily narrowing his privilege assertions would create a perverse incentive to maintain overbroad claims rather than engage in the ongoing reassessment that furthers the efficient administration of justice. *Id.* ¶ 36.

The numbers confirm that Plaintiff's withholding was neither unusual nor disproportionate. Of the 142,761 emails Plaintiff has produced in this case, only 3,177 (approximately 2.2%) have been withheld; of the 73,119 CREF-related emails produced, only 2,364 (approximately 3.2%). Jaffe Decl. ¶ 34. Those percentages are well within the normal range for complex commercial litigation involving communications with counsel, and approximately 5,912 of the emails Plaintiff produced bear "Attorney Client Privileged" or similar language in the subject line—confirming that Plaintiff did not rely on labels, but assessed whether the documents it continues to withhold are truly privileged. *Id.*

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court reverse the Magistrate Order—and the underlying Discovery Master Order No. 26—and hold that Gendron's presence does not waive privilege for otherwise privileged communications with Steward's in-house or outside counsel.

Respectfully submitted,

**MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,**

By his Attorneys,

*<u>/s/ Jeremy H. Wells</u>*
Howard M. Cooper (BBO No. 543842)
Seth J. Robbins (BBO No. 655146)
Josh L. Launer (BBO No. 673661)
**TODD & WELD LLP**
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
hcooper@toddweld.com
srobbins@toddweld.com
jlauner@toddweld.com

William T. Reid IV (*pro hac vice*)
Jeremy H. Wells (*pro hac vice*)
Barbara Whiten Balliette (*pro hac vice*)
Julia P. Gokhberg (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
wreid@reidcollins.com
jwells@reidcollins.com
bballiette@reidcollins.com
jgokhberg@reidcollins.com

Jeffrey E. Gross (*pro hac vice*)
Yonah Jaffe (*pro hac vice*)
**REID COLLINS & TSAI LLP**
420 Lexington Avenue, Suite 2515
New York, NY 10170
Tel.: (212) 344-5200
jgross@reidcollins.com
yjaffe@reidcollins.com

Dated: September 11, 2026

**CERTIFICATE OF SERVICE**

I, Jeremy H. Wells, Esq., hereby certify that the foregoing was filed through the Court's CM/ECF system on September 11, 2026, and will therefore be sent electronically to all counsel of record who have appeared in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ Jeremy H. Wells*
Jeremy H. Wells